UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ELLEN MAE FISHER, | Civil Case No. 5:26-CV-00073-H |
| Plaintiff | |
| vs. | |
| CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of the Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of the Texas Tech School of Law, JAROD GONZALES, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council, | |
| Defendants. | |

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

**TABLE OF CONTENTS**

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Table of Contents ......................................................................................................... ii

Table of Authorities ..................................................................................................... iii

   I.    Factual Background ........................................................................................... 1

   II.    Argument ......................................................................................................... 10

      A.   Legal Standard ........................................................................................ 10

      B.   Plaintiff Will Succeed on the Merits Regardless of Forum ........................................ 11

         1)   Viewpoint Discrimination Is Illegal in Any Forum ................................................. 11

         2)   The First Amendment Cannot Be Canceled to Prevent Hypothetically Hurting Others' Subjective Feelings or Even Actually Hurting Others' Subjective Feelings ....... 14

         3)   The Suppression of Fisher's Speech Is Subject to Strict Scrutiny ........................... 16

         4)   Defendants Fail the Test of Strict Scrutiny ................................................. 19

         5)   Even if the Court Considers the Clinic Office or Professors' Offices to Be a "Limited Public Forum," Defendants Are Still Liable ....................................... 19

         6)   Fisher Has Suffered an Adverse Action ................................................... 21

      C.   First Amendment Retaliation Automatically Causes Irreparable Harm ....................... 22

      D.   Fisher Spoke on a Matter of Public Concern ............................................... 23

      E.   The Balance of Interests Favors the Entry of a Preliminary Injunction/Temporary Restraining Order ............................................................................ 23

   III.    Conclusion ....................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Beckerman v. Tupelo*, 664 F.2d 502 (former 5th Cir. 1981) ............................................................15

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2001) ...........................................16, 17, 19

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010) ..............................................................................................................................13

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 105 S. Ct. 3439 (1985) ..................... 14, 17

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579 (5th Cir. 2013) ...........................11

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................................................................22

*Estiverne v. La. State Bar Ass'n*, 863 F.2d 371 (5th Cir. 1989) .......................................................17

*Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) ..............................................1

*Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417 (5th Cir. 2020) ..................................17

*Gay Student Servs. v. Tex. A & M Univ.,* 737 F.2d 1317 (5th Cir. 1984) .......................................12

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001) ........ 18, 20

*Healy v. James*, 408 U.S. 169, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972) ..............................11, 12

*Hobbs v. Hawkins*, 968 F.2d 471 (5th Cir. 1992) ..............................................................................14

*Keyishian v. Board of Regents*, 385 U.S. 589, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967) ............................12, 14

*MacRae v. Mattos*, __ U.S. __, 145 S. Ct. 2617, 222 L. Ed. 2d 1141 (2025) ...........................................14

*Mahmoud v. Taylor*, 606 U.S. 522, 145 S. Ct. 2332 (2025) ...........................................................12, 21, 22

*McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021) .......................................................................22, 23

*Minn. Voters All. v. Mansky*, 585 U.S. 1, 138 S. Ct. 1876 (2018) ...............................................18

*NRA of Am. v. Vullo*, 602 U.S. 175, 144 S. Ct. 1316 (2024) .......................................................21

*Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279 (5th Cir. 2012) ........................22

*Planned Parenthood v. Sanchez*, 403 F.3d 324 (5th Cir. 2005) ........................................................10

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ..............................................................................................................................12, 19

*Ryan v. Grapevine—Colleyville Indep. Sch. Dist.*, No. 4:21-cv-1075-P, 2023 U.S. Dist. LEXIS 41478 (N.D. Tex. Mar. 13, 2023) ................................................................................................ 17, 20

*Shamloo v. Miss. State Bd. of Trs.*, 620 F.2d 516 (5th Cir. 1980) .................................................... 11

*Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972) ........................................................ 12

*Smith v. Tarrant County College Dist.,* 670 F. Supp. 2d 534 (N.D. Tex. 2010) .................................. 21, 22

*Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610 (N.D. Tex. 2010) ............................... 12, 15, 17, 22

*Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207 (2011) ................................................................. 23

*Snyder v. Phelps*, 562 U.S. 443 (2011) ........................................................................................ 16

*Spectrum WT v. Wendler*, 151 F.4th 714 (5th Cir. 2025) .......................................................... 17, 19

*Speech First, Inc. v. McCall*, No. 1:23-cv-411-DAE, 2023 U.S. Dist. LEXIS 246986 (W.D. Tex. Sep. 1, 2023) ............................................................................................................................... 23

*Students for Just. in Palestine v. Abbott*, 756 F. Supp. 3d 410 (W.D. Tex. 2024) ................................. 12, 13

*Sweezy v. New Hampshire*, 354 U.S. 234, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957) ................................... 18

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) ....................................... 23

*Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ...................................... 16

*Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) .. 11, 13, 15

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) .............................. 10

*Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321 (5th Cir. 1997) ....................................................... 10

*William E. McBryde, Inc. v. Rodriguez*, Civil Action No. SA-07-CA-143-XR, 2007 U.S. Dist. LEXIS 12272 (W.D. Tex. Feb. 13, 2007) .............................................................................................. 10

**Statutes**

42 USC § 1983 ........................................................................................................................... 4

**Rules**

Board of Law Examiners Guidelines ................................................................................................ 13

Fed. R. Civ. P. 65(b) ................................................................................................................... 15

Rules Governing Texas Bar Admission, Rule 4(e)(2) ........................................................................ 14

**Regulations**

Texas Tech University System Regulation 07.04 ........................................................................23

Plaintiff Ellen Mae "Ellie" Fisher respectfully moves on an emergency basis for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") to maintain the status quo of the parties pending the conclusion of this litigation.

