U N I T E D   S T A T E S   D I S T R I C T   C O U R T
F O R   T H E   N O R T H E R N   D I S T R I C T   O F   T E X A S
L U B B O C K   D I V I S I O N

| | |
|---|---|
| ELLEN FISHER,<br><br>   Plaintiff<br><br>  vs.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEYSWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of the Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of the Texas Tech School of Law, JAROD GONZALES, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>   Defendants. | Civil Case No. _____ |

**PLAINTIFF ELLEN MAE FISHER'S RECORD APPENDIX**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ELLEN FISHER,<br><br>   Plaintiff<br><br>  vs.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEYSWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of the Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of the Texas Tech School of Law, JAROD GONZALES, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>   Defendants. | Civil Case No. _____ |

**AFFIDAVIT OF ELLEN FISHER IN SUPPORT OF
MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Ellen "Ellie" Fisher, am over the age of 18 and understand the meaning of an oath; and I do hereby attest under the laws of the United States of America that the foregoing is true based on my direct knowledge and experience.

I. THE AUTHENTICATION OF DOCUMENTS FOR THE PURPOSE OF INTRODUCING ADMISSIBLE EVIDENCE

1. I attach, as **Exhibit A,** a true and correct copy of the letter dated January 23, 2026, from Professor William R. Keffer to Professor Larry R. Spain referring the matter to the Honor Council.

1

2.      I attach, as **Exhibit B,** a true and correct copy of the Honor Council notice, dated February 4, 2026, from Larry R. Spain, Chair of the Honor Council, scheduling a hearing for February 20, 2026.

3.      I attach, as **Exhibit C,** a true and correct copy of the report of Professor William Keffer, captioned "Honor Code Violation-Ms. Ellen Fisher," dated January 23, 2026.

4.      I attach, as **Exhibit D,** a true and correct copy of the full written Hearing Transcript.

5.      I am also submitting to this Court a live audio recording of the full hearing, a true and accurate copy of which is submitted as **Exhibit E.**

6.      I attach, as **Exhibit F,** a true and correct copy of the Honor Council's decision dated March 11, 2026, which was sent to me via email by Larry R. Spain, Chair of the Honor Council.

7.      I attach, as **Exhibit G,** a true and correct copy of the Affidavit of Holland Pombrio.

8.      I attach, as **Exhibit H,** a true and correct copy of the Affidavit of Ashanty Bishop.

9.      I attach, as **Exhibit I,** a true and correct copy of the Affidavit of Caleb Barkman.

10.      I attach, as **Exhibit J,** a true and correct copy of the Affidavit of Callahan Ard.

11.      I attach, as **Exhibit K,** a true and correct copy of the Affidavit of Patrick Metze.

12.      I attach, as **Exhibit L,** a true and correct copy of the Affidavit of Tristan Perez.

13.      I attach, as **Exhibit M**, a true and correct copy of the Texas Tech University School of Law Honor Code, available online at https://www.depts.ttu.edu/law/policies/honor-code.php.

14.      I attach, as **Exhibit N**, a true and correct copy of an email from Attorney Michael Thad Allen to Professor Larry Spain, dated February 16, 2026, with the subject line "Request for

Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 1/2." An identical email was sent as 2/2 with the remaining Affidavits because the files were too large to send in one email.

15.    I attach, as **Exhibit O**, a true and correct copy of Texas Tech System Regulation 07.04. This policy is also available at https://www.texastech.edu/offices/cfo/system-regulation-07.04-freedom-of-expression.pdf.

16.    Texas Tech School of Law also maintains its own Academic Freedom and Freedom of Expression Policy and Statement of Compliance, effective March 3, 2025. I attach, as **Exhibit P**, a true and correct copy of this policy, which can also be found at https://www.depts.ttu.edu/law/policies/academic-freedom-and-freedom-of-expression.php.

17.    I attach, as **Exhibit Q**, a true and correct copy of the Board of Law Examiners Guidelines for Determining Character and Fitness and Overseeing Probationary License Holders, adopted June 28, 2024.

18.    I attach, as **Exhibit R**, a true and correct copy of the Rules Governing Admission to the Bar of Texas, adopted by the Supreme Court of Texas, effective January 6, 2026.

19.    I attach, as **Exhibit S**, a true and correct copy of a photograph I took of the word "nigger" scrawled on my car, which I discovered on Texas Tech property on November 6, 2025.

## II.    ELLEN FISHER'S RECORD AS A STUDENT OF TEXAS TECH UNIVERSITY

20.    I am currently a third-year (3L) law student at Texas Tech University School of Law, where I serve as a zealous advocate for my clients in the Criminal Law Defense Clinics.

21.    Up until the unlawful disciplinary sanction imposed against me for my protected speech, I had consistently demonstrated exemplary conduct as both an undergraduate and law student of Texas Tech University, maintaining strong academic performance, active leadership,

and a commitment to service within the law school community. My record reflects professionalism, integrity, and a sustained dedication to upholding the values of the institution.

22. I started Texas Tech University as an undergraduate student in 2018 and earned my BS degree in Agricultural Sciences in 2023.

23. I am an African American woman who was raised by white parents. I am also a resident of the Bay Area in the State of California.

24. I first enrolled at the Texas Tech University as an undergraduate student in 2018 and was awarded the Agricultural Education and Communications Endowed Alumni Scholarship for the academic years 2021–2022 and 2022–2023.

25. In undergrad I was selected by the Law School to serve as a Texas Tech Pre-Law Ambassador.

26. In 2021, I founded the Texas Tech University chapter of the NAACP. I have served in state-level leadership roles within the Texas NAACP, including Secretary, Press and Publications Chair, and Assistant Secretary. I was also appointed First Vice President of the Texas NAACP, Youth and College Division for the State of Texas.

27. I founded the Texas Tech University chapter of NextGen America, the nation's largest youth voter organization.

28. In 2022, I was recognized by the Texas Tech University Student Body Senate through Resolution 57.145.

29. In 2022, I received the Texas Tech University "Raider Who Rocks Difference Maker Award."

30. In 2022, I was also honored with the Texas Tech University President's Excellence in Diversity Award.

31.     In 2023, I enrolled at Texas Tech University School of Law as a law student.

32.     In 2023, I was awarded the Texas Tech University School of Law Admissions Scholarship.

33.     In 2023, I was recognized as Speaker of the Year by Pulse Magazine.

34.     I have served two terms as President of the Texas Tech University Chapter of the National Lawyers' Guild (2024–2025 and 2025–2026).

35.     In Spring 2024, I earned the distinction of Top Oralist Advocate in Texas Tech's Advanced Mock Trial competition through the School of Law's Law Board of Barristers. In Fall 2024 and Spring 2025, I was a Semi-Finalist in Advanced Mock Trial.

36.     I have been the President of Tech Law Chapter of the National Lawyers Guild for two terms.

### III.     FISHER SPEAKS ON MATTERS OF PUBLIC CONCERN

37.     On September 10, 2025, I was attending my Race and Racism Law class with Professor Kenneth Williams, the Fred Gray Endowed Chair for Civil Rights and Constitutional Law at Texas Tech University School of Law.

38.     While class was still in session, I learned that Charlie Kirk had been assassinated.

39.     A student named Henry Tecssi first announced to the class that Charlie Kirk had been shot. Mr. Tecssi also stated that Kirk was a racist or white supremacist, or words to that effect.

40.     During the class, students viewed videos of the assassination and discussed various aspects of the event, including whether the shooting would likely be fatal, as well as Kirk's alleged "racism."

41.     The students who participated in this discussion in Professor Williams' Race and Racism class included Henry Tecssi and others, all of whom are not Black.

42.     After class ended, I went down one flight of stairs to the hallway where faculty who teach the Law School's clinical programs have their offices.

43.     I first stopped at Professor Joe Stephens' office, which is positioned near the beginning of the hallway, as I routinely do to discuss matters related to the law, criminal defense, and other topics.

44.     Because of my relationship with Professor Stephens, and our practice of discussing issues, I stood at his door and briefly began discussing the assassination of Charlie Kirk.

45.     Specifically, I asked Professor Stephens, "Have you heard that Charlie was shot?" and informed him, "It looks bad," or words to that effect. The interaction lasted approximately thirty seconds.

46.     Directly across from Professor Stephens' office is the Family Law Clinic, where Professor Terri Morgeson's students, Madison Wright and Allison Monacelli—both of whom are not Black—could also be heard discussing the assassination of Charlie Kirk that day.

47.     Professor Stephens did not appear frustrated by my question, nor did he reprimand me for anything I said. The conversation remained general and consistent with our usual interactions.

48.     After leaving Professor Stephens' office, I entered the office of my clinical law professor, Patrick Metze. At that time, fellow law students Ashanty Bishop and Bridget Pembroke were already present, neither of whom are not black.

49.     At some point we discussed Charlie Kirk's assassination, similar to the conversation in Professor Williams' class or with Professor Stephens.  This discussion was with Professor Metze, the other students present, and myself.

50.    Sensitive topics such as the crime of Kirk's murder had been discussed in the law school clinic offices before. We were encouraged to engage in open conversations in these offices, which were previously presented to us as safe spaces by Professor Metze to discuss challenging or controversial issues.

51.    While in Professor Metze's office, he showed me and the other law students a video of Charlie Kirk's assassination that was circulating on the internet.

52.    At some point, Professor Terri Morgeson entered Professor Metze's office and announced, "Trump just said that he [Charlie Kirk] died," or words to that effect.

53.    The conversation in Professor Metze's office lasted approximately five to ten minutes and was focused on discussing the events surrounding Charlie Kirk's assassination.

54.    At no time upon entering Professor Metze's office did Professor Morgeson display any discomfort or displeasure with what was being discussed.

55.    For example, Professor Morgeson did not indicate that our conversation was inappropriate or otherwise objectionable. Professor Morgeson did not close the door to avoid overhearing the conversation.

56.    The conversation in Professor Metze's office was normal and consistent with the news of the day.

57.    At no time did I refer to Charlie Kirk using the term "motherfucker," as I was originally accused of by Professor Morgeson in the William Keffer Investigation Report.

58.    After leaving Professor Metze's office I continued down the hall to the Clinic Office, a conference room at the end of the hall, which serves as a kind of common area for clinical students.

59.     The Clinic Office is a space used by law students to take calls with clients, meet with clients, discuss cases with other students, and talk about daily events, or even gossip.  It is not uncommon that students use curse words in the Clinic Office and talk about sensitive and controversial topics.

60.     The conversation about Charlie Kirk's assassination continued in the Clinic Office among myself and other law students. I recall discussions about whether Charlie Kirk had actually died and conversations regarding his political viewpoints.

61.     Aside from myself, I recall the following law students being present in the Clinic Office at various points in time that day: 1) Caleb Barkman, 2) Holland Pombrio, 3) Callighan Ard, 4) Tristen Perez, 5) Jacob Gomez, and 6) Anthony Bomar. None of these students are black.

62.     The law students in the conference room expressed a range of viewpoints during the discussion. Some, like Anthony Bomar and Jacob Gomez, hold conservative views. Others are more liberal, and some are in between.

63.     I recall the conversation being respectful, with no hostility toward any participant. I remember that one person remarked that Charlie Kirk would go to hell. Others characterized him as racist. I was the only black student discussing Charlie Kirk in the Clinic Office.

64.     To the best of my knowledge, I am the only law student who was brought before the Honor Council and ultimately sanctioned for discussing the public assassination of Charlie Kirk, despite the fact that it was discussed throughout the law school that day.

## IV.    TEXAS TECH UNIVERSITY SANCTIONS FISHER FOR PROTECTED SPEECH

65.     About a week later, I think September 16, 2025, I was called into the office of Assistant Dean for Student Life, Sophia Chapman, and clinical law instructor Dwight McDonald. They wished to discuss my "over exuberance."

66.    On October 14, 2026—ironically, Charlie Kirk's birthday—I received an email from Professor William Keffer informing me that he would investigate me for an Honor Code violation.  He requested a meeting on October 16, 2026.

67.    I learned that I had also been reported to the Texas Tech Police Department, although I was never interviewed by the police. It is my understanding that, at least at this time, accusations of expressing improper emotions do not yet qualify as worthy of criminal investigation in the State of Texas or having what others consider improper subjective feelings violate no laws.

68.    The investigation meeting with William Keffer was held on October 21, 2026.

69.    On or about November 6, 2026, the word "Nigger" was written on the rear window of my car while it was parked at Texas Tech University. I reported this incident to the Law School. I was subsequently informed that the University would not conduct an investigation.

70.    On January 23, 2026, I received an official letter from William Keffer informing me that based on his investigation there was probable cause to believe that I violated Section H of the Honor Code, and he was referring the matter to the Honor Council.

71.    Section H of the Honor Code (**Exhibit L**), provides as follows:

A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.

72.    On February 16, 2026, through my counsel, I submitted six affidavits to the Texas Tech University School of Law Honor Council (**Exhibits F-K**). These affidavits demonstrated that I was not the only student discussing Charlie Kirk on September 10, 2025 and indicated that the Keffer Report excluded exculpatory evidence.

73.    On February 16, 2026, my emailed Professor Larry Spain, Chair of the Honor Council, and cc'ed all Honor Council members, attaching all affidavits.  **Exhibit M**.

74.    The email also requested clarification on how the subjective thoughts and feelings I allegedly expressed that day could possibly constitute violations of the Honor Code.

75.    Professor Larry Spain never provided any response to this question.

76.    The Honor Council scheduled my hearing for February 20, 2025. **Exhibit B**. The hearing lasted over three hours and required "clear and convincing evidence."

77.    Texas Tech System Regulation 07.04 (Freedom of Expression) provides:

The Texas Tech University System ("System") and its component universities (referred to herein collectively as the "University") recognize freedom of speech and expression as a fundamental right and seek to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the University and employees of the University (collectively, "University Members"). This regulation is intended to protect the expressive rights of University Members guaranteed by the constitutions of the United States and the State of Texas by recognizing freedom of speech and assembly as central to the mission of the University and ensuring that University Members may assemble peaceably on University campuses for expressive activities.

78.    The Texas Tech School of Law's Academic Freedom and Freedom of Expression Policy and Statement of Compliance, effective March 3, 2025, reads as follows:

… academic freedom and freedom of expression in the Law School extends to all full and part-time law faculty as well as staff who teach law courses. These freedoms extend, as appropriate, to conducting research, publishing scholarship, engaging in law school governance, participating in law-related public service activities, curating library collections and providing information services, and exercising teaching responsibilities, including those related to client representation in clinical programs. System and University policies and procedures afford appropriate due process, such as notice, hearing, and appeal rights, to assess claims of violation of academic freedom and freedom of expression.

[…]

a.  Under System and University policies and procedures, faculty, staff, and students have a right to freedom of expression that includes communicating ideas that may be controversial or unpopular, including through robust debate, demonstrations, and protests.

b.  System and University policies and procedures also proscribe disruptive conduct that hinders free expression by preventing or substantially

interfering with the carrying out of Law School functions or approved activities, such as classes, meetings, library services, interviews, ceremonies, and public events.

c.  System and University policies and procedures also allow for protection of individuals and the community through regulation of unprotected forms of expression such as those that violate the law, that falsely defame a specific individual, that constitute a genuine threat or harassment, or that unjustifiably invade substantial privacy or confidentiality interests. System and University policies and procedures also allow for reasonable time, place, and manner regulations of expression.

**Exhibit O.**

79.  I have never been informed of any specific professional or fiduciary obligations I failed to meet with regard to any clinical program or other work or courses I have been involved with at the Texas Tech School of Law.

80.  I know of no actual disruption to clinical programs on September 10, 2025.

81.  I will be required to self-report the alleged infraction of the Texas Tech School of Law Honor Council to the Texas Board of Bar Examiners and must demonstrate "good moral character" under the Rules Governing Admission to the Bar of Texas.  See **Exhibit P** at § IV.A.1; **Exhibit Q,** Rule 4 (b) and (e)(3).

82.  The decision therefore jeopardizes my ability to pursue my future legal career, and labels me as being unfit to practice law. The Honor Council's actions have already had a chilling effect on my free expression on campus. For example, I have direct knowledge of multiple witnesses whom I approached but who refused to participate in the Honor Council hearing out of fear that they, too, could be sanctioned for "thought crimes" or face consequences for their own speech.

83.  I have always been an outspoken student leader and activist, but I now fear speaking on matters of public concern in class or in the Clinic Office or to my professors.

84.    On information and belief, other students also feel reluctant to speak frankly and openly concerning controversial matters of contemporary politics in class and in the Clinic Office or to our professors because of the Honor Council's actions.

85.    By punishing me, the Honor Council has suppressed dialogue and debate at the School of Law more generally, undermining the mission of the University.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 7th DAY OF APRIL 2026,



Ellen Fisher

Before me appeared the above identified individual, and upon confirmation of his identity, I witnessed the individual affix his verified signature to this document on the date indicated above,

_____, Notary

My commission expires on: October 23 2029

PATRICE SHANIC' MCCLINE
Notary ID #126361079
My Commission Expires
October 23, 2029

Fisher Appendix: 013

Fisher Appendix: 014

# EXHIBIT A



TEXAS TECH UNIVERSITY
School *of* Law·

January 23, 2026

Professor Larry Spain
Chair, Honor Council
Texas Tech University School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Dear Professor Spain:

I am referring to the Honor Council a matter regarding Ellen Fisher. The Law School received information that Ms. Fisher allegedly violated Section H of the Honor Code ("Violation of Professional Duties") "…by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities."

Pursuant to the Student Handbook, I have conducted a preliminary factual investigation and have determined that probable cause exists to believe that Ms. Fisher violated the Honor Code. Accordingly, I am referring the matter to the Honor Council for consideration. In addition, on this date, I am notifying Ms. Fisher of this referral. Please contact Dean Chapman for information related to Ms. Fisher's case.

Please let me know if you have any questions or need more information.

Sincerely,

William R. Keffer
Texas Tech University School of Law
Janet Scivally and David Copeland Endowed Professor of Energy Law
Director, Energy Law Programs
Assistant Director, Bar Preparation Resources
806/834-3178
william.keffer@ttu.edu

Fisher Appendix: 016

# EXHIBIT B

**HONOR COUNCIL NOTICE**

February 4, 2026

Ellie Fisher                                                    **Confidential**
Law School                                                     *Sent via Email*
                                                               Ellie.fisher@ttu.edu

Dear Ms. Fisher:

Under the provisions of the Law School Honor Code, Professor William R. Keffer, acting as an Honor Code Investigator, found probable cause to believe that a violation of the Honor Code had occurred, specifically Section 2.H (**Violation of Professional Duties**) ". . . by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) and referring the matter to the Honor Council for further action.

After communicating with you as to your availability, a hearing has been set for **FRIDAY, February 20, 2026** at **9 am** at: Texas Tech University System Building. Room 106, 1508 Knoxville Avenue, Lubbock, Texas  79409.

The following members of the Honor Council will hear your case:  Professors Amy Hardberger,  Alyson Outenreath, and Larry Spain along with student member Allyson Owens. Under Section 3(C) of the Honor Code, you may challenge any member of the Council as biased and present facts and arguments in support of the challenge.  If you wish to do so, please communicate such challenge to me in writing as soon as possible.

Your rights and procedures to be followed in conducting the hearing are set forth in detail in the Honor Code located at the following link:  Honor Code | School of Law | TTU  The following documents, which are attached, were forwarded to the Honor Council and will be considered as part of the hearing process:

- Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council from Professor William R. Keffer, Investigator, referring the matter to the Honor Council
- Report of Investigation dated January 23, 2026 from Profesor William R. Keffer

At this time, the Honor Council intends to call the following individuals to provide information at the hearing:  Professor Terri Morgeson, Professor Joe Stephens, Madison Wright, Allison Monacelli, Anthony Bomar, and Jakob Gomez.  If there are any changes to those that will provide information, I will advise you in writing in advance.

Fisher Appendix: 018

You may also request that witnesses provide information to the Council.  If you desire that any witnesses having information be called to provide testimony, it is your responsibility to request that they be called by the Honor Council.  If you desire the assistance of the Council in procuring the attendance of witnesses, please contact me.  Please note that this process is not a court of law.  Accordingly, the ability to subpoena witnesses for the hearing process does not apply to the Honor Council proceedings.  Additionally, students may not retaliate against, harass, or threaten anyone participating in the process.

I acknowledge your written request that the hearing be recorded (audio only) and will arrange for that to occur.

If you have any other questions concerning the hearing in advance, please let me know.

Sincerely,

Larry R. Spain
Alvin R. Allison Professor of Law
Chair, Honor Council

Encl.

Copy to:  Honor Council Members
          Associate Dean Sofia Chapman

Fisher Appendix: 019

# EXHIBIT C

Fisher Appendix: 020

**TEXAS TECH UNIVERSITY**
## School *of* Law

January 23, 2026

Re: Honor Code Violation - Ms. Ellen Fisher

On 9/23/25, Dean Nowlin and Dean Chapman appointed me under Section 4(B) of the law school's Honor Code to investigate a potential violation concerning:

*"H. Violation of Professional Duties*

**A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One."**

Specifically, you are alleged to have acted unprofessionally on Wednesday, 9/10/25 relating to your behavior and statements in a clinical setting made about the assassination of Charlie Kirk.

I met with Dean Chapman on Tuesday, 9/23/25 regarding this matter. I then met with the following people as part of this investigation (Dean Chapman was present during all student interviews):

1. 10/1/25 – Dwight McDonald (faculty)
2. 10/2/25 – Joe Stephens (faculty)
3. 10/2/25 – Terri Morgeson (faculty)
4. 10/8/25 – Madison Wright (student)
5. 10/8/25 – Allison Monacelli (student)
6. 10/14/25 – Pat Metze (faculty)
7. 10/16/25 – Bridget Pembroke (student)
8. 10/21/25 – Ellen Fisher (student)
9. 10/22/25 – Ashanty Wilson Bishop (student)
10. 10/28/25 – Dwight McDonald (faculty) and Sofia Chapman (Associate Dean)
11. 10/28/25 – Jack Nowlin (Dean), Larry Spain (faculty) , and Dwight McDonald (faculty)
12. 11/6/25 – Ken Williams (faculty)
13. 11/7/25 – Kashmala Khan (student)
14. 11/12/25 – Anthony Bomar (student)
15. 11/13/25 – Tristan Perez (student)
16. 11/13/25 – Jakob Gomez (student)
17. 11/14/25 – Rodger Advincula (student)
18. 11/14/25 – Callighan Ard (student)

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

Fisher Appendix: 021

The following information supporting the allegations was gathered from the interviews (all references are to events that occurred on 9/10/25, unless otherwise indicated):

1. Joe Stephens stated that Fisher made the following statements to him:
    a. "They shot Charlie."
    b. "There's video."
    c. "It looks bad."
2. Terri Morgeson stated that she heard Fisher make the following statements to others:
    a. "I'm in such a good mood."
    b. "That mother fucker got shot."
3. Morgeson described Fisher as loud, happy, and celebratory.
4. Morgeson later told Pat Metze and the students who were in his office (including Fisher) that Kirk had just died. Metze responded: "Well, my students are in a very good mood."
5. On the next day (9/11/25), Morgeson told Metze that he and his students had offended Morgeson's students with their behavior the previous day. Metze responded: "Well, it was Ellie."
6. Morgeson's student, Madison Wright, heard Fisher make the following statements:
    a. [to Joe Stephens] "I'm in the best mood ever."
    b. [to Joe Stephens] "They shot Charlie Kirk."
7. Wright was upset by the behavior she witnessed and statements she heard seemingly celebrating Kirk's death and asked Morgeson if she could go home early.
8. Morgeson's student, Allison Monacelli, heard the following statements coming from a female student that sounded like Fisher:
    a. "They got him."
    b. "This is great."
    c. "He's dead."
9. Pat Metze made the following statements about the alleged incident:
    a. Fisher came "bopping into his office" and was "animated."
    b. He recalled Fisher saying that her mother was "really excited" about Kirk's assassination.
    c. When discussing the matter later with Dean Jack Nowlin, along with Dwight McDonald and Larry Spain, Metze told Nowlin that he himself did not celebrate Charlie Kirk's death, but Fisher did. Nowlin told Metze that he should have corrected Fisher's behavior. Metze responded that he "didn't think it was his place." Metze also stated in his meeting with Dean Nowlin that Fisher's behavior was immature, but she was entitled to her opinion. At no time during the lengthy discussion did Metze ever dispute the fact that Fisher had celebrated Charlie Kirk's murder while in his office.

d. Even though Metze later insisted in his interview with me that he couldn't recall any details and was of the opinion that Fisher had done nothing wrong, he eventually stated that:

    i. Fisher was loud and "expressed her happiness."

    ii. Not confirming or denying that Fisher stated, "that mother fucker got shot", Metze responded: "That's a common term in the Black community."

    iii. In response to my question as to whether Fisher could benefit from constructive criticism about her behavior (even if Metze didn't find it objectionable), Metze responded that "she would benefit from talking to a Black, female counselor."

10. While she and Fisher were in Metze's office, Bridget Pembroke stated that Fisher commented that she had been on the phone with her mother earlier about Kirk's assassination. She also stated that Fisher seemed to be repeating her mom's happiness.

11. Ellen Fisher made the following statements:

a. When she briefly spoke to Stephens, he was the one who asked her if she had "heard." She responded: "About what?"

b. While she was in Metze's office, Metze told her and other students who Kirk was. Metze showed her and others the video of the shooting on his phone. Fisher said she didn't look at it.

c. Fisher stated that she never showed anyone the video on her phone.

d. In response to her alleged statement that "that mother fucker got shot", Fisher stated that she doesn't use curse words. She further stated that she would never use that kind of language in the clinic suite because clients are frequently present.

e. Fisher stated that, before the shooting, she hadn't known who Charlie Kirk was.

f. Fisher stated that she didn't talk to her mother about the Kirk assassination until later that day.

g. Fisher agreed that behaving in the manner alleged would be wrong.

h. Fisher agreed that making any of the alleged statements would be unprofessional but also referenced the First Amendment.

12. Anthony Bomar stated that Fisher showed him the video of Kirk's shooting on her phone.

13. Bomar stated that Fisher used "choice" words in her description of Kirk.

14. Bomar believes that, based on Fisher's discussion about Kirk that day, she seemed to know who he was.

15. Tristan Perez stated that Fisher talked about Kirk like she knew who he was.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

16. When Jakob Gomez entered the conference room in the clinic where Fisher was, she was on her phone exclaiming that Kirk had been shot and showing others, including Gomez, the video. He was surprised at the manner in which she was describing the news because she was happy and excited. Gomez stated that he would definitely describe her behavior as celebrating Kirk's death. Gomez also said, "I wanted to say something, but we have to be in the room for two semesters, so I didn't want to get into a fight." Gomez also said, "Had I said something, it would have caused me stress." Gomez also said, "She said he got what he deserved." Gomez also said, "I feel it's not the right environment."

17. Gomez believes that Fisher knew who Kirk was before the shooting because she was quoting something Kirk had once said about the Second Amendment.

18. Callighan Ard stated that Fisher offered to show her the video on her phone.

After conducting my investigation, I am of the opinion, pursuant to Section 4(D), that probable cause exists that you violated the Honor Code and that this matter should be referred to the Honor Council for further disposition.

Sincerely,

William R. Keffer
Janet Scivally and David Copeland Endowed Professor of Energy Law

Cc: Dean Jack Nowlin
Associate Dean Sofia Chapman

# EXHIBIT D

Fisher Appendix: 025

This transcript was exported on Feb 24, 2026 - view latest version here.

Alison Outenbury (00:00:01):

All right, here we go. Okay. I'm going to leave it right here in the middle and I'll go get... Well, I'll let you start first.

Lori Spain (00:00:08):

Yeah, I'm going to make some introductions.

Alison Outenbury (00:00:10):

Yes. Sorry. Okay.

Lori Spain (00:00:12):

So we're recording now?

Alison Outenbury (00:00:13):

We are recording now.

Lori Spain (00:00:18):

Okay. All right. Good morning, everyone. This is an Honor Council hearing involving Ellie Fischer. This hearing will be conducted in accordance with the honor code adopted by the Texas Tech University School of Law. This is an informal, non-adversarial hearing, not a court of law, designed to gather relevant information to allow us, as the Honor Council, to decide whether a violation of the honor code has occurred.

(00:00:52):

Hearing is being recorded at your request. I'm going to start by having everyone introduce themselves for the record. So I'll start. My name is Lori Spain, member of the Faculty School of Law, and I'm chair of the Honor Council.

Amy Herberger (00:01:10):

My name is Amy Herberger. I'm also a faculty at the Law School.

Alison Outenbury (00:01:14):

Alison Outenbury, also faculty at the Law School.

Ellie Owens (00:01:18):

Ellie Owens. I'm a 2L student at the law school.

Lori Spain (00:01:19):

Okay. And do you want to introduce yourself as well?

Michael Allen (00:01:19):

My name is Michael Allen. I'm an attorney and advisor serving the interests of my client, Ellie Fischer.

Lori Spain (00:01:33):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay.

Ellie Mae Fisher (00:01:34):

Ellie Mae Fischer. I'm a 3L law student.

Lori Spain (00:01:35):

Okay.

Alison Outenbury (00:01:38):

Hi, I'm Sophia Chapman. I'm associate dean, dean of students at the Texas Tech School of Law.

Ronnie Wall (00:01:43):

And I'm Ronnie Wall. I'm from the Office of General Counsel.

Lori Spain (00:01:48):

The expectations throughout this hearing is that any individual providing information will be honest and forthright. It is also expected that all individuals involved will conduct themselves in a professional and respectful manner and that no individual will be retaliated against for any statements or information that it's provided.

(00:02:12):

So as chair of the Honor Council, I will oversee and manage the hearing process, make any determinations as to relevancy, grant breaks as necessary, including allowing Ms. Fischer to consult with counsel upon request at any time, and adhere to the procedural requirements set forth in the honor code.

(00:02:36):

As an expectation, prior to this hearing, all panel members have thoroughly reviewed the information provided in the investigation report as well as the affidavit submitted by the student's legal counsel. At this time, can each panel member verbally acknowledge that they have read these materials?

Amy Herberger (00:02:58):

Yes, I have.

Alison Outenbury (00:02:58):

Yes.

Alison Outenbury (00:03:00):

Yes.

Lori Spain (00:03:01):

Ms. Fischer, do you acknowledge that you've received and had an opportunity to review the investigation report as well as the affidavits that have been submitted?

Ellie Mae Fisher (00:03:11):

Fisher Appendix: 027

This transcript was exported on Feb 24, 2026 - view latest version here.

Yes, sir.

Lori Spain (00:03:12):

And we will make those a part of the record of these proceedings as well. Okay. Accordingly, we will move directly into the information-gathering portion of the hearing. Ms. Fischer, you'll have an opportunity to make an opening statement if you so desire. You're not required to, but if you wish to do so, you can do so at this time.

Ellie Mae Fisher (00:03:35):

Yes, sir. I would respectfully request that this Council allow me to make an opening statement. I'm a little bit nervous this morning, so I preprepared something. I also have it here. It's a copy if you guys would like that. I can-

Lori Spain (00:03:54):

A copy of the opening statement?

Ellie Mae Fisher (00:03:54):

Yes, sir.

Lori Spain (00:03:54):

Okay.

Ellie Mae Fisher (00:03:54):

It's a copy. I was going to say, I'm not sure if you want me to pass it along.

Lori Spain (00:03:54):

We'll make that a part of your record as well.

Ellie Mae Fisher (00:03:54):

Sorry. It's kind of a big table. Yeah.

Lori Spain (00:03:58):

Okay.

Ellie Mae Fisher (00:03:58):

And Chair Spain, is it okay if I remain sitting or would-

Lori Spain (00:04:00):

Sure.

Ellie Mae Fisher (00:04:00):

Okay.

This transcript was exported on Feb 24, 2026 - view latest version here.

Lori Spain (00:04:00):

That's fine. This is informal.

Ellie Mae Fisher (00:04:02):

Yes, sir. Good morning, members of the council. I really appreciate everybody taking their time being here today. I'm a little bit nervous, so I would appreciate if everybody just bears with me. In addition, I am going to read through this. I hope not to take too much of y'all's time, but I really appreciate you guys giving me this opportunity.

(00:04:23):

So good morning, members and Chair of the Honor Council. I appear before you with respect for this institution and for the responsibility laid on your shoulders. You must determine whether my actions on September 10th, 2025, in the aftermath of the assassination of public figure Charlie Kirk violated section H, Violation of Professional Duties, of the Texas Tech University School of Law Honor Code.

(00:04:46):

Section H provides a student may violate this code by failing to uphold professional or fiduciary obligations, including but not limited to performance related to clinical programs, Student Bar Association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. It further reflects the foundational principle of our honor code, that we all must act with honor and integrity in matters pertaining to legal education.

(00:05:10):

I would first like to address the standard of evidence. Importantly, you must make your determination based on clear and convincing evidence. I understand that this council is not bound by the formal rules of evidence applicable in civil or criminal matters. Yet this council is bound to follow its own rules that require a clear and convincing standard.

(00:05:27):

This means in Texas, to find a violation, the evidence must weigh heavier than merely the greater weight of criminal evidence. This is not as strict as beyond the reasonable doubt, but it is the highest of standard of proof in the civil law, absent quasi-criminal issues such as the involuntary civil commitment of the mentally ill. To underscore the seriousness of the standard of proof that you must apply, Texas law reserves this clear and convincing standard for such critical issues like severing the parent-child relationship and terminating parental rights.

(00:05:55):

The clear and convincing standard requires the firm belief or conviction of the truth of allegations, not just a modicum of proof on one side that outweighs the other by a feather. It certainly requires more evidence than individuals' attestations that their subjective feelings may have been hurt, which some of the allegations in the Keffer report appear to dwell upon. I emphasize this only to underscore the heavy burden the university must carry.

(00:06:18):

I'd now like to briefly address the Keffer report. This matter was referred to the Honor Council by Professor William Keffer following his investigation and conclusion that probable cause, by contrast one of the lowest possible standards of proof, existed in my conduct on September 10th constituting a violation of Section H.

(00:06:35):

This transcript was exported on Feb 24, 2026 - view latest version here.

I stand before you, well, sitting after all that is followed since September 10th, with a heavy heart. A lot has been said about that day, much has been assumed. And yet this matter is not only about my actions, it is also about the fairness and integrity of this process.

(00:06:51):

To my knowledge, and as other students attest under oath in affidavits provided to this council, I do not believe that I acted any differently than other students that day. And yet, as far as I know, it is only I that have been brought before this council. You will see that the witnesses who have submitted affidavits demonstrate that Professor Keffer's referral was not fashioned from the whole of the evidence, but from a selection calculated to place me in the worst possible light, and not least by excluding evidence that other students acted in the same way or did not proceed in the unprofessional behavior.

(00:07:19):

Another example: I requested that Professor Kenneth Williams appears before this council. He would tell you that another student, Henry Teske, first announced in class that Charlie Kirk had been shot and words to the effect that he was a right-wing or a right-winger.

(00:07:32):

This is relevant for two reasons. First, it is further evidence that students did exactly what I'm accused of, but Henry Teske, who is significantly not Black, has not been charged or investigated. It is also relevant because Professor Williams was told that his testimony is irrelevant and was excluded from this hearing. In fact, he was excluded altogether from the Keffer report.

(00:07:51):

This does not indicate an attempt to apply the honor code consistently. Instead, it suggests an effort to shape the truth to fit a forgone verdict. Our honor code calls everyone to act with integrity, professors and students alike. It has been crafted to build us up, to show the courage and earn the public trust of the practice of law requires, but that sacred charge binds faculty, staff, and the very process by which we are judged.

(00:08:13):

When exculpatory evidence is intentionally set aside and excluded, the integrity and reliability of that process must be examined with the utmost seriousness and care. I humbly submit that it also fails the test of clear and convincing evidence.

(00:08:25):

I therefore humbly ask that you not only look to the allegations in the Keffer report, but please also look to the completeness of the evidence and the partiality of the investigation itself.

(00:08:35):

Now I'd like to turn to the facts. I fully understand by making this statement, I obligate myself to answer y'all's questions. Let me therefore give you a little bit of an account of what happened that day.

(00:08:45):

I believe the events that unfolded were confined to approximately two to three hours between when the shooting of Charlie Kirk was made known through social and general media in Professor Williams' class and about 5:00 PM when I went home. As I already indicated, we discussed Kirk's shooting in Professor Williams' class. I particularly remember discussing whether the gunshot would've been fatal.

(00:09:04):

This transcript was exported on Feb 24, 2026 - view latest version here.

Students were sharing videos which had just become publicly known. I had not much known about Charlie Kirk prior to that time, but news exploded across the internet. I quickly became increasingly informed, as everyone did, as we shared the news on our phones. Had this disrupted class, I firmly believe Professor Williams would've stopped it. As that was a Race and Racism class, I, for one, believe the events surrounding Charlie Kirk's assassination fell within the course.

(00:09:26):

After class, I walked downstairs to Professor Metz's office. I remember Ashanti Bishop and Bridget Pembroke were there. I also stopped to discuss the matter briefly with Professor Joe Stevens. I did not show Professor Stevens a video. I did ask if he had heard the news, and we talked about the shooting probably for less than 30 seconds.

(00:09:43):

Then the same kind of conversation that we had towards the end of Professor Williams' class continued in Professor Metz's office. Again, I learned more and more about Charlie Kirk. I confess, I didn't like what I learned about the man because we do not share the same political viewpoints, but I don't think that that entitles anyone to take another's life, certainly not in front of his wife and children, and definitely not on national TV.

(00:10:04):

I deny calling Charlie Kirk a "motherfucker." In the report, no student testifies to that. In the affidavit, no student testifies to that. Neither Professor Stevens nor Professor Metz say that, only Professor Morgeson. The clear and convincing weight of evidence is therefore against it.

(00:10:20):

Student shared videos and, as I recall, so too did Professor Metz. I cannot say any longer what any single individual shared with any other single individual, including myself, especially in the content. I do know that commentary among students, as well as online, included that Kirk was "a racist" and a gun nut or a transphobe, among other critical views. But there was also hero-worship of Kirk.

(00:10:43):

I did not know when, but at some point Professor Morgeson poked her head into the office to announce Charlie Kirk is dead, or other words to that effect. I'm still unclear as to why what I said or did was somehow more disruptive to her Family Law clinic students, if it was even disruptive at all. I remember Family Law clinic students outside Professor Metz's office, but I believe that Professor Stevens and Professor Morgeson will tell you that students in the Family Law clinic were also talking about Charlie Kirk's murder.

(00:11:08):

At some point I continued down to the hall to the clinic office, which serves as some kind of common area for clinical students. The conversation continued. Again, there was discussion of whether or not Charlie Kirk had died and discussion of political viewpoints. I think, again, there were different points of view.

(00:11:23):

I believe Anthony Beaumar will tell you the view that Charlie Kirk was a "racist" is a common thing among clinic law students. From what I know, Anthony Beaumar is conservative and does not share that view. I've always considered Anthony my friend, and I hope he still considers me his. At no point did our conversation seem out of the ordinary or disrupt the clinic office.

(00:11:41):

This transcript was exported on Feb 24, 2026 - view latest version here.

In closing, I'd like to say one last thing. Professor Keffer seems to rise the First Amendment in his report, but please conduct this thought experiment. Please accept the investigation's version of what was said as true. Please disregard, as Professor Keffer did, exculpatory evidence as "irrelevant."

(00:11:59):

I believe you all know, as attorneys with decades of experience, that all of the alleged speech is constitutionally protected. For example, the First Amendment does not permit the state of Texas to discipline students for private conversations with their mother. I think you know that there is no evidence of disruption to clinical programs. A far greater disruption has been the removal of Professor Metz for his protected speech.

(00:12:19):

Texas Tech School of Law is a state school and cannot discipline protected expression. Charlie Kirk and all that he stood for was in the public sphere, not to mention his tragic public assassination. We therefore know this speech addressed a matter of public concern. I believe you also know that the discussion of this School of Law is what the School of Law is actually for.

(00:12:37):

As Professor Metz states, Texas Tech is not a third grade schoolyard. Absent narrow exceptions that are not present here, all of this speech is protected. My academic standing, my future in this noble profession, and my good name as a law student and future attorney stand in the balance.

(00:12:52):

You hold the authority to ensure the justice within the school is done rightly and in accordance with the clear and convincing standard you are sworn to uphold. When all the evidence is laid bare before you, the whole of it, I trust you will find but one conclusion consistent with that burden: that my actions on September 10th, 2025, did not violate Section H nor any provision of our honor code.

(00:13:11):

Thank you.

Lori Spain (00:13:12):

Thank you. Do you want to see if Joe Stevens is available first?

Alison Outenbury (00:13:17):

Yep. Uh-huh.

Lori Spain (00:13:18):

Because I know he has an appointment.

Alison Outenbury (00:13:19):

Yes. I'm just going to check. Excuse me. Test, test, test. Okay. Still going. Thank you.

(00:13:28):

I'm going to go ahead and have you... I'll go ahead and have you take a seat here if that's okay. And we've got a recording going, so if you'll speak up.

Professor Joe Stevens (00:14:40):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay. I can do that for the record.

Lori Spain (00:14:41):

Morning, Joe.

Professor Joe Stevens (00:14:41):

How are you?

Lori Spain (00:14:46):

Could you state your name for the record?

Professor Joe Stevens (00:14:48):

Joe Stevens.

Lori Spain (00:14:49):

Okay. We are interested in finding out any information from you as to the events that occurred on September 10th, 2025, shortly after the shooting of Charlie Kirk. Do you remember that day?

Professor Joe Stevens (00:15:09):

I do.

Lori Spain (00:15:10):

Okay.

Professor Joe Stevens (00:15:10):

Yeah.

Lori Spain (00:15:12):

Okay. And did you have any interactions with Ellie Fischer that day?

Professor Joe Stevens (00:15:15):

I did.

Lori Spain (00:15:16):

Okay. Could you explain what the nature of those contacts were?

Professor Joe Stevens (00:15:24):

Yeah.

Lori Spain (00:15:24):

As best you can.

Professor Joe Stevens (00:15:25):

This transcript was exported on Feb 24, 2026 - view latest version here.

Sure. I had been in court in Castro County that morning with a student, which is notable only because of how far away it is. And we got back shortly before lunch, I would assume, about a 160 mile roundtrip.

(00:15:45):

I came back from court, and I was in my office, and Ellie came in. My office is at the beginning of the clinic hallway.

Lori Spain (00:15:55):

It's towards the front of the clinic space.

Professor Joe Stevens (00:15:57):

Yeah.

Lori Spain (00:15:58):

Okay.

Professor Joe Stevens (00:15:58):

Other than Melissa's and Nancy's is the first one that you come from.

Lori Spain (00:16:00):

Okay. And is the Family Law clinic workroom directly across from your office?

Professor Joe Stevens (00:16:09):

It is.

Lori Spain (00:16:09):

Okay.

Professor Joe Stevens (00:16:12):

And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, "No." I didn't know who Charlie was. And she said, " It looks bad," and at some point said something that it's all over the Internet or something like that.

Lori Spain (00:16:39):

Had you been aware of the shooting prior to that?

Professor Joe Stevens (00:16:42):

No, and I'd spent the entire morning in the car with a student, and we had been talking about cases, we'd been in court, and the degree to which we were even listening to anything, there was no way that we would've been informed. He didn't tell me, we weren't listening to news or anything.

(00:17:01):

I also don't do that. I have enough drama in my work life.

Lori Spain (00:17:09):

This transcript was exported on Feb 24, 2026 - view latest version here.

So you didn't ask her if she had heard of the shooting?

Professor Joe Stevens ([00:17:13](#)):
I did not.

Lori Spain ([00:17:14](#)):
Okay, okay.

Professor Joe Stevens ([00:17:15](#)):
No. But that was it. It was obviously a very newsworthy event. Ellie and I think a lot of students, when Ellie left my office, I was aware that this was a buzz in the law school. People were finding out.

([00:17:38](#)):
I am not one who is on social media. I have an Instagram account, but I'm not really on Twitter. I don't have any social media. I don't really absorb news or listen to news podcasts. It's just not the thing that matters to me.

([00:17:51](#)):
But that interaction was 30 seconds and then that was it.

Lori Spain ([00:17:59](#)):
Okay. Did she attempt to show you a video of the shooting?

Professor Joe Stevens ([00:18:02](#)):
No, she let me know that it was, as other people did later, that it was all across the Internet. But to my knowledge, there was no effort on her part to show me except to let me know that it was everywhere, and that obviously turned out to be true.

Lori Spain ([00:18:23](#)):
Okay. Were her actions disruptive at all?

Professor Joe Stevens ([00:18:27](#)):
I didn't get a sense that they were, to me. When that news trickled out nationally, it was obviously quite nationally disruptive. So I imagine that people, when they found out about it, were also affected by it in different ways.

([00:18:48](#)):
To be frank, I handle cases where there's a lot of difficult subject matter associated with them. And the way that she told me, it was kind of like, "Okay, this is just informative news." Again, I've interacted with Ellie a lot this semester, much more substantially than the 30 seconds she was in my office that day.

([00:19:17](#)):
And Ellie is a passionate person, and Ellie is an animated person. She cares a lot about the work that she does in the clinic. And the way that she was in that moment felt very in keeping with the way that she is when she's talking about a client or when she's talking about someone that she is trying to get out of jail or get their case dismissed. So it didn't feel out of the sync with who she is in that moment, for me.

This transcript was exported on Feb 24, 2026 - view latest version here.

Lori Spain (00:19:42):

Did she make any other statements that you can recall? Any specific statements?

Professor Joe Stevens (00:19:47):

None that I can-

Lori Spain (00:19:47):

Other than what you've relayed?

Professor Joe Stevens (00:19:48):

No.

Lori Spain (00:19:48):

Okay.

Professor Joe Stevens (00:19:48):

None that I can remember that day.

Lori Spain (00:19:52):

Do you know if there were any other persons in the vicinity that day?

Professor Joe Stevens (00:19:57):

No, I just... As you described earlier, when I walk in that clinic hallway, I go to my office on the right. I don't remember if Nancy and Melissa were there. I would see them, but I don't remember if they were there.

(00:20:08):

When Ellie left, I remember because I'm directly across the Family Law clinic, the Family Law clinic was... There were people in that clinic, the doors, I don't know if they were open or not. I assume mine was. But those are the only people that I remember just seeing because I see them every day.

Lori Spain (00:20:27):

Okay. Any other members of the council have questions?

Amy Herberger (00:20:32):

I just have two really quick questions. So you mentioned that you've interacted quite a bit with Ellie. So I'm to assume there was nothing unusual about her popping her head into your office to chat with you about this or anything else?

Professor Joe Stevens (00:20:46):

No, not at all. And I think that's a point actually worth underscoring. She, dozens of times last semester, would come down and we'd talk about cases or she'd say she's got a situation, she's trying to get another opinion on what to do. I have students in my own clinic who don't come and talk to me as much

This transcript was exported on Feb 24, 2026 - view latest version here.

as Ellie does, and Ellie would really... She cares about the work that she does, and that has been 99% of the substance of the conversations we've had.

(00:21:20):

So nothing unusual about it at all, and I encourage that. I want people to feel comfortable coming to us and talking to us.

Amy Herberger (00:21:27):

So I guess my last question is just to sort of confirm, I know it was a long time ago, but how would you characterize the way that she was giving you this information?

Professor Joe Stevens (00:21:36):

The way that I took it, I remember when she left, I was like... Because I obviously know who Charlie Kirk is, but I don't... We got on my computer and I looked, and indeed she was right. He had been shot. At that point, I don't think he had been pronounced dead, but I was kind of taken aback.

(00:21:55):

And as I recall, we then had a clinic... I don't know if this is true, but we had a clinic-wide safety meeting. Maybe it was that day. It was definitely scheduled for that day. Maybe it was changed, but I was so in between things that I remember looking and then having to go into something else.

(00:22:12):

Ellie's demeanor to me was no different that day when she comes down and she's talking about, "What's happening to my client is not right." And there's passion behind what she says and what she does, but it didn't feel at all out of character. When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong."

Lori Spain (00:22:30):

Anyone else have questions?

Amy Herberger (00:22:41):

No.

Lori Spain (00:22:42):

Ellie, do you have any questions?

Ellie Mae Fisher (00:22:45):

Yes, just a few, please.

Lori Spain (00:22:45):

Okay.

Ellie Mae Fisher (00:22:46):

Professor Stevens, I want to keep it really quick. I really appreciate you for being here. So just for a little bit of context, I want to set the scene. When I walked past your office, that's because I was walking through the front doors and headed back, correct?

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Joe Stevens (00:23:00):

I would assume so.

Ellie Mae Fisher (00:23:02):

Okay, right. So I was just trying to... For the people who aren't familiar with the clinic, I was trying to just set up where it is and things like that. And to the best of your recollection, your door was open?

Professor Joe Stevens (00:23:11):

[inaudible 00:23:13].

Ellie Mae Fisher (00:23:12):

Okay. And so you testified, and the chair also mentioned that I made the following statements to you on the date in question, "They shot Charlie." "There's video." "It looks bad." Is that correct?

Professor Joe Stevens (00:23:25):

That sounds right to me, yes.

Ellie Mae Fisher (00:23:27):

And to the best of your knowledge, are any of those statements false?

Professor Joe Stevens (00:23:30):

No.

Ellie Mae Fisher (00:23:31):

And would you recall me saying any words to the effect of, "They shot the motherfucker"?

Professor Joe Stevens (00:23:35):

I don't remember you saying that, Ellie, not to me.

Ellie Mae Fisher (00:23:38):

Was that a question asked to you by Professor Keffer in his investigation?

Professor Joe Stevens (00:23:46):

I don't remember if he asked me that specifically, but what's in the report about what I remember you saying is the extent of evidence.

Ellie Mae Fisher (00:23:57):

I did not show you a video of Charlie Kirk's assassination, right?

Professor Joe Stevens (00:24:00):

No, you did not.

Ellie Mae Fisher (00:24:01):

This transcript was exported on Feb 24, 2026 - view latest version here.

And you recall saying that to Professor Keffer as well?

Professor Joe Stevens (00:24:05):

Yes, I would imagine... If he had asked me that, I would've said the same thing.

Ellie Mae Fisher (00:24:08):

And so after, if you asked that question, do you know any reason why that wouldn't be included in his investigation report?

Professor Joe Stevens (00:24:15):

No, I don't.

Ellie Mae Fisher (00:24:16):

Based on our very brief conversation on the date in question, do you believe that I was providing this information or intentionally misleading you in any way?

Professor Joe Stevens (00:24:23):

No.

Ellie Mae Fisher (00:24:24):

And in your view, did my statements constitute unprofessional conduct?

Professor Joe Stevens (00:24:29):

No.

Ellie Mae Fisher (00:24:29):

Do you believe anything that I said with you during our conversation violated any probation of the honor code as you're familiar with it?

Professor Joe Stevens (00:24:37):

Yes, I don't think that your interaction with me did not be violate anything that I know about the honor code.

Ellie Mae Fisher (00:24:45):

Professor Stevens, did you hear other students in the clinic offices speaking about the public assassination of Charlie Kirk?

Professor Joe Stevens (00:24:51):

Yeah, later that day, for sure. Everyone was speaking of it.

Ellie Mae Fisher (00:24:59):

And do you recall students in the other clinical programs such as the Family Law clinic assessing the assassination of Charlie Kirk?

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Joe Stevens (00:25:06):

Yeah, I remember later that day as well that... It came up. "Have you heard what happened? Did you see what happened?" Things like that. Yeah, people were talking about it in that clinic. People were talking about it in my clinic. People were talking about it.

(00:25:23):

Obviously, both criminal clinics are at the end of the hallway, and I remember getting a cup of coffee and people were stirring about it there too.

Ellie Mae Fisher (00:25:30):

And any of those conversations by students, other than myself, would you consider that to be unprofessional?

Professor Joe Stevens (00:25:37):

I don't remember hearing anyone actually talk about it in an unprofessional way.

Ellie Mae Fisher (00:25:42):

And last question, I promise we'll get you out of here. Have you heard that any of the other students were investigated by this law school for unprofessional behavior or honor code violations?

Professor Joe Stevens (00:26:03):

I have not.

Ellie Mae Fisher (00:26:03):

No further questions, Chair Spain.

Lori Spain (00:26:03):

Okay.

Ellie Mae Fisher (00:26:03):

Thank you so much, Professor Stevens.

Lori Spain (00:26:03):

Any other questions before we dismiss? Thanks.

Professor Joe Stevens (00:26:03):

Thank you.

Alison Outenbury (00:27:05):

You can sit right here.

Terri Morgeson (00:27:07):

Okay.

This transcript was exported on Feb 24, 2026 - view latest version here.

Alison Outenbury (00:27:07):

And I'm going to double check to just make sure that our recording is still going.

Terri Morgeson (00:27:12):

Okay.

Alison Outenbury (00:27:14):

Hello? Hello? Hello. Okay. Okay.

Lori Spain (00:27:15):

All right. All right. Do you want to introduce yourself for the record?

Terri Morgeson (00:27:25):

Yes. My name is Terri Morgeson. I'm the director of the Family Law clinic at Texas Tech.

Lori Spain (00:27:30):

Okay. And do you recall the events that occurred on September 10th of 2025?

Terri Morgeson (00:27:38):

Yes.

Lori Spain (00:27:39):

The day that Charlie Kirk was shot?

Terri Morgeson (00:27:41):

Yes, sir.

Lori Spain (00:27:45):

Okay. Can you kind of briefly explain what occurred that day, particularly in relationship to Ellie Fischer?

Terri Morgeson (00:27:54):

Yes, sir. So I had just got through teaching ISL class, and it is my custom that when I finish teaching a class, that I'm gone from the clinic for a period of time, that I check in with my students. So I was in my clinic speaking to two students, specifically Alison Monticelli and Madison Wright. And-

Lori Spain (00:28:14):

Was that in the clinic workspace for the Family-

Terri Morgeson (00:28:17):

Yeah, in my designated clinic workspace.

Lori Spain (00:28:20):

And where is that located in relationship to the clinic space, I guess?

This transcript was exported on Feb 24, 2026 - view latest version here.

Terri Morgeson (00:28:28):

It's the very first clinic, like past the offices, we have that reception area where Nancy Mojica sits, and then Melissa has her office right there at the front. But it is the first student space when you're walking down the hallway on your left.

Lori Spain (00:28:46):

And it's directly across from Professor Stevens' office?

Terri Morgeson (00:28:50):

Yes, it is literally directly across.

Lori Spain (00:28:52):

Okay, okay. So you want to continue on in terms of what you observed?

Terri Morgeson (00:28:58):

Yes. So as I'm sitting in there talking to Madison and Ali, I hear the doors of the clinic open, and I hear... I don't see her at first, but I hear Ms. Fischer walk in. She's making statements about, and it's loudly, "It's the best day ever. I'm so happy." And she's making these statements as she's walking down the hallway.

Lori Spain (00:29:20):

So those occurred in the reception area?

Terri Morgeson (00:29:24):

Yes, sir.

Lori Spain (00:29:24):

In the hallway?

Terri Morgeson (00:29:25):

Yes sir.

Lori Spain (00:29:25):

Even before she got to Professor Stevens' office?

Terri Morgeson (00:29:27):

Yes. And she was making them as she was walking in, just saying them out loud, not speaking to anybody, she was making those statements as she walked into the clinic. And then she gets to the doorway of Professor Stevens' office. He's in there, he's working on his computer. And I can see at this point, out of my periphery vision, she walks in and she's like, "It's the best day ever. Have you heard?" And he was very confused. And then she tells him that she's so happy because Charlie Kirk has died. And I hear Professor Stevens immediately respond, "Don't do that. Don't say that. Don't do that."

(00:30:16):

This transcript was exported on Feb 24, 2026 - view latest version here.

I know that there was more interaction. I believe she asked him if he knew who Charlie Kirk was. He said that he did. And that at that point in time, I leave my students because I've checked in with them, I go and I sit in my office. My office is... It's on the same side as Joe Stevens, and I'm kind of sandwiched in between Joe Stevens and Professor Metz, who was the director of the Criminal Defense clinic at that time.

(00:30:48):

There is a little bit of a delay. I don't remember how long, but then I see Ms. Fischer walking in the hallway and kind of... I can hear her standing in the doorway of Professor Metz's office, and I hear her say, "They shot that motherfucker." That's what I remember. And then she goes into Professor Metz's office, and they start talking about the video and kind of laughing and carrying on about that video.

Lori Spain (00:31:22):

You're certain as to the statement that she made?

Terri Morgeson (00:31:30):

I know she made a statement that she was happy... I don't know if she said "motherfucker." That could have been Professor Metz. But I do know that she made a statement, just being very happy that he had been shot. He had not died at that point.

(00:31:49):

And then I do remember her walking into Professor Metz's office, and they started watching the video because I hear Professor Metz say, "Look at his head. Look at his head. Nobody can survive that. Look at his head." And I get up, I call myself the noise monitor of the clinic. And I get up and I start shutting clinic doors because we have students who do not have... They have a variety of political beliefs. That's what makes the clinic great. And I don't want anybody to be offended about what I can hear in that room.

(00:32:25):

So I go back to my clinic office, I'm like, "Are y'all okay? I'm going to shut the door." And at that point in time, I receive a text from Sarah Hudman, who's a professional colleague of mine, saying, "Charlie Kirk is dead." So at that point in time, I shut the Family Law clinic office. I walk to see that your clinic office is closed. I walk into Professor Metz's office and I say, "By the way, he's dead." And I shut the door.

(00:32:58):

And then I walk all the way down the clinic hallway. I make sure that Tax is closed, I make sure that Professor Ryan's office is closed, and I make sure that the Criminal Defense clinic office is closed. And then I walk back to my office and continue to work.

Lori Spain (00:33:15):

So just to clarify, do you recall who made the statement, "That motherfucker got shot"? You said you didn't know-

Terri Morgeson (00:33:34):

I don't. I don't. And I've tried to remember, I think I was very vague in that in my statement to Professor Keffer. I don't remember who said it, but I do remember Ms. Fischer being very exuberant that he had been shot and that when she went into Professor Metz's office, they were very happy that he had been shot. And there was lots of discussion about, "He has to be dead. My daughter is a nurse. There's no way you can survive that."

This transcript was exported on Feb 24, 2026 - view latest version here.

Terri Morgeson (00:34:03):

My daughter is a nurse, there's no way you can survive that, and just lots of discussion about that. And that he was a horrible person and that he deserved it.

PART 1 OF 6 ENDS [00:34:04]

Moderator (00:34:13):

Did you consider Ms. Fisher's conduct that day unprofessional?

Terri Morgeson (00:34:19):

I considered it inappropriate for the setting, considering the diversity of students, which is why I was shutting doors because I did not want other students to be offended. She is not my student, I do not believe it's my responsibility to correct her. She was in the criminal clinics and I considered that to be her view of Professor Metz. And I do believe that Professor Stevens did try to quash those statements from her. That's what I heard him do.

Moderator (00:34:55):

How did your students react to the situation?

Terri Morgeson (00:34:58):

They were shocked and offended. That's why I went back to check on him. Lots of shaking their head in disgust. And then after we knew that he had died and I had shut the doors, they specifically came to my office and asked to be able to leave so they wouldn't have to listen to it anymore. And I granted them permission even though that was their designated office hours and we don't normally do that.

Moderator (00:35:28):

Did you have any discussions with Professor Metz the next day?

Terri Morgeson (00:35:31):

Yes, I did.

Moderator (00:35:35):

Okay. What was the content to her? What was the subject matter about?

Terri Morgeson (00:35:39):

It was the fact that I had hoped that none of the other students had heard him. There is a history between him and specifically the Federal Society. He had kind of gotten into it with them in years before. The year prior I had the president of FedSoc in my clinic, so I knew that those students were kind of integrated into the clinical setting. And I told him, I was like, "I hope nobody heard that. I hope nobody who is Republican and right-leaning, or a member of FedSoc had heard that. I think it's going to cause you some problems."

Moderator (00:36:19):

Anybody else have questions?

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 2 (00:36:21):

Yeah, I have a few. So just going back to the beginning, when you talked about what you had overheard in Professor Stevens office. In your recollection, did you mention that part? Did that come up in your discussion with Professor Keffer when you were initially interviewed, that Professor Stevens had asked Ms. Fisher, or at least indicated to her that maybe what she was saying was not appropriate?

Terri Morgeson (00:36:45):

Yes.

Speaker 2 (00:36:46):

Okay.

Terri Morgeson (00:36:46):

His response was immediate. It stands out immediately in my mind.

Speaker 2 (00:36:52):

And then, so Professor Stang kind of got to this, but I just wanted to dig in a little bit more on sort of, I haven't spent a lot of time in the clinic, so I'm a little unclear on the layout and how easy it's to overhear things. But you were confident that whatever was going on in Professor Metz's office, when Ms. Fisher was in there, was overheard by either people on your side or just other people in the clinic, before you close the door?

Terri Morgeson (00:37:22):

The walls are, they're like stone. I don't even know what they're made out of, but everything echoes down that hallway. Even if you're just talking to a student in your office, if you project too much, it just echoes. That's why, I mean, it sounds bad, but I'm always shutting doors because you can just overhear stuff, and confidentiality, and it drives me nuts when people are loud in the hallway. And particularly when you are standing in a doorway, like she was before she walked in, that is heard by everyone in that space.

Speaker 2 (00:38:00):

Okay. And when you put your head in Professor Metz's office to close the door, who was in there at that time?

Terri Morgeson (00:38:09):

I remember Ms. Fisher sitting on the couch with Ashanti, I'm sorry, I don't know her name. There was another student in there who I do not remember who it was. Professor Metz is sitting behind his desk with his phone in his hand, and yeah. Yeah.

Speaker 2 (00:38:29):

Okay. And do you recall anybody else participating in the conversation? Did you hear other voices besides Ms. Fisher and Professor Metz?

Terri Morgeson (00:38:38):

This transcript was exported on Feb 24, 2026 - view latest version here.

No. I remember Ashanti being on her computer, it looked like she was doing some sort of task. I don't remember hearing her.

Speaker 2 (00:38:45):

Okay. And then turning to the students, I assume that were in your clinic, when you said you were asking them if they were okay. Can you just provide some specific, you said shaking their head, what was said or what was other evidence did you take to show that they were offended or upset before they asked to leave? I have more questions about that too.

Terri Morgeson (00:39:15):

I remember one of the students shaking her head. I remember them saying that that's not appropriate. I remember, yeah, I just remember them shaking her head at her when she was doing that. I remember there being eye rolling like it shouldn't have happened.

Speaker 2 (00:39:36):

Okay. And do you have any way of knowing if they were feeling that way based on her statements or Professor Metz's statements, or a combination? Was there any statements made by them about Ms. Fisher specifically?

Terri Morgeson (00:39:49):

Their reaction was to her walking down the hallway and the interaction with Joe. I did not ask them after I sat down at my desk and when I went back the second time to ask them if they were okay, I did not stay in the room that long. I was literally, "Are y'all okay?" Yes. And I remember shutting the door and walking back.

Speaker 2 (00:40:11):

And so you know that it was attached to her initial statements because of the timing of when you asked them, "Are they okay?"

Terri Morgeson (00:40:16):

Mm-hmm.

Speaker 2 (00:40:16):

Okay. And then can you let us know who, you said some students or student asked to leave because they were upset. Was that multiple students? One student? Can you tell us who that was?

Terri Morgeson (00:40:27):

It was my two students. It was Madison Wright and Allison [inaudible 00:40:29]

Speaker 2 (00:40:29):

Okay. Those were the only questions I had.

Moderator (00:40:37):

Anybody else?

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 3 (00:40:41):

I had a question. I know you said that there was students, you mentioned the students in there when you poked your head in. When she was standing in the doorway, do you remember seeing any students in there specifically in that moment? Or would they have came in after?

Terri Morgeson (00:40:55):

I don't know if Ashanti and the other student were in there when she walked in. I just know that when I went to shut the door, they were in there. I don't remember when they entered the office.

Speaker 2 (00:41:10):

Actually, can I ask one more question? Are you done?

Speaker 3 (00:41:11):

Yes.

Speaker 2 (00:41:14):

I don't mean to interrupt. Again, I'm confused about the layout of the clinic. I understand that the, I'm just visual sight lines is what I'm interested in-

Terri Morgeson (00:41:21):

Do you want me to draw it?

Speaker 2 (00:41:22):

No, no, it's fine. I'm sort of putting it together in my head. But from your office, either from your office or from your workspace, can you see into Professor Metz's office?

Terri Morgeson (00:41:33):

No.

Speaker 2 (00:41:33):

Okay.

Terri Morgeson (00:41:33):

I can't.

Speaker 2 (00:41:33):

[inaudible 00:41:36]

Terri Morgeson (00:41:35):

... this way, and of course, but I can see, when she's walking down the hallway and she's making the corner, she's literally like this far away from my door, right?

Speaker 2 (00:41:45):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay.

Terri Morgeson (00:41:45):

So I can just see that she's kind of turned. And I remember she had a black sweatshirt and it has something on the back that was white. And I remember seeing that as she's kind of standing inside his doorway before she walks in. And that's when she makes a comment ... I just don't remember if she cussed, but she said they shot ...

Speaker 2 (00:42:10):

And same thing when you said in the beginning, you heard a voice, you weren't sure where it was, but then you were able to put that together because she became visible as she moved into Professor Stevens office. Is that ...

Terri Morgeson (00:42:23):

No, you got the timeline wrong. Okay.

Speaker 2 (00:42:25):

No, no, that's at the beginning. I understand. I'm switching. It's my fault, I'm going out of order.

Terri Morgeson (00:42:28):

No, when she's walking down the hallway, I am kind of leaning up against the desk parallel again to the doorway. And so when she walks by and she's standing there talking to Professor Stevens, she's clearly in my eyesight, all I can do is turn my head.

Speaker 2 (00:42:45):

Oh, okay.

Terri Morgeson (00:42:45):

She's right there.

Speaker 2 (00:42:47):

Okay, great. I was just confused by your, that you started to hear her before you saw her type of thing.

Terri Morgeson (00:42:51):

Right. Because when she comes in the doors, the double doors of the clinic, she is loud. She's like, "I'm having the best day." She's projecting.

Speaker 2 (00:43:04):

Okay.

Terri Morgeson (00:43:07):

I perceived she wanted engagement, she wanted to talk to somebody, she wanted to talk about it.

Speaker 2 (00:43:12):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay. Thank you.

Moderator (00:43:12):
Anything else [inaudible 00:43:17]?

Ms. Fisher (00:43:21):
Just a few questions, Professor Morgeson. I really appreciate you being here today. So just to kind of get it clear, you testified earlier to Professor Keffer that in the report that I said, and you heard me say, quote, "I'm in such a good mood," and quote, "That motherfucker got shot." Is that correct?

Terri Morgeson (00:43:37):
Mm-hmm.

Ms. Fisher (00:43:40):
But today you don't recall if I used the term motherfucker, would that be fair to say?

Terri Morgeson (00:43:44):
That's fair to say. And that's what I remember. I told Professor Keffer, it was the one thing that I was iffy about of whether or not you said it or whether or not Professor Metz said it. And I specifically always me and shaky on that term.

Ms. Fisher (00:44:00):
Well, do you have any reason to wonder or understand why that wouldn't be included in the final investigative report?

Terri Morgeson (00:44:07):
All I know is that I'm telling the truth of what I remember. I did not help Professor Keffer write that report, but I have always been consistent on that point.

Ms. Fisher (00:44:17):
I think we all know, but just to be clear, do I sound similarly to Professor Metz?

Terri Morgeson (00:44:22):
Not at all.

Ms. Fisher (00:44:24):
Okay. And so it would be fair to say that somebody would probably be able to differentiate between our voices.

Terri Morgeson (00:44:32):
Mm-hmm.

Ms. Fisher (00:44:33):

This transcript was exported on Feb 24, 2026 - view latest version here.

And so, to your knowledge, Professor Morgeson, do you recall anybody else hearing me make the statements quote, "I'm in such a good mood," or, "The motherfucker got shot?"

Terri Morgeson (00:44:44):

As far as you being in a good mood, Allison and Madison heard you say that when you walked in. So again, I did not review Professor Keffer's report, but yes, they heard you say that. But you were standing at Professor Metz's office door when you made the second statement. I don't know if they heard you or not, I wasn't with them at that time.

Ms. Fisher (00:45:07):

Well, just I'll break them down. So for the second statement, quote, "The motherfucker got shot," you would be the only person who's testified or it comes out in the report that you heard me make those statements directly?

Terri Morgeson (00:45:22):

I have been consistent in saying, "I don't know if you said motherfucker." I do remember you standing at his doorway being exuberant that Charlie Kirk got shot.

Ms. Fisher (00:45:33):

Okay. Perfect. Well, for sake of argument, we'll just take the whole MF word out of it. If you heard me make the statement, "He got shot," would that be factually incorrect or false in any way?

Terri Morgeson (00:45:45):

No.

Ms. Fisher (00:45:47):

And kind of jumping back to when you mentioned that you heard me in Professor Stevens's office discussing that he's dead, but Charlie Kirk wasn't actually-

Terri Morgeson (00:45:58):

No, no, no.

Ms. Fisher (00:45:59):

Did I get that mixed up?

Terri Morgeson (00:46:00):

You did. You got that very mixed up. You were, "Have you heard he got shot," and you were very happy that he got shot. And then when you asked Professor Stevens had he heard, he told you not to do that ... He told you. What I remember him saying is, "Don't do that. Don't come in here with that. Don't do that. That's not appropriate." And then he engaged with you about that and told you that that was not an appropriate discussion to be having in a clinical setting.

Ms. Fisher (00:46:31):

This transcript was exported on Feb 24, 2026 - view latest version here.

So I guess I'm a little confused, just for the council's understanding, did you hear Professor Stevens tell me, "Don't," or did we have kind of a longer discussion? Do you remember about how lengthy that discussion would've been?

Terri Morgeson (00:46:46):

45 seconds, maybe. 30 seconds.

Ms. Fisher (00:46:48):

Okay.

Terri Morgeson (00:46:49):

Because I remember leaving my office, or leaving the clinical office when you started talking to Professor Stevens, and then I had just sat down when you had made your way down the hallway and now you're standing at Professor Metz's door.

Ms. Fisher (00:47:05):

Okay. And can you confirm that you leaned into Professor Metz's office and informed us in there that Charlie Kirk is dead, or words to that effect?

Terri Morgeson (00:47:13):

I know I did that. Yes, ma'am.

Ms. Fisher (00:47:15):

And you didn't-

Terri Morgeson (00:47:15):

Because y'all were being inappropriate, and I wanted to shut the door because he was now not just shot, he had passed away. And I thought if I went in there and said that to y'all that there might be some stopping of the conversation or maybe some reflection on your part and his part. And I shut the door.

Ms. Fisher (00:47:40):

So you keep using the term inappropriate. Would you describe to you the difference between inappropriate versus unprofessional or do you kind of consider those one and the same?

Terri Morgeson (00:47:49):

I consider them one and the same. If you're having an inappropriate conversation in a professional setting, it by definition is unprofessional.

Ms. Fisher (00:47:59):

And just kind of going back to the inappropriate part, is that the entirety of the discussion happening, for example, that we were discussing the shooting, or for sake of the argument, that I made the comments, quote, "I'm in such a good mood," and quote, "That blank," or just he got shot?

Terri Morgeson (00:48:16):

This transcript was exported on Feb 24, 2026 - view latest version here.

Y'all were laughing at what his head was doing in the video that y'all were watching. It was the tone and the manner in which the discussion was being held. It wasn't, "Oh my gosh, have you heard that Charlie Kirk got shot?" It was exuberance in the fact that he got shot, that he deserved it because he was a horrible human being and y'all thought that he was dead because of the way that his head had moved and the blood shooting out of his neck. And Professor Metz was confirming that he probably got shot because his daughter was a nurse and there's no way that anyone could provide a direct shot to the jugular because of the way the blood was spurting out of his neck.

(00:48:56):

And it was those comments of why I got up the second time to shut the door, because again, we do have people in the clinical setting who are probably respect- ... not respectful, but TP members, Turning Point USA members, and FedSoc members. And so if they had heard y'all laughing at the fact that one of their political heroes had been shot and then ultimately was dead, that they would be very, very offended.

Ms. Fisher (00:49:30):

And so Professor Morgeson, were you yourself offended? Did you consider yourself offended or you were more so doing that action to ensure that other students were not later offended?

Terri Morgeson (00:49:42):

Yes, ma'am. I thought it was inappropriate. I thought Professor Metz should have done what Professor Stevens had done and told you to stop immediately.

Ms. Fisher (00:49:51):

And Professor Morgeson, do you recall telling me to stop or make any comments of indicating that my behavior may have not been allowed in the clinic that day?

Terri Morgeson (00:50:00):

Ma'am, you're not my student. You're his student.

Ms. Fisher (00:50:04):

So for sake of the record, that would ... No?

Terri Morgeson (00:50:07):

No ma'am.

Ms. Fisher (00:50:07):

Okay.

Terri Morgeson (00:50:07):

And I answered that earlier. I did not think it was my job to reprimand you. I thought that was Professor Metz's job.

Ms. Fisher (00:50:15):

Completely understood. So just jumping back to something that you said a little bit earlier, you mentioned FedSoc, and I believe you mentioned that Professor Metz kind of has this history with

This transcript was exported on Feb 24, 2026 - view latest version here.

FedSoc. Do you recall, is that because of his time in the organizations he's in or just because of his political leanings?

Terri Morgeson (00:50:37):

No, I believe that ... Well, I honestly don't know. I do know that there was kind of something between the Criminal Law Society and the Federalist Society. He's also had other investigations against him. So yeah, that's what I was referring to.

Ms. Fisher (00:50:59):

Right. And so the Federalist Society, it's your kind of understanding that they would oppose the view of any celebration, because you mentioned that that's like a prominent figure to them, correct?

Terri Morgeson (00:51:09):

Mm-hmm.

Ms. Fisher (00:51:09):

And Professor Morgeson, were you aware that the organization Professor Metz is currently an advisor of is the National Lawyers Guild?

Terri Morgeson (00:51:18):

No.

Ms. Fisher (00:51:18):

Okay. And so you didn't have any recollection prior to this day that the National Lawyer's Guild is sometimes known as a organization on campus that opposes the work of FedSoc?

Terri Morgeson (00:51:30):

No.

Ms. Fisher (00:51:31):

Okay. And so just kind of jumping around, were you aware that the students in your family law clinic were discussing Charlie Kirk?

Terri Morgeson (00:51:42):

Yes, they were.

Ms. Fisher (00:51:43):

And just kind of to give us-

Terri Morgeson (00:51:45):

But they weren't being loud and they weren't being disrespectful. Their comments were shock that he had been shot.

Ms. Fisher (00:51:53):

This transcript was exported on Feb 24, 2026 - view latest version here.

And so it would be fair to say that different people accept and experience different events differently and in different ways.

Terri Morgeson (00:52:04):

I don't think I can say that.

Ms. Fisher (00:52:05):

So you would disagree that students may react to something that's on the news or an event in differing ways?

Terri Morgeson (00:52:12):

Of that, I can say. I think that's kind of my point.

Ms. Fisher (00:52:17):

And so while some students would express discomfort or in your words, feeling offended, those feelings alone don't necessarily demonstrate that my actions were unprofessional.

Terri Morgeson (00:52:28):

It was the volume and the tone, and the manner in which you were having those conversations, particularly the volume that was unprofessional. Again, I never told y'all to stop, it wasn't my job. I shut the door, right?

Ms. Fisher (00:52:45):

And so back to my volume. Since, I guess just kind of for context, since you were not necessarily in the exact room with Professor Metz and I, you mentioned my volume, would it be fair to assume that other people or other persons in the clinic would've been able to hear the statements [inaudible 00:53:01] was making and you were overhearing as well?

Terri Morgeson (00:53:04):

It depends on which clinic. That's why I was shutting the doors. I think there was a high likelihood that if the Civil Clinic Office had been open, you could have been heard. I think that if the Tax Office door had been open that you could have been heard. I think it would've been very difficult for somebody to hear you in the Criminal Defense Clinic. And then the Civil Clinic, I mean, excuse me, my Family Law Clinic, I don't think you could have been heard there. But in that hallway, in that immediate area, you were being overheard, in my opinion. Professor Metz was being overheard, in my opinion.

Ms. Fisher (00:53:42):

And so I guess just to get it clear, you're saying that it was not necessarily the content that is alleged being discussed, but the manner in which it was being discussed, tone, other actions like that?

Terri Morgeson (00:53:59):

It's not the topic, it's what you were saying and how you were saying it. You were disrespectful in the fact that a man had gotten shot. Y'all were laughing at the way that his head bobbed and the way that he fell. Y'all were making fun of it and you were celebrating and said that he deserved it.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (00:54:17):

Professor Morgeson, you are currently a practicing attorney, correct?

Terri Morgeson (00:54:25):

Yes, ma'am.

Ms. Fisher (00:54:26):

And do you agree that the discussion of Charlie Kirk's assassination is like a matter of public concern or on the news?

Terri Morgeson (00:54:33):

It is a national topic, yes ma'am. Again, it's not that you were discussing it, it's the manner in which you were discussing it. It was specifically the things that you were saying and how you were saying them.

Ms. Fisher (00:54:46):

And I know you mentioned that you're not my clinic director, but I think you might be able to ... On that day in question, and kind of the timing question, when I was either in Professor Stevens office or I was in Professor Metz's office, do you recall there being any outside attorneys out of the clinic, any clients, any representatives of the court, anything like that?

Terri Morgeson (00:55:05):

No, I don't think I told Professor Keffer that. I don't remember there being any clients up front in the hallway or anybody having clients in their respective clinics.

Ms. Fisher (00:55:15):

And would you be able to think of any reason why that wouldn't be included in Professor Keffer's report?

Terri Morgeson (00:55:22):

No, ma'am.

Ms. Fisher (00:55:23):

And assuming that I did make the alleged statements, and I guess now just for purpose of it, we'll go with, " He got shot," do you believe that that statement would fall within the protection of the First Amendment?

Terri Morgeson (00:55:34):

In a political setting? Could you explain? Just the fact that you hold that belief or the fact that you were saying it?

Moderator (00:55:50):

Maybe you could reframe the question.

Ms. Fisher (00:55:51):

This transcript was exported on Feb 24, 2026 - view latest version here.

Yeah, absolutely. So assuming that, I guess back up because at the beginning and just what was indicated in the report is the terms, "I'm in such a good mood," and then, "I shot the motherfucker." But I think we kind of deduced, and just for sake of the argument, I'm going to use, "They shot him," Professor Morgeson. And so assuming that I did make those statements in question, do you believe that those statements would fall within the protection of the First Amendment?

Terri Morgeson (00:56:18):

I think you have every right to say the statements. However, just because of the fact that you make the statement does not mean that you were free from consequences for making the statement.

Ms. Fisher (00:56:32):

And so you mentioned that I made the statements in the Clinical Office. Do you recall any other professors who were in the clinic at that time? I know that not everyone's aware, but you know how there's like, do you recall if Professor Caudillo or any of the other offices?

Terri Morgeson (00:56:49):

I don't remember if Professor Caudillo was in his office. I do remember obviously that Professor Stevens was in his office. Miranda's office, I remember being closed. And I don't think Spain was in his office.

Ms. Fisher (00:57:04):

Okay. And then I'll just wrap this up to keep it really short. You mentioned that students had left clinic during office hours because they felt, quote, upset or offended?

Terri Morgeson (00:57:15):

Mm-hmm.

Ms. Fisher (00:57:15):

And did you have any indication beyond what Professor Hardberger already asked you? Did they ever make any affirmative statement that, "I would like to go home because of Ellie's conduct?"

Terri Morgeson (00:57:27):

They said, "I don't want to listen to this anymore, may I have please go home?"

Ms. Fisher (00:57:30):

And so they went home during office hours, and as you mentioned, those are scheduled and require that students attend those. Would you consider leaving during your scheduled office hours professional?

Terri Morgeson (00:57:44):

Ma'am, they're supposed to do 200 hours for the semester. And so it was about four o'clock. Yeah, I consider it professional. If they were kept from the ability to practice law and to do things because of your behavior, I do think it was professional to leave. It wasn't like they could talk on their phone. It wasn't like they could call a client into their office. So yeah, I think it was a professional decision to leave.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (00:58:09):

And so you mentioned they weren't able to practice law. Do you recall about, from the time that you heard me first with Professor Stevens to the time that you alleged you overheard but did not see me and Professor Metz's ... Do you know about how long that is, just kind of ballpark? Minutes, seconds, hours?

Terri Morgeson (00:58:28):

Wait a minute. I did see you in Professor Metz's office when I went in to shut the door, you were sitting on the couch.

Ms. Fisher (00:58:34):

Right, but you had mentioned when you said that I was just standing in the doorway?

Terri Morgeson (00:58:38):

Mm-hmm.

Ms. Fisher (00:58:39):

And so you said that I was standing in a doorway, but you would not be able to see that because your view was obstructed because you were next door.

Terri Morgeson (00:58:45):

Sorry, I saw you ... No, no, no. I did see you for a minute.

Ms. Fisher (00:58:48):

Okay.

Terri Morgeson (00:58:48):

You walked down the hallway. You slanted into the office to see if he was going to engage you, and then you walked into the office. I did see you.

Ms. Fisher (00:58:56):

Okay. And for sake of the argument, from that point, from when you heard me walk into the Clinic Office to that point, do you remember about how long it was or recall in any way?

Terri Morgeson (00:59:11):

That you were in there and y'all were laughing about the video?

Ms. Fisher (00:59:14):

Yeah. Or just from the time that-

Terri Morgeson (00:59:15):

About 35 minutes is what I remember that y'all were in there.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (00:59:19):

35. Okay. And so from the time that I walked into that time, you would say it would be about ... the time from I talked with Professor Stevens before, plus that, in total 40 minutes. Is that fair to say?

Terri Morgeson (00:59:33):

I think so, yeah.

Ms. Fisher (00:59:35):

Okay. And so for 40 minutes you overheard us quote-unquote laughing about the head-bobbing and kind of the situation in question you would argue is about 40 minutes long?

Terri Morgeson (00:59:47):

So when the door is open, I could hear distinctly what y'all were saying.

Ms. Fisher (00:59:51):

Okay.

Terri Morgeson (00:59:52):

Okay? And then after I shut the door, I can hear laughter and voices, but can't make out distinctly what y'all were saying.

Ms. Fisher (01:00:01):

Yes ma'am.

Terri Morgeson (01:00:02):

Okay.

Ms. Fisher (01:00:02):

Okay, yeah. Perfect. Okay, I've got that now. Thank you. And then you had mentioned earlier, and I promise this will be my last one, you'd mentioned earlier, it was not necessarily the subject, but my over-exuberance, et cetera. Do you, to your knowledge, know any student at the Texas Tech University School of Law who has been disciplined for their "exuberance?"

Terri Morgeson (01:00:25):

No, ma'am. I don't even really understand the question.

Ms. Fisher (01:00:28):

I can repeat. I don't want you to feel like I asked you something-

Terri Morgeson (01:00:31):

What do you mean disciplined for their exuberance?

Ms. Fisher (01:00:34):

This transcript was exported on Feb 24, 2026 - view latest version here.

Well-

Terri Morgeson (01:00:34):

Again, it wasn't your exuberance that was the issue. It was the fact that you were laughing that he was shot, you were saying that he deserved it. I don't consider that exuberance.

Ms. Fisher (01:00:51):

Okay, so I'll reframe. The way that you alleged that I was laughing about it, despite that not being contained in the Keffer report, the way that I was laughing about it and was discussing it with Professor Metz, have you heard of anybody at Texas Tech School of Law being brought forth, and by discipline, I mean an honor counsel hearing due to similar behavior of them laughing?

Terri Morgeson (01:01:24):

I don't have any knowledge of honor counsel proceedings at all.

Ms. Fisher (01:01:29):

And so-

Terri Morgeson (01:01:29):

Do you understand what I'm saying? I would not know that.

Ms. Fisher (01:01:31):

Okay.

Terri Morgeson (01:01:32):

If a student had been disciplined, it would not be ... I'm not allowed to know that.

Ms. Fisher (01:01:36):

Okay.

Terri Morgeson (01:01:37):

That's not my, I don't know how to say that, but we're not allowed to know this.

Ms. Fisher (01:01:41):

Right. And last question, your family law students, maybe you would know this or maybe you wouldn't, to the best of your knowledge, your family law students haven't been brought before the Honor Council due to their discussions of Charlie Kirk on September 10th, is that correct?

Terri Morgeson (01:01:55):

There were private conversations. They were not projecting into the hallway. And them saying that he got shot is not the same thing as, "He deserved it," and laughing about his head bobbing, and being joyful that he died. Their comments were, "Did you hear Charlie Kirk got shot? Isn't that crazy?" Do you see how those two things are different? That's my point.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:02:24):

Yeah. I guess I'm getting a little bit confused on your answer. So would it be fair to say that you have not heard of other students in the students in your Family Law Clinic that you allege made the statements, "He got shot," and, "Did you hear he got shot," they have not been disciplined or had any disciplinary proceedings brought against them?

Terri Morgeson (01:02:47):

No, because I don't think that those are the statements that brings you here today.

Ms. Fisher (01:02:52):

Okay. But Professor Morgeson, do you recall previously stating to this counsel that you overheard me telling Professor Stevens, "Charlie got shot," and, "He got shot," in Professor Mess's doorway?

Terri Morgeson (01:03:09):

Yes, ma'am, but you also said other things.

Ms. Fisher (01:03:13):

And were those other things the, "I'm in such a good mood," and quote ... I guess, quote, "I'm in such a good mood?"

Terri Morgeson (01:03:21):

"I'm in such a good mood." And then, "Look at his head, look at his head." And then your comments about that he deserved it, that he was such a horrible person, that you weren't going to feel sorry for him because of the other things that he had said. All of those things were said in Metz's office.

Ms. Fisher (01:03:40):

Okay, perfect. Yeah, no further questions for [inaudible 01:03:42]

Moderator (01:03:44):

Okay. Any other question?

Speaker 2 (01:03:46):

I do. I'm sorry, go ahead. Go ahead. I have one too.

Speaker 3 (01:03:48):

This might just be my question. I'm not familiar with the clinics and how [inaudible 01:03:53] clients. Would you know if any of the other clinics, like if any students or any of the clinic directors were meeting with clients during that time? Or is it all separate?

Terri Morgeson (01:04:02):

No, I would know.

Speaker 3 (01:04:03):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay.

Terri Morgeson (01:04:05):

And again, I walked down the hallway, so I would recognize that there was somebody else in one of the spaces. And normally we don't meet with clients in those spaces, but there are times that we do. So I would know if there was a student and a client in one of the other clinics.

Speaker 3 (01:04:22):

Thank you.

Terri Morgeson (01:04:22):

You're welcome.

Speaker 2 (01:04:25):

I know that you stated that you are aware that they were watching the video because you heard comments about it. Did you see Ms. Fisher showing the video to anyone in the clinic?

Terri Morgeson (01:04:36):

No, no, no. I saw Professor Metz showing her the video and them laughing about it. When I went in there, he had his phone in his hand and then he was watching it and then showing them, and then they were making comments. That's what I remember.

Speaker 2 (01:04:54):

Okay, great. And then my last question is, when you were having the discussion with Professor Keffer as part of the investigation, the report says that in the next day when you spoke with Professor Metz, which you discussed earlier, Professor Metz had said something to the effect of, "Well, it was Ellie." When you said, it says, I guess you mentioned to him that some of your students were offended, and he said, "Well, it was Ellie." Can you expand on, was that the full extent of that conversation?

Terri Morgeson (01:05:30):

No. He was saying that it was her making the statements, and then he went on to say that it wasn't him. And I was like, "Are you sure?" And then I remember him also saying that it wasn't his job to tell her that she shouldn't say those things.

Speaker 2 (01:05:46):

Okay.

Terri Morgeson (01:05:46):

That he didn't think it was his job as her professor to rein her in.

Speaker 2 (01:05:51):

Okay. That was it. Thank you.

Speaker 4 (01:05:56):

This transcript was exported on Feb 24, 2026 - view latest version here.

I have one question. Terri, at the beginning you talked about loud statements while walking down the hallway in the reception area. Can you go through that again?

Terri Morgeson (01:06:08):

Yes. So when she comes in, she's just talking about being in a good mood. "It's the best day ever. I'm so happy." And so she's not making statements about Charlie Kirk then, she's talking about being happy. But then when she stops in Joe Stevens doorway, she was like, "I'm so happy. It's the best day ever." And I think he looks up and says, "Why?" And she was like, "Well, have you heard Charlie Kirk got shot?" And then, "Do you know who that is?" And he was like, "Yes, I know who that is." And then I remember him going, "Don't do that. Don't say that. Don't come in here with that," maybe. And then that's when I left and I walked down the hallway and then they had that little interaction, and then she moved on to the next doorway.

Speaker 4 (01:06:54):
The statements were made before Joe's office?

Terri Morgeson (01:06:59):
There were statements made when she was standing in the hallway to Joe's office, yes, ma'am.

Speaker 4 (01:07:03):
[inaudible 01:07:09]

Moderator (01:07:12):
Anything else? Thank you, Terri. Madison should be on the same-

Speaker 2 (01:07:21):
Yep.

Speaker 3 (01:07:22):
Thank you, Terri.

Speaker 1 (01:07:25):
Is she going to be on both [inaudible 01:07:26].

Speaker 5 (01:07:27):
Yes. Yes.

Speaker 1 (01:07:30):
Okay. This is going to be [inaudible 01:07:31].

Speaker 2 (01:07:30):
They're every where.

Speaker 5 (01:07:31):

This transcript was exported on Feb 24, 2026 - view latest version here.

And I tested it yesterday, and full disclosure, I'm not the best with technology, but we're going to make it work. But it's voice activated, so it will move.

Speaker 2 (01:07:39):

Oh, okay.

Speaker 5 (01:07:39):

Yeah. So just let me get in there real quick. Bear with me. Now it's not working. Of course. [inaudible 01:08:01]

PART 2 OF 6 ENDS [01:08:04]

Dean Chapman (01:08:04):

Thank you.

(01:08:04):

Okay. And Maddie's the.... Madison Wright?

Professor Spain (01:08:04):

Right.

Dean Chapman (01:08:29):

Okay.

(01:08:29):

Okay. There's more people right now in the waiting room.

Ms. Fisher (01:08:45):

Where's the camera?

Speaker 6 (01:08:45):

[inaudible 01:08:55].

Ms. Fisher (01:08:45):

Okay. That's crazy.

Dean Chapman (01:08:45):

They're everywhere.

Dean Chapman (01:08:58):

Yeah, it's really cool. It's really good.

Professor Spain (01:08:59):

It actually looks like a little nut or acorn.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman ([01:09:00](#)):

Yeah.

Dean Chapman ([01:09:01](#)):

Yup, a cone now.

Speaker 6 ([01:09:01](#)):

All right. We're that much closer to Star Wars.

Dean Chapman ([01:09:08](#)):

Yes. Also going for the record, I'm recording this as well, the Zoom, but also have this because I want to make sure. Okay. Maddie, can you hear us?

Madison Wright ([01:09:21](#)):

Yes. Can you hear me?

Dean Chapman ([01:09:22](#)):

Yes.

Professor Spain ([01:09:26](#)):

Okay. Thank you for joining us today. Could you state your name for the record please?

Madison Wright ([01:09:34](#)):

Yes, Madison Wright.

Professor Spain ([01:09:36](#)):

Okay. What I'm going to do is ask some questions of you. This all relates to an incident on September 10th, 2025, the day that Charlie Kirk was shot. Can you briefly explain what kind of observations you had that day regarding Ellie Fisher?

Madison Wright ([01:10:03](#)):

Yes. Can you all hear me?

Professor Spain ([01:10:05](#)):

Yes.

Madison Wright ([01:10:07](#)):

Okay. I was in my clinic office, which is in the front of the office, and it was me and Allison [inaudible 01:10:13] in there. And I had heard Ellie walk in and go to Joe's office and say that she's in a good mood because Charlie Kirk was shot.

Professor Spain ([01:10:25](#)):

Okay. And how would you describe her mood that day?

This transcript was exported on Feb 24, 2026 - view latest version here.

Madison Wright (01:10:34):

She seemed happy, but she's always pretty chipper, so nothing out of the ordinary.

Professor Spain (01:10:42):

Okay. And your workspace is directly across the hallway from Joe Stevens' office. Is that right?

Madison Wright (01:10:47):

Yes.

Professor Spain (01:10:47):

Okay.

Madison Wright (01:10:47):

Yes.

Professor Spain (01:10:50):

Were there any other students or clients or staff around at that time?

Madison Wright (01:10:57):

There were no clients. I don't know if Melissa or Nancy were in the front. It was at the end of the day, but there there was not many people there. It was pretty quiet.

Professor Spain (01:11:11):

Okay. And did she enter Joe Stevens' office? Or was she speaking with him in kind of the doorway?

Madison Wright (01:11:19):

The doorway.

Professor Spain (01:11:20):

Okay. And did she appear to be celebrating the shooting of Charlie Kirk in any way? I mean from your observation?

Madison Wright (01:11:42):

I don't think I'd call it celebrating. What do you mean by celebrating?

Professor Spain (01:11:48):

Well, was there anything about her actions or her statements that she is making where she seemed pleased with the fact that he had been shot?

Madison Wright (01:12:01):

Yeah, I think saying she's in a good mood he got killed is being pleased, but it was just the statement. She wasn't really doing anything else.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (01:12:14):

What was your reaction to this whole interaction that she had with Joe Stevens?

Madison Wright (01:12:23):

I thought it was a little inappropriate. I had just seen the video right before that, and it was pretty brutal, so I just thought the statement was a little bit inappropriate.

Professor Spain (01:12:37):

Okay. Was it upsetting to you?

Madison Wright (01:12:43):

I wasn't upset about it. I was just like, "It's just not appropriate to say after something like that." But I wasn't personally offended by it.

Professor Spain (01:12:57):

Okay. And did you later on that day ask to leave early from your office hours?

Madison Wright (01:13:07):

Yeah, I had walked into Dwight's office where Terry was sitting and I just asked to go home.

Professor Spain (01:13:18):

Okay. Why was that? Why did you ask to go home early?

Madison Wright (01:13:23):

I think it was just the situation was just awkward after that point and Allison had also asked to go home and it was just her and I in there. So I was like, "I don't think I'm going to get any more work done today."

Professor Spain (01:13:41):

Anyone else have questions?

Dean Chapman (01:13:42):

I do. Yep.

Professor Spain (01:13:42):

Okay.

Dean Chapman (01:13:44):

Hi, I just have a couple of questions. Were you able to hear anything that Professor Stevens said in response to Miss Fisher's statements that you mentioned?

Madison Wright (01:13:58):

No, I was not. He said something but I couldn't hear it and it looked really brief.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (01:14:05):

Okay, so it was a brief interaction and you didn't hear that?

Madison Wright (01:14:08):

Yeah.

Dean Chapman (01:14:08):

That's fine. And then did you hear conversations that Miss Fisher was involved in in Professor Metz's office after she-

Madison Wright (01:14:18):

I did not.

Dean Chapman (01:14:19):

You did not? Okay, great.

Madison Wright (01:14:21):

No.

Dean Chapman (01:14:22):

And then I just want to ask you, you just stated that you had asked to leave early because sort of it was upsetting and you weren't going to get work done. Can you recall when you say "It was upsetting," do you mean Miss Fisher's statements and how she was responding? Are you referencing the whole situation, the video that you've seen? Can you remember back how you would characterize what you found to be the end of the day for you?

Madison Wright (01:14:49):

Yeah, I think it was really the whole situation in general. I had seen the video and then she came in and said that and I think it was just... Yeah, the whole situation.

Dean Chapman (01:15:04):

Okay. Thank you. That's all I have.

Professor Spain (01:15:10):

Anybody else have any questions?

Ms. Fisher (01:15:18):

Okay. I don't know how to do this.

Dean Chapman (01:15:19):

Just go ahead and speak in it. It'll turn to you.

Dean Chapman (01:15:20):

This transcript was exported on Feb 24, 2026 - view latest version here.

And then you'll hear.

Ms. Fisher (01:15:23):

Hi, Maddie. Sorry, I'm waiting for the-

Madison Wright (01:15:25):

Hi.

Ms. Fisher (01:15:26):

Okay, hold on. It should come over. I'm going to keep this really brief.

Madison Wright (01:15:29):

It's turning.

Ms. Fisher (01:15:30):

Yeah, I'm sorry.

Dean Chapman (01:15:30):

There it goes.

Ms. Fisher (01:15:31):

Okay, period. So I'm going to keep this really, really brief, Maddie, I really appreciate you being here today. So you testified or I guess, told Professor Keffer that I said quote, "I'm in the best mood ever," End quote. "They shot Charlie Kirk." Is that correct?

Madison Wright (01:15:46):

Yes.

Ms. Fisher (01:15:47):

And you mentioned that that would've been in Joe's office, right where y'all's work space is directly across the hall?

Madison Wright (01:15:56):

Correct, in the doorway. Yes.

Ms. Fisher (01:15:58):

You mentioned that you and Allison were in y'all's office. Do you recall anybody else being around? I know you say you don't remember if Nancy or Melissa, but do you recall anybody else?

Madison Wright (01:16:10):

No, I don't remember anybody else being around.

Ms. Fisher (01:16:13):

This transcript was exported on Feb 24, 2026 - view latest version here.

And it stated that you were upset because of what happened on September 10th. Just so can you clarify, was that because of the shooting of Charlie Kirk? Or did you ever mention to Professor Morgeson that you wanted to go home due to my conduct?

Madison Wright (01:16:36):

I think it was just the whole situation. I didn't think that your comment was appropriate, but I think seeing the video and just everything combined about that afternoon was what was upsetting.

Ms. Fisher (01:16:53):

Do you recall other people in the clinic and throughout the law school discussing that Charlie Kirk being shot that day?

Madison Wright (01:17:04):

No, I was only in the clinic office that day, so I didn't really talk to anybody else.

Ms. Fisher (01:17:10):

Do you recall if anybody else in the clinical space was discussing it?

Madison Wright (01:17:18):

I heard voices, but I didn't hear if people were talking about that. I didn't hear anything else.

Ms. Fisher (01:17:24):

Okay. And so just to confirm, I didn't threaten you, direct you to leave, or prevent you from participating in class or clinic in any way. Is that correct?

Madison Wright (01:17:34):

No, definitely not.

Ms. Fisher (01:17:36):

And do you agree that discussion of Charlie Kirk's public murder would be considered protected by the First Amendment?

Madison Wright (01:17:50):

Yeah, I would think so.

Ms. Fisher (01:17:52):

That's all. No further questions, Professor Spain. Thank you, Maddie.

Professor Spain (01:17:56):

Anything else? Thank you very much for appearing today.

Madison Wright (01:18:03):

Yes.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (01:18:03):

Okay.

Dean Chapman (01:18:07):

So I'll let... Maddie, I'll let you exit.

Madison Wright (01:18:10):

Okay, thank you.

Ms. Fisher (01:18:12):

Can we just have a quick bathroom break after?

Dean Chapman (01:18:15):

Yeah, absolutely.

Professor Spain (01:18:15):

Sure.

Ms. Fisher (01:18:15):

Thank you.

Dean Chapman (01:18:15):

So for the record, we're going to take a quick break, but I'm just going to keep the recording going if that's okay.

Ms. Fisher (01:18:21):

I just grabbed the big slot [inaudible 01:18:22].

Dean Chapman (01:18:22):

Yes. Let me show you where to go.

Ms. Fisher (01:18:24):

Yes, ma'am. Thank you.

Speaker 6 (01:18:31):

Just to note, is there another witness waiting? Do we need to... I mean, I don't want to hold anyone.

Professor Spain (01:18:37):

They're just in the waiting room so they'll be fine.

Dean Chapman (01:18:47):

Yeah, let me show you.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (01:18:48):

Okay. Is Allison next?

Professor Spain (01:19:19):

Yeah.

Dean Chapman (01:19:19):

[inaudible 01:21:11]. Thank you. I like that open that gives you a little breeze. And then I've got, yeah, I wrap around it. I need that to be warmer.

Allyson (01:19:52):

I always bring a jacket.

Dean Chapman (01:21:24):

No, you have to. In fact, I left without one and then went back and I was like, "I should get my wrap because you just never know when you're going to."

Allyson (01:21:31):

I actually so TMI, but I have lost like 60 pounds.

Dean Chapman (01:21:36):

Wow.

Allyson (01:21:36):

Ever since I lost all that weight-

Dean Chapman (01:21:37):

I bet.

Allyson (01:21:38):

... I'm like-

Dean Chapman (01:21:39):

Got to feel totally different.

Allyson (01:21:44):

Yes. I'm like cold all the time.

Dean Chapman (01:21:44):

Must feel very different.

Allyson (01:21:44):

Fisher Appendix: 071

This transcript was exported on Feb 24, 2026 - view latest version here.

It does, yes. But now I used to get, be warm all the time, and now I'm freezing all day. So I always have to have a jacket with me.

Dean Chapman ([01:21:45](#)):

Just a reminder, the recording is still going.

Dean Chapman ([01:21:46](#)):

Oh, yeah, we're talking about-

Allyson ([01:21:56](#)):

Losing weight.

Dean Chapman ([01:21:57](#)):

... menopause and being hot. So I'll go on the record for that all day long. I want to warn the young people. Nobody tells you. I'm like, "I'm here to inform. It's a monster that's coming toward you."

Dean Chapman ([01:22:08](#)):

I have a thyroid condition, and so Hashimoto's, I'm always cold and my hands are always cold. I mean literally all the time. So my boyfriend bought me, I didn't even know there were battery-operated hand warmers.

Dean Chapman ([01:22:23](#)):

Oh, yeah, those things are-

Allyson ([01:22:23](#)):

Warmers.

Dean Chapman ([01:22:24](#)):

I've used some skiing before, in your boots too.

Allyson ([01:22:27](#)):

At my job, I keep an electric snuggy at my desk so I can put arms in it and stay warm.

Dean Chapman ([01:22:32](#)):

That's nice.

Allyson ([01:22:34](#)):

And they also make little hoodies that you can fill up, wrap up in.

Dean Chapman ([01:22:44](#)):

Just to remind everybody, the recording is still on.

Professor Spain ([01:22:46](#)):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay.

Dean Chapman (01:22:47):

Okay.

Allyson (01:22:47):

Your name is spelled A-L-Y, assuming, the Allison.

Dean Chapman (01:22:47):

Right.

Allyson (01:22:47):

Okay. That's my name is spelled almost exactly the same.

Dean Chapman (01:23:09):

Are you E or A? Are you also A?

Allyson (01:23:11):

Yes.

Dean Chapman (01:23:11):

Yeah. Okay.

Allyson (01:23:12):

So it's A-L-L-Y-S-O-N but I hardly ever meet someone else.

Dean Chapman (01:23:14):

Oh, okay.

Allyson (01:23:17):

I saw that on there, I was like, "Wow."

Dean Chapman (01:23:28):

The next is Allison, right?

Speaker 6 (01:23:28):

Right.

Dean Chapman (01:23:30):

I got a friend, I helped set up her whole Africa trip. The questions I get, what kind of plug do they use in Tanzania? Just Google it. I don't know what the name of it is. I just have it in my drawer. I'm not the end-all deal.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:24:20):

Thank you all.

Dean Chapman (01:24:22):

For the record, we're back in and I'm going to let Allison Monticelli into the room. Hi, Allison, it's Dean Chapman, are you there, Mija?

Allison Monticelli (01:24:45):

Yes, I am.

Professor Spain (01:24:48):

Good morning, Allison. Thank you for appearing today. We are going to ask you a few questions about the events of September 10th, 2025, the day that Charlie Kirk was shot. Can you briefly kind of explain what you observed or heard that day particularly related to Ellie Fisher in the clinic offices?

Allison Monticelli (01:25:20):

Sure. So it started when I got into clinic after evidence. It was around 3:00 o'clock that day. I'd gotten out of class and Madison Wright and I were the only ones in clinic. And we were discussing the shooting because this was, it was my first opportunity to talk about it with anybody because I had been in class when I found out about it.

(01:25:43):

And Madison told me that while I was in class, Ellie had come in and stopped by Joe Stevens' office, Professor Stevens, and said something to the effect of, "They got him." Or, "This is a great day." And Madison told me that Professor Stevens told Ellie to get out of his office and not do that here.

(01:26:11):

So Madison and I were talking about it. And then either during that or right after it, we had both seen Ellie walk into clinic, so we kind of stopped talking about it. Yeah. So then we got some notifications on our-

Professor Spain (01:26:31):

Let me stop you there. So just to clarify, you did not actually hear any statements yourself that Ellie Fisher may have made to Joe Stevens?

Allison Monticelli (01:26:47):

No, I did not. I was in class at that time.

Professor Spain (01:26:47):

Okay. So you came in after she had stopped by his office, is that right?

Allison Monticelli (01:26:52):

Yes.

Professor Spain (01:26:52):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay.

Allison Monticelli (01:26:53):

Yes.

Professor Spain (01:26:54):

Did you hear any statements that she may have made subsequent to stopping by Joe Stevens' office?

Allison Monticelli (01:27:03):

Yes. So after we got the notifications on our phones that Charlie Kirk had passed away, Madison and I heard yelling and laughing from down the hall, and so I was curious. So I went up and I walked past. I went down to the printer in the clinic office down the hall and I walked past Professor Metz's office and I saw Ellie in there with two other students and Professor Metz.

(01:27:34):

And they were saying, "He's dead." And it seemed to me like they were excited looking at the video, maybe laughing. Or it was like, I just remember walking by and being like, "Oh, that's a weird energy in the room for having found out somebody died." So that's what I had heard and seen as I walked by.

(01:27:59):

And then later when Professor Morgeson came into the clinic office with Madison, she shut the door and that's when she told us she heard Ellie saying, I'm going to curse for the quotation. But that's when Professor Morgeson told us, "Ellie said they got the motherfucker."

Professor Spain (01:28:20):

So did you yourself hear any statements yourself that Ellie Fisher may have said in Professor Metz's office?

Allison Monticelli (01:28:32):

I didn't hear. I can't recall anything that I heard specifically, but I know I walked by and I saw her laughing and chatting about it with other students in Professor Metz's office.

Professor Spain (01:28:45):

What was your reaction to the situation?

Allison Monticelli (01:28:51):

I think I felt very uncomfortable in clinic and I think that was exemplified through Professor Morgeson coming in and checking on us after and being like, "Are you okay? Is everything okay?" I was uncomfortable just because we're all finding out this news as it comes, and it was a very strange day.

Professor Spain (01:29:16):

Did you leave your office hours early that day?

Allison Monticelli (01:29:21):

This transcript was exported on Feb 24, 2026 - view latest version here.

I did, yes. After Professor Morgeson came in and checked on Madison and I, the three of us were actually talking about how even though everyone may not agree with what somebody says, you shouldn't act like this in the clinic. The three of us were talking about that and she told us that we could leave clinic hours early. It was about 4:30 I think when I left. So I was done with office hours at 5:00, so I didn't miss too much of office hours.

Professor Spain (01:29:53):

Okay. So did you have any contact or conversations with Miss Fisher thereafter?

Allison Monticelli (01:30:01):

About, I think it was about a week after, I was outside the school. This wasn't planned contact or anything. I was outside the school on a call with a client and Ellie and Holland and my friend Callahan Ard were outside the school. And I went up to say hi to Callahan and they were in the middle of talking about the situation.

(01:30:27):

And this was after I had met with Dean Chapman. I was called into Dean Chapman's office to talk about it beforehand. And Ellie was talking about how they're trying to get her and she was asking if we, because she knew I was in clinic, so she was asking if I knew anything.

Professor Spain (01:30:47):

What was your response?

Allison Monticelli (01:30:50):

I said I didn't, because at that time, Dean Chapman told me to not speak about it with anyone. And so I said I didn't know anything and I left the conversation pretty quickly after that. Because I don't enjoy to lie and I was uncomfortable and I didn't want to get stuck in a situation where I would have to lie to her. I didn't like saying I didn't know anything to her, but I also felt like I couldn't say anything.

Professor Spain (01:31:17):

What specifically did she ask of you?

Allison Monticelli (01:31:23):

She just turned to me and was like, "Did you hear about this? They're trying to get me." It's hard to recall because it wasn't something I had to, I knew I should commit to memory because this was so long ago. But the conversation was about her looking for information about who reported her.

Professor Spain (01:31:45):

Who reported her. She is asking for the name of anybody that had made a report?

Allison Monticelli (01:31:53):

Yes, I believe. I took it that way, yes.

Professor Spain (01:31:57):

Okay. Did that whole situation make you uncomfortable?

This transcript was exported on Feb 24, 2026 - view latest version here.

Allison Monticelli (01:32:01):

It did for me because I didn't know the appropriate way to react, so I was pretty uncomfortable there. Yeah.

Professor Spain (01:32:09):

Okay. Were you reluctant to appear at this hearing today?

Allison Monticelli (01:32:16):

Yes. I had told Dean Chapman, had I told Professor Morgeson, this is not something I wanted to be involved in, and it really stinks that I was there that day, but I'm here.

Professor Spain (01:32:31):

Other questions?

Dean Chapman (01:32:33):

Yeah, I just have a couple. When you went to the copy machine and saw into Professor Metz's office, do you recall who else was in there?

Allison Monticelli (01:32:44):

Yes, Ashanti, I don't know her last name. But Ashanti was in there and I believe it was Diana Garcia was the other student.

Dean Chapman (01:32:54):

Okay. And you said earlier that you heard laughing. Could you tell, I mean, would you say that Miss Fisher was the one person that you heard laughing and others weren't laughing? Was it sort of just a general noise from the office? Were you able to tell or provide any more specifics about who might've been saying what in that context?

Allison Monticelli (01:33:21):

I thought it was Ellie at the time because Ashanti has a very distinct laugh. And it's like if anybody knows Ashanti, they know her laugh and it wasn't Ashanti's laugh. So when I walked by, that's when I thought it was Ellie.

Dean Chapman (01:33:39):

And did you hear the statements that they were talking about? I mean, did you hear them saying anything about Mr. Kirk before you heard the laughter? Or you just knew they were generally talking about what had happened?

Allison Monticelli (01:33:55):

The laughter was pretty immediate after Madison and I got the notifications on our phone that were like, he had died. It was within the same minute that occurred. Madison and I looked at each other and we were like, "Oh, they also got the news."

Dean Chapman (01:34:12):

This transcript was exported on Feb 24, 2026 - view latest version here.

So because of the timing, you connected those two things. Okay. And then when you said that you decided to leave or were offered to go home early, can you just talk a little bit about, if you can remember back, how would you characterize when you said just that you wanted to leave maybe because of the situation? What do you mean by this? Is that one thing in particular? Was it the news itself? Can you just talk a little bit about that if you can recall?

Allison Monticelli (01:34:45):

I think it was. I think, so when Professor Morgeson came and talked to us, Madison, Professor Morgeson, and I were all talking about how we were all kind of uncomfortable. Because none of us had dealt with a situation like this, especially with it being so politically charged one way and the other, it was almost like the tensions were weird in the room.

(01:35:10):

Nobody wanted to, I wasn't going to turn around and write a client letter after that. My brain, I was kind of distracted. I was processing what I had heard from Professor Morgeson about what was being said and what I saw and the conversations we were having. And so Professor Morgeson was like, "If you can't focus for the rest of the day, that's okay. You can go home."

Dean Chapman (01:35:34):

Okay. So it's fair to say it was the event itself and then sort of what was happening in the space together?

Allison Monticelli (01:35:43):

Yeah, for sure.

Dean Chapman (01:35:45):

Okay. Then my last question for you is, there's an irony to me asking you this question, so I apologize, but the reticence to appear, can you talk a little bit? What made you reticent to appear or be involved in this investigation any further? Can you be specific on that?

Allison Monticelli (01:36:08):

I mean, it's obviously a very politically charged conversation we're having today. And I think that it's very easy for someone to be involved on the side that I am right now, where a student is being charged with something for expressing her feelings in the moment, to be classified as an ultra conservative where that's not who I am.

(01:36:39):

So it's hard to... I'm trying to figure out the best way to say this. I don't want to be attacked because I was asked to be here because I was in clinic that day. And I feel like there is a chance that I would be brought up in this when I did not ask. I did not make the report to be here. And it's just a situation that I really don't love to be tied into.

(01:37:12):

I've had a lot of anxiety about how my classmates would perceive me, even though I didn't ask to be here. And with the whole situation with Professor Metz saying it's two blond Republicans and Family Clinic who reported him, it is not a great look to be involved.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (01:37:38):

Thank you. That's helpful. That's all I have.

Allison Monticelli (01:37:41):

Okay.

Speaker 6 (01:37:44):

Ellie, your turn.

Ms. Fisher (01:37:48):

Good morning, Allison. It's going to switch over to me. Okay. There we go. I'm going to try to keep you really brief. I really appreciate you being here. I know this is not where you want to be on a Friday.

(01:37:57):

So I'm going to, first, I have a few questions and then we'll just kind of jump to some of the things that you told the counsel. So just to confirm, the first statements of me in Professor Stevens' office, whatever is alleged, you yourself didn't hear those. You were told those by Maddie?

Allison Monticelli (01:38:16):

Yeah.

Ms. Fisher (01:38:17):

And then when it comes to the statement of, "The mother effer was shot." Or, "He was shot," that was later told to you by Professor Morgeson?

Allison Monticelli (01:38:28):

Yeah, she came in and told us about it.

Ms. Fisher (01:38:30):

Okay. And so would it be fair to say what you witnessed was when you walked down the clinic hall and you saw me laughing in Professor Metz's office?

Allison Monticelli (01:38:43):

Yep. That's what I saw.

Ms. Fisher (01:38:44):

Okay, good deal. I just wanted to make sure I have everything right.

Allison Monticelli (01:38:46):

Okay.

Ms. Fisher (01:38:47):

This transcript was exported on Feb 24, 2026 - view latest version here.

So with going back a little bit to the discussion you had with Professor Morgeson, do you recall ever leaving the family law office and then meeting Professor Morgeson in Professor Dwight McDonald's office and asking her if you could go home?

Allison Monticelli (01:39:10):

I am trying to remember. I don't remember if Professor McDonald was there at the time. He might've been, but I don't know.

Ms. Fisher (01:39:20):

And so just, do you recall, I know it was so long ago, but do you recall kind of around when all the incidents are alleged to the time in question, do you recall whose doors were open or maybe shut? Do you recall if the family law clinic doors kind of thing? Do you know? I can rephrase it, if that makes sense.

Allison Monticelli (01:39:42):

Yeah, our door was open, Professor Stevens' door was open, but he wasn't in there when I was in clinic. And then Terri's door was, Professor Morgeson's door was open, Metz's door was open. I didn't see Sybil's door open. Their door's always closed in Sybil.

(01:40:03):

I think Professor McDonald's door was closed because I don't remember seeing him, but he might've been in there. I have no idea. And then Taks, I have no idea if Taks' door was open or closed.

Ms. Fisher (01:40:16):

And do you recall Professor Morgeson ever shutting the doors or going up and down? Okay. And so do you recall about when that was? Was that prior to you walking up and down the hall or after?

Allison Monticelli (01:40:34):

It was after I went down the hall, I think because our door was open because that we heard the noise. So our door was open and then she came in and we had a closed door conversation.

Ms. Fisher (01:40:45):

Right. And so, perfect. So when you guys were having that closed door conversation, you mentioned that you, Professor Morgeson, Maddie, were all kind of discussing how you're feeling uncomfortable. You yourself mentioned that it was kind of a lot, right? It's all over the news, this whole thing. Do you recall about how long that conversation was with the private conversation with you three?

Allison Monticelli (01:41:08):

Oh, my gosh, if I had to guess. I don't remember exactly. Maybe five minutes.

Ms. Fisher (01:41:17):

Okay. Yeah.

Allison Monticelli (01:41:17):

The three of us [inaudible 01:41:18].

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:41:17):

Doesn't need to be exact. Just trying to spitball it. And so then, would it be fair to say, you're kind of having this conversation, y'all are discussing your reactions to the news and what the videos that y'all are viewing online. And then at that time, Professor Morgeson expresses that she's uncomfortable as well, and "If we can't do this, we could all just go home." Is that kind of, am I understanding that correctly?

Allison Monticelli (01:41:45):

Terri came in and... Sorry Professor Morgeson came in and talked to us and then she left us and closed the door. And Madison I think, and then Madison and I were in there for a little bit longer. And then she had came back a little bit later maybe, I don't know. But I know Madison and I were in there alone after.

Allison Monticelli (01:42:03):

... spirits, maybe? I don't know, but I know Madison and I were in there alone after Professor Morgansen talked to us for a short amount of time, and then we were told we could go home.

PART 3 OF 6 ENDS [01:42:04]

Ms. Fisher (01:42:13):

Okay. Good deal. So, I'm not going to keep you forever, I promise. So jumping a little bit to your reluctance to be here today, trust me, I get it, but I just want to make it kind of clear for everybody's understanding. Have you and I... Have we ever shared other conversations not concerning Charlie Kirk in the clinic? Would you say that that would be out of the norm for us to have a discussion?

Allison Monticelli (01:42:34):

No. You stopped by family clinic and chat. I stopped by criminal clinic and visit people, and we chat. Yeah.

Ms. Fisher (01:42:39):

Then, just to jump back from... We were talking about a week after when you mentioned that Callahan and Holland and I were outside the school discussing me being referred or the investigation, do you recall if we walked up to you or if you kind of walked up to us as you were walking in?

Allison Monticelli (01:43:02):

I went to say hi to Callahan, and you guys were deep in that conversation? Yeah.

Ms. Fisher (01:43:07):

Okay. Good deal, and so, assuming for sake of the argument, like I did make any alleged statements, were those statements in any way, did they obstruct you to meet with any clients or anything like that, or was it more so, the entirety of the day, the videos, et cetera, et cetera?

Allison Monticelli (01:43:31):

That day, I didn't have any clients coming in. I mean, I had work that I was supposed to be doing, but I didn't have any clients coming in.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:43:43):

Last kind of thing. Do you, in your opinion, because we're using like, professional/unprofessional, would you consider leaving office hours to be professional?

Allison Monticelli (01:43:55):

Leaving office hours early?

Ms. Fisher (01:43:57):

Yeah.

Allison Monticelli (01:43:58):

I would not leave office hours early unless I was directed to.

Ms. Fisher (01:44:01):

Okay, perfect.

Allison Monticelli (01:44:02):

Or if I had permission to do so.

Ms. Fisher (01:44:05):

Oh, absolutely. So then would it be fair to say that you recognize that that would be kind of allowed, because you were told that you were able to do so either by, I'm going to assume Professor Morgansen, but I could be incorrect.

Allison Monticelli (01:44:20):

So you're asking if it was okay that day that we got excused early?

Ms. Fisher (01:44:25):

Yeah.

Allison Monticelli (01:44:25):

I'm trying to figure out...

Ms. Fisher (01:44:27):

Yeah, so what I'm kind of asking is to you, because first you're saying that you would never leave office hours, and I totally believe you on that one. You would never leave office hours without being given express consent to leave or whatever, and so then my follow-up to that is, do you yourself consider the act of leaving office hours early, that would be considered to be professional because you were given that kind of allowance by Professor Morgansen?

Allison Monticelli (01:44:58):

That day, when I left office hours.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:44:59):

Yeah. Just that day.

Allison Monticelli (01:45:00):

I thought...

Ms. Fisher (01:45:00):

Okay.

Allison Monticelli (01:45:03):

Yeah, I thought she let us go.

Ms. Fisher (01:45:06):

Okay. Understood. Thank you so much for being here, Allison. No further questions, Professor Stern.

Professor Spain (01:45:09):

Anything else? Anybody else? Yeah.

Speaker 7 (01:45:12):

I have a couple questions. Maybe it'll come to [inaudible 01:45:16]-

Ms. Fisher (01:45:16):

Can you speak up?

Speaker 7 (01:45:17):

Yes, sorry, I'll speak up.

(01:45:19):

Hi, Allison. I had two questions. So my first question was, I know you said Madison was the one that told you about the statements. Was this something that she... I guess happened way before? I'm just trying to understand the timeline. Or is this something that happened maybe like five minutes before or what did she express about the timeline of when that happened?

Allison Monticelli (01:45:45):

I think so I had gone out of evidence at three, and when I sat down in evidence at two was when I found out about the shooting. So I came into clinic at three, and she told me right when I got there, because I was like, "Did you hear what happened?". It was my first opportunity to talk about it, and I think it had happened right after the shooting maybe, and she didn't specify a time, but it felt like, oh yeah, when it happened, this also occurred in Joe's office.

Speaker 7 (01:46:22):

Okay, thank you, and my next question, talking about Professor Morgansen, did she direct you that you can go home, or was this... Could you kind of go re-explain the conversation that you had?

This transcript was exported on Feb 24, 2026 - view latest version here.

Allison Monticelli (01:46:39):

Yeah, I mean, we were all talking about how it was kind of uncomfortable, and the tensions were kind of high in the clinic office, because it is a small space. You can't really get away from anybody in there, and so she said, "If you feel like you can't get any work done, you can go home," and Madison and I went home.

Speaker 7 (01:47:03):

Okay. So she didn't directly send you home or anything? This was, she offered it and then you took the offer, I guess?

Allison Monticelli (01:47:13):

Yeah. She didn't say like, "Get out of here". She was like, "If you want to go, it is totally fine, and you can go."

Speaker 7 (01:47:20):

Okay, thank you.

Allison Monticelli (01:47:22):

Yeah.

Professor Spain (01:47:28):

Nothing else? Okay. Thank you very much for appearing this morning.

Allison Monticelli (01:47:30):

Okay, thank you. I'll go ahead and let you exit the room.

(01:47:35):

Okay.

Ms. Fisher (01:47:39):

Anthony Bomar.

Professor Spain (01:47:39):

Yeah.

Ms. Fisher (01:47:44):

Okay.

(01:47:44):

Oh, sorry I didn't bring you another one.

Professor Spain (01:47:45):

No.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (01:47:46):

Anthony Bomar is next.

(01:47:54):

Hi Anthony, it's Dean Chapman. How are you, [inaudible 01:47:57]?

Anthony Bomar (01:47:58):

Good. How are you doing?

Ms. Fisher (01:47:59):

Good, good.

Professor Spain (01:48:01):

Good morning, thank you for appearing. I'm going to ask a couple of questions about the events that occurred on September 10th, 2025, and I know that you had spoken to Professor Keffer before. Let me start out by asking, at any time that day, did Ellie Fisher show you a video of the shooting of Charlie Kirk? Do you recall?

Anthony Bomar (01:48:33):

Like I said to Keffer, after I came in from evidence, I think it had just broken. She had showed me, but I think it was just to let me know what had happened. So I was kind of in disbelief whenever she said it initially.

Professor Spain (01:48:47):

This occurred in the Criminal Defense Clinic conference room, is that right?

Anthony Bomar (01:48:54):

Yes, sir.

Professor Spain (01:48:54):

All of you were meeting in there?

Anthony Bomar (01:48:57):

Yes sir.

Professor Spain (01:48:58):

So do you recall who else was in the room at the time?

Anthony Bomar (01:49:02):

Like I said to Keffer, I just remember Jacob and Tristan. I mean, I think there was a few other people, but those were the immediate ones right next to me. So that's all I can remember off the top of my head.

Professor Spain (01:49:12):

Okay, and how would you describe Ellie Fisher's demeanor that day?

This transcript was exported on Feb 24, 2026 - view latest version here.

Anthony Bomar (01:49:22):

I mean, like I said, when we talked, I think it was a little disrespectful, but I don't think it was celebratory at all or anything like that, but yeah.

Professor Spain (01:49:31):

When you say disrespectful, what do you mean by that?

Anthony Bomar (01:49:37):

Just because she had said he was a racist. I thought that was a crude thing to say at that moment.

Professor Spain (01:49:44):

Okay, and did she make any other statements that you found disrespectful or offensive in any way?

Anthony Bomar (01:49:55):

Not that I remember now.

Professor Spain (01:49:56):

Not that you recall? Okay.

Anthony Bomar (01:49:57):

Not that I recall now.

Professor Spain (01:49:57):

Okay.

Dean Chapman (01:50:02):

Hi. Yeah, I just have a couple of questions. I just want to just move a little bit backwards from when you said she showed you the video, can you just talk about... Were you already in the room when she came in? Can you just kind of talk about the beginning of that interaction as you remember it?

Anthony Bomar (01:50:20):

I think they were already talking about it, because it had just happened, like I said, and I was coming out of evidence, and I came in and she was like, "Did you hear Charlie Kirk got shot?", and I was like, "No, that's not what happened," and she said, "No, it did, and then she showed me," because I really wasn't believing it initially.

Dean Chapman (01:50:37):

Okay, and at any time, did you say, "I don't want to see that video," or was it all just part of just the conversation of overcoming your disbelief?

Anthony Bomar (01:50:51):

I think it was just part of the conversation.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (01:50:52):

Okay. Did you hear Ms. Fisher in any conversations in Professor Metz's office with any other students one-on-one? Okay.

Anthony Bomar (01:51:00):

No.

Dean Chapman (01:51:00):

So this interaction that you had that you just described was the only one that you had with Ms. Fisher about this situation?

Anthony Bomar (01:51:10):

Yes ma'am.

Dean Chapman (01:51:10):

Okay. Did she say anything else? You said they said that he was a racist. Did she say anything else specifically that you recall about Mr. Kirk?

Anthony Bomar (01:51:21):

Not that I recall right now.

Dean Chapman (01:51:22):

And who all was, I know you said... Can you just... Who all was in the room during this part of the conversation?

Anthony Bomar (01:51:30):

Like I was saying, I can only remember Jacob and Tristan, because they were sitting next to me when it happened, but I think it was a few other people. I just don't remember exactly who it was.

Dean Chapman (01:51:39):

Do you remember anyone else that was in that room discussing the event itself?

Anthony Bomar (01:51:46):

I mean, I think we were all talking about it when I came in because it just happened. So we were all just trying to figure out, I guess, what happened.

Dean Chapman (01:51:54):

Do you remember anyone else in the room saying anything positive or negative about Mr. Kirk?

Anthony Bomar (01:52:01):

I remember somebody saying that he probably was going to hell because I had said something about my Christian beliefs to them, but I don't remember who it was exactly who said that. Okay. I know it wasn't Ellie Fisher, it wasn't Ellie who said that one. It was someone else, but I don't recall who exactly it was.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (01:52:21):

Okay. I think that's all I have.

Professor Spain (01:52:22):

Okay. Yeah.

Speaker 7 (01:52:28):

I had a question. Hi. So I know you said that what she said was disrespectful in the sense that she said he was racist. What was the tone? Or was it like the volume was... Did she say it really loud, or what was kind of the tone of it?

Anthony Bomar (01:52:47):

I don't think she was saying it real loud. I think we were mainly just talking about his political stances.

Speaker 7 (01:52:54):

Okay.

(01:52:54):

So I guess when I say the volume, was it something that others could have heard throughout the clinic, or just maybe in the office?

Anthony Bomar (01:53:02):

I don't think others could have heard that throughout the clinic. I think we had the clinic door closed at that time, but I'm not sure.

Professor Spain (01:53:05):

Anything else?

Ms. Fisher (01:53:18):

Hi Anthony, or Mr. Bomar. I'm going to keep it really quick. I know. Thank you so much for being here today. So just to make it really concise for everybody, do you recall there being other students in the clinic room at that time discussing Charlie Kirk?

Anthony Bomar (01:53:35):

I think, like I said, we were all discussing it, because it was a pretty big thing that had happened that day.

Ms. Fisher (01:53:39):

Right, and so in Professor Keffer's report, it states that I used quote-unquote choice words in describing Charlie Kirk. Do you mean that I used the term racist by those choice words?

Anthony Bomar (01:53:51):

Yeah.

Ms. Fisher (01:53:54):

This transcript was exported on Feb 24, 2026 - view latest version here.

Do you think that it is a common viewpoint among students in the clinical office that Charlie Kirk is a " racist"?

Anthony Bomar (01:54:01):

I mean other, people were saying it afterwards. A few others in the defense clinic when we talked about later.

Ms. Fisher (01:54:08):

To your knowledge, have any of those students who made this similar comment that Charlie Kirk is a "racist", have they been investigated or have any disciplinary sanctions?

Anthony Bomar (01:54:18):

No, not to my knowledge.

Ms. Fisher (01:54:20):

Based on our brief conversations that day, and I know we interact all the other time, but on September 10th, 2025, would you say that I acted unprofessionally?

Anthony Bomar (01:54:31):

I wouldn't say unprofessionally. Like I said, I would say maybe just a little disrespectful just because of the racist thing, but other than that, I mean, we were all trying to process, I guess, what happened.

Ms. Fisher (01:54:45):

So based off of that conversation, were you in any way unable to perform your clinical duties, meet with clients, go to court, read cases, et cetera.

Anthony Bomar (01:54:58):

No.

Ms. Fisher (01:54:58):

Okay, and so to your knowledge, am I the only student who was brought before this counsel regarding your discussion of Mr. Kirk on September 10th?

Anthony Bomar (01:55:07):

Yes.

Ms. Fisher (01:55:09):

To the best of your knowledge, again, are you aware of anyone being investigated or being brought before this counsel for making the comment that Charlie Kirk's "going to hell" on September 10th, 2025?

Anthony Bomar (01:55:22):

No.

Ms. Fisher (01:55:23):

This transcript was exported on Feb 24, 2026 - view latest version here.

Mr. Bomar, is it fair to say that we both know that you and I have different political viewpoints?

Anthony Bomar (01:55:30):

Yes.

Ms. Fisher (01:55:31):

But has that ever gotten in the way of us acting professionally any of our duties together as clinic students or even us interacting as students at tech law?

Anthony Bomar (01:55:40):

No.

Ms. Fisher (01:55:42):

No further questions, Chair [inaudible 01:55:44]. Thank you so much, Anthony.

Speaker 7 (01:55:45):

I have one more question.

(01:55:46):

Hi. I have one more question. So I know in the report, it said that based on the discussion about Kirk that day, it seems that Ellie knew who he was. Could you kind of elaborate on what you kind of meant with that exactly?

Anthony Bomar (01:56:05):

Just because we were talking about his viewpoints on things, I assume she knew who he was, because we were talking about the different stances we had on his issues.

Speaker 7 (01:56:14):

Okay. Thank you.

Professor Spain (01:56:17):

Thank you very much for appearing today.

Ms. Fisher (01:56:20):

Okay, thank you, Anthony. Thank you. I'll let you go ahead and exit the room.

Anthony Bomar (01:56:25):

All right, thank you all.

Professor Spain (01:56:30):

Yeah, I don't see Ashanti or Ken.

Ms. Fisher (01:56:33):

No, Ashanti's there. I don't think Ken... I'm going to message Ken.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (01:56:36):

Do you want to have Frank maybe text him?

Ms. Fisher (01:56:42):

Yeah, let me go see.

Professor Spain (01:56:42):

Just the numbers.

Ms. Fisher (01:56:42):

Okay, perfect. Yeah. Thank you.

Professor Spain (01:56:42):

Very aggressive.

Speaker 7 (01:56:42):

Thank you, Dean Chapman.

Professor Spain (01:56:42):

Thanks so much.

Ms. Fisher (01:56:42):

You're welcome.

Speaker 7 (01:58:13):

You can bill me for all of the waters that I drink.

Ms. Fisher (01:58:17):

Oh yeah.

Speaker 7 (01:58:17):

I'll add it to my tuition. Sorry about that.

Ms. Fisher (01:58:19):

You're fine. You have, you're fine. Don't worry about that. Please know we're still recording.

(01:58:43):

Hello? Hello?

(01:58:44):

Okay, does anybody else need a water? Okay.

Professor Spain (01:59:16):

[inaudible 01:59:14] video [inaudible 01:59:17].

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 7 (01:59:16):

Way too much of it picks up the sound in here.

Ms. Fisher (01:59:20):

It's cool, isn't it? Yeah. I came yesterday afternoon just to make sure and test it all.

Professor Spain (01:59:26):

I think you've got to give them little nice little attractive hats.

Ms. Fisher (01:59:27):

Yes, right?

Professor Spain (01:59:33):

Or a mask. Isn't the mascot here like the...

Speaker 7 (01:59:35):

Masked Rider.

Ms. Fisher (01:59:36):

The Masked...

Professor Spain (01:59:36):

The Lone Ranger, sort of?

Ms. Fisher (01:59:38):

Yeah... Masked Rider.

Professor Spain (01:59:40):

I think they deserve real masks.

Ms. Fisher (01:59:44):

Yeah. Yeah. Those are always fun.

Speaker 7 (01:59:45):

[inaudible 02:00:06]

(01:59:45):

[inaudible 02:00:17].

Professor Spain (01:59:45):

[inaudible 02:00:26].

Speaker 7 (02:00:33):

This transcript was exported on Feb 24, 2026 - view latest version here.

Such a shame it's cold today. I should've prepared for yesterday [inaudible 02:00:40].

Ms. Fisher (02:00:39):
When did you get in?

Professor Spain (02:00:41):
Last night.

Ms. Fisher (02:00:43):
Okay. I was thinking the same thing today.

Professor Spain (02:00:45):
It's not easy to get to Loch.

Ms. Fisher (02:00:47):
Yeah. Where did you fly in from?

Professor Spain (02:00:48):
Well, I came from Connecticut, but that means I had to go Providence, which is one regional area to another regional area.

Ms. Fisher (02:00:57):
Yeah.

Professor Spain (02:01:01):
But it is what it is.

Ms. Fisher (02:01:08):
Yeah.
(02:01:08):
Okay. Jacob?

Jacob Gomez (02:01:08):
Yeah.

Ms. Fisher (02:01:14):
Okay.
(02:01:14):
There's Ken.
(02:01:21):
Hi Jacob. Hi Michal. You there? This is Dean Chapman.

This transcript was exported on Feb 24, 2026 - view latest version here.

Jacob Gomez (02:01:29):

Yes. Sorry, excuse me.

Ms. Fisher (02:01:36):

Thank you.

Professor Spain (02:01:36):

Thank you for appearing today, Jacob. We're going to ask you a few questions about the events that occurred on September 10th, 2025, the day that Charlie Kirk was shot. Do you recall the events that occurred that day, particularly related to discussions that were being had in the Criminal Defense Clinic conference room?

Jacob Gomez (02:02:05):

I do recall.

Professor Spain (02:02:06):

Okay. Can you briefly explain, I guess, what was going on that day?

Jacob Gomez (02:02:12):

Yep. I walked into the clinic room. There was, I don't know, discussions going around, walked in, Ms. Fisher was on her phone looking at something. I asked what was going on. I had just found out that Charlie Kirk had been shot, and then she showed me the video of that. I sat down, I was waiting for my fiance to pick me up. We only have one vehicle at the moment.

Professor Spain (02:02:54):

Do you recall who else was in the conference room that day when you entered the room?

Jacob Gomez (02:03:02):

It was Ms. Fisher, Mr. Bomar, I believe Ms. Pombrio, if I'm pronouncing that correctly. Another female, I forget her name. It ends with a C. Ms. Collinsworth, something along those lines, and Mr. Barkman, I believe.

Professor Spain (02:03:41):

Okay. What was Ellie Fisher's mood that day when you entered the room?

Jacob Gomez (02:03:45):

I'm sorry?

Professor Spain (02:03:46):

What was her mood that day when you entered the room?

Jacob Gomez (02:03:52):

She seemed in an excited state, happy even.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:04:02):

Okay.

Jacob Gomez (02:04:03):

Or joking wrong, something along that.

Professor Spain (02:04:06):

Did she make any kind of statement that Charlie Kirk got what he deserved? Do you recall that statement being made?

Jacob Gomez (02:04:17):

I recall something along those lines.

Professor Spain (02:04:22):

Something along those lines. Okay. Did you believe that that statement was appropriate to make in that kind of a setting?

Jacob Gomez (02:04:31):

I don't. My personal opinion is that I don't think it was appropriate considering the circumstances of what was happening to him.

Professor Spain (02:04:49):

Did it bother you that that statement was made?

Jacob Gomez (02:04:52):

It did, yeah.

Professor Spain (02:04:52):

Was it upsetting to you?

Jacob Gomez (02:05:00):

Yeah, it was quite shocking.

Professor Spain (02:05:01):

Okay. Anything else that you can recall about that day that you think may be relevant?

Jacob Gomez (02:05:21):

No, just really quite shocking that, obviously, what happened to him and people's attitude towards somebody dying at that moment, but that's all my personal opinion.

Professor Spain (02:05:45):

Okay, thank you.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (02:05:47):

Yes. I just have a couple of questions for you. Going back to Mr. [inaudible 02:05:52] showing folks the video, did you feel like she was showing it... What's the word? Sort of without people wanting to see it? Was that upsetting for you or anyone else in the room? Not the video itself, which I think most people would find upsetting, but the actual... Her either volunteering to show it. Was there consent in that conversation?

Jacob Gomez (02:06:24):

I can't speak for anybody else. I know I asked what was going on, and she was on her phone in an excited state, so I asked what was going on, and so for myself, I suppose there was consent.

Dean Chapman (02:06:44):

Okay, and then in terms of the conversation in the room, and I know it was a while ago, and there are a lot of people in the room, but do you recall anyone else saying anything negative or positive about Charlie Kirk?

Jacob Gomez (02:07:04):

Only bits and pieces, just mentioning, I guess, some of his political points, like something along the lines of... There are... No matter what, for the Second Amendment to continue, people are going to get shot, and then discussion of irony or things of that nature.

Dean Chapman (02:07:35):

Do you remember that specifically? Was that Ms. Fisher saying that, or others, or you don't recall?

Jacob Gomez (02:07:40):

I don't recall.

Dean Chapman (02:07:44):

Did you hear Ms. Fisher reference Mr. Kirk as a racist, or did anyone else use that term in the room?

Jacob Gomez (02:07:54):

I don't recall that specifically.

Dean Chapman (02:07:57):

Okay. I think that's it for me.

Ms. Fisher (02:08:05):

Jacob, you indicated that Ms. Fisher was in an excited state and happy. Do you describe it as celebratory related to Charlie Kirk's death?

Jacob Gomez (02:08:26):

It could be described as that. Yeah, it could be that. Yeah.

Professor Spain (02:08:33):

This transcript was exported on Feb 24, 2026 - view latest version here.

Okay. Any other questions?

(02:08:33):

Nothing. Ellie.

Ms. Fisher (02:08:55):

Hi, Mr. Gomez, I really appreciate you being here today. It's going to switch over to me in a sec. I'm going to try to keep this brief so you can go back to class or whatever else you have going on on Fridays. So you stated that you walked into the clinic space and you had just learned about Mr. Kirk being shot. Do you recall other students also engaging in discussing the topic of Charlie Kirk?

Jacob Gomez (02:09:20):

Yes.

Ms. Fisher (02:09:21):

Are you aware of any other students who have been brought before the Honor Council other than myself?

Jacob Gomez (02:09:27):

None to my knowledge.

Ms. Fisher (02:09:29):

So you described my reaction as happy and excited, but is it fair to say that was your perception and not something that I announced, "I am excited"?

Jacob Gomez (02:09:44):

Correct. My perception of it.

Ms. Fisher (02:09:48):

So we're chatting about my mood and how I was for the council and maybe people who don't interact with me often. Can you describe what my mood is generally? Would you describe me as a generally animated person? I'm reserved, quiet, etc.

Jacob Gomez (02:10:06):

Yeah, animated, outspoken, pretty upbeat.

Ms. Fisher (02:10:13):

So would you agree that it's possible that other people who are present with us in the clinic suites may have perceived my reaction differently, similarly to how people could perceive the news differently?

Jacob Gomez (02:10:27):

Sure, yeah.

Ms. Fisher (02:10:29):

This transcript was exported on Feb 24, 2026 - view latest version here.

Moving along. Did I threaten you, instruct you or do anything to prevent you from leaving the room or doing any of your work in the space that day?

Jacob Gomez (02:10:39):

No.

Ms. Fisher (02:10:41):

Do you feel... Actually, I'm going to ask this in a different way, right? So you mentioned that you were there with Mr. Bomar... or not Mr. Perez, I believe you said Mr. Barkman. Do you recall kind of the content of their discussion? Were they also engaging in talking about Charlie Kirk?

Jacob Gomez (02:11:06):

I think they joined him in the conversation.

Ms. Fisher (02:11:10):

Okay, and this is just kind of like your subjective feelings. Do you feel as if law students at Texas Tech School of Law should have a right not to feel upset about certain viewpoints and other viewpoints?

Jacob Gomez (02:11:26):

Sorry, the connection broke out. Can you...

Ms. Fisher (02:11:27):

You're good. Yeah, I'll repeat it. Again, it's just subjective. So how you feel. Do you believe that law students at Texas Tech Law have a right to not feel upset by others' viewpoints and opposing viewpoints and things like that?

Jacob Gomez (02:11:48):

I mean, I think that they can... Any student can feel how they want to feel.

Ms. Fisher (02:11:55):

Okay, and then I'm just going to chitchat a little bit about just kind of our time in clinic. Mr. Gomez, would it be fair to say that topics, sometimes even sensitive topics, are regularly discussed in the clinic as well as the clinic suite?

Jacob Gomez (02:12:18):

Sensitive topics? I mean, pertaining to the nature of some of our cases, some of those can be sensitive topics, so yes.

Ms. Fisher (02:12:29):

Okay, perfect, and then just kind of jumping to the end, assuming whatever I'm alleged of, this statement of... Whatever my statement is and whatever my actions or however they were interpreted, to your knowledge, is reacting publicly to publicly reported news, even with words that may be upsetting, is that generally falling under the protections of the First Amendment?

This transcript was exported on Feb 24, 2026 - view latest version here.

Jacob Gomez (02:13:02):

Yeah.

Ms. Fisher (02:13:03):

No further questions. I really appreciate your time, Mr. Gomez.

Professor Spain (02:13:06):

Anything else?

Speaker 7 (02:13:09):

Hi, I had a question. I know in the report it said had you said something, it would've caused you stress. In that moment, when all this was going on, did you feel... Was it the environment itself or were you just more reluctant to say something, or did you feel that if you did say something... I know you said there could have been a fight, but was it the environment itself, or could you just kind of elaborate on what the environment was?

Jacob Gomez (02:13:40):

Right, and as you know, politics at the moment are quite polarized. I may not think in ways that other students think when I'm not outspoken as to my political beliefs as others are. I wanted to leave politics out of it and if I would've said anything, I was concerned of their perception of me or what they would think my political beliefs are, and obviously, the murder of Charlie Kirk was a hot topic and could have led to further verbal discussions and disagreements, but I just wanted to work with that, since we're all in the same clinic room for the remainder of the year.

Speaker 7 (02:14:43):

Okay. So I guess it wasn't... Just clarifying, it was that's more of a general statement about all kind of political talk, or was it just the specific conversation that you didn't feel comfortable saying something in?

Jacob Gomez (02:15:00):

At the moment, that specific topic, but I also looked at it generally. I don't really bring up politics for that reason as well.

Speaker 7 (02:15:14):

Okay. Thank you.

Dean Chapman (02:15:15):

Can I just clarify...

(02:15:18):

On your previous statement about feeling uncomfortable in that politically charged room, was that specific to Ms. Fisher and how you perceived sort of her mood, or was that just everybody talking about it and feeling like there were maybe people on both sides, and you just really didn't want to weigh in and create more friction in the room?

This transcript was exported on Feb 24, 2026 - view latest version here.

Jacob Gomez (02:15:46):

I guess more generally for the entire room, it seems they were leaning one way politically. I, myself or a few others in the minority were leaning a different way.

PART 4 OF 6 ENDS [02:16:04]

Jacob Gomez (02:16:04):

In the minority, we're leaning a different way.

Heidi (02:16:05):

Okay.

Jacob Gomez (02:16:05):

If that makes sense.

Heidi (02:16:06):

Yeah, it does. Thank you so much.

Professor Spain (02:16:10):

Thank you very much for appearing today.

Jacob Gomez (02:16:14):

Not a problem.

Dean Chapman (02:16:16):

Thank you. Jacob, I'll go ahead and let you exit the room meanwhile, thank you.

Professor Spain (02:16:20):

We've got another hour.

Jacob Gomez (02:16:20):

Okay. Thank you.

Speaker 8 (02:16:22):

Can I request another-

Professor Spain (02:16:22):

Can we have a-

Speaker 8 (02:16:23):

... short bathroom break?

Dean Chapman (02:16:26):

This transcript was exported on Feb 24, 2026 - view latest version here.

Yes, absolutely.

Speaker 8 (02:16:26):
Okay, thank you.

Dean Chapman (02:16:26):
Yes, yes, yes.

Speaker 8 (02:16:26):
I'm sorry.

Dean Chapman (02:16:27):
Yep, no, no, no, I actually am going to do that as well.

Professor Spain (02:16:29):
We have two-

Speaker 8 (02:16:30):
[inaudible 02:16:30] I won't drink anymore.

Professor Spain (02:16:30):
... witnesses left, am I wrong?

Dean Chapman (02:16:32):
Two. Yes, sir. Yes. For the record, we're taking another break.

Professor Spain (02:16:35):
[inaudible 02:16:37].

Heidi (02:16:47):
So Ken and Ashanti are the [inaudible 02:16:48]?

Professor Spain (02:16:47):
What's that?

Heidi (02:16:47):
We have Ken left.

Professor Spain (02:16:47):
Ken, and Ashanti-

Heidi (02:16:47):
And Ashanti-

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:16:47):

Yeah.

Heidi (02:16:47):

... and then we have an opportunity to question.

Professor Spain (02:16:47):

Yeah. Yeah, might have.

Heidi (02:16:47):

Yeah, got it.

Speaker 10 (02:16:47):

Hey Larry?

Heidi (02:16:47):

Got it.

Speaker 10 (02:16:47):

If you all are waiting on me to come back over there, you do not have to wait on me.

Professor Spain (02:16:47):

Okay.

Speaker 10 (02:16:47):

I may have to step out-

Professor Spain (02:16:47):

That's fine.

Speaker 10 (02:16:47):

... at various times-

Professor Spain (02:16:47):

Okay. Okay.

Speaker 10 (02:16:59):

... and you do not have to wait on me.

Professor Spain (02:17:00):

Okay. Okay.

Speaker 10 (02:17:00):

This transcript was exported on Feb 24, 2026 - view latest version here.

So I apologize-

Heidi (02:17:00):

My-

Speaker 10 (02:17:07):

... for that. I've been depending on... We're waiting down. Because depending on what kind of [inaudible 02:17:10] I had to step out, see what's going on.

Professor Spain (02:17:13):

Right.

Heidi (02:17:14):

You have other things to do, that's shocking. The world continued?

Professor Spain (02:17:18):

It does, unfortunately.

Heidi (02:17:19):

I know it. I had a student first year in my office the other day, stressed. I was talking about law school and they said, "I know, it's not just the pressure and the whatever, it's this other stuff in life that's happening." And I go, "You think that's not true for your faculty?"

Professor Spain (02:17:38):

Right.

Heidi (02:17:38):

The difference is you don't know because we compartmentalize like crazy.

Professor Spain (02:17:44):

Right.

Heidi (02:17:44):

Welcome to the rest of your life.

Professor Spain (02:17:46):

And it's all getting faster and faster.

Heidi (02:17:48):

I know. Every day.

Professor Spain (02:17:49):

I feel so sorry for the next generation of lawyers because AI-

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 10 (02:18:03):

AI.

Professor Spain (02:18:03):

... is not going to be helpful.

Speaker 10 (02:18:04):

Right.

Professor Spain (02:18:07):

And right now, attorneys struggle with that work-life balance.

Speaker 10 (02:18:15):

Right.

Professor Spain (02:18:15):

And I don't think AI is going to help with that. I think it's going to make it worse.

Speaker 10 (02:18:15):

Right.

Professor Spain (02:18:16):

So, it's going to be-

Speaker 11 (02:18:16):

We use AI sometimes and, oh, I use AI sometimes when I'm like, is my email too aggressive or is it too nice? How can I make this? I have-

Speaker 10 (02:18:29):

A lot of students using chat GPT that way.

Speaker 11 (02:18:34):

Yes.

Speaker 10 (02:18:34):

And it's gotten to where I can actually recognize it.

Speaker 11 (02:18:36):

Yes. And the em dashes-

Speaker 10 (02:18:37):

[inaudible 02:18:39].

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 11 (02:18:38):

... that's always my first giveaways when I see a bunch of the em dashes all throughout, I'm like, "This was written by ChatGPT."

Speaker 10 (02:18:48):

Yeah, once you get used to it, you can start to spot it.

Speaker 11 (02:18:49):

Mm-hmm.

Speaker 10 (02:18:51):

But yeah, I've noticed that in a lot of interactions, probably the last three months or so. It seems like everybody's running, what they're going to say, they're running it through ChatGPT to change the tone.

Speaker 11 (02:19:03):

Yes.

Professor Spain (02:19:03):

Yes. But-

Speaker 11 (02:19:03):

I'm glad you asked him already.

Dean Chapman (02:19:03):

Yes.

Speaker 11 (02:19:03):

I was like, "Huh-"

Dean Chapman (02:19:03):

"Hi, Tony, [inaudible 02:19:04]-"

Speaker 11 (02:19:03):

... I was coming down, I was like, "I think I'm going to head to that soup-

Dean Chapman (02:19:04):

Yeah.

Speaker 11 (02:19:14):

... myself real quick."

Dean Chapman (02:19:15):

Yeah. No, no, no. Take your time.

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 10 (02:19:15):

So, when you stepped out, Sofia told Larry that, "Y'all do not have to wait on me." They have to step out.

Speaker 8 (02:19:15):

Okay.

Speaker 10 (02:19:15):

Come back.

Speaker 8 (02:19:27):

Yep. Tell us then. Yep.

Speaker 10 (02:19:39):

You all just keep on [inaudible 02:19:39].

Speaker 8 (02:19:39):

Yes, sir.

Speaker 10 (02:19:39):

[inaudible 02:19:39].

Speaker 8 (02:19:39):

I know.

Dean Chapman (02:19:39):

There's like a vent right outside the bathroom.

Speaker 8 (02:19:39):

Yeah.

Dean Chapman (02:19:39):

It's like a-

Speaker 8 (02:19:39):

I should have brought my head warmers.

Dean Chapman (02:19:39):

Okay. Arctic blast. Blanket time. Okay.

Heidi (02:19:40):

Are we all back?

Professor Spain (02:19:50):

This transcript was exported on Feb 24, 2026 - view latest version here.

Yep.

Heidi (02:19:50):

Yep. All right. Next is Ashanti.

Professor Spain (02:19:52):

Right.

Speaker 10 (02:19:52):

Mmkay. Yeah, oh, Professor, you're going to have to move [inaudible 02:19:56].

Heidi (02:19:52):

We can some, good to do, right.

Dean Chapman (02:20:01):

Hi, Ashanti. Oh, let's see. Hi Ashanti, it's Dean Chapman. Okay. Hi Miha. I think you're on mute. There we go.

Ashanti (02:20:14):

Sorry, I didn't see her.

Dean Chapman (02:20:14):

No worries.

Professor Spain (02:20:19):

Thank you very much for appearing today. I've just got a few questions and then we'll let others ask questions of you as well.

Dean Chapman (02:20:27):

And I-

Professor Spain (02:20:29):

I'm going to be referring to the events that occurred on the day that Charlie Kirk was shot. And I understand that you were in Professor Metz's office that morning and-

Ashanti (02:20:44):

Yes.

Professor Spain (02:20:44):

... some discussion about Charlie Kirk's death. Is that right?

Ashanti (02:20:50):

Yes.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:20:51):

Can you relate as best you can, the substance of the conversation that day in his office?

Ashanti (02:21:02):

So basically me, Bridget, and Ellie were in there to talk to Professor Metz about some of our clinic stuff. And then one of the professors, Terry Morgan, she came in and said, "He died" or something like that.

(02:21:19):

And we were like, "Who died?" And then someone said, "Charlie Kirk." And we're like, "Who is that?" And then Professor Metz was like, "Do you want to see this video?" Or like, "Here's the video of him getting shot." And then that was it, basically. We were like, "Who is he?" And that was it.

Professor Spain (02:21:45):

So, are you saying that it was Professor Morgensen that first informed the people in his office as to the-

Ashanti (02:21:53):

Yes.

Professor Spain (02:21:53):

... shooting of Charlie Kirk?

Ashanti (02:21:56):

Yes. She said he died. She didn't say who? I don't know if it was her or somebody else who said who, but she definitely came in and said he died.

Professor Spain (02:22:08):

So there hadn't been any discussion about Charlie Kirk prior to her entering the room?

Ashanti (02:22:17):

No. Talking about our... I think me and Bridget came in to talk about our PNC that we just had, and then Ellie came in and sat on the couch and was waiting to ask them him a question about something. And then Terry came in and was like, "He died."

Professor Spain (02:22:38):

Okay. Do you recall any specific statements that Ellie Fisher may have made while in the office that morning or that afternoon?

Ashanti (02:22:52):

Mm-hmm. Yeah.

Professor Spain (02:22:52):

So you-

Ashanti (02:22:52):

This transcript was exported on Feb 24, 2026 - view latest version here.

It was a really long time ago.

Professor Spain (02:22:52):

Right. Right.

Ashanti (02:22:52):

I can't really remember it exactly, but no.

Professor Spain (02:22:55):

Okay. And she was not celebrating his death in any way?

Ashanti (02:23:06):

Not when I was in the office, no.

Professor Spain (02:23:09):

Nothing that she said or indicated that would indicate that, is that right?

Ashanti (02:23:17):

No, it was more like we all were just like, "Who's that?" And then we got explained, and then the video was shown to us, and then that was basically it.

Professor Spain (02:23:31):

And you don't recall her... When I say "her," Ellie Fisher indicating in any way that Charlie Kurt got what he deserved. Do you recall that statement-

Ashanti (02:23:42):

No.

Professor Spain (02:23:42):

... being made at all? Okay.

Ashanti (02:23:46):

Hm-mm.

Professor Spain (02:23:46):

Okay. [inaudible 02:23:49].

Heidi (02:23:51):

Yeah, sorry. I can't write and talk at the same time. So I know it was a long time ago, so just let us know what you do remember. Do you remember either before, I guess not before, but after Professor Morgensen came in viewing the video either as a group or individually while y'all were together in the office?

This transcript was exported on Feb 24, 2026 - view latest version here.

Ashanti (02:24:13):

Terry didn't watch the video with us. She came in, said, "He died," and then left. And then Professor Metz went and showed us the video. I don't know if it was like two of us that saw it or all three of us. I can't really remember. But-

Heidi (02:24:27):

Okay.

Ashanti (02:24:28):

... he went and showed us after she left.

Heidi (02:24:31):

Okay. And you don't remember, do you remember any from anyone in the office, any laughter or profanities being used against Mr. Kirk? Name calling-

Ashanti (02:24:45):

Not when I was in the office or anything. I can't really remember specific details.

Heidi (02:24:53):

Okay, that's fine.

Ashanti (02:24:54):

But I don't remember. Yeah. Okay.

Heidi (02:24:54):

Yeah, that's good. Thank you.

Ashanti (02:24:55):

Mm-hmm.

Professor Spain (02:24:55):

Others' questions?

Speaker 11 (02:25:04):

I have a question. Sorry, I may have missed it when you first said it, but what was the order of going into Professor Metz's office? Was Ellie already in there when you got in there or what, I guess, could you explain that?

Ashanti (02:25:18):

I think me and Bridget came back from our PNCs, went into his office, and then I think Ellie came in and then sat down on the couch.

Speaker 11 (02:25:35):

This transcript was exported on Feb 24, 2026 - view latest version here.

Thank you.

Professor Spain (02:25:37):

Did you all leave the office at the same time or did you leave before?

Ashanti (02:25:42):

I don't think so, because I needed to talk about my PNC, so I stayed and went and asked questions about my PNC.

Professor Spain (02:25:50):

Okay. Helen?

Helen (02:25:53):

Hi Shulti, thank you so much for being here today. I'm going to ask you just some brief questions just so that I can keep it quick. So just to confirm, you were present there with me, Bridget, and Professor Metz in his office on September 10th, 2025?

Ashanti (02:26:07):

Yes.

Helen (02:26:08):

And you learned about the news regarding Charlie Kirk in his passing from Professor Morgensen who popped her head in?

Ashanti (02:26:17):

Yes.

Helen (02:26:18):

Do you recall Professor Morgensen making any statements to the effect of making it known that she was upset, offended, wanted any conversation to continue or making any actions like shutting the door?

Ashanti (02:26:31):

No, I can't remember.

Helen (02:26:33):

And I know it was super long time ago, but even to the best of your memory, did you ever hear me use the word "motherfucker" when discussing Charlie Kirk?

Ashanti (02:26:45):

No.

Helen (02:26:46):

And did you ever hear me say, "Charlie Kirk got what he deserved"?

This transcript was exported on Feb 24, 2026 - view latest version here.

Ashanti (02:26:50):

No.

Helen (02:26:51):

And when you first saw the video of the assassination, was that in Professor Metz's office?

Ashanti (02:26:58):

Yes.

Helen (02:26:59):

And do you recall who showed you the video?

Ashanti (02:27:02):

Yes. Professor Metz.

Helen (02:27:04):

Did you ever witness me celebrating the death of Charlie Kirk?

Ashanti (02:27:08):

No.

Helen (02:27:09):

Would you say that you and I are social friends and we spend a lot of time together?

Ashanti (02:27:16):

Yes.

Helen (02:27:17):

And so would it not be unusual for you and I to be laughing together?

Ashanti (02:27:23):

Yeah, that wouldn't be unusual.

Helen (02:27:25):

And is your testimony today consistent with the statement you gave to Professor William Keffer on October 22nd, 2025?

Ashanti (02:27:33):

Yes.

Helen (02:27:34):

To your knowledge, would you have any reasoning as to why your statements wouldn't be included in the final investigative report delivered by Professor Keffer?

This transcript was exported on Feb 24, 2026 - view latest version here.

Ashanti (02:27:44):

No.

Helen (02:27:44):

Do you recall Professor Keffer asking you if I used the terms "mother fucker" and said, "He got what he deserved" in Professor Metz's office?

Ashanti (02:27:53):

I do remember him saying something about you saying "mother fucker," but that's-

Helen (02:27:59):

And to wrap it up, based on your observations that day and obviously your understanding of the honor code, did you witness me engaging in any conduct that you would consider unprofessional or a violation of our honor code?

Ashanti (02:28:09):

No.

Helen (02:28:12):

No further questions, Chair. Thank you-

Professor Spain (02:28:13):

Thank you, Ms. Baxter.

Helen (02:28:13):

Oh.

Professor Spain (02:28:14):

Just because you're [inaudible 02:28:17]-

Helen (02:28:18):

Oh, can I say one more thing?

Professor Spain (02:28:19):

Sure.

Helen (02:28:19):

Just because we're friends also, I want to ensure just for the council's awareness as well that you are forthcoming in this process. And just because of our social, you weren't prompted to make any testimony today and you wouldn't lie to this counsel on my behalf or anything like that?

Ashanti (02:28:32):

No.

This transcript was exported on Feb 24, 2026 - view latest version here.

Helen ([02:28:35](#)):

Thank you.

Dean Chapman ([02:28:35](#)):

Okay. Final question.

Professor Spain ([02:28:38](#)):

Anything else anybody has? Yeah.

Speaker 11 ([02:28:40](#)):

Sorry, I have too many questions. Hi, I have two questions. So, my first question is, were you in Professor Metz's office the entire time Ellie would've been in the office or would there have been any times that you weren't or vice versa?

Ashanti ([02:28:57](#)):

I think so. I'm not sure who left first. Because it was just, I don't know, it wasn't that significant for me to remember all the details, but I know we all left at different times, so I don't know if she left before me or I left after her.

Dean Chapman ([02:29:15](#)):

Okay. Thank you.

Ashanti ([02:29:18](#)):

And then-

Professor Spain ([02:29:19](#)):

Right, thank you for her-

Dean Chapman ([02:29:20](#)):

Oh, she has some more, she might have some more.

Professor Spain ([02:29:20](#)):

Oh, okay.

Ashanti ([02:29:40](#)):

Sorry, I'm trying to remember. Okay.

Professor Spain ([02:29:41](#)):

You're okay?

Ashanti ([02:29:41](#)):

Yes.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:29:41):

Okay. Anything else?

Dean Chapman (02:29:44):

No, sir. But thank you.

Ashanti (02:29:45):

Okay.

Dean Chapman (02:29:45):

Ashanti, thank you.

Professor Spain (02:29:47):

Thank you.

Dean Chapman (02:29:47):

We'll go ahead and let you exit the room, Miha.

Miha (02:29:51):

Okay. Thank you. Bye-bye.

Dean Chapman (02:29:53):

Mm-hmm, bye-bye. Hi, Professor Williams. It's Dean Chapman, I think you're on mute.

Professor Williams (02:30:09):

Hi.

Professor Spain (02:30:10):

Good morning, Professor Williams. Thank you for appearing today. I'm going to ask you a few questions and the others may have questions as well, but I am referring to events that occurred on September 10th, 2025, when Charlie Kirk was shot. As far as I understand, news of that occurred during your class, is that right?

Professor Williams (02:30:43):

Right at the end of class, that's correct.

Professor Spain (02:30:45):

Right at the end of class. And do you recall any students making any or statements regarding the shooting?

Professor Williams (02:30:55):

I do, yes. A student announced that Charlie Kirk had been... I don't remember the exact word that we used, killed, assassinated, or whatever, but a student did announce that as we were ending a class.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:31:08):

Mmkay. Do you remember which student it was?

Professor Williams (02:31:11):

I believe it was Henry. I don't remember his last name, but I'm not certain about that. But I believe he was the one who did.

Professor Spain (02:31:19):

Okay. And what was the substance of his statement? Simply that he had been shot or?

Professor Williams (02:31:26):

That he had been, yeah, he had been shot, killed, assassinated. Like I said, I don't remember the exact word that was used.

Professor Spain (02:31:34):

Okay. Was there anything said beyond that by either him or-

Professor Williams (02:31:39):

Yeah.

Professor Spain (02:31:40):

... any other students and?

Professor Williams (02:31:42):

Well, I asked the question after he said that, I asked the question, "Well, who is Charlie Kirk?"

Professor Spain (02:31:50):

Okay.

Professor Williams (02:31:51):

Because I actually didn't know who he was, so I asked the question, who was Charlie Kirk.

Professor Spain (02:31:53):

Okay. I know this occurred at the end of class. Did any other student make any kind of comment after it was announced that Charlie Kirk had been shot that you can recall?

Professor Williams (02:32:08):

After? You mean before I asked the question?

Professor Spain (02:32:13):

No. Any other comment after-

Professor Williams (02:32:15):

This transcript was exported on Feb 24, 2026 - view latest version here.

At any point? Okay.

Professor Spain (02:32:16):
Yeah.

Professor Williams (02:32:16):
Yeah. I believe a student did indicate that he had been... Who he was, I believe something to the effect, I don't remember again, the exact wording that was used, that he was a conservative activist or something along those lines.

Professor Spain (02:32:35):
Okay.

Professor Williams (02:32:35):
Somebody said something like that. Yeah.

Professor Spain (02:32:38):
Okay. And do you recall which student it was that made that comment?

Professor Williams (02:32:42):
I believe it was Henry, but again, I'm not certain about that.

Professor Spain (02:32:45):
Okay.

Professor Williams (02:32:46):
It was right at the end of class. I was packing my books, getting ready to leave class, and yeah, I asked the question, he made the announcement, I believe it was him who made the announcement, and I just asked, "Who's Charlie Kirk?"

(02:32:59):
And then a comment was made about I guess who he was. And then I left class and I looked at my phone to check messages. Generally, I usually do that after a class. And my phone finally had blown up with news about Charlie Kirk. So-

Professor Spain (02:33:14):
Okay. Okay. Others?

Heidi (02:33:17):
I just have one quick question. Do you recall any students making any celebratory comments or comments that were negative about Charlie Kirk or "He got what he deserved"? Anything? Were there-

Professor Williams (02:33:34):

This transcript was exported on Feb 24, 2026 - view latest version here.

Nothing like that, no, I would've remembered that. I'm pretty certain I would've remembered that. Had there been any sort of celebratory comments, anything like that had been made, I would've remembered that. No. I just remembered kind of a matter of fact response to my question. "Well, you know," so, I asked the question.

(02:33:54):

I remember that for certain, asked the question, and I do remember a student did announce that he had been killed. But no, I don't remember any sort of celebratory or any kind of real reaction to it.

Heidi (02:34:07):

Mmkay. And then after you completed class, did you go to the clinic at any time that afternoon?

Professor Williams (02:34:14):

No, I did not. No. I went straight to my office.

Heidi (02:34:19):

Okay. Thank you.

Professor Williams (02:34:23):

Okay.

Professor Spain (02:34:23):

Others?

Heidi (02:34:23):

No.

Professor Spain (02:34:23):

Pauline?

Pauline (02:34:24):

Professor Williams, thank you so much for being here today. I'm going to keep it really short. SBA is most respectful with your time. So just to confirm, I was a student in your race and racism class on September 10th, 2025, correct?

Professor Williams (02:34:34):

Correct.

Pauline (02:34:37):

And I recall you saying, "It's been so long ago," but can you say that I was not the student who announced Charlie Kirk's being shot?

Professor Williams (02:34:47):

I don't believe it was you, but again, I can't say with 100% certainty.

This transcript was exported on Feb 24, 2026 - view latest version here.

Pauline (02:34:52):

And do you recall in the class there being further discussions about Charlie Kirk? I think we kind of mentioned that, but just from my end.

Professor Williams (02:35:01):

No, no, no. Hm-mm.

Pauline (02:35:03):

And as your time as a law professor, have you heard any discussions now to present day about Charlie Kirk in the law school? Has it become a point of discussion, that sort of thing?

Professor Williams (02:35:16):

Has Charlie Kirk become a point of discussion at the law school?

Pauline (02:35:20):

Right. Have you heard... Sorry if I'm not being loud enough... Have you heard other students discussing it? Was it widely discussed at the law school or was it kind of confined to that discussion? And this is not just me, just kind of your knowledge of the law school and being a professor.

Professor Williams (02:35:36):

Yeah, I haven't heard any students discuss Charlie Kirk, no. No.

Pauline (02:35:42):

And so in your opinion, the announcement, I believe it's attributed to Henry, the announcement of saying just plain, "Charlie Kirk was shot." Would you consider that unprofessional in any way?

Professor Williams (02:35:57):

No. No.

Pauline (02:36:00):

And to confirm, did you ever hear me use the term "motherfucker" in your class?

Professor Williams (02:36:06):

No.

Pauline (02:36:07):

Did you ever hear me make statements sort of to statements similar to that of, "Charlie Kirk got what he deserved," or, "He should be shot," anything to that effect?

Professor Williams (02:36:17):

No.

Pauline (02:36:18):

This transcript was exported on Feb 24, 2026 - view latest version here.

Do you recall any of my actions to be that of out of the ordinary of how I usually am in your class after Charlie Kirk was shot?

Professor Williams (02:36:29):

No.

Pauline (02:36:30):

And I know you said you can't say with 100% certainty, but just want to wrap back to after you had asked the question, who was Charlie Kirk and a student mentioned, "Oh, he's conservative," or right-wing, or whatever it was. Can you reasonably say that you recall that that was not me?

Professor Williams (02:36:54):

I don't believe it was you, but I can't say again with certainty-

Pauline (02:36:55):

Okay.

Professor Williams (02:36:56):

... that it wasn't.

Pauline (02:36:57):

Okay. No further questions at this time. Thank you so much, Professor Williams.

Professor Williams (02:37:00):

Okay.

Professor Spain (02:37:02):

Anybody else?

Pauline (02:37:02):

Okay. All right.

Professor Spain (02:37:05):

Thank you very much.

Pauline (02:37:06):

Thank you Professor Williams-

Professor Williams (02:37:06):

Okay.

Pauline (02:37:07):

... I'll let you go ahead and exit.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Williams (02:37:10):

Okay.

Heidi (02:37:10):

Well, [inaudible 02:37:11] class.

Professor Spain (02:37:17):

All right. At this time, Ellie, I know that you made an opening statement. Would you like to make any kind of further statement to the counsel at this time?

Ellie (02:37:29):

Yes, but-

Professor Spain (02:37:29):

Particularly in response to anything that may have been stated?

Ellie (02:37:34):

Like a closing statement? Just asking for clarification.

Professor Spain (02:37:36):

Well, just any kind of statement.

Ellie (02:37:39):

Yes, please. But-

Professor Spain (02:37:40):

Okay.

Ellie (02:37:40):

... I would request, can I confer with my counsel for a bit-

Professor Spain (02:37:43):

Sure.

Ellie (02:37:43):

... before?

Professor Spain (02:37:43):

Sure.

Ellie (02:37:43):

Thank you so much.

This transcript was exported on Feb 24, 2026 - view latest version here.

Professor Spain (02:37:44):

Yeah.

Dean Chapman (02:37:44):

You'll take-

Ellie (02:37:44):

[inaudible 02:37:45].

Dean Chapman (02:37:45):

... the secret passage.

Ellie (02:37:46):

Okay. That's what we call it.

Dean Chapman (02:37:59):

We're still recording.

Ellie (02:38:03):

So, procedurally-

Dean Chapman (02:38:06):

We're still-

Ellie (02:38:06):

... she's going to say to-

Dean Chapman (02:38:07):

Yeah.

Ellie (02:38:07):

Yeah.

Professor Spain (02:38:07):

She's making a statement.

Ellie (02:38:07):

I know.

Professor Spain (02:38:07):

Yeah.

Ellie (02:38:09):

This transcript was exported on Feb 24, 2026 - view latest version here.

Sorry. I'm sorry. I'm sorry. Yeah, yeah.

Dean Chapman (02:38:11):
I know the rules. And then she'll make a statement and then we can follow up with any questions.

Professor Spain (02:38:15):
Right. Right.

Dean Chapman (02:38:15):
And then if she wants to make a closing statement she can.

Professor Spain (02:38:15):
On the statement she can, yeah, yeah. Right.

Speaker 10 (02:38:15):
I just wanted to confirm.

Ellie (02:38:15):
Okay, it's okay. Sorry. [inaudible 02:38:29]-

Dean Chapman (02:38:15):
I'm a lawyer. I know the rules.

Ellie (02:38:15):
Yeah, no, no. Yeah.

Dean Chapman (02:38:15):
Been one for 20-plus years.

Ellie (02:38:15):
Yes.

Dean Chapman (02:38:15):
[inaudible 02:39:10].

Speaker 12 (02:38:15):
[inaudible 02:39:16]. Okay. [inaudible 02:39:25]. [inaudible 02:39:30]. Okay. And then [inaudible 02:40:04]. [inaudible 02:40:28]. [inaudible 02:40:40] yeah, [inaudible 02:40:43]. [inaudible 02:41:01]. [inaudible 02:41:38].

Dean Chapman (02:38:15):
Okay, yeah, if you're [inaudible 02:42:37] confined [inaudible 02:42:40] shoot [inaudible 02:42:41] and then if you're shooting then out after the government [inaudible 02:42:51] and then [inaudible

This transcript was exported on Feb 24, 2026 - view latest version here.

02:42:54] and yeah, Hosanna got it, [inaudible 02:43:01] read it, but I think that's going off that [inaudible 02:43:06]. But they are 3D, because I [inaudible 02:43:10] I have extra wood.

(02:38:15):

But, you know, [inaudible 02:43:15] black really [inaudible 02:43:28] don't die, [inaudible 02:43:34] and then you could do three meals after this, so that changed [inaudible 02:43:40]. I've already been with Joseph. I'm just [inaudible 02:44:12] and she'd come down and she would keep pushing me to [inaudible 02:44:18].

(02:38:15):

I was [inaudible 02:44:21].

Speaker 10 (02:38:15):
Larry, do you want to step out for just a second?

Professor Spain (02:38:15):
Let's get some air.

Speaker 10 (02:38:15):
Do you step out for a second?

Professor Spain (02:38:15):
Sure.

Speaker 10 (02:38:15):
Yeah. Yeah. [inaudible 02:46:17].

Dean Chapman (02:46:18):
I know. We had two individuals step out for a second.

Heidi (02:46:20):
Okay, no worries.

Dean Chapman (02:46:22):
Yeah. I'm going to get another water. You all good on water?

Professor Spain (02:46:24):
I'll be fine.

Dean Chapman (02:46:24):
Yeah.

Professor Spain (02:46:24):
Yeah.

This transcript was exported on Feb 24, 2026 - view latest version here.

Dean Chapman (02:46:26):

I didn't have time to do coffee, I apologize. No, it's perfect.

Professor Spain (02:46:28):

That's not your responsibility, don't worry.

Dean Chapman (02:46:33):

Well, I wanted to and I just, it was just a busy...

Heidi (02:46:36):

You always ensure that we have coffee every week at the school.

Dean Chapman (02:46:39):

Right.

Heidi (02:46:39):

So, we'll let you off on this one.

Dean Chapman (02:46:42):

All righty hun, and all the fun stuff, right?

Heidi (02:46:43):

Yeah. You make sure that we're fed throughout finals, so all the fun stuff.

Dean Chapman (02:46:47):

Yeah.

Heidi (02:46:54):

As long as it's not the Monster energy drinks. I don't like y'all drinking those. I worry about y'all.

Dean Chapman (02:47:01):

They need to get them out of the-

Heidi (02:47:02):

I know.

Professor Spain (02:47:02):

Well, I think last I tried-

Dean Chapman (02:47:02):

... mainline-

Professor Spain (02:47:02):

This transcript was exported on Feb 24, 2026 - view latest version here.

... one of those I [inaudible 02:47:05]-

Dean Chapman (02:47:04):

... [inaudible 02:47:05] by Monster.

Heidi (02:47:05):

Main route, yeah, I know. And-

Dean Chapman (02:47:09):

I have the Redbulls-

Heidi (02:47:09):

... I did the-

Dean Chapman (02:47:09):

... that are so bad for you.

Heidi (02:47:11):

... I just worry. And my first year at the law school, I saw a lot of it and then was where I saw the students were Door Dashing food. I was like, "We can't have this." That's why I kind of restructured my budget. I was like, "Let's have food and try to take care of ourselves." So.

Dean Chapman (02:47:26):

It really is nice.

Heidi (02:47:27):

Yeah.

Dean Chapman (02:47:28):

Sometimes I don't eat any kind of meal during that time, so it's like a meal of the day.

Heidi (02:47:30):

Yeah, yeah.

Dean Chapman (02:47:31):

So [inaudible 02:47:33] stress, should I eat? No.

Heidi (02:47:36):

I try to make sure you have a little bit of good, a little bit of bad.

Dean Chapman (02:47:38):

Eat Turkey. That's your friend.

This transcript was exported on Feb 24, 2026 - view latest version here.

Heidi (02:47:38):

Yes.

Dean Chapman (02:47:38):

Down at Costco-

Heidi (02:47:43):

Yes.

Dean Chapman (02:47:43):

... organic beef.

Heidi (02:47:44):

That one's really good. My son goes through the whole bag in three days.

Dean Chapman (02:47:48):

That's what I have for my office.

Speaker 9 (02:47:48):

I like the sticks-

Heidi (02:47:48):

Yeah. I know.

Speaker 9 (02:47:48):

... the Chomp Sticks.

Heidi (02:47:48):

The Chomp-

Speaker 9 (02:47:48):

All those are so good.

Heidi (02:47:54):

Those are good.

Speaker 9 (02:47:55):

They need a Trader Joe's out here.

Heidi (02:47:56):

Yeah.

Speaker 9 (02:47:58):

This transcript was exported on Feb 24, 2026 - view latest version here.

That would be awesome.

Heidi (02:47:58):

Oh, I know.

Speaker 10 (02:47:58):

It'll come [inaudible 02:47:59]-

Heidi (02:47:58):

And it won't come. It will never be here.

Speaker 10 (02:48:00):

I don't have one in my area [inaudible 02:48:02]-

Heidi (02:48:02):

All right, we're back.

Professor Spain (02:48:02):

Heidi?

Heidi (02:48:02):

Yeah.

Professor Spain (02:48:02):

Are you still recording?

Heidi (02:48:02):

Yeah, I'll still recording.

Professor Spain (02:48:02):

Still recording.

Heidi (02:48:04):

Yeah, I'm still recording. I haven't turned it off.

Speaker 9 (02:48:06):

Always be recording.

Heidi (02:48:08):

Yes.

Professor Spain (02:48:09):

This transcript was exported on Feb 24, 2026 - view latest version here.

All right. I just want to clarify that we've received a lot of information here this morning, and so I want to give you an opportunity to make any kind of statement that you might wish to make-

Ellie (02:48:22):

Yes, sir.

Professor Spain (02:48:22):

... to the counsel. If you do so, counsel will have an opportunity to ask you any follow- up questions. You're not required to make a statement, but if you choose to do so after that concludes, then I'll give you an opportunity to make a closing statement. Okay?

Ellie (02:48:42):

Oh, so this is not my closing statement.

Professor Spain (02:48:43):

Wouldn't necessarily be considered a closing statement.

Ellie (02:48:48):

Okay. Yeah. I'll go ahead. Just to preface this one I did not type up before, so apologies if it's not necessarily a scripted, but I think the first thing that I wanted to address with this counsel is it's been asked a bunch of some witnesses.

(02:49:04):

It's been asked of me, so I wanted to provide a little bit of clarification on the allegations surrounding this video. Right? So it was asked to a few witnesses if I showed this video, your interpretation of the video, et cetera. What I want to bring forth to the counsel is that I believe my statement in the report or the investigative report was a little bit misconstrued, and so I'd like to provide a little bit of context behind that.

(02:49:29):

When I was first asked about showing this video, what I understood and how I was asked was if I had shown the video in Professor Metz's office, what I brought forth to Professor Keffer was that I was not the one in Professor Metz's office who had the video, and I submitted to him that it was Professor Metz.

(02:49:48):

I did not intend for this statement to be taken as I did not ever view the video. I did not ever watch the video or share it or view it with other students. My understanding was that I was being asked about this situation in Professor Metz's office.

Ms. Fisher (02:50:03):

... listen, I was being asked about this situation in Professor Metz' office, further, I was asked directly if I had shown the video to Professor Stevens, which through his testimony and his affidavits, he testified here today that I did not, which was similar to exactly what I had told Professor Keffer.

(02:50:17):

So, when it came down to being questioned about the video, I had understood that I was being asked in a short situation. And so, I believe that it was a little bit misrepresented on that video. I absolutely

This transcript was exported on Feb 24, 2026 - view latest version here.

submit to the council that I saw the video. I believe it was quite public that day. I watched it, other students watched it. In fact, it wasn't even something that people were Googling. It was just coming up on social media.

([02:50:47](#)):

I believe that other witnesses also shared that they viewed the video. They watched the video either on my cellphone or theirs. However, they did confirm that that was not without their consent, and that there was no time that I was showing this graphic image or a graphic video without people's consent. And, additionally, of course not, in a way to make them uncomfortable, or to offend anybody, and definitely not to be celebratory.

([02:51:13](#)):

And so, that takes me to my second point of the insinuation that I did not know who Charlie Kirk was. Summarily, I think that my statements of that was a little bit misrepresented in this report. Of course, I think y'all could understand just how confusing it is to be confronted with allegations that aren't necessarily true by a law professor. In doing so, I was also pretty nervous. Right? And so, what I was trying to bring forth to the council was that prior to Charlie Kirk's death I did not have strong feelings in which would make me celebrate him further.

([02:51:54](#)):

Of course, as my clinic mates and fellow students at the school were learning about who he was through what's being posted on the news, once it got towards the end of the day I definitely would say that I had a further indication of Charlie Kirk, who he was, but I still submit that I don't necessarily know him to the point of even knowing his viewpoints. Right? I know that he is conservative. However, it was on that day that I actually learned about what Turning Point was. The only way I was made aware of what Turning Point was was that it was shared to me that it was similar to FedSoc. And so, I assumed what Turning Point stood for.

([02:52:38](#)):

I think one of the main things that I hope that this council recalls, and understands throughout the testimony today is that there was a lot of speculative reports made about him. However, none of them were confirmed.

([02:52:52](#)):

To the allegation that I said the term, "Motherfucker," the person who was with me all day, Ashanti, testifies that that wasn't heard. Professor Stevens testified that I didn't say that statement. In fact, family law students also testified that I didn't make that statement.

([02:53:11](#)):

It was further alleged that I was celebratory, or I was engaged in some sort of conduct that could be understood as celebratory. And, even though, we had witnesses come today and say that I was not celebratory, I'd like to take this opportunity to further reference how me being in a good mood is not necessarily something that is out of the ordinary.

([02:53:33](#)):

Witnesses testified today that I am generally in a good mood, I'm generally animated. I believe it's encompassed in Professor Metz' affidavit that I'm known as somebody who "bops around." And so, I'd just like to remind the council that my behavior, and who I am as a person, combined with a day of tragedy that I didn't necessarily schedule, I'm not sure if it meets the clear and convincing burden that I, for some reason, was specifically celebrating the death of Charlie Kirk.

This transcript was exported on Feb 24, 2026 - view latest version here.

(02:54:06):

We heard from Professor Morgeson, who in her initial statement was pretty sure that I had said the, "Motherfucker" and today she said that she was not able to confirm that. However, other witnesses were able to confirm with certainty that they didn't hear that.

(02:54:22):

I submit that after the testimony of Professor Morgeson today I don't believe that her remembrance of the event is necessarily equal to that of all the other witnesses who came forth today and their recollection of the events. For example, Professor Morgeson recalls shutting the door. Her own clinic students don't recall her shutting the door. Professor Stevens, certainly, didn't testify to her shutting the door. Ashanti recalls her not shutting the door. Professor Metz also in his affidavit testifies to the door not being shut.

(02:54:56):

Further, it was stated that I was corrected. And Professor Stevens, certainly, didn't bring that forth to the council today. Although, Professor Williams' testimony was not able to confirm 100%, as he said, with certainty that I was not the one who first announced that Charlie Kirk was shot in Professor Williams' course, he was able to say that he reasonably believed it was another student. And that's consistent with the statement that I gave to Professor Keffer in October.

(02:55:28):

Through that ... Right? I think that it is extremely relevant that it was a male student, and not a female student. Even if you're not able to identify which who made that statement that day.

(02:55:38):

Throughout the investigative report, it was stated that a lot of the exculpatory evidence for me was considered "irrelevant," however, I believe it's incredibly relevant to my stance as well as my integrity. I stand here before you with not only my credibility, but my future as in this profession is hanging in the balance.

(02:55:59):

And so, it's incredibly important for me to ensure that this council has a full view of what I believe to be the events. It's been my understanding that there's been a lot of rumors circulating, and that's no surprise. Right? It's a law school. However, I'm not necessarily sure that because I was somebody who also reacted to the rumors of the largest news that was on the news that day how I find myself singled out in here before this council.

(02:56:29):

I really appreciate all of the time that everybody's taken in investigating this. I recognize that there's been a lot of evidence, and there's been a lot of testimony today, but with that I hope that this council finds when it's all laid out before them the clear and convincing burden is not met. And, in fact, this council should not be able to find that a violation even occurred at all.

(02:56:54):

On that day, I remember it as being nothing out of the ordinary. Right? As many of the witnesses came to say, "It was months ago." However, the aftermath of the situation has been incredibly devastating. People talked about this in court. People know I'm a clinical student. This has affected my mental health. This has affected the way in which I participate in school.

(02:57:18):

This transcript was exported on Feb 24, 2026 - view latest version here.

And through that, and I only bring this up, because we're talking about my professional conduct, I have continued in clinical programs, I've continued to represent my clients, I've continued to go to class. In fact, I've been purely successful in clinical end.

(02:57:32):

So, I would bring that forth to say in the wake of the allegations of my unprofessional conduct, using that as an example of just how professional I am. In addition, I take this process extremely seriously. I take my role as a student at Texas Tech Law very seriously. And I would hope that this council recognizes the position that I'm in when I have to defend myself to allegations that seemingly were either swayed against me or exculpatory evidence was completely left out. And, thus, this council hadn't really had the opportunity to view all the evidence in light.

(02:58:07):

And so, with that, I really appreciate y'all's time. I appreciate you guys giving me this opportunity to bring forth my witnesses. And if you guys have any questions, I'd be more than happy to answer them.

PART 5 OF 6 ENDS [02:50:04]

Speaker 13 (02:58:16):

I've just got a few questions. So, just for clarification, you're indicating that Professor Keffer mischaracterized some of your statements to him?

Ms. Fisher (02:58:33):

I'm not here to necessarily speak to motives, but I recall what was stated that day. And what I read in the investigative report I don't feel as it was the correct characterization of our conversation.

Speaker 13 (02:58:51):

You're saying that it was inaccurate then?

Ms. Fisher (02:58:53):

I believe that some of the statements were definitely left out of context or were even combined or shortened to leave out the necessary context that would give this council the fullest informed light of the situation.

Speaker 13 (02:59:11):

Okay. One of the statements that was in his report was that you had made a statement that it was Professor Stevens that asked you whether or not you had heard, presumably, about the shooting of Charlie Kirk. Is that accurate?

Ms. Fisher (02:59:29):

Similar. I think that was mischaracterized. When I was explaining it to Professor Keffer I was, basically, walking him through it. So, instead of answering direct questions like you and I are doing now, I was giving him more so a summary. And so, what I brought forth to Professor Keffer was that when I walked into the clinic, I got just about here and it is a clear glass, and then Professor Stevens' door was open. When I saw Professor Stevens was there I took about an inch step back, and I said, "What's up, Joe Lou?" Because that's what I call him. I said, "What's up?" to Joe Lou. And he said, "Hey. Did you hear?"

This transcript was exported on Feb 24, 2026 - view latest version here.

(03:00:02):

And so, at that time, Professor ... I told the council that Professor Stevens asked me, "Did you hear?" What I told him was, "No. About Charlie Kirk?" And he said, "No. What happened?" And I said, "He was shot." And that was the conversation.

(03:00:21):

So, I think what was mischaracterized was maybe what discussion was started, if that makes sense. I think what I've brought forward to Professor Keffer was the initial interaction of Joe and I in the office when I said, "What's up?" He said, "Hey." But was I the first one to say that [inaudible 03:00:44] Charlie Kirk? Absolutely. I just don't think that that was necessarily the question that I was asked.

Speaker 13 (03:00:57):

Okay. And did you show the video on your phone to Joe Stevens?

Ms. Fisher (03:01:03):

No. Not to Joe Stevens and-

Speaker 13 (03:01:05):

Okay.

Ms. Fisher (03:01:05):

... I did not show it to Professor [inaudible 03:01:07].

Speaker 13 (03:01:10):

Okay. What other parts of his report did you think were inaccurate?

Ms. Fisher (03:01:15):

Some of the things that I found to be inaccurate was just ... So, some of the things that I found to be inaccurate, at least, were people's exclamations. For example, Anthony Bomar in the report is stated as I'm using choice words, which I think reasonably assumes that I was using curse words as is alleged further in the report.

(03:01:37):

But there was testimony today, Anthony Bomar confirmed that the choice word I used was the term "racist". And I think that that is an example of something that was misconstrued. And I don't think that it was necessarily construed to put me in a positive light.

(03:01:51):

And I also think that the report just plain lacks exculpatory evidence. You would note that Ashanti ... Sorry. She has two last names. Ashanti Bishop, as she's referenced here, she was spoken with with Professor Keffer. And not only does she confirm my contention of how the events went, but she actually further goes on to state that it was Professor Morgeson who made people aware of Charlie Kirk dying, that it was not I, it was Professor Metz, who had the video on his phone, that I was not acting celebratory, that I did not use the terms "Motherfucker," that the door was not shut.

(03:02:33):

This transcript was exported on Feb 24, 2026 - view latest version here.

And she was actually one of the only people who testified that I was in their presence. However, Ashanti's completely left out of that report. Similarly, Professor Williams is left out of the report. And it's my understanding that Professor Williams was told that his testimony is "irrelevant," but I actually think that it's extremely relevant, especially, when we're talking about something months ago to, at least, build context around the situation.

Speaker 13 (03:03:04):

So, was the statement in the report by Professor Keffer inaccurate? That he asked you if the acts and statements alleged were true, that you acknowledge that that would be wrong, and unprofessional.

Ms. Fisher (03:03:22):

Again, I think that that was not necessarily even being misconstrued. I just think that it was an extremely short version of events. When I was asked by Professor Keffer, I actually answered multiple times and said that I was unable to speak to that answer, because he was requiring me to place subjective feelings on something that did not happen. And so, I was unable to let him know how I felt about something that did not occur.

(03:03:48):

After being asked that, I was then asked again, "Well, place yourself in that situation. If you were in a law office or a clinical setting where there is clients and people around, and somebody was running up and down the hall, and screaming, "The motherfucker is dead," would you consider that professional?" And, at that point, I conceded, "If that had happened, and there was clients around, and there was members of court staff, I would not believe that conduct to be professional."

(03:04:17):

But I further tried to bolster it, and tried to set the scene similarly to how we did today, and say, "But there was not clients present. We were back in this room. It was later in the day." However, that part didn't make it into the report.

Speaker 13 (03:04:31):

Okay. Others?

Speaker 14 (03:04:35):

Yeah. I have a few. So, in the different testimony, we have you in, at least, three different locations. So, I'm just going to ... If you'll just help me walk through that. So, you walk in the door. Do you have any memory of stating wildly the statements, "I'm having such a good day"? Or, I don't remember what the other one was, that Professor Morgeson ... Before you got to Professor Stevens' office.

Ms. Fisher (03:05:03):

I would say that I did not make those statements.

Speaker 14 (03:05:07):

Okay. You have no memory of making those statements. Okay. Then you go into Professor Stevens' office. Do you recall him saying anything to you after you had the conversation that you just mentioned? Where you said-

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (03:05:18):

No. At no point ... After I said, "There's a video. It looks bad," he said, "Well ..." We just headed out. At no point do I recall him telling me to, "Stop," "Leave," anything like that. And, in fact, I think I would have remembered that, because if I had felt like Professor Stevens was uncomfortable with my presence I don't think I would have continued to go to him as a professor as often as I do. And I still go to him pretty constantly. I go into his office. I text message him with questions, things of that sort.

Speaker 14 (03:05:50):

Okay. So, where did you go from there? Is that when you went to Professor Metz' office?

Ms. Fisher (03:05:57):

Yes, ma'am. And I'm going to be the one to get the map, because I think it's helpful. Right? So, the clinic office starts here. And right at the front that's the clinic office, everybody sees the double doors. When you walk in, you have Miss Nancy's desk, Miss Melissa's office right here. So, about five feet, maybe 10. Joe's office, family law clinic.

Speaker 14 (03:06:17):

Okay.

Ms. Fisher (03:06:18):

Another five feet ... So, all these offices are sharing a wall. I believe that's the civil ... No. That's Professor Caudillo on this side. And then one down is Professor Morgeson. Then go another down, you have I want to say it's either ... I think civil practice clinic is prior to Professor McDonald's office, but then there's another clinic-

Speaker 13 (03:06:41):

[inaudible 03:06:42].

Ms. Fisher (03:06:43):

I'm so close. Right?

Speaker 13 (03:06:45):

Yeah.

Ms. Fisher (03:06:45):

Professor McDonald's office directly across ... Yeah. I wish there was a [inaudible 03:06:50].

Speaker 14 (03:06:49):

It's fine.

Ms. Fisher (03:06:51):

Directly across from Professor Metz' office. Then we have civil practice clinic, we have ... I don't know her last name. So, I'm just going to refer to her as the tax clinic professor.

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 14 (03:07:02):

Sure.

Ms. Fisher (03:07:03):

Right here. And then we have the tax clinic down here right at the corner right in front of the clinic. And then at the end of the hall, that's Professor Spain, and right next to Professor Spain around this corner is the clinic's office.

Speaker 14 (03:07:17):

Okay.

Ms. Fisher (03:07:18):

And so, the norm is that you walk in the front doors, and because where my conference room is is in the back, I was walking down the hallway.

Speaker 14 (03:07:29):

Sure.

Ms. Fisher (03:07:29):

And so, as I'm walking down the hallway ... Professor Stevens, as he had mentioned, he's always in court. And since he does cap [inaudible 03:07:36] he's the far out one. And so, I walked past him, and I was surprised. That's why I said hi to him. I was surprised to see him in the office after court, because we thought court was going to take longer. And so, that's why I said hi. I said, "Hi." We had 20 seconds of conversation maybe, if that. At no point ... I didn't even take my bag off. I was in his office. Walked out, said, "Okay. What's happening today," and I brought this forth to Professor Keffer, but it didn't make it in the report is I was having issues with Discovery.

(03:08:07):

And I only recall that, because that's why I went to Professor Metz' office in clinic to get Discovery, because we're not actually attorneys. Our professors are the ones who get it. And so, it's a code that you need, a verification code. And so, the verification code expires after two minutes, or something like that.

(03:08:27):

And what I had been dealing with was, as Ashanti mentioned, PNCs were coming up, and every time my Discovery would download to about 75%, it would log me out. And so, I was extremely frustrated, because I was trying to get back and forth to that computer, and get that code.

(03:08:44):

And so, after I saw Joe Lou. All right. I walked in. Bridget and Ashanti were already in the office and they were discussing their PNCs, which was a big topic, because this was earlier in the semester. So, nobody had really had experience with them yet. And so, they were discussing them. And so, that's why I chose to sit on the couch instead of sitting in the chairs that used to be in Professor Metz' office, because they were in front of them.

(03:09:08):

This transcript was exported on Feb 24, 2026 - view latest version here.

So, we're sitting there, discussing PNCs. In fact, I wasn't really saying anything. I'm on my phone. They're talking about PNCs. I recall asking Ashanti, "It wasn't as bad as it really was. Right?" And she's like, "No. It wasn't as bad."

(03:09:23):

And then we're sitting there. There's this announcement. Right? And I don't recall who, similar to Ashanti, "He's dead." And I believe it was Ashanti like, "Who's that?"

Speaker 14 (03:09:36):

Okay. Can I just pause you real quick?

Ms. Fisher (03:09:38):

Yeah.

Speaker 14 (03:09:38):

So, before that time you were not discussing the shooting? Even though, you were aware of it, because it had happened in crim law class, and then you had mentioned it to Professor Stevens. And when you walked in, that wasn't the topic of conversation?

Ms. Fisher (03:09:51):

Uh-uh. I walked in for my Discovery code.

Speaker 14 (03:09:52):

Okay.

Ms. Fisher (03:09:52):

And so-

Speaker 14 (03:09:53):

So, then Professor Morgeson, is that your memory of who came in to shift the conversation?

Ms. Fisher (03:10:00):

And I recall because she had it on her phone.

Speaker 14 (03:10:02):

Okay.

Ms. Fisher (03:10:02):

So, she poked in the office, and she said, "Hey, y'all. Trump just announced he died."

Speaker 14 (03:10:05):

Okay.

Ms. Fisher (03:10:06):

This transcript was exported on Feb 24, 2026 - view latest version here.

And so, when she did that she poked her head in, and Ashanti was like, "Who?" And I think Professor Metz said something to the effect of, like, "Turning Point" or, "He's right ..." Something like that, "Oh, he's Turning Point." And that's when he said, "Did y'all see the video?"

(03:10:25):

And so, he had the video and he was behind his own desk. He's like, "Y'all see?" They're looking at it. And that's where Sam goes, "Of course, he died. I'm sure he died. That doesn't look like somebody could survive that" kind of thing.

(03:10:41):

But it wasn't necessarily even long enough that people ... There was no [inaudible 03:10:46]. It was, "Wow. Oh my gosh. That's super graphic. He must be dead." I got my Discovery code, walked out of Metz' office down to the ... I guess now it's 20 feet down into the clinic suite where there were already students present. There was-

Speaker 14 (03:11:01):

Okay. Before we get to that, can I ask you a couple more questions about-

Ms. Fisher (03:11:03):

Yup. Absolutely. Sorry.

Speaker 14 (03:11:05):

Sorry. So, after he shows the video do you have any recollection of any laughter by anyone in the room? Or other celebratory comments.

Ms. Fisher (03:11:15):

I can say no celebratory comments, but I wouldn't be able to say that we weren't laughing. I can say we weren't laughing about Charlie Kirk.

Speaker 14 (03:11:22):

Okay.

Ms. Fisher (03:11:24):

But Bridget, Ashanti, and I, we're goofy. And so, it would not be uncommon that we were joking about Ashanti being nervous for PNCs, which we were laughing about that. We were joking ... It's a big joke that all three of us, they call us the three dwarves, because we're all about, like, 5'1. And so, we were laughing about how we were going to go into court for the first time and no one was going to notice us, because we're this tall.

(03:11:54):

And so, I know that we didn't have a party about Charlie Kirk. And, in fact, I don't even recall the conversation about Mr. Kirk being long enough, or so substantial that celebrating could even happen.

Speaker 14 (03:12:09):

So, I'm hearing you say ... And how long do you think you were in that office? Total.

This transcript was exported on Feb 24, 2026 - view latest version here.

Ms. Fisher (03:12:14):

To me, it was, like, max five, 10 minutes.

Speaker 14 (03:12:18):

Okay. And the conversation was moving between things?

Ms. Fisher (03:12:22):

Mm-hmm.

Speaker 14 (03:12:23):

Okay. Now you go to the conference room.

Ms. Fisher (03:12:26):

Right.

Speaker 14 (03:12:26):

And there's people in the conference room. Who do you recall was in that room?

Ms. Fisher (03:12:29):

So, I walk in and the door ... Imagine the door is over there, and the room is similar to this. So, I walk in, I recall Anthony ... So, Anthony, Jacob, and Caleb Barkman were in the corner. And they were also discussing the video. And I guess they have experience in hunting and guns, and stuff. And so, they were discussing, "Well, from this angle with this gun, could the person"-

Speaker 14 (03:12:55):

So, they were already discussing it when you walked in?

Ms. Fisher (03:12:57):

Already discussing it.

Speaker 14 (03:12:58):

Okay.

Ms. Fisher (03:12:59):

So, then I sat down, and I believe that's when Callahan came in at one point. She was either already there. But just for context, people also leave their stuff in there. So, since it's between classes people are in and out, in and out. And so, Callahan came in. Everybody is discussing it. Callahan mentioned that one of her friends had messaged her, and was upset, but she wasn't necessarily sure how to respond kind of thing. And then that's when the discussion turned to politics, and what I recall saying was that it was ironic that a school shooting happened with somebody who, seemingly, is pro-firearms. And that was it.

Speaker 14 (03:13:52):

This transcript was exported on Feb 24, 2026 - view latest version here.

Do you recall anyone visually seeming upset by any part of the conversation? It's hard to separate maybe from the event, or expressing that what anybody, you, or anyone else in the room was saying was inappropriate or making them uncomfortable?

Ms. Fisher (03:14:11):

No. And, in fact, I would further state that if somebody was uncomfortable, I think they would have felt like they could say that. It's not uncommon that we talk about sensitive topics in the clinical programs. But we also are quite respectful of each other. And we also are aware of people's political leanings at this point. We've been in school for three years.

(03:14:35):

And so, I think not only were people in recognition of that, but there was never any sense that people who had different viewpoints than me, or even similar viewpoints to me, was uncomfortable with the discussion, wanted the discussion to stop, or even felt like they didn't want to be in the presence of that topic.

Speaker 14 (03:14:57):

Okay. And on that day in the clinic did you have any conversations directly with Madison Wright or Alison Monticelli?

Ms. Fisher (03:15:07):

I did not.

Speaker 14 (03:15:08):

Okay. I think that's it for me now. Thank you.

Speaker 15 (03:15:13):

I had a question. So, I read the ... Obviously, I read the report, and then I read the affidavit that y'all submitted for Professor Metz. One thing it didn't touch on was Professor Morgeson saying something the next day. I think he said it was not [inaudible 03:15:31] ... Oh, yeah. At the time. But it doesn't touch on I guess going the next day and talking, and him saying ... I believe he said ... Oh, he, himself, didn't celebrate Charlie Kirk's death, but Fisher did.

(03:15:49):

Just to get an understanding of what he was referencing, like, the conduct I guess he made in referencing in that, was there any sort of ... I guess what actions would he have meant about celebrating and then saying it wasn't him, it was you? I'm just trying to get an understanding of-

Ms. Fisher (03:16:09):

I'm not sure. So, I was made aware of that conversation when I was given this investigative report about a week ago. I was not privy to the conversation between Professor Morgeson and Professor Metz. I wasn't made aware of it.

(03:16:24):

My understanding after Professor Morgeson's testimony today was that she went in, and by her own admission I guess said that she was uncomfortable. He said that he did not say anything to make her

This transcript was exported on Feb 24, 2026 - view latest version here.

uncomfortable, and she said it was me. And then I believe what Professor Morgeson testified today was that she asked Professor Metz, "Are you sure? I think it was you."

(03:16:50):

But I wouldn't be able to speak to what Professor Metz is referencing in that point.

Speaker 14 (03:16:52):

I do have one more. Okay. Either in the clinic or after that, have you heard other students reference Charlie Kirk as a racist?

Ms. Fisher (03:17:07):

Oh, yeah.

Speaker 14 (03:17:08):

Okay. Do you remember saying that yourself?

Ms. Fisher (03:17:11):

I'm sure.

Speaker 14 (03:17:11):

Okay.

Speaker 13 (03:17:18):

Any other questions anybody has? Okay. At this time, if you want to make a closing statement you're welcome to do so. I know we've asked you some questions, but if you want to summarize anything.

Ms. Fisher (03:17:42):

No. I think I'm just going to wrap it up. If I could just thank all of y'all for taking this time to allow me to be here. I really appreciate you guys allowing me to write this testimony. I really appreciate the council considering the evidence I brought forth, and if you guys have any questions, please contact me.

Speaker 13 (03:18:00):

Okay. Well, at this point, the council will deliberate, and consider all of the information that we have received as well as everything that was said today. We will then issue a written determination, and send that out to you as soon as it's made.

Ms. Fisher (03:18:21):

Yes, sir.

Speaker 13 (03:18:22):

I can't promise how quickly that will be, but-

Ms. Fisher (03:18:25):

I understand.

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 13 (03:18:25):

... it will be no longer than two weeks.

Ms. Fisher (03:18:28):

Okay. Yeah. No. Completely. I understand.

Speaker 13 (03:18:30):

Okay. So, that concludes the hearing.

Ms. Fisher (03:18:33):

Thank you so much.

Speaker 13 (03:18:33):

Thank you.

Speaker 14 (03:18:34):

Allie, just a reminder, we have resources should you need anything.

Ms. Fisher (03:18:38):

Okay. Yes, ma'am.

Speaker 14 (03:18:38):

Okay? All right. You know how to find me.

Ms. Fisher (03:18:40):

Yes, ma'am.

Speaker 16 (03:18:40):

Will the recording of the session be made available to Miss Fisher?

Speaker 14 (03:18:45):

Yes. Absolutely. And so, what I will do, give me some time, I will make sure that the recording is available, send that to you all. Absolutely. And I am also going to look into seeing if I can get a written transcript of it as well. Okay?

Speaker 16 (03:19:00):

Thank you.

Speaker 14 (03:19:01):

Absolutely. Yeah.

Ms. Fisher (03:19:02):

Can we be excused?

This transcript was exported on Feb 24, 2026 - view latest version here.

Speaker 13 (03:19:03):

Sure.

Speaker 14 (03:19:04):

Yeah.

(03:19:05):

At this time, we are done with the questioning.

Speaker 13 (03:19:10):

Yes.

Speaker 14 (03:19:10):

Okay.

Speaker 16 (03:19:10):

You don't need anything from me?

Speaker 13 (03:19:10):

I don't believe so.

Speaker 16 (03:19:10):

Okay.

Speaker 14 (03:19:10):

Nope.

Speaker 16 (03:19:23):

I am upstairs on the third floor. You know [inaudible 03:19:25].

Speaker 14 (03:19:24):

Okay.

PART 6 OF 6 ENDS [03:19:29]

# EXHIBIT F

March 11, 2026

Ellie Fisher                                                        **Confidential**
Law School                                                         *Sent via Email*
                                                                   ellie.fisher@ttu.edu

Dear Ms. Fisher:

Please find attached a copy of the Report of Honor Council Hearing with Findings of Fact, Conclusion as to Violation of the Honor Code, and Recommended Sanction.

Under Section 6 of the Honor Code, if you do not consent to the sanction recommended by the Honor Council, you have a right to request review in writing to the Associate Dean for Academic Affairs which must be submitted within ten (10) calendar days from the date of the Council's transmittal of the Report to the Dean and the student.

You should also be advised that wellness resources are available to you at any time through the Office for Student Life within the School of Law.

Sincerely,

Professor Larry R. Spain
Chair, Honor Council


Copy:  Dean Jack Wade Nowlin via email  jack.nowlin@ttu.edu
       Associate Dean Sofia Chapman via email  sofia.chapman@ttu.edu
       Assistant Dean JaWana Green via email  jawana.green@ttu.edu
       Michael Allen via email  mallen@allenharrislaw.com

Fisher Appendix: 145

**IN RE: ELLIE MAE FISHER**

**Report of Honor Council Hearing**

The Honor Council met on Friday, February 20, 2026 at 9 am in Room 106 of the Texas Tech University System Building to consider whether Ellie Fisher violated Section 2.H (Violation of Professional Duties) of the Texas Tech University School of Law Honor Code "...by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of public figure Charlie Kirk on September 10, 2025.

Professor William R. Keffer, as Honor Code Investigator, referred the matter to the Honor Council after conducting a preliminary investigation and concluding that probable cause existed that a violation of the Honor Code had occurred. Present at the hearing and constituting a quorum were the following members of the Honor Council: Professors Amy Hardberger, Alyson Outenreath, and Larry Spain in addition to law student member Allyson Owens. Ellie Fisher appeared with her legal counsel, Michael Thad Allen. Also present was Sofia Chapman, Associate Dean for Student Life, and Ronny H. Wall, Office of General Counsel, Texas Tech University System.

This report includes a summary of the Honor Council proceedings; the Council's findings of fact; and it's recommended disposition of the case.

### SUMMARY OF PROCEEDINGS

Prior to the hearing and by letter dated February 4, 2026, Professor Larry Spain, Chair of the Honor Council, communicated with Ms. Fisher in writing to provide notice of the time and date of the hearing, information about the nature of the allegations prompting a referral to the Honor Council, and a general description of the process for conducting the hearing as outlined in the Honor Code of the Texas Tech University School of Law.

The following relevant documents were considered by the Honor Council, each of which was also made available to or otherwise submitted by Ms. Fisher and her counsel, and are made a part of the record of these proceedings:

1. Honor Council Notice dated February 4, 2026 and attachments from Professor Larry R. Spain, Chair of the Honor Council, to Ellie Fisher scheduling the hearing for February 20, 2026.

2. Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council, from Professor William R. Keffer referring the matter to the Honor Council.
3. Report of the Honor Code Investigator, Professor William R. Keffer, dated January 23, 2026.

In addition, the following documents were submitted to the Honor Council by counsel for Ellie Fisher, are made a part of the record of these proceedings, and were considered in deciding the matter:

1. Affidavit of Holland Pombrio
2. Affidavit of Ashanty Bishop
3. Affidavit of Caleb Barkman
4. Affidavit of Callahan Ard
5. Affidavit of Patrick Metze
6. Affidavit of Tristan Perez
7. Ellie Mae Fisher's Opening Statement

The following individuals appeared and provided information to the Honor Council relevant to the allegations concerning a violation of the Honor Code:

1. Professor Joe Stephens
2. Professor Terri Morgeson
3. Madison Wright
4. Allison Monacelli
5. Anthony Bomar
6. Jakob Gomez
7. Ashanty Bishop (at the request of Ellie Fisher)
8. Professor Kenneth Williams (at the request of Ellie Fisher)
9. Ellie Fisher

Each of these individuals responded to questions both from members of the Honor Council as well as Ellie Fisher.

## FINDINGS OF FACT

After a careful review and consideration of the Report of the Honor Council Investigator, the Affidavits submitted by legal counsel for Ellie Fisher, and the information provided by various witnesses at the hearing held on February 20, 2026 and assessing the credibility of the information provided, the Honor Council makes the following findings of fact:

1. The Council takes administrative notice that the Clinical Programs is an academic program of the School of Law in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic

2

Fisher Appendix: 147

credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

2.  Various statements were made as to the actions taken and statements made by Ellie Fisher following the assassination of Charlie Kirk on September 10, 2025 within the Clinical Programs offices which could have been considered celebratory in tone.

3.  Upon entering the offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that Professor Terri Morgeson and Madison Wright provided credible information that Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

4.  Such statements endorsing or celebrating death or violence, particularly in a professional office setting,  are contrary to respect for the rule of law and violate ordinary standards of professional conduct.

5.  As a result of Ellie Fisher's  actions, several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting which interfered with their normal work routine.

6.  A majority of the Honor Council believed that certain activities took place in Professor Metze's office involving several students of the Criminal Defense Clinic, including Ellie Fisher. Information was provided by Professor Metze that Ellie Fisher was celebrating the shooting. However, there was conflicting information provided as to whether statements celebrating the death of Charlie Kirk and laughing at the video of Charlie Kirk's assassination could be attributed to Ellie Fisher. Accordingly, a majority of the Honor Council could not reach the conclusion that the actions and statements attributed to Ellie Fisher were supported by clear and convincing evidence.

7.  Likewise, there was conflicting information about what actions and statements could be attributed to Ellie Fisher in the Criminal Defense Clinics workspace on that date and, as a result, the Honor Council was unable to reach a majority view on whether or not the statements or actions alleged had occurred.

8.  Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

9.  The actions and statements that were made by Ellie Fisher in a professional office setting were inappropriate, disrespectful, and demonstrated a lack of professional judgment and self-discipline.

10. As a result of the actions taken and statements made by Ellie Fisher, the operations of the Clinical Program were adversely affected and made some individuals uncomfortable.

### CONCLUSION AS TO VIOLATION OF THE HONOR CODE

Based on the foregoing findings of fact and applying the clear and convincing evidence standard, the Honor Council concludes, by a majority vote of 3-1,  that the

3

Respondent, Ellie Fisher, violated the Honor Code including *Principle One-A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education*, specifically Section 2.H (**Violation of Professional Duties**) "by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as result of her actions and statements.

On the other hand, one member of the Honor Council concluded the evidence presented in the investigative report and at the February 20, 2026, hearing does not meet the clear and convincing standard required to find Ms. Fisher responsible for violating Section H of the Honor Code entitled "Violation of Professional Duties." This decision is based on conflicting evidence at the hearing and with the investigative report. The following are a few examples of conflicts on which this decision is based.

According to the majority of the Honor Council, the strongest evidence that Ms. Fisher acted unprofessionally on September 10, 2025, is her actions when she entered the clinic. Specifically, Professor Morgeson and Madison Wright stated they overheard Ms. Fisher saying "It's the best day ever. I'm so happy" and Ms. Fisher either said this alone or repeated it to Professor Stephens and said her happiness was because of Mr. Kirk's assassination. Professor Stephens does agree that Ms. Fisher stopped in his doorway, but then the accounts differ significantly. Professor Stephens stated that: "And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, 'No.' I didn't know who Charlie was. And she said, 'It looks bad,' and at some point said something that it's all over the Internet or something like that" which contradicts what Professor Morgeson stated she heard. As to Ms. Fisher's affect, he stated: "Ellie's demeanor to me was no different that day," she simply reported what had happened in the news, it was not disruptive or unprofessional. He repeated the last point several times during his testimony. Despite his location near clinic entrance, Professor Stephens did not report hearing Ms. Fisher make any loud proclamations upon entry. Although he may not have heard her, if she entered the clinic announcing Mr. Kirk's death in a celebratory manner, it seems inconsistent to me that she would be able to switch quickly to simply reporting the news to Professor Stephens.

Another conflict is Professor Morgeson's and Madison Wright's testimony that they heard Professor Stevens admonish Ms. Fisher because her behavior was not appropriate. Professor Morgeson stated she overheard Professor Stephens say "Don't do that. Don't say that. Don't do that" or something similar. Because Professor Morgenson testified after Professor Stephens, he was not asked directly about this, but in his testimony, he stated: "When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong," which essentially answers the question, had it been asked. He also stated: "that interaction was 30 seconds and then that was it." Professor Stephens repeated statements that Ms. Fisher did not say anything he found to be unprofessional generally negates any statement that he was concerned about her behavior at the time she entered his door.

While much of the focus is on the statements and actions of Ms. Fisher as she entered the clinic office, I do not feel the evidentiary standard was met in Professor Metze's office or later in the conference room either. The primary testimony against Ms. Fisher in Professor Metze's office centered on watching the video of the shooting and discussing whether Mr. Kirk could have survived. Although I find this behavior reprehensible, there were several people in that room, including a faculty member, and no one at the hearing could tie any statements from the office directly to Ms. Fisher versus other parties. Professor Morgeson stated she is not sure who used a profanity, which she stated to the investigator although her doubt was not noted. She also said it might have been Professor Metze who said it. Professor Morgeson stated her students were "shocked and offended" which they both denied at the hearing and stated they did not request to leave early based specifically on Ms. Fisher's statements. Unfortunately, Professor Metze's statement in the investigation report provides no specific information related to Ms. Fisher's "celebratory" behavior or actions in his office and his affidavit seems to contract his initial statements. Testimony from students in the conference room also did not provide details of Ms. Fisher being unprofessional. Although Jacob Gonzalez did state Ms. Fisher's mood could have been interpreted as celebratory, Anthony Bomar disagreed.

In summary, while I do not believe that Ms. Fisher's behavior (and that of others around her) on September 10, 2015 was proper under the circumstances, I also do not feel that the evidence is sufficient to meet the clear and convincing evidentiary standard required to find her responsible for a violation of Section H of the Honor Code.

## RECOMMENDED SANCTION

In recommending a sanction appropriate to the violation, the majority of the Honor Council that concluded a violation of the Honor Code was established has been guided by those mitigating and aggravating factors set forth in the Honor Code. After careful consideration of all information provided and made a part of the record of the proceedings, the Honor Council determines that Respondent's actions and conduct reflected poorly on the exercise of professional judgment in the particular setting in which her actions took place. Accordingly, the Honor Council recommends that the Respondent, Ellie Fisher, receive a written letter of reprimand from the Dean of the School of Law to be placed in her permanent school record. The Council believes such sanction is proportionate to the severity of the conduct involved and sufficient to reinforce the obligation on the part of all law students to always act with honor and integrity in all of their professional interactions,

particularly when they may have serious consequences to the reputation of the School of Law and its academic programs.

*This decision may be subject to review by the Office of Student Conduct per university policies. A representative from the Office of Student Conduct is cc'd on this Honor Council Hearing report and will be in contact with you.*

_____
Professor Amy Hardberger

_____
Professor Larry Spain

/s/ Alyson Outenreath
_____
Associate Dean and Professor
Alyson Outenreath

_____
Ally Owens

6

# EXHIBIT G

## AFFIDAVIT OF HOLLAND POMBRIO

My name is Holland Pombrio. I am over the age of eighteen (18), competent to testify, and understand the obligation to provide truthful statements under oath. The following statements are made based upon my personal knowledge and experience:

1.     I am a third-year law student at Texas Tech University School of Law, which has its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2.     I met Ellie Fisher on the first day of law school. She was the first person I spoke to, and we have been close friends since that time.

3.     On Wednesday, September 10, 2025, at approximately 2:47 p.m., I received a text message from Ellie Fisher. I informed her that I was in the clinic office at that time.

4.     While in the clinic office, Anthony Bomar and Caleb Barkman were present. I believe Jakob Gomez and Tristan Perez were also present.

5.     A few minutes later, Ellie entered the clinic office. She asked whether I had heard the news. I told her I had not. She informed me that Charlie Kirk had been shot.

6.     Ellie asked whether I wanted to see the video, and I said yes. She showed me a video depicting Charlie Kirk being shot.

7.     We discussed the incident and expressed disbelief that it had occurred.

8.     Callighan Ard later entered the room and, after asking about the news, was also shown the video.

9.     Multiple individuals in the room participated in the conversation.

10.    Statements were made by various individuals that Charlie Kirk was a racist and a white supremacist. I cannot state with certainty who made those remarks.

11.    Someone stated that it had not yet been confirmed whether he had died. Ellie, Caleb, and I expressed that, based on the video, it appeared the gunshot was fatal.

1

12.    I commented that I was surprised that someone who likely received death threats would not have protective measures such as bulletproof glass in place.

13.    The discussion concerned a current event, and most individuals present contributed to the conversation.

14.    We have consistently been informed that the clinic suites are a safe environment for discussing sensitive topics. In the past, we have discussed matters of similar sensitivity, including public incidents.

15.    Someone mentioned that the shooter might never be identified. Ellie stated that authorities already had someone in custody.

16.    Anthony made a statement regarding felons not being permitted to possess firearms. I responded that there had been no indication the shooter was a felon and that such an assumption was speculative.

17.    Caleb and Anthony then discussed matters relating to felons, juveniles, and Texas gun laws.

18.    The discussion lasted approximately ten (10) minutes.

19.    I had completed my work for the day and informed Ellie that I was leaving. She exited the clinic office with me.

20.    I did not witness Ellie celebrate the death of Charlie Kirk.

21.    I did not hear Ellie say "that mother fucker got shot" or use the term "mother fucker" when referencing Charlie Kirk.

22.    I have heard several law students use curse words in the clinic suites but have never seen anyone brought before the honor council except Ellie.

23.    I have even used curse words.

2

24.     I understand that this affidavit may be reviewed and relied upon by the Honor Code

Office or other related decision-makers.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF FEBRUARY 2026,



Holland Pombrio

STATE OF TEXAS
COUNTY OF   Lubbock

Subscribed, sworn, and acknowledged before me
this 13th day of February, 2026.
Notary Public

My commission Expires: April 9 2028

> C DOCKAL
> Notary ID #134841518
> My Commission Expires
> April 9, 2028

3

Fisher Appendix: 155

# EXHIBIT H

## AFFIDAVIT OF ASHANTY BISHOP

My name is Ashanty Bishop. I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience:

1. I am currently a third-year law student at Texas Tech University School of Law, which has its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2. I know Ellie Fisher because she is a fellow third-year law student and a member of the Criminal Defense Clinic previously taught by Professor Patrick Metze. I am also a member of the Criminal Defense Clinic.

3. I distinctly remember the day that Charlie Kirk was assassinated, which was September 10, 2025.

4. On the day of Charlie Kirk's assassination, I was in Professor Metze's office with Ellie Fisher, Bridget Pembroke, and Professor Metze.

5. I learned about Charlie Kirk's assassination while in Professor Metze's office. The conversation in the room was normal and productive, and lasted no more than 5 or 10 minutes.

6. The first time I saw the video of the assassination was when Professor Metze showed it to me on his phone.

7. Initially, I did not know that Charlie Kirk had died. I learned that he had died when Professor Terri Morgeson walked into the room and told Professor Metze words to the effect of "he died" or "he is dead."

8. I never witnessed anyone in the room, including Ellie, say that "Charlie Kirk got what he deserved."

9. I did not hear Ellie Fisher use the term "motherfucker" when discussing Charlie Kirk. I did not hear Ellie Fisher say, "The motherfucker got shot" or "They shot the motherfucker."

1

10. I never saw Ellie celebrate the death of Charlie Kirk.

11. This affidavit is consistent with the statement I gave to William Keffer during my interview with him on or about October 22, 2025.

12. I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13 DAY OF FEBRUARY 2026,

_____

Ashanty Bishop

STATE OF TEXAS
COUNTY OF _Lubbock_

Subscribed, sworn, and acknowledged before me this 13st day of _Febuary_, 2026.
Notary Public _Marlyse Jarrett_
My commission expires: 01/27/2029

MARLYSE JARRETT
Notary Public, State of Texas
Comm. Expires 01-27-2029
Notary ID 132891673

2

Fisher Appendix: 158

# EXHIBIT I

AFFIDAVIT OF CALEB BARKMAN

My name is Caleb Barkman. I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience.

1.      I am currently a third year law student at Texas Tech University School of Law.

2.      I know Ellie Fisher because she is a fellow third-year law student who is a member of one of the Criminal Defense Clinics that shares the Criminal Defense Clinic workroom.

3.      I distinctly remember the day that Charlie Kirk was assassinated, which was September 10, 2025.

4.      On the day of Charlie Kirk's assassination, after my Evidence class ended at 2:50 p.m., I walked into the Criminal Defense Clinic workroom.

5.      I learned about Charlie Kirk's assassination while in my Evidence class and had already seen the video prior to entering the Criminal Defense Clinic workroom.

6.      When I entered the Criminal Defense Clinic workroom, several students were already discussing the assassination, including, as I recall, Ellie Fisher, Holland Pombrio, Tristen Perez, and Anthony Bomar.

7.      With respect to the discussion about Charlie Kirk's assassination, we were not discussing it in a political context. Instead, we were discussing how gruesome the video of the shooting appeared and the low likelihood that he survived.

8.      I do not recall Ellie Fisher coming across as celebratory when discussing the assassination of Charlie Kirk.

9.      I do not remember anyone in the clinic workroom stating that Charlie Kirk deserved what happened to him.

1

Fisher Appendix: 100

10.    I did not hear Ellie Fisher use the term "motherfucker" when discussing Charlie Kirk.

11.    I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 11 DAY OF FEBRUARY 2026,

_____
Caleb Barkman

STATE OF TEXAS
COUNTY OF        LUBBOCK

Subscribed, sworn, and acknowledged before
me this 11 day of FEBUARY        , 2026.
Notary Public
My commission expires: April 4, 2029

ANDRES CASTRO
Notary ID #135510110
My Commission Expires
April 4, 2029

2

Fisher Appendix: 161

# EXHIBIT J

## AFFIDAVIT OF CALLIGHAN ARD

My name is Callighan Ard. I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience

1.      I am currently a third-year law student at Texas Tech University School of Law, where I was enrolled in the Criminal Defense Clinic alongside Ellie Fisher

2.      On September 10, 2025, at approximately 2:55 p.m., I was in the Criminal Defense Clinic workroom, sitting at the conference table with Anthony Bomar, a student in the Caprock Criminal Defense Clinic. The door to the workroom was open, and students were coming in and out of the room. I did not hear anything unusual, loud, or concerning at that time.

3.      Shortly thereafter, Ellie Fisher entered the workroom and asked if I had heard that Charlie Kirk had been shot. She asked if I wanted to see the video, and I said yes. I wanted to see the video and consented to the same. She showed me the video on her phone. Others in the room viewed the video if they chose to, and some of us also reviewed news articles about the incident.

4.      We discussed the event and what we knew about what had happened to Charlie Kirk. I asked if he had died, and Ellie said he probably had. Other students, including Caleb Barkman and Diana Garcia, may have joined the conversation. Others may have joined the conversation as well as it was the topic of discussion amongst law students at the time. Several students were entering and exiting the clinic workroom during this time, but all were students in the Criminal Defense Clinic or Caprock Criminal Defense Clinic programs.

5.      The discussion in the clinic workroom was ordinary and aligned with the type of sensitive conversations that occur routinely in the clinic, which often include topics such as criminal matters, the death penalty, racism, and mental health. People in the room held differing political

1

opinions, but the discussion remained civil, and no one became emotional or indicated a desire to end the conversation abruptly.

6. At the start of the semester, Professor Metze emphasized that the clinic was a "safe space" where students could discuss sensitive topics they might not discuss elsewhere. Conversations in the clinic are understood to be confidential and are part of the professional environment in which students learn to navigate challenging discussions related to criminal law and client representation.

7. My initial reaction to the video and conversation was shock. I do not recall Ellie making any statements to the effect that "he got what he deserved."

8. I have heard other law students including myself use curse words but have never heard of someone brought before the honor council like Ellie.

9. Her demeanor was consistent with the range of reactions I observed among students present. Nothing she said or did struck me as inappropriate or unprofessional.

10. Based on my direct observations, Ellie's conduct that day did not interfere with any work in the clinic or violate any rules or expectations I am familiar with.

11. I have had the opportunity to review the investigative report prepared by William Keffer regarding the interview I gave on November 11, 2025. In that report, my statement is summarized in a single sentence noting that "Fisher offered to show me her video on her phone." I am unsure why the remainder of my statements from that interview were omitted.

12. During the interview, I was asked whether I heard Ellie make a statement such as "The mother fucker got shot" or "They shot the mother fucker," and I responded that I did not.

13. This response was not included in the report.

2

14.    I was also asked whether I believed Ellie was capable of making such a statement, and I explained that it would depend on the setting, but that she would never say something like that in class. This was also omitted from the report.

15.    I don't know why these statements were excluded from the report, though it appears that leaving them out served to unfairly portray Ellie in a negative light.

16.    I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS __ DAY OF FEBRUARY 2026,



Callighan Ard

STATE OF TEXAS
COUNTY OF _____Lubbock_____

Subscribed, sworn, and acknowledged before me this 12th day of _February_, 2026.
Notary Public
My commission expires: _5/2/2028_

SALLY ANN MORENO
Notary Public, State of Texas
Notary ID# 134853808
My Commission Expires 05-02-2028

Fisher Appendix: 165

# EXHIBIT K

## AFFIDAVIT OF PATRICK METZE

My name is Patrick Metze, I am over the age of 18 and understand the meaning of an oath.  I make the following statements based on my direct knowledge and experience:

1.      I am an attorney licensed to practice law in the state of Texas.

2.      Until I was forced into retirement, I was the director of the criminal clinical programs at Texas Tech School of Law.

3.      While I served as their clinical law professor at the Texas Tech School of Law, I made sure that the students knew my office was a safe space in which they could say anything that they needed to say.

4.      All kinds of things have been said in my office, which have included the use of profanity, but this was never an issue because previously the Texas Tech School of Law, at least prior to my forced retirement, did not conceive of itself as a third grade school yard.  All my students have been grown adult, graduate students in their third year of law school.

5.      In my decades of experience, it is not uncommon that professional attorneys licensed in the state of Texas use profanity.  Anyone who suggests otherwise is either hopelessly naïve or lying.

6.      I am not aware of anyone being declared "unprofessional" for that reason, without more.

7.      On September 10, 2025, I recall that Charlie Kirk was murdered in Utah.  This almost immediately became a widespread topic of conversation throughout the school of law.

8.      I am only aware that the third-year law student Ellie Fisher, who is black, has been singled out for discipline because she discussed this obvious topic of national news.

1

9. For example, I remember my colleague and fellow clinical law professor Terri Morgeson standing in my door while students were in my office, and announced something to the effect, "Trump just said that he [Charlie Kirk] died." I did not consider this unprofessional.

10. I no longer recall exactly what the students or clinical professors said that day, and my quote above of Ms. Morgeson is a paraphrase.

11. I worked with the third-year law student Ellie Fisher directly in my law clinic.

12. I know Ellie Fisher to be an excellent student who represented our clients in a professional manner. I am not aware that any client has ever complained about Ms. Fisher.

13. On the day Charlie Kirk was shot, Ellie Fisher came in my office, probably at some point after 3:00 PM.

14. I remember Ellie was animated, but that is more or less her nature. I have a hard time thinking of any occasion on which Ellie behaved in a subdued manner.

15. Other students were in my office and were discussing the shooting of Charlie Kirk as well. To my knowledge, no one considered this unprofessional behavior.

16. I do not recall Ellie Fisher using any description of Charlie Kirk's murder that included "mother fucker."

17. But again, I no longer recall exactly what the students said.

18. I can say that students have used strong language in my office before, but this has never been an issue of "unprofessional behavior."

19. Only Ellie Fisher has been singled out based on the allegation that she said various things about Charlie Kirk.

20. Even if Ellie Fisher did say "mother fucker," I would not consider that unprofessional behavior in the privacy of my office.

2

21.    I do recall that Terri Morgeson was standing outside my office at the time the students were discussing Charlie Kirk.

22.    To my knowledge, Terri Morgeson did not say anything at the time about professionalism, although she was standing in my door.  For example, Morgeson did not shut my door, which she could easily have done.

23.    Nothing was unusual about these interactions.  It was just another day at work in the clinical programs of the Texas Tech School of Law—until Texas Tech opened an investigation into Ellie Fisher and forced me into retirement.  I had never heard of anything like that happening in the school of law.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF FEBRUARY 2026,



Patrick Metze

STATE OF TEXAS
COUNTY OF         **Lubbock**

Subscribed, sworn, and acknowledged before me this 13th day of **February**, 2026.
Notary Public

My commission expires:         **July 19, 2028**

JENNIFER M. BEADLES
My Notary ID # 129557834
Expires July 19, 2028

3

# EXHIBIT L

## AFFIDAVIT OF TRISTAN PEREZ

My name is Tristan Perez I am over the age of eighteen (18), competent to testify, and understand the obligation to provide truthful statements under oath. The following statements are made based upon my personal knowledge and experience:

1. I am a third-year law student at Texas Tech University School of Law, which has its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2. I know Ellie Fisher from law school, where we are both third-year students at Texas Tech University School of Law. I consider her to be a friend.

3. I provide this affidavit voluntarily in connection with an Honor Code investigation involving Ellie Fisher.

4. I recall the day that Charlie Kirk was assassinated, which occurred on September 10, 2025.

5. On the day of Charlie Kirk's assassination, at approximately 2:55 p.m., I was in the Criminal Defense Clinic Workroom with Ellie Fisher and Anthony Bomar.

6. Mr. Bomar, Ms. Fisher, and I were discussing the assassination within hours of its occurrence. It was a topic widely discussed among students at the law school that day.

7. The Criminal Defense Clinic Workroom is a shared space used by students from the Criminal Defense Clinic and the Caprock Criminal Defense Clinic. It has always been a place where students may speak freely and discuss sensitive topics, including matters such as the assassination of Charlie Kirk.

8. During the discussion, Ellie was not disrespectful or hostile towards me or Mr. Bomar despite our differing opinions. During the conversation, I recall Ellie stating that she found it ironic that Charlie Kirk was shot while discussing gun violence and while holding views that, in her opinion, treated gun violence as essentially acceptable. Ellie did not direct hostility toward anyone present; she simply did not appear upset by the news of Charlie Kirk's assassination.

9. In my opinion, Ellie's reaction to Charlie Kirk's assassination was one of genuine surprise and shock, as if she was processing what she had seen out loud in real time. In fact, all of us appeared to be in a state of shock after seeing a widely circulated video of a controversial political figure being shot in the neck.

10. I have heard other law students use curse words in the clinic workroom on numerous occasions, and none of those students have ever been brought before the Honor Council as Ellie has.

11. Several months later, on or about November 13, 2025, I was asked to participate in an interview with William Keffer and Dean Chapman.

1

12.     At the beginning of the interview, I was not informed of its purpose. I initially believed the interview concerned an incident in which I had shown Ellie Fisher a photograph of her vehicle after racial slurs, specifically the word "nigger," had been written on it days earlier. I later learned that the interview instead concerned the discussion regarding Charlie Kirk's assassination that had occurred months prior. I found this unexpected.

13.     During the interview, I was asked whether I believed Ellie Fisher knew who Charlie Kirk was prior to his assassination. I responded that she "probably had heard of him, like most people," because Mr. Kirk was widely covered in the news at the time. I did not intend to state that Ms. Fisher knew him personally or was particularly familiar with him. After reviewing the investigative report regarding Ellie Fisher, I observed that it states, "Tristen Perez stated that Fisher talked about Kirk like she knew who he was." I do not believe this accurately reflects my statement or the context in which it was made. I do not know why my statements to Professor Keffer would be misconstrued in this light other than to make Fisher somehow look bad.

14.     I was also asked whether Ellen Fisher insinuated that Charlie Kirk was going to hell. I informed the investigator that I did not recall Ms. Fisher making such a statement and further stated that such a statement would not be determinative, as she is not God. This portion of my response was not included in the investigative report.

15.     As I was leaving the interview, I informed the investigator that I could understand why Ellie Fisher felt scared or apprehensive regarding the school's response, and that I believed it was unreasonable for the institution to focus more heavily on a months-old conversation about Charlie Kirk rather than the recent incident involving racial slurs written on Ms. Fisher's vehicle. I was informed that campus police would be present going forward. These statements were also not reflected in the investigative report.

16.     This affidavit is based solely on my personal observations and recollection. I have not been pressured, threatened, or promised anything in exchange for providing this statement.

17.     I understand that this affidavit may be reviewed and relied upon by the Honor Code Office or other related decision-makers.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 16th DAY OF FEBRUARY 2026,

_____
Tristen Perez

STATE OF TEXAS
COUNTY OF _____Lubbock_____

Subscribed, sworn, and acknowledged before me this 14th day of February, 2026.
Notary Public
_____
My commission Expires: 09/04/2029

CHRISTA GIBSON
Notary Public, State of Texas
Comm. Expires 09-04-2029
Notary ID 135529832

2

# EXHIBIT M

Fisher Appendix: 173

**Texas Tech**  //  School of Law



| Title | Honor Code |
|---|---|
| Category | Honor Code and Rules of the School of Law |
| Date Approved and/or Revised | April 19, 2017 (approved), August 31, 2017 (revised), November 7, 2018 (revised); May 8, 2019 (revised), November 19, 2019 (revised effective January 1, 2020), November 18, 2020 (revised) |

# 1. INTRODUCTION

### A. Preamble

Texas Tech University School of Law's Honor Code emphasizes the importance of academic and professional integrity. Academic and professional integrity refers to honest and ethical behavior within an academic and a professional community. The Honor Code promotes an atmosphere in which students can work and interact with mutual respect, trust, and individual responsibility.

Faculty, staff, and students have a responsibility to uphold the principles of academic integrity, and to create an environment that encourages honesty and an open discussion of integrity. Students in the School of Law are expected to exhibit the same qualities of honesty, responsibility, and respect for the rights of others that are demanded of members of the legal profession.

Each student has a responsibility to uphold the spirit of the Honor Code. When a student has reason to believe that a violation of the Code has occurred or will occur soon, he or she has a duty to report the matter to the Dean or the designated faculty Honor Code Investigator. A student who fails to report a suspected violation may violate this Code. If a student reports a suspected violation to a faculty or staff member and that person also has reason to believe that a violation of the Code has occurred or will occur soon, the faculty or staff member has a duty to report it to the Dean or the Honor Code Investigator. To avoid concerns about the confidentiality of a conversation, faculty and staff members should inform students of the faculty or staff member's duty to report.

### B. Scope

The Honor Code applies to all students admitted to Texas Tech University School of Law. Students are responsible for their conduct at the law school; they also will be responsible for their off-campus and virtual and online conduct when the law school's programs, activities, or reputation, the student's ability to practice law, or the professional well-being of other School of Law students, faculty, or staff are implicated.

The Honor Code governs conduct related to integrity and academic endeavors at all times from submission of an application for admission through graduation. If an Honor Code matter is pending when a student is scheduled to graduate, the student's degree may be withheld at least until the matter is resolved. An investigation may arise regarding a graduate when the conduct in question arose before graduation. A finding of a violation that occurred before a student graduated may result in the revocation of a degree previously awarded.

### C. Relation to University Code of Student Conduct

The Honor Code is one of the two codes that govern the conduct of law students at Texas Tech University. The second is the Texas Tech University Code of Student Conduct, which can be found in the University Student Handbook.

Law students are held to standards beyond those of other students at the University because they intend to enter a profession that has high expectations of character and ethical behavior.

The Honor Code sets out guidelines and expectations for appropriate behavior and professional decorum. The Honor Code Investigator and the Honor Council resolve matters relating to the Honor Code, while the University resolves matters involving the Texas Tech University Code of Student Conduct.

The School of Law partners with the University in attempting to provide a disciplinary process to law students that addresses problem behavior fairly and respectfully. This Code typically will govern the conduct of law students in cases where the Honor Code and the University Code of Student Conduct might apply concurrently. The Dean will confer as necessary with appropriate University officials when questions arise concerning whether this Code, the University Code of Student Conduct, or both should apply.

# 2. CONDUCT SUBJECT TO SANCTION

The Honor Code addresses matters of academic dishonesty, based on the following principles that illustrate the rigorous demands of integrity required of students.

*Principle One - A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education.*

*Principle Two - A Law Student Should Perform All Work in Academic Matters Honestly.*

*Principle Three - A Law Student Should Not Take Unfair Advantage in Academic Matters of Another Student, Faculty Member, Staff Member, or the Law School.*

The following list includes, but is not limited to, acts that violate the Honor Code.

### A. Cheating

Fisher Appendix: 174

assignment, or other academic exercise. Conduct of this kind typically violates Principle One, Principle Two, Principle Three, or a combination.

### B. Improper Collaboration

A student cannot work with another person without express authorization from the supervising instructor or a sponsoring organization, such as a journal. This includes work done for an internal or external advocacy competition. Prohibited conduct may include talking about the assignment, assisting or receiving assistance with editing, or sharing research. Students cannot collaborate in any manner on the write-on competition for journals. Conduct of this kind typically violates Principle Two, Principle Three, or both.

### C. Unfair Academic Advantage

A student violates this Code by intentionally causing a disadvantage to other students by failing to return needed library books, damaging or removing pages or materials from needed books such that others cannot use them, gaining unauthorized access to an examination before the examination period, continuing to work on an examination after time has been called, handing in another person's work as one's own for credit, or trying to duplicate from memory, photographs, or otherwise specific questions from an examination not intended for circulation to others. Other forms of unfair academic advantage may be represented by taking, keeping, misplacing, damaging or altering property. This type of conduct may violate Principle Two, Principle Three, or both.

### D. Deception and Misrepresentation

A student violates this Code by lying about or misrepresenting his or her work, academic records, credentials, or other academic matters or information. This includes, but is not limited to forging a signature on any document, forging letters of recommendation, falsifying externship or clinical documentation, falsifying pro bono records, falsifying class attendance rolls, or falsely claiming to be a licensed attorney. This type of conduct may violate Principle One, Principle Three, or both.

### E. Electronic Dishonesty

A student cannot use a network or gain access to a computer inappropriately, in a way that affects a class or other students' academic work. A non-exhaustive list of examples include tampering with another student's account so that the student cannot complete or submit an assignment, stealing a student's work through electronic means, or knowingly spreading a computer virus or malware, impersonating another via electronic means, improperly accessing online accounts or data, and using a computer or device during class in a manner not authorized by the instructor in a way that affects other student's academic work. Conduct of this kind typically violates Principle Three.

### F. Plagiarism

A student cannot represent the words or ideas of another as his or her own. The misrepresentation does not need to be intentional. It is oftentimes manifested by a failure to properly cite or acknowledge the words or work of others. Plagiarism includes, but is not limited to:

1. Quoting without citations or without appropriate punctuation, including quotation marks;

2. Paraphrasing without appropriate attribution;

3. Misrepresenting another's analysis, synthesis, organization, or compilation of sources as one's own; or

4. Using Internet sources without appropriate attribution, on the same basis as any other source.

Conduct of this kind typically violates Principle One, Principle Two, Principle Three, or a combination.

### G. Failure to Disclose Offenses

A student may violate this Code by failing to disclose legal, academic, and behavioral offenses as required on his or her Application for Admission to the School of Law. A student may also violate this Code by failing to disclose legal, academic, and behavioral offenses that occur after submitting the Application for Admission to the School of Law until the student graduates, as required by the Application. A student must disclose any such offense to the Associate Dean for Student Life within 30 days. This duty to report includes behavioral offenses under the Texas Tech University Student Code of Conduct and any legal offenses other than Class C misdemeanor traffic offenses. Conduct of this kind typically violates Principle One.

### H. Violation of Professional Duties

A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.

## 3. HONOR COUNCIL

### A. Members

The Honor Council consists of five members: three full-time law faculty and two students. Each year, the Dean will appoint the faculty members, designating one as the Chair of the Honor Council. The Dean may also appoint two additional full-time faculty members as alternates. The Dean will arrange training for the members and alternate members of the Honor Council every year. Each faculty member will serve for the entire academic year and will continue until the Dean appoints a successor. Student members are elected by their peers. One must be a third-year student at the time of election and is elected by the third-year class. The other must be a second-year student at the time of election and is elected by the second-year class. The Dean may replace any faculty member who fails to serve or is otherwise unable to serve. If any student member fails to serve or is otherwise unable to serve, the Chair of the Honor Council may appoint a student from the same class year as the replaced student member, after consulting with the Student Bar Association and the Dean.

### B. Quorum

A quorum of the Council consists of three members. At least two must be faculty members and at least one must be a student. A Council member who recuses himself or herself, or is otherwise unable to serve, may have a temporary replacement appointed, as described above.

### C. Challenges

Fisher Appendix: 175

violating the Honor Code may challenge any Council member as biased and present facts and arguments to support the challenge. Members of the Council who have not been challenged will determine, by majority vote, whether the challenged member is recused. The Dean may appoint replacement Council members as described above to hear a challenge if fewer than three members are available to hear the challenge. Following any challenges, the Chair of the Council will reschedule the hearing if the remaining members do not conform to the quorum requirements above.

# 4. PROCESS

### A. General Provisions

An Honor Council hearing is not a court proceeding, nor is it designed to imitate one. The proceeding provides an educational and non-adversarial process to resolve matters concerning academic misconduct and dishonesty. It is not governed by legal rules of evidence or rules of procedure in criminal or civil court. Students are expected to cooperate fully with matters connected to the allegation. Students may not retaliate against, harass, or threaten anyone participating in the process.

### B. Honor Code Investigator

Each year, the Dean will appoint an Honor Code Investigator, typically a full-time faculty member, to conduct preliminary factual investigations of alleged violations of the Honor Code. The Dean may appoint multiple Honor Code Investigators in years when several suspected violations must be processed. The Investigator will report the findings of all investigations to the Dean.

If the Dean or the Investigator determines, at any point, that the Investigator has a conflict of interest or is unable to serve, the Dean will appoint another Investigator for that particular matter.

### C. Referral and Investigation

Students or other members of the law school community may consult with the Honor Code Investigator, the Associate Dean for Student Life, or a faculty or staff member, about possible academic misconduct or dishonesty. When a student has reason to believe that a violation of the Code has occurred or will occur soon, he or she has a duty to report the matter to the Dean or the designated faculty Honor Code Investigator. If a student reports a suspected violation to a faculty or staff member and that person also has reason to believe that a violation of the Code has occurred or will occur soon, the faculty or staff member has a duty to report it to the Dean or the Honor Code Investigator.

If a student consults with a faculty or staff member, that faculty or staff member should report the concern to the Dean, the Honor Code Investigator or the Associate Dean for Student Life. Ultimately, the Honor Code Investigator will decide whether an investigation is necessary to determine whether probable cause exists to believe that the student has violated this Code.

If the Honor Code Investigator decides that the allegation does not indicate a possible Honor Code violation, the Investigator will send a written report to the Dean to that effect. If the Dean believes that an investigation is necessary, the Investigator will begin an investigation to determine whether probable cause exists to believe that the student has violated this Code, as described below.

If the Honor Code Investigator decides that an investigation is necessary, the Investigator will conduct an investigation of the alleged conduct to determine whether probable cause exists to believe that a violation of this Code has occurred. The Investigator may contact the student who is the subject of the allegation as part of the determination of whether probable cause exists.

As part of the investigation, the Investigator may, among other things, contact students and others about their alleged involvement, send an email message to the student body requesting individuals with information to come forward, or communicate with professors who have information regarding the allegations. During the investigation process, the Investigator will act with the utmost care to keep the identity of the involved students confidential.

Students have a duty to cooperate during the investigation process. Students also have an obligation to respond in a timely manner to communications related to the investigation. Failure to respond or cooperate during the investigation process may result in a violation of this Code.

### D. Determination by Investigator

Following the investigation, if the Honor Code Investigator determines that no probable cause exists to believe that a violation occurred, the Investigator will close the matter and send a written report to the

Dean to that effect. The Investigator will notify the student in writing of the determination and prepare a memorandum for the student's file that the student can use if ever asked about the matter.

If the Investigator determines that probable cause exists to believe that a violation occurred, the Investigator, after notifying the Dean, will then determine whether the matter should be sent to the Honor Council or if it qualifies for administrative disposition as described in Part 4.E. below. If the Investigator determines that the matter does not qualify for administrative disposition, the Investigator will transfer his or her file to the Honor Council, without including any findings of fact.

### E. Administrative Disposition

The School of Law encourages students who have violated the Honor Code to be honest in any investigation and hearing. The Honor Code Investigator may offer an administrative disposition in lieu of an Honor Council hearing when: 1) the allegation involves a less serious matter, such as one committed negligently; 2) the key facts do not appear to be in dispute; and 3) the student acts with candor and is forthright during the investigation. The Investigator must consult with the Chair of the Honor Council before offering administrative disposition to a student. If the Chair does not agree that the offense qualifies for administrative disposition, the Investigator will refer the alleged offense to the Honor Council for consideration.

#### Purpose

An administrative disposition provides an avenue for students who have violated the Honor Code to admit their violations, agree to sanctions that will reconcile their standing at the School of Law, and avoid Honor Council hearings. If the Investigator offers an administrative disposition, a student may decide whether to accept it or proceed to an Honor Council hearing. By accepting an administrative disposition, the student agrees to waive any right to appeal.

#### Limitation

Fisher Appendix: 176



School of Law

The Investigator may consider mitigating or aggravating factors in determining whether to offer an administrative disposition and in recommending what sanctions should be imposed. The following non-exhaustive list provides examples of such factors.

a. Pre-referral admission: When a student voluntarily admits misconduct to the Investigator before learning that someone has referred the matter or is about to refer the matter, the Investigator may consider the admission as a mitigating factor.

b. Other admissions: An admission after a referral has been made may still have some mitigating value. However, a post-referral admission is not as strong a mitigating factor as pre-referral admission.

c. Cooperation: The Investigator may consider how cooperative the student was during the investigation process. This includes, but is not limited to, whether the student responded timely and respectfully to inquiries and requests for meetings, provided requested information, and dealt honestly with the Investigator and with others involved.

d. Intent/discriminatory motive: The Investigator may consider intent when recommending sanctions. A violation of the Honor Code that is malicious, willful, intentional, reckless, or grossly negligent may be an aggravating factor. Where conduct may be considered merely negligent, accidental, or careless, the sanction may be less severe. If a student violated the Honor Code and also directed the conduct intentionally toward a person or group because of race, color, religion, age, national origin, ancestry, disability, gender, sexual orientation, gender identity, gender expression, status as a protected veteran, marital, or parental status of the targeted group or person, the Investigator may find the discriminatory motive to be an aggravating factor in recommending sanctions.

e. Degree of harm or seriousness of offense: The degree of harm to others and the seriousness of the violation are relevant factors in recommending sanctions.

f. Prior violations: The Investigator may consider prior violations of the Honor Code as aggravating factors.

g. Willingness to make restitution: The Investigator may consider a student's willingness to make restitution. Restitution may include compensation for loss, damage, or injury, in the form of appropriate service or monetary or material replacement.

**Notification**

If the Investigator determines that the student qualifies for an administrative disposition, the Investigator will inform the student in writing. The writing will notify the student that accepting an administrative disposition constitutes an admission that the student violated the Honor Code. The notice will include findings of fact, a description of the appropriate sanction or sanctions, and a letter of admonishment from the Dean. The notice will also inform the student that if he or she does not accept the offer of an administrative disposition, the matter will be referred to Honor Council. The student will have ten business days from receiving written notice to accept or reject the offer and must do so in writing. If a student refuses to accept the offer, the Investigator will transfer the file to the Honor Council, without including any findings of fact.

**F. Notice of Hearing**

After the Investigator transfers the file, the Chair of the Honor Council will notify the student in writing of the allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow. Students may request that witnesses provide information for them to the Council. The Chair will inform the student in writing of any witnesses the Council intends to call.

**G. Hearing**

At the hearing, the student may question any witnesses called by the Honor Council. The student may make a statement on his or her behalf, but the student may choose to remain silent. If the student offers a statement, members of the Council may question the student.

A student may not be represented by an attorney or other person at the hearing. A student is free to retain counsel who may be present at the hearing, but may not participate in the proceeding; however, the student may confer with counsel outside the hearing room. A member of the Texas Tech University faculty, staff, or student body cannot serve as counsel for any student during any process under this Code.

The Honor Council hearing may be recorded (limited to audio recording) if the student requests this at least 24 hours before the hearing.

**H. Determination by Honor Council**

The Honor Council will determine whether the student violated the Honor Code, based on clear and convincing evidence. The Council may find a violation based on a student's intentional, knowing, reckless, or negligent act.

If the Council finds no violation of this Code, the Chair of the Honor Council will issue a report to that effect to the student, the Honor Code Investigator, and the Dean. Absent exigent circumstances, the report should be issued within two weeks of the hearing.

If the Council finds a violation, it will then determine the appropriate sanction or sanctions to recommend to the Dean. A majority of the Council members present must vote affirmatively to find that a violation of the Honor Code has occurred and to select one or more sanctions to recommend to the Dean.

The Honor Council may consider mitigating and aggravating factors, a non-exhaustive list of which appears in Part 4.E. above, in determining which sanction or sanctions to recommend to the Dean.

Following a hearing, the Chair of the Honor Council will issue findings of fact, the Honor Council's decision, and the recommended sanction or sanctions. Absent exigent circumstances, these documents should be provided to the student and the Dean within two weeks of the hearing.

**I. Failure to Appear**

Students who fail to attend their scheduled Honor Council hearings forfeit their right to respond, absent some extenuating circumstance as determined by the Honor Council. If the student fails to attend or fails to respond to requests to participate, the Honor Council may proceed to determine whether the student violated this Code and recommend one or more sanctions to the Dean.

# 5. SANCTIONS

For any violation of the Honor Code, the Honor Council may recommend one or more of the following sanctions that it considers appropriate. These options are not exhaustive.

Fisher Appendix: 177

3. Suspension or revocation of a degree, certificate, recognition, or other award conferred by the School of Law;

4. Satisfaction of additional work in the School of Law for graduation not to exceed a total of 15 additional hours (e.g., taking additional courses in a subject area);

5. Written letter of reprimand from the Dean that will be placed in the student's permanent file;

6. Educational or restorative sanctions to include, but not limited to, a research project, a letter of apology, or counseling;

7. Disciplinary probation. Disciplinary probation is distinct from academic probation. It is a period prescribed by the Investigator (as part of an administrative disposition) or by the Honor Council during which time conditions imposed as sanctions must be met or during which time the student's behavior will be subject to review. The conditions of disciplinary probation may be varied, depending on the circumstances.

Each year, the Chair of the Honor Council will publish a summary of cases heard in which violations were found and sanctions imposed. Names of offenders will not be revealed. The Chair will not report summaries of cases heard in which the Council found no violations. The Chair of the Honor Council will not include administrative dispositions in the report. For years in which three or fewer cases must be reported, the Chair of the Council may delay reporting and include the summaries in the report for the next year, to help protect the identity of the students involved.

# 6. REVIEW

If the student consents to the sanction or sanctions recommended by the Honor Council, the Dean shall impose the recommended sanction or sanctions and send written notice to the Honor Code Investigator and to the Chair of the Honor Council. The Investigator shall forward a copy of the notice to the student and to any other necessary persons.

If the student does not consent, the student may submit a written request for a review by the Associate Dean for Academic Affairs, asking the sanction or sanctions be reduced or vacated and including the reasons for the request. This statement will be submitted to the Associate Dean no later than 10 calendar days from the date of the Council's report to the Dean and the student.

The Associate Dean may impose, modify, or vacate any sanction recommended, but cannot increase the severity of a sanction. The Associate Dean cannot modify or vacate the finding of a violation of this Code made by the Honor Council, except when the Associate Dean determines that the Council's finding is clearly erroneous. If the Associate Dean finds such an error, the Associate Dean will include the basis for this determination in his or her decision. The Associate Dean will send notice of his or her decision to the Dean, the student, the Honor Code Investigator, and the Chair of the Honor Council. The Dean will impose the sanction determined by the Associate Dean.

There is no further right to appeal or review within the University.

# 7. RECORD KEEPING AND REPORTING

The Registrar will record the findings of the Honor Council and the Honor Code Investigator, in the case of an administrative disposition. If a violation was found, the Registrar will also record the sanction or sanctions imposed by the Dean. The Registrar will ensure the record is kept in the appropriate law school files.

The School of Law will report all matters in which the Honor Code Investigator determined that probable cause existed to believe that a violation of this Code occurred to the extent required by the Texas Board of Law Examiners (BLE) or similar authorities in other states, regardless of whether violations of this Code were found. Students found to have violated the Honor Code will likely face a formal hearing before the BLE or similar authorities in other states to determine the students' character and fitness to practice law.

**School of Law**



**ADDRESS**
Texas Tech University School of Law, 3311 18th Street, Lubbock, Texas 79409-0004

**PHONE**
806.742.3791

**EMAIL**
law@ttu.edu

**TEXAS TECH UNIVERSITY**

2500 Broadway Lubbock, Texas 79409

806-742-2011



| | |
|---|---|
| Contact Us | TTU System |
| Campus Map | TTU Health Sciences Center |
| Jobs @ TTU | TTUHSC El Paso |
| TechAlert | Angelo State University |
| General Policy Information | Midwestern State University |
| Public Access to Course Info | Statewide Search |
| Energy Management | State of Texas |
| Mental Health Resources | Texas Homeland Security |
| Title IX | Texas Veterans Portal |
| Fraud and Misconduct Hotline | Texas CREWS |
| Online Institutional Resumes | SAO Fraud Reporting |
| Texas Transparency | Open Records Requests |
| Digital Accessibility | |

Fisher Appendix: 178



Case 5:26-cv-00073-X     Document 4-1     Filed 04/12/26     Page 180 of 294     PageID 280



Fisher Appendix: 179

# EXHIBIT N

Fisher Appendix: 180

## Michael Allen

| | |
|---|---|
| **From:** | Michael Allen |
| **Sent:** | Monday, February 16, 2026 12:52 PM |
| **To:** | Spain, Larry; Chapman, Sofia; Outenreath, Alyson; Hardberger, Amy; Owens, Allyson |
| **Cc:** | Tiffany Lawson; Ellie Mae Fisher |
| **Subject:** | FW: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 1/2 |
| **Attachments:** | Notaraized Affidavit of Holland Pombrio.pdf; Notarized Affidavit of Ashanty Bishop.pdf; Notarized Affidavit of Caleb Barkman.pdf |

Dear Professor Spain,

As you are an attorney and as the Honor Code and Rules of the School of Law of Texas Tech only state that I may not speak on behalf of my client, Ellen Fisher, only "at the hearing," but the Code and Rules are otherwise silent; I am writing you directly on her behalf.  We know of no indication that this is not permitted.  I will also accompany Ms. Fisher to the hearing, but as your rules prescribe, I will remain silent but be available to consult with her at the hearing itself.

Also, according to the Honor Code and Rules, Ms. Fisher is to receive a notice of hearing specifying the "allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow."  At this time, we have received no information about the latter.  Please forward to us information concerning the procedures the Council will follow at your earliest convenience.

Although Ms. Fisher did receive a notice of allegations, these appear chiefly to recite reactions common to all students in the wake of the public assassination of Charlie Kirk, including factual statements such as, "They shot Charlie"; "There's video"; and "It looks bad."  All of which are factually true and all of which were clearly observations made by many other students in addition to Ms. Fisher.  Thus, it is unclear how these allegations support "probable cause" of an honor code violation.

In addition, it is apparently alleged that Ms. Fisher was in a good mood, in other words that she had impermissible subjective feelings of some sort.  One other allegation is that she spoke to her mother, who likewise is alleged to have had impermissible subjective feelings, although why these are monitored by Texas Tech and its School of Law is nowhere stated or clear.  In particular, what is unclear is how Ms. Fisher is alleged to have violated the honor code prohibiting conduct that, "fail[ed] to uphold professional or fiduciary obligations" of any kind.  None of the witnesses report disruption to the clinics or work at the law school, which was likewise suppressed in the Keffer Report.

In addition, all of the actions, words, or observations listed in the Keffer Report, even if they were all true, cannot remotely be considered violations of clinical work or duties.  Moreover, they are quite obviously protected by the First Amendment to United States Constitution.

I believe, as a lawyer yourself, you will therefore recognize that the Notice is impossibly vague.

I also write to address your questions about the relevance of witnesses that Ms. Fisher's has requested to be summoned to the honor Council meeting.  To that end, I attach the following evidence for the honor Council's consideration:

1

1) Affidavit of Holland Pombrio
2) Affidavit of Ashanty Bishop
3) Affidavit of Caleb Barkman
4) Affidavit of Callahan Ard
5) Affidavit of Patrick Metze
6) Affidavit of Tristan Perez

We have taken the liberty of gathering sworn affidavits from witnesses in the event that Ms. Fisher will be required to file for a Temporary Restraining Order and Preliminary Injunction following the hearing. You will receive two emails due to the size of the files. This is one of two; each will have the identical message.

As to relevance, you will see that material facts provided by these witnesses, whether they were interviewed by Professor Keffer or not, have been suppressed in his Report.

By way of example, Tristan Perez, Callahan Ard, Caleb Barkman, and Holland Pombrio all attest that Ms. Fisher was not disrespectful, hostile, or unprofessional in the Clinic Office, and did not say "mother fucker" in connection with Charlie Kirk's death. Several attest that their statements to Professor Keffer were misrepresented in his report— which would seem to be itself an Honor Code violation that you are obligated to report and investigate.

In fact, there appears to have been a concerted effort to eliminate exculpatory information. For example, Ashanty Bishop, who was in the office of Professor Metze, attests that Ms. Fisher did not use the term "mother fucker" when discussing the murder of Charlie Kirk—but again. this important fact was suppressed in Professor Keffer's report. In fact, no one testifies to the use of "mother fucker" except Professor Terri Morgeson, and yet it was she who interjected words to the effect that Charlie Kirk had died or "he is dead" in Professor Metze's office, as Ms. Bishop also attests. To our knowledge, Ms. Bishop is the only witness available to testify to this fact and who was in the presence of both Ms. Fischer and Professor Morgeson.

Several affiants also attest to cursing and curse words being commonly used in the Clinic Office and in Professor Metze's office, as does Professor Metze, and yet no evidence in the Keffer Report suggests or implies that this has ever interfered with either the operation of the law clinics or the representation of clients. Multiple witnesses attest that the kinds of discussions engaged in by the students, and even profanity, was common in the Clinic Office; and yet somehow only Ms. Fisher has been investigated and faces discipline.

As to your question of what can be provided by the other witness, Professor Kenneth Williams, whom Ms. Fisher has respectfully requested that you call before the Council; we expect him to testify that it was the student, Henry Tecssi (not Ms. Fisher), who first announced in Professor Williams' Race & Racism class that Charlie Kirk had been shot as well as words to the effect that Charlie Kirk was a "right wing" figure or a "right-winger." In other words, some of the same things of which Ms. Fisher now stands accused of saying. And yet Henry Tecssi, who is not black, was somehow spared a disciplinary investigation for an honor code violation—obviously because there was none, just as there is none in the case of Ms. Fisher-- even if the worst alleged against her were true.

Again, we respectfully request that the Honor Council consider the attached affidavits as well as summon Professor Kenneth Williams and Ashanty Bishop.  However, if the Council intends to exclude exculpatory evidence, as does the Keffer Report, please inform us of that fact in writing, and we will proceed accordingly.

Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Spain, Larry <Larry.Spain@ttu.edu>
**Sent:** Friday, February 13, 2026 5:09 PM
**To:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Chapman, Sofia <Sofia.Chapman@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; Owens, Allyson <Allyson.Owens@ttu.edu>
**Cc:** Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Re: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing

In response to your inquiry, have you attempted on your own to request the appearance of Ashanty Bishop and Professor Kenneth Williams and do they have information that would be relevant to the matter resulting in a referral to the Honor Council?  I had asked Professor William Keffer who conducted the investigation and made the referral to the Honor Council for clarification.  He indicated that he had interviewed both but concluded that neither had information relevant to the issues resulting in a referral.  Can you explain what information they might have that would be relevant?  If justified, I can ask if they would appear to provide information but since the Honor Council proceeding is not a formal process such as a court hearing, we do not have subpoena power.

As to your other procedural questions:

- Likely the witnesses will be called in the order listed in the notice previously provided although this could vary depending on their particular availability
- For witnesses that the Council requests, each member of the Council will have the opportunity to ask questions and you will have the opportunity as well
- You are permitted to make an Opening Statement and Closing Statement if you desire as well as any other information you wish to present although you are not required to do so

If you have any other questions, please let me know.

Professor Larry R. Spain
Alvin R. Allison Professor of Law
*Texas Tech University School of Law*
3311 18th Street
Lubbock, TX  79409-0004
(806) 834-6649
(806) 742-4199 FAX
larry.spain@ttu.edu

---

3

**From:** Fisher, Ellie <Ellie.Fisher@ttu.edu>
**Sent:** Friday, February 13, 2026 12:00 PM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Spain, Larry <Larry.Spain@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; Owens, Allyson <Allyson.Owens@ttu.edu>
**Cc:** mallen@allenharrislaw.com <mallen@allenharrislaw.com>; tlawson@allenharrislaw.com <tlawson@allenharrislaw.com>
**Subject:** Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing

Dear Members of the Honor Council,

I hope this message finds you well. I am writing in advance of my hearing scheduled for February 20, 2026, to respectfully request the Council's assistance in securing two witnesses and to seek clarification regarding certain aspects of the hearing process, as the Honor Code does not address these details.

First, I kindly request that the Council assist in securing the attendance of the following witnesses: Ashanty Bishop (student) and Kenneth Williams  (Faculty). With respect to Bishop, I want to formally express my concern that she may be hesitant to testify due to fear of potential retaliation. I believe it is important to place this concern on the record now as I do not have subpoena power to require her attendance. I respectfully ask the Council to consider any steps available to ensure she may participate without concern.

Additionally, I would appreciate guidance on the following procedural questions:

• Will there be a designated order in which witnesses are called?

• For witnesses the University intends to call, who will conduct the questioning—the Honor Council or the General Counsel?

• Will I be permitted to provide an opening statement and a closing statement?

Thank you in advance for your time and assistance. I would be grateful for clarification at your earliest convenience.

Sincerely,

Ellie

**Ellie Mae Fisher | She, Her**

Texas Tech Law, *Candidate for Doctor of Jurisprudence* 26'

Criminal Defense Clinic, *Texas State Bar Qualified Law Student* | (806) 834-2194

4

Fisher Appendix: 184

Tech Law National Lawyers Guild, *President*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

5

**Michael Allen**

| | |
|---|---|
| **From:** | Michael Allen |
| **Sent:** | Monday, February 16, 2026 12:52 PM |
| **To:** | Spain, Larry; Chapman, Sofia; Outenreath, Alyson; Hardberger, Amy; Owens, Allyson |
| **Cc:** | Tiffany Lawson; Ellie Mae Fisher |
| **Subject:** | FW: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 2/2 |
| **Attachments:** | Notarized Affidavit of Callighan Ard.pdf; 2026-02-13 EXECUTED P. Metze Affidavit.pdf; Notarized Affidavit of Tristen Perez.pdf |

Dear Professor Spain,

As you are an attorney and as the Honor Code and Rules of the School of Law of Texas Tech only state that I may not speak on behalf of my client, Ellen Fisher, only "at the hearing," but the Code and Rules are otherwise silent; I am writing you directly on her behalf. We know of no indication that this is not permitted. I will also accompany Ms. Fisher to the hearing, but as your rules prescribe, I will remain silent but be available to consult with her at the hearing itself.

Also, according to the Honor Code and Rules, Ms. Fisher is to receive a notice of hearing specifying the "allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow." At this time, we have received no information about the latter. Please forward to us information concerning the procedures the Council will follow at your earliest convenience.

Although Ms. Fisher did receive a notice of allegations, these appear chiefly to recite reactions common to all students in the wake of the public assassination of Charlie Kirk, including factual statements such as, "They shot Charlie"; "There's video"; and "It looks bad." All of which are factually true and all of which were clearly observations made by many other students in addition to Ms. Fisher. Thus, it is unclear how these allegations support "probable cause" of an honor code violation.

In addition, it is apparently alleged that Ms. Fisher was in a good mood, in other words that she had impermissible subjective feelings of some sort. One other allegation is that she spoke to her mother, who likewise is alleged to have had impermissible subjective feelings, although why these are monitored by Texas Tech and its School of Law is nowhere stated or clear. In particular, what is unclear is how Ms. Fisher is alleged to have violated the honor code prohibiting conduct that, "fail[ed] to uphold professional or fiduciary obligations" of any kind. None of the witnesses report disruption to the clinics or work at the law school, which was likewise suppressed in the Keffer Report.

In addition, all of the actions, words, or observations listed in the Keffer Report, even if they were all true, cannot remotely be considered violations of clinical work or duties. Moreover, they are quite obviously protected by the First Amendment to United States Constitution.

I believe, as a lawyer yourself, you will therefore recognize that the Notice is impossibly vague.

I also write to address your questions about the relevance of witnesses that Ms. Fisher's has requested to be summoned to the honor Council meeting. To that end, I attach the following evidence for the honor Council's consideration:

1

1) Affidavit of Holland Pombrio
2) Affidavit of Ashanty Bishop
3) Affidavit of Caleb Barkman
4) Affidavit of Callahan Ard
5) Affidavit of Patrick Metze
6) Affidavit of Tristan Perez

We have taken the liberty of gathering sworn affidavits from witnesses in the event that Ms. Fisher will be required to file for a Temporary Restraining Order and Preliminary Injunction following the hearing.  You will receive two emails due to the size of the files.  This is one of two; each will have the identical message.

As to relevance, you will see that material facts provided by these witnesses, whether they were interviewed by Professor Keffer or not, have been suppressed in his Report.

By way of example, Tristan Perez, Callahan Ard, Caleb Barkman, and Holland Pombrio all attest that Ms. Fisher was not disrespectful, hostile, or unprofessional in the Clinic Office, and did not say "mother fucker" in connection with Charlie Kirk's death.  Several attest that their statements to Professor Keffer were misrepresented in his report— which would seem to be itself an Honor Code violation that you are obligated to report and investigate.

In fact, there appears to have been a concerted effort to eliminate exculpatory information.  For example, Ashanty Bishop, who was in the office of Professor Metze, attests that Ms. Fisher did not use the term "mother fucker" when discussing the murder of Charlie Kirk—but again. this important fact was suppressed in Professor Keffer's report.  In fact, no one testifies to the use of "mother fucker" except Professor Terri Morgeson, and yet it was she who interjected words to the effect that Charlie Kirk had died or "he is dead" in Professor Metze's office, as Ms. Bishop also attests.  To our knowledge, Ms. Bishop is the only witness available to testify to this fact and who was in the presence of both Ms. Fischer and Professor Morgeson.

Several affiants also attest to cursing and curse words being commonly used in the Clinic Office and in Professor Metze's office, as does Professor Metze, and yet no evidence in the Keffer Report suggests or implies that this has ever interfered with either the operation of the law clinics or the representation of clients.  Multiple witnesses attest that the kinds of discussions engaged in by the students, and even profanity, was common in the Clinic Office; and yet somehow only Ms. Fisher has been investigated and faces discipline.

As to your question of what can be provided by the other witness, Professor Kenneth Williams, whom Ms. Fisher has respectfully requested that you call before the Council; we expect him to testify that it was the student, Henry Tecssi (not Ms. Fisher), who first announced in Professor Williams' Race & Racism class that Charlie Kirk had been shot as well as words to the effect that Charlie Kirk was a "right wing" figure or a "right-winger."  In other words, some of the same things of which Ms. Fisher now stands accused of saying.  And yet Henry Tecssi, who is not black, was somehow spared a disciplinary investigation for an honor code violation—obviously because there was none, just as there is none in the case of Ms. Fisher-- even if the worst alleged against her were true.

2

Again, we respectfully request that the Honor Council consider the attached affidavits as well as summon Professor Kenneth Williams and Ashanty Bishop.  However, if the Council intends to exclude exculpatory evidence, as does the Keffer Report, please inform us of that fact in writing, and we will proceed accordingly.

Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com |
Tel: (610) 634-8258 | Fax: (860) 481-7899

3

# EXHIBIT O

# Texas Tech University System
# Regulation 07.04

**Freedom of Expression**
Approved: August 9, 2019
Modified:  November 05, 2025
Next Scheduled Review:  August 2026

1.  Purpose

    a.  The Texas Tech University System ("System") and its component universities (referred to herein collectively as the "University") recognize freedom of speech and expression as a fundamental right and seek to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the University and employees of the University (collectively, "University Members"). This regulation is intended to protect the expressive rights of University Members guaranteed by the constitutions of the United States and the State of Texas by recognizing freedom of speech and assembly as central to the mission of the University and ensuring that University Members may assemble peaceably on  University campuses for expressive activities.  For purposes of this regulation, "expressive activities" means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, of the Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions.

2.  Outdoor Common Areas

    a.  For purposes of this regulation, Outdoor Common Areas are the generally accessible, open, outdoor spaces on a University campus such as:

        • Grassy areas and open fields;

        • Sidewalks and pedestrian walkways.

3.  Limited Public Forum

    a.  In accordance with Texas Education Code, Section 51.9315, the Texas Tech University System Board of Regents has designated each Outdoor Common Area (operated and either owned or leased by the University) as a limited public forum where only University Members are permitted to engage in expressive activities, subject to the provisions of this Regulation. The University reserves the right to implement and enforce reasonable time, place, and manner restrictions regarding expressive activities including, but not limited to, those set forth in this regulation. Further, activities that are unlawful or that materially and substantially disrupt the normal operations of the University's campus are prohibited. Expressive activities on University grounds do not necessarily imply endorsement by the University.

4.  General Guidelines and Policy Regarding Expressive Activities

    a.  *Applicability*. This regulation applies to all expressive activities of University Members in the University's Outdoor Common Areas.  This regulation does not apply to the activities of the University itself. University Members may engage in expressive activities without prior

Fisher Appendix: 190

reservation, registration, or approval, provided such activities are conducted pursuant to applicable law as well as System and University policy.

Access to Outdoor Common Areas for expressive activity by individuals or groups who are not University Members is restricted. Such individuals may not engage in public discourse, demonstrations, or distribution of materials on University grounds. Except as stated otherwise herein, this policy does not restrict recognized University student organizations and their ability to invite guest speakers for events (e.g. talks, performances, etc.) at designated University venues, provided such actions are done in accordance with this regulation as well as System and University policies.

b. *Prohibited Commercial Activities.* For purposes of this regulation, expressive activities do not include commercial speech. As such, commercial activities are prohibited on University grounds without a prior written agreement with the University.

c. *Other Prohibited Activities.* For purposes of this regulation, expressive activities do not include activities which lose legal protection under the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, including commercial speech, defamation, unlawful harassment, incitement to unlawful activity, obscenity, or threats to engage in unlawful activity. Groups or individuals engaging in materially and substantially disruptive activities, or those failing to comply with applicable laws or System or University policy, may face immediate removal from University premises and/or other appropriate actions by University officials, including University police.

d. *Reservation of Outdoor Common Areas*. Each University may adopt operating policies and procedures regarding the reservation of Outdoor Common Areas by University Members for the purpose of engaging in expressive activities. If any area of the University's Outdoor Common Areas has been reserved, the reserving individual or group shall be given priority for use of such area.

e. *Statutory Prohibitions*. For purposes of this regulation and in accordance with the Texas Education Code, University Members are legally prohibited from the following:

    i. Use of a device to amplify sound on University property during class hours that intimidates others, interferes with University campus operations, or interferes with a University employee's or peace officer's lawful performance of duty;

    ii. During the last two weeks of an academic semester or academic term (unless otherwise specified by University in its respective operating policies to accommodate schools with different academic calendars), engaging in expressive activities, including the invitation of guest speakers to speak on campus, the use of a device to amplify sound, or the use of drums or other percussive instruments in a manner that materially and substantially disrupts University campus functioning;

    iii. Camping or erecting tents or other living accommodations on University's campus;

    iv. Wearing a disguise or other means of concealing the wearer's identity with an intent to obstruct the enforcement of University rules or law by avoiding identification, intimidate others, or interfere with a University employee's or peace officer's lawful performance of duties;

Fisher Appendix: 191

       v. Lowering a flag of the United States or flag of the State of Texas flown by the University with the intent to raise the flag of another nation or a flag representing an organization or group of people; and

       vi. Engaging in expressive activities on campus between the hours of 10:00 p.m. and 8:00 a.m. in a manner that materially and substantially disrupts University campus functioning.

   f. *Antisemitic Speech and Acts*. The University is committed to upholding principles of free speech and academic freedom as fundamental components of its mission. However, the exercise of free speech must be conducted in a manner that respects the dignity and rights of all individuals within our community. By directive of the Governor's Executive Order GA-44, the University prohibits antisemitism and adopts the following definition of antisemitism adopted by the State of Texas in Section 448.001 of the Texas Government Code: *"Antisemitism" means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016.*

   g. *Damage Caused by Expressive Activities*. Groups or individuals are responsible for any damage and harm to persons and property that arise from their expressive activities.

   h. *Identification*. University Members shall be required, upon request by a University official on University's campus —including University law enforcement—engaging in an official duty, to present proof of identity and status at the University. Failure to present identification may result in appropriate action, including but not limited to cessation of engagement in expressive activity until such identification is sufficiently presented.

5. Reasonable Time, Place, and Manner Restrictions

   a. *Reasonable Time, Place, and Manner Restrictions*.  Subject to section 4.e , the following reasonable time, place, and manner restrictions are applicable to expressive activities in University outdoor common areas:

       i. Activities that are unlawful or that materially and substantially disrupt the normal operations of the University are prohibited.

       ii. Activities that materially and substantially prevent other University Members from carrying out an expressive activity are prohibited.

       iii. Activities that substantially interfere with vehicular or pedestrian traffic including the ingress or egress of University facilities are prohibited.

       iv. Activities that substantially interfere with fire protection, law enforcement, or emergency or medical services are prohibited.

       v. Activities that threaten or endanger the health or safety of any person on University grounds are prohibited.

       vi. Activities that result in damage or destruction of University property are prohibited. Nothing may be affixed to or written on University property or grounds.

Fisher Appendix: 192

vii. Activities that inherently lose First Amendment protection (e.g., defamatory statements, true threats/fighting words, obscenity [as defined by law]) are prohibited.

viii. Expressive signage, posters, displays, or structures (herein "displays") must be hand-held. Displays, literature, and other items may not be left unattended.

ix. Amplified sound shall not exceed 80 decibel levels near University buildings, as measured at the outdoor edge of such buildings closest to the amplified sound. Any amplification device must be hand-held.

x. No open flames are permitted on the University campus without the express written permission of the University.

xi. Any activities that are subject to licensing, code, or ordinance requirements/permits must have the proper licenses/permits and satisfy such codes and ordinances (e.g., serving food and beverages).

b. *Additional Restrictions*. The above list of reasonable time, place, and manner restrictions is not intended to be all-inclusive. The University reserves the right, as necessary, to impose additional reasonable time, place, and manner restrictions as circumstances arise.

c. *Restrictions Are Viewpoint-Neutral*. The University's decisions will not be based on political, religious, philosophical, ideological, or academic viewpoints.

d. *Relocation, Limitation, and Prohibition*. The University reserves the right to relocate, limit, or prohibit University Members engaged in expressive activities in University outdoor common areas based on reasonable time, place, and manner restrictions.

6. Speaker Fees and Approvals

a. University faculty, staff, and student organizations have the right to invite speakers to University forums to speak. When reviewing speakers, the University will not consider any anticipated controversy related to the event. The University will consider content-neutral and viewpoint neutral criteria including, but not limited to, the following when reviewing speakers:

i. Proposed venue and the size of the expected crowd;

ii. Anticipated needs for security;

iii. Any other necessary accommodations the University deems necessary for the speaker; and

iv. Relevant history of compliance or noncompliance with University policies by the speaker or the requestor.

7. Disciplinary Sanctions

a. Students, student organizations, faculty, or staff who unduly interfere with the expressive activities of other University Members on campus or who have been found to violate System or University policies and procedures, or other applicable laws, rules, and regulations, to include the requirements set forth in this System Regulation 07.04, may be subject to the disciplinary policies and procedures, to include possible expulsion or termination, as applicable, outlined in the applicable University Student Code of Conduct, Student Handbook, University Catalog, or University operating policies and

Fisher Appendix: 193

procedures.

b.  Violation of this regulation may also constitute a breach of applicable criminal law. In such circumstances, the Penal Code and Code of Criminal Procedure will apply.

8.  <u>Grievances</u>

a.  University Members may file a grievance regarding an alleged violation of this regulation in the manner provided in the applicable University Student Code of Conduct, Student Handbook, University Catalog, Faculty Handbook, or employee/personnel manual.

9.  <u>Free Speech</u>

a.  Nothing in this Regulation may be construed to limit or infringe on a person's right to freedom of speech or expression protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution.

Contact Office:  System Office of General Counsel
806-742-2155

Fisher Appendix: 194

# EXHIBIT P

Case 5:26-cv-00073-X     Document 4-1     Filed 04/12/26     Page 197 of 294     PageID 297



**School of Law**



| | |
|---|---|
| **Title** | Academic Freedom and Freedom of Expression Policy and Statement of Compliance |
| **Category** | Miscellaneous Policies |
| **Date Approved and/or Revised** | March 3, 2025 |

## 1. Purpose

The purpose of this statement is to ensure full recognition of the Law School's compliance with ABA Standard 208 on Academic Freedom and Freedom of Expression. The policies and procedures of the Texas Tech University System and Texas Tech University extend to the Law School and fully comply with ABA Standard 208.

## 2. Instructors, Activities, and Process

Under System and University policies and procedures, academic freedom and freedom of expression in the Law School extends to all full and part-time law faculty as well as staff who teach law courses. These freedoms extend, as appropriate, to conducting research, publishing scholarship, engaging in law school governance, participating in law-related public service activities, curating library collections and providing information services, and exercising teaching responsibilities, including those related to client representation in clinical programs. System and University policies and procedures afford appropriate due process, such as notice, hearing, and appeal rights, to assess claims of violation of academic freedom and freedom of expression.

## 3. Freedom of Expression

a. Under System and University policies and procedures, faculty, staff, and students have a right to freedom of expression that includes communicating ideas that may be controversial or unpopular, including through robust debate, demonstrations, and protests.

b. System and University policies and procedures also proscribe disruptive conduct that hinders free expression by preventing or substantially interfering with the carrying out of Law School functions or approved activities, such as classes, meetings, library services, interviews, ceremonies, and public events.

c. System and University policies and procedures also allow for protection of individuals and the community through regulation of unprotected forms of expression such as those that violate the law, that falsely defame a specific individual, that constitute a genuine threat or harassment, or that unjustifiably invade substantial privacy or confidentiality interests. System and University policies and procedures also allow for reasonable time, place, and manner regulations of expression.

Fisher Appendix: 196

**School of Law**

**School of Law**

   

**ADDRESS**
Texas Tech University School of Law, 3311 18th Street, Lubbock, Texas 79409-0004

**PHONE**
806.742.3791

**EMAIL**
law@ttu.edu

## TEXAS TECH UNIVERSITY

2500 Broadway Lubbock, Texas 79409

806-742-2011



| | |
|---|---|
| Contact Us | TTU System |
| Campus Map | TTU Health Sciences Center |
| Jobs @ TTU | TTUHSC El Paso |
| TechAlert | Angelo State University |
| General Policy Information | Midwestern State University |
| Public Access to Course Info | Statewide Search |
| Energy Management | State of Texas |
| Mental Health Resources | Texas Homeland Security |
| Title IX | Texas Veterans Portal |
| Fraud and Misconduct Hotline | Texas CREWS |
| Online Institutional Resumes | SAO Fraud Reporting |
| Texas Transparency | Open Records Requests |
| Digital Accessibility | |

© 2026  Texas Tech University    Mar 3, 2025    12:54 PM

...

Fisher Appendix: 197

# EXHIBIT Q

**Board of Law Examiners**
# Guidelines for Determining Character and Fitness and Overseeing Probationary License Holders

Adopted June 28, 2024

### I. Introduction

Every person seeking admission to the Texas Bar must file a complete Application for Admission with the required fees. Texas law students must also timely file a Declaration of Intention to Study Law with the required fees. Applicants who believe they may have matters potentially affecting the determination of their character and fitness for admission to the Bar are strongly encouraged to file a Declaration or Application as early as possible so that these issues may be resolved as soon as practicable and without causing a delay in the licensing process. See Rules 6, 9 and 18, Rules Governing Admission to the Bar of Texas.

### II. Purpose of Guidelines

The Board of Law Examiners adopted these Guidelines on June 28, 2024. These Guidelines replace and supersede the version adopted by the Board in November 2018.

To the extent that these Guidelines conflict with the Rules Governing Admission to the Bar of Texas, the Rules prevail.

These Guidelines are designed in accordance with section 82.039(a)(1) of the Texas Government Code to assist the Board of Law Examiners in making decisions involving character and fitness issues related to the licensing of attorneys in Texas and in overseeing probationary license holders. The purpose of these Guidelines is to promote: (1) consideration of factors relevant to determinations of an Applicant's present good moral character and fitness; (2) consideration of the appropriate weight of such factors in light of the stated goal to exclude Applicants whose character traits or current fitness indicate a likelihood of injury to future clients, the obstruction of justice, or a violation of the Texas Disciplinary Rules of Professional Conduct; and (3) consistency in decisions involving the same or similar facts or issues relating to character and fitness and in overseeing probationary license holders. These Guidelines do not limit the authority of the Board or a panel of three or more Board members to make a finding or decision based on the specific facts relating to an Applicant's or Probationary Licensee's present character or fitness.

### III.  Good Moral Character

An Applicant's good moral character is evaluated through a functional assessment of the character of a prospective lawyer. This requirement is intended to exclude from the practice of law those who possess character traits likely to result in injury to future clients, in the obstruction of justice, or in a violation of the Texas Disciplinary Rules of Professional Conduct. These character traits usually involve either dishonesty or lack of trustworthiness in carrying out responsibilities. There may be other character traits that are relevant in the admissions process, but such traits must have a rational connection with the Applicant's present fitness or capacity to practice law. Accordingly, these traits must relate to the legitimate interests of Texas in protecting clients and in safeguarding the system of justice in Texas. *See* Rule 4(b), Rules Governing Admission to the Bar of Texas.

### IV.  Fitness

An Applicant's fitness is evaluated through an assessment of mental and emotional health as it affects the competence of a prospective lawyer. This requirement is intended to exclude from the practice of law persons having mental or emotional illnesses or conditions that likely would prevent them from carrying out their duties to clients, courts, or the profession. Applicants may be of good moral character, but may be unfit to properly discharge their duties as lawyers by reason of such illness or condition. The fitness required is "present" fitness, and previous mental illness or emotional conditions are relevant only insofar as they indicate the existence of a present lack of fitness. *See* Rule 4(c), Rules Governing Admission to the Bar of Texas.

A.  The following non-exhaustive list of facts and circumstances may be considered as an indication of lack of present fitness:

1.  Evidence of recent aberrant conduct or behavior that calls into question the Applicant's ability to practice law in a competent, ethical, and professional manner;

2.  Applicant's assertion of any substance use disorder, or any mental, emotional, or nervous disorder or condition, as a defense or explanation, in any forum, in response to any allegation of misconduct.

B. Diagnosis or treatment for mental health conditions does not constitute evidence of a lack of present fitness. Treatment or counseling is encouraged.

## V. Chemical Dependency

Chemical dependency means a substance use disorder as defined by the DSM-5, Diagnostic and Statistical Manual of Mental Disorders. Rule 1(a)(7), *Rules Governing Admission to the Bar.*

A. A history of substance use disorder, if in uninterrupted remission for two years or more at the time of application, will not support a finding of chemical dependency.
B. With or without a finding of current chemical dependency, any other facts or circumstances suggesting substance abuse or chemical dependency may be considered evidence of a lack of fitness.
C. Treatment, counseling, and participation in abstinence-support groups such as Alcoholics Anonymous or Lawyers Concerned for Lawyers are encouraged and will be considered evidence of responsible behavior and/or rehabilitation.
D. A finding of current substance use disorder or chemical dependency will result in issuance of a probationary license for two years as required by section 82.038(f) of the Texas Government Code and Rule 16(d)(1) of the Rules Governing Admission to the Bar.

## VI. General Factors to be Considered in Decision on Character and Fitness Issues

In making a determination whether to certify an Applicant's character and fitness for admission to the Bar, the Board panel should consider the following factors:

A. The misconduct or duty of care violated;
B. The Applicant's level of culpability;
C. The potential or actual injury caused by the Applicant's misconduct or violation; and
D. The existence of aggravating or mitigating factors.

## VII. Dispositions Based on Particular Findings

The Board may certify an Applicant's present good moral character and fitness, deny certification, or grant conditional approval, depending on an Applicant's acts or omissions and the existence of aggravating or mitigating factors. Multiple bad acts or omissions increase the likelihood of a decision adverse to the Applicant.

A. Lack of Diligence—Examples include neglect or disregard of financial responsibilities; abandonment of employment, scholastic, or other professional duties; failure to timely file tax returns or pay taxes; neglect of obligations in another licensed profession or occupation; violation of any court order; failure to fully and truthfully respond to requests for information by the Applicant's law school, employers, or the Board of Law Examiners; and an uncured default on a loan guaranteed by the Texas Guaranteed Student Loan Corporation or other private or publicly funded student loans. In general, depending on aggravating and mitigating factors, a finding of lack of diligence may result in conditional admission or denial.

B. Lack of Respect for the Law—Examples include commission or conviction of a crime and failure to appear in a court when required. In general, depending on aggravating and mitigating factors, a finding of lack of respect for the law may result in conditional admission or denial.

C. Lack of Respect for Rights of Others—Examples include acts constituting sexual harassment, dangerous behavior, unlawful discrimination, or bullying. In general, depending on aggravating and mitigating factors, a finding of lack of respect for rights of others may result in conditional admission or denial.

D. Lack of Candor—Examples include failing to respond or omitting material information in any application or in response to requests for information by the Applicant's law school, employers, the Board of Law Examiners, or any other governmental entity. In general, depending on aggravating and mitigating factors, a

finding of lack of candor may result in conditional admission or denial.

E.  False Statements, Fraud, and Misrepresentation—Examples include knowingly or negligently making false statements to the Applicant's law school, employers, fiduciaries, the Board of Law Examiners, or any other governmental entity or legal tribunal. In general, depending on aggravating and mitigating factors, a finding of false statements, fraud, and misrepresentation may result in conditional admission or denial.

F.  Abuse of the Legal Process—Examples include litigation of frivolous civil actions or imposition of sanctions by any court due to abusive litigation conduct. In general, depending on aggravating and mitigating factors, a finding of abuse of the legal process may result in conditional admission or denial.

G.  Failure to Maintain Personal Integrity—Examples include termination or discipline for employee misconduct; violation of the honor code or other academic or behavioral misconduct as determined by the Applicant's educational institution; engaging in the unauthorized practice of law or the existence of unresolved allegations of unauthorized practice of law by the Applicant; and engaging in conduct prohibited by the Texas Bar Examination Security Policy during the administration of the Texas Bar Examination. In general, depending on aggravating and mitigating factors, a finding of failure to maintain personal integrity may result in conditional admission or denial.

H.  Finding of Neglect or Violation of Other Professional Duties—Examples include denial of admission to the Bar in another jurisdiction based on a finding of misconduct or lack of good character or fitness; and disciplinary action by a lawyer disciplinary agency or professional disciplinary group of any jurisdiction, including pending, unresolved disciplinary complaints or grievances, regardless of finality. In general, depending on aggravating and mitigating factors, a finding of neglect or

Fisher Appendix: 203

violation of other professional duties may result in conditional admission or denial.

I. Lack of Compliance with Board Order—Failure to comply with the terms and conditions of any order by the Board of Law Examiners recommending conditional approval or conditional admission with terms of probation. In general, depending on aggravating and mitigating factors, a finding of a lack of compliance with a Board Order may result in continued conditional admission, with the same or modified terms, or denial.

J. Other Evidence of Lack of Good Moral Character—Other character traits that are likely to result in injury to future clients, obstruction of justice, or a violation of the Texas Disciplinary Rules of Professional Conduct as provided by Rule 4(b) of the Rules Governing Admission to the Bar, provided such character traits have a rational connection with the Applicant's present fitness or capacity to practice law and relate to the legitimate interests of Texas in protecting prospective clients and in safeguarding the system of justice within Texas. In general, depending on aggravating and mitigating factors, a finding that the Applicant possesses such other character traits may result in conditional admission or denial.

## VIII. Mitigating and Aggravating Factors

The following non-exhaustive list of factors may be considered in determining the present character and fitness of an Applicant based on his or her conduct:

A. Age of the Applicant at the time of the conduct;

B. How recently the conduct in question occurred;

C. Reliability of the information evidencing the conduct;

D. Seriousness of the conduct;

E. Cumulative effect of multiple negative character and fitness factors and other information about the Applicant;

F. Evidence of rehabilitation;

G. Positive work performance and steady employment;

H. Positive social contributions of the Applicant since the conduct;

I. Candor and cooperation of the Applicant throughout the application process;

J. Materiality of any omission or misrepresentations;

K. Reliable evidence of opinions held by persons personally acquainted with the Applicant who have confirmed comprehensive knowledge of the negative factors at issue;

L. Evidence of genuine remorse and recognition of personal responsibility for past misconduct;

M. Sincerity, honesty, and respect as demonstrated at any interview, informal conference, or hearing before the Board or any Board staff member; and

N. Degree of culpability of the Applicant for any actual injury caused by the misconduct.

## IX. Evidence of Rehabilitation

Applicants who assert rehabilitation from previous conduct have the burden to show present good moral character and fitness for admission to the Bar through evidence of the following:

A. The Applicant's compliance with any curative measures ordered by the Board, as well as any disciplinary, judicial, or administrative orders imposed by any relevant forum, educational institution, employer, or agency;

B. The Applicant's reputation for present good moral character based on recommendations from persons aware of all alleged misconduct at issue and who have specifically considered the Applicant's character and fitness with knowledge of that misconduct;

C. The Applicant's lack of malice and ill-feeling toward any victim of the Applicant's misconduct or those responsible for taking disciplinary, judicial, or administrative action in response to the

Applicant's misconduct, including, but not limited to, the staff of the Board of Law Examiners;

D. The Applicant's restitution of funds or property lost, damaged, or stolen by the Applicant in connection with the misconduct, where applicable; and

E. The Applicant's sustained and substantial positive conduct and behavior. Evidence of the lack of misconduct, although necessary to show rehabilitation, does not necessarily prove rehabilitation nor does it necessarily prove that the Applicant has the requisite present good moral character and fitness to be admitted to the Bar.

## X.    Probationary Licenses

The Board may recommend probationary licensing with conditions designed to protect the public from potential harm that the probationary licensee might cause.

A. Redetermination of present good moral character and fitness may be made with or without a hearing. The Board may specify as a term of the probationary license that a hearing must be conducted to make the redetermination.

B. If a hearing on redetermination of present good moral character and fitness is not required as a term of the probationary license, Board staff may recommend conversion to a regular license without a hearing.

C. If Board staff determines that a probationary licensee has failed to comply with any material term of a probationary license order, the staff will issue notice of non-compliance and provide the probationary licensee an opportunity for hearing.

D. The following non-exhaustive list of facts or circumstances may be considered as evidence of non-compliance with a probationary license order:

1. Failure to comply with a requirement for periodic drug or alcohol testing;

Fisher Appendix: 206

2. Failure to cooperate with Board staff in efforts to monitor the probationary licensee;

3. Failure to cooperate or meet with an assigned attorney monitor, if required;

4. Failure to remain abstinent from the use of alcohol or controlled substances, if required;

5. Failure to maintain residency in Texas, if required;

6. Failure to comply with any periodic reporting requirement;

7. Failure to comply with a requirement to complete or continue treatment for chemical dependency or mental health issues;

8. Violation of any state or federal law or attorney disciplinary rule;

9. Attorney disciplinary action by any state or federal court or any licensing authority of this or any other state;

10. Failure to comply with requirements of any criminal probation;

11. Negative reports from any employer, mentor, or attorney monitor;

12. Failure to complete any additional requirements of the probationary license, including continuing education requirements and pro bono service; or

13. Unreasonable or unjustified failure to comply with treatment recommendations of any treating mental health or substance abuse treatment provider.

E. At the discretion of the Board, based upon a finding of material non-compliance, a probationary license may be terminated or extended with or without additional terms and conditions, or a request for redetermination and certification for a regular license may be denied.

# EXHIBIT R

# Rules Governing Admission
# to the Bar of Texas



# Adopted by the Supreme Court of Texas
## Effective January 6, 2026

Fisher Appendix: 209

# The Supreme Court of Texas

### Chief Justice
Jimmy Blacklock

### Justices
Debra Lehrman

John Phillip Devine
James P. Sullivan
Brett Busby
Jane Bland
Rebeca Aizpuru Huddle
Evan A. Young
Kyle D. Hawkins

### Clerk
Blake A. Hawthorne

| Board of Law Examiners | Board of Law Examiners Administrative Staff |
|---|---|
| **Chair** | |
| Augustin Rivera, Jr., Corpus Christi | Nahdiah Hoang |
| | Executive Director |
| **Members** | |
| Teresa Ereon Giltner, Vice Chair, Dallas | Michael Sullivan |
| Al Odom, Past Chair, Houston | Director of Admissions |
| Anna M. McKim, Lubbock | |
| Cynthia Eva Hujar Orr, San Antonio | Kendelyn Schiller |
| C. Alfred Mackenzie, Houston | Director of Investigations |
| Carlos R. Soltero, Austin | |
| Alexis Howard Lewis, Houston | Dondraius Mayhew |
| W. Stephen Benesh, Austin | General Counsel |

205 W. 14th Street, Suite 500
Austin, Texas 78701
Post Office Box 13486
Austin, Texas 78711-3486

Phone: (512) 463-1621   TDD: 1-800-RELAYTX
www.ble.texas.gov

Fisher Appendix: 210

## About the Texas Board of Law Examiners

The Texas Board of Law Examiners is an agency of the Texas Supreme Court. The Board's sole purpose is to qualify applicants for admission to the State Bar of Texas. The Supreme Court is ultimately responsible for admitting those applicants certified by the Board as eligible for admission to the State Bar of Texas. In performing its duties, the Board administers and interprets the *Rules Governing Admission to the Bar of Texas,* promulgated by the Supreme Court. The State Bar of Texas disciplines its members, independent of the Board's work.

Nine Texas lawyers serve as members of the Board. They are appointed by the Supreme Court to serve staggered six-year terms. Each member must be a U.S. citizen, licensed to practice law in Texas, over the age of 35, and have been a practicing lawyer or judge of a court of record for a combined total of at least 10 years.

The Board staff investigates the background of every Bar applicant. The process begins with investigation of all first-year students in ABA-approved Texas law schools who intend to apply for admission after graduation. When Texas law students later apply for admission, the Board updates its investigation as the final step in certification of their character and fitness. Applicants for admission from other states and foreign countries are also investigated before being certified by the Board as eligible for admission. The investigation focuses on conduct indicating whether the applicant may have certain character traits or any currently existing mental or emotional condition likely to cause injury to a client, obstruct the administration of justice, or violate the *Texas Disciplinary Rules of Professional Conduct* if licensed to practice law.

The Board finally determines whether each applicant for admission has the good moral character and present fitness to practice law. In some cases, the Board may conduct a hearing to consider evidence offered by the Board staff and the applicant that is relevant to an applicant's moral character and present fitness. After consideration of the evidence and argument presented at the hearing, the Board issues a written order either certifying the applicant for admission, conditionally certifying, or declining to certify and stating its findings of fact and conclusions of law in support of that decision. The Board's character and fitness investigations, hearings, and orders are confidential by statute.

In addition to evaluating the character and fitness of Bar applicants, the Board is responsible for administration of the Texas Bar Exam as prescribed by the *Rules Governing Admission to the Bar of Texas.* The bar exam is administered semi-annually over two days during the last weeks of February and July. Members of the Board are responsible for grading answers to the written portions of the exam.

On behalf of the Supreme Court, the Board also receives payments for fees required of non-resident attorneys who seek to appear by permission before a Texas court. The Board remits all such fee payments to the Texas Comptroller for use by the Supreme Court in funding programs to provide basic legal services to indigent persons.

The Board's business meetings and final decisions in character and fitness hearings are conducted in open sessions with public notice under the Texas Open Meetings Act. Board records are subject to the Public Information Act, except where confidentiality is required by statute, rule or order of the Supreme Court. At every public meeting of the Board, time is allotted for interested persons to address the Board on matters of public interest and concern.

**Rule 1**
## Definitions and General Provisions

(a) Frequently used terms are defined as follows:

(1) "Accredited" means that a law school is recognized as being qualified by the competent accrediting agency of a State or foreign jurisdiction, by a political subdivision of a State or foreign jurisdiction, or by another authorized body of a State or foreign jurisdiction.

(2) "Applicant" means a person, including a person approved for a Probationary License, who files with the Board any Application to take the Texas Bar Examination, to be admitted to the Bar with or without the Texas Bar Examination, or for certification as a Foreign Legal Consultant.

(3) "Application" means an application or re-application submitted to the Board to take the Texas Bar Examination, to be admitted to the Bar with or without the Texas Bar Examination, or for certification as a Foreign Legal Consultant.

(4) "Approved law school" means a law school approved by the Supreme Court.

(5) "Authorized to practice law" means that the Applicant has achieved the ability to engage in activities that would be recognized in the United States as the practice of law.

(6) "Bar" means the State Bar of Texas.

(7) "Board" means the Texas Board of Law Examiners.

(8) "Chemical dependency" means substance use disorder as defined by the American Psychiatric Association in the Diagnostic and Statistical Manual DSM-5 and any subsequent revisions thereof.

(9) "Controlled substance" has the meaning assigned by Section 462.001, Health and Safety Code.

(10) "Declarant" means a person who files with the Board a Declaration of Intention to Study Law.

(11) "Declaration" means a Declaration of Intention to Study Law.

(12) "Practice of law" includes:

(A) Private practice as a sole practitioner or for a law firm, legal service office, legal clinic, public agency, or similar entity;

(B) Practice as an attorney for an individual or for a corporation, partnership, trust, or other entity with the primary duties of furnishing legal counsel and advice; drafting and interpreting legal documents and pleadings: interpreting and giving advice regarding the law: or preparing, trying, or presenting cases before courts, departments of government, or administrative agencies;

(C) Practice as an attorney for a local, State or federal government, with the same primary duties described in the preceding subsection;

(D) Employment as a judge, magistrate, referee, or similar official for a local, State or federal government, provided that the employment is open only to licensed attorneys;

5                                          Fisher Appendix: 212

(E)   Employment as a full-time teacher of law at an approved law school; or

(F)   Any combination of the preceding categories.

(13)   "State" means any state or territory of the United States, as well as the District of Columbia.

(14)   "Supreme Court" means the Supreme Court of Texas.

(15)   "Texas Bar Examination" means the Uniform Bar Examination administered by the Board beginning with the February 2021 administration and the examination administered by the Board before the February 2021 administration.

(16)   "Texas Bar Examination Security Policy" means the written policy statement published by the Board describing the conduct and activity of Applicants that is either prohibited or allowed during administration of the Texas Bar Examination.

(17)   "Uniform Bar Examination" means the assessment coordinated by the National Conference of Bar Examiners and administered by the Board or by another State that is composed of the Multistate Essay Examination, two Multistate Performance Test tasks, and the Multistate Bar Examination.

(b) The terms "admitted," "admitted to the Bar," "licensed," and "licensed to practice law in Texas" are used interchangeably in these Rules.

(c) A document is considered filed when:

(1)   the document and any required fee are submitted electronically through the Board's website; or

(2)   the document and any required fee are received by the Board in accordance with the Board's written policies and instructions.

(d) A document submitted electronically is considered signed if the document includes:

(1)   a name typed in the space where the signature would otherwise appear;

(2)   an electronic or scanned image of the signature;

(3)   a digital signature; or

(4)   any other form of signature allowed by the Board's written policies and instructions.

(e) The Board must not disclose to any third party any information obtained with respect to the character or fitness of any Applicant or Declarant, except:

(1)   upon written authority of the Applicant or Declarant;

(2)   in response to a valid subpoena from a court of competent jurisdiction; or

(3)   to the Bar's Office of Chief Disciplinary Counsel or to the Texas Unauthorized Practice of Law Committee.

(f) A document must be filed with the Board by the date stated in these Rules even if the date falls on a weekend or holiday.

(g) Every document required to be filed by these Rules must be filed through the electronic filing manager established by the Board. A document is considered timely filed if it is electronically filed by 11:59 p.m. Central Standard Time on the filing deadline.

**Rule 2**

## General Eligibility Requirements for Admission to the Bar

(a) To be eligible for admission or reinstatement as a licensed attorney in Texas, an Applicant must:

    (1) comply with all applicable requirements of these Rules;

    (2) be at least 18 years of age;

    (3) be of present good moral character and fitness;

    (4) have completed the law study required under these Rules, unless specifically exempted under Rule 13;

    (5) qualify under one of the following categories:

        (A) be a United States citizen;

        (B) be a United States national;

        (C) be an alien lawfully admitted for permanent residence;

        (D) be otherwise authorized to work lawfully in the United States, including in a period of Optional Practical Training; or

        (E) be an Applicant who does not reside in the United States when the Application is submitted;

    (6) have satisfactorily completed the Texas Bar Examination, unless specifically exempted from the Texas Bar Examination under Rule 13 (but an Applicant for reinstatement must not be so exempted);

    (7) have satisfactorily completed the Multistate Professional Responsibility Examination;

    (8) have satisfactorily completed the Texas Law Component, unless specifically exempted under Rule 5 (but an Applicant for reinstatement must not be so exempted);

    (9) be willing to take the oath required of attorneys in Texas;

    (10) pay the appropriate licensing fee to the Clerk of Supreme Court of Texas; and

    (11) enroll in the Bar by filing an enrollment form and paying the appropriate fees and assessments due within the time specified in the State Bar Rules.

(b) If an Applicant does not satisfy all requirements for admission to the Bar within five years from the date that the Applicant is notified that the Applicant has passed the Texas Bar Examination, the Applicant's Texas Bar Examination score is void; provided, however, that the Board may waive this provision for good cause shown.

## Rule 3
## Law Study Requirement

(a) The law study requirement for eligibility of an Applicant to take the Texas Bar Examination, unless otherwise provided in Rule 13, is met by:

    (1) graduation with a J.D. degree from an approved law school;

    (2) satisfaction of all requirements for graduation from an approved law school with a J.D. degree; or

    (3) study of law in an approved law school or schools by satisfying all requirements for

Fisher Appendix: 214

graduation with a J.D. degree, except for not more than four semester hours or its equivalent in quarter hours; provided, however, that no person shall be licensed to practice law until graduation or satisfaction of all requirements for graduation, unless specifically excepted.

(b) If a law school was an approved law school when the Applicant enrolled, the law school is deemed to be an approved law school as to that Applicant for four years thereafter, regardless of its status when the Applicant graduated. If a law school was an approved law school when the Applicant graduated, the Applicant is deemed to be a graduate of an approved law school, regardless of the status of the school when the Applicant enrolled.

(c) If an Applicant graduated from a law school that was not an approved law school when the Applicant enrolled and was not an approved law school when the Applicant graduated, the Applicant is not a graduate of an approved law school even if the law school later became or becomes an approved law school.

## Rule 4
### Present Good Moral Character and Fitness Requirement

(a) No one shall be eligible for admission to the Bar or for certification as a Foreign Legal Consultant until the investigation of such person's moral character and fitness has been completed, and it has been determined by the Board that such individual possesses present good moral character and fitness.

(b) Good moral character is a functional assessment of character and fitness of a prospective lawyer. The purpose of requiring an Applicant to possess present good moral character is to exclude from the practice of law those persons possessing character traits that are likely to result in injury to future clients, in the obstruction of the administration of justice, or in a violation of the Texas Disciplinary Rules of Professional Conduct. These character traits usually involve either dishonesty or lack of trustworthiness in carrying out responsibilities. There may be other character traits that are relevant in the admission or certification process, but such traits must have a rational connection with the Applicant's present fitness or capacity to practice law and accordingly must relate to the legitimate interests of Texas in protecting prospective clients and in safeguarding the system of justice within Texas.

(c) Fitness, as used in these Rules, is the assessment of mental and emotional health as it affects the competence of a prospective lawyer. The purpose of requiring an Applicant to possess this fitness is to exclude from the practice of law any person having a mental or emotional illness or condition which would be likely to prevent the person from carrying out duties to clients, courts or the profession. A person may be of good moral character, but may be incapacitated from proper discharge of his or her duties as a lawyer by such illness or condition. The fitness required is a present fitness, and prior mental or emotional illness or conditions are relevant only so far as they indicate the existence of a present lack of fitness.

(d) The following provisions shall govern the determination of present good moral character and fitness of a Declarant or an Applicant who has been convicted of a felony in Texas or placed on deferred adjudication community supervision in Texas, or who has been convicted or placed on deferred adjudication community supervision or similar in another jurisdiction for a crime that would be a felony in Texas. A Declarant or

8                                                    Fisher Appendix: 215

Applicant may be found lacking in present good moral character and fitness under this rule based on the underlying facts of a felony conviction or deferred adjudication community supervision, as well as based on the conviction or deferred adjudication community supervision itself.

 (1) Except as otherwise provided in paragraph (2), a felony conviction or felony deferred adjudication community supervision creates a rebuttable presumption that the Declarant or Applicant lacks present good moral character and fitness for a period of five years after the completion of the sentence and /or period of deferred adjudication community supervision. Such presumption may be rebutted based on the evidence shown under subsection (f).

 (2) A felony conviction or felony deferred adjudication community supervision does not create a presumption that the Declarant or Applicant lacks present good moral character and fitness, if:

  (A) the felony conviction or felony deferred adjudication community supervision has been reversed on review by an appellate court;

  (B) the Declarant or Applicant has been pardoned for the felony; or

  (C) the felony for which the Declarant or Applicant received deferred adjudication community supervision has been dismissed and discharged under Article 42A.111, Code of Criminal Procedure, unless the Declarant or Applicant was placed on deferred adjudication community supervision for a felony:

   (i) listed in Article 42A.054(a), Code of Criminal Procedure;

   (ii) described by Article 62.001(5) or (6), Code of Criminal Procedure;

   (iii) committed under Chapter 21 or 43, Penal Code; or

   (iv) related to the practice of law.

(e) The following provisions shall govern the determination of present good moral character and fitness of a Declarant or Applicant who has been licensed to practice law in any jurisdiction and has been disciplined, or allowed to resign in lieu of discipline, in that jurisdiction:

 (1) A certified copy of the order or judgment of discipline from the jurisdiction is prima facie evidence of the matters contained in such order or judgment, and a final adjudication in the other jurisdiction that the individual in question has committed professional misconduct is conclusive of the professional misconduct alleged in such order or judgment.

 (2) An individual disciplined for professional misconduct in the course of practicing law in any jurisdiction or an individual who resigned in lieu of disciplinary action ("disciplined individual") is deemed not to have present good moral character and fitness and is therefore ineligible to file a Declaration or an Application during the period of such discipline imposed by such jurisdiction, and in the case of disbarment or resignation in lieu of disciplinary action, until the disciplined individual has properly filed an application for re- licensure in the disciplining jurisdiction, in accordance with the procedures established for re-licensure in that jurisdiction, and has obtained a final determination on that application.

      Fisher Appendix: 216

Notwithstanding the foregoing provision of this paragraph (e)(2), if the period of discipline imposed by another jurisdiction exceeds five years, the disciplined individual may file a Declaration or an Application after the expiration of five years from the date of imposition of such discipline, provided that (s)he has obtained a final determination on his/her application for re-licensure in the disciplining jurisdiction.

(3)   The only defenses available to an Applicant or Declarant under subsection (e) are outlined below and must be proved by clear and convincing evidence:

(A)   The procedure followed in the disciplining jurisdiction was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process.

(B)   There was such an infirmity of proof establishing the misconduct in the other jurisdiction as to give rise to the clear conviction that the Board, consistent with its duty, should not accept as final the conclusion on the evidence reached in the disciplining jurisdiction.

(C)   The deeming of lack of present good moral character and fitness by the Board during the period required under the provisions of subsection (e) would result in grave injustice.

(D)   The misconduct for which the individual was disciplined does not constitute professional misconduct in Texas.

(4)   If the Board determines that one or more of the foregoing defenses has been established, it shall render such orders as it deems necessary and appropriate.

(f) An individual who applies for admission to practice law in Texas or who files a petition for redetermination of present moral character and fitness under subsection (d) or after the completion of the disciplinary period assessed or ineligibility period imposed by any jurisdiction under paragraph (e)(2) shall be required to prove, by a preponderance of the evidence:

(1)   that the best interest of the public and the profession, as well as the ends of justice, would be served by his or her admission to practice law;

(2)   that (s)he is of present good moral character and fitness; and

(3)   that during the five years immediately preceding the present application, (s)he has been living a life of exemplary conduct.

(g) An individual who files a petition for redetermination of present moral character and fitness after an adverse determination based on a felony conviction, felony deferred adjudication community supervision, or professional misconduct or resignation in lieu of disciplinary action and whose petition is denied after a hearing, is not eligible to file another petition for redetermination until after the expiration of three years from the date of the Board's order denying the preceding petition for redetermination.

(h) If an Applicant is alleged to have violated the Texas Bar Examination Security Policy, the Executive Director may withhold delivery of the Applicant's Texas Bar Examination results until the allegation is resolved by the Board. If, after notice and a hearing, the Board determines that an Applicant violated the policy, the Board may deem the Applicant to have failed the Texas Bar Examination and prohibit the Applicant from taking the Texas Bar Examination in the future.

Fisher Appendix: 217

### Rule 5
### Multistate Professional Responsibility Examination
### and Texas Law Component Requirements

(a) Multi Professional Responsibility Examination. An Applicant for admission to the Bar must earn a scaled score of at least 85 on the Multistate Professional Responsibility Examination.

(b) Texas Law Component.

   (1)  Except as provided in paragraph (2), an Applicant for admission to the Bar must successfully complete the Texas Law Component prescribed by the Board and approved by the Supreme Court.

   (2)  An Applicant who passed the Texas Bar Examination before February 2021 need not successfully complete the Texas Law Component.

### Rule 6
### Declaration of Intention to Study Law
### General Provisions

(a) Every person who is beginning law study in an approved law school in Texas for the first time (an entrant) and who intends to apply for admission to the Bar shall, unless prohibited from filing by these Rules, file with the Board a Declaration, on a form promulgated by the Board.

   (1)   The Declaration shall show:

      (A)  the history, employment, experience, and educational qualifications of the Declarant;

      (B)  any law school in which the Declarant is or was enrolled;

      (C)  the Declarant's criminal history;

      (D) any history of significant mental illness that is related to a history of misconduct;

      (E   the Declarant's history with regard to charges of fraud in any legal proceeding;

      (F)  the Declarant's involvement in any civil litigation or bankruptcy proceedings;

      (G)  the Declarant's willingness to take the oath required of attorneys in Texas;

      (H)  the Declarant's history as to compliance with court orders regarding child support and spousal support;

      (I)  the Declarant's history regarding re-payment of federally guaranteed student loans;

      (J)  the Declarant's history regarding the filing of required federal income tax returns and the payment of federal income tax liability;

      (K)  the Declarant's history regarding payment to the IRS of payroll taxes (s)he collected as an employer of others; and

      (L)  such other information regarding the Declarant as the Board deems reasonably related to its investigation of the Declarant's moral character and fitness.

   (2)   The Board may also require the Declarant to provide such supporting documents relating to the Declarant as the Board deems reasonable.

    Fisher Appendix: 218

(3)    The Board may also require the Declarant to execute a consent form supplied by the Board, authorizing all persons, firms, officers, corporations, associations, organizations, and institutions to furnish to the Board or any of its authorized representatives, all relevant documents, records, or other information pertaining to the Declarant.

(b) The timely filing deadline for such Declaration shall be as follows:

(1)    Fall entrants, October 1;

(2)    Regular spring entrants, May 1;

(3)    Spring entrants at quarter-hour law schools, June 1;

(4)    Summer entrants, September 15; and

(5)    Entrants transferred from out-of-state schools, within 60 days of matriculation at a Texas law school.

(c) Declarations filed with the Board after the foregoing timely filing deadlines will be accepted only upon payment of applicable late fees as set forth in Rule 18, so long as they are filed by the final filing deadline set out in Rule 9. However, regardless of the date a Declaration is filed, the Board shall have 270 days from the date the Declaration is filed to conduct its character and fitness investigation and notify the Declarant of the Board's determination, as provided in Rule 8.

(d) Upon receipt of a Declaration, the Board shall note the filing date in its records. Absent a Declarant's written request to retain a Declaration, all Declarations will be destroyed five years after the date of filing if the Declarant has not applied to take the Texas Bar Examination or to transfer a Uniform Bar Examination score from another State.

(e) The Board shall conduct a complete investigation of the moral character and fitness of the Declarant.

## Rule 7
## Confidential Information

Pursuant to Government Code Section 82.003, the following records of the Board of Law Examiners are exempt from disclosure under the Public Information Act, Texas Government Code, Chapter 552:

(a) examinations, including:

(1)    current or potential future questions, including drafts and related research;

(2)    model answers or scoring keys;

(3)    the grades, results, or answers of an examinee;

(4)    raw scores or grader comments; and

(5)    the name and contact information of any grader who is not a Board member; and

(b) except as provided by Rule 15, moral character and fitness records and deliberations, including:

(1)    Declarations and Applications, including attachments;

(2)    any documents resulting from the Board's moral character and fitness investigation of an Applicant; and

12                                                            Fisher Appendix: 219

(3)  minutes or recordings of Board meetings or hearings on an Applicant's moral character and fitness.

## Rule 8
## Determination of Declarant Character and Fitness

(a) After completing its investigation, the Board shall determine whether, on all the documentation before it, the Board is satisfied that the Declarant possesses the good moral character and fitness necessary for admission to the Bar and shall advise the Declarant accordingly, no later than the 270th day after the date the Declaration and fees were filed with the Board. If the determination is that the Declarant does not have the requisite good moral character and fitness, such notice shall include:

   (1)  a detailed analysis of the results of the investigation; and

   (2)  an objective list of actions, if any, which the Declarant may take to correct the deficiencies and to become qualified for admission to the Bar after completing all other requirements for admission.

(b) A hearing may be set on any such adverse preliminary determination, in accordance with Rule 15.

(c) If, after investigation, the Board determines that a Declarant:

   (1)  may suffer from chemical dependency, the Board shall direct the Declarant to meet with representatives of the Bar's Lawyers Assistance Program or a similar program of the Bar, and may require that the Declarant submit to a treatment facility for evaluation.

   (2)  does suffer from chemical dependency, the Board shall assist the Declarant in working with the Bar's Lawyers Assistance Program or a similar program of the Bar to address the dependency.

(d) Any preliminary determination that the Declarant possesses the good moral character and fitness necessary for admission to the Bar is issued on the condition that the Declarant has faithfully complied with these Rules. If at any time before the Declarant is certified to the Supreme Court for licensure it appears that the Declarant obtained such preliminary determination via fraud, concealment, deception, material omission, or by failure to comply with these Rules, the Board may suspend such preliminary determination and continue its investigation for an additional 90 days from the date the Board discovers the apparent fraud, concealment, deception, material omission, or failure to comply with these Rules.

## Rule 9
## Application to Take the Texas Bar Examination

(a) Except as provided in (f), every Applicant to take the Texas Bar Examination must file with the Board an Application with all required fees by the deadlines stated below.

Fisher Appendix: 220

 (1) February Texas Bar Examination.

  (A) Timely Filing Deadline for Application to Take the Texas Bar Examination. The timely filing deadline is September 1.

  (B) *Late Filing Deadline for Application to Take the Texas Bar Examination.* If accompanied by a $150 late filing fee, the Board will accept an Application filed after September 1 and by November 1.

  (C) *Application for Testing Accommodations.* An application for testing accommodations must be filed with the Application to take the Texas Bar Examination, but no later than November 1.

  (D) *Final Filing Deadline for Application to Take the Texas Bar Examination.* If accompanied by a $300 late fee, the Board will accept an Application submitted by December 1. The Board will not accept an Application for the February Texas Bar Examination after December 1 for any reason.

 (2) July Texas Bar Examination.

  (A) Timely Filing Deadline for Application to Take the Texas Bar Examination. The timely filing deadline is February 1.

  (B) *Late Filing Deadline for Application to Take the Texas Bar Examination.* If accompanied by a $150 late filing fee, the Board will accept an Application filed after February 1 and by April 1.

  (C) *Application for Testing Accommodations.* An application for testing accommodations must be filed with the Application to take the Texas Bar Examination, but no later than April 1.

  (D) *Final Filing Deadline for Application to Take the Texas Bar Examination.* If accompanied by a $300 late fee, the Board will accept an Application submitted by May 1. The Board will not accept an Application for the July Texas Bar Examination after May 1 for any reason.

(b) The Application shall be made on a form furnished by the Board and calling for information reasonably related to a thorough inquiry into the Applicant's good moral character, fitness, legal education and other qualifications required in these Rules. Applicants who have filed a Declaration required under these Rules shall be required to complete the Application with information relating only to the period since the filing of the Declaration.

(c) The Board may require the filing of a Supplemental Investigation Form in situations deemed appropriate by the Board.

(d) The Applicant shall furnish proof satisfactory to the Board of compliance with the law study requirements of Rule 3, and no Applicant shall be admitted to the Texas Bar Examination until the Board has determined that these requirements have been met.

(e) Upon the filing of an Application, the Board shall note the filing date and shall initiate an investigation of the Applicant. For Applicants who filed a Declaration required under these Rules, the investigation shall cover only the period of time subsequent to the filing of the Declaration, unless other matters relevant to moral character or fitness not previously revealed in such Declaration shall have come to the attention of the Board.

(f) The filing deadlines and late fees set out in subsection (a) shall not apply to re-applicants who failed the immediately preceding Texas Bar Examination and who therefore could not have met the subsection (a) deadlines. Any such re-applicant may take the next Texas Bar Examination given upon filing a re-application and paying the required fees by:

    (1)   December 1, for the February Texas Bar Examination; or

    (2) June 1, for the July Texas Bar Examination.

## Rule 10
## Determination of Applicant Character and Fitness

(a) After completing its investigation on the Application, the Board shall determine whether, on all the documentation before it, the Board is satisfied that the Applicant possesses the requisite present good moral character and fitness. The Board must advise an Applicant who timely filed a Declaration of the Board's determination no later than the 150th day after the date the Application and fees were filed. The Board must advise all other Applicants of its determination no later than 270 days after the date that the Application and fees were filed. If the determination is that the Applicant does not have the requisite present good moral character and fitness, such notice shall include:

    (1)   a detailed analysis of the results of the investigation; and

    (2) an objective list of actions, if any, which the Applicant may take to correct the deficiencies and to become qualified for admission to the Bar after completing all other requirements for admission.

(b) If, after investigation, the Board determines that an Applicant:

    (1)  may suffer from chemical dependency, the Board shall require the Applicant to obtain a chemical dependency evaluation performed by a mental health professional designated by the Board;

    (2) does suffer from chemical dependency, the Board shall assist the Applicant in working with the Bar's Lawyers Assistance Program or a similar program of the Bar; or

(c) A hearing may be set on any such adverse preliminary determination, in accordance with Rule 15.

(d) Any preliminary determination that the Applicant possesses the requisite present good moral character and fitness is issued on the condition that the Applicant has faithfully complied with these Rules. If at any time before the Applicant is certified to the Supreme Court for licensure it appears that the Applicant obtained such preliminary determination via fraud, concealment, deception, material omission, or by failure to comply with these Rules, the Board may suspend such preliminary determination and continue its investigation for an additional 90 days from the date the Board discovers the apparent fraud, concealment, deception, material omission, or failure to comply with these Rules.

(e) The Applicant has a continuing duty to ensure the accuracy and completeness of the Applicant's responses on the Application and to update those responses until the Applicant is certified to the Supreme Court for licensure. The Applicant shall notify the Board, in writing, as soon as practicable, but no later than 30 days after the Applicant knew or should have known of any information necessary to ensure the accuracy and

15

completeness of the Applicant's responses. The Applicant shall promptly furnish any additional documentation requested by the Board in connection therewith. The Board is authorized to re-open its investigation for up to 90 days following receipt of any addition, change, or update to information previously provided to the Board.

## Rule 11
## Texas Bar Examination

(a) The Texas Bar Examination will be given at such places as the Board may direct.

(b) The Texas Bar Examination will be given twice a year, beginning on the Tuesday before the last Wednesday of the months of February and July, unless the Board otherwise directs.

(c) An Applicant approved to take the Texas Bar Examination must attend the Texas Bar Examination at the time and place designated by the Board.

(d) The Texas Bar Examination administered before the February 2021 administration will last two days and consist of the Multistate Performance Test (MPT); the Procedure and Evidence Questions (P&E); the Multistate Bar Examination (MBE); and the Texas Essay Questions (Essays). After grading the answers to the MPT, the P&E, and the Essays, the resulting raw scores on each of these portions will be scaled to the MBE, using the standard deviation method. Scores on the various portions of the examination will be weighted as follows: MPT, 10%; P&E, 10%; MBE, 50%; and Essays, 30%. An Applicant must earn a combined scaled score of at least 675 (out of a possible 1,000 points) to pass the Texas Bar Examination. A partial score on any portion of a failed examination must not be applied to any subsequent examination.

(e) The Texas Bar Examination administered beginning with the February 2021 administration will last two days and consist of the Uniform Bar Examination components: the Multi Essay Examination (MEE), given on Tuesday; the MPT, given on Tuesday; and the MBE, given on Wednesday. Scores on the various portions of the examination will be weighted as follows: MEE, 30%; MPT, 20%; and MBE, 50%. An Applicant must earn a combined scaled score of at least 270 (out of a possible 400 points) to pass the Texas Bar Examination. A partial score on any portion of a failed examination must not be applied to any subsequent examination.

(f) An Applicant—who, after a combined total of five examinations, has failed to pass the Texas Bar Examination or earn a score of at least 270 on the Uniform Bar Examination administered in another State—cannot take another Texas Bar Examination or be admitted to the Bar based on a transferred Uniform Bar Examination score. For good cause shown, the Board may waive this prohibition.

(g) An Applicant who has failed the Texas Bar Examination more than once may submit a written request, within two weeks of the release of the Texas Bar Examination results, for a Formal Review of the Applicant's performance on the immediately preceding Texas Bar Examination, excluding the MBE portion). A Formal Review means an individual oral review of the Applicant's Texas Bar Examination papers by the examining Board members that takes place in Austin at a time selected by the Board. Regardless of the number of Texas Bar Examinations taken, an Applicant may receive only one Formal Review under this subsection.

(h) An Applicant who has failed the Texas Bar Examination is eligible to receive a written analysis of the Applicant's performance on the Texas Bar Examination. The Board may determine the form and content of the written analysis.

(i) The Board must keep, for one year from the date of every Texas Bar Examination, all failing Texas Bar Examinations. The Board need not keep any part of passing Texas Bar Examinations.

## Rule 12
## Examinees with Disabilities

(a) The Texas Bar Examination shall be administered to all eligible Applicants in a reasonable manner, while maintaining the integrity of the Texas Bar Examination. In each city in which the Texas Bar Examination is administered, the Board shall provide facilities that are reasonably accessible and which enable persons having disabilities to take the Texas Bar Examination.

(b) Any Applicant who desires special testing accommodations based upon a disability shall submit a written request to the Board on forms designated by the Board, such request to be submitted at the same time as the Application is submitted.

(c) A request for special testing accommodations must be accompanied by written proof evidencing the existence of the disability. Statements from licensed physicians or a professional specialist that specifically set forth the physical, mental or emotional handicap or disability and the relationship between the disability and the inability to take the Texas Bar Examination under standard conditions shall be required. The Board may require additional information or evidence from the Applicant and may, at its option, seek professional evaluation of such data. The Applicant will be responsible for the cost of obtaining documented medical evidence and other required information.

(d) After considering the written request of the Applicant and the evidence submitted, the Board shall determine what reasonable special testing accommodations will be granted.

(e) Board deliberations and determinations regarding the request of an Applicant for testing accommodations on the Texas Bar Examination shall be closed to the public and associated records are confidential. However, this does not limit the Board's option under subsection (c) to seek professional evaluation of any confidential information supplied by Applicants.

## Rule 13
## Applicants from Other Jurisdictions

### §1 Exemption from the Texas Bar Examination Based on a Transferred   Uniform Bar Examination Score

An Applicant who has earned a score of at least 270 on the Uniform Bar Examination in another State must meet the requirements imposed on any other Applicant under these Rules, except that the Applicant is exempt from the requirement of successfully completing the Texas Bar Examination if the Uniform Bar Examination score was earned within five years immediately preceding the filing of the Application.

### §2 Exemption from the Texas Bar Examination for Applicants Who Are Authorized

to Practice Law in Another State

An Applicant who is authorized to practice law in another State must meet the requirements imposed on any other Applicant under these Rules, except that the Applicant is exempt from the requirement of successfully completing the Texas Bar Examination if the Applicant has been actively and substantially engaged in the lawful practice of law as the Applicant's principal business or occupation for at least five of the last seven years immediately preceding the filing of the Application.

## §3 Exemption from the Law Study Requirement for Applicants Who Are Authorized to Practice Law in Another State

An Applicant who is authorized to practice law in another State is exempt from the law study requirement prescribed by Rule 3 if the Applicant:

(a) has been actively and substantially engaged in the lawful practice of law as the Applicant's principal business or occupation for at least three of the last five years immediately preceding the filing of the most recent Application; and

(b) either;

    (1)   holds a J.D. degree, from an unapproved law school that is accredited in the State where it is located; or

    (2) holds the equivalent of a J.D. degree from a law school that is accredited in the State where it is located and that requires a course of study that is substantially equivalent in duration and substance to the legal education provided by an approved law school.

## §4 Exemption from the Law Study Requirement for Foreign Applicants with a Common-Law Legal Education or Who Are Authorized to Practice Law in a Common-Law Country

An Applicant is exempt from the law study requirement prescribed by Rule 3 if the Applicant satisfies the requirements of subsection (a), (b), or (c) below:

(a) the Applicant:

    (1)   has completed a course of study at a foreign law school that is accredited in the jurisdiction where it is located, and the course of study is:

        (A)  based on the principles of English common law; and

        (B)  substantially equivalent in duration to the legal education provided by an approved U.S. law school;

    (2) is authorized to practice law in a foreign jurisdiction or another State; and

    (3) has been actively and substantially engaged in the lawful practice of law for at least three of the last five years immediately preceding the Applicant's most recent Application;

(b) the Applicant:

    (1)   has completed a course of study at a foreign law school that is accredited in the jurisdiction where it is located, and the course of study is:

        (A)  based on the principles of English common law; and

        (B)  at least two years in duration; and

    (2) has completed an LL.M. degree that meets the curricular requirements of Section 9

at an approved U.S. law school; or

(c) the Applicant:

 (1) is authorized to practice law in a foreign jurisdiction, the jurisprudence of which is based on the principles of English common law; and

 (2) has completed an LL.M. degree that meets the curricular requirements of Section 9 at an approved U.S. law school.

### §5 Exemption from Law Study Requirement for Foreign Applicants Without a Common-Law Legal Education

An Applicant is exempt from the law study requirement prescribed by Rule 3 if the Applicant satisfies the requirements of subsections (a)-(c) below:

(a) the Applicant has completed a course of study at a foreign law school that is accredited in the jurisdiction where it is located, and the course of study is:

 (1) not based on the principles of English common law; and

 (2) substantially equivalent in duration to the legal education provided by an approved U.S. law school;

(b) the Applicant has completed an LL.M. degree that meets the curricular requirements of Section 9 at an approved U.S. law school; and

(c) the Applicant is authorized to practice law in a foreign jurisdiction or in another State.

### §6 No Degree by Correspondence

A J.D. degree or an equivalent degree completed at a foreign law school that is earned primarily through online courses or other distance-learning programs does not satisfy the requirements of this Rule.

### §7 Credits Earned at Foreign Law Schools

An Applicant may be exempt from the law study requirement under Sections 4 or 5 even if the Applicant completed his or her course of study at a different foreign law school than the school at which the Applicant began, provided that all coursework and credit hours that count towards the applicable durational requirement are based on the same type of legal system—English common law or other—and are earned at a school accredited in the jurisdiction where it is located.

### §8 Accreditation of Foreign Law Schools

(a) If a law school was accredited when the Applicant enrolled, the law school is deemed to be an accredited law school as to that Applicant for four years thereafter, regardless of its status at the date of the Applicant's graduation. If a law school was accredited when the Applicant graduated, the Applicant is deemed to be a graduate of an accredited law school, regardless of the status of the school when the Applicant enrolled.

(b) If an Applicant graduated from a law school that was not accredited when the Applicant enrolled and was not accredited when the Applicant graduated, the Applicant is not a graduate of an accredited law school even if the law school later became or becomes an accredited law school.

(c) Notwithstanding Sections 4 and 5, an Applicant is excused from demonstrating that a foreign law school is accredited if the Applicant demonstrates that no entity accredits or

     Fisher Appendix: 226

approves law schools in the jurisdiction in which the school is located.

## §9 LL.M. Curriculum Criteria

(a) Unless subsection (b) or (c) applies, for an LL.M. degree to satisfy the requirements of this Rule, the course of study for which the degree is awarded must meet each of the following requirements:

(1) the program must consist of minimum of 24 semester hours of credit—or the equivalent, if the law school is on an academic schedule other than a conventional semester system—which must consist of courses in substantive and procedural law or professional skills;

(2) the program must require at least 700 minutes of instruction time, exclusive of examination time, for the granting of one semester of credit;

(3) the program must include a period of instruction consisting of no fewer than two semesters of at least 13 calendar weeks each, or the equivalent thereof, exclusive of reading periods, examinations, and breaks;

(4) the program must not be completed exclusively during summer semesters, but a maximum of four semester hours of credit may be earned in courses completed during summer semesters;

(5) the program must be completed within 24 months of matriculation;

(6) all coursework for the program must be completed at the U.S. campus of, or through synchronous online instruction offered by, an approved law school, except as otherwise permitted by paragraph (8) or subsection (b);

(7) the program must include:

(A) at least two semester hours of credit in professional responsibility;

(B) at least two semester hours of credit in legal research, writing, and analysis, which may not be satisfied by a research-and-writing requirement in a substantive law course;

(C) at least two semester hours of credit in a course designed to introduce students to distinctive aspects and fundamental principles of United States law, which may be satisfied by an introductory course in the American legal system or a course in United States constitutional law, civil procedure, or contract law—additional credit hours earned in a course that meets the requirements of this subparagraph may be applied towards the requirements of subparagraph (D); and

(D) at least six semester hours of credit in subjects tested on the Texas Bar Examination; and

(8) the program may also include, towards satisfaction of the 24 semester hours of credit required by this Rule:

(A) up to four semester hours of credit in clinical coursework, if:

(i) the coursework includes an instructional component that incorporates discussion, review, and evaluation of the clinical experience;

(ii) the clinical work is performed under the direct supervision of a member of the law school faculty or instructional staff; and

Fisher Appendix: 227

(iii) the time and effort required and the anticipated educational benefit are commensurate with the credit awarded; and

(B) up to six semester hours of credit in other coursework related to the law or legal training taught in conjunction with a joint degree program by a member of the law school faculty, a faculty member of the university or college with which the law school is affiliated, or a faculty member of a university or college with which the law school offers a joint degree program.

(b) As used in paragraph (a)(6), "synchronous online instruction" means that the instructor and the students in the course engage with the course content and each other at the same time, but from different locations. A law school may petition the Board for an exception to the requirements of paragraph (a)(6).

(c) An Applicant who completed an LL.M. degree before October 1, 2016 is exempt from demonstrating that the degree meets the curricular requirements of subsection (a).

### §10 Proof of Active and Substantial Engagement in the Practice of Law and Authorization to Practice Law in a Foreign Jurisdiction

(a) An Applicant who seeks exemption from the Texas Bar Examination or the law study requirement under a section of this Rule that requires a period of active and substantial engagement in the practice of law preceding the Application must furnish to the Board proof of active and substantial engagement in the practice of law. But this requirement may not be satisfied by proof of practice *pro hac vice* under Rule 19.

(b) Unless subsection (c) or (d) applies, an Applicant who seeks exemption from the Texas Bar Examination or the law study requirement under a section of this Rule that requires that the Applicant be authorized to practice law in a foreign jurisdiction or another State must submit written proof of the authorization from the entity with final jurisdiction over professional discipline in the foreign jurisdiction or State where the Applicant is authorized to practice. The document must certify:

(1)  that the Applicant is authorized to practice law in the jurisdiction or State;

(2) the date that the Applicant became authorized to practice law in the jurisdiction or State; and

(3) that the Applicant remains in good standing as an attorney or counselor at law in the jurisdiction or State.

(c) The Board may waive the requirements of subsection (b) if an Applicant demonstrates good cause for failing to obtain the certificate required by that subsection.

(d) Proof of authorization to practice law may be satisfied by proof that the Applicant is lawfully engaged in the practice of law as an inhouse counsel in a foreign jurisdiction that requires a person to surrender that person's law license in order to practice in-house.

### Rule 14
### Foreign Legal Consultants

### §1 General Requirements for Certification

In its discretion, the Supreme Court may certify to practice in Texas as a legal consultant (a "Foreign Legal Consultant"), without examination, an Applicant who satisfies the

requirements of subsection (a) or (b):

(a) the Applicant:

    (1) for at least three of the five years immediately preceding the Application, has been a member in good standing of a recognized legal profession in a foreign country, the members of which are authorized to practice as attorneys or counselors at law or the equivalent and are subject to effective regulation and discipline by a duly constituted professional body or a public authority;

    (2) possesses the present good moral character and general fitness requisite for a member of the Bar;

    (3) is at least 26 years of age; and

    (4) intends to practice as a Foreign Legal Consultant in Texas and to maintain an office in Texas for that purpose; or

(b) the Applicant:

    (1) for at least three of the five years immediately preceding the Application:

        (A) has been authorized to practice law in a foreign jurisdiction;

        (B) has been a member in good standing of the bar of another State; or

        (C) has been actively and substantially engaged in the lawful practice of law in a foreign country or another United States jurisdiction;

    (2) possesses the present good moral character and general fitness requisite for a member of the Bar;

    (3) is at least 26 years of age; and

    (4) intends to practice as a Foreign Legal Consultant in Texas only as an employee of and on behalf of a single individual, corporation, limited liability company, partnership, association, nonprofit entity, or governmental agency whose primary business is not the provision of legal services to the public.

## §2 Application for Certification

An Applicant under this Rule must submit to the Board:

(a) an Application on the forms designated by the Board, that is signed by both the Applicant and a sponsoring member of the Bar who is in good standing and has been a member of the Bar for at least five years;

(b) the fee required by the Board;

(c) either:

    (1) a certificate or other document from the entity with final jurisdiction over professional discipline in the foreign jurisdiction or State where the Applicant is authorized to practice that certifies:

        (A) that the Applicant is authorized to practice law in the jurisdiction or State;

        (B) the date that the Applicant was authorized to practice law in the jurisdiction or State; and

        (C) that the Applicant remains in good standing as an attorney or counselor at law in the jurisdiction or State; or

(2) if the Applicant seeks certification under subparagraph 1(b)(1)(C), but the Applicant is not authorized to practice in a foreign jurisdiction or another State, proof that the Applicant has been actively and substantially engaged in the lawful practice of law in a foreign jurisdiction or another State for at least three of the five years immediately preceding the Application;

(d) a duly authenticated English translation of every document required by this Rule, if the original is not in English; and

(e) any other evidence demonstrating that the Applicant satisfies the requirements of Section 1 that the Board may require.

Upon completion of the Board's review of the information submitted by the Applicant and its investigation of the Applicant's qualifications, moral character, and fitness, if the Board determines that Applicant has satisfied the requirements of Sections 1 and 2, the Board must recommend to the Court the certification of the Applicant to practice in Texas as a Foreign Legal Consultant.

### §3 Scope of Practice

A person certified to practice as a Foreign Legal Consultant under this Rule may render legal services in Texas in the manner and to the extent permitted by the jurisdiction in which the person is authorized to practice or, in the case of a person who satisfies the requirements of subparagraph 1(b)(1)(C), to the extent permitted by the jurisdiction in which the person has been actively and substantially engaged in the lawful practice of law. But the Foreign Legal Consultant must not:

(a) appear for a person other than himself or herself as an attorney in any court, or before any magistrate or other judicial officer, in Texas;

(b) prepare any instrument effecting the transfer or registration of title to real estate located in the United States of America;

(c) prepare:

    (1) any will or trust instrument effecting the disposition on death of any property located in the United States of America and owned by a resident thereof; or

    (2) any instrument relating to the administration of a decedent's estate in the United States of America;

(d) prepare any instrument in respect of the marital or parental relations, rights, or duties of a resident of the United States of America, or the custody or care of the children of such a resident;

(e) render professional legal advice on the law of Texas or of the United States (unless the person is licensed in another State), except:

    (1) on the basis of advice from a person, whom the Foreign Legal Consultant has identified to the client, who:

        (A) is authorized to practice law in Texas or in the United States; and

        (B) either:

            (i) serves as co-counsel with the Foreign Legal Consultant on a matter for the client; or

            (ii) is affiliated with the Foreign Legal Consultant through employment,

partnership, or membership in the same law firm, company, or governmental agency; or

(2) as an in-house counsel advising the Foreign Legal Consultant's employer in the scope of his or her employment;

(f) in any way hold himself or herself out as a member of the Bar; or

(g) carry on his or her practice under, or use in connection with such practice, any name, title, or designation other than one or more of the following:

(1) his or her own name;

(2) the name of the law firm with which he or she is affiliated;

(3) his or her authorized title in the foreign country in which he or she is authorized to practice, which may be used in conjunction with the name of such country; and

(4) the title "Foreign Legal Consultant," which may be used in conjunction with the words "authorized to the practice of law in [name of the foreign country in which he or she is authorized to practice]."

## §4 Rights and Obligations

Subject to the limitations set forth in Section 3, a person certified as a Foreign Legal Consultant under this Rule is considered to be a lawyer affiliated with the Bar and is entitled and subject to:

(a) the rights and obligations of a member of the Bar that are set forth in the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Professional Conduct or that arise from the other conditions and requirements that apply to a member of the Bar under the Texas Disciplinary Rules of Professional Conduct; and

(b) the rights and obligations of a member of the Bar with respect to:

(1) affiliation in the same law firm with one or more members of the Bar, including by:

(A) employing one or more members of the Bar;

(B) being employed by one or more members of the Bar or by any partnership or professional corporation that includes members of the Bar or that maintains an office in Texas; and

(C) being a partner in any partnership or a shareholder in any professional corporation that includes members of the Bar or that maintains an office in Texas; and

(2) attorney-client privilege, work-product  privilege, and similar professional privileges.

A person certified as a Foreign Legal Consultant under this Rule is not a "nonlawyer" as that term is used in Rules 5.03 or 5.04 of the Texas Disciplinary Rules of Professional Conduct.

A person who receives legal advice from a Foreign Legal Consultant is entitled to all privileges arising from the attorney-client relationship.

## §5 Disciplinary Provisions

(a) Every person certified to practice as a Foreign Legal Consultant under this Rule is subject

24

to censure, suspension, removal, or revocation of his or her certification to practice by the Supreme Court.

(b) Every Foreign Legal Consultant must execute and file with the Board, in such form and manner as the Board may prescribe:

  (1)  a written commitment

  (A)  to observe the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Professional Conduct, to the extent that the Act and the Rules are applicable to the legal services authorized under Section 3; and

  (B)  to notify the Board of any change in the person's good standing as a member of a foreign legal profession and of any final disciplinary action of the professional body or public authority that regulates attorneys in the foreign jurisdiction in which the Foreign Legal Consultant is authorized to practice law; and

  (2) a notarized document that sets forth the person's address in Texas and designates the Executive Director of the Board as the person's agent for service of process in any action or proceeding brought against the person that arises from legal services rendered or offered to be rendered by the person within or to residents of Texas, whenever after due diligence service cannot be made on the person at the address on file with the Board.

(c) Service of process on the Executive Director of the Board under paragraph (b)(2) must be made by personally delivering to, and leaving with, the Executive Director, or another person at the office of the Board who is authorized to receive service, two copies of the citation and petition and a fee of $10. The Board must promptly send one copy to the Foreign Legal Consultant by certified mail, return receipt requested, at the address designated by the Foreign Legal Consultant under paragraph (b)(2).

## §6 Renewal of Certification

(a) Unless revoked by the Board under Section 7, a certification to practice as a Foreign Legal Consultant is valid for one year.

(b) A Foreign Legal Consultant may renew his or her certification by submitting to the Board at least 60 days before the certification expires:

  (1)  a written request for renewal of the certification;

  (2) the renewal fee required by Rule 18(a);

  (3) proof that the Applicant completed three hours of minimum continuing legal education in ethics courses accredited by the Bar; and

  (4) a written statement, signed by the Applicant under oath, that the Applicant complied with the terms of the certificate and this Rule during the certification period.

(c) The Board must grant the Applicant's request unless it determines that the Applicant is not entitled to renew his or her certification under this Rule.

(d) If the renewal application is timely submitted, the Board must notify the Applicant of the Board's decision before the Applicant's certification expires. If the renewal application is not timely submitted, the Applicant, upon a showing of good cause, may submit a renewal application up to 180 days after the Applicant's certification expires. After the 180-day

grace period has passed, an Applicant must reapply for certification under Section 2.

## §7 Revocation of Certification

If the Board determines that a person certified as a Foreign Legal Consultant under this Rule no longer meets the requirements for certification set forth in Section 1, the Board must recommend to the Court that the person's certification be revoked, unless the Board waives under Rule 20(e) the requirements that are lacking.

## §8 Admission to Bar

If a person certified as a Foreign Legal Consultant under this Rule is subsequently admitted to the Bar under other provisions of these Rules, the certification to practice as a Foreign Legal Consultant is superseded by the license to practice law as a person admitted to the Bar.

## Rule 15
## Hearings

(a) The Board shall set a time and place for a hearing on the question of the requisite moral character and fitness of an Applicant or Declarant, under the following circumstances:

   (1)  When any Applicant or Declarant who is the subject of an adverse preliminary character and fitness determination files a written request for such a hearing within 30 days of his or her receipt of the Board's letter containing the notice of such determination; or

   (2) When the Board determines that, in the interest of fairness, such a hearing is necessary regardless of whether the Applicant or Declarant files a timely request for hearing.

(b) If there are pending proceedings involving the Applicant or Declarant, the resolution of which could affect the determination of his/her character and fitness, the Board may exercise its discretion to defer the hearing until such time as the pending proceeding is resolved.

(c) Board hearings, deliberations, and determinations relating to the moral character and fitness of an Applicant or Declarant shall be closed to the public and records relating to these subjects are confidential. On written request of an Applicant or Declarant, however, the Applicant or Declarant is entitled to have the hearing open to persons designated by the Applicant or Declarant.

(d) Reasonable notice of the time and place for the hearing may be served electronically if the email address of the party or attorney to be served is on file with the Board. Any notice not served electronically may be served in person, by mail, by commercial delivery service, by fax, by email or by such other means as the Board may direct.

(e) An Applicant or Declarant, either before or after receiving notice of a hearing, may agree to waive the hearing, stipulate to the facts regarding good moral character and fitness, and allow the Board to proceed with making a final determination as to the Applicant's moral character and fitness under these Rules. An Applicant may additionally agree to a Probationary License and to any conditions imposed by the Board to protect the public.

(f) At the hearing:

   (1)  The Board shall have the burden of proof and be required to present evidence that

the Applicant or Declarant does not have the requisite good moral character or fitness. Upon the admission of such evidence, the burden of proof shall shift to the Applicant or Declarant to show that the Applicant possesses good moral character and fitness as defined in these Rules. However, in a redetermination hearing on a Probationary License, the burden of proof shall be on the Probationary Licensee to demonstrate that (s)he has complied with the conditions of the Probationary License.

(2) The Applicant or Declarant shall be given the opportunity to be present in person and by attorney, to present evidence, to confront and to cross-examine adverse witnesses, and to present argument to the Board on the issues of law and fact; provided, however, that evidence otherwise inadmissible may be admitted if the evidence is of a type on which a reasonably prudent person commonly relies in the conduct of the person's affairs.

(g) In connection with hearings conducted under this Rule, the Board shall have the authority to administer oaths, issue subpoenas, take depositions, and employ court reporters.

(h) After the hearing, in closed deliberations, the Board may:

(1)  determine that an Applicant or Declarant has the requisite present good moral character and fitness and, in the case of an Applicant, should be recommended for admission to the Bar;

(2) determine that a Declarant should be granted conditional approval of his or her present good moral character and fitness and be required to meet such conditions as the Board deems appropriate;

(3) determine that an Applicant should be granted conditional approval of his or her present good moral character and fitness and be recommended for a Probationary License subject to Rule 16, after meeting all other requirements of these Rules;

(4) determine that an Applicant or Declarant does not possess the requisite present good moral character and fitness required for admission to the Bar;

(5) defer a decision until such time as the Board has the opportunity to consider further information, evaluations, or documentation as deemed necessary by the Board; or

(6) in the case of a Probationary License, recommend to the Supreme Court that the license should be renewed in its present form, renewed with additional or amended conditions, or revoked and no regular license be issued.

(i) Within a reasonable period of time after the decision is made, the Board shall furnish to the Applicant or Declarant a written order setting forth the decision of the Board. If the decision is adverse, such order shall specify the bases of the Board's determination and shall include an objective list of actions, if any, the Applicant or Declarant may take to become qualified for a license to practice law in Texas. Any such order containing a determination that the Applicant or Declarant suffers from chemical dependency shall include provisions setting out the rights under Section 82.038, Texas Government Code. The Board's order may be served electronically if the email address of the party or attorney to be served is on file with the Board. Any notice not served electronically may be served in person, by mail, by commercial delivery service, by fax, by email or by such other means as the Board may direct.

27                                              Fisher Appendix: 234

(j) An individual who has been the subject of a Board order containing an adverse character and fitness determination may petition the Board in writing for a redetermination hearing subject to Rule 15 on the issue of character and fitness, as follows:

  (1) No petition for redetermination may be filed earlier than the date specified in the Board's order (or if none, then no earlier than 12 months from the date of the hearing), nor more often than once every 12 months.

  (2) Such individual shall have the burden of proof as to rehabilitation and the possession of present good moral character and fitness.

  (3) Such individual shall complete and file with the Board a Supplemental Investigation Form and pay the requisite fees therefore within 30 days of the filing of the redetermination petition.

  (4) This subsection shall not apply to character and fitness redeterminations in Probationary License cases, which are governed under Rule 16.

(k) The following provisions shall govern judicial review of the Board's decisions:

  (1) The affected Applicant or Declarant shall institute, in the district courts of Travis County, Texas proceedings for review of such decision within 60 days after the date the written decision is sent to the Applicant.

  (2) The petition for review shall name the Board as defendant and shall be served on the Executive Director of the Board.

  (3) After service of such petition, and within the time permitted for filing an answer, the Board shall file with the district court a certified copy of the record of the Board's proceedings.

  (4) The review of the Board's decision shall be tried by the court without a jury.

  (5) The court shall determine from the certified record on file whether or not the Board's decision is reasonably supported by substantial evidence. The reviewing court may affirm the action complained of or remand the matter to the Board for further proceedings.

  (6) Appeals from any final judgment of the court may be taken by either party in the manner provided for in civil actions generally, but no appeal bond shall be required of the Board.

(l) The Board shall have the authority to adopt such other rules of procedure for character and fitness hearings, not inconsistent with these Rules, as the Board deems necessary or appropriate to implement these Rules.

(m) Decisions of the Board on matters other than character and fitness following a hearing under this Rule shall not be subject to judicial review unless another statute or rule specifically provides to the contrary.

(n) The Board may assess costs against any Applicant or Declarant who has been sent reasonable notice of a hearing before the Board and who does not appear.

## Rule 16
### Probationary Licenses

(a) The Board shall have the authority to grant conditional approval of the present good moral

character and fitness of an Applicant and to recommend the granting of a Probationary License, after the Applicant meets all other requirements under these Rules, in the following circumstances:

(1)    when the Board determines that the Applicant suffers from chemical dependency or has been convicted of, or is on probation for, a first offense of driving while intoxicated under Texas Penal Code §49.04; or

(2) in other circumstances in which, on the record before it, the Board determines that the protection of the public requires the temporary monitoring of the Applicant in question.

(b) The Board shall not have authority to refuse to recommend the granting of a Probationary License to an Applicant who has passed the applicable bar examination solely because the Applicant suffers from chemical dependency or has been convicted for a first offense for driving while intoxicated under Texas Penal Code §49.04.

(c) In any order recommending the issuance of a Probationary License to practice law, the Board shall specify the conditions of the license, which may include, but are not limited to, the following:

(1)    prohibiting the use of alcohol or controlled substances;

(2) requiring treatment for chemical dependency;

(3) requiring the individual to practice law under the supervision of an attorney admitted to the Bar;

(4) requiring submission to periodic, random drug testing;

(5) requiring the individual to report periodically to the Board;

(6) requiring suspension, for any portion of the probationary period, of an activity for which a license to practice law is required;

(7) requiring the individual to reside continuously in Texas during the period of the Probationary License, unless for good cause shown, the Board waives such requirement; or

(8) requiring the individual to take specific actions designed to cure or end any deficiencies in his or her moral character and fitness, as determined by the Board.

(d) Probationary Licenses shall expire as follows:

(1)    A Probationary License issued solely because of the Board's determination that the individual suffers from chemical dependency shall expire on the second anniversary of the date on which it is issued, unless temporarily extended hereunder.

(2) Any other Probationary License shall expire on the date specified by the Board in the order recommending issuance of the Probationary License, unless temporarily extended hereunder.

(3) The term of a Probationary License may be temporarily extended, upon the request of the Probationary Licensee, in the event that the normal expiration date falls before the Board has had the opportunity to make a redetermination as provided hereunder.

(e) A Probationary Licensee may apply for a renewal of the Probationary License or for a regular license to practice law, by filing a written request and a Supplemental Investigation

29                                                        Fisher Appendix: 236

Form and the requisite fees, at least 60 days before the expiration date of the Probationary License.

(f) The Board shall require any Probationary Licensee issued a Probationary License because of a determination of chemical dependency, before the redetermination hearing, to submit to an evaluation, at the sole cost of the Probationary Licensee, by a licensed mental health professional designated by the Board.

(g) After a hearing held subject to Rule 15 on the redetermination of the character and fitness of a Probationary Licensee, the Board may:

    (1) recommend, upon a finding of the requisite present good moral character and fitness, the issuance of a regular license to practice law in Texas; provided, however, that in any case in which a Probationary License was issued on the basis of chemical dependency, the Board shall not recommend the Probationary Licensee for regular admission until the Board finds that the Probationary Licensee has successfully completed treatment and has been free from chemical dependency for the preceding two years;

    (2) recommend, upon a finding that a condition of the Probationary License has been violated:

        (A) extension of the Probationary License; or

        (B) termination or immediate revocation of the Probationary License.

(h) The Board shall initiate and maintain a working relationship with the Lawyers Assistance Program or similar program of the Bar in order to provide for the evaluation and referral to treatment for those persons issued a Probationary License hereunder. The treatment and professional evaluation shall be at the sole expense of the Probationary Licensee.

(i) The Board shall initiate and maintain a working relationship with the Bar to coordinate disclosure of information concerning an individual's status as a Probationary Licensee. On request, the Board, in coordination with the Bar, shall inform a member of the public whether a particular individual is a Probationary Licensee. This disclosure may occur via the official website of the Bar or other means reasonably available to members of the public. Any information that forms the basis for the issuance of a Probationary License is confidential, as required by statute.

(j) A person whose Probationary License has been terminated or revoked upon recommendation by the Board must begin the licensure process anew in accordance with the Board order recommending such termination or revocation if the person wishes to attempt re-licensure.

## Rule 17
### Issuance of License Certificates
### and Cancellation of License Unlawfully Obtained

(a) Upon an Applicant's becoming entitled to a license under these Rules, the Board must certify the Applicant to the Supreme Court, whose Clerk will issue the corresponding license in the form of a written certificate. The license may be issued only in the name shown on a valid, government-issued identification card, except that a given name may be omitted or represented by an initial if the Applicant so requests in writing. No license may

be issued using an alias, assumed name, nickname, or abbreviation of a name.

(b) All law licenses are issued on the condition that the Applicant has faithfully complied with these Rules. If at any time it appears that an Applicant has obtained a license fraudulently or by willful failure to comply with these Rules, after notice and hearing, the Board may recommend to the Supreme Court that the license be withdrawn and canceled, and the name of the license holder stricken from the roll of attorneys.

(c) No license issued under this Rule is valid unless the license holder has paid all required fees and has enrolled in the Bar in compliance with the State Bar Rules.

(d) The license certificate belongs to the Supreme Court and must be surrendered to the Court upon proper demand.

Fisher Appendix: 238

## Rule 18
### Fees

(a) The following provisions shall govern the fees charged by the Board:

| | |
|---|---|
| Attorney Application Fee | $700 |
| Check Returned for Insufficient Funds Fee | $25 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Incomplete Application Fee | $75 |
| Investigation Fee | $150 |
| Foreign Legal Consultant Certification Renewal Fee | $150 |
| Foreign Nation Inquiry Fee | $100 |
| Foreign Trained Application Fee | $700 |
| Laptop Examination Fee | $50 |
| Late Fee for Declaration of Intention to Study Law | $150 |
| Late Fee for Texas Bar Examination | |
|     February by November 1 | $150 |
|     February by December 1 | $300 |
|     July by April 1 | $150 |
|     July by May 1 | $300 |
| MBE Transfer Fee | $25 |
| Military Attorney Application Fee | $25 |
| Practice Time Evaluation Fee | $150 |
| Student Application Fee | $150 |
| Uniform Bar Examination Transfer Fee | $150 |

(b) No refund or transfer of fees will be made in the event of the withdrawal of any Declaration or Application, nor in the event a determination is made by the Board that the Applicant or Declarant does not meet the requirements imposed under these Rules.

(c) Any fee required under these Rules may be waived or reduced by the Board upon written request and proof of indigence.

## Rule 19
### Requirements for Participation in Texas Proceedings
### by a Non-Resident Attorney

(a) A reputable attorney, licensed in another State or in a foreign jurisdiction but not in Texas, who resides outside of Texas may seek permission to participate in the proceedings of any particular cause in a Texas court by complying with the requirements of Texas Government Code Section 82.0361 concerning payment of a non-resident attorney fee to the Board as a mandatory initial requirement. Upon completion of this requirement and receipt of an acknowledgment issued by the Board, the non-resident attorney shall file with the applicable Texas court a written, sworn motion requesting permission to participate in a particular cause. The motion shall contain:

  (1) the office address, telephone number, fax number, and email address of the non-resident attorney movant;

  (2) the name and State Bar card number of an attorney licensed in Texas, with whom the non-resident attorney will be associated in the Texas proceedings, and that attorney's office address, telephone number, fax number, and email address;

  (3) a list of all cases and causes, including cause number and caption, in Texas courts in which the non-resident attorney has appeared or sought leave to appear or participate within the past two years;

  (4) a list of jurisdictions in which the non-resident attorney is licensed, including federal courts, and a statement that the non-resident attorney is or is not an active member in good standing in each of those jurisdictions;

  (5) a statement that the non-resident attorney has or has not been the subject of disciplinary action by the Bar or courts of any jurisdiction in which the attorney is licensed within the preceding five years, and a description of any such disciplinary actions;

  (6) a statement that the non-resident attorney has or has not been denied admission to the courts of any State or to any federal court during the preceding five years;

  (7) a statement that the non-resident attorney is familiar with the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Professional Conduct governing the conduct of members of the Bar, and will at all times abide by and comply with the same so long as such Texas proceeding is pending and said Applicant has not withdrawn as counsel therein.

(b) The motion of the non-resident attorney seeking permission to participate in Texas proceedings must be accompanied by motion of the resident practicing Texas attorney with whom the non-resident attorney will be associated in the proceeding of a particular cause. The motion must contain a statement that the resident attorney finds the Applicant to be a reputable attorney and recommends that the Applicant be granted permission to participate in the particular proceeding before the court.

(c) The motion of the non-resident attorney must also be accompanied by the proof of payment or proof of indigency acknowledgment issued by the Board.

(d) The court may examine the non-resident attorney to determine that the non-resident attorney is aware of and will observe the ethical standards required of attorneys licensed

33                                    Fisher Appendix: 240

in Texas and to determine whether the non-resident attorney is appearing in courts in Texas on a frequent basis. If the court determines that the non-resident attorney is not a reputable attorney who will observe the ethical standards required of Texas attorneys, that the non-resident attorney has been appearing in courts in Texas on a frequent basis, that the non-resident attorney has been engaging in the unauthorized practice of law in the State of Texas, or that other good cause exists, the court or hearing officer may deny the motion.

(e) If, after being granted permission to participate in the proceedings of any particular cause in Texas, the non-resident attorney engages in professional misconduct as that term is defined by the State Bar Act, the State Bar Rules, or the Texas Disciplinary Rules of Professional Conduct, the court may revoke the non-resident attorney's permission to participate in the Texas proceedings and may cite the non-resident attorney for contempt. In addition, the court may refer the matter to the Grievance Committee of the Bar District in which the court is located.

(f) The filing of a motion under this Rule constitutes submission to the jurisdiction of the Grievance Committee for the District in which the court is located. The county in which the court is located is considered the county of residence of the non-resident attorney for purposes of determining venue in any disciplinary action involving the attorney.

## Rule 20
## Organizational and Miscellaneous Powers of the Board

(a) Upon completion of the tabulation of grades given on the Texas Bar Examination and approval of such tabulation by the Chairman, the grades shall be released to the examinees in the manner directed by the Board. The Deans of the Law Schools in the State of Texas shall be furnished a list of the candidates passing the Texas Bar Examination after release of results to the individual candidates. Before releasing grades to examinees, no grades shall be given by the Board by telephone to any person, nor shall any Board member or employee of the Board give grades in person to an examinee or anyone inquiring on behalf of an examinee.

(b) Unless the Court designates the member of the Board who shall serve as Chair, the Board shall have authority to select a Chair. The Board shall select other officers from its own membership, assign their respective duties, may delegate power and authority to one or more of its members, and shall have authority to formulate the procedure of the Board.

(c) The Board shall maintain its files on Declarants and Applicants until such time as their destruction is authorized, as follows:

    (1)   Files in which a regular license has been issued shall be destroyed five years from the date the license was issued.

    (2) Files in which a Probationary License has been issued but no regular license has been issued shall be destroyed 10 years from the date of the last formal activity on the file (i.e., petition for redetermination, hearing, order, expiration of last term of Probationary License, issuance of regular license following redetermination hearing, etc.).

    (3) Files in which a Declaration, but not an Application, has been filed shall be destroyed

34

five years from the date the Declaration was filed.

    (4) Files in which an Application has been filed, but no regular or Probationary License issued, shall be destroyed five years from the date of the last formal activity on the file (i.e., re-application, examination, hearing, petition for redetermination, etc.), after inputting into the Board's computer database pertinent and necessary data contained therein.

(d) Insofar as may be consistent with these Rules, the Board is authorized to make all reasonable regulations, including written interpretations of general application with respect to these Rules or provisions of general application for relevant subjects not covered by these Rules. The Board may also prescribe forms and certificates to be executed by Applicants for admission to the Bar, whether for a first license to practice law or as a practicing attorney of another jurisdiction, or certificates or other forms to be executed by or on behalf of the Board itself.

(e) The Board is given discretion in the interpretation and application of these Rules. For good cause shown to the satisfaction of the Board, upon written request, waivers of specific requirements described in these Rules may be granted, unless it appears that no exceptions are contemplated by the Supreme Court.

(f) The Board may, in conjunction with its investigation of moral character and fitness or the administration of the bar examination, require Declarants and Applicants to furnish a complete set of fingerprints.

(g) The Board may delegate its duties to a panel of the Board or to the staff, as necessary and where not prohibited by law; provided, however, that the Board shall not delegate to staff its authority to make final determinations that an Applicant or Declarant lacks the requisite good moral character and fitness.

(h) The Supreme Court hereby establishes the Board of Law Examiners Fund, into which shall be deposited all fees and monies received and interest earned by the Board and which shall be used by the Board to administer the functions of the Supreme Court and the Board relating to the licensing of lawyers as directed by the Court. The Fund shall be maintained in one or more financial institutions in Texas, as designated by the Board.

(i) The Board shall have full power to contract for the performance of all of its functions, and any person dealing or contracting with the Board shall be conclusively entitled to rely upon the Board's written determination that the expense thus incurred or contracted is for a proper function of the Board.

(j) The disbursement of funds shall be according to such rules, regulations and budgets as the Board may adopt. The Board shall keep a full record of such receipts and disbursements.

## Rule 21
## Civil Immunity

Without limiting, restricting, or waiving any privilege or immunity otherwise available under Texas or federal law:

(a) The Board and its members, employees, and agents are immune from all civil liability for damages for conduct and communications occurring in the performance of and within the scope of their official duties relating to the character and fitness qualification, eligibility,

35

examination, monitoring, and licensing of Declarants, Applicants and Probationary Licensees.

(b) Records, statements of opinion, and other information regarding a Declarant, Applicant, or Probationary Licensee communicated without malice to the Board or to its members, employees, or agents by any person, entity, firm, or institution are privileged, and civil suits for damages predicated thereon are barred.

**Rule 22**
**Registration Program for Military Attorneys**
**on Military Assignment in Texas but not Licensed in Texas**

## §1 General Requirements for Registration and Limited Permission to Practice Law

Upon the Board's approval, a military attorney who is admitted to practice law in a State other than Texas , and who is a full-time, active-duty military officer serving in the office of a Staff Judge Advocate of the United States Air Force, Army, Navy, Marines, or Coast Guard, a Naval Legal Service Office, or a Trial Service Office, located in Texas, may appear as an attorney and practice law before the courts and other tribunals of Texas in any civil proceeding, subject to the conditions and limitations in this Rule and applicable law. This Rule does not preclude a non-resident military attorney's request under Rule 19 to participate in the proceedings of a particular cause in a Texas court.

## §2 Specific Requirements

The military attorney must be of good moral character and apply for registration annually by:
(a) filing an application and paying fees in the form and manner that the Board prescribes;
(b) presenting satisfactory proof of admission to practice law and current good standing as a member of the bar in any State;
(c) complying with the training requirements in this Rule and
(d) furnishing any additional information or proof that the Board requires in the course of processing the application.

## §3 Training

Permission to practice law under this Rule requires that the military attorney complete at least 15 credit hours of Accredited Continuing Legal Education (CLE) Activity, including a minimum of three hours of legal ethics or professional responsibility, within the first year of registration. The minimum of three hours of legal ethics or professional responsibility must also be completed within each subsequent year of registration. Accredited CLE Activity has the meaning assigned by Article XII of the State Bar Rules.

## §4 No Bar Membership or Texas Law License Granted

Military attorneys permitted to practice law under this Rule are not, and shall not represent themselves to be, members of the Bar or licensed to practice law in the State of Texas.

## §5 Termination

The military attorney's privilege to practice law under this Rule may be terminated by the

Board at any time, with or without cause. In addition, the military attorney's privileges under this Rule shall be terminated when the military attorney ends full-time, active-duty military service as described in Section 1. The military attorney registered under this Rule or the military attorney's supervisory Staff Judge Advocate or other supervisory military attorney shall:

(a) advise the Board as soon as practicable of any change in the military attorney's status that may affect the military attorney's right to practice law under this Rule;

(b) immediately notify each court or tribunal in which the military attorney is involved in a pending civil proceeding when the military attorney is unable to continue to serve as counsel under this Rule; and

(c) immediately obtain substitution of counsel when the military attorney involved in any pending civil proceeding is unable to continue to serve as counsel under this Rule.

## §6 Subject-Matter Jurisdiction, Authorized Clients, and Pleading Requirements

A military attorney granted limited permission to practice law under this Rule may, with approval of the military attorney's supervisory Staff Judge Advocate or other supervisory military attorney, represent:

(a) enlisted military personnel in grades E-1 through E-4; and

(b) immediate family members who qualify under armed services regulations as dependents of enlisted military personnel in grades E-1 through E-4 if the military attorney's supervisory Staff Judge Advocate or other supervisory military attorney determines that retaining civilian legal counsel for the matter in controversy would present a substantial financial hardship for the family member involved.

A military attorney granted limited permission to practice law under this Rule may represent other military personnel, as well as their immediate family members who qualify under armed services regulations as their dependents, only if the military attorney receives written approval from the Judge Advocate General of the Army, Navy, Coast Guard, or Air Force, or the Staff Judge Advocate to the Commandant of the Marine Corps, as appropriate. The written authorization must include a determination that retaining civilian legal counsel for the matter in controversy would present a substantial financial hardship for the service member or family member involved.

A military attorney granted limited permission to practice law under this Rule may not demand or receive any compensation, beyond the military attorney's regular pay and allowances, for the legal services provided under this Rule.

The practice of a military attorney under this Rule shall be subject to the limitations and restrictions of 10 U.S.C. § 1044 and the regulations of that attorney's military service and shall be further limited to:

(a) cases arising under all Titles, except Title 3, of the Family Code;

(b) guardianships;

(c) landlord-tenant disputes on behalf of tenants;

(d) consumer-law cases on behalf of consumers;

(e) garnishment defenses;

37

(f) estate planning and probate matters;

(g) enforcement of rights under the Servicemembers Civil Relief Act;

(h) enforcement of rights under the Uniformed Services Employment and Reemployment Rights Act; and

(i) other cases within the discretion of the court or tribunal before which the civil proceeding is pending, provided that written permission of the court or tribunal is obtained in advance of the appearance.

All pleadings filed in a civil proceeding by a military attorney under this Rule shall expressly disclose that limited permission to practice in Texas has been obtained under this Rule ; include the name, complete address, and telephone number of the military legal office of the military attorney representing the client and of the military attorney's supervisory Staff Judge Advocate or other supervisory military attorney; and include the name, grade, and armed service of the military attorney who is registered under this Rule and providing representation. Upon making an appearance in a civil proceeding, the military attorney shall file a document with the court or other tribunal in which the civil proceeding is pending, designating each individual authorized to accept service of process on the military attorney's behalf and providing the name and complete address of each authorized individual. If the military attorney does not file this document, the military attorney's agent for service of process shall be the supervisory Staff Judge Advocate or supervisory military attorney whose name appears on the military attorney's most recent application filed pursuant to this Rule, or the successor to that office.

## §7 Discipline

A military attorney granted limited permission to practice law in Texas under this Rule is subject to the Rules Governing Admission to the Bar of Texas, the Texas Disciplinary Rules of Professional Conduct, the Texas Rules of Disciplinary Procedure, and any other rules and laws governing the discipline of attorneys admitted to the Bar. The Bar, Supreme Court of Texas, and other Texas courts have jurisdiction over the discipline of the military attorney, regardless of whether the military attorney retains the right to practice in the state, for the military attorney's professional conduct while practicing in this state. This jurisdiction includes, but is not limited to, the authority—concurrent with the Board's authority under Section 5 —to terminate the military attorney's privilege to practice law in Texas under this Rule.

## Rule 23
### Temporary License for Military Service Member or Military Spouse

## §1 Definitions

(a) "Military Service Member" means an active-duty military service member.

(b) "Military Spouse" means the spouse of a Military Service Member.

## §2 Eligibility

A Military Service Member or a Military Spouse is eligible for a three-year temporary license

to practice law in Texas if the Military Service Member or the Military Spouse:

(a) is admitted to practice law in another State;

(b) is in good standing in all jurisdictions where admitted and an active member of the bar in at least one State;

(c) is not currently subject to discipline or the subject of a pending disciplinary matter in any jurisdiction;

(d) has never been disbarred or resigned in lieu of discipline in any jurisdiction;

(e) has never had an application for admission to any jurisdiction denied on character or fitness grounds;

(f) meets the law study requirements of Rule 3 or is exempted under Rule 13 §§ 3, 4, or 5;

(g) has satisfactorily completed the Texas Law Component; and

(h) is residing in Texas.

## §3 Application

A Military Service Member or a Military Spouse must submit to the Board:

(a) an application for temporary licensure on a form prescribed by the Board;

(b) a copy of the Military Service Member's military orders;

(c) a certificate of good standing from the entity with final jurisdiction over professional discipline in each jurisdiction of admission; and

(d) any other evidence demonstrating that the Military Service Member or the Military Spouse satisfies the eligibility requirements of Section 2 that the Board may require.

## §4 Certification to Supreme Court

If the Board determines that a Military Service Member or a Military Spouse has satisfied the requirements of Sections 2 and 3, the Board must recommend to the Supreme Court the temporary licensure of the Military Service Member or the Military Spouse.

## §5 Fee Waiver

A Military Service Member or a Military Spouse is not required to pay:

(a) the fees required by Rule 18; or

(b) the licensing fee to the Supreme Court Clerk.

39

Fisher Appendix: 246

Appendix Fee Schedule

**Declaration of Intention**
**to Study Law**

| | |
|---|---|
| Investigation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $190 |

**In-State Law Student**
**Admission by UBE Transfer**

| | |
|---|---|
| Application Fee | $150 |
| UBE Transfer Fee | $150 |
| Total | $300 |

**Exam Application for**
**In-State Law Students**

| | |
|---|---|
| Application Fee | $150 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Total | $450 |

**Out of State Law Student**
**Admission by UBE Transfer**

| | |
|---|---|
| Application Fee | $150 |
| UBE Transfer Fee | $150 |
| Investigation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $490 |

**Exam Application for**
**Out of State Law Students**

| | |
|---|---|
| Application Fee | $150 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Investigation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $640 |

**Attorney**
**Admission by UBE Transfer**

| | |
|---|---|
| Application Fee | $700 |
| UBE Transfer Fee | $150 |
| Investigation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $1040 |

**Exam Application for**
**Attorneys Licensed in Another State**

| | |
|---|---|
| Application Fee | $700 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Investigation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $1190 |

**Foreign-Trained Applicants**
**Admission by UBE Transfer**

| | |
|---|---|
| Application Fee | $700 |
| UBE Transfer Fee | $150 |
| Investigation Fee | $150 |
| Foreign Nation Inquiry Fee | $100 |
| Fingerprint Processing Fee | $40 |
| Total | $1140 |

**Exam Application for**
**Foreign-Trained Applicants**

| | |
|---|---|
| Application Fee | $700 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Investigation Fee | $150 |
| Foreign Nation Inquiry Fee | $100 |
| Fingerprint Processing Fee | $40 |
| Total | $1290 |

**Attorney**
**Admission Without Examination**

| | |
|---|---|
| Application Fee | $700 |
| Investigation Fee | $150 |
| Practice Time Evaluation Fee | $150 |
| Fingerprint Processing Fee | $40 |
| Total | $1040 |

Fisher Appendix: 247

**Exam Application for Re-Applicants**

| | |
|---|---|
| Application Fee | $150 |
| Investigation Fee | $95 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Total | $545 |

**Exam Application for Courtesy Seating**

| | |
|---|---|
| Application Fee | $150 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Total | $450 |

**Exam Application for Courtesy Seating Re-Applicants**

| | |
|---|---|
| Application Fee | $150 |
| Examination Fee | $150 |
| Venue Fee | $150 |
| Total | $450 |

**Application for Redetermination of Character & Fitness**

| | |
|---|---|
| Supplemental Investigation Fee | $150 |
| Fingerprint Processing | $40 |
| Total | $190 |

**Miscellaneous Fees**

| | |
|---|---|
| Late Fee February Exam App. filed by November 1 | $150 |
| Late Fee February Exam App. filed by December 1 | $300 |
| Late Fee July Exam App. filed by April 1 | $150 |
| Late Fee July Exam App. filed by May 1 | $300 |
| Laptop Examination Fee | $50 |
| Incompleteness Fee | $75 |
| MBE Transfer | $25 |
| Check Returned for Insufficient Funds | $25 |

**Foreign Legal Consultant**

| | |
|---|---|
| Application Fee | $700 |
| Investigation Fee | $150 |
| Foreign Nation Inquiry Fee | $100 |
| Fingerprint Processing Fee | $40 |
| Total | $990 |

**Foreign Legal Consultant Renewal**

| | |
|---|---|
| Application Fee | $150 |

**Military Attorney Application**

| | |
|---|---|
| Application Fee | $25 |

**Military Attorney Application Renewal**

| | |
|---|---|
| Application Fee | $25 |

41

## Texas Constitution
## Article II
## The Powers of Government

**Tex. Const. § 1. Division of powers; three separate departments; exercise of power properly attached to other departments**

Sec. 1. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

## Government Code
## Title 2.     Judicial Branch
## Subtitle G. Attorneys
## Chapter 82. Licensing of Attorneys
## Subchapter A. Board of Law Examiners

**Tex. Gov't Code §82.001. Board of Law Examiners**

(a) The Board of Law Examiners is composed of nine attorneys who have the qualifications required of members of the supreme court.

(b) The supreme court shall appoint the members of the board for staggered six-year terms, with the terms of one-third of the members expiring May 31 of each odd-numbered year. A member is subject to removal by the supreme court as provided by Section 82.0021.

(c) Appointments to the board shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointees.

**Tex. Gov't Code §82.002.  Conflict of Interest**

(a) In this section, "Texas trade association" means a cooperative and voluntarily joined statewide association of business or professional competitors in this state designed to assist its members and its industry or profession in dealing with mutual business or professional problems and in promoting their common interest.

(b) A person may not be a member of the Board of Law Examiners and may not be a board employee employed in a "bona fide executive, administrative, or professional capacity," as that phrase is used for purposes of establishing an exemption to the overtime provisions of the federal Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.), and its subsequent amendments, if:

    (1)   the person is an officer, employee, or paid consultant of a Texas trade association in the field of board interest; or

    (2) the person's spouse is an officer, manager, or paid consultant of a Texas trade association in the field of board interest.

(c) A person may not be a member of the board or act as the general counsel to the board if the person is required to register as a lobbyist under Chapter 305 because of the person's

42                                                          Fisher Appendix: 249

activities for compensation on behalf of a profession related to the operation of the board.

(d) A member of the board who has a financial interest, other than a remote financial interest, in a decision pending before the board is disqualified from participating in the decision.

## Tex. Gov't Code §82.0021. Removal of Board Members

(a) It is a ground for removal from the Board of Law Examiners that a member:

    (1)   does not have, at the time of taking office, the qualifications required by Section 82.001;

    (2) does not maintain during service on the board the qualifications required by Section 82.001;

    (3) is ineligible for membership under Section 82.002;

    (4) cannot, because of illness or disability, discharge the member's duties for a substantial part of the member's term;

    (5) is absent from more than half of the regularly scheduled board meetings that the member is eligible to attend during a calendar year without an excuse approved by a majority vote of the board;

    (6) is incompetent; or

    (7) is inattentive to the member's duties.

(b) The validity of an action of the board is not affected by the fact that it is taken when a ground for removal of a board member exists.

(c) If the executive director of the board has knowledge that a potential ground for removal exists, the executive director shall notify the presiding officer of the board of the potential ground. The presiding officer shall then notify the supreme court that a potential ground for removal exists. If the potential ground for removal involves the presiding officer, the executive director shall notify the next highest ranking officer of the board, who shall then notify the supreme court that a potential ground for removal exists.

## Tex. Gov't Code §82.003. Open Records and Open Meetings

(a) Except as provided by this section, the Board of Law Examiners is subject to Chapter 552 and Chapter 551.

(b) Examination questions that may be used in the future and examinations other than the one taken by the person requesting it are exempt from disclosure.

(c) Board deliberations, hearings, and determinations relating to moral character and fitness of an applicant shall be closed to the public, and records relating to these subjects are confidential. On the written request of an applicant, however, the applicant is entitled to:

    (1)   have the applicant's character and fitness hearing open to persons designated by the applicant; or

    (2) have disclosed to the applicant records relating to the applicant's own moral character and fitness unless the person who supplied the information has requested that it not be disclosed.

(d) The board shall not inquire of a person who supplies information relating to an applicant's moral character and fitness whether the person objects to disclosure nor inform the person

43                                                            Fisher Appendix: 250

of the right to object.

(e) Board deliberations, hearings, and determinations relating to a request by an applicant who has a disability for testing accommodations under Section 82.0272 on the bar examination shall be closed to the public, and records relating to that subject are confidential.

## Tex. Gov't Code §82.004. Board Duties

(a) The Board of Law Examiners, acting under instructions of the supreme court as provided by this chapter, shall determine the eligibility of candidates for examination for a license to practice law in this state.

(b) The board shall examine each eligible candidate as to the candidate's qualifications to practice law.

(c) The board may not recommend any person for a license to practice law unless the person has shown to the board, in the manner prescribed by the supreme court, that the person is of the moral character and of the capacity and attainment proper for that person to be licensed.

(d) On written request of an applicant who fails an examination administered by the board, the board shall give the applicant an oral or written analysis of the applicant's performance on the examination. The applicant may record an oral analysis.

(e) In each city in which an examination is administered, the board shall provide facilities that enable persons having physical, mental, or developmental disabilities to take the examination.

## Tex. Gov't Code §82.005. Board Compensation

(a) The supreme court shall set the compensation of each member of the Board of Law Examiners, excluding reasonable and necessary actual expenses, at an amount that does not exceed $30,000 a year.

(b) Subchapter B, Chapter 659, does not apply to the compensation set under this section.

## Tex. Gov't Code §82.006. Sunset Provision

The Board of Law Examiners is subject to Chapter 325 (Texas Sunset Act). Unless continued in existence as provided by that chapter, the board is abolished September 1, 2029.

## Tex. Gov't Code §82.007. Career Ladder; Annual Performance Evaluations

(a) The executive director of the Board of Law Examiners or the executive director's designee shall develop an intraagency career ladder program. The program shall require intraagency postings of all nonentry level positions concurrently with any public posting.

(b) The executive director or the executive director's designee shall develop a system of annual performance evaluations. All merit pay for board employees must be based on the system established under this subsection.

## Tex. Gov't Code §82.0071. Equal Employment Opportunity Policy

(a) The executive director of the Board of Law Examiners or the executive director's designee shall prepare and maintain a written policy statement that implements a program of equal employment opportunity to ensure that all personnel decisions are made without regard

44                                                      Fisher Appendix: 251

to race, color, disability, sex, religion, age, or national origin.

(b) The policy statement must include:

    (1)   personnel policies, including policies relating to recruitment, evaluation, selection, training, and promotion of personnel, that show the intent of the board to avoid the unlawful employment practices described by Chapter 21, Labor Code; and

    (2) an analysis of the extent to which the composition of the board's personnel is in accordance with state and federal law and a description of reasonable methods to achieve compliance with state and federal law.

(c) The policy statement must be:

    (1)   updated annually;

    (2) reviewed by the Commission on Human Rights for compliance with Subsection (b)(1); and

    (3) filed with the governor's office and the supreme court.

### Tex. Gov't Code §82.0072. Standards of Conduct

The executive director of the Board of Law Examiners or the executive director's designee shall provide to members of the board and to board employees, as often as necessary, information regarding the requirements for office or employment under this chapter, including information regarding a person's responsibilities under applicable laws relating to standards of conduct for state officers or employees.

### Tex. Gov't Code §82.0073. Separation of Responsibilities; Delegation.

(a) The Board of Law Examiners shall develop and implement policies that clearly separate the policymaking responsibilities of the board and the management responsibilities of the executive director and the staff of the board.

(b) Subject to supreme court rules, the Board of Law Examiners may delegate routine decisions to the executive director of the board, including waiver requests.

### Tex. Gov't Code § 82.008. Public Information

(a) The Board of Law Examiners shall prepare information of public interest describing the functions of the board. The board shall make the information available to the public and appropriate agencies.

(b) The board shall develop and implement policies that provide the public with a reasonable opportunity to appear before the board and to speak on any issue under the jurisdiction of the board. However, the board may prohibit public testimony that would reveal the examination questions described by Section 82.003(b) or would relate to the moral character or fitness of an applicant for a license.

### Tex. Gov't Code §82.009. Program Accessibility

The Board of Law Examiners shall prepare and maintain a written plan that describes how a person who has a physical, mental, or developmental disability can be provided reasonable access to the board's programs.

**Tex. Gov't Code §82.010. Training Program Required**

(a) A person who is appointed to and qualifies for office as a member of the Board of Law Examiners may not vote, deliberate, or be counted as a member in attendance at a meeting of the board until the person completes a training program that complies with this section.

(b) The training program must provide the person with information regarding:

    (1)   the law governing board operations;

    (2) the programs, functions, rules, and budget of the board;

    (3) the results of the most recent formal audit of the board;

    (4) the requirements of:

        (A)   laws relating to open meetings, public information, administrative procedure, and disclosing conflicts of interest; and other laws applicable to members of a state policymaking body in performing their duties; and

        (B)   any applicable ethics policies adopted by the Board of the Texas Ethics Commission.

    (5) The executive director of the Board of Law Examiners shall create a training manual that includes the information required by subsection (b). The executive director shall distribute a copy of the training manual annually to each member of the board. On receipt of the training manual, each member of the board shall sign and submit to the executive director a statement acknowledging receipt of the training manual.

**Tex. Gov't Code §82.011. Written Complaints**

(a) The Board of Law Examiners shall maintain a file on each written complaint filed with the board. The file must include:

    (1)   the name of the person who filed the complaint;

    (2)   the date the complaint was received by the board;

    (3)   the subject matter of the complaint;

    (4) the name of each person contacted in relation to the complaint;

    (5) a summary of the results of the review or investigation of the complaint; and

    (6) an explanation of the reason the file was closed, if the board closed the file without taking action other than to investigate the complaint.

(b) The board shall provide to the person filing the complaint and to each person who is a subject of the complaint a copy of the board's policies and procedures relating to complaint investigation and resolution.

(c) The board, at least quarterly until final disposition of the complaint, shall notify the person filing the complaint and each person who is a subject of the complaint of the status of the investigation unless the notice would jeopardize an undercover investigation.

**Tex. Gov't Code §82.012. [Repealed effective June 19, 2009.]**

**Tex. Gov't Code §82.013. Effective Use of Technology**

The Board of Law Examiners shall develop and implement a policy requiring the executive director and board employees to research and propose appropriate technological solutions to improve the board's ability to perform its functions. The technological solutions must:

46

    (1)   ensure that the public is able to easily find information about the board on the Internet;

    (2) ensure that persons who want to use the board's services are able to:

        (A)   interact with the board through the Internet; and

        (B)   access any service that can be provided effectively through the Internet; and

    (3) be cost-effective and developed through the board's planning processes.

## Subchapter B. Licensing of Attorneys

### Tex. Gov't Code §82.021. Supreme Court Authority

Only the supreme court may issue licenses to practice law in this state as provided by this chapter. The power may not be delegated.

### Tex. Gov't Code §82.022. Supreme Court Rulemaking

(a) The supreme court may adopt rules on eligibility for examination for a license to practice law and on the manner in which the examination is conducted. The rules may include:

    (1)   provisions to ensure:

        (A)   good moral character of each candidate for a license;

        (B)   adequate prelegal study and attainment; and

        (C)   adequate study of the law for at least two years, covering the course of study prescribed by the supreme court or the equivalent of that course;

    (2) the legal topics to be covered by the course of study and by the examination;

    (3) the times and places for holding the examination;

    (4) the manner of conducting the examination;

    (5) the grades necessary for licensing; and

    (6) any other matter consistent with this chapter desirable to make the issuance of a license to practice law evidence of good character and fair capacity and attainment and proficiency in the knowledge of law.

(a-1) In adopting rules on eligibility for examination for a license to practice law, the supreme court shall ensure that no rule violates Chapter 110, Civil Practice and Remedies Code.

(b) The supreme court shall adopt rules necessary to administer its functions and to govern the administration of the Board of Law Examiners' functions relating to the licensing of lawyers.

### Tex. Gov't Code §82.023. Declaration of Intention to Study Law

(a) Each person intending to apply for admission to the bar must file with the Board of Law Examiners, on a form provided by the board, a declaration of intention to study law.

(b) The form for the declaration must clearly identify those conditions of character and fitness that may be investigated by the board and that may result in the denial of the declarant's application to take the examination.

(c) The board shall notify each first-year law student who files the declaration not later than the date established by supreme court rule of the board's decision as to the student's

        

acceptable character and fitness. The board shall notify all other declarants not later than the date established by supreme court rule whether or not it has determined that the declarant has acceptable character and fitness.

(d) If the board determines that an applicant does not have acceptable character and fitness, the notice of the decision must be accompanied by an analysis of the character investigation that specifies in detail the results of the investigation. The analysis must include an objective list of actions the applicant may take to become qualified for a license to practice law.

(e) If the board determines that an applicant may suffer from chemical dependency, the board shall require the applicant to meet with representatives of the Lawyers' Assistance Program of the State Bar of Texas or a similar program of the state bar and may require the applicant to submit to evaluation by a licensed mental health professional designated by this board. The Board may seek advice and consultation from the Lawyers' Assistance Program of the State Bar of Texas or a similar program of the state bar in designating mental health professionals qualified to conduct evaluations of declarants who may suffer from chemical dependency.

(f) If the board determines that an applicant suffers from chemical dependency, the board shall assist the applicant in working with the Lawyers' Assistance Program of the State Bar of Texas or a similar program of the state bar.

### Tex. Gov't Code §82.024. Law Study Requirements; Eligibility for Examination

A person who has completed the prescribed study in an approved law school has satisfied the law study requirements for taking the examination for a license to practice law and is eligible to take the bar examination. An approved law school is one that is approved by the supreme court for the time period designated by the court as maintaining the additional standards to retain approval.

### Tex. Gov't Code §82.0241.  Unaccredited Schools of Law

All matters relating to licensing of persons who were enrolled at unaccredited schools of law in this state are within the exclusive jurisdiction of the Supreme Court of the State of Texas.

### Tex. Gov't Code §82.0242. [This section expired September 1, 2004.]
### Tex. Gov't Code §82.025.  [Repealed effective September 1, 2003.]
### Tex. Gov't Code §82.026.  [Repealed effective September 1, 1991.]

### Tex. Gov't Code §82.027. Application for Examination

(a) Each applicant to take a bar examination must file an application with the Board of Law Examiners not later than the date established by supreme court and pay the fee established by supreme court rule.

(b) The application must include a statement certifying that since the filing of the applicant's original declaration of intention to study law, the applicant:

    (1)   has not been formally charged with any violation of law, excluding:

        (A)  cases that have been dismissed for reasons other than technical defects in the

charging instrument;

    (B)   cases in which the applicant has been found not guilty;

    (C)   minor traffic violations;

    (D)   cases in which the record of arrest or conviction was expunged by court order;

    (E)   pardoned offenses; and

    (F)   Class C misdemeanors;

(2) has not been charged with fraud in any legal proceeding; and

(3) has not been involved in civil litigation or bankruptcy proceedings that reasonably bear on the applicant's fitness to practice law.

(c) On a showing of good cause or to prevent hardship, the board may permit an applicant to file an application with the board not later than the date established by supreme court rule on payment of applicable late fees established by supreme court rule.

(d) The filing deadlines and late fees do not apply to an applicant who failed the preceding bar examination. Any such applicant may take the next examination administered on filing an application with the board and paying the required examination fees not later than the date established by supreme court rule established by supreme court rule.

## Tex. Gov't Code §82.0271. Residency or Citizenship Status of Applicant

A person who has applied to take the bar examination may not be denied admission to the bar examination based on the applicant's lack of:

    (1)   permanent residency in the United States; or

    (2) United States citizenship.

## Tex. Gov't Code §82.0272. Testing Accommodations for Applicants with Disabilities

An applicant who has a physical, mental, or developmental disability may request that the Board of Law Examiners provide testing accommodations on the bar examination. An applicant whose request is denied may appeal the decision to a committee appointed by, and composed of three or more members of, the board.

## Tex. Gov't Code §82.028. Moral Character and Fitness of Applicant

(a) The Board of Law Examiners may conduct an investigation of the moral character and fitness of each applicant for a license.

(b) The board may contract with public or private entities for investigative services relating to the moral character and fitness of applicants.

(c) The board may not recommend denial of a license and the supreme court may not deny a license to an applicant because of a deficiency in the applicant's moral character or fitness unless:

    (1)   the board finds a clear and rational connection between a character trait of the applicant and the likelihood that the applicant would injure a client or obstruct the administration of justice if the applicant were licensed to practice law; or

    (2) the board finds a clear and rational connection between the applicant's present mental or emotional condition and the likelihood that the applicant will not discharge

49

properly the applicant's responsibilities to a client, a court, or the legal profession if the applicant is licensed to practice law.

(d) The board shall limit its investigation under this section to those areas clearly related to the applicant's moral character and present fitness to practice law.

## Tex. Gov't Code §82.029. Release of Bar Examination Results

(a) On request of a law school that is conducting research on the achievement of the law school's students or graduates on the Texas bar examination, the Board of Law Examiners shall provide the law school with information concerning the results of a bar examination and the achievement of particular applicants on the examination, including examination results disaggregated by section or portion of the examination and any relevant statistics related to the results of the examination.

(b) An applicant may request that the board not release the applicant's identity to a law school that requests information under Subsection (a). The board shall grant the applicant's request if the applicant:

   (1)  sends the request to the board by certified mail or a comparable mailing method that provides proof of delivery; and

   (2) makes the request before the applicant takes the bar examination.

(c) A law school that receives information from the board under Subsection (a) is subject to any restriction on the release of the information under federal or state law.

(d) Notwithstanding any other law, information that the board provides to a law school under Subsection (a) is confidential and may not be disclosed under any law related to open records or public information.

## Tex. Gov't Code §82.0291.  [This section expired January 1, 2005.]

## Tex. Gov't Code §82.030. Board Assessment of Moral Character and Fitness

(a) The Board of Law Examiners shall assess each applicant's moral character and fitness based on:

   (1)  the investigation of character and fitness performed after the filing of the declaration of intention to study law; and

   (2) the filing of the application required by Section 82.027 and the board's investigation into the accuracy and completeness of the application.

(b) If the board determines that the applicant does not have the requisite good moral character and fitness, the board, not later than the 150th day after the day on which the application is filed, shall furnish the applicant an analysis of the character investigation that specifies in detail the results of the investigation. The analysis must include an objective list of actions the applicant may take to become qualified for a license to practice law.

(c) If the board determines that an applicant may suffer from chemical dependency, the board shall require the applicant to submit to evaluation by a licensed mental health professional designated by the board. The board may seek advice and consultation from the Lawyers' Assistance Program of the State Bar of Texas or a similar program of the state bar in designating mental health professionals qualified to conduct evaluations of applicants who

Fisher Appendix: 257

may suffer from chemical dependency.

(d) If the board determines that an applicant suffers from chemical dependency, the board shall assist the applicant in working with the Lawyers' Assistance Program of the State Bar of Texas or a similar program of the State Bar in designating mental health professionals qualified to conduct evaluations of applicants who may suffer from chemical dependency.

(e) The board may not deny an applicant the opportunity to take the bar examination solely because the applicant:

    (1)   suffers or appears to suffer from chemical dependency; or

    (2) has been convicted of or is on community supervision for a first offense of operating a motor vehicle while intoxicated under Section 49.04, Penal Code, or intoxication assault committed while operating a motor vehicle under Section 49.07, Penal Code.

(f)  Repealed effective September 1, 2017.

(g) Subject to supreme court adoption by rule, the board shall define "chemical dependency."

**Tex. Gov't Code §82.031. [Repealed effective September 1, 2003.]**
**Tex. Gov't Code §82.032. [Repealed effective September 1, 2003.]**

**Tex. Gov't Code §82.033. Fees**

(a) The supreme court shall set the fee for the investigation of the moral character and fitness of each candidate at an amount that does not exceed $150. The candidate must pay the investigation fee to the Board of Law Examiners at the time it is requested by the board.

(b) The supreme court shall set the fee for any examination given by the board at an amount that does not exceed $150. The candidate must pay the fee to the board at the time the candidate applies for examination.

(c) The supreme court may set an application fee for foreign attorneys at an amount that does not exceed $700.

(d) The supreme court may set reasonable fees for additional services provided by the board, but the fee for any single additional service, other than the late fee for an examination application, may not exceed $150.

(e) The fees set by the supreme court must be sufficient to pay all costs of the board, including staff salaries, compensation to members of the board, and costs of investigation and administering the examinations, so that state general revenue funds are not necessary to operate the board.

(f) The board may adopt rules that provide for waiving or lowering for indigent persons a fee required by this section.

**Tex. Gov't Code §82.034. Use of Funds**

Fees received by the Board of Law Examiners shall be deposited in a fund established by the supreme court. The fund may be used only to administer the functions of the supreme court and the board relating to the licensing of lawyers. The fund shall be used as directed by the supreme court and under supreme court rules.

**Tex. Gov't Code §82.035.  Audit; Financial Report**

Fisher Appendix: 258

(a) The financial transactions of the Board of Law Examiners are subject to audit by the state auditor in accordance with Chapter 321.

(b) The board shall file annually with the supreme court, the governor, and the presiding officer of each house of the legislature a copy of the annual financial report prepared by the board under Section 2101.011.

## Tex. Gov't Code §82.036. Foreign Attorneys

The supreme court shall make such rules and regulations as to admitting attorneys from other jurisdictions to practice law in this state as it shall deem proper and just. All such attorneys shall be required to furnish satisfactory proof as to good moral character.

## Tex. Gov't Code §82.0361. Nonresident Attorney Fee

(a) In this section, "nonresident attorney" means a person who resides in and is licensed to practice law in another state but who is not a member of the State Bar of Texas.

(b) Except as provided by Subsection (e), a nonresident attorney requesting permission to participate in proceedings in a court in this state shall pay a fee of $250 for each case in which the attorney is requesting to participate. The attorney shall pay the fee to the Board of Law Examiners before filing with the applicable court a motion requesting permission to participate in proceedings in that court as provided by rules adopted by the supreme court.

(c) Fees under this section shall be collected in the same manner as other fees collected by the Board of Law Examiners. The board shall remit the fees collected under this section to the comptroller not later than the 10th day after the end of each calendar quarter.

(d) The comptroller shall deposit the fees received under this section to the credit of the basic civil legal services account of the judicial fund for use in programs approved by the supreme court that provide basic civil legal services to the indigent.

(e) The supreme court may adopt rules to waive or reduce the fee required by this section for a nonresident attorney who seeks to represent an indigent person in proceedings in a court in this state.

(f) A nonresident attorney who files a motion requesting permission to participate in proceedings in a court in this state shall provide to that court proof of payment of the fee required by this section. The supreme court by rule shall prescribe the method of proof.

## Tex. Gov't Code §82.037. Oath of Attorney

(a) Each person admitted to practice law shall, before receiving a license, take an oath that the person will:

    (1)  support the constitutions of the United States and this state;

    (2)   honestly demean oneself in the practice of law;

    (3) discharge the attorney's duty to the attorney's client to the best of the attorney's ability; and

    (4) conduct oneself with integrity and civility in dealing and communicating with the court and all parties.

(b) The oath shall be endorsed on the license, subscribed by the person taking the oath, and

attested by the officer administering the oath.

**Tex. Gov't Code §82.038. Probationary License for Applicant Suffering from Chemical Dependency**

(a) If, after a moral character and fitness assessment, the Board of Law Examiners determines that the applicant suffers from chemical dependency, the board shall notify the applicant of its determination and of the applicant's rights under this section.

(b) To obtain judicial review of the board's determination that the applicant suffers from chemical dependency, an applicant must file a petition in the district court of Travis County before the 60th day after the date that the board delivers notice of its determination. The petition must name the board as a defendant and be served on the executive director of the board. Before the date on which the applicant may obtain a default judgment against the board, the board shall file with the district court a certified record of the proceedings before the board.

(c) A party is not entitled to a jury in a judicial review of the board's determination that an applicant suffers from chemical dependency. The court may not substitute its judgment for that of the board as to the weight of the evidence on questions submitted to the board's discretion but shall affirm the board's decision if the decision is reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole.

(d) The board may not deny a person who successfully takes the bar examination a probationary license to practice law solely because the person:

    (1) suffers from chemical dependency; or

    (2) has been convicted of or is on community supervision for a first offense of operating a motor vehicle while intoxicated under Section 49.04, Penal Code, or intoxication assault committed while operating a motor vehicle under Section 49.07, Penal Code.

(e) The board shall specify the conditions of a probationary license to practice law, which must be designed to protect the public from the potential harm the person might cause. Conditions of a probationary license may include one or more of the following:

    (1) prohibiting the person from using alcohol or controlled substances;

    (2) treatment for chemical dependency;

    (3) supervision of the person's work by a licensed attorney;

    (4) submissions to periodic drug testing;

    (5) periodic reporting by the person to the board; or

    (6) suspension, for a portion of the probationary period, of an activity for which a license to practice law is required.

(f) A probationary license issued under this section expires on the second anniversary of the date on which the license is issued. A person who holds a probationary license may apply for a renewal of the probationary license or for a regular license to practice law. The board, after redetermination of the character and fitness of a person who holds a probationary license, may recommend to the supreme court that it grant the person a regular license to practice law. The redetermination must include an evaluation of the person by a treatment facility. The board may not recommend to the supreme court that the person be granted

a regular license to practice law unless the board finds that the person has successfully completed treatment and has been free from chemical dependency for the preceding two years.

(g) The supreme court shall adopt rules under which the board and the State Bar of Texas jointly develop and fund a program for evaluation and referral to treatment for persons who have been issued a probationary license under this section.

(h) A probationary license may be immediately revoked if the person violates a condition of probation imposed by the board.

(i) On request, the board in coordination with the State Bar of Texas shall inform a member of the public whether a particular person holds a probationary license. Any information that forms the basis for the issuance of the probationary license is confidential.

(j) In this section:

    (1) "Chemical dependency" has the meaning provided by supreme court rule adopted under Section 82.030.

    (2) "Controlled substance," "treatment facility," and "treatment" have the meanings assigned by Section 462.001, Health and Safety Code.

## Tex. Gov't Code §82.039. Licensing Guidelines

(a) To assist the Board of Law Examiners in making consistent and fair determinations related to the licensing of attorneys in this state, the board shall develop specific guidelines for:

    (1) determining the moral character and fitness of license applicants;

    (2) overseeing probationary license holders; and

    (3) granting waiver requests.

(b) The Board of Law Examiners shall develop the guidelines required under Subsection (a) based on the board's past decisions and on any other criteria the board considers necessary. The board is not required to take any specific action provided in the guidelines.

**Title 4. Executive Branch**
**Subtitle B. Law Enforcement and Public Protection**
**Chapter 411. Department of Public Safety of the State of Texas**
**Subchapter F. Criminal History Record Information**
**(excerpts pertaining to Board of Law Examiners)**

## § 411.0765.  Application of Subchapter

(a) A criminal justice agency may disclose criminal history record information that is the subject of an order of nondisclosure of criminal history record information under this subchapter to the following noncriminal justice agencies or entities only: (3) to an agency or entity listed in Subsection (b)

(b) A criminal justice agency may disclose criminal history record information that is the subject of an order of nondisclosure of criminal history record information under this subchapter to the following noncriminal justice agencies or entities only: (5) the Board of Law Examiners.

## Tex. Gov't Code § 411.100. Access to Criminal History Record Information: Board of

**Law Examiners and State Bar of Texas**

(a)  The Board of Law Examiners is entitled to obtain from the department criminal history record information maintained by the department that relates to a person who is an applicant to take a bar examination.

(a-1) The State Bar of Texas is entitled to obtain:

    (1)   from the department, criminal history record information maintained by the department that relates to a person who is a member of the state bar; or

    (2) from the Board of Law Examiners, criminal history record information obtained under Subsection (a).

(b) Criminal history record information obtained under Subsection (a) or (a-1) may not be released or disclosed to any person, except on court order or with consent of the applicant.

(c) Immediately following the decision of the Board of Law Examiners on recommending an applicant, the board shall collect and make accessible to the State Bar of Texas all criminal history record information obtained by the board that relate to that applicant.

## CODE OF CRIMINAL PROCEDURE
## TITLE 1. CODE OF CRIMINAL PROCEDURE
## CHAPTER 42A. COMMUNITY SUPERVISION

**Crim. P. Art. 42A.054.  LIMITATION ON JUDGE-ORDERED COMMUNITY SUPERVISION**

  (a)  Article 42A.053 does not apply to a defendant adjudged guilty of an offense under:

    (1)  Section 15.03, Penal Code, if the offense is punishable as a felony of the first degree;

    (2)  Section 19.02, Penal Code (Murder);

    (3)  Section 19.03, Penal Code (Capital Murder);

    (4)  Section 20.04, Penal Code (Aggravated Kidnapping);

    (5)  Section 20A.02, Penal Code (Trafficking of Persons);

    (6)  Section 20A.03, Penal Code (Continuous Trafficking of Persons);

    (7)  Section 21.11, Penal Code (Indecency with a Child);

    (8)  Section 22.011, Penal Code (Sexual Assault);

    (9)  Section 22.021, Penal Code (Aggravated Sexual Assault);

    (10) Section 22.04(a)(1), Penal Code (Injury to a Child, Elderly Individual, or Disabled Individual), if:

      (A)  the offense is punishable as a felony of the first degree; and

      (B)  the victim of the offense is a child;

    (11) Section 29.03, Penal Code (Aggravated Robbery);

    (12) Section 30.02, Penal Code (Burglary), if:

      (A)  the offense is punishable under Subsection (d) of that section; and

      (B)   the actor committed the offense with the intent to commit a felony under Section 21.02, 21.11, 22.011, 22.021, or 25.02, Penal Code;

    (13) Section 43.04, Penal Code (Aggravated Promotion of Prostitution);

(14) Section 43.05, Penal Code (Compelling Prostitution);

(15) Section 43.25, Penal Code (Sexual Performance by a Child);

(16) Chapter 481, Health and Safety Code, for which punishment is increased under:

    (A) Section 481.140 of that code (Use of Child in Commission of Offense); or

    (B)  Section 481.134(c), (d), (e), or (f) of that code (Drug-free Zones) if it is shown that the defendant has been previously convicted of an offense for which punishment was increased under any of those subsections; or

(17) Section 481.1123, Health and Safety Code (Manufacture or Delivery of Substance in Penalty Group 1-B), if the offense is punishable under Subsection (d), (e), or (f) of that section.

## Crim P. Art. 42A.111.  DISMISSAL AND DISCHARGE

(a) On expiration of a period of deferred adjudication community supervision imposed under this subchapter, if the judge has not proceeded to an adjudication of guilt, the judge shall dismiss the proceedings against the defendant and discharge the defendant.

(b) The judge may dismiss the proceedings and discharge a defendant before the expiration of the period of deferred adjudication community supervision if, in the judge's opinion, the best interest of society and the defendant will be served, except that the judge may not dismiss the proceedings and discharge a defendant charged with an offense requiring the defendant to register as a sex offender under Chapter 62.

(c)  Except as provided by Section 12.42(g), Penal Code, a dismissal and discharge under this article may not be considered a conviction for the purposes of disqualifications or disabilities imposed by law for conviction of an offense.

(c-1)  Subject to Subsection (d), an offense for which the defendant received a dismissal and discharge under this article may not be used as grounds for denying issuance of a professional or occupational license or certificate to, or suspending or revoking the professional or occupational license or certificate of, an individual otherwise entitled to or qualified for the license or certificate.

(d)  For any defendant who receives a dismissal and discharge under this article:

    (1)  on conviction of a subsequent offense, the fact that the defendant previously has received deferred adjudication community supervision is admissible before the court or jury for consideration on the issue of penalty;

    (2)  if the defendant is an applicant for or the holder of a license under Chapter 42, Human Resources Code, the Department of Family and Protective Services may consider the fact that the defendant previously has received deferred adjudication community supervision in issuing, renewing, denying, or revoking a license under that chapter;

    (3)  if the defendant is an applicant for or the holder of a license to provide mental health or medical services for the rehabilitation of sex offenders, the Council on Sex Offender Treatment may consider the fact that the defendant previously has received deferred adjudication community supervision in issuing, renewing, denying, or revoking a license issued by that council; and

(4) if the defendant is an applicant for or the holder of a professional or occupational license or certificate, the licensing agency may consider the fact that the defendant previously has received deferred adjudication community supervision in issuing, renewing, denying, or revoking a license or certificate if:

    (A) the defendant was placed on deferred adjudication community supervision for an offense:

        (i) listed in Article 42A.054(a);

        (ii) described by Article 62.001(5) or (6);

        (iii) committed under Chapter 21 or 43, Penal Code; or

        (iv) related to the activity or conduct for which the person seeks or holds the license;

    (B) the profession for which the defendant holds or seeks a license or certificate involves direct contact with children in the normal course of official duties or duties for which the license or certification is required; or

    (C) the defendant is an applicant for or the holder of a license or certificate issued under Chapter 1701, Occupations Code.

(e) A judge who dismisses the proceedings against a defendant and discharges the defendant under this article:

    (1) shall provide the defendant with a copy of the order of dismissal and discharge; and

    (2) if the judge determines that the defendant is or may become eligible for an order of nondisclosure of criminal history record information under Subchapter E-1, Chapter 411, Government Code, shall, as applicable:

        (A) grant an order of nondisclosure of criminal history record information to the defendant;

        (B) inform the defendant of the defendant's eligibility to receive an order of nondisclosure of criminal history record information without a petition and the earliest date on which the defendant is eligible to receive the order; or

        (C) inform the defendant of the defendant's eligibility to petition the court for an order of nondisclosure of criminal history record information and the earliest date the defendant is eligible to file the petition for the order.

Added by Acts 2015, 84th Leg., R.S., Ch. 770 (H.B. 2299), Sec. 1.01, eff. January 1, 2017.

Amended by:

    Acts 2017, 85th Leg., R.S., Ch. 324 (S.B. 1488), Sec. 23.012(c), eff. September 1, 2017.

    Acts 2021, 87th Leg., R.S., Ch. 638 (H.B. 757), Sec. 1, eff. September 1, 2021.

## Crim. P. Art. 62.001.  DEFINITIONS

In this chapter:

(5) "Reportable conviction or adjudication" means a conviction or adjudication, including an adjudication of delinquent conduct or a deferred adjudication, that, regardless of the pendency of an appeal, is a conviction for or an adjudication for or based on:

    (A) a violation of Section 21.02 (Continuous sexual abuse of young child or disabled individual), 21.09 (Bestiality), 21.11 (Indecency with a child), 22.011 (Sexual assault), 22.021 (Aggravated sexual assault), or 25.02 (Prohibited sexual conduct), Penal Code;

57

(B)   a violation of Section 43.04 (Aggravated promotion of prostitution), 43.05 (Compelling prostitution), 43.25 (Sexual performance by a child), or 43.26 (Possession or promotion of child pornography), Penal Code;

(B-1)   a violation of Section 43.021 (Solicitation of Prostitution), Penal Code, if the offense is punishable as a felony of the second degree;

(C)   a violation of Section 20.04(a)(4) (Aggravated kidnapping), Penal Code, if the actor committed the offense or engaged in the conduct with intent to violate or abuse the victim sexually;

(D)   a violation of Section 30.02 (Burglary), Penal Code, if the offense or conduct is punishable under Subsection (d) of that section and the actor committed the offense or engaged in the conduct with intent to commit a felony listed in Paragraph (A) or (C);

(E)   a violation of Section 20.02 (Unlawful restraint), 20.03 (Kidnapping), or 20.04 (Aggravated kidnapping), Penal Code, if, as applicable:

(i)  the judgment in the case contains an affirmative finding under Article 42.015; or

(ii)   the order in the hearing or the papers in the case contain an affirmative finding that the victim or intended victim was younger than 17 years of age;

(F)   the second violation of Section 21.08 (Indecent exposure), Penal Code, but not if the second violation results in a deferred adjudication;

(G)   an attempt, conspiracy, or solicitation, as defined by Chapter 15, Penal Code, to commit an offense or engage in conduct listed in Paragraph (A), (B), (C), (D), (E), (K), or (L);

(H)   a violation of the laws of another state, federal law, the laws of a foreign country, or the Uniform Code of Military Justice for or based on the violation of an offense containing elements that are substantially similar to the elements of an offense listed under Paragraph (A), (B), (B-1), (C), (D), (E), (G), (J), (K), or (L), but not if the violation results in a deferred adjudication;

(I)   the second violation of the laws of another state, federal law, the laws of a foreign country, or the Uniform Code of Military Justice for or based on the violation of an offense containing elements that are substantially similar to the elements of the offense of indecent exposure, but not if the second violation results in a deferred adjudication;

(J)  a violation of Section 33.021 (Online solicitation of a minor), Penal Code;

(K)   a violation of Section 20A.02(a)(3), (4), (7), or (8) (Trafficking of persons), Penal Code; or

(L)  a violation of Section 20A.03 (Continuous trafficking of persons), Penal Code, if the offense is based partly or wholly on conduct that constitutes an offense under Section 20A.02(a)(3), (4), (7), or (8) of that code.

(6)  "Sexually violent offense" means any of the following offenses committed by a person 17 years of age or older:

(A)  an offense under Section 21.02 (Continuous sexual abuse of young child or disabled individual), 21.11(a)(1) (Indecency with a child), 22.011 (Sexual assault), or 22.021

(Aggravated sexual assault), Penal Code;

(B)  an offense under Section 43.25 (Sexual performance by a child), Penal Code;

(C)  an offense under Section 20.04(a)(4) (Aggravated kidnapping), Penal Code, if the defendant committed the offense with intent to violate or abuse the victim sexually;

(D)  an offense under Section 30.02 (Burglary), Penal Code, if the offense is punishable under Subsection (d) of that section and the defendant committed the offense with intent to commit a felony listed in Paragraph (A) or (C) of Subdivision (5); or

(E)  an offense under the laws of another state, federal law, the laws of a foreign country, or the Uniform Code of Military Justice if the offense contains elements that are substantially similar to the elements of an offense listed under Paragraph (A), (B), (C), or (D).

# Texas Penal Code
## CHAPTER 21. SEXUAL OFFENSES

### Penal Code Sec. 21.01.  DEFINITIONS

In this chapter:

(1)  "Deviate sexual intercourse" means:

(A)  any contact between any part of the genitals of one person and the mouth or anus of another person;  or

(B)  the penetration of the genitals or the anus of another person with an object.

(2)  "Sexual contact" means, except as provided by Section 21.11 or 21.12, any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.

(3)  "Sexual intercourse" means any penetration of the female sex organ by the male sex organ.

(4)  "Spouse" means a person to whom a person is legally married under Subtitle A, Title 1, Family Code, or a comparable law of another jurisdiction.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1979, 66th Leg., p. 373, ch. 168, Sec. 1, eff. Aug. 27, 1979;  Acts 1981, 67th Leg., p. 203, ch. 96, Sec. 3, eff. Sept. 1, 1981;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 2001, 77th Leg., ch. 739, Sec. 1, eff. Sept. 1, 2001.
Amended by:
Acts 2005, 79th Leg., Ch. 268 (S.B. 6), Sec. 1.124, eff. September 1, 2005.
Acts 2021, 87th Leg., R.S., Ch. 631 (H.B. 246), Sec. 1, eff. September 1, 2021.

### Penal Code Sec. 21.02.  CONTINUOUS SEXUAL ABUSE OF YOUNG CHILD OR DISABLED INDIVIDUAL

(a)  In this section:

(1)  "Child" has the meaning assigned by Section 22.011(c).

(2)  "Disabled individual" has the meaning assigned by Section 22.021(b).

(b)  A person commits an offense if:

   (1)  during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

   (2)  at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

      (A)  a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense; or

      (B)  a disabled individual.

(c)  For purposes of this section, "act of sexual abuse" means any act that is a violation of one or more of the following penal laws:

   (1)  aggravated kidnapping under Section 20.04(a)(4), if the actor committed the offense with the intent to violate or abuse the victim sexually;

   (2)  indecency with a child under Section 21.11(a)(1), if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child;

   (3)  sexual assault under Section 22.011;

   (4)  aggravated sexual assault under Section 22.021;

   (5)  burglary under Section 30.02, if the offense is punishable under Subsection (d) of that section and the actor committed the offense with the intent to commit an offense listed in Subdivisions (1)-(4);

   (6)  sexual performance by a child under Section 43.25;

   (7)  trafficking of persons under Section 20A.02(a)(3), (4), (7), or (8); and

   (8)  compelling prostitution under Section 43.05.

(d)  If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed.  The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

(e)  A defendant may not be convicted in the same criminal action of an offense listed under Subsection (c) the victim of which is the same victim as a victim of the offense alleged under Subsection (b) unless the offense listed in Subsection (c):

   (1)  is charged in the alternative;

   (2)  occurred outside the period in which the offense alleged under Subsection (b) was committed; or

   (3)  is considered by the trier of fact to be a lesser included offense of the offense alleged under Subsection (b).

(f)  A defendant may not be charged with more than one count under Subsection (b) if all of the specific acts of sexual abuse that are alleged to have been committed are alleged to have been committed against a single victim.

(g)  With respect to a prosecution under this section involving only one or more victims described by Subsection (b)(2)(A), it is an affirmative defense to prosecution under this section that the actor:

60

    (1) was not more than five years older than:

        (A) the victim of the offense, if the offense is alleged to have been committed against only one victim; or

        (B)  the youngest victim of the offense, if the offense is alleged to have been committed against more than one victim;

  (2) did not use duress, force, or a threat against a victim at the time of the commission of any of the acts of sexual abuse alleged as an element of the offense; and

  (3) at the time of the commission of any of the acts of sexual abuse alleged as an element of the offense:

        (A)  was not required under Chapter 62, Code of Criminal Procedure, to register for life as a sex offender; or

        (B)  was not a person who under Chapter 62 had a reportable conviction or adjudication for an offense under this section or an act of sexual abuse as described by Subsection (c).

(h) An offense under this section is a felony of the first degree, punishable by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years.

Added by Acts 2007, 80th Leg., R.S., Ch. 593 (H.B. 8), Sec. 1.17, eff. September 1, 2007.
Amended by:
    Acts 2011, 82nd Leg., R.S., Ch. 1 (S.B. 24), Sec. 6.04, eff. September 1, 2011.
    Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 31, eff. September 1, 2017.
    Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 2, eff. September 1, 2017.
    Acts 2021, 87th Leg., R.S., Ch. 221 (H.B. 375), Sec. 1.01, eff. September 1, 2021.
    Acts 2021, 87th Leg., R.S., Ch. 221 (H.B. 375), Sec. 1.02, eff. September 1, 2021.

Section 21.06 was declared unconstitutional by Lawrence v. Texas, 123 S.Ct. 2472.

## Penal Code Sec. 21.06.  HOMOSEXUAL CONDUCT

(a)  A person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex.

(b)  An offense under this section is a Class C misdemeanor.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.
Amended by
    Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

## Penal Code Sec. 21.07.  PUBLIC LEWDNESS

(a)  A person commits an offense if the person knowingly engages in any of the following acts in a public place or, if not in a public place, the person is reckless about whether another is present who will be offended or alarmed by the person's:

  (1) act of sexual intercourse;

  (2) act of deviate sexual intercourse; or

Fisher Appendix: 268

(3)  act of sexual contact.

(b)  An offense under this section is a Class A misdemeanor.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.
Amended by:
    Acts 2017, 85th Leg., R.S., Ch. 739 (S.B. 1232), Sec. 1, eff. September 1, 2017.

## Penal Code Sec. 21.08.  INDECENT EXPOSURE

(a)  A person commits an offense if he exposes his anus or any part of his genitals with intent to arouse or gratify the sexual desire of any person, and he is reckless about whether another is present who will be offended or alarmed by his act.

(b)  An offense under this section is a Class B misdemeanor.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1983, 68th Leg., p. 509, ch. 924, Sec. 1, eff. Sept. 1, 1983;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

## Penal Code Sec. 21.09.  BESTIALITY

(a)  A person commits an offense if the person knowingly:

(1)  engages in an act involving contact between:
    (A)  the person's mouth, anus, or genitals and the anus or genitals of an animal; or
    (B)  the person's anus or genitals and the mouth of the animal;

(2)  fondles or touches the anus or genitals of an animal in a manner that is not a generally accepted and otherwise lawful animal husbandry or veterinary practice, including touching through clothing;

(3)  causes an animal to contact the seminal fluid of the person;

(4)  inserts any part of a person's body or any object into the anus or genitals of an animal in a manner that is not a generally accepted and otherwise lawful animal husbandry or veterinary practice;

(5)  possesses, sells, transfers, purchases, or otherwise obtains an animal with the intent that the animal be used for conduct described by Subdivision (1), (2), (3), or (4);

(6)  organizes, promotes, conducts, or participates as an observer of conduct described by Subdivision (1), (2), (3), or (4);

(7)  causes a person to engage or aids a person in engaging in conduct described by Subdivision (1), (2), (3), or (4);

(8)  permits conduct described by Subdivision (1), (2), (3), or (4) to occur on any premises under the person's control;

(9)  engages in conduct described by Subdivision (1), (2), (3), or (4) in the presence of a child younger than 18 years of age; or

(10)  advertises, offers, or accepts the offer of an animal with the intent that the animal be used in this state for conduct described by Subdivision (1), (2), (3), or (4).

(b)  An offense under this section is a state jail felony, unless the offense is committed under Subsection (a)(9) or results in serious bodily injury or death of the animal, in which event

the offense is a felony of the second degree.

(c)  It is an exception to the application of this section that the conduct engaged in by the actor is a generally accepted and otherwise lawful animal husbandry or veterinary practice.

Added by Acts 2017, 85th Leg., R.S., Ch. 739 (S.B. 1232), Sec. 2, eff. September 1, 2017.

## Penal Code Sec. 21.11.  INDECENCY WITH A CHILD

(a)  A person commits an offense if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person:

   (1)   engages in sexual contact with the child or causes the child to engage in sexual contact; or

   (2)  with intent to arouse or gratify the sexual desire of any person:
      (A)  exposes the person's anus or any part of the person's genitals, knowing the child is present; or
      (B)  causes the child to expose the child's anus or any part of the child's genitals.

(b)  It is an affirmative defense to prosecution under this section that the actor:

   (1)  was not more than three years older than the victim and of the opposite sex;

   (2)  did not use duress, force, or a threat against the victim at the time of the offense; and

   (3)  at the time of the offense:
      (A)  was not required under Chapter 62, Code of Criminal Procedure, to register for life as a sex offender;  or
      (B)   was not a person who under Chapter 62 had a reportable conviction or adjudication for an offense under this section.

(b-1)  It is an affirmative defense to prosecution under this section that the actor was the spouse of the child at the time of the offense.

(c)  In this section, "sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person:

   (1)  any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child;  or

   (2)  any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person.

(d)  An offense under Subsection (a)(1) is a felony of the second degree and an offense under Subsection (a)(2) is a felony of the third degree.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1981, 67th Leg., p. 472, ch. 202, Sec. 3, eff. Sept. 1, 1981;  Acts 1987, 70th Leg., ch. 1028, Sec. 1, eff. Sept. 1, 1987;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 1999, 76th Leg., ch. 1415, Sec. 23, eff. Sept. 1, 1999;  Acts 2001, 77th Leg., ch. 739, Sec. 2, eff. Sept. 1, 2001.
Amended by:
      Acts 2009, 81st Leg., R.S., Ch. 260 (H.B. 549), Sec. 1, eff. September 1, 2009.

Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 32, eff. September 1, 2017.

Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 3, eff. September 1, 2017.

## Penal Code Sec. 21.12.  IMPROPER RELATIONSHIP BETWEEN EDUCATOR AND STUDENT

(a)  An employee of a public or private primary or secondary school commits an offense if the employee:

(1)  engages in sexual contact, sexual intercourse, or deviate sexual intercourse with a person who is enrolled in a public or private primary or secondary school at which the employee works;

(2)  holds a position described by Section 21.003(a) or (b), Education Code, regardless of whether the employee holds the appropriate certificate, permit, license, or credential for the position, and engages in sexual contact, sexual intercourse, or deviate sexual intercourse with a person the employee knows is:

(A)  enrolled in a public or private primary or secondary school, other than a school described by Subdivision (1); or

(B)  a student participant in an educational activity that is sponsored by a school district or a public or private primary or secondary school, if students enrolled in a public or private primary or secondary school are the primary participants in the activity; or

(3)  engages in conduct described by Section 33.021, with a person described by Subdivision (1), or a person the employee knows is a person described by Subdivision (2)(A) or (B), regardless of the age of that person.

(b)  An offense under this section is a felony of the second degree.

(b-1)  It is an affirmative defense to prosecution under this section that:

(1)  the actor was the spouse of the enrolled person at the time of the offense; or

(2)  the actor was not more than three years older than the enrolled person and, at the time of the offense, the actor and the enrolled person were in a relationship that began before the actor's employment at a public or private primary or secondary school.

(c)  If conduct constituting an offense under this section also constitutes an offense under another section of this code, the actor may be prosecuted under either section or both sections.

(d)  The name of a person who is enrolled in a public or private primary or secondary school and involved in an improper relationship with an educator as provided by Subsection (a) may not be released to the public and is not public information under Chapter 552, Government Code.

(d-1)  Except as otherwise provided by this subsection, a public or private primary or secondary school, or a person or entity that operates a public or private primary or secondary school, may not release externally to the general public the name of an employee of the school who is accused of committing an offense under this section until the employee is indicted for the offense.  The school, or the person or entity that operates

the school, may release the name of the accused employee regardless of whether the employee has been indicted for the offense as necessary for the school to:

(1) report the accusation:

(A) to the Texas Education Agency, another state agency, or local law enforcement or as otherwise required by law; or

(B) to the school's members or community in accordance with the school's policies or procedures or with the religious law observed by the school; or

(2) conduct an investigation of the accusation.

(e) In this section, "sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person:

(1) any touching by an employee of a public or private primary or secondary school of the anus, breast, or any part of the genitals of:

(A) an enrolled person described by Subsection (a)(1) or (a)(2)(A); or

(B) a student participant described by Subsection (a)(2)(B); or

(2) any touching of any part of the body of the enrolled person or student participant with the anus, breast, or any part of the genitals of the employee.

Added by Acts 2003, 78th Leg., ch. 224, Sec. 1, eff. Sept. 1, 2003.
Amended by:

Acts 2007, 80th Leg., R.S., Ch. 610 (H.B. 401), Sec. 1, eff. September 1, 2007.
Acts 2007, 80th Leg., R.S., Ch. 772 (H.B. 3659), Sec. 1, eff. September 1, 2007.
Acts 2009, 81st Leg., R.S., Ch. 260 (H.B. 549), Sec. 2, eff. September 1, 2009.
Acts 2011, 82nd Leg., R.S., Ch. 761 (H.B. 1610), Sec. 3, eff. September 1, 2011.
Acts 2017, 85th Leg., R.S., Ch. 178 (S.B. 7), Sec. 1, eff. September 1, 2017.
Acts 2021, 87th Leg., R.S., Ch. 631 (H.B. 246), Sec. 2, eff. September 1, 2021.

## Penal Code Sec. 21.15.  INVASIVE VISUAL RECORDING

(a) In this section:

(1) "Female breast" means any portion of the female breast below the top of the areola.

(2) "Intimate area" means the naked or clothed genitals, pubic area, anus, buttocks, or female breast of a person.

(3) "Changing room" means a room or portioned area provided for or primarily used for the changing of clothing and includes dressing rooms, locker rooms, and swimwear changing areas.

(4) "Promote" has the meaning assigned by Section 43.21.

(b) A person commits an offense if, without the other person's consent and with intent to invade the privacy of the other person, the person:

(1) photographs or by videotape or other electronic means records, broadcasts, or transmits a visual image of an intimate area of another person if the other person has a reasonable expectation that the intimate area is not subject to public view;

(2) photographs or by videotape or other electronic means records, broadcasts, or transmits a visual image of another in a bathroom or changing room; or

(3) knowing the character and content of the photograph, recording, broadcast, or

65

transmission, promotes a photograph, recording, broadcast, or transmission described by Subdivision (1) or (2).

(c) An offense under this section is a state jail felony.

(d) If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section or the other law.

(e) For purposes of Subsection (b)(2), a sign or signs posted indicating that the person is being photographed or that a visual image of the person is being recorded, broadcast, or transmitted is not sufficient to establish the person's consent under that subdivision.

Added by Acts 2001, 77th Leg., ch. 458, Sec. 1, eff. Sept. 1, 2001.  Amended by Acts 2003, 78th Leg., ch. 500, Sec. 1, eff. Sept. 1, 2003.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 306 (H.B. 1804), Sec. 1, eff. September 1, 2007.
    Acts 2015, 84th Leg., R.S., Ch. 955 (S.B. 1317), Sec. 1, eff. June 18, 2015.
    Acts 2015, 84th Leg., R.S., Ch. 955 (S.B. 1317), Sec. 2, eff. June 18, 2015.

## Penal Code Sec. 21.16.  UNLAWFUL DISCLOSURE OR PROMOTION OF INTIMATE VISUAL MATERIAL

(a) In this section:

(1) "Intimate parts" means the naked genitals, pubic area, anus, buttocks, or female nipple of a person.

(2) "Promote" means to procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise or to offer or agree to do any of the above.

(3) "Sexual conduct" means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse.

(4) "Simulated" means the explicit depiction of sexual conduct that creates the appearance of actual sexual conduct and during which a person engaging in the conduct exhibits any uncovered portion of the breasts, genitals, or buttocks.

(5) "Visual material" means:

(A) any film, photograph, videotape, negative, or slide or any photographic reproduction that contains or incorporates in any manner any film, photograph, videotape, negative, or slide;  or

(B) any disk, diskette, or other physical medium that allows an image to be displayed on a computer or other video screen and any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method.

(b) A person commits an offense if:

(1) without the effective consent of the depicted person and with the intent to harm that person, the person discloses visual material depicting another person with the person's intimate parts exposed or engaged in sexual conduct;

(2) at the time of the disclosure, the person knows or has reason to believe that the visual material was obtained by the person or created under circumstances in which the depicted person had a reasonable expectation that the visual material would

66

remain private;

(3) the disclosure of the visual material causes harm to the depicted person; and

(4) the disclosure of the visual material reveals the identity of the depicted person in any manner, including through:

    (A) any accompanying or subsequent information or material related to the visual material; or

    (B) information or material provided by a third party in response to the disclosure of the visual material.

(c) A person commits an offense if the person intentionally threatens to disclose, without the consent of the depicted person, visual material depicting another person with the person's intimate parts exposed or engaged in sexual conduct and the actor makes the threat to obtain a benefit:

(1) in return for not making the disclosure; or

(2) in connection with the threatened disclosure.

(d) A person commits an offense if, knowing the character and content of the visual material, the person promotes visual material described by Subsection (b) on an Internet website or other forum for publication that is owned or operated by the person.

(e) It is not a defense to prosecution under this section that the depicted person:

(1) created or consented to the creation of the visual material; or

(2) voluntarily transmitted the visual material to the actor.

(f) It is an affirmative defense to prosecution under Subsection (b) or (d) that:

(1) the disclosure or promotion is made in the course of:

    (A) lawful and common practices of law enforcement or medical treatment;

    (B) reporting unlawful activity; or

    (C) a legal proceeding, if the disclosure or promotion is permitted or required by law;

(2) the disclosure or promotion consists of visual material depicting in a public or commercial setting only a person's voluntary exposure of:

    (A) the person's intimate parts; or

    (B) the person engaging in sexual conduct; or

(3) the actor is an interactive computer service, as defined by 47 U.S.C. Section 230, and the disclosure or promotion consists of visual material provided by another person.

(g) An offense under this section is a state jail felony.

(h) If conduct that constitutes an offense under this section also constitutes an offense under another law, the actor may be prosecuted under this section, the other law, or both.

Added by Acts 2015, 84th Leg., R.S., Ch. 852 (S.B. 1135), Sec. 3, eff. September 1, 2015. Amended by:

    Acts 2017, 85th Leg., R.S., Ch. 858 (H.B. 2552), Sec. 16(b), eff. September 1, 2017.

    Acts 2019, 86th Leg., R.S., Ch. 1354 (H.B. 98), Sec. 2, eff. September 1, 2019.

**Penal Code Sec. 21.17.  VOYEURISM**

(a) A person commits an offense if the person, with the intent to arouse or gratify the sexual desire of the actor, observes another person without the other person's consent while the other person is in a dwelling or structure in which the other person has a reasonable expectation of privacy.

(b)  Except as provided by Subsection (c) or (d), an offense under this section is a Class C misdemeanor.

(c)  An offense under this section is a Class B misdemeanor if it is shown on the trial of the offense that the actor has previously been convicted two or more times of an offense under this section.

(d)  An offense under this section is a state jail felony if the victim was a child younger than 14 years of age at the time of the offense.

(e) If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both.

Added by Acts 2015, 84th Leg., R.S., Ch. 676 (H.B. 207), Sec. 1, eff. September 1, 2015. Redesignated from Penal Code, Section 21.16 by Acts 2017, 85th Leg., R.S., Ch. 324 (S.B. 1488), Sec. 24.001(35), eff. September 1, 2017.

## Penal Code Sec. 21.18.  SEXUAL COERCION

(a)  In this section:

    (1)  "Intimate visual material" means the visual material described by Section 21.16(b)(1) or (c).

    (2)  "Sexual conduct" has the meaning assigned by Section 43.25.

(b)  A person commits an offense if the person intentionally threatens, including by coercion or extortion, to commit an offense under Chapter 43 or Section 20A.02(a)(3), (4), (7), or (8), 21.02, 21.08, 21.11, 21.12, 21.15, 21.16, 21.17, 22.011, or 22.021 to obtain, in return for not committing the threatened offense or in connection with the threatened offense, any of the following benefits:

    (1)  intimate visual material;

    (2)  an act involving sexual conduct causing arousal or gratification; or

    (3)  a monetary benefit or other benefit of value.

(c)  A person commits an offense if the person intentionally threatens, including by coercion or extortion, to commit an offense under Chapter 19 or 20 or Section 20A.02(a)(1), (2), (5), or (6) to obtain, in return for not committing the threatened offense or in connection with the threatened offense, either of the following benefits:

    (1)  intimate visual material; or

    (2)  an act involving sexual conduct causing arousal or gratification.

(d)  This section applies to a threat regardless of how that threat is communicated, including a threat transmitted through e-mail or an Internet website, social media account, or chat room and a threat made by other electronic or technological means.

(e)  An offense under this section is a state jail felony, except that the offense is a felony of the third degree if it is shown on the trial of the offense that the defendant has previously

been convicted of an offense under this section.

Added by Acts 2017, 85th Leg., R.S., Ch. 858 (H.B. 2552), Sec. 16(c), eff. September 1, 2017.
Added by Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 4(b), eff. September 1, 2017.

**Penal Code Sec. 21.19.  UNLAWFUL ELECTRONIC TRANSMISSION OF SEXUALLY EXPLICIT VISUAL MATERIAL**

(a)   In this section, "intimate parts," "sexual conduct," and "visual material" have the meanings assigned by Section 21.16.

(b)   A person commits an offense if the person knowingly transmits by electronic means visual material that:

   (1)  depicts:

      (A)   any person engaging in sexual conduct or with the person's intimate parts exposed; or

      (B)  covered genitals of a male person that are in a discernibly turgid state; and

   (2)  is not sent at the request of or with the express consent of the recipient.

(c)   An offense under this section is a Class C misdemeanor.

(d)  If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section or the other law.

Added by Acts 2019, 86th Leg., R.S., Ch. 848 (H.B. 2789), Sec. 1, eff. September 1, 2019.

**PENAL CODE
TITLE 9. OFFENSES AGAINST PUBLIC ORDER AND DECENCY
CHAPTER 43. PUBLIC INDECENCY
SUBCHAPTER A. PROSTITUTION**

**Penal Code Sec. 43.01.  DEFINITIONS**

In this subchapter:

   (1)  "Access software provider" means a provider of software, including client or server software, or enabling tools that perform one or more of the following functions:

      (A)  filter, screen, allow, or disallow content;

      (B)  select, analyze, or digest content; or

      (C)  transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

   (1-a)  "Deviate sexual intercourse" means any contact between the genitals of one person and the mouth or anus of another person.

   (1-b)  "Fee" means the payment or offer of payment in the form of money, goods, services, or other benefit.

   (1-c)  "Information content provider" means any person or entity that is wholly or partly responsible for the creation or development of information provided through the Internet or any other interactive computer service.

Fisher Appendix: 276

(1-d)  "Interactive computer service" means any information service, system, or access software provider that provides or enables computer access to a computer server by multiple users, including a service or system that provides access to the Internet or a system operated or service offered by a library or educational institution.

(1-e)  "Internet" means the international computer network of both federal and nonfederal interoperable packet switched data networks.

(1-f)  "Premises" has the meaning assigned by Section 481.134, Health and Safety Code.

(2)  "Prostitution" means the offense defined in Section 43.02.

(2-a)  "School" means a public or private primary or secondary school.

(3)  "Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.

(4)  "Sexual conduct" includes deviate sexual intercourse, sexual contact, and sexual intercourse.

(5)  "Sexual intercourse" means any penetration of the female sex organ by the male sex organ.

(6)  "Solicitation of prostitution" means the offense defined in Section 43.021.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1979, 66th Leg., p. 373, ch. 168, Sec. 2, eff. Aug. 27, 1979;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.
Amended by:
    Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 35, eff. September 1, 2017.
    Acts 2019, 86th Leg., R.S., Ch. 413 (S.B. 20), Sec. 3.01, eff. September 1, 2019.
    Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 54, eff. September 1, 2021.
    Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 60, eff. September 1, 2021.
    Acts 2021, 87th Leg., R.S., Ch. 1049 (S.B. 1831), Sec. 8, eff. September 1, 2021.

## Penal Code Sec. 43.02.  PROSTITUTION

(a)  A person commits an offense if the person knowingly offers or agrees to receive a fee from another to engage in sexual conduct.

(b-1)  Repealed by Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 44(2), eff. September 1, 2017.

(c)  An offense under Subsection (a) is a Class B misdemeanor, except that the offense is:

(1)  a Class A misdemeanor if the actor has previously been convicted one or two times of an offense under Subsection (a); or

(2)  a state jail felony if the actor has previously been convicted three or more times of an offense under Subsection (a).

(c-2)  The punishment prescribed for an offense under Subsection (b) is increased to the punishment prescribed for the next highest category of offense if it is shown on the trial of the offense that the actor committed the offense in a location that was:

(1)  on the premises of or within 1,000 feet of the premises of a school; or

(2)  on premises or within 1,000 feet of premises where:

(A)  an official school function was taking place; or

70

   (B) an event sponsored or sanctioned by the University Interscholastic League was taking place.

(d) It is a defense to prosecution for an offense under Subsection (a) that the actor engaged in the conduct that constitutes the offense because the actor was the victim of conduct that constitutes an offense under Section 20A.02 or 43.05.

(e) A conviction may be used for purposes of enhancement under this section or enhancement under Subchapter D, Chapter 12, but not under both this section and Subchapter D, Chapter 12. For purposes of enhancement of penalties under this section or Subchapter D, Chapter 12, a defendant is previously convicted of an offense under this section if the defendant was adjudged guilty of the offense or entered a plea of guilty or nolo contendere in return for a grant of deferred adjudication, regardless of whether the sentence for the offense was ever imposed or whether the sentence was probated and the defendant was subsequently discharged from community supervision.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974. Amended by Acts 1977, 65th Leg., p. 757, ch. 286, Sec. 1, eff. May 27, 1977; Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 2001, 77th Leg., ch. 987, Sec. 1, eff. Sept. 1, 2001.
Amended by:
  Acts 2009, 81st Leg., R.S., Ch. 1002 (H.B. 4009), Sec. 8, eff. September 1, 2009.
  Acts 2011, 82nd Leg., R.S., Ch. 515 (H.B. 2014), Sec. 4.02, eff. September 1, 2011.
  Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 15, eff. September 1, 2013.
  Acts 2015, 84th Leg., R.S., Ch. 332 (H.B. 10), Sec. 14, eff. September 1, 2015.
  Acts 2015, 84th Leg., R.S., Ch. 1273 (S.B. 825), Sec. 1, eff. September 1, 2015.
  Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 36, eff. September 1, 2017.
Reenacted and amended by Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 37, eff. September 1, 2017.
Amended by:
  Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 44(2), eff. September 1, 2017.
Reenacted and amended by Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 8, eff. September 1, 2017.
Amended by:
  Acts 2019, 86th Leg., R.S., Ch. 413 (S.B. 20), Sec. 2.05, eff. September 1, 2019.
  Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 29, eff. September 1, 2021.
  Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 61, eff. September 1, 2021.
  Acts 2021, 87th Leg., R.S., Ch. 1049 (S.B. 1831), Sec. 9, eff. September 1, 2021.

## Penal Code Sec. 43.021. SOLICITATION OF PROSTITUTION

(a) A person commits an offense if the person knowingly offers or agrees to pay a fee to another person for the purpose of engaging in sexual conduct with that person or another.

(b) An offense under Subsection (a) is a state jail felony, except that the offense is:

 (1) a felony of the third degree if the actor has previously been convicted of an offense under Subsection (a) or under Section 43.02(b), as that law existed before September 1, 2021; or

 (2) a felony of the second degree if the person with whom the actor agrees to engage in

71

sexual conduct is:

    (A)  younger than 18 years of age, regardless of whether the actor knows the age of the person at the time of the offense;

    (B)  represented to the actor as being younger than 18 years of age; or

    (C)  believed by the actor to be younger than 18 years of age.

(c)  A conviction may be used for purposes of enhancement under this section or enhancement under Subchapter D, Chapter 12, but not under both this section and that subchapter. For purposes of enhancement of penalties under this section or Subchapter D, Chapter 12, a defendant is considered to have been previously convicted of an offense under this section or under Section 43.02(b), as that law existed before September 1, 2021, if the defendant was adjudged guilty of the offense or entered a plea of guilty or nolo contendere in return for a grant of deferred adjudication, regardless of whether the sentence for the offense was ever imposed or whether the sentence was probated and the defendant was subsequently discharged from community supervision.

Added by Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 28, eff. September 1, 2021.
Amended by:

    Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 29, eff. September 1, 2021.
    Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 30, eff. September 1, 2021.

## Penal Code Sec. 43.03.  PROMOTION OF PROSTITUTION

(a)  A person commits an offense if, acting other than as a prostitute receiving compensation for personally rendered prostitution services, he or she knowingly:

    (1)  receives money or other property pursuant to an agreement to participate in the proceeds of prostitution;  or

    (2)  solicits another to engage in sexual conduct with another person for compensation.

(b)  An offense under this section is a felony of the third degree, except that the offense is:

    (1)  a felony of the second degree if the actor has been previously convicted of an offense under this section; or

    (2)  a felony of the first degree if the actor engages in conduct described by Subsection (a)(1) or (2) involving a person younger than 18 years of age engaging in prostitution, regardless of whether the actor knows the age of the person at the time of the offense.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1977, 65th Leg., p. 758, ch. 287, Sec. 1, eff. May 27, 1977;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.
Amended by:

    Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 16, eff. September 1, 2013.
    Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 38, eff. September 1, 2017.
    Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 9, eff. September 1, 2017.
    Acts 2019, 86th Leg., R.S., Ch. 273 (S.B. 1802), Sec. 3, eff. September 1, 2019.

## Penal Code Sec. 43.031.  ONLINE PROMOTION OF PROSTITUTION

(a)  A person commits an offense if the person owns, manages, or operates an interactive

computer service or information content provider, or operates as an information content provider, with the intent to promote the prostitution of another person or facilitate another person to engage in prostitution or solicitation of prostitution.

(b) An offense under this section is a felony of the third degree, except that the offense is a felony of the second degree if the actor:

(1) has been previously convicted of an offense under this section or Section 43.041; or

(2) engages in conduct described by Subsection (a) involving a person younger than 18 years of age engaging in prostitution, regardless of whether the actor knows the age of the person at the time of the offense.

Added by Acts 2019, 86th Leg., R.S., Ch. 413 (S.B. 20), Sec. 3.02, eff. September 1, 2019.
Amended by:
        Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 55, eff. September 1, 2021.

## Penal Code Sec. 43.04.  AGGRAVATED PROMOTION OF PROSTITUTION

(a)  A person commits an offense if he knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes.

(b)  An offense under this section is a felony of the first degree.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.
Amended by:
        Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 17, eff. September 1, 2013.
        Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 39, eff. September 1, 2017.
        Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 10, eff. September 1, 2017.
        Acts 2019, 86th Leg., R.S., Ch. 273 (S.B. 1802), Sec. 4, eff. September 1, 2019.

## Penal Code Sec. 43.041.  AGGRAVATED ONLINE PROMOTION OF PROSTITUTION

(a)  A person commits an offense if the person owns, manages, or operates an interactive computer service or information content provider, or operates as an information content provider, with the intent to promote the prostitution of five or more persons or facilitate five or more persons to engage in prostitution or solicitation of prostitution.

(b)  An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if the actor:

(1) has been previously convicted of an offense under this section; or

(2)  engages in conduct described by Subsection (a) involving two or more persons younger than 18 years of age engaging in prostitution, regardless of whether the actor knows the age of the persons at the time of the offense.

Added by Acts 2019, 86th Leg., R.S., Ch. 413 (S.B. 20), Sec. 3.02, eff. September 1, 2019.
Amended by:
        Acts 2021, 87th Leg., R.S., Ch. 807 (H.B. 1540), Sec. 56, eff. September 1, 2021.

## Penal Code Sec. 43.05.  COMPELLING PROSTITUTION

73

(a)  A person commits an offense if the person knowingly:

   (1)  causes another by force, threat, coercion, or fraud to commit prostitution; or

   (2)  causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time of the offense.

(b)  An offense under this section is a felony of the first degree.

(c)  If conduct constituting an offense under this section also constitutes an offense under another section of this code, the actor may be prosecuted under either section or under both sections.

(d)  For purposes of this section, "coercion" as defined by Section 1.07 includes:

   (1)  destroying, concealing, confiscating, or withholding from a person, or threatening to destroy, conceal, confiscate, or withhold from a person, the person's actual or purported:
   (A)  government records; or
   (B)  identifying information or documents;

   (2)  causing a person, without the person's consent, to become intoxicated, as defined by Section 49.01, to a degree that impairs the person's ability to appraise the nature of the person's conduct that constitutes prostitution or to resist engaging in that conduct; or

   (3)  withholding alcohol or a controlled substance to a degree that impairs the ability of a person with a chemical dependency, as defined by Section 462.001, Health and Safety Code, to appraise the nature of the person's conduct that constitutes prostitution or to resist engaging in that conduct.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.
Amended by:
   Acts 2009, 81st Leg., R.S., Ch. 1002 (H.B. 4009), Sec. 9, eff. September 1, 2009.
   Acts 2011, 82nd Leg., R.S., Ch. 1 (S.B. 24), Sec. 1.03, eff. September 1, 2011.
   Acts 2015, 84th Leg., R.S., Ch. 1273 (S.B. 825), Sec. 2, eff. September 1, 2015.
   Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 40, eff. September 1, 2017.
   Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 11, eff. September 1, 2017.
   Acts 2019, 86th Leg., R.S., Ch. 273 (S.B. 1802), Sec. 5, eff. September 1, 2019.

## Penal Code Sec. 43.06.  ACCOMPLICE WITNESS;  TESTIMONY AND IMMUNITY

(a)  A party to an offense under this subchapter may be required to furnish evidence or testify about the offense.

(b)  A party to an offense under this subchapter may not be prosecuted for any offense about which he is required to furnish evidence or testify, and the evidence and testimony may not be used against the party in any adjudicatory proceeding except a prosecution for aggravated perjury.

(c)  For purposes of this section, "adjudicatory proceeding" means a proceeding before a

Fisher Appendix: 281

court or any other agency of government in which the legal rights, powers, duties, or privileges of specified parties are determined.

(d)  A conviction under this subchapter may be had upon the uncorroborated testimony of a party to the offense.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

**PENAL CODE**
**TITLE 9. OFFENSES AGAINST PUBLIC ORDER AND DECENCY**
**CHAPTER 43. PUBLIC INDECENCY**
**SUBCHAPTER B. OBSCENITY**

**Penal Code Sec. 43.21.  DEFINITIONS**

(a)  In this subchapter:

(1)  "Obscene" means material or a performance that:
   (A)  the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;
   (B)  depicts or describes:
      (i)  patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality;  or
      (ii)  patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs;  and
   (C)  taken as a whole, lacks serious literary, artistic, political, and scientific value.

(2)  "Material" means anything tangible that is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound, or in any other manner, but does not include an actual three dimensional obscene device.

(3)  "Performance" means a play, motion picture, dance, or other exhibition performed before an audience.

(4)  "Patently offensive" means so offensive on its face as to affront current community standards of decency.

(5)  "Promote" means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise, or to offer or agree to do the same.

(6)  "Wholesale promote" means to manufacture, issue, sell, provide, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, or to offer or agree to do the same for purpose of resale.

(7)  "Obscene device" means a device including a dildo or artificial vagina, designed or marketed as useful primarily for the stimulation of human genital organs.

75

(b)  If any of the depictions or descriptions of sexual conduct described in this section are declared by a court of competent jurisdiction to be unlawfully included herein, this declaration shall not invalidate this section as to other patently offensive sexual conduct included herein.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1975, 64th Leg., p. 372, ch. 163, Sec. 1, eff. Sept. 1, 1975;  Acts 1979, 66th Leg., p. 1974, ch. 778, Sec. 1, eff. Sept. 1, 1979;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

## Penal Code Sec. 43.22.  OBSCENE DISPLAY OR DISTRIBUTION

(a)  A person commits an offense if he intentionally or knowingly displays or distributes an obscene photograph, drawing, or similar visual representation or other obscene material and is reckless about whether a person is present who will be offended or alarmed by the display or distribution.

(b)  An offense under this section is a Class C misdemeanor.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

## Penal Code Sec. 43.23.  OBSCENITY

(a)  A person commits an offense if, knowing its content and character, he wholesale promotes or possesses with intent to wholesale promote any obscene material or obscene device.

(b)  Except as provided by Subsection (h), an offense under Subsection (a) is a state jail felony.

(c)  A person commits an offense if, knowing its content and character, he:

(1)  promotes or possesses with intent to promote any obscene material or obscene device;  or

(2)  produces, presents, or directs an obscene performance or participates in a portion thereof that is obscene or that contributes to its obscenity.

(d)  Except as provided by Subsection (h), an offense under Subsection (c) is a Class A misdemeanor.

(e)  A person who promotes or wholesale promotes obscene material or an obscene device or possesses the same with intent to promote or wholesale promote it in the course of his business is presumed to do so with knowledge of its content and character.

(f)  A person who possesses six or more obscene devices or identical or similar obscene articles is presumed to possess them with intent to promote the same.

(g)  It is an affirmative defense to prosecution under this section that the person who possesses or promotes material or a device proscribed by this section does so for a bona fide medical, psychiatric, judicial, legislative, or law enforcement purpose.

(h)  The punishment for an offense under Subsection (a) or (c) is increased to the punishment for a felony of the second degree if it is shown on the trial of the offense that obscene material that is the subject of the offense visually depicts activities described by Section

76

43.21(a)(1)(B) engaged in by:

 (1) a child younger than 18 years of age at the time the image of the child was made;

 (2) an image that to a reasonable person would be virtually indistinguishable from the image of a child younger than 18 years of age; or

 (3) an image created, adapted, or modified to be the image of an identifiable child.

(i) In this section, "identifiable child" means a person, recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature:

 (1) who was younger than 18 years of age at the time the visual depiction was created, adapted, or modified;  or

 (2) whose image as a person younger than 18 years of age was used in creating, adapting, or modifying the visual depiction.

(j) An attorney representing the state who seeks an increase in punishment under Subsection (h)(3) is not required to prove the actual identity of an identifiable child.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1979, 66th Leg., p. 1975, ch. 778, Sec. 2, eff. Sept. 1, 1979;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 2003, 78th Leg., ch. 1005, Sec. 1, eff. Sept. 1, 2003.
Amended by:
 Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 19, eff. September 1, 2013.

## Penal Code Sec. 43.24.  SALE, DISTRIBUTION, OR DISPLAY OF HARMFUL MATERIAL TO MINOR

(a) For purposes of this section:

 (1) "Minor" means an individual younger than 18 years.

 (2) "Harmful material" means material whose dominant theme taken as a whole:
  (A) appeals to the prurient interest of a minor, in sex, nudity, or excretion;
  (B) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors;  and
  (C) is utterly without redeeming social value for minors.

(b) A person commits an offense if, knowing that the material is harmful:

 (1) and knowing the person is a minor, he sells, distributes, exhibits, or possesses for sale, distribution, or exhibition to a minor harmful material;

 (2) he displays harmful material and is reckless about whether a minor is present who will be offended or alarmed by the display;  or

 (3) he hires, employs, or uses a minor to do or accomplish or assist in doing or accomplishing any of the acts prohibited in Subsection (b)(1) or (b)(2).

(c) It is an affirmative defense to prosecution under this section that  the sale, distribution, or exhibition was by a person having scientific, educational, governmental, or other similar justification.

(c-1) It is a defense to prosecution under this section that the actor was the spouse of the minor at the time of the offense.

77

(d)  An offense under this section is a Class A misdemeanor unless it is committed under Subsection (b)(3) in which event it is a felony of the third degree.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994.

Amended by:

   Acts 2011, 82nd Leg., R.S., Ch. 497 (H.B. 1344), Sec. 1, eff. September 1, 2011.

## Penal Code Sec. 43.25.  SEXUAL PERFORMANCE BY A CHILD

(a)  In this section:

   (1)  "Sexual performance" means any performance or part thereof that includes sexual conduct by a child younger than 18 years of age.

   (2)  "Sexual conduct" means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola.

   (3)  "Performance" means any play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons.

   (4)  "Produce" with respect to a sexual performance includes any conduct that directly contributes to the creation or manufacture of the sexual performance.

   (5)  "Promote" means to procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise or to offer or agree to do any of the above.

   (6)  "Simulated" means the explicit depiction of sexual conduct that creates the appearance of actual sexual conduct and during which a person engaging in the conduct exhibits any uncovered portion of the breasts, genitals, or buttocks.

   (7)  "Deviate sexual intercourse" and "sexual contact" have the meanings assigned by Section 43.01.

(b)  A person commits an offense if, knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct or a sexual performance.  A parent or legal guardian or custodian of a child younger than 18 years of age commits an offense if he consents to the participation by the child in a sexual performance.

(c)  An offense under Subsection (b) is a felony of the second degree, except that the offense is a felony of the first degree if the victim is younger than 14 years of age at the time the offense is committed, regardless of whether the actor knows the age of the victim at the time of the offense.

(d)  A person commits an offense if, knowing the character and content of the material, he produces, directs, or promotes a performance that includes sexual conduct by a child younger than 18 years of age.

(e)  An offense under Subsection (d) is a felony of the third degree, except that the offense is a felony of the second degree if the victim is younger than 14 years of age at the time the offense is committed, regardless of whether the actor knows the age of the victim at

the time of the offense.

(f) It is an affirmative defense to a prosecution under this section that:

  (1) the defendant was the spouse of the child at the time of the offense;
  (2) the conduct was for a bona fide educational, medical, psychological, psychiatric, judicial, law enforcement, or legislative purpose; or
  (3) the defendant is not more than two years older than the child.

(g) When it becomes necessary for the purposes of this section or Section 43.26 to determine whether a child who participated in sexual conduct was younger than 18 years of age, the court or jury may make this determination by any of the following methods:

  (1) personal inspection of the child;
  (2) inspection of the photograph or motion picture that shows the child engaging in the sexual performance;
  (3) oral testimony by a witness to the sexual performance as to the age of the child based on the child's appearance at the time;
  (4) expert medical testimony based on the appearance of the child engaging in the sexual performance; or
  (5) any other method authorized by law or by the rules of evidence at common law.

(h) Conduct under this section constitutes an offense regardless of whether the actor knows the age of the victim at the time of the offense.

Added by Acts 1977, 65th Leg., p. 1035, ch. 381, Sec. 1, eff. June 10, 1977. Amended by Acts 1979, 66th Leg., p. 1976, ch. 779, Sec. 1, eff. Sept. 1, 1979; Acts 1985, 69th Leg., ch. 530, Sec. 1, eff. Sept. 1, 1985; Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 1999, 76th Leg., ch. 1415, Sec. 22(b), eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 1005, Sec. 4, 5 eff. Sept. 1, 2003.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 593 (H.B. 8), Sec. 1.20, eff. September 1, 2007.
    Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 41, eff. September 1, 2017.
    Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 12, eff. September 1, 2017.

## Penal Code Sec. 43.251.  EMPLOYMENT HARMFUL TO CHILDREN

(a) In this section:

  (1) "Child" means a person younger than 21 years of age.
  (2) "Massage" has the meaning assigned to the term "massage therapy" by Section 455.001, Occupations Code.
  (3) "Massage establishment" has the meaning assigned by Section 455.001, Occupations Code.
  (4) "Nude" means a child who is:
    (A) entirely unclothed; or
    (B) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the child is female, or any portion of the genitals or buttocks.

79                                    Fisher Appendix: 286

(5) "Sexually oriented commercial activity" means a massage establishment, nude studio, modeling studio, love parlor, or other similar commercial enterprise the primary business of which is the offering of a service that is intended to provide sexual stimulation or sexual gratification to the customer.

(6) "Topless" means a female child clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of her breasts below the top of the areola.

(b) A person commits an offense if the person employs, authorizes, or induces a child to work:

(1) in a sexually oriented commercial activity; or

(2) in any place of business permitting, requesting, or requiring a child to work nude or topless.

Text of subsection as amended by Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 42

(c) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if the child is younger than 14 years of age at the time the offense is committed, regardless of whether the actor knows the age of the child at the time of the offense.

Text of subsection as amended by Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 13

(c) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if the victim is younger than 14 years of age at the time the offense is committed, regardless of whether the actor knows the age of the victim at the time of the offense.

Text of subsection as added by Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 42

(d) Conduct under this section constitutes an offense regardless of whether the actor knows the age of the child at the time of the offense.

Text of subsection as added by Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 13

(d) Conduct under this section constitutes an offense regardless of whether the actor knows the age of the victim at the time of the offense.

Added by Acts 1987, 70th Leg., ch. 783, Sec. 1, eff. Aug. 31, 1987. Amended by Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 2001, 77th Leg., ch. 1420, Sec. 14.832, eff. Sept. 1, 2001.
Amended by:
    Acts 2011, 82nd Leg., R.S., Ch. 515 (H.B. 2014), Sec. 4.03, eff. September 1, 2011.
    Acts 2011, 82nd Leg., R.S., Ch. 938 (H.B. 290), Sec. 1, eff. September 1, 2011.
    Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 18, eff. September 1, 2013.
    Acts 2017, 85th Leg., R.S., Ch. 685 (H.B. 29), Sec. 42, eff. September 1, 2017.
    Acts 2017, 85th Leg., R.S., Ch. 1038 (H.B. 1808), Sec. 13, eff. September 1, 2017.
    Acts 2021, 87th Leg., R.S., Ch. 79 (S.B. 315), Sec. 8, eff. May 24, 2021.
    Acts 2021, 87th Leg., R.S., Ch. 942 (S.B. 766), Sec. 8, eff. September 1, 2021.

## Penal Code Sec. 43.26.  POSSESSION OR PROMOTION OF CHILD

**PORNOGRAPHY**

(a) A person commits an offense if:

(1) the person knowingly or intentionally possesses, or knowingly or intentionally accesses with intent to view, visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct, including a child who engages in sexual conduct as a victim of an offense under Section 20A.02(a)(5), (6), (7), or (8); and

(2) the person knows that the material depicts the child as described by Subdivision (1).

(b) In this section:

(1) "Promote" has the meaning assigned by Section 43.25.
(2) "Sexual conduct" has the meaning assigned by Section 43.25.
(3) "Visual material" means:
(A) any film, photograph, videotape, negative, or slide or any photographic reproduction that contains or incorporates in any manner any film, photograph, videotape, negative, or slide;  or
(B) any disk, diskette, or other physical medium that allows an image to be displayed on a computer or other video screen and any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method.

(c) The affirmative defenses provided by Section 43.25(f) also apply to a prosecution under this section.

(d) An offense under Subsection (a) is a felony of the third degree, except that the offense is:

(1) a felony of the second degree if it is shown on the trial of the offense that the person has been previously convicted one time of an offense under that subsection; and

(2) a felony of the first degree if it is shown on the trial of the offense that the person has been previously convicted two or more times of an offense under that subsection.

(e) A person commits an offense if:

(1) the person knowingly or intentionally promotes or possesses with intent to promote material described by Subsection (a)(1);  and

(2) the person knows that the material depicts the child as described by Subsection (a)(1).

(f) A person who possesses visual material that contains six or more identical visual depictions of a child as described by Subsection (a)(1) is presumed to possess the material with the intent to promote the material.

(g) An offense under Subsection (e) is a felony of the second degree, except that the offense is a felony of the first degree if it is shown on the trial of the offense that the person has been previously convicted of an offense under that subsection.

(h) It is a defense to prosecution under Subsection (a) or (e) that the actor is a law enforcement officer or a school administrator who:

81

(1)  possessed or accessed the visual material in good faith solely as a result of an allegation of a violation of Section 43.261;

(2)  allowed other law enforcement or school administrative personnel to possess or access the material only as appropriate based on the allegation described by Subdivision (1); and

(3)  took reasonable steps to destroy the material within an appropriate period following the allegation described by Subdivision (1).

Added by Acts 1985, 69th Leg., ch. 530, Sec. 2, eff. Sept. 1, 1985.  Amended by Acts 1989, 71st Leg., ch. 361, Sec. 1, eff. Sept. 1, 1989;  Acts 1989, 71st Leg., ch. 968, Sec. 1, eff. Sept. 1, 1989;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 1995, 74th Leg., ch. 76, Sec. 14.51, eff. Sept. 1, 1995;  Acts 1997, 75th Leg., ch. 933, Sec. 1, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 1415, Sec. 22(c), eff. Sept. 1, 1999.
Amended by:
     Acts 2011, 82nd Leg., R.S., Ch. 1322 (S.B. 407), Sec. 2, eff. September 1, 2011.
     Acts 2013, 83rd Leg., R.S., Ch. 1252 (H.B. 8), Sec. 20, eff. September 1, 2013.
     Acts 2015, 84th Leg., R.S., Ch. 933 (H.B. 2291), Sec. 2, eff. September 1, 2015.

## Penal Code Sec. 43.261.  ELECTRONIC TRANSMISSION OF CERTAIN VISUAL MATERIAL DEPICTING MINOR

(a)  In this section:

(1)  "Dating relationship" has the meaning assigned by Section 71.0021, Family Code.

(2)  "Minor" means a person younger than 18 years of age.

(3)  "Produce" with respect to visual material includes any conduct that directly contributes to the creation or manufacture of the material.

(4)  "Promote" has the meaning assigned by Section 43.25.

(5)  "Sexual conduct" has the meaning assigned by Section 43.25.

(6)  "Visual material" has the meaning assigned by Section 43.26.

(b)  A person who is a minor commits an offense if the person intentionally or knowingly:

(1)  by electronic means promotes to another minor visual material depicting a minor, including the actor, engaging in sexual conduct, if the actor produced the visual material or knows that another minor produced the visual material; or

(2)  possesses in an electronic format visual material depicting another minor engaging in sexual conduct, if the actor produced the visual material or knows that another minor produced the visual material.

(c)  An offense under Subsection (b)(1) is a Class C misdemeanor, except that the offense is:

(1)  a Class B misdemeanor if it is shown on the trial of the offense that the actor:

   (A)  promoted the visual material with intent to harass, annoy, alarm, abuse, torment, embarrass, or offend another; or

   (B)  except as provided by Subdivision (2)(A), has previously been convicted one time of any offense under this section; or

(2)  a Class A misdemeanor if it is shown on the trial of the offense that the actor has previously been:

     (A) convicted one or more times of an offense punishable under Subdivision (1)(A); or

     (B) convicted two or more times of any offense under this section.

(d) An offense under Subsection (b)(2) is a Class C misdemeanor, except that the offense is:

    (1) a Class B misdemeanor if it is shown on the trial of the offense that the actor has previously been convicted one time of any offense under this section; or

    (2) a Class A misdemeanor if it is shown on the trial of the offense that the actor has previously been convicted two or more times of any offense under this section.

(e) It is an affirmative defense to prosecution under this section that the visual material:

    (1) depicted only the actor or another minor:

      (A) who is not more than two years older or younger than the actor and with whom the actor had a dating relationship at the time of the offense; or

      (B) who was the spouse of the actor at the time of the offense; and

    (2) was promoted or received only to or from the actor and the other minor.

(f) It is a defense to prosecution under Subsection (b)(2) that the actor:

    (1) did not produce or solicit the visual material;

    (2) possessed the visual material only after receiving the material from another minor; and

    (3) destroyed the visual material within a reasonable amount of time after receiving the material from another minor.

(g) If conduct that constitutes an offense under this section also constitutes an offense under another law, the defendant may be prosecuted under this section, the other law, or both.

(h) Notwithstanding Section 51.13, Family Code, a finding that a person has engaged in conduct in violation of this section is considered a conviction for the purposes of Subsections (c) and (d).

Added by Acts 2011, 82nd Leg., R.S., Ch. 1322 (S.B. 407), Sec. 3, eff. September 1, 2011.

## Penal Code Sec. 43.262.  POSSESSION OR PROMOTION OF LEWD VISUAL MATERIAL DEPICTING CHILD

(a) In this section:

    (1) "Promote" and "sexual conduct" have the meanings assigned by Section 43.25.

    (2) "Visual material" has the meaning assigned by Section 43.26.

(b) A person commits an offense if the person knowingly possesses, accesses with intent to view, or promotes visual material that:

    (1) depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created;

    (2) appeals to the prurient interest in sex; and

    (3) has no serious literary, artistic, political, or scientific value.

(c) An offense under this section is a state jail felony, except that the offense is:

(1) a felony of the third degree if it is shown on the trial of the offense that the person has been previously convicted one time of an offense under this section or Section 43.26; and

(2) a felony of the second degree if it is shown on the trial of the offense that the person has been previously convicted two or more times of an offense under this section or Section 43.26.

(d) It is not a defense to prosecution under this section that the depicted child consented to the creation of the visual material.

Added by Acts 2017, 85th Leg., R.S., Ch. 350 (H.B. 1810), Sec. 1, eff. September 1, 2017.

## Penal Code Sec. 43.27.  DUTY TO REPORT

(a) For purposes of this section, " visual material" has the meaning assigned by Section 43.26.

(b) A business that develops or processes visual material and determines that the material may be evidence of a criminal offense under this subchapter shall report the existence of the visual material to a local law enforcement agency.

Added by Acts 2003, 78th Leg., ch. 1005, Sec. 6, eff. Sept. 1, 2003.

# EXHIBIT S

