# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>     *Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALES, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>     *Defendants.* | Civil Action No. 5:26-cv-00073-X |

---

## DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Introduction ...................................................................................................................1

Factual Background.........................................................................................................1

Legal Standard ...............................................................................................................3

Argument and Authorities ............................................................................................ 4

I. Plaintiff has failed to show standing against some Defendants in their official capacity because they cannot grant Plaintiff's requested relief........................... 4

II. Sovereign Immunity bars Plaintiff's claims for equitable relief against the members of the Board of Regents sued in their official capacity........................................... 6

III. Qualified Immunity bars Plaintiff's damages claims against the Defendants sued in their individual capacity. ............................................................................................ 9

IV. Plaintiff has failed to state a claim for first amendment retaliation. ...................................13

A. Plaintiff's claim fails under either test. ........................................................................14

1. *Pickering* applies because Plaintiff's work in the clinic makes her the functional equivalent of an employee.............................................................14

2. Under *Pickering*, Plaintiff fails to show a causal connection and that her interests prevail.................................................................................................15

3. *Under* ordinary citizen, Plaintiff fails to show any adverse action by Defendants that was substantially motivated by her constitutionally protected activity. ............................................................................................18

a. Plaintiff fails to show she was engaging in constitutionally protected activity..................................................................................................19

b. Defendants did not engage in viewpoint discrimination, and the Honor Council's decision and Dean's reprimand were reasonable in light of the Clinical Suite's purpose. ...........................................................................21

c. Even if strict scrutiny applies, Defendants have a compelling interest in maintaining professionalism in areas where clients could be present and the Honor Council's decision was narrowly tailored to serve that interest. ...................................................................................................23

Conclusion .................................................................................................................... 24

Certificate of Service.......................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 4

*Bishop v. Aronov*,
    926 F.2d 1066 (11th Cir. 1991) ............................................................................

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
    70 F.4th 914 (5th Cir. 2023) .............................................................................. 4

*Brawner v. Richardson*,
    855 F.2d 187 (5th Cir. 1988) ................................................................................

*Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*,
    915 F.2d 167 (5th Cir. 1990) .............................................................................. 4

*Colson v. Grohman*,
    174 F.3d 498 (5th Cir. 1999) ................................................................................

*Delta Commer. Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*,
    364 F.3d 269 (5th Cir. 2004) ............................................................................... 3

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 100 (2025) ............................................................................................... 5

*El Paso Cnty. v. Trump*,
    982 F.3d 332 (5th Cir. 2020) ................................................................................

*Hooks v. Landmark Indus.*,
    797 F.3d 309 (5th Cir. 2015) ............................................................................... 3

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ................................................................................................

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) .............................................................................. 4

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ................................................................................................

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004)) ............................................................................ 4

*Students for Just. in Palestine v. Abbott*,
    756 F. Supp. 3d 410 (W.D. Tex. 2024) ................................................................

*Whittier v. Ocwen Loan Servicing, L.L.C.*,
    128 F.4th 724 (5th Cir. 2025) .............................................................................. 3

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ..........................................................................................................

**Statutes**

Tex. Educ. Code § 109.001....................................................................................................7

Tex. Educ. Code § 109.004....................................................................................................7

**Other Authorities**

Clinical Programs homepage, available at https://www.depts.ttu.edu/law/clinics-and-
    externships/clinics/. ....................................................................................................15

Criminal Defense Clinic website, available at https://www.depts.ttu.edu/law/clinics-and-
    externships/clinics/crim/index.php. .............................................................................15

Law Clinics promotional video, available at https://www.depts.ttu.edu/law/clinics-and-
    externships/clinics/index.php. .....................................................................................21

Tex. Tech Univ. Operating Policy and Procedure 01.08, Rule 4(a) (April 2, 2026),
    available at https://www.depts.ttu.edu/opmanual/OP01.08.pdf. ................................7

Tex. Tech Univ. Operating Policy and Procedure 10.14 (April 4, 2024), available at
    https://www.depts.ttu.edu/opmanual/OP10.14.pdf. ...................................................12

Tex. Tech Univ. Operating Policy and Procedure 32.03, Rule 4(a) (Jan. 5, 2023)........................13

Tex. Tech Univ. Operating Policy and Procedure 32.03, Rule 4(a) (Jan. 5, 2023), available
    at https://www.depts.ttu.edu/opmanual/OP32.03.pdf. ...........................................7, 8

Texas Tech Univ. Sch. of Law Honor Code § 4 (Nov. 18, 2020), available at
    https://www.depts.ttu.edu/law/policies/honor-code.php ............................................10

**Rules**

Tex. Tech Univ. Sys., Regents' Rules § 01.02.1(c) (Feb. 26, 2026) available at
    https://www.texastech.edu/board-of-regents/regents-rules/chapter-01-bylaws.pdf..............7

Tex. Tech Univ. Sys., Regents' Rules § 02.04.1–02.04.2 (Feb. 26, 2026), available at
    https://www.texastech.edu/board-of-regents/regents-rules/chapter-02-
    administration.pdf.........................................................................................................7

**Constitutional Provisions**

Tex. Const. art. IV, § 1............................................................................................................ 8

iv

## INTRODUCTION

Plaintiff files a First Amendment retaliation claim against 17 defendants attempting to undo the issuance of reprimand and report thereof to the Texas Board of Law Examiners (TBLE). While Plaintiff may be unhappy with a reprimand being placed in her academic file, this comes nowhere close to First Amendment retaliation.

Texas Tech University School of Law Honor Code includes the reasonable restriction that one must act professionally while working in the Law School Clinical Suite, which is a professional setting that operates like a law firm. The evidence clearly shows that the reprimand given to Fisher was a result of the Dean's and Honor Council's factual finding after multiple investigations and a hearing, right or wrong, that Fisher violated Texas Tech University School of Law's Honor Code by loudly and disruptively celebrating the murder of Charlie Kirk while she was in the Law Clinic. This is not a First Amendment case, as there is no evidence that Fisher was discriminated against due to the viewpoint she expressed.

To make matters worse, Plaintiff sues a host of people, many individually, including a 2-L law student who was on the Honor Council, having little to no involvement or simply performing their official-capacity duties. Remarkably, Plaintiff seeks punitive damages from these individuals. Even if there was a valid First Amendment claim, suit against these Defendants is not proper due to lack of standing, sovereign immunity, and/or qualified immunity. This entire case is an overreach and should be dismissed for the reasons set forth below.