Fisher has sued the Regents of Texas Tech University System Board of Regents, Cody Campbell, Dustin Womble, Arcilia Acosta, Pat Gordon, Clay Cash, Tim Culp, Shelley Sweatt, Doug Mcreaken, Donald Sinclair, and Eli Heath in their official capacities under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) (the "Regents Defendants") and Jack Wade Nowlin, in his individual and official capacity as Dean of the Texas Tech School of Law, Jarod Gonzales, in his individual and official capacity as Associate Dean for Academic Affairs, Larry Spain, Amy Hardberger, Allison Outenreath, Ally Owens, and Terri Morgeson in their official and individual capacities (the "Individual Defendants").

Fisher sues to vindicate the exercise of her free speech as protected under the First Amendment to the United States Constitution which has been applied to the states under the Fourteenth Amendment and made actionable under 42 USC § 1983.

As supported by the Affidavit of Ellie Fisher, by the Declaration of Attorney Michael Thad Allen and the by admissible evidence authenticated in the record, Fisher respectfully requests that this court entered a Temporary Restraining Order and schedule a hearing as soon as practical for the Court in order to enter a Preliminary Injunction.

## I.    FACTUAL BACKGROUND

Plaintiff Ellen Mae "Ellie" Fisher has attested under the penalties of perjury to a narrative of events set forth in the Affidavit of Ellen Mae Fisher in support of this motion. Fischer Appendix ("FA") at 001-14 (the "Fisher Aff"). Fisher's Affidavit is incorporated here by reference as if fully restated here. Because of Fisher's detailed narrative and the accompanying admissible evidence, only a brief summary of the relevant facts is set forth here.

As a 3L law student at Texas Tech University School of Law, Fisher now nears her graduation. FA at 3, Fisher Aff, ¶ 20. She also attended Texas Tech as an undergrad, enrolling in 2018 and graduating in 2023. FA at 3-4, Fisher Aff, ¶¶ 22, 24. She has consistently demonstrated exemplary conduct and leadership, for which Texas Tech (among other institutions) recognized her with scholarships and awards. FA at 4-5, Fisher Aff, ¶¶ 25-36. In 2023, she enrolled in Texas Tech's School of Law. Id., ¶ 31.

She continued to distinguish herself. In spring 2024, she earned Top Oralist Advocate in Texas Tech's Mock Trial; and in spring 2025, she reached the semifinals in Advanced Mock Trial. Id., ¶ 35. She is a passionate activist and in 2021 founded the first Texas Tech chapter of the NAACP, and she has served the NAACP in state-level leadership roles. FA at 4, Fisher Aff, ¶ 26. Fisher is also black, although she was raised by white parents in California. Id., ¶ 23.

At around 1:30 p.m., central time, on September 10, 2025, an assassin's bullet cut down the public intellectual, conservative political organizer, and father, Charlie Kirk, while he advocated for free and open debate on a university campus in Utah. ECF No. 1, ¶ 42. Bizarrely, and contrary to all that Kirk stood for, faculty and administrators at Texas Tech took this tragic murder as an opportunity to suppress free speech at the School of Law, in particular Fisher's speech.

When news of Kirk's murder broke at Texas Tech, Ellie Fisher was in the law class of Professor Kenneth Williams, Fred Gray Endowed Chair for Civil Rights and Constitutional Law. Fisher Aff, ¶ 36.  Another student, Henry Tescci, who is not black, announced Charlie Kirk had been shot just before class ended, and that Kirk will was a conservative activists or white supremacist (accounts differ). FA at 5, Fisher Aff, ¶ 39; FA at 116-117 (**Exhibit D**, Hearing Transcript ("HT") at 2:31:08, 2:32:42). Students immediately shared videos of the assassination. FA at 5, Fisher Aff, ¶ 4o. Professor Williams did not consider this disruptive, out of the ordinary, or unprofessional. HT at 119-120 (2:36:00-29).

From Professor Williams' class, Fisher went down one flight of stairs to the clinical program offices. FA at 6, Fisher Aff, ¶ 42. She first stopped in Professor Joe Stephens' office, a clinical professor who handles criminal defense. Id., ¶ 43; HT at 32-40 (14:04-26:03). They discussed Charlie Kirk's assassination for approximately 30 seconds.  HT at 35 (17:51).  Professor Stephens did not consider Fisher's interactions disruptive. HT at 35 (18:27). As Professor Stephens himself made clear, "… nothing unusual about it at all, and I encourage that. I want people to feel comfortable coming to us [clinical faculty] and talking to us." HT at 37 (21:20-27).

Fisher continued down the hall to her clinical professor's office, Patrick Metze. FA at 6, Fisher Aff, ¶ 48; FA at 168, **Exhibit K** (Affidavit of Metze), ¶ 13. Other students were already discussing Charlie Kirk, including Ashanty Bishop. FA at 157, **Exhibit H** (Affidavit of Bishop), ¶ 4; FA at 168, **Exhibit K**, ¶ 15.  Professor Metze did not consider anything said in his office unprofessional. FA at 167, ¶ 6. "The conversation was normal and productive." FA at 157, **Exhibit H**, ¶ 5. Like Stephens, Metze made his students understand that his office was a safe space for open and frank conversations "rather than a third grade schoolyard."  FA at 167, **Exhibit K**, ¶¶ 3-4.