## FACTUAL BACKGROUND

On September 10, 2025, there were multiple reports, including from Prof. Morgeson (Defendant), that Plaintiff, Ellie Fisher, celebrated the assassination of Charlie Kirk while in the Law School's Clinical Suite during work hours. ECF 4-1 at 146. This occurred while Fisher was a clinical student with a supervised practice card and thus able to represent clients in the Law School's Criminal Defense Clinic under professional supervision. *Id.* at 147–48. The celebration was loud, overheard by others, and adversely affected the operation of the clinics. *Id.* at 148.

On September 23, 2025, this matter was referred to Prof. William R. Keffer, who serves as the Honor Code Investigator pursuant to section 4.B. of the Honor Code to investigate whether there was probable cause to believe Fisher violated section 2.H. of the Honor Code:

> Violation of Professional Duties: A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.

ECF 4-1 at 21–24. During his investigation, Prof. Keffer met with Prof. Chapman and 18 other individuals identified in his report. *Id.* at 21. Prof. Keffer's investigation did not consider any viewpoint expressed by Fisher but rather focused solely on whether Fisher's behavior in the Law School Clinical Suite on September 10, 2025, was unprofessional conduct in violation of section 2.H. of the Honor Code. *Id.* at 21–24. Prof. Keffer concluded there was probable cause Fisher violated the Honor Code and the matter should therefore be referred to the Honor Council for further disposition. *Id.* at 24.

On February 20, 2026, as required by the Honor Code, the Honor Council (Defendants Spain, Hardberger, Outenreath, and Owens) convened to consider whether Fisher's behavior and statements within the Clinical Suite publicly celebrating the assassination of public figure Charlie Kirk on September 10, 2025, violated the Honor Code. ECF 4-1 at 146–51. On March 11, 2026, the Honor Council issued a report pursuant to Honor Code section 4.H., including findings of fact, conclusion as to the violation of the Honor Code, and recommended sanction. *Id.* at 150–51. The Honor Council found that statements endorsing or celebrating death or violence, particularly in a professional setting, are contrary to respect for the rule of law and violate ordinary standards of professional conduct. *Id.* at 148. The Honor Council did not consider the viewpoint of Fisher's comments in its decision. *Id.* at 146–51. The Honor Council, applying the clear and convincing evidence standard, concluded by majority vote of 3-1 that Fisher violated section 2.H. of the Honor Code and recommended a sanction of written letter of reprimand from Dean Nowlin to be placed in her permanent school record. *Id.* at 148–49.

On March 27, 2026, pursuant to Honor Code section 6, Fisher emailed Associate Dean Gonzalez (Defendant) to request a review of the Honor Council's decision. ECF 3 at ¶ 179. On April 13, 2026, Dean Gonzalez, after conducting a review pursuant to Honor Code section 6, determined that the Honor Council's finding was not clearly erroneous. That same day, Dean Nowlin (Defendant) sent a letter to Fisher serving as a formal reprimand for violation of the Honor Code and notified the Texas Board of Law Examiners (TBLE) that he does not recommend Fisher's admission to the Texas Bar.[1]

## LEGAL STANDARD

When a court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject matter jurisdiction. *Hooks v. Landmark Indus.*, 797 F.3d 309, 312 (5th Cir. 2015). The party seeking to assert federal jurisdiction, the plaintiff in this case, bears the burden to prove by a preponderance of the evidence that federal jurisdiction exists. *Whittier v. Ocwen Loan Servicing, L.L.C.*, 128 F.4th 724, 726 (5th Cir. 2025). "A plaintiff's failure to establish one of the three elements of Article III standing deprives federal courts of jurisdiction to hear the plaintiff's suit." *Delta Commer. Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004) (internal quotations omitted). To do this, "a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021). A plaintiff "must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (internal quotations omitted).

---

[1] Defendant acknowledges that Dean Gonzalez's denial of the appeal and Dean Nowlin's issuance of the reprimand and report to the TBLE transpired the day after Plaintiff filed the Complaint and First Amended Complaint and therefore Plaintiff was not aware of these events at that time. These documents are attached to Defendant's response to Plaintiff's motion for TRO and preliminary injunction. *See* App. 2, Gonzalez Decl., ¶ 6, Ex. A; App. 6, Nowlin Decl. ¶ 15–16, Exs. G-I.

Requesting a declaratory judgement does not provide standing. "Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgement action," the plaintiff must show that standing exists against the defendant "on the underlying cause of action." *Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 172 (5th Cir. 1990); *see also Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 932 (5th Cir. 2023).

To avoid dismissal under Rule 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While courts must accept all factual allegations as true, they "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Qualified immunity can be asserted in a 12(b)(6) motion to dismiss. *See, e.g.*, *Santander v. Salazar*, 133 F.4th 471, 477 (5th Cir. 2025).

### ARGUMENT AND AUTHORITIES

**I.      Plaintiff has failed to show standing against some Defendants in their official capacity because they cannot grant Plaintiff's requested relief.**

"To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Preczewski*, 592 U.S. at 285; *see also Murthy*, 603 U.S. at 61 (the plaintiff "must demonstrate standing for *each claim* that they press against *each defendant*, and for *each form of relief* they seek." (emphasis added)). The plaintiff cannot simply show that the remedy will address any injury, but "must show 'a substantial likelihood' that the requested relief will remedy the alleged injury in fact." *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (citation modified) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). "Article III's redressability requirement serves to align injuries and remedies. The primary goals of that requirement are to ensure that plaintiffs do not sue the wrong

parties and that courts do not issue advisory opinions." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 120 (2025).

Plaintiff's Amended Complaint brings one cause of action for First Amendment retaliation against Defendants. *See* ECF 3. However, in the First Amendment retaliation context, the Fifth Circuit "has held that '[a]lthough some actions may have . . . the effect of chilling [the plaintiff's] protected speech, they are not actionable." *Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir. 1999) (substitutions in *Colson*) (quoting *Pierce v. Tex. Dep't of Criminal Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir.1994)). While criticism, false accusations, verbal reprimands, and investigations are not actionable, formal reprimands are. *See id.* (citing cases).