At some point the administrator and Director of the Family Law Clinic, Defendant Terri Morgeson inserted herself into Metze and his students' conversation by appearing at his office door to announce, "By the way, he's [Charlie Kirk] dead" (HT at 43 (32:25)) or "Trump just said that he died," or words to that effect. FA at 7, Fisher Aff, ¶ 51; FA at 157, **Exhibit H**, ¶ 7; FA at 168, **Exhibit K**, ¶ 9.  Later, Morgeson feigned some sort of emotional dyspepsia over this interaction, apparently self-inflicted by her eavesdropping on Professor Metze and his students. For example, Morgeson repeatedly insisted that this distress caused her to "shut [Metze's] door" to shield her and her students' supposedly tender ears from things they did not like and disagreed with. HT at 43, 44, 47, 51, 52, 54, 57, 58 (32:25; 34:58; 40:55; 47:15; 48:56, 52:28; 58:28; 59:52). In reality, Morgeson

3

never shut Metze's door. No witness confirms this melodramatic gesture; several affirmatively testified that it did not happen. FA at 7, Fisher Aff, ¶¶ 54-55; FA at 169, **Exhibit K**, ¶ 22.

Closing Metze's door was one of things Morgeson made up and testified to in an apparent effort to set herself up as some sort of Texas Tech hall monitor to punish Fisher. Morgeson reported to the eventual investigator, William Keffer, that Fisher pronounced about Kirk, "That mother fucker got shot"; but Morgeson retracted this later.  See HT at 43, 49, 50 (30:48-31:49, 33:15-34; 43:21-44; 45:07-33).  No other witness confirmed this, not even her own students, Allison Monacelli or Madison Wright.  HT at 38 (Stephens), 64-69 (Wright), 111 (Bishop), 119 (Williams); FA at 154, **Exhibit G** (Affidavit of Pombrio), ¶ 21; 168, **Exhibit K** (Metze), ¶ 16, FA at 7, Fisher Aff, ¶ 57. Allison Monacelli testified that it was Morgeson who spread this "mother fucker" story, and she never heard it from Fisher. HT at 75 (1:27:59). In other words, Morgeson started the malicious rumor at the time. Morgeson also reported witnessing Professor Stephens dressing down Fisher for her improper feelings about Kirk's murder. HT at 42 (29:27-30:16).  Of course, this never happened either. HT at 37 (22:12).  Stephens had no memory "of being like, … 'That [Fisher's speech] was wrong.'" Id. The most notable thing that stands out about Fisher's speech was that, unique among all the students, she is black; and the others discussing Charlie Kirk in Morgeson's proximity were not.

After discussing this national tragedy in Metze's office as well as their criminal defense work, Fisher left to go to the student Clinic Office. FA at 7-8, Fisher Aff, ¶¶ 58-59. The Clinic Office is a conference room at the end of the hall where students can call clients, finish course work, discuss cases, and even gossip. Id. Until recently, students have always felt free to discuss sensitive topics in the Clinic Office, as students attested—even those who disagreed with Fisher's viewpoints. See e.g., HT at 98 (Gomez at 2:11:55- 12:18).

In the Clinic Office, students continued the conversation about Kirk. One opined that Charlie Kirk was going "to hell." HT At 87 (Bomar at 1:52:01); FA at 8, Fisher Aff, ¶ 63. Of course, Fisher, the only black student, was investigated for having uttered such improper thoughts and feelings but no one else. See e.g., HT at 89 (1:55:09-22).

On information and belief, it was Morgeson herself who not only made things up about Fisher but also scurried off to the administration to tattletale on her for alleged "unprofessionalism." ECF No. 1, ¶ 96. Apparently, at Texas Tech, this is professional but speaking one's mind is somehow not professional.

Scarcely two weeks later (September 23, 2025), Dean Jack Nowlin appointed Professor William Keffer to "investigate" whether Fisher had "acted unprofessionally." FA at 21. This effort took five months, with Keffer interviewing no fewer than nine faculty members, one Associate Dean, the Law School Dean, and 12 students. Id.

Somehow, Keffer only had room in his eventual report for information that cast Fisher in the worst possible light. Id. at 22-24. Keffer excluded all exculpatory evidence. By way of example, Keffer excluded evidence from numerous witnesses who affirmed that Fisher had not said, "the mother fucker got shot." Id. The almost comical bias of the Keffer report is captured by law student Callahan Ard, whom Keffer interviewed on November 11, 2025. FA at 164-166 (**Exhibit J**). Having reviewed the Keffer Report, Ard attested:

> In that report, my statement is summarized in a single sentence noting that "Fisher offered to show me her video on her phone." I am unsure why the remainder of my statements from that interview were omitted.
>
> During the interview, I was asked whether I heard Ellie [Fisher] make a statement such as "The mother fucker got shot" or "They shot the mother fucker," and I responded that I did not.
>
> This response was not included in the report.

> I was also asked whether I believed Ellie was capable of making such a statement, and I explained that it would depend on the setting, but that she would never say something like that in class. That was also omitted from the report.

> I don't know why the statements were excluded from the report, though it appears that leaving them out served to unfairly portray Ellie in a negative light.

Id., ¶¶ 11-15. Keffer even included wildly irrelevant statements, in particular from an interview with Patrick Metze, to the effect that "mother fucker" is a phrase "common … in the black community"—as if white people are somehow too proper to say this, or as if Fisher had not been raised by white parents. FA at 23. Keffer also found it significant that witnesses reported that Fisher spoke to her mother. Id. Thus, the School of Law not only has volunteer hall monitors like Morgeson; it apparently also purports to monitor law students' conversations with their mommies.

At the beginning of the spring semester (on January 23, 2026), Keffer referred Fisher to the School of Law's Honor Council. FA at 16. The Chair of the Honor Council was Defendant Professor Larry Spain. Id. A little over a week later (on February 4, 2026), Spain notified Fisher that she would have to appear at a hearing set for February 20, 2026. Id. at 18. Defendants Hardberger, Outenreath, and Owens were also members of the Honor Council convened to condemn her improper thoughts and expressions. Id.