To proceed with a "claim for prospective injunctive or declaratory relief, a plaintiff must demonstrate continuing harm or a 'real and immediate threat of repeated injury in the future,'" as "'allegations of possible future injury' do not suffice." *Adams v. Pearl River Valley Water Supply Dist.*, No. 21-60749, 2022 WL 2829756, at *3 (5th Cir. July 20, 2022) (cleaned up and citations omitted). Plaintiff requests that this Court enjoin any sanction to be imposed by the Texas Tech School of Law, any report of any sanction, and from any further violation of Fisher's rights under the First and Fourteenth Amendments. ECF 3 at 33. While the issuance of a reprimand by Dean Nowlin and his report thereof to TBLE may constitute "continuing harm," Plaintiff has not shown any other "real and immediate threat" of "certainly impending" future injury.

The only potential proper defendant for Plaintiff's First Amendment retaliation claim is a defendant who can withdraw Dean Nowlin's formal reprimand and report of the formal reprimand to TBLE. All Prof. Morgeson did was report Fisher's unprofessional behavior that she witnessed, as she is required to do as a Family Law Clinic Instructor. Prof. Larry Spain, Prof. Amy Hardberger, Prof. Allison Outenreath, and 2L-student Ally Owens simply performed their official duties as Honor Council members, holding a hearing and submitting findings of fact and recommendation of the proposed sanction—that Dean Nowlin reprimand Fisher. The Associate Dean for Academic Affairs (Jarod Gonzalez) also performed his official duty in reviewing Fisher's appeal to determine there was no clear error in the findings. And, as noted below, the Board of Regents were not

involved whatsoever. None of these individuals have any ongoing involvement in the disciplinary process with Plaintiff and therefore are not engaging in "continuing harm" against Plaintiff. Furthermore, none of these Defendants can grant Plaintiff her requested relief. Plaintiff has not shown that these Defendants will certainly violate Plaintiff's First Amendment rights in the future, nor can they withdraw (or prevent) Dean Nowlin's letter of reprimand or Dean Nowlin's Character and Fitness Certification to TBLE. Plaintiff's claim seeking equitable relief against Board of Regents, Honor Council members, and Prof. Morgeson should therefore be dismissed.

## II.    Sovereign Immunity bars Plaintiff's claims for equitable relief against the members of the Board of Regents sued in their official capacity.

"'Generally, state sovereign immunity precludes suits against state officials in their official capacities.'" *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quoting *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020)) (hereinafter, "*Mi Familia Vota II*"). The *Ex parte Young* doctrine, however, provides an "'exception to Eleventh Amendment sovereign immunity' in the subset of cases to which it applies." *Id.* (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)). "The exception permits federal courts to enjoin prospective unconstitutional conduct by 'individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature.'" *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 155–56 (1908)).

"To be a proper defendant under *Ex parte Young*, a state official 'must have some connection with the *enforcement* of' the law being challenged." *Id.* (emphasis added) (quoting *Ex parte Young*, 209 U.S. at 157)). While the Fifth Circuit has previously expressed that its "'decisions are not a model of clarity on what constitutes a sufficient connection to enforcement,'" *id.* (quoting *Texas Democratic Party*, 961 F.3d at 400 n.21), it has identified three "guideposts" to help make the determination. *Id.* (citing *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022)). These three elements are whether: "(1) the state official has 'more than the general duty to see that the laws of the state are implemented," *i.e.*, a 'particular duty to enforce the statute in question'; (2) the state official has 'a demonstrated willingness to exercise that duty'; and (3) the state official,

6

through her conduct, 'compel[s] or constrain[s persons] to obey the challenged law.' " *Id.* (quoting *Tex. All. For Retired Ams.*, 28 F.4th at 672) (modifications and substitutions in *Mi Familia Vota II*).

In light of these three elements, the individual members of the Board of Regents are improper defendants. The Board of Regents are generally responsible for the "governance, control, jurisdiction, organization, and management of the Texas Tech University System." Tex. Educ. Code § 109.001(c). The Board of Regents is also required by law to "appoint a chief executive officer, who shall devote the officer's attention to the executive management of the university system and who shall be directly accountable to the board for the conduct of the university system." *Id.* at § 109.004. This "chief executive officer" is the Chancellor of the Texas Tech University System. Tex. Tech Univ. Sys., Regents' Rules § 01.02.1(c) (Feb. 26, 2026).[2] "The president of each component institution of the TTU system is the chief executive officer of that institution and reports to and is responsible to the chancellor . . . the president has general authority and responsibility for the administration of the component institution." Tex. Tech Univ. Sys., Regents' Rules § 02.04.1–02.04.2 (Feb. 26, 2026).[3] The Provost of Texas Tech University, also the Senior Vice President of the University, "oversees the academic enterprise of the university" and reports to the President of the University. Tex. Tech Univ. Operating Policy and Procedure 01.08, Rule 4(a) (April 2, 2026).[4] The deans of each academic school, like Defendant Dean Nowlin for the Texas Tech School of Law, "serve in their administrative capacities without tenure and at the direction of the PSVP [i.e., the Provost and Senior Vice President]." Tex. Tech Univ. Operating Policy and Procedure 32.03, Rule 4(a) (Jan. 5, 2023).[5] "A dean's chief responsibility is the development, supervision, and operation of the academic programs of the college or school." *Id.* "Associate or assistant deans," like Defendant Associate Dean for Academic Affairs Jarod

---

[2] Available at: https://www.texastech.edu/board-of-regents/regents-rules/chapter-01-bylaws.pdf.

[3] Available at: https://www.texastech.edu/board-of-regents/regents-rules/chapter-02-administration.pdf.

[4] Available at: https://www.depts.ttu.edu/opmanual/OP01.08.pdf.

[5] Available at: https://www.depts.ttu.edu/opmanual/OP32.03.pdf.

Gonzalez, "aid in the administrative work of the colleges and schools" and "serve in their administrative capacities without tenure and at the discretion of the dean." *Id.* at Rule 4(b).