The Honor Council is governed by the Texas Tech School of Law's Honor Code and Policy. Id. at 174-178 (**Exhibit M**). Importantly, the Honor Council may only impose sanctions on a student under the demanding standard of "clear and convincing evidence." Id. at 177. As Fisher emphasized at her hearing, this is the demanding standard that Texas reserves in civil cases for "critical issues like severing the parent-child relationship and terminating parental rights." HT at 29 (5:27). Yet the Honor Council breached its policy by failing to apply the clear and convincing evidence standard. Not only did the Honor Council except a blatantly biased report; its eventual decision followed Morgeson's testimony despite her efforts, exposed in the hearing, to make things up; and also by claiming that Fisher somehow "interfered with" Madison Wright's work in the clinic

6

despite Wright testifying that she "wasn't upset about" what Fisher said.  FA at 148 (Finding 5); HT at 66 (1:12:37-43).

Approximately two weeks after the hearing (on March 11, 2026), the Honor Council, over one (unnamed) member's vigorous dissent, found Fisher responsible for violating § H (Violation of Professional Duties) of the Honor Code. FA at 174-178, **Exhibit F**.

Section H reads as follows:

> A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.[1]

FA at 175. Yet the only portion this rule that the Honor Council condemned Fisher for supposedly violating was "failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs…"  See FA at 149. The record is devoid of evidence of performance-related deficiencies in representing clients, completing legal work, or interacting with colleagues of any kind—e.g., Madison Wright actually testifying she "wasn't upset" by Fisher. HT at 66 (1:12:37-43).

The Honor Council based its entire decision on evidence provided by Terri Morgeson and Madison Wright, although the former testified only two eavesdropping on other professors' offices. FA at 148 (Finding 3). The Honor Council's vague decision is also unclear on exactly which of Fisher's utterances him Morgeson or Wright found "unprofessional."  The Honor Council merely stated:

> Upon entering the [unspecified] offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that … Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

---

[1] Principle One refers to the following "A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education."  FA at 174.

Id. In other words, Ellie Fisher was found guilty for having impure subjective feelings.

> What really bothered the Honor Council was Fisher's viewpoints:

>> Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

Id. at 148 (Finding 8). The Honor Council also addressed Fisher's express viewpoints. She had uttered "[alleged] statements endorsing or celebrating death or violence … contrary to respect for the rule of law and [which allegedly] violate ordinary standards of professional conduct."  Id. (Finding No. 4). Although it is not clear what specific statements Fisher is punished for, it is absolutely clear that the Honor Council punished her for expressing feelings and viewpoints that might injure supposedly fragile conservatives and *their* subjective feelings. Of course, the record is also devoid of evidence that Texas Tech's conservative students are such frail, wilting creatures.

By contrast, the Honor Council found no clear and convincing evidence that Fisher expressed inappropriate subjective feelings or viewpoints in Professor Metze's office. Id. (Finding No. 6). Likewise, there was no majority opinion concerning "actions and statements" that might have expressed inappropriate subjective feelings or viewpoints in the Clinic Office. Id. (Finding No.7.) This left only Professor Stephens' Office, but Stephens, the only direct participant besides Fisher, directly refuted that anything unprofessional was said.  See e.g. HT at 35 (18:27). And Morgeson had only eavesdropped on this conversation.

Thus, there can be no dispute that Defendants retaliated against Fisher for her viewpoints. Furthermore, no other students were punished for opining on Charlie Kirk's alleging "racism" or that he would "go to hell." Also left unsaid in the Honor Council report is that the chief difference that leaps out between Fisher and any other student who expressed supposedly improper opinions was that they were not black and she is. Only the "uppity" black woman was punished.

Morgeson, who anointed herself Law School Hall Monitor that day, also made clear that Fisher's viewpoint needed to be suppressed (albeit not without making things up, e.g., "I was shutting doors because I did not want other students to be offended"). HT at 44 (34:19). She testified to the Honor Council about the political dimension of Fisher's discussions: "I hope nobody who is Republican and right-leaning… had heard that." Id (35:39). Or as Morgeson lectured Fisher:

> Fisher: So you keep using the term inappropriate. Would you describe … the difference between inappropriate versus unprofessional …
>
> Morgeson: I consider them one and the same.…
>
> It was the tone and the manner in which the discussion was being held. It wasn't, "Oh my gosh, have you heard that Charlie Kirk got shot?" It was exuberance in the fact that he got shot, that he deserved it because he was a horrible human being and y'all thought that he was dead because of the way that his head had moved and the blood shooting out of his neck.

Id. (48:16-56). In sum, if only this uppity black student, Ellie Fisher, had instead expressed correct feelings, opinions, and expressions, Morgeson would have found this "professional" and unoffensive.  By contrast, Morgeson's Family Law Clinic students could be heard chattering about the murder of Charlie Kirk from Professor Stephens' office, but to Morgeson and the Honor Council, they allegedly had correct viewpoints and "private conversations." FA at six, Fisher Aff, ¶ 46; HT at 34, 36, 39-40, 59 (20:08; 24:51-25:23; 1:01:55, Stephens testifying he could hear them). They have not been disciplined or even investigated. Neither were the white students in Professor Metze's office, who could be heard laughing and partaking in the same conversation with Fisher. HT at 43, 57, 75 (30:48; 59:11; 1:27:03).

The Honor Council recommended a written reprimand to be issued by the Dean of the School of Law (i.e., Defendant Nowlin) and then committed to Fisher's permanent student record. FA at 150. This reprimand will follow Fisher throughout her career, and must be reported to the Texas Bar Association, for example.  See e.g., FA at 200, 201, 203, **Exhibit Q (**Board of Law Examiners Guidelines)), §§ IV.A.1, VI.A, VII.G-H (listing adverse effect on applicant of "violation

9

of honor code" and "finding of misconduct"); FA at 215, **Exhibit R** (Rules Governing Texas Bar Admission), Rule 4(e)(2) (assessment of fitness dependent upon whether applicant has been disciplined).