The individual members of the Board of Regents for the Texas Tech University System do not have a "particular duty to enforce" the Texas Tech University School of Law's Honor Code, nor is there any evidence they were involved with the drafting of the Honor Code, aware of the Honor Code's existence, or were personally involved with Plaintiff's investigation and reprimand. While the Board of Regents has general authority over the Texas Tech University System, a "'general duty to enforce the law is insufficient.'" *Mi Familia Vota II*, 105 F.4th at 326 (quoting *Texas Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020) (hereinafter, *Texas Democratic Party II*)). For example, even though the Governor of Texas is the "Chief Executive Officer of the State," Tex. Const. art. IV, § 1, and may promulgate an executive order, that does not necessarily mean the Governor is the proper defendant under *Ex parte Young* to challenge the executive order. *See Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (citing *Mi Familia Vota v. Abbott*, 977 F.3d 461, 477 (5th Cir. 2020)). This is a familiar legal principle in many areas of law. Similar to how the individual members of a company's board of directors are the wrong defendants to sue when they are not personally involved with the alleged wrongdoing of a middle manager, the individual members of the Board of Regents do not have any "particular duty to enforce" the Texas Tech University School of Law's Honor Code, and are the wrong defendants in this case. *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (rejecting the notion that a senior official may be held liable in a federal constitutional tort action simply because of supervisory status); *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir.2008) ("A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.").

Neither have the individual members of the Board of Regents "demonstrated willingness to exercise" their nonexistent, particularized duty to enforce the Texas Tech University School of Law's Honor Code. Nor has Plaintiff shown that each member of the Board of Regents, through their own personal conduct, "compel[s] or constrain[s persons]" to engage in alleged First

Amendment retaliation. Each of the three "guideposts" from the Fifth Circuit suggest that the individual members of the Board of Regents retain their sovereign immunity and are the wrong defendants under *Ex parte Young*. However, even if this Court disagrees with this determination, *see Heilrayne v. Univ. of Tex. At Austin*, No. 1:25-CV-640-DAE, 2026 WL 630966, at *6–7 (W.D. Tex. Jan. 27, 2026) (citing *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023)), this Court should still dismiss the individual members of the Board of Regents under Federal Rule of Civil Procedure 12(b)(6), *see id.* at *10 (dismissing, for failure to state a claim, members of a university system's board of regents who were not personally involved in the allegedly unlawful actions, even though plaintiff alleged the individual board members had the authority to expunge their disciplinary records).

### III.   Qualified Immunity bars Plaintiff's damages claims against the Defendants sued in their individual capacity.

Qualified immunity bars Plaintiff's individual capacity claims against the members of the Texas Tech School of Law Honor Council (Prof. Larry Spain, Prof. Amy Hardberger, Prof. Allison Outenreath, and 2L-student Ally Owens), Prof. Terri Morgeson, the Associate Dean for Academic Affairs (Prof. Jarod Gonzalez), and the Dean of the School of Law (Dean Nowlin). The doctrine of qualified immunity prevents courts from awarding damages against a government official in his personal capacity unless: (1) "the official violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the challenged conduct." *Pearson v. Callahan*, 555 U.S. 223, 243 (2009) (quoting *al-Kidd*, 563 U.S. at 735)). Courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735.

The question of whether the right was "clearly established" must be "beyond debate" at the time of the government official's action. *Pearson*, 555 U.S. at 246  (quoting *al-Kidd*, 563 U.S. at 741). And while a "case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741  (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to

the defendant and the law that was clearly established at the time of the defendant's actions." *Kokesh v. Curlee*, 14 F.4th 382, 393 (5th Cir. 2021) (internal quotations omitted).

In the Fifth Circuit, the qualified immunity defense involves a shifting burden of proof. The defendant must first satisfy his burden by showing "the challenged conduct was within the scope of his discretionary authority," which is satisfied "when he performs non-ministerial acts within the boundaries of his official capacity." *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019) (internal quotations omitted). Then, it becomes the "plaintiff's burden" to show that "it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,'" where the identified "right may not be defined at a 'high level of generality.'" *Santander*, 133 F.4th at 478, 480 (first quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015), then quoting *al-Kidd*, 563 U.S. at 742)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Plaintiff's individual capacity claims against the members of the Honor Council should be dismissed. It is the official duty of the Honor Council to hold a hearing and listen to witness testimony to make the factual determination of "whether the student violated the Honor Code, based on clear and convincing evidence." Honor Code § 4.H, ECF 4-1 at 178. If the Honor Council finds a violation of the Honor Code, it has a duty to "determine the appropriate sanction or sanctions to recommend to the Dean." *Id.* "A majority of the Council members present must vote affirmatively to find that a violation of the Honor Code has occurred and to select one or more sanctions to recommend to the Dean." *Id.* In determining which sanction or sanctions to recommend to the Dean, the Honor Council may consider mitigating and aggravating factors. *Id.* Absent exigent circumstances, the Chair of the Honor Council will issue findings of fact, the Honor Council's decision, and the recommended sanction within two weeks of the hearing. *Id.*

In the present case, the Honor Council exercised its duties diligently. The audio recording of the hearing, where Plaintiff was advised by council and the Honor Council considered witness testimony for over three hours, is strong evidence of how diligent and professional the Honor

10

Council exercised its duties. *See* Honor Council Hearing Recording, ECF 4-1, Ex. E. The Honor Council carefully considered the report of the Honor Code Investigator, six relevant affidavits, the testimony of eight witnesses, as well as Plaintiff's own testimony. *See* Honor Council Determination, ECF 4-1 at 248. And the Honor Council ultimately determined, under the clear and convincing evidence standard, that Plaintiff violated section 2.H (Violation of Professional Duties) of the Honor Code "by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . . as result of her actions and statements." *Id.* at 250. The Honor Council noted that "the Clinical Programs is an academic program of the School of Law in which law students provide legal services to actual clients" and therefore "law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney." *Id.* at 248–49.