## II.  ARGUMENT

### A.  Legal Standard

"The factors that govern an application for a temporary restraining order [TRO] are the same as those that govern a request for preliminary injunction [PI]." *William E. McBryde, Inc. v. Rodriguez*, Civil Action No. SA-07-CA-143-XR, 2007 U.S. Dist. LEXIS 12272, at *6 (W.D. Tex. Feb. 13, 2007) (collecting cases).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). Plaintiff Ellie Fisher seeks a "prohibitory injunction [which] freezes the *status quo*, and is intended to preserve the relative positions of the parties until a trial on the merits can be held." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (internal quotations omitted). "Preliminary injunctions commonly favor the *status quo* and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned."  Id.

"To obtain a preliminary injunction plaintiffs must show[:]

(1) a substantial likelihood of success on the merits,

(2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted,

(3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and

(4) that the injunction will not disserve the public interest."

*Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

10

For a prohibitory injunction (rather than the more strenuous mandatory injunction), "[t]o show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013).

The chief difference between a TRO and PI motion is that the TRO imposes strict preliminary notice requirements. "A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Fed. R. Civ. P. 65(b)." *William E. McBryde*, 2007 U.S. Dist. LEXIS 12272, at *7. The accompanying Declaration of Attorney Michael Thad Allen indicates that these conditions have been met.

## B. Plaintiff Will Succeed on the Merits Regardless of Forum

### 1) Viewpoint Discrimination Is Illegal in Any Forum

Texas' public "colleges and universities are not enclaves immune from the sweep of the First Amendment." *Shamloo v. Miss. State Bd. of Trs.*, 620 F.2d 516, 521 (5th Cir. 1980) (reversing denial of preliminary injunction) (quoting *Healy v. James*, 408 U.S. 169, 180-81, 92 S. Ct. 2338, 2345-46, 33 L. Ed. 2d 266 (1972)). "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969).

Indeed, in *Tinker*, high school students prevailed in asserting their right to express opposition to the Vietnam War by wearing black armbands in protest, *including into* the classroom and

throughout the school. Id. It has thus already been clearly established that viewpoint discrimination in spaces such as the classroom, a professor's office, or the hallways of the University or College is illegal under *Tinker* and its progeny.  See e.g., *Mahmoud v. Taylor*, 606 U.S. 522, 555-56, 145 S. Ct. 2332 (2025) (reversing denial of injunction by lower court where county school board subjected students to reprimands if they expressed disfavored viewpoints, opinions, and emotional reactions to "LGBT + storybooks"); *Gay Student Servs. v. Tex. A & M Univ.,* 737 F.2d 1317, 1326 (5th Cir. 1984) ("Perceiving college classrooms and their 'surrounding environs as a "marketplace of ideas,"' the Court reaffirmed "this Nation's dedication to safeguarding academic freedom") (quoting *Healy v. James*, 408 U.S. at 180-81 and *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 683, 17 L. Ed. 2d 629, 640 (1967)).

The "Supreme Court has long recognized that universities are 'vital centers for the Nation's intellectual life,' to the extent that 'danger . . . from the chilling of individual thought and expression' 'is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.'" *Students for Just. in Palestine v. Abbott*, 756 F. Supp. 3d 410, 426 (W.D. Tex. 2024) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995)).

Although public universities may have a legitimate interest in preventing "substantial disruption" (here none was ever shown); the university setting requires consideration of the "special characteristics of the environment." *Healy*, 400 8U.S. at 180. "A school's administration 'cannot rely on *ipse dixit* to demonstrate . . . interference with school discipline,' but must instead make 'some inquiry, and establish [] substantial fact, to buttress the determination.'" *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610, 629 (N.D. Tex. 2010) (quoting *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 970 (5th Cir. 1972)).

Of course, *Tinker* is a K-12 case addressing the speech of minors. But "precedents of [the Supreme Court] leave **no room** for the view that . . . First Amendment protections should apply with **less force** on college campuses than in the community at large" (emph. added). *Healy*, 408 U.S. at 180. "[P]assionate political debate is essential at universities, where students are forming their worldview as adults." *Students for Just. in Palestine*, 756 F. Supp. 3d at 426.  In fact, the Supreme Court has singled out law schools as places where these rights hold special importance:

> Law students come from many backgrounds and have but three years to meet each other and develop their skills. They do so by participating in a community that teaches them how to create arguments in a convincing, rational, and respectful manner and to express doubt and disagreement in a professional way. … A vibrant dialogue is not possible if students wall themselves off from opposing points of view.

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 705, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010) (Kennedy, J. concurring).

In short, at Texas Tech, this Court must address the First Amendment rights of full-grown adults training to be lawyers who must confront the messy, often vulgar reality of civil and criminal justice. This is not, in the words of Professor Patrick Metze, a "third grade schoolyard." After a 167 (Metze Affidavit, ¶ 4). Suppression of Fisher's viewpoints is simply illegal under our law.

Furthermore, Fisher's expression is "pure speech."  See *Tinker*, 393 U.S. at 505-506 ("'pure speech' … we [the Supreme Court] have repeatedly held, is entitled to comprehensive protection under the First Amendment"). Above and beyond that, Fisher is even disciplined for her subjective feelings, whether vocalized or not, for having the equivalent of "impure" thoughts about Charlie Kirk's death. But Texas Tech cannot "prohibit[] … expression" simply out of "'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Students for Just. in Palestine* at 426 (quoting *Tinker*, 393 U.S. at 509).