After considering the evidence, a majority of the Honor Council ultimately determined by clear and convincing evidence that upon entering the clinical offices, Plaintiff made statements "endorsing or celebrating death or violence" and that these statements were "contrary to respect for the rule of law and violate ordinary standards of professional conduct." *Id.* at 249. Notably, these statements were not made in a classroom or the privacy of a dormitory, but were made "[u]pon entering the offices," *id.*, where clients could have witnessed Plaintiff's actions and statements. The Honor Council recommended that Plaintiff "receive a written letter of reprimand from the Dean of the School of Law to be placed in her permanent school record" and determined that "such sanction is proportionate to the severity of the conduct involved." *Id.* at 251. Considering these facts, the individual members of the Honor Council are entitled to qualified immunity. Plaintiff cannot show that "every reasonable official" with the "information then available" would have known that the Honor Council's determination "clearly" violated Plaintiff's constitutional rights "beyond debate." Recall, "qualified immunity protects 'all but the plainly incompetent or those who knowingly vfiolate the law.'" *Mullenix*, 577 U.S. at 12  (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

11

Similarly, Prof. Morgeson is entitled to qualified immunity. It is the official policy of Texas Tech University to "require employees to report, or cause to be reported, known or suspected violations of laws, rules, policies, or regulations, or improper activities, and to cooperate in any investigation by persons authorized or responsible for such matters." Tex. Tech Univ. Operating Policy and Procedure 10.14 (April 4, 2024).[6] Prof. Morgeson witnessed what she suspected was violation of the Honor Code, an opinion later affirmed by a majority of the Honor Council, and was duty-bound to report it. Prof. Morgeson then cooperated with the investigation, including meeting with the Honor Code Investigator and being a witness at the Honor Council hearing. ECF 3 at 19, 25; Honor Council Determination, ECF 4-1, Ex. F, at 148. And the Honor Council explicitly noted that Prof. Morgeson "provided credible information" and relied on her testimony in their determination. Honor Council Determination, ECF 4-1, Ex. F, at 149. Ultimately, Plaintiff cannot show that "every reasonable official" with the "information then available" to Prof. Morgeson would have believed her actions violated Plaintiff's constitutional rights "beyond debate."

Similarly, Associate Dean Gonzalez, is entitled to qualified immunity. The Associate Dean is required to consider the student's appeal of the Honor Council Determination. Honor Code § 6, ECF 4-1 at 179. There is no requirement for the Associate Dean to disagree with or modify the Honor Council Determination. *Id.* The Associate Dean "may impose, modify, or vacate any sanction recommended, but cannot increase the severity of a sanction." *Id.* However, the Associate Dean "cannot modify or vacate the finding of a violation of [the Honor] Code made by the Honor Council, except when the Associate Dean determines that the Council's finding is clearly erroneous." *Id.* Plaintiff's amended complaint hardly mentions Dean Gonzalez, except to mention he received Plaintiff's appeal. ECF 3 at 3–4, 28. Given these facts, Plaintiff cannot show that "every reasonable official" with the "information then available" to Dean Gonzalez would have believed his actions violated Plaintiff's constitutional rights "beyond debate."

---

[6] Available at: https://www.depts.ttu.edu/opmanual/OP10.14.pdf.

Finally, Dean Nowlin is also entitled to qualified immunity. Dean Nowlin was acting in his official capacity when he issued the written reprimand to Plaintiff. Note that under the Honor Code, the Dean is required to "impose the sanction determined by the Associate Dean." Honor Code § 6, ECF 4-1 at 179. And the Dean of the School of Law is "the principal administrative officer[] of . . . the School of Law" and is responsible for the "supervision, and operation of the academic programs" of the School of Law, including its clinical programs where students work for academic credit. *See* Tex. Tech Univ. Operating Policy and Procedure 32.03, Rule 4(a) (Jan. 5, 2023). In his official administrative capacity, the dean is ultimately responsible for responding to the TBLE's Character and Fitness Certification. Dean Nowlin has a duty to provide the TBLE with his honest assessment, even if the TBLE ultimately disagrees with him.

## IV.    Plaintiff has failed to state a claim for first amendment retaliation.

This Court should dismiss Plaintiff's retaliation claim.[7] In a retaliation case, the legal test courts apply depends on the plaintiff's relationship to the defendants. If the relationship can properly be characterized as a public employer-public employee relationship, then *Pickering* balancing applies. *Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004). Otherwise, the "ordinary citizen" test applies. *Id*

Context matters. This is not a case where a student was targeted for expressing an unpopular viewpoint. Rather, this is a case where a third-year law student with her supervised practice card who was the functional equivalent of an employee of Texas Tech Law School's Criminal Defense Clinic where she represented real clients in court, was properly disciplined under the school's Honor Code for behaving in an unprofessional manner in the clinic where clients could have been present. The incidents occurred in a nonpublic forum, and the disciplinary action was not based on viewpoint discrimination.

---

[7] Plaintiff has plead only a claim for First Amendment retaliation. *See* ECF 3 at 31–33. The Fifth Circuit does not recognize any freestanding chilled speech claims or claims of unlawful suppression of speech in the university context, so to the extent Plaintiff argues Defendants actions chilled her speech, that argument "rises and falls with [her] retaliation claim." *Lowery v. Mills*, 157 F.4th 729, 741 (5th Cir. 2025).

Here, Plaintiff has failed to show any adverse action by Defendants that was motivated by her speech. If the Court applies the ordinary citizen framework, Plaintiff has additionally failed to show she was engaging in constitutionally protected activity. Because the Clinical Suite is a nonpublic forum, and Defendants' actions were reasonable and did not constitute viewpoint discrimination, Plaintiff's claim fails and should be dismissed.

### A. Plaintiff's claim fails under either test.

#### 1. *Pickering* applies because Plaintiff's work in the clinic makes her the functional equivalent of an employee.

At issue here is the regulated conduct of a professional trainee rather than the protected speech of a citizen. Plaintiff's position working for the Criminal Defense Clinic renders her the functional equivalent of an employee for *Pickering* purposes. A public employee plaintiff must plead four elements to assert a retaliation claim cognizable under the First Amendment: (1) the plaintiff has suffered an adverse employment action; (2) the plaintiff was speaking as a citizen on a matter of public concern; (3) the plaintiff's interest in free speech on matters of public concern outweighs the defendant's interests in efficiently managing a public function; and (4) the defendant's action was motivated by the plaintiff's speech. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). Here, Defendants agree that the assassination of Charlie Kirk is a matter of public concern, but Plaintiff has failed to show any adverse action that was motivated by her speech.