Therefore, what the Supreme Court has held for grade school and high school cases applies even more forcefully to the School of Law.  "[T]he First Amendment … does not tolerate laws that

13

cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 683, 17 L. Ed. 2d 629 (1967). "The classroom is peculiarly the 'marketplace of ideas.'" Id. See also *MacRae v. Mattos*, __ U.S. __, 145 S. Ct. 2617, 2620-21, 222 L. Ed. 2d 1141 (2025) (Thomas, J., concurring) (noting that "It undermines core First Amendment values … to adopt an institutional viewpoint on the issues of the day and then … portray this disagreement as evidence of disruption").

Fisher expressed her viewpoints in private conversations in her professor's offices or with her peers in the Clinic Office, only to have eavesdroppers like Morgeson scamper to the administration as tattletales. Moreover, this same conversation was taking place throughout the School of Law, with had one student interjecting in Professor Kenneth Williams' class that Charlie Kirk and been shot and was a "right-wing" activist.

Texas Tech cannot punish Fisher for doing nothing different than these other participants simply because it disapproves of her viewpoints.  "[V]iewpoint discrimination violates the First Amendment regardless of the forum's classification."  *Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812, 105 S. Ct. 3439, 3454 (1985)).

Because Defendants targeted Fisher's viewpoint and unique of all students, punished her, which is obvious from the fact that no one else was even investigated, the Court's analysis should end here. Morgeson even says the quiet part out loud: Fisher's speech was inappropriate because it might offend the tender ears of Republicans. FA at 44 (35:39).  Defendants are therefore liable for illegally suppressing Fisher's viewpoints.

### 2) The First Amendment Cannot Be Canceled to Prevent Hypothetically Hurting Others' Subjective Feelings or Even Actually Hurting Others' Subjective Feelings

"[C]oncerns about the reaction of the student body to [plaintiffs'] message is not a sufficient basis to suppress their symbolic speech." *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610, 630

14

(N.D. Tex. 2010).  And "[t]he existence of a hostile audience, standing alone, has never been sufficient to sustain a denial of or punishment for the exercise of First Amendment rights." *Beckerman v. Tupelo*, 664 F.2d 502, 510 (former 5th Cir. 1981).  "Controversial symbolic speech, with the potential to evoke a strong and possibly violent emotional response from those who see it has time and again been held protected, even in nonpublic forums, including the classroom." *Smith v. Tarrant Cty. Coll. Dist.* at 631 (citing *Tinker*, 393 U.S. at 508-09).

In *Smith*, the plaintiff advocated for the right to carry concealed firearms on campus by engaging in "empty holster protests"; that is, wearing empty holsters into classrooms and through the hallways of their Texas community college. Id. at 624.  The community college cracked down on the practice. Id. As does the School of Law here, the community college was less concerned about actual disruption than about imaginary disruption. The Honor Council vaguely refers to "different political viewpoints and … statements and actions [that] ***could*** create conflict among coworkers that would interfere with performance of work" (emph. added). FA at 148 (Finding No. 8). Likewise, the school in *Smith* worried about hypothetical injuries to campus culture and its students' feelings.

There, however, the community college at least preoccupied itself with potential live-shooter incidents on campus, a truly horrific danger. Here, Texas Tech is more concerned with the subjective feelings of supposedly fragile, full-grown, adult students (despite actual testimony indicating they are ***not fragile***). Yet, even in *Smith* the school could not suppress free speech notwithstanding genuine concern for student safety.

Here, no evidence suggests impaired work performance at Texas Tech. This is because there was and is none. Furthermore, Morgeson's actions, not only appointing herself Texas Tech's unofficial hall monitor, but also in sending her students home (HT at 78 (1:34:45-35:10)), caused far more disruption than Ellie Fisher. No evidence suggests a single law-clinic client was compromised in any way.

15

The School of Law claims the right to safeguard its supposedly fragile students, whose opinions it prefers, from being "upset" upon hearing a black student's viewpoints, which are supposedly intolerable. Defendants apparently believe they can shield students from the dyspepsia of opposing viewpoints. Yet, as Fisher's fellow student Monacelli testified, all Texas Tech has done is chill the speech of all students, conservative and liberal, and of all races.  Fisher Appendix at ## (1:32:09-31, 1:36:08-37:12).

Unsurprisingly, it is the suppression of free speech that encourages unprofessionalism, here, not Fisher's speech. Frankly, it infantilizes Texas Tech's capable law students. But most important, it tramples the First Amendment.  See, e.g., *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding, "speech … at a public place on a matter of public concern … is entitled to 'special protection' under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt"); *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

3)  *The Suppression of Fisher's Speech Is Subject to Strict Scrutiny*

Because Defendants discriminated against Fisher on the basis of her viewpoints, impure thoughts, and emotive expression concerning Charlie Kirk's death, the Court need not reach the issue of whether Fisher's expressed her views in a public forum, a limited public forum, or a nonpublic forum. Her viewpoints are protected regardless of the forum. See *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 349-50 (5th Cir. 2001).

Nevertheless, in the alternative, Ellie Fisher sets forth the standard here for protected speech in "public fora" as defined by First Amendment jurisprudence.

In approaching First Amendment protections for student speech, the Supreme Court has "identified three types of forums: [1] the traditional public forum,[2] [2] the public forum created by governmental designation, and [3] the nonpublic forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2001) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 87 L. Ed. 2d 567, 105 S. Ct. 3439 (1985)).

There is some confusion in the Fifth Circuit whether the first category, the "public forum," includes the "designated public forum" or whether the "designated public forum" is a subcategory of the "limited public forum" that fits into a second category. Compare *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d at 344-47 (treating traditional public forum distinct from the second, "middle category between traditional and nonpublic forums," to include both limited and designated public fora); *Ryan v. Grapevine—Colleyville Indep. Sch. Dist.*, No. 4:21-cv-1075-P, 2023 U.S. Dist. LEXIS 41478, at *6-*8 (N.D. Tex. Mar. 13, 2023) (addressing traditional public forum and designated public forum as one category; and the "limited public forum[]" as the "second category").