*Pickering* balancing exists because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Therefore, courts must strike a balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

Professional degree programs often permit students to gain practical experience by performing professional tasks under supervision. Although the Fifth Circuit has not directly addressed this issue, other circuits have viewed students as public employees when those students

14

participate in practicum programs, internships, or student teaching positions for course credit. *See Andersen v. McCotter,* 100 F.3d 723, 726 (10th Cir. 1996) (holding that a student intern, working for college credit in a penitentiary, was properly treated as a public employee rather than as a student in a First Amendment suit against the Department of Corrections.); *Hennessy v. City of Melrose*, 194 F.3d 237, 244–45 (1st Cir. 1999) (holding that a student teacher was a public employee because the "apprentice-type relationship more closely resembles an employer-employee relationship than a school-pupil relationship."); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) (practicum student at psychiatric hospital); *Snyder v. Millersville Univ.*, No. CIV.A. 07-1660, 2008 WL 5093140, at *14–15 (E.D. Pa. Dec. 3, 2008) (student teacher).

The Texas Tech Law School Clinical Program offers students real-world experience through opportunities to provide free legal representation and counseling to real clients. *See* Clinical Programs homepage.[8] Although they are supervised by Prof. McDonald, students working in the Criminal Defense Clinic "are fully responsible for their cases, from intake to disposition." *See* Criminal Defense Clinic website.[9] As was the case in *Hennessy*, the relationship between students working in the clinic and the professors who supervise is an apprentice-type relationship that more closely resembles an employer-employee relationship than a student-professor relationship. *Hennessy*, 194 F.3d at 244–45. Therefore, *Pickering* balancing applies.

### 2. Under *Pickering*, Plaintiff fails to show a causal connection and that her interests prevail.

Plaintiff's claim fails for two reasons. First, she has not shown any adverse action that was motivated by her speech. Second, she has failed to show that her interests prevail under *Pickering* balancing.

*Pickering* requires "'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin v.*

---

[8]Available at: https://www.depts.ttu.edu/law/clinics-and-externships/clinics/.
[9]Available at: https://www.depts.ttu.edu/law/clinics-and-externships/clinics/crim/index.php.

*McPherson*, 483 U.S. 378, 384 (1987) (quoting *Pickering*, 391 U.S. at 568 and citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)). Courts should not scrutinize the speech at issue in a vacuum; courts should consider the "manner, time, and place of the employee's expression, as well as the context in which the dispute arose." *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 799 (5th Cir. 1989) (citing *Rankin*, 483 U.S. at 388 and collecting cases). Among a court's considerations should be "whether the speech was likely to generate controversy and disruption, impeded the school's general performance and operation, and affected working relationships necessary to the department's proper functioning." *Harris*, 168 F.3d at 223 (citing *Brawner v. Richardson*, 855 F.2d 187, 192 (5th Cir. 1988)).

Public employers occupy a "dual role . . . as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin*, 483 U.S. at 384. Even though public employers cannot act in certain ways that would violate the First Amendment, they are still employers that are responsible for the efficient performance of a certain public function. *Id.* Thus, second-guessing every decision related to enforcement of professionalism standards would burden that performance. *Id.*

One factor is whether the employee's speech caused a disruption. The Fifth Circuit recognizes reasonable predictions of disruption as sufficient. *Nixon v. City of Houston*, 511 F.3d 494, 499 n.4 (5th Cir. 2007). "[A] government employer need not produce evidence of actual harm or disruption to governmental operations." *Id.* (quoting *Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office . . . is manifest before taking action.")). Courts have therefore given "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994).

Although Plaintiff has likely suffered an adverse action, she has not shown that the Defendants' action was motivated by her speech. First, as discussed *supra*, most of the seventeen Defendants in this case have no real tie to the alleged harm. But even if they did, Plaintiff was disciplined because of her unprofessional conduct in violation of the Honor Code, not her speech.

16

Untethered and conclusory allegations that racial discrimination was afoot do not suffice to plead causation for First Amendment retaliation. See, *e.g.*, ECF 3 at 26 ¶ 161 ("it now violates the Honor Code for a black law student to hurt people's feelings by saying something they disagree with . . . ."). Specifically, the Honor Council found there was clear and convincing evidence "that Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot." ECF 4-1, Ex. F, at 149. Furthermore, the Honor Council found that "[s]uch statements endorsing or celebrating death or violence, particularly in a professional office setting, are contrary to respect for the rule of law and violate ordinary standards of professional conduct." *Id.* Plaintiff has failed to plausibly plead causation.

Furthermore, Plaintiff has failed to show her interests prevail under *Pickering*. Defendants, in their official capacity as officers of Texas Tech School of Law, have an interest in promoting the efficiency of public services for *Pickering* purposes. This interest is especially implicated when the unprofessional conduct at issue involves openly celebrating a public figure's assassination. A public employee who shows support for political violence necessarily violates basic professionalism standards.

And Plaintiff's unprofessional conduct created a substantial disruption to the law clinic operations. Plaintiff alleges she was punished for merely hurting people's feelings and that all Defendants knew no actual disruption had occurred. *See* ECF 3 at 32 ¶202. She also claims that the Honor Council's decision was not based on any evidence that the Clinical Programs had been disrupted. Complaint at 26 ¶162. Not so. As the Honor Council noted, "[a]s a result of Ellie Fisher's actions, several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting which interfered with their normal work routine." ECF 4-1, Ex. F, at 149. And apart from the actual disruption that occurred, for a public workplace, Defendants' reasonable predictions of substantial disruption would have been

sufficient. When Plaintiff abruptly and forcefully threw open the Clinical Suite front doors,[10] she could not have known whether any clients were present or whether students or faculty members were in virtual client meetings or other important meetings. It was thus entirely reasonable to assume that Plaintiff's complete disregard for the professionalism of the Clinical Suite would cause disruption. Plaintiff has not shown her interests prevail under *Pickering*.

3. *Under* **ordinary citizen, Plaintiff fails to show any adverse action by Defendants that was substantially motivated by her constitutionally protected activity.**

On the other hand, even if this Court does not view Plaintiff as a public employee, her claim still fails under the ordinary citizen test. In a nonemployment context, a plaintiff must plead three elements to assert a retaliation claim cognizable under the First Amendment: "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were *substantially* motivated against the plaintiff['s] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citations omitted). Here, unprofessional conduct inside a law school clinic where clients could have been present does not constitute constitutionally protected activity. Furthermore, Plaintiff has not shown that any constitutionally protected activity *substantially* motivated Defendants' allegedly adverse actions. The ordinary citizen test adds the modifier, "substantially" and thus heightens the causation standard. Plaintiff has not plead that Defendants' adverse actions were substantially motivated by Plaintiff's exercise of constitutionally protected conduct, and she cannot do so for the reasons discussed *supra*.