However, any strict three-part categorization is less relevant here than whether Texas Tech's suppression of Fisher's speech must be subject to strict scrutiny. The relevant analysis is whether strict scrutiny applies based on whether these spaces in which Fisher spoke were "designated public fora" or whether a more relaxed standard applies because she spoke in "limited public fora." See *Ryan v. Grapevine* at *6-*8. "Limited public forums … provide for public expression "for certain

---

[2] The traditional public forum includes places that "by long tradition or by government fiat have been devoted to assembly or debate." *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)). These spaces typically include "streets or parks" which public educational institutions are typically not. Compare *Chiu v. Plano Indep. Sch. Dist.,* 260 F.3d 330, 347-48 (5th Cir. 2001). Suppression of free speech in a traditional public forum is subject to strict scrutiny. See *Spectrum WT v. Wendler*, 151 F.4th 714 (5th Cir. 2025) (rehear. *en banc* pending on other grounds) ("A content-based restriction on First Amendment-protected activity in a designated public forum is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest"); *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426-27 (5th Cir. 2020) ("Regulations on speech in traditional and designated public forums are subject to strict scrutiny review—they must be narrowly tailored to serve a compelling state interest"); *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610, 625 (N.D. Tex. 2010) ("regulations of student speech in these areas is subject to strict scrutiny").

groups or for the discussion of certain topics." Id. at *7 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-107, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001)). "Designated public fora are 'spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose.'" Id. (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11, 138 S. Ct. 1876, 1885 (2018)). "[T]he government creates a designated public forum only by intentionally opening a nontraditional forum for public discourse." Id.

Here, Texas Tech designated the clinic spaces for law student participation, learning, and what Patrick Metze described as a "safe space" for free expression— despite Morgeson, in particular, finding this so uniquely offensive. See e.g. HT at 43 (31:49). The Clinic Office was another such space, where Jacob Gomez (who disagrees with Fisher's viewpoints) testified that students discussed sensitive topics by Texas Tech clinic students— at least up until their recent suppression. HT at 98 (2:11:55-12:29.) Thus, the clinical office spaces were clearly open to Fisher for exactly the kind of discussion she had on September 10, 2025.

Although these were not traditional "public fora," they were no less designated by Texas Tech to be used for open and frank debate for students, most especially on the specific subject matter (in particular, here, matters of public concern related to criminal law) for which they were designated. This is nothing more or less than what any university should and must do. See e.g., *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"). This ethos is also made clear by the School of Law rules and regulations that safeguard free academic expression. FA at 190-194 (System Regulation 07.04); 196-197 (School of Law Academic Freedom and Freedom of Expression Policy).

18

Because the spaces in which Fisher spoke were designated for the very discussions that she used them for in speaking to her professors and to her fellow students, they are "designated public fora." Strict scrutiny therefore applies.

### 4) Defendants Fail the Test of Strict Scrutiny

"A content-based restriction on First Amendment-protected activity in a designated public forum is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest." *Spectrum WT v. Wendler*, 151 F.4th 714, 728 (5th Cir. 2025).

Clearly, a ban on one black student's expression of improper sentiments regarding Charlie Kirk's death is not only deficient on the basis of its "narrowness"; it is worse. It is simply arbitrary and capricious. As Professor Stephens testified to the Honor Council, Ellie Fisher was always ebullient and expressive; but only on the day that she addressed Charlie Kirk's death did this become punishable because she apparently hurt others' feelings. Furthermore, there is no evidence that the Honor Council's reprimand serves any compelling state interest, because Fisher's speech interfered with no law clinic clients' legal needs or clinic work. The reprimand only serves to punish one uppity black woman for having expressed thoughts that hurt or might potentially hurt the feelings of Morgeson or, at most, supposedly fragile conservatives.

There is no possible analysis in which the Honor Council's decision can survive strict scrutiny.

### 5) Even if the Court Considers the Clinic Office or Professors' Offices to Be a "Limited Public Forum," Defendants Are Still Liable

The "limited public fora" is "open for public expression of particular kinds or by particular groups" and can be restricted when a speaker attempts to use the forum for other, more general public speech on matters of public concern. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. at 829 (describing campus facilities opened to various student groups as a "limited" forum).

19

Even if this Court were to hold that Texas Tech's clinical areas are a "limited public forum," the standard protecting free speech is still an exacting one. Texas Tech may only "restrict speech … if the regulation (1) does not discriminate against speech 'on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'" *Ryan v. Grapevine.*, 2023 U.S. Dist. LEXIS 41478, at *9 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001)).

*Ryan v. Grapevine*, shows just how high a bar is set by the "reasonable" standard. There, this Court addressed a private citizen's right to hold forth about "culture war issues" at a school board meeting. Although the school board designated the meetings as open for public comment, it nevertheless restricted discussion periods to 30 minutes and restricted them to set agenda topics. *Ryan v. Grapevine*, 2023 U.S. Dist. LEXIS 41478, at *3-*5.  Moreover, the school board forbid speakers from identifying its employees personally by name. Id.

Yet one citizen went off topic. He sarcastically criticized a principal and the principal's wife by name for certain Facebook photos—which no doubt caused considerably more emotional discomfort than Fisher's utterances here.  Id. at *3-*4. The school board president gaveled the citizen into silence. Id. But the Court denied summary judgment to the school board for the suppression of the citizen's speech on an as-applied basis of its policy, even despite the school's subsequent policy change to avoid a preliminary injunction.  Id. at *4, *17.