---

[10] It's also important to note that Plaintiff's disruptive conduct was not merely expressed in private conversations in her professor's offices or with her peers in the Clinic Office. ECF 3 at 26 ¶ 162. The Honor Council's decision was based solely on the clinic entrance incident, and Dean Nowlin's reprimand was based on three incidents—clinic entrance, Prof. Metze's office, and clinic office. ECF 4-1, Ex. F, at 149. These incidents were extremely loud and disruptive. *Id.*

### a. Plaintiff fails to show she was engaging in constitutionally protected activity.

The Clinical Suite is a nonpublic forum. Restrictions on speech therefore need only be reasonable and devoid of viewpoint discrimination.

The First Amendment does not require government actors to permit all forms of speech on government-owned property. *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

As Plaintiff correctly highlights, the Fifth Circuit has articulated the forum category structure differently in different cases, but the simplest formulation organizes the categories based on the level of scrutiny applied to speech restrictions in each type of forum. *See Freedom From Religion Found.*, 955 F.3d at 426. Under this formulation, the types of forums can be grouped into two broad categories: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums. *Id.* (collecting cases). Traditional public forums are places that "'by long tradition or by government fiat have been devoted to assembly or debate.'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (quoting *Estiverne v. La. State Bar Ass'n,* 863 F.2d 371, 376 (5th Cir. 1989)). Designated public forums "may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Chiu*, 260 F.3d at 345 (quoting *Cornelius*, 473 U.S. at 802). Speech restrictions in traditional public and designated public forums must serve a compelling state interest and must be narrowly tailored. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

A limited public forum is a forum opened for public expression "for certain groups or for the discussion of certain topics." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks omitted)). Finally, a nonpublic forum "is not by tradition or designation open for public communication . . . ." *Chiu*, 260 F.3d at 247 (citing *Estiverne*, 863 F.2d at 376). "As with limited public forums, '[t]he government can restrict access to a nonpublic forum 'as long as the

19

restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998)).

Courts focus on two factors to separate designated public forums from limited public forums: "(1) the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" *Chiu*, 260 F.3d at 346 (quoting *Estiverne*, 863 F.2d at 378). Creating a designated public forum is an intentional, deliberate act. *Chiu*, 260 F.3d at 347 (citing *Cornelius*, 473 U.S. at 3449). And it does not happen automatically when the government permits limited discourse or selective access. *Id.* (citing *Ark. Educ. Television*, 523 U.S. at 677).

Public universities consist of different types of forums. Although a university campus, "at least for its students, possesses many of the characteristics of a public forum, . . . [a] university's mission is education, and decisions of [the Supreme Court] have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). "The Supreme Court's forum analysis jurisprudence does not require [courts] to choose between the polar extremes of treating an entire university campus as a forum designated for *all* types of speech by *all* speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld." *Just. For All v. Faulkner*, 410 F.3d 760, 766–67 (5th Cir. 2005).

Indeed, "the entire University campus is not a public forum subject to strict scrutiny." *Roberts v. Haragan*, 346 F. Supp. 2d 853, 860 (N.D. Tex. 2004). While campus park areas, sidewalks, streets, or other similar common areas "comprise the irreducible public forums on the campus," the remaining areas—dorms, classrooms, faculty offices, auditoriums, dining halls, etc.—can be designated public forums, limited public forums, or nonpublic forums depending on how the university treats them. *Id.* "As for classrooms and adjacent hallways, generally speaking, these areas are considered nonpublic forums." *Smith v. Tarrant Cnty. Coll. Dist.*, 694 F. Supp. 2d 610, 626 (N.D. Tex. 2010) (citing *Bowman*, 444 F.3d at 977 ("Classrooms are not public forums . . . ."); *Axson–Flynn v. Johnson,* 356 F.3d 1277, 1285 (10th Cir. 2004) (concluding, under *Hazelwood School District* and *Perry Education Association* that a university classroom is a non-public forum); *Bishop v. Aronov,* 926 F.2d 1066, 1071 (11th Cir. 1991) (stating that although a university *may* open its classrooms for other purposes, they are generally dedicated to the

20

university's teaching purposes); *also cf. M.A.L. v. Kinsland,* 543 F.3d 841, 847 (6th Cir. 2008) (concluding hallways of a public school are a nonpublic forum)).

Here, because the Clinical Suite is a professional workplace and is not open for any public expression but has been reserved for certain groups—students, clients, and professors—and for the discussion of certain topics—matters pertaining to the students' education and clinical cases— these spaces are most accurately classified as nonpublic forums. It is neither by tradition nor designation open for public communication. Students use the Clinical Suite to complete case assignments, meet with supervising professors, and meet with clients. Plaintiff has not shown that the Clinical Suite is open for public expression in any way.

Even if this Court does not conclude the Clinical Suite is a nonpublic forum, Applying the *Chiu* test, the Clinical Suite is not a designated public forum. First, Texas Tech Law School's intent for the Clinical Suite is to function as law offices and provide an opportunity for law students to represent real clients and participate in real cases before graduating. *See* Law Clinics promotional video, Prof. Dwight McDonald at 3:10–17 ("Basically, we tell our students, you get to practice law here for a year before you graduate, so you're a year ahead of everybody else.").[11] Plaintiff argues the Clinical Suite is for student participation, learning, and what Patrick Metze described as a "safe space" for free expression. ECF 3 at 13 ¶ 80, 15–16 ¶¶ 99–101. The Clinical spaces are indeed open for student participation and learning, but standards of professionalism and decorum are necessary to achieve these goals. And, consistent with the Honor Council's Findings, when a student loudly celebrates a murder in these spaces, student participation and learning are inhibited. *See* ECF 4-1, Ex. F. Second, Plaintiff has not shown that classifying the Clinical Suite as a limited public forum is inconsistent with the way the Clinical Suite has been used in the past. Plaintiff has provided no examples of students disruptively celebrating a murder and facing no discipline. The Clinical Suite is not a designated public forum.