As outlined above, it is clear that here the only reason to suppress Fisher's speech is its content. Yet it had always been clear from her professors' testimony (Stephens and Metze) that their offices were open to Fisher for exactly the kind of discussions she had with them that day. She turned to them as her mentors. Applying the limited-public-forum analysis, Texas Tech's restriction on Fisher's speech on the pretext of "professionalism" is unreasonable in light of the forum's

purpose: namely, to foster open discussion between professors, students, and among students themselves.

Importantly, the individuals to whom Fisher actually spoke (including the students in the Clinic Office) found nothing unusual about her speech or her actions. Both Stephens and Metze welcomed her interactions. The only disgruntled individuals were eavesdroppers (Morgeson, Wright) or were told by Morgeson lurid, made up stories about what Fisher had said (Monacelli). For his part, the conservative student Gomez not only testified that it was the general atmosphere he found uncomfortable, rather than Fisher's speech specifically, but also, "Any student can feel how they want to feel." HT at 98 (2:11:48). Gomez also testified that Fisher's speech should be protected by the First Amendment *in the Clinic Office*. Id. (2: 12:29-02)

Therefore, even if this Court were to apply the "limited public forum" standard, Defendants flunk this test as well.

### 6) *Fisher Has Suffered an Adverse Action*

"A plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive." *NRA of Am. v. Vullo*, 602 U.S. 175, 203, 144 S. Ct. 1316, 1335 (2024) (internal quotation omitted).

A student a reprimand qualifies as an adverse action imposed upon Fisher by the state of Texas.  See e.g., *Mahmoud v. Taylor*, 606 U.S. 522, 555-56, 145 S. Ct. 2332 (2025) (reversing denial of injunction by lower court where county school board subjected students to reprimands if they expressed unapproved viewpoints, opinions, and emotional reactions to the contents of "LGBT + storybooks").  Even subjecting students to disciplinary action for protected speech is sufficient for First Amendment retaliation. See *Smith v. Tarrant County College Dist.,* 670 F. Supp. 2d 534, 539 (N.D. Tex. 2010) (finding plaintiffs faced irreparable harm by being forced to choose between exercising

21

First Amendment rights or risking disciplinary action). As argued below, this reprimand must also be reported to the Texas Bar Association and will have an impact on Fisher that is both damaging and incalculable.

Fisher therefore satisfies this element of a First Amendment retaliation claim.

## C. First Amendment Retaliation Automatically Causes Irreparable Harm

The TRO/PI requirement of irreparable harm is easily satisfied here. Fisher suffered irreparable harm and continues to face prospective irreparable harm.

This is because the "loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (finding reversible error and abuse of discretion in the denial of a PI for violation of First Amendment rights) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). See also *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 294-97 (5th Cir. 2012) (finding abuse of discretion where lower court disregarded irreparable harm of First Amendment infringement).

This Court has already found that students who face disciplinary action in retaliation for their free exercise of First Amendment rights have suffered irreparable harm. *Smith v. Tarrant County College Dist.*, 670 F. Supp. 2d 534, 539 (N.D. Tex. 2010) (granting TRO and finding plaintiffs faced irreparable harm by being forced to choose between exercising First Amendment rights or risking disciplinary action).[3] See also *Mahmoud v. Taylor*, 606 U.S. 522, 569, 145 S. Ct. 2332, 2363-64 (2025) (holding school board's threat to reprimand students, among others, for dissent from message purveyed by LGBTQ+ storybooks created impermissible burden on First Amendment rights).

---

[3] The Court denied plaintiff's TRO/PI "to wear empty holsters inside … classrooms and … adjacent hallways." *Smith v. Tarrant Cty. Coll. Dist.*, 670 F. Supp. 2d 534, 541 (N.D. Tex. 2009). However, plaintiffs prevailed on this issue at trial. *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp. 2d 610, 633 (N.D. Tex. 2010).

Furthermore, should it enter, Texas Tech's reprimand will force Fisher to report the suppression of her First Amendment speech "unprofessionalism" to the Texas Bar or to any other bar to which she may apply in the future.

### D. Fisher Spoke on a Matter of Public Concern

There can be no serious dispute that the murder of Charlie Kirk on September 10, 2025 was a matter of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011)

Students and faculty were discussing the assassination of Kirk throughout the law school almost as soon as it erupted in the national media. Indeed, Kirk's signature issue, that campuses be open to free debate and viewpoint diversity, is exactly what Texas Tech now seeks to squelch by punishing Fisher's viewpoints while privileging those it considers more proper.

This subject matter obviously addressed a matter of public concern.

### E. The Balance of Interests Favors the Entry of a Preliminary Injunction/Temporary Restraining Order

"As to the balance of harms and public interest, the only harm here 'is the inability to . . . violat[e] the First Amendment, which is really no harm at all." *Speech First, Inc. v. McCall*, No. 1:23-cv-411-DAE, 2023 U.S. Dist. LEXIS 246986, at *31 (W.D. Tex. Sep. 1, 2023) (quoting *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021)).

Furthermore, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation marks omitted).

The balancing of interests overwhelmingly favors Fisher. If granted, the requested injunction will require Texas Tech to do nothing more than maintain a real law school once again rather than

23

one that resembles a "third grade" playground or a Montessori school, with self-anointed hall monitors like Morgeson who police students' and professors' free discussion of issues of public concern.

## III.    CONCLUSION

For the foregoing reasons, the Court should enter a Temporary Restraining Order enjoining Texas Tech School of Law and all Defendants from entering a Reprimand and annulling all disciplinary action against Plaintiff Ellie Fisher and order a hearing on Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

Michael Thad Allen
*pro hac vice admission pending*
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06320
(860) 772-4738
mallen@allenharrislaw.com

Mark T. Mansfield
Local Counsel for Ellie Fisher
Mansfield & Mansfield, P.C.
1550 Norwood Dr. Suite 107
Hurst, Texas 76054
817-282-3450
mark@mansfieldpc.com