> **b. Defendants did not engage in viewpoint discrimination, and the Honor Council's decision and Dean's reprimand were reasonable in light of the Clinical Suite's purpose.**

Viewpoint discrimination happens when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *Rosenberger*, 515 U.S. at 829 (citing

---

[11] Available at: https://www.depts.ttu.edu/law/clinics-and-externships/clinics/index.php.

*Perry Educ. Assn.,* 460 U.S. at 46). The Supreme Court has distinguished between content discrimination, which may be permissible when reasonable, and viewpoint discrimination, which is never permissible. *Id.* So, the government may select the topics for discussion in a limited or nonpublic forum, but it may not allow some viewpoints on a topic and punish others. *See id.*

The K–12 school-speech line of cases is instructive for general principles, but those cases do not control this case. True, neither the Fifth Circuit nor the Supreme Court has ever squarely held that *Tinker* does not apply at the university level, *See Students for Just. in Palestine v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024), but three reasons counsel against applying it to this case.

First, university students are treated as adult citizens for First Amendment analysis purposes, and the ordinary citizen test is the applicable test for retaliation claims. *See Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (applying ordinary citizen test to non-employee retaliation claim). Second, the incidents here occurred not merely in a traditional public forum on a university campus, nor even in the nonpublic forum of a university classroom. ECF 3 at 10–18; ECF 4-1, Ex. F. The incidents here occurred in a professional working environment where students work on real cases for real clients. *Id.* The government has more leeway in restricting speech in a public workplace under either the *Pickering* test or the ordinary citizen test. *See Pickering*, 391 U.S. at 568; *cf. Keenan*, 290 F.3d at 258. Third, no viewpoint discrimination occurred here. At most, this was content discrimination—prohibiting celebrations of murder—which is entirely permissible in a limited public or nonpublic forum. *Rosenberger*, 515 U.S. 819 at 829. Therefore, *Tinker*'s substantial and material disruption standard does not constrain this case, and any alleged absence of an actual disruption would not prove Plaintiff's retaliation claim.

This is not viewpoint discrimination. Plaintiff was disciplined pursuant to the Honor Code because she disruptively celebrated a political assassination in the Clinical Suite where clients could have been present. Plaintiff was not disciplined for her "subjective feelings" or for any "'impure' thoughts about Charlie Kirk's death," nor was she disciplined for her viewpoint. ECF 3 at 18 ¶ 116, 26 ¶ 161. Rather, Plaintiff was disciplined for the disruptive and unprofessional way she expressed

her viewpoint. As Plaintiff points out, at least one other student expressed a similar viewpoint to Plaintiff's, but this student was not disciplined because his comments were neither disruptive nor unprofessional like Plaintiff's were. *See* ECF 3 at 32 ¶ 204 ("One student went so far is to announce as to announce that Charlie Kirk would 'go to hell.'"). Ms. Fisher was disciplined because her conduct was disruptive and unprofessional, not because her viewpoint was disfavored.

Celebrating the brutal and public murder of a fellow human being offends any formulation of professionalism standards. Certainly, such conduct would be considered unprofessional and inappropriate in professional law firms, especially when clients may be present. The Clinical Suite functions like a professional law firm. There, client meetings are held, students working in the clinics receive mentorship and supervision from professors, and work is done in the clinical workspaces. Several of the clinics, particularly the Family Law Clinic and the Criminal Defense Clinic, serve low-income individuals facing some of the most difficult circumstances in their lives. Just like a law firm, these factors demand professionalism. Furthermore, law schools are charged with training young lawyers and Law School Deans in Texas generally submit a Dean's Certification to the TBLE, verifying graduation, academic standing, and character and fitness qualifications, and ultimately recommending for or against a student-applicant's admission to the Bar. A professional environment necessitates professional standards, which often include restrictions on speech. Defendants' actions were therefore reasonable in light of the purpose of the Clinical Suite.

### c. Even if strict scrutiny applies, Defendants have a compelling interest in maintaining professionalism in areas where clients could be present and the Honor Council's decision was narrowly tailored to serve that interest.

Even if this Court concludes that the Clinical Suite is a designated public forum and applies strict scrutiny, Plaintiff has failed to show the Honor Council's decision and Dean's reprimand are not narrowly tailored to achieve a compelling interest. Public universities have a compelling interest in providing an effective learning environment, which requires the authority to enforce student codes of conduct. *See Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 808 (S.D. Tex. 2025). That interest is even more pressing for a law school that is preparing students to

23

become members of state bar organizations, which have rigorous professionalism standards for admission. *See e.g.*, ECF 4-1, Ex. R.

The challenged disciplinary actions are also narrowly tailored to that compelling interest. Plaintiff frames this case as an effort to punish her because "TTU faculty view Fisher's advocacy, distinctions, and achievements as nothing more than evidence that Fisher is a loud-mouth, uppity black woman whose viewpoints and zealous advocacy activism they despise." ECF 3 at 7 ¶ 37. But Plaintiff has not brought a claim for racial discrimination and has not established she was targeted for her viewpoint. Instead, this case is about maintaining a professional environment conducive to effective learning and professional public service within the Clinical Suite. ECF 4-1, Ex. F. Disciplining Plaintiff for her disruptive, unprofessional behavior in the Clinical Suite is narrowly tailored to the compelling interest here. Thus, Defendants' actions would pass even strict scrutiny.

## CONCLUSION

For the foregoing reasons, this Court should dismiss this case.

Date: April 27, 2026

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

Respectfully submitted.

*/s/ Wade Johnson*
WADE JOHNSON
Special Counsel
Texas State Bar No. 24062197
wade.johnson@oag.texas.gov

BRIAN B. TUNG
Assistant Attorney General
Texas State Bar No. 24145179
Brian.Tung@oag.texas.gov

LAUREN E. SAEGER
Assistant Attorney General
Texas State Bar No. 24149365
Lauren.Saeger@oag.texas.gov

COUNSEL FOR THE STATE OF TEXAS

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on April 27, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

MICHAEL THAD ALLEN
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06320
Telephone (860) 772-4738
mallen@allenharrislaw.com

MARK T. MANSFIELD
MANSFIELD & MANSFIELD
P.C. 1550 Norwood Dr. Suite 107
Hurst, Texas 76054
Telephone: (817) 282-3450
mark@mansfieldpc.com

COUNSEL FOR ELLIE FISHER

*/s/ Wade Johnson*
WADE JOHNSON
Special Counsel