**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

ELLIE MAE FISHER,

      *Plaintiff,*

v.

THE TEXAS TECH UNIVERSITY SYSTEM BOARD
OF REGENTS, et al.,

      *Defendants.*

CIVIL ACTION NO. 5:26-cv-00073-X

---

**APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

---

Appendix 1:      Declaration of Sofia Rodriguez Chapman

Appendix 2:      Declaration of Jarod S. Gonzalez

Appendix 3:      Declaration of William R. Keffer

Appendix 4:      Declaration of Dwight McDonald

Appendix 5:      Declaration of Terri M. Morgeson

Appendix 6:      Declaration of Jack Wade Nowlin

Appendix 7:      Declaration of Alyson Outenreath

Appendix 8:      Declaration of Allyson Owens

Appendix 9:      Declaration of Larry R. Spain

**Defs.' Appx. 1**

Date:  April 27, 2026

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

Respectfully submitted.

*/s/ Wade Johnson*
WADE JOHNSON
Special Counsel
Texas State Bar No. 24062197
wade.johnson@oag.texas.gov

BRIAN B. TUNG
Assistant Attorney General
Texas State Bar No. 24145179
Brian.Tung@oag.texas.gov

LAUREN E. SAEGER
Assistant Attorney General
Texas State Bar No. 24149365
Lauren.Saeger@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2100
COUNSEL FOR THE STATE OF TEXAS

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on April 27, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

MICHAEL THAD ALLEN
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06320
Telephone: (860) 772-4738
mallen@allenharrislaw.com

MARK T. MANSFIELD
MANSFIELD & MANSFIELD
P.C. 1550 Norwood Dr. Suite 107
Hurst, Texas 76054
Telephone: (817) 282-3450
mark@mansfieldpc.com

COUNSEL FOR ELLIE FISHER

*/s/ Wade Johnson*
WADE JOHNSON
Special Counsel

**Defs' Appx. 2**

# Appendix 1

Declaration of Sofia Rodriguez Chapman

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

ELLIE MAE FISHER,

           *Plaintiff,*

v.

CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,

           *Defendants.*

| Civil Action No. 5:26-cv-00073-X |

---

## DECLARATION OF SOFIA RODRIGUEZ CHAPMAN

Pursuant to 28 U.S.C. § 1746, I, Sofia Rodriquez Chapman, declare the following:

1. My name is Sofia Rodriguez Chapman. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I am Associate Dean for Student Life and Director of Community Engagement and Wellness at Texas Tech School of Law (the "Law School").

3. On April 7, 2026, I wrote a letter to the Texas Board of Law Examiners regarding information related to Ellie Fisher's character and fitness and her unprofessional behavior in the celebration of Charlie Kirk's assassination. The content of this affidavit reflects my April 7th letter. A true and correct copy of my April 7th letter can be found in Dean Nowlin's complete response to the Texas Boad of Law Examiner's inquiry, which is attached hereto as **Exhibit A**.

**Defs.' Appx. 4**

4.      In accordance with my duties under Section 4.C. of the Honor Code, I interviewed Professor Terri Morgeson and two students within 48 hours of the September 10, 2025, incident. During those interviews, I received corroborating accounts that Ms. Fisher celebrated the death of Charlie Kirk in a disruptive manner while in the clinic hallway and in Professor Patrick Metze's office.. In addition to the above, I also attended all student interviews conducted by William R. Keffer, the Honor Code Investigator,  in part to provide wellness support to the students.

5.      On September 11, 2025, Professor Terri Morgeson, who was visibly upset, came to me, as is common for anyone in the law school community, to report an alleged violation of the Honor Code given my professional duties at the law school. Professor Morgeson also reported this to me because I oversee all wellness and mental health support for the law school community. As such, Professor Morgeson asked me to check on two of her Family Law Clinic students, as Professor Morgeson reported that they were upset and bothered by the unprofessional behavior of Ms. Fisher and Professor Pat Metze.

6.      Professor Morgeson reported to me that Ms. Fisher was celebrating Charlie Kirk's death and that she heard Ms. Fisher use curse words related to Charlie Kirk's death. She also reported to me that Ms. Fisher tried to engage Professor Joe Stephens in a celebratory way about Charlie Kirk and that Professor Stephens "shut Ellie down." She also reported that this behavior upset her family law students. Thus, she allowed them to go home early due to the totality of events.

7.      On September 12, 2025, two students reported to me that they both thought that Ms. Fisher's behavior was unprofessional. One student reported that she heard Ms. Fisher say, "I am in the best mood ever, they killed Charlie Kirk." Overall, both students reported that they were upset the day of the incident and they both confirmed that Ms. Fisher was, in fact, celebrating in the Law School Clinic. Both reported that they left early as they could not get any work done due to the unprofessionalism in the Law School Clinic.

8.      On September 12, 2025, I reported these facts to Dean Nowlin in preparation for his meeting with Professor Pat Metze.

**Defs.' Appx. 5**

9.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __23__, 2026.

Sofia Rodríguez Chapman

3

**Defs.' Appx. 6**

# Exhibit A

**Defs.' Appx. 7**

**SCHOOL
OF LAW**
TEXAS TECH

April 7, 2026

Dear Texas Board of Law Examiners,

I, Sofia Rodriguez Chapman, Associate Dean for Student Life, am writing this letter to the Texas Board of Law Examiners regarding information related to Ellie Fisher's character and fitness and her unprofessional behavior in the celebration of Charlie Kirk. I am 100% certain that Ellie Fisher celebrated the death of Charlie Kirk in both the clinic hallway and in Professor Patrick Metze's office, as I met with Professor Terri Morgeson and students **Student 2** and **Student 3** who confirmed Miss Fisher's behavior within 48 hours of September 10, 2025. Please see below for a summary of said meetings.

On September 11, 2025, Professor Terri Morgeson, who was visibly upset, came to me as it is common for anyone in the law school community to report an alleged violation of the Honor Code given my professional duties at the law school.  Professor Morgeson also reported this to me as I oversee all wellness and mental health support for the law school community. As such, Professor Morgeson asked me to check on two of her Family Law students, **Student 2** and **Student 3**, as Professor Morgeson reported that they were upset and bothered by the unprofessional behavior of Miss Fisher and Professor Pat Metze.

Professor Morgesson reported to me that Ellie Fisher was celebrating Charlie Kirk's death and that she heard Ellie Fisher use curse words related to Charlie Kirk's death. She also reported to me that Ellie Fisher tried to engage Professor Joe Stephens in a celebratory way about Charlie Kirk and that Professor Stephens "shut Ellie down". She also reported that this behavior upset her family law students, **Student 2** and **Student 3**. Thus, she allowed them to go home early due to the totality of events.

On September 12, 2025, students **Student 2** and **Student 3** reported to me that they both thought that Ellie's behavior was unprofessional. **Student 2** reported that she heard Ellie Fisher say. "I am in the best mood ever, they Killed Charlie Kirk." Overall, both students reported that they were upset the day of the incident and that they both confirmed that Ellie Fisher was in fact celebrating in the clinic. Both reported that they left early due as they could not get any work done due to the unprofessionalism in the clinic.

In conclusion, on September 12, 2025, I reported these facts to Dean Nowlin in preparation for his meeting with Professor Patrick Metze. Please contact at sofia.chapman@ttu.edu should you have questions regarding this letter.

Sincerely,

Sofia Rodriguez Chapman, Ph.D.
Associate Dean for Student Life



3311 18th Street I Box 40004 I Lubbock, Texas 79409-0004 I T 806.742.3791 I F 806.742.1629

**Defs.' Appx. 8**

# Appendix 2

Declaration of Jarod S. Gonzalez

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

ELLIE MAE FISHER,

     *Plaintiff,*

v.

CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,

     *Defendants.*

Civil Action No. 5:26-cv-00073-X

---

**DECLARATION OF JAROD S. GONZALEZ**

---

Pursuant to 28 U.S.C. § 1746, I, Jarod S. Gonzalez, declare the following:

1.     My name is Jarod S. Gonzalez. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am Associate Dean for Academic Affairs and J. Hadley and Helen Edgar Professor at Law at Texas Tech School of Law (the "Law School").

3.     On March 27, 2026, pursuant to Honor Code section 6, I received a request to review the Honor Council's decision related to the underlying matter. A true and correct copy of this email is attached hereto as **Exhibit A**.

1

**Defs.' Appx. 10**

4.      Pursuant to part 6 of the Honor Code, the Associate Dean may impose, modify, or vacate any sanction recommended, but cannot increase the severity of a sanction. The Associate Dean cannot modify or vacate the finding of a violation of this Code made by the Honor Council, except when the Associate Dean determines that the Council's finding is clearly erroneous. If the Associate Dean finds such an error, the Associate Dean will include the basis for this determination in his or her decision. The Associate Dean will send notice of his or her decision to the Dean, the student, the Honor Code Investigator, and the Chair of the Honor Council. The Dean will impose the sanction determined by the Associate Dean. There is no further right to appeal or review within the University.

5.      After receiving Ms. Fisher's request, I conducted a review pursuant to Section 6 of the Honor Code. Following that review, on April 13, 2026, I transmitted my conclusion that the Honor Council's finding regarding Ms. Fisher's violation of Section 2.H. for unprofessional conduct was not clearly erroneous. The evidence that I reviewed supported that the Honor Council's finding was based on Ms. Fisher's conduct as opposed to the viewpoint expressed. A true and correct copy of my response to Ms. Fisher's request for review is attached hereto as **Exhibit B**.

6.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 23rd, 2026.


Jarod S. Gonzalez

2

**Defs.' Appx. 11**

# Exhibit A

**Defs.' Appx. 12**

**Chapman, Sofia**

| | |
|---|---|
| **From:** | Chapman, Sofia |
| **Sent:** | Monday, March 30, 2026 2:53 PM |
| **To:** | 'Michael Allen'; Gonzalez, Jarod |
| **Cc:** | Fisher, Ellie; Tiffany Lawson; Gonzalez, Jarod |
| **Subject:** | RE: Ellie Mae Fisher - Request for Review of Honor Council Decision |

Dear Mr. Allen and Ms. Fisher,

As per Dean Gonzalez's email, the full evidentiary record has been provided by me to Dean Gonzalez which includes the two emails you sent on February 16th along with the attached six sworn affidavits.

Sincerely,

Sofia

Sofia Chapman, Ph.D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness
Office for Student Life Suite 103/104
Texas Tech University School of Law
Direct line: 806-834-2468
Sofia.chapman@ttu.edu

I recognize and understand that my working hours may be at times that are not your own. Please don't feel pressured to respond outside of your working hours. All the best!

**If you are in crisis, please call 911 immediately.**

Privacy/Confidentiality Notice:  This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Michael Allen <mallen@allenharrislaw.com>
**Sent:** Monday, March 30, 2026 1:26 PM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** RE: Ellie Mae Fisher - Request for Review of Honor Council Decision

This email originated outside TTU. Please exercise caution!

Thank you Associate Dean Chapman, Has the complete record, including the six sworn affidavits of students, many clearly indicating the biased nature of the Keffer Report, been forwarded to Associate

**Defs.' Appx. 13**

Dean Gonzalez?  Or just the transcript of the hearing?  We can also forward those to Associate Dean Gonzalez if you do not have them readily available.

Thanks, and we appreciate your help throughout all of this.

Mike Allen

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Chapman, Sofia <Sofia.Chapman@ttu.edu>
**Sent:** Monday, March 30, 2026 2:13 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** Re: Ellie Mae Fisher - Request for Review of Honor Council Decision

Dear Ellie,

As a follow up to Dean Gonzalez's email, I have also provided Dean Gonzalez with the full typed transcript of the hearing.

Sincerely,

Sofia

Sofia Chapman, Ph. D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness

This email and any files transmitted with it may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this information contained herein (including any reliance thereon) is strictly prohibited.  If you have received this email transmission in error, please immediately notify me by telephone or via return email, and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.

On Mar 30, 2026, at 12:44 PM, Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu> wrote:

2

**Defs.' Appx. 14**

Dear Ellie:

I received your written request to review the Honor Council's decision.  The record has been provided to me.  You do not need to send any additional materials to me.

Best,

Dean Gonzalez

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law
Texas Tech University School of Law
806-834-8378
jarod.gonzalez@ttu.edu

---

**From:** Fisher, Ellie <Ellie.Fisher@ttu.edu>
**Sent:** Friday, March 27, 2026 2:10 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Ellie Mae Fisher - Request for Review of Honor Council Decision

Dean Gonzalez,

Pursuant to the Texas Tech University School of Law policies, I am formally requesting a review of the Honor Council's decision, including the sanction imposed. I trust that you will be provided with the full evidentiary record considered by the Honor Council from the appropriate university official. However, please let me know if you would like me to submit any materials directly. Attached is my written request for review.

Thank you,
Ellie Mae Fisher

**Ellie Mae Fisher | She, Her**
Texas Tech Law, *Candidate for Doctor of Jurisprudence* 26'
Criminal Defense Clinic, *Texas State Bar Qualified Law Student* | (806) 834-2194
Tech Law National Lawyers Guild, *President*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

**Defs.' Appx. 15**

# Exhibit B

**Defs.' Appx. 16**



TEXAS TECH UNIVERSITY
School *of* Law™

April 13, 2026

**Confidential**
Sent via Email
ellie.fisher@ttu.edu

IN RE: ELLIE MAE FISHER

REVIEW

On March 27, 2026, Ellie Fisher submitted her Request for Review of the Honor's Council's Decision. As Associate Dean for Academic Affairs, I conducted the review pursuant to *Section 6. Review* of the Honor Code and determined that the Honor Council's finding of an Honor Code violation is not clearly erroneous. Accordingly, I uphold the Honor Council's finding and the Council's recommended sanction. There is no further right to appeal or review within the University.

You have been found responsible for violating university policy. Your conduct may also be considered a violation of the Texas Tech University Code of Student Conduct 20252026StudentCodeoConduct.pdf and may be investigated through the University Conduct System. Thus, the Office of Student Conduct has been copied on my decision.

Sincerely,

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law

Copy:  Dean Jack Wade Nowlin via email jack.nowlin@ttu.edu
        Professor William R. Keffer via email william.keffer@ttu.edu
        Professor Larry Spain via email larry.spain@ttu.edu
        Associate Dean Sofia Chapman via email sofia.chapman@ttu.edu
        Assistant Dean JaWana Green via email jawana.green@ttu.edu

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629
An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 17**

# Appendix 3

Declaration of William R. Keffer

**Defs.' Appx. 18**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>     *Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>     *Defendants.* | Civil Action No. 5:26-cv-00073-X |

---

### DECLARATION OF WILLIAM R. KEFFER

---

Pursuant to 28 U.S.C. § 1746, I, William R. Keffer, declare the following:

1.     My name is William R. Keffer. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am the Janet Scivally and David Copeland Endowed Professor of Energy Law; Director, Energy Law Programs; and Assistant Director, Bar Preparation Resources at Texas Tech School of Law (the "Law School").

3.     I currently serve as an Honor Code Investigator. In this role, I determine if probable cause exists to believe an Honor Code violation occurred and whether the matter should be sent to the Honor Council, or if it qualifies for administrative disposition as described in Part 4.E. of the Honor Code.

**Defs.' Appx. 19**

4.    On September 10, 2025, there were multiple reports that Ms. Fisher celebrated the public assassination of Charlie Kirk in the Law School's clinical suite during work hours.

5.    On September 23, 2025, this matter was referred to me by Dean Nowlin and Dean Chapman pursuant to part 4.B. of the Honor Code to investigate a potential violation concerning:

*"H. Violation of Professional Duties*

*A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records,*

*and pro bono activities. Conduct of this kind typically violates Principle One."*

6.    During my investigation I met with Dean Chapman and 18 other individuals identified in my report. I did not consider any viewpoint expressed by Ms. Fisher in my investigation. My investigation focused solely on whether Ms. Fisher's behavior in the Law School Clinic on September 10, 2025, was unprofessional conduct in violation of section 2.H. of the Honor Code.

7.    After conducting my investigation, I was of the opinion, as set forth in my report, pursuant to section 4.D., that probable cause existed that Ms. Fisher violated the Honor Code and that this matter should be referred to the Honor Council for further disposition. Accordingly, on January 23, 2026, I referred the matter of Ellie Fisher to the Honor Council.  A true and correct copy of my referral and investigation report is attached hereto as **Exhibit A.**

8.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 22, 2026.

William R. Keffer

2

**Defs.' Appx. 20**

# Exhibit A

**Defs.' Appx. 21**


TEXAS TECH UNIVERSITY
School *of* Law·

January 23, 2026

Professor Larry Spain
Chair, Honor Council
Texas Tech University School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Dear Professor Spain:

I am referring to the Honor Council a matter regarding Ellen Fisher. The Law School received information that Ms. Fisher allegedly violated Section H of the Honor Code ("Violation of Professional Duties") "…by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities."

Pursuant to the Student Handbook, I have conducted a preliminary factual investigation and have determined that probable cause exists to believe that Ms. Fisher violated the Honor Code. Accordingly, I am referring the matter to the Honor Council for consideration. In addition, on this date, I am notifying Ms. Fisher of this referral. Please contact Dean Chapman for information related to Ms. Fisher's case.

Please let me know if you have any questions or need more information.

Sincerely,

William R. Keffer
Texas Tech University School of Law
Janet Scivally and David Copeland Endowed Professor of Energy Law
Director, Energy Law Programs
Assistant Director, Bar Preparation Resources
806/834-3178
william.keffer@ttu.edu

**Defs.' Appx. 22**


TEXAS TECH UNIVERSITY
School *of* Law™

January 23, 2026

Re: Honor Code Violation - Ms. Ellen Fisher

On 9/23/25, Dean Nowlin and Dean Chapman appointed me under Section 4(B) of the law school's Honor Code to investigate a potential violation concerning:

*"H. Violation of Professional Duties*

**A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One."**

Specifically, you are alleged to have acted unprofessionally on Wednesday, 9/10/25 relating to your behavior and statements in a clinical setting made about the assassination of Charlie Kirk.

I met with Dean Chapman on Tuesday, 9/23/25 regarding this matter. I then met with the following people as part of this investigation (Dean Chapman was present during all student interviews):

1.  10/1/25 – Dwight McDonald (faculty)
2.  10/2/25 – Joe Stephens (faculty)
3.  10/2/25 – Terri Morgeson (faculty)
4.  10/8/25 – **Student 2** (student)
5.  10/8/25 – **Student 3** (student)
6.  10/14/25 – Pat Metze (faculty)
7.  10/16/25 – **Student 7** (student)
8.  10/21/25 – Ellen Fisher (student)
9.  10/22/25 – **Student 6** (student)
10. 10/28/25 – Dwight McDonald (faculty) and Sofia Chapman (Associate Dean)
11. 10/28/25 – Jack Nowlin (Dean), Larry Spain (faculty) , and Dwight McDonald (faculty)
12. 11/6/25 – Ken Williams (faculty)
13. 11/7/25 – **Student 13** (student)
14. 11/12/25 – **Student 4** (student)
15. 11/13/25 – **Student 11** (student)
16. 11/13/25 – **Student 5** (student)
17. 11/14/25 – **Student 14** (student)
18. 11/14/25 – **Student 10** (student)

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 23**

The following information supporting the allegations was gathered from the interviews (all references are to events that occurred on 9/10/25, unless otherwise indicated):

1.  Joe Stephens stated that Fisher made the following statements to him:
    a.  "They shot Charlie."
    b.  "There's video."
    c.  "It looks bad."
2.  Terri Morgeson stated that she heard Fisher make the following statements to others:
    a.  "I'm in such a good mood."
    b.  "That mother fucker got shot."
3.  Morgeson described Fisher as loud, happy, and celebratory.
4.  Morgeson later told Pat Metze and the students who were in his office (including Fisher) that Kirk had just died. Metze responded: "Well, my students are in a very good mood."
5.  On the next day (9/11/25), Morgeson told Metze that he and his students had offended Morgeson's students with their behavior the previous day. Metze responded: "Well, it was Ellie."
6.  Morgeson's student, **Student 2**, heard Fisher make the following statements:
    a.  [to Joe Stephens] "I'm in the best mood ever."
    b.  [to Joe Stephens] "They shot Charlie Kirk."
7.  **Student 2** was upset by the behavior she witnessed and statements she heard seemingly celebrating Kirk's death and asked Morgeson if she could go home early.
8.  Morgeson's student, **Student 3**, heard the following statements coming from a female student that sounded like Fisher:
    a.  "They got him."
    b.  "This is great."
    c.  "He's dead."
9.  Pat Metze made the following statements about the alleged incident:
    a.  Fisher came "bopping into his office" and was "animated."
    b.  He recalled Fisher saying that her mother was "really excited" about Kirk's assassination.
    c.  When discussing the matter later with Dean Jack Nowlin, along with Dwight McDonald and Larry Spain, Metze told Nowlin that he himself did not celebrate Charlie Kirk's death, but Fisher did. Nowlin told Metze that he should have corrected Fisher's behavior. Metze responded that he "didn't think it was his place." Metze also stated in his meeting with Dean Nowlin that Fisher's behavior was immature, but she was entitled to her opinion. At no time during the lengthy discussion did Metze ever dispute the fact that Fisher had celebrated Charlie Kirk's murder while in his office.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 24**

d.  Even though Metze later insisted in his interview with me that he couldn't recall any details and was of the opinion that Fisher had done nothing wrong, he eventually stated that:
    i.   Fisher was loud and "expressed her happiness."
    ii.  Not confirming or denying that Fisher stated, "that mother fucker got shot", Metze responded: "That's a common term in the Black community."
    iii. In response to my question as to whether Fisher could benefit from constructive criticism about her behavior (even if Metze didn't find it objectionable), Metze responded that "she would benefit from talking to a Black, female counselor."

10. While she and Fisher were in Metze's office, **Student 7** stated that Fisher commented that she had been on the phone with her mother earlier about Kirk's assassination. She also stated that Fisher seemed to be repeating her mom's happiness.

11. Ellen Fisher made the following statements:
    a.  When she briefly spoke to Stephens, he was the one who asked her if she had "heard." She responded: "About what?"
    b.  While she was in Metze's office, Metze told her and other students who Kirk was. Metze showed her and others the video of the shooting on his phone. Fisher said she didn't look at it.
    c.  Fisher stated that she never showed anyone the video on her phone.
    d.  In response to her alleged statement that "that mother fucker got shot", Fisher stated that she doesn't use curse words. She further stated that she would never use that kind of language in the clinic suite because clients are frequently present.
    e.  Fisher stated that, before the shooting, she hadn't known who Charlie Kirk was.
    f.  Fisher stated that she didn't talk to her mother about the Kirk assassination until later that day.
    g.  Fisher agreed that behaving in the manner alleged would be wrong.
    h.  Fisher agreed that making any of the alleged statements would be unprofessional but also referenced the First Amendment.

12. **Student 4** stated that Fisher showed him the video of Kirk's shooting on her phone.

13. **Student 4** stated that Fisher used "choice" words in her description of Kirk.

14. **Student 4** believes that, based on Fisher's discussion about Kirk that day, she seemed to know who he was.

15. **Student 11** stated that Fisher talked about Kirk like she knew who he was.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 25**

16. When **Student 5** entered the conference room in the clinic where Fisher was, she was on her phone exclaiming that Kirk had been shot and showing others, including **Student 5**, the video. He was surprised at the manner in which she was describing the news because she was happy and excited. **Student 5** stated that he would definitely describe her behavior as celebrating Kirk's death. **Student 5** also said, "I wanted to say something, but we have to be in the room for two semesters, so I didn't want to get into a fight." **Student 5** also said, "Had I said something, it would have caused me stress." **Student 5** also said, "She said he got what he deserved." **Student 5** also said, "I feel it's not the right environment."

17. **Student 5** believes that Fisher knew who Kirk was before the shooting because she was quoting something Kirk had once said about the Second Amendment.

18. **Student 10** stated that Fisher offered to show her the video on her phone.

After conducting my investigation, I am of the opinion, pursuant to Section 4(D), that probable cause exists that you violated the Honor Code and that this matter should be referred to the Honor Council for further disposition.

Sincerely,

William R. Keffer
Janet Scivally and David Copeland Endowed Professor of Energy Law

Cc: Dean Jack Nowlin
Associate Dean Sofia Chapman

**Defs.' Appx. 26**

# Appendix 4

Declaration of Dwight McDonald

**Defs.' Appx. 27**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

ELLIE MAE FISHER,

    *Plaintiff,*

v.

CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,

    *Defendants.*

Civil Action No. 5:26-cv-00073-X

---

### DECLARATION OF DWIGHT MCDONALD

Pursuant to 28 U.S.C. § 1746, I, Dwight McDonald, declare the following:

1.    My name is Dwight McDonald. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I am a Clinic Instructor for the Criminal Defense Clinic at Texas Tech School of Law (the "Law School"), where I assist and mentor students with their clients.

3.    I submitted a formal statement to Dean Nowlin pursuant to his independent investigation into the facts giving rise to this case. The content of this affidavit reflects my formal statement to Dean Nowlin. A true and correct copy of my statement to Dean Nowlin can be found in Dean Nowlin's complete response to the Texas Board of Law Examiners' inquiry, which is attached hereto as **Exhibit A**.

**Defs.' Appx. 28**

4.      On September 10, 2025, I returned to my office from my ISL class. Professor Morgeson, Director of the Family Law Clinic, immediately came to my office and told me that Ellie Fisher had come into the Law School Clinic Suites and loudly proclaimed, "They shot that mother fucker."

5.      Professor Morgeson then explained that Ms. Fisher had gone into Professor Metze's office and there was loud talking, so much so that she felt the need to close the door as they were disturbing herself and other students in the Law School Clinic Suites. She went to close the door and explained to Professor Metze and the students in his office (Ms. Fisher being one of three students in the office) that Charlie Kirk had died and they were being too loud, so she was going to close the door.

6.      On September 12th, I met with Dean Nowlin, Professor Pat Metze and Professor Larry Spain regarding the incident involving Ms. Fisher on September 10th.

7.      Dean Nowlin explained to Professor Metze that there had been information relayed to him that Ellie Fisher had said something to the effect of, "They shot that mother fucker" while she was in the Law School Clinic Suites and she had participated in a loud, celebratory conversation regarding the shooting while in his office and that he did nothing. He also asked Professor Metze if that were true and Professor Metze stated, "who am I to tell a black woman what she can or can't say."

8.      Professor Metze never denied that Ms. Fisher made the statement during the meeting, nor did he deny that she was in his office being loud and that Professor Morgeson had to close the door to his office due to the loudness.

9.      Professor Metze and I had several conversations about the situation involving Ms. Fisher and his response, or lack thereof, over the following couple of weeks. At no time did Professor Metze ever deny or contest that Ms. Fisher made the statement, "They shot the mother fucker." Nor did he deny that Ms. Fisher participated in the loud, celebratory conversation regarding Charlie Kirk's assassination while in his office and that Professor Morgeson had to close the door to his office due to the volume of the office.

**Defs.' Appx. 29**

10.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 23 , 2026.

Dwight McDonald

**Defs.' Appx. 30**

# Exhibit A

**Defs.' Appx. 31**

# CLINICAL PROGRAMS

March 30, 2026

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law
Texas Tech University School of Law

On September 10, 2025, I returned to my office from my ISL class. Professor Morgeson immediately came to my office and told me that Ellie Fisher had come into the Clinic Suites and loudly proclaimed "They shot that Mfer." Professor Morgeson then explained that Ms. Fisher had gone into Professor Metze office and there was loud talking coming from Metze's office, so much so that she felt the need to close the door as they were disturbing herself and other students in the Clinic Suites. She went to close the door and explained to Professor Metze and the students in his office (Ms. Fisher being one of three students in the office) that Charlie Kirk had died and they were being too loud so she was going to close the door.

On September 12th, I met with Dean Nowlin, Pat Metze and Larry Spain regarding the incident on September 10th. Dean Nowlin explained to Pat that there had been information relayed to him that Ellie Fisher had said something to the effect of," They shot that Mfer" while she was in the Clinic Suites and she had participated in a loud, celebratory conversation regarding the shooting while in his office and that he did nothing. He also asked Pat if that were true and Pat stated, "who am I to tell a black woman what she can or can't say." Pat Metze never denied that Ms. Fisher made the statement during the meeting, nor did he deny that Ellie Fisher was in his office being loud and that Professor Morgeson had to close the door to his office due to the loudness. Pat Metze and I had several conversations about the situation involving Ms. Fisher and his response or lack thereof over the next 10 days to two weeks. At no time did Pat ever deny or contest that Ms. Fisher made the statement, "They shot the Mfer." Nor did he deny that Ellie Fisher participated in the loud, celebratory conversation regarding Charlie Kirk's assassination while in his office and that Professor Morgeson had to close the door to his office due to the volume of the conversation in his office.

Dwight McDonald



## TEXAS TECH
### School of Law

FROM HERE, IT'S POSSIBLE.™

**Defs.' Appx. 32**

3311 18TH STREET • BOX 40004 • LUBBOCK, TEXAS 79409-0004 • T: 806.742.4312 • F: 806.742.4199 • TTU.EDU

# Appendix 5

Declaration of Terri M. Morgeson

Defs.' Appx. 33

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>   *Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>   *Defendants.* | Civil Action No. 5:26-cv-00073-X |

**DECLARATION OF TERRI M. MORGESON**

Pursuant to 28 U.S.C. § 1746, I, Terri M. Morgeson, declare the following:

1. My name is Terri M. Morgeson. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. I am a clinical instructor and Director of the Family Law Clinic at Texas Tech School of Law (the "Law School").

3. I submitted a formal statement to Dean Nowlin pursuant to his independent investigation into the facts giving rise to this case. The content of this affidavit reflects my formal statement to Dean Nowlin. A true and correct copy of my statement to Dean Nowlin can be found in Dean Nowlin's complete response to the Texas Boad of Law Examiner's inquiry, which is attached hereto as **Exhibit A**.

**Defs.' Appx. 34**

4.      On Monday, September 10, 2025, I had just concluded teaching my Introduction to the Study of Law class and returned to the clinic to check in with my students.

5.      I was in the family law clinic speaking with two students, when the clinic's front doors were abruptly and forcefully thrown open.

6.      Ellie Fisher entered the clinic loudly exclaiming, "This is the best day ever. I am so happy." Her tone rose to a near-yell and was loud enough to be heard throughout the clinic hallway.

7.      Ms. Fisher proceeded down the hallway toward faculty offices, continuing to speak at a disruptive volume. I was standing leaning up against a computer station on the north wall of my clinic. As Ms. Fisher approached, I turned to watch her walk down the hallway. I saw her enter the doorway to Professor Steven's office. I was standing less than 6 feet away from her. Her back was to me. Professor Stevens was sitting at his desk facing me and the hallway.

8.      She stopped at Professor Stevens's office, entered the threshold, and stated, "I am so happy. I'm having the best day ever." When he asked why, she responded, "Because Charlie Kirk was shot."

9.      Professor Stevens appeared visibly taken aback. Ms. Fisher then asked whether he knew who Charlie Kirk was. Professor Stevens instructed her not to enter his office, making statements of that nature. Ms. Fisher then asked if he knew who Charlie was and about all the inflammatory statements he had made.

10.      When they were discussing the matter, I left the family law clinic at that time. The volume of Ms. Fisher's voice made it difficult to continue my discussion with my students. Her entire conversation with Professor Stevens was within arm's length of the Family Law Clinic.

11.      A short time later, Ms. Fisher left Professor Stevens's office and proceeded toward Professor Metze's office.

12.      From my office, I observed Ms. Fisher standing in Professor Metze's doorway. She raised her hands over her head and exclaimed, "They shot him." I do not clearly recall whether she also used profanity.

2

**Defs.' Appx. 35**

13.    Ms. Fisher then entered Professor Metze's office. Professor Metze's office shares a wall with mine, and voices from it can be heard clearly in mine.

14.    While in his office, Ms. Fisher and Professor Metze engaged in a conversation about the shooting. Their voices were loud and clearly audible, carrying into the hallway.

15.    During this conversation, they discussed the circumstances of the shooting and speculated about whether Charlie Kirk was deceased. Professor Metze referenced that his daughter is a nurse and discussed possible medical implications from being shot in the neck.

16.    Then I returned to my office, closed my door, and continued to try to work.

17.    Even with all doors closed, I could still hear laughter, giggling, and comments that I considered inappropriate in a professional clinic setting. Their behavior limited my ability to work. I was scared to call anyone, so I tried to respond to clients' emails and texts.

18.    When I refer to "they," I am referring to the voices I could clearly identify as Professor Metze and Ms. Fisher.

19.    Less than 10 minutes later, my two students wanted to leave the clinic early. Their office hours were scheduled to end at 5. They did not want to deal with the noise and disruption, which made it impossible to continue working. I agreed and allowed them to leave early.

20.    Two additional students were present in Professor Metze's office during this time. Those students were not participating in the conversation about the shooting. Based on what I could hear and observe from the doorway, they were engaged in separate work related to a case.

21.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2026.

*Terri M. Morgeson*
Terri M. Morgeson

3

**Defs.' Appx. 36**

# Exhibit A

# CLINICAL PROGRAMS

April 10, 2026

Dean Jack Nowlin                                         **SENT VIA EMAIL**
Texas Tech School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Re: Formal Statement

Dear Dean Nowlin,

Please find below my formal statement of the events that occurred on September 10, 2026, in the Clinical Suite of the law school.

1. On Monday, September 10, 2025, I had just concluded teaching my Introduction to the Study of Law class and returned to the clinic to check in with my students.

2. I was in the family law clinic speaking with two students, **Student 2** and **Student 3**, when the clinic's front doors were abruptly and forcefully thrown open.

3. Ellie Fisher entered the clinic loudly exclaiming, "This is the best day ever. I am so happy." Her tone rose to a near-yell and was loud enough to be heard throughout the clinic hallway.

4. Ms. Fisher proceeded down the hallway toward faculty offices, continuing to speak at a disruptive volume. I was standing leaning up against a computer station on the north wall of my clinic. As Ellie approached, I turned to watch her walk down the hallway. I saw her enter the doorway to Professor Steven's office. I was standing less than 6 feet away from her. Her back was to me. Joe Stevens was sitting at his desk facing me and the hallway,

3311 18TH STREET · BOX 40004 · LUBBOCK, TEXAS 79409-0004 · T: 806.742.4312 · F: 806.742.4199 · TTU.EDU



## TEXAS TECH
### School of Law

FROM HERE, IT'S POSSIBLE.™

**Defs.' Appx. 38**

April 10, 2026
Dean Nowlin – Formal Statement

5. She stopped at Joe Stevens's office, entered the threshold, and stated, "I am so happy. I'm having the best day ever." When he asked why, she responded, "Because Charlie Kirk was shot."

6. Professor Stevens appeared visibly taken aback. Ms. Fisher then asked whether he knew who Charlie Kirk was. Professor Stevens responded that he had done so and instructed her not to enter his office, making statements of that nature. Ellie then asked if he knew who Charlie was and about all the inflammatory statements he had made.

7. When they were discussing the matter, I saw my opportunity, and I left the family law clinic at that time. The volume of Ms. Fisher's voice made it difficult to continue my discussion with my students. Her entire conversation with Professor Steven was within arm's length of the Family Law Clinic.

8. A short time later, Ms. Fisher left Professor Stevens's office and proceeded toward Professor Metze's office.

9. From my office, I observed Ms. Fisher standing in Professor Metze's doorway. She raised her hands over her head and exclaimed, "They shot him." I do not clearly recall whether she also used profanity.

10. Ms. Fisher then entered Professor Metze's office. Professor Metze's office shares a wall with mine, and voices from it can be heard clearly in mine.

11. While in his office, Ms. Fisher and Professor Metze engaged in a conversation about the shooting. Their voices were loud and clearly audible, carrying into the hallway.

12. During this conversation, they discussed the circumstances of the shooting and speculated about whether Charlie Kirk was deceased. Professor Metze referenced that his

**Defs.' Appx. 39**

April 10, 2026
Dean Nowlin – Formal Statement

daughter is a nurse and discussed possible medical implications from being shot in the neck.

13. The tone of the conversation was animated and loud. They were loud, laughing, almost giddy with happiness.

14. During this time, all doors were open. I could still clearly hear the conversation from Professor Metze's office and distinguish the speakers.

16. At one point, they were watching a video related to the shooting and laughing while describing how Mr. Kirk's head moved after he was shot.

17. I was concerned that this conduct would be disruptive to the educational and professional environment and potentially offensive to students and any clients present in the clinic. In an effort to minimize disruption, I decided to close all of the doors in the clinic suite.

19. While I was in the Family Law clinic, I learned that Charlie Kirk had died after President Trump publicly confirmed his death on social media.

20. After closing my Clinic door, I walked down the hallway to Professor Metze's office and informed them that Mr. Kirk had died. I stood in his doorway and observed clearly who was in his office and what they were doing.

21. As I was standing in his doorway, Professor Metze commented, "My students are having a really good day. I'm sorry—they're just really, really happy." After this statement, I walked out, closing his office door.

22. I then walked through the clinic suite to confirm that the doors to other clinic areas were closed.

**Defs.' Appx. 40**

April 10, 2026
Dean Nowlin – Formal Statement

23. Then I returned to my office, closed my door, and continued to try to work.

24. Even with all doors closed, I could still hear laughter, giggling, and comments that I considered inappropriate in a professional clinic setting. Their behavior limited my ability to work. I was scared to call anyone, so I tried to respond to clients' emails and texts.

25. Less than 10 minutes later, my two students wanted to leave the clinic early. Their office hours were scheduled to end at 5. They did not want to deal with the noise and disruption, which made it impossible to continue working. I agreed and allowed them to leave early.

25. When I refer to "they," I am referring to the voices I could clearly identify as Professor Metze and Ellie Fisher.

26. Two additional students were present in Professor Metze's office during this time. Those students were not participating in the conversation about the shooting. Based on what I could hear and observe from the doorway, they were engaged in separate work related to a case.

Sincerely,

Terri Morgeson
*Director of the Family Law Clinic*
*Attorney at Law*

**Defs.' Appx. 41**

# Appendix 6

Declaration of Jack Wade Nowlin

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>    *Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>    *Defendants.* | Civil Action No. 5:26-cv-00073-X |

## DECLARATION OF JACK WADE NOWLIN

Pursuant to 28 U.S.C. § 1746, I, Jack Wade Nowlin, declare the following:

1.    My name is Jack Wade Nowlin. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.    I am Dean and W. Frank Newton Professor of Law at Texas Tech School of Law (the "Law School).

3.    The Honor Code is one of the two codes that govern the conduct of law students at Texas Tech University. A true and correct copy of the Honor Code is attached hereto as **Exhibit A.**

4.    As Dean, each year I appoint Honor Code Investigators and Honor Council Members pursuant to part 4 of the Honor Code. Honor Code Investigators, who are typically

1

**Defs.' Appx. 43**

full-time faculty members, conduct preliminary factual investigations of alleged violations of the Honor Code.

5.    If the Honor Code Investigator determines that probable cause exists to believe a violation occurred, the Honor Code Investigator, will consult with me and determine whether the matter should be sent to the Honor Council or if it qualifies for administrative disposition as described in Part 4.E. of the Honor Code.

6.    Professor William R. Keffer currently serves as an Honor Code Investigator.

7.    On September 10, 2025, there were multiple reports that Ms. Fisher celebrated a political assassination in the Law School's clinical suite during work hours. This occurred while Ms. Fisher was a clinical student with a supervised practice card and thus able to represent clients in our clinics under our professional supervision. The celebration was loud, overheard by others, and adversely affected the operation of the clinic. The matter was referred to Professor Keffer to investigate pursuant to parts 4.B. & C. of the Honor Code.

8.    On January 23, 2026, after conducting a preliminary factual investigation and consulting with me, Professor Keffer referred the matter of Ellie Fisher to the Honor Council, as he found probable cause existed to believe that Ms. Fisher violated the Honor Code pursuant to part 4.D. of the Honor Code. A true and correct copy of the letter is attached hereto as **Exhibit B**.

9.    On February 20, 2026, the Honor Council convened to consider whether Ellie Fisher violated part 2.H. (Violation of Professional Duties) of the Honor Code ("… by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs …") as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of public figure, Charlie Kirk, on September 10, 2025.

10.    On March 11, 2026, the Honor Council issued a report pursuant to Honor Code part 4.H., including findings of fact, a conclusion as to the violation of the Honor Code, and the

recommended sanction. A true and correct copy of the Honor Council's Report in the matter of Ms. Fisher is attached hereto as **Exhibit C**.

11.    On March 17, 2026, the Law School received notification from the Texas Board of Law Examiners that Ms. Fisher applied for admission to the Bar of Texas and requested the completion of a reference form regarding the applicant to assist in completing an investigation. A true and correct copy of this request is attached hereto as **Exhibit D**.

12.    On March 27, 2026, pursuant to Honor Code part 6, Ms. Fisher emailed Associate Dean Jarod Gonzalez to request a review of the Honor Council's decision. A true and correct copy of this email is attached hereto as **Exhibit E**.

13.    Pursuant to part 6 of the Honor Code, the Associate Dean may impose, modify, or vacate any sanction recommended, but cannot increase the severity of a sanction. The Associate Dean cannot modify or vacate the finding of a violation of this Code made by the Honor Council, except when the Associate Dean determines that the Council's finding is clearly erroneous. If the Associate Dean finds such an error, the Associate Dean will include the basis for this determination in his or her decision. The Associate Dean will send notice of his or her decision to the Dean, the student, the Honor Code Investigator, and the Chair of the Honor Council. The Dean will impose the sanction determined by the Associate Dean. There is no further right to appeal or review within the University.

14.    On April 13, 2026, in response to Ms. Fisher's request to review the decision, Associate Dean Gonzalez, after conducting a review pursuant to part 6 of the Honor Code, determined that the Honor Council's finding of an Honor Code violation was not clearly erroneous. A true and correct copy of the response to Ms. Fisher's request for review is attached hereto as **Exhibit F**.

15.    On April 13, 2026, I sent a letter, through the Associate Dean of Student Life, Ms. Sofia Chapman, to Ms. Fisher serving as a formal reprimand for violation of the Honor Code. A true and correct copy of this letter is attached hereto as **Exhibit G**.

**Defs.' Appx. 45**

16.     On April 13, 2026, I responded to the Texas Board of Law Examiners' inquiry, recommending against Ms. Fisher's admission to the Texas Bar and setting forth the reasons for my recommendation. My recommendation against Ms. Fisher's admission to the Texas Bar was not based on any viewpoint she expressed but rather her unprofessional conduct in the Law School Clinic.  Specifically, my recommendation was based on three related reasons. First, Ms. Fisher, as a clinical student with a supervised practice card, disrupted our clinical spaces with a celebration of a political assassination. Second, she has refused to take responsibility or show any remorse for her unprofessional actions. And third, she has displayed dishonesty when discussing this incident in our Honor Code proceedings. The Dean's Office is confident in its fact-finding that Ms. Fisher celebrated an assassination in the Law School Clinic in disruptive fashion. A true and correct copy of my letter to the Texas Board of Law Examiners is attached as **Exhibit H**. A true and correct copy of the complete response to the Texas Boad of Law Examiner's inquiry is attached hereto as **Exhibit I**.

17.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 22, 2026.


Jack Wade Nowlin
Dean and W. Franklin Newton Professor of Law

**Defs.' Appx. 46**

# Exhibit A

Defs.' Appx. 47

Case 5:26-cv-00073-X    Document 25    Filed 04/27/26    Page 48 of 294    PageID 606



**School of Law**

**Texas Tech**  //  School of Law



| Title | Honor Code |
|---|---|
| **Category** | Honor Code and Rules of the School of Law |
| **Date Approved and/or Revised** | April 19, 2017 (approved), August 31, 2017 (revised), November 7, 2018 (revised); May 8, 2019 (revised), November 19, 2019 (revised effective January 1, 2020), November 18, 2020 (revised) |

# 1. INTRODUCTION

### A. Preamble

Texas Tech University School of Law's Honor Code emphasizes the importance of academic and professional integrity. Academic and professional integrity refers to honest and ethical behavior within an academic and a professional community. The Honor Code promotes an atmosphere in which students can work and interact with mutual respect, trust, and individual responsibility.

Faculty, staff, and students have a responsibility to uphold the principles of academic integrity, and to create an environment that encourages honesty and an open discussion of integrity. Students in the School of Law are expected to exhibit the same qualities of honesty, responsibility, and respect for the rights of others that are demanded of members of the legal profession.

Each student has a responsibility to uphold the spirit of the Honor Code. When a student has reason to believe that a violation of the Code has occurred or will occur soon, he or she has a duty to report the matter to the Dean or the designated faculty Honor Code Investigator. A student who fails to report a suspected violation may violate this Code. If a student reports a suspected violation to a faculty or staff member and that person also has reason to believe that a violation of the Code has occurred or will occur soon, the faculty or staff member has a duty to report it to the Dean or the Honor Code Investigator. To avoid concerns about the confidentiality of a conversation, faculty and staff members should inform students of the faculty or staff member's duty to report.

### B. Scope

**Defs.' Appx. 48**

 **School of Law**

The Honor Code governs conduct related to integrity and academic endeavors at all times from submission of an application for admission through graduation. If an Honor Code matter is pending when a student is scheduled to graduate, the student's degree may be withheld at least until the matter is resolved. An investigation may arise regarding a graduate when the conduct in question arose before graduation. A finding of a violation that occurred before a student graduated may result in the revocation of a degree previously awarded.

### C. Relation to University Code of Student Conduct

The Honor Code is one of the two codes that govern the conduct of law students at Texas Tech University. The second is the Texas Tech University Code of Student Conduct, which can be found in the University Student Handbook.

Law students are held to standards beyond those of other students at the University because they intend to enter a profession that has high expectations of character and ethical behavior.

The Honor Code sets out guidelines and expectations for appropriate behavior and professional decorum. The Honor Code Investigator and the Honor Council resolve matters relating to the Honor Code, while the University resolves matters involving the Texas Tech University Code of Student Conduct.

The School of Law partners with the University in attempting to provide a disciplinary process to law students that addresses problem behavior fairly and respectfully. This Code typically will govern the conduct of law students in cases where the Honor Code and the University Code of Student Conduct might apply concurrently. The Dean will confer as necessary with appropriate University officials when questions arise concerning whether this Code, the University Code of Student Conduct, or both should apply.

## 2. CONDUCT SUBJECT TO SANCTION

The Honor Code addresses matters of academic dishonesty, based on the following principles that illustrate the rigorous demands of integrity required of students.

*Principle One - A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education.*

*Principle Two - A Law Student Should Perform All Work in Academic Matters Honestly.*

*Principle Three - A Law Student Should Not Take Unfair Advantage in Academic Matters of Another Student, Faculty Member, Staff Member, or the Law School.*

The following list includes, but is not limited to, acts that violate the Honor Code.

### A. Cheating

A student cannot use or attempt to use unauthorized materials or sources in connection with any assignment, examination, or other academic exercise, or have another person do work for a class when not expressly authorized by the instructor. This includes copying another's work on an examination, assignment, or other academic

**Defs.' Appx. 49**



A student cannot work with another person without express authorization from the supervising instructor or a sponsoring organization, such as a journal. This includes work done for an internal or external advocacy competition. Prohibited conduct may include talking about the assignment, assisting or receiving assistance with editing, or sharing research. Students cannot collaborate in any manner on the write-on competition for journals. Conduct of this kind typically violates Principle Two, Principle Three, or both.

### C. Unfair Academic Advantage

A student violates this Code by intentionally causing a disadvantage to other students by failing to return needed library books, damaging or removing pages or materials from needed books such that others cannot use them, gaining unauthorized access to an examination before the examination period, continuing to work on an examination after time has been called, handing in another person's work as one's own for credit, or trying to duplicate from memory, photographs, or otherwise specific questions from an examination not intended for circulation to others. Other forms of unfair academic advantage may be represented by taking, keeping, misplacing, damaging or altering property. This type of conduct may violate Principle Two, Principle Three, or both.

### D. Deception and Misrepresentation

A student violates this Code by lying about or misrepresenting his or her work, academic records, credentials, or other academic matters or information. This includes, but is not limited to forging a signature on any document, forging letters of recommendation, falsifying externship or clinical documentation, falsifying pro bono records, falsifying class attendance rolls, or falsely claiming to be a licensed attorney. This type of conduct may violate Principle One, Principle Three, or both.

### E. Electronic Dishonesty

A student cannot use a network or gain access to a computer inappropriately, in a way that affects a class or other students' academic work. A non-exhaustive list of examples include tampering with another student's account so that the student cannot complete or submit an assignment, stealing a student's work through electronic means, or knowingly spreading a computer virus or malware, impersonating another via electronic means, improperly accessing online accounts or data, and using a computer or device during class in a manner not authorized by the instructor in a way that affects other student's academic work. Conduct of this kind typically violates Principle Three.

### F. Plagiarism

A student cannot represent the words or ideas of another as his or her own. The misrepresentation does not need to be intentional. It is oftentimes manifested by a failure to properly cite or acknowledge the words or work of others. Plagiarism includes, but is not limited to:

1. Quoting without citations or without appropriate punctuation, including quotation marks;

2. Paraphrasing without appropriate attribution;

3. Misrepresenting another's analysis, synthesis, organization, or compilation of sources as one's own; or

4. Using Internet sources without appropriate attribution, on the same basis as any other source.



**School of Law**

A student may violate this Code by failing to disclose legal, academic, and behavioral offenses as required on his or her Application for Admission to the School of Law. A student may also violate this Code by failing to disclose legal, academic, and behavioral offenses that occur after submitting the Application for Admission to the School of Law until the student graduates, as required by the Application. A student must disclose any such offense to the Associate Dean for Student Life within 30 days. This duty to report includes behavioral offenses under the Texas Tech University Student Code of Conduct and any legal offenses other than Class C misdemeanor traffic offenses. Conduct of this kind typically violates Principle One.

### H. Violation of Professional Duties

A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.

## 3. HONOR COUNCIL

### A. Members

The Honor Council consists of five members: three full-time law faculty and two students. Each year, the Dean will appoint the faculty members, designating one as the Chair of the Honor Council. The Dean may also appoint two additional full-time faculty members as alternates. The Dean will arrange training for the members and alternate members of the Honor Council every year. Each faculty member will serve for the entire academic year and will continue until the Dean appoints a successor. Student members are elected by their peers. One must be a third-year student at the time of election and is elected by the third-year class. The other must be a second-year student at the time of election and is elected by the second-year class. The Dean may replace any faculty member who fails to serve or is otherwise unable to serve. If any student member fails to serve or is otherwise unable to serve, the Chair of the Honor Council may appoint a student from the same class year as the replaced student member, after consulting with the Student Bar Association and the Dean.

### B. Quorum

A quorum of the Council consists of three members. At least two must be faculty members and at least one must be a student. A Council member who recuses himself or herself, or is otherwise unable to serve, may have a temporary replacement appointed, as described above.

### C. Challenges

Council members who feel they are or may be biased in a particular case will recuse themselves from the hearing and consideration of the case. Previous enrollment of the student in question in a class taught by a faculty member on the Council is not in itself grounds for recusal. Any student accused of violating the Honor Code may challenge any Council member as biased and present facts and arguments to support the challenge. Members of the Council who have not been challenged will determine, by majority vote, whether the challenged member is recused. The Dean may appoint replacement Council members as described above to hear a challenge if fewer than three members are available to hear the challenge. Following any challenges, the Chair of the Council will reschedule the hearing if the remaining members do not conform to the quorum requirements above.

**Defs.' Appx. 51**


**School of Law**

An Honor Council hearing is not a court proceeding, nor is it designed to imitate one. The proceeding provides an educational and non-adversarial process to resolve matters concerning academic misconduct and dishonesty. It is not governed by legal rules of evidence or rules of procedure in criminal or civil court. Students are expected to cooperate fully with matters connected to the allegation. Students may not retaliate against, harass, or threaten anyone participating in the process.

### B. Honor Code Investigator

Each year, the Dean will appoint an Honor Code Investigator, typically a full-time faculty member, to conduct preliminary factual investigations of alleged violations of the Honor Code. The Dean may appoint multiple Honor Code Investigators in years when several suspected violations must be processed. The Investigator will report the findings of all investigations to the Dean.

If the Dean or the Investigator determines, at any point, that the Investigator has a conflict of interest or is unable to serve, the Dean will appoint another Investigator for that particular matter.

### C. Referral and Investigation

Students or other members of the law school community may consult with the Honor Code Investigator, the Associate Dean for Student Life, or a faculty or staff member, about possible academic misconduct or dishonesty. When a student has reason to believe that a violation of the Code has occurred or will occur soon, he or she has a duty to report the matter to the Dean or the designated faculty Honor Code Investigator. If a student reports a suspected violation to a faculty or staff member and that person also has reason to believe that a violation of the Code has occurred or will occur soon, the faculty or staff member has a duty to report it to the Dean or the Honor Code Investigator.

If a student consults with a faculty or staff member, that faculty or staff member should report the concern to the Dean, the Honor Code Investigator or the Associate Dean for Student Life. Ultimately, the Honor Code Investigator will decide whether an investigation is necessary to determine whether probable cause exists to believe that the student has violated this Code.

If the Honor Code Investigator decides that the allegation does not indicate a possible Honor Code violation, the Investigator will send a written report to the Dean to that effect. If the Dean believes that an investigation is necessary, the Investigator will begin an investigation to determine whether probable cause exists to believe that the student has violated this Code, as described below.

If the Honor Code Investigator decides that an investigation is necessary, the Investigator will conduct an investigation of the alleged conduct to determine whether probable cause exists to believe that a violation of this Code has occurred. The Investigator may contact the student who is the subject of the allegation as part of the determination of whether probable cause exists.

As part of the investigation, the Investigator may, among other things, contact students and others about their alleged involvement, send an email message to the student body requesting individuals with information to come forward, or communicate with professors who have information regarding the allegations. During the investigation process, the Investigator will act with the utmost care to keep the identity of the involved students confidential.

 **School of Law**

### D. Determination by Investigator

Following the investigation, if the Honor Code Investigator determines that no probable cause exists to believe that a violation occurred, the Investigator will close the matter and send a written report to the

Dean to that effect. The Investigator will notify the student in writing of the determination and prepare a memorandum for the student's file that the student can use if ever asked about the matter.

If the Investigator determines that probable cause exists to believe that a violation occurred, the Investigator, after notifying the Dean, will then determine whether the matter should be sent to the Honor Council or if it qualifies for administrative disposition as described in Part 4.E. below. If the Investigator determines that the matter does not qualify for administrative disposition, the Investigator will transfer his or her file to the Honor Council, without including any findings of fact.

### E. Administrative Disposition

The School of Law encourages students who have violated the Honor Code to be honest in any investigation and hearing. The Honor Code Investigator may offer an administrative disposition in lieu of an Honor Council hearing when: 1) the allegation involves a less serious matter, such as one committed negligently; 2) the key facts do not appear to be in dispute; and 3) the student acts with candor and is forthright during the investigation. The Investigator must consult with the Chair of the Honor Council before offering administrative disposition to a student. If the Chair does not agree that the offense qualifies for administrative disposition, the Investigator will refer the alleged offense to the Honor Council for consideration.

#### Purpose

An administrative disposition provides an avenue for students who have violated the Honor Code to admit their violations, agree to sanctions that will reconcile their standing at the School of Law, and avoid Honor Council hearings. If the Investigator offers an administrative disposition, a student may decide whether to accept it or proceed to an Honor Council hearing. By accepting an administrative disposition, the student agrees to waive any right to appeal.

#### Limitation

A student who has received an administrative disposition for an Honor Code violation previously cannot receive another for a subsequent violation.

#### Mitigating or Aggravating Factors

The Investigator may consider mitigating or aggravating factors in determining whether to offer an administrative disposition and in recommending what sanctions should be imposed. The following non-exhaustive list provides examples of such factors.

a. Pre-referral admission: When a student voluntarily admits misconduct to the Investigator before learning that someone has referred the matter or is about to refer the matter, the Investigator may consider the admission as a mitigating factor.

b. Other admissions: An admission after a referral has been made may still have some mitigating value. However, a post-referral admission is not as strong a mitigating factor as pre-referral admission.

**Defs.' Appx. 53**


**School of Law**

d. Intent/discriminatory motive: The Investigator may consider intent when recommending sanctions. A violation of the Honor Code that is malicious, willful, intentional, reckless, or grossly negligent may be an aggravating factor. Where conduct may be considered merely negligent, accidental, or careless, the sanction may be less severe. If a student violated the Honor Code and also directed the conduct intentionally toward a person or group because of race, color, religion, age, national origin, ancestry, disability, gender, sexual orientation, gender identity, gender expression, status as a protected veteran, marital, or parental status of the targeted group or person, the Investigator may find the discriminatory motive to be an aggravating factor in recommending sanctions.

e. Degree of harm or seriousness of offense: The degree of harm to others and the seriousness of the violation are relevant factors in recommending sanctions.

f. Prior violations: The Investigator may consider prior violations of the Honor Code as aggravating factors.

g. Willingness to make restitution: The Investigator may consider a student's willingness to make restitution. Restitution may include compensation for loss, damage, or injury, in the form of appropriate service or monetary or material replacement.

**Notification**

If the Investigator determines that the student qualifies for an administrative disposition, the Investigator will inform the student in writing. The writing will notify the student that accepting an administrative disposition constitutes an admission that the student violated the Honor Code. The notice will include findings of fact, a description of the appropriate sanction or sanctions, and a letter of admonishment from the Dean. The notice will also inform the student that if he or she does not accept the offer of an administrative disposition, the matter will be referred to Honor Council. The student will have ten business days from receiving written notice to accept or reject the offer and must do so in writing. If a student refuses to accept the offer, the Investigator will transfer the file to the Honor Council, without including any findings of fact.

**F. Notice of Hearing**

After the Investigator transfers the file, the Chair of the Honor Council will notify the student in writing of the allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow. Students may request that witnesses provide information for them to the Council. The Chair will inform the student in writing of any witnesses the Council intends to call.

**G. Hearing**

At the hearing, the student may question any witnesses called by the Honor Council. The student may make a statement on his or her behalf, but the student may choose to remain silent. If the student offers a statement, members of the Council may question the student.

A student may not be represented by an attorney or other person at the hearing. A student is free to retain counsel who may be present at the hearing, but may not participate in the proceeding; however, the student may confer with counsel outside the hearing room. A member of the Texas Tech University faculty, staff, or student body cannot serve as counsel for any student during any process under this Code.

The Honor Council hearing may be recorded (limited to audio recording) if the student requests this at least 24 hours before the hearing.

**H. Determination by Honor Council**

 **School of Law**

If the Council finds no violation of this Code, the Chair of the Honor Council will issue a report to that effect to the student, the Honor Code Investigator, and the Dean. Absent exigent circumstances, the report should be issued within two weeks of the hearing.

If the Council finds a violation, it will then determine the appropriate sanction or sanctions to recommend to the Dean. A majority of the Council members present must vote affirmatively to find that a violation of the Honor Code has occurred and to select one or more sanctions to recommend to the Dean.

The Honor Council may consider mitigating and aggravating factors, a non-exhaustive list of which appears in Part 4.E. above, in determining which sanction or sanctions to recommend to the Dean.

Following a hearing, the Chair of the Honor Council will issue findings of fact, the Honor Council's decision, and the recommended sanction or sanctions. Absent exigent circumstances, these documents should be provided to the student and the Dean within two weeks of the hearing.

**I. Failure to Appear**

Students who fail to attend their scheduled Honor Council hearings forfeit their right to respond, absent some extenuating circumstance as determined by the Honor Council. If the student fails to attend or fails to respond to requests to participate, the Honor Council may proceed to determine whether the student violated this Code and recommend one or more sanctions to the Dean.

# 5. SANCTIONS

For any violation of the Honor Code, the Honor Council may recommend one or more of the following sanctions that it considers appropriate. These options are not exhaustive.

1. Expulsion from the School of Law;

2. Suspension from the School of Law;

3. Suspension or revocation of a degree, certificate, recognition, or other award conferred by the School of Law;

4. Satisfaction of additional work in the School of Law for graduation not to exceed a total of 15 additional hours (e.g., taking additional courses in a subject area);

5. Written letter of reprimand from the Dean that will be placed in the student's permanent file;

6. Educational or restorative sanctions to include, but not limited to, a research project, a letter of apology, or counseling;

7. Disciplinary probation. Disciplinary probation is distinct from academic probation. It is a period prescribed by the Investigator (as part of an administrative disposition) or by the Honor Council during which time conditions imposed as sanctions must be met or during which time the student's behavior will be subject to review. The conditions of disciplinary probation may be varied, depending on the circumstances.

Each year, the Chair of the Honor Council will publish a summary of cases heard in which violations were found and sanctions imposed. Names of offenders will not be revealed. The Chair will not report summaries of cases heard in which the Council found no violations. The Chair of the Honor Council will not include administrative

**Defs.' Appx. 55**

 **School of Law**

## 6. REVIEW

If the student consents to the sanction or sanctions recommended by the Honor Council, the Dean shall impose the recommended sanction or sanctions and send written notice to the Honor Code Investigator and to the Chair of the Honor Council. The Investigator shall forward a copy of the notice to the student and to any other necessary persons.

If the student does not consent, the student may submit a written request for a review by the Associate Dean for Academic Affairs, asking the sanction or sanctions be reduced or vacated and including the reasons for the request. This statement will be submitted to the Associate Dean no later than 10 calendar days from the date of the Council's report to the Dean and the student.

The Associate Dean may impose, modify, or vacate any sanction recommended, but cannot increase the severity of a sanction. The Associate Dean cannot modify or vacate the finding of a violation of this Code made by the Honor Council, except when the Associate Dean determines that the Council's finding is clearly erroneous. If the Associate Dean finds such an error, the Associate Dean will include the basis for this determination in his or her decision. The Associate Dean will send notice of his or her decision to the Dean, the student, the Honor Code Investigator, and the Chair of the Honor Council. The Dean will impose the sanction determined by the Associate Dean.

There is no further right to appeal or review within the University.

## 7. RECORD KEEPING AND REPORTING

The Registrar will record the findings of the Honor Council and the Honor Code Investigator, in the case of an administrative disposition. If a violation was found, the Registrar will also record the sanction or sanctions imposed by the Dean. The Registrar will ensure the record is kept in the appropriate law school files.

The School of Law will report all matters in which the Honor Code Investigator determined that probable cause existed to believe that a violation of this Code occurred to the extent required by the Texas Board of Law Examiners (BLE) or similar authorities in other states, regardless of whether violations of this Code were found. Students found to have violated the Honor Code will likely face a formal hearing before the BLE or similar authorities in other states to determine the students' character and fitness to practice law.

### School of Law

   

**ADDRESS**

Texas Tech University School of Law, 3311 18th Street, Lubbock, Texas 79409-0004

**Defs.' Appx. 56**

**School of Law**

EMAIL
law@ttu.edu

## TEXAS TECH UNIVERSITY

2500 Broadway Lubbock, Texas 79409

806-742-2011

 

| | |
|---|---|
| Contact Us | TTU System |
| Campus Map | TTU Health Sciences Center |
| Jobs @ TTU | TTUHSC El Paso |
| TechAlert | Angelo State University |
| General Policy Information | Midwestern State University |
| Public Access to Course Info | Statewide Search |
| Energy Management | State of Texas |
| Mental Health Resources | Texas Homeland Security |
| Title IX | Texas Veterans Portal |
| Fraud and Misconduct Hotline | Texas CREWS |
| Online Institutional Resumes | SAO Fraud Reporting |
| Texas Transparency | Open Records Requests |
| Digital Accessibility | |

© 2026  Texas Tech University   May 28, 2025   4:03 PM

…

**Defs.' Appx. 57**

# Exhibit B

**Defs.' Appx. 58**



**TEXAS TECH UNIVERSITY**
**School *of* Law·**

January 23, 2026

Professor Larry Spain
Chair, Honor Council
Texas Tech University School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Dear Professor Spain:

I am referring to the Honor Council a matter regarding Ellen Fisher. The Law School received information that Ms. Fisher allegedly violated Section H of the Honor Code ("Violation of Professional Duties") "…by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities."

Pursuant to the Student Handbook, I have conducted a preliminary factual investigation and have determined that probable cause exists to believe that Ms. Fisher violated the Honor Code. Accordingly, I am referring the matter to the Honor Council for consideration. In addition, on this date, I am notifying Ms. Fisher of this referral. Please contact Dean Chapman for information related to Ms. Fisher's case.

Please let me know if you have any questions or need more information.

Sincerely,

William R. Keffer
Texas Tech University School of Law
Janet Scivally and David Copeland Endowed Professor of Energy Law
Director, Energy Law Programs
Assistant Director, Bar Preparation Resources
806/834-3178
william.keffer@ttu.edu

**Defs.' Appx. 59**

TEXAS TECH UNIVERSITY
School *of* Law™

January 23, 2026

Re: Honor Code Violation - Ms. Ellen Fisher

On 9/23/25, Dean Nowlin and Dean Chapman appointed me under Section 4(B) of the law school's Honor Code to investigate a potential violation concerning:

*"H. Violation of Professional Duties*

**A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One."**

Specifically, you are alleged to have acted unprofessionally on Wednesday, 9/10/25 relating to your behavior and statements in a clinical setting made about the assassination of Charlie Kirk.

I met with Dean Chapman on Tuesday, 9/23/25 regarding this matter. I then met with the following people as part of this investigation (Dean Chapman was present during all student interviews):

1. 10/1/25 – Dwight McDonald (faculty)
2. 10/2/25 – Joe Stephens (faculty)
3. 10/2/25 – Terri Morgeson (faculty)
4. 10/8/25 – **Student 2** (student)
5. 10/8/25 – **Student 3** (student)
6. 10/14/25 – Pat Metze (faculty)
7. 10/16/25 – **Student 7** (student)
8. 10/21/25 – Ellen Fisher (student)
9. 10/22/25 – **Student 6** (student)
10. 10/28/25 – Dwight McDonald (faculty) and Sofia Chapman (Associate Dean)
11. 10/28/25 – Jack Nowlin (Dean), Larry Spain (faculty) , and Dwight McDonald (faculty)
12. 11/6/25 – Ken Williams (faculty)
13. 11/7/25 – **Student 13** (student)
14. 11/12/25 – **Student 4** (student)
15. 11/13/25 – **Student 11** (student)
16. 11/13/25 – **Student 5** (student)
17. 11/14/25 – **Student 14** (student)
18. 11/14/25 – **Student 10** (student)

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 60**

The following information supporting the allegations was gathered from the interviews (all references are to events that occurred on 9/10/25, unless otherwise indicated):

1. Joe Stephens stated that Fisher made the following statements to him:
   a. "They shot Charlie."
   b. "There's video."
   c. "It looks bad."
2. Terri Morgeson stated that she heard Fisher make the following statements to others:
   a. "I'm in such a good mood."
   b. "That mother fucker got shot."
3. Morgeson described Fisher as loud, happy, and celebratory.
4. Morgeson later told Pat Metze and the students who were in his office (including Fisher) that Kirk had just died. Metze responded: "Well, my students are in a very good mood."
5. On the next day (9/11/25), Morgeson told Metze that he and his students had offended Morgeson's students with their behavior the previous day. Metze responded: "Well, it was Ellie."
6. Morgeson's student, **Student 2**, heard Fisher make the following statements:
   a. [to Joe Stephens] "I'm in the best mood ever."
   b. [to Joe Stephens] "They shot Charlie Kirk."
7. **Student 2** was upset by the behavior she witnessed and statements she heard seemingly celebrating Kirk's death and asked Morgeson if she could go home early.
8. Morgeson's student, **Student 3**, heard the following statements coming from a female student that sounded like Fisher:
   a. "They got him."
   b. "This is great."
   c. "He's dead."
9. Pat Metze made the following statements about the alleged incident:
   a. Fisher came "bopping into his office" and was "animated."
   b. He recalled Fisher saying that her mother was "really excited" about Kirk's assassination.
   c. When discussing the matter later with Dean Jack Nowlin, along with Dwight McDonald and Larry Spain, Metze told Nowlin that he himself did not celebrate Charlie Kirk's death, but Fisher did. Nowlin told Metze that he should have corrected Fisher's behavior. Metze responded that he "didn't think it was his place." Metze also stated in his meeting with Dean Nowlin that Fisher's behavior was immature, but she was entitled to her opinion. At no time during the lengthy discussion did Metze ever dispute the fact that Fisher had celebrated Charlie Kirk's murder while in his office.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 61**

d. Even though Metze later insisted in his interview with me that he couldn't recall any details and was of the opinion that Fisher had done nothing wrong, he eventually stated that:

    i. Fisher was loud and "expressed her happiness."

    ii. Not confirming or denying that Fisher stated, "that mother fucker got shot", Metze responded: "That's a common term in the Black community."

    iii. In response to my question as to whether Fisher could benefit from constructive criticism about her behavior (even if Metze didn't find it objectionable), Metze responded that "she would benefit from talking to a Black, female counselor."

10. While she and Fisher were in Metze's office, **Student 7** stated that Fisher commented that she had been on the phone with her mother earlier about Kirk's assassination. She also stated that Fisher seemed to be repeating her mom's happiness.

11. Ellen Fisher made the following statements:

a. When she briefly spoke to Stephens, he was the one who asked her if she had "heard." She responded: "About what?"

b. While she was in Metze's office, Metze told her and other students who Kirk was. Metze showed her and others the video of the shooting on his phone. Fisher said she didn't look at it.

c. Fisher stated that she never showed anyone the video on her phone.

d. In response to her alleged statement that "that mother fucker got shot", Fisher stated that she doesn't use curse words. She further stated that she would never use that kind of language in the clinic suite because clients are frequently present.

e. Fisher stated that, before the shooting, she hadn't known who Charlie Kirk was.

f. Fisher stated that she didn't talk to her mother about the Kirk assassination until later that day.

g. Fisher agreed that behaving in the manner alleged would be wrong.

h. Fisher agreed that making any of the alleged statements would be unprofessional but also referenced the First Amendment.

12. **Student 4** stated that Fisher showed him the video of Kirk's shooting on her phone.

13. **Student 4** stated that Fisher used "choice" words in her description of Kirk.

14. **Student 4** believes that, based on Fisher's discussion about Kirk that day, she seemed to know who he was.

15. **Student 11** stated that Fisher talked about Kirk like she knew who he was.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 62**

16. When **Student 5** entered the conference room in the clinic where Fisher was, she was on her phone exclaiming that Kirk had been shot and showing others, including **Student 5**, the video. He was surprised at the manner in which she was describing the news because she was happy and excited. **Student 5** stated that he would definitely describe her behavior as celebrating Kirk's death. **Student 5** also said, "I wanted to say something, but we have to be in the room for two semesters, so I didn't want to get into a fight." **Student 5** also said, "Had I said something, it would have caused me stress." **Student 5** also said, "She said he got what he deserved." **Student 5** also said, "I feel it's not the right environment."

17. **Student 5** believes that Fisher knew who Kirk was before the shooting because she was quoting something Kirk had once said about the Second Amendment.

18. **Student 10** stated that Fisher offered to show her the video on her phone.

After conducting my investigation, I am of the opinion, pursuant to Section 4(D), that probable cause exists that you violated the Honor Code and that this matter should be referred to the Honor Council for further disposition.

Sincerely,

William R. Keffer
Janet Scivally and David Copeland Endowed Professor of Energy Law

Cc: Dean Jack Nowlin
Associate Dean Sofia Chapman

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 63**

# Exhibit C

Defs.' Appx. 64

March 11, 2026

Ellie Fisher                                          **Confidential**
Law School                                            *Sent via Email*
                                                      ellie.fisher@ttu.edu

Dear Ms. Fisher:

Please find attached a copy of the Report of Honor Council Hearing with Findings of Fact, Conclusion as to Violation of the Honor Code, and Recommended Sanction.

Under Section 6 of the Honor Code, if you do not consent to the sanction recommended by the Honor Council, you have a right to request review in writing to the Associate Dean for Academic Affairs which must be submitted within ten (10) calendar days from the date of the Council's transmittal of the Report to the Dean and the student.

You should also be advised that wellness resources are available to you at any time through the Office for Student Life within the School of Law.

Sincerely,

Professor Larry R. Spain
Chair, Honor Council

Copy:  Dean Jack Wade Nowlin via email  jack.nowlin@ttu.edu
       Associate Dean Sofia Chapman via email  sofia.chapman@ttu.edu
       Assistant Dean JaWana Green via email  jawana.green@ttu.edu
       Michael Allen via email  mallen@allenharrislaw.com

**Defs.' Appx. 65**

**IN RE: ELLIE MAE FISHER**

**Report of Honor Council Hearing**

The Honor Council met on Friday, February 20, 2026 at 9 am in Room 106 of the Texas Tech University System Building to consider whether Ellie Fisher violated Section 2.H (Violation of Professional Duties) of the Texas Tech University School of Law Honor Code "...by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of public figure Charlie Kirk on September 10, 2025.

Professor William R. Keffer, as Honor Code Investigator, referred the matter to the Honor Council after conducting a preliminary investigation and concluding that probable cause existed that a violation of the Honor Code had occurred. Present at the hearing and constituting a quorum were the following members of the Honor Council: Professors Amy Hardberger, Alyson Outenreath, and Larry Spain in addition to law student member **Student 1**. Ellie Fisher appeared with her legal counsel, Michael Thad Allen. Also present was Sofia Chapman, Associate Dean for Student Life, and Ronny H. Wall, Office of General Counsel, Texas Tech University System.

This report includes a summary of the Honor Council proceedings; the Council's findings of fact; and it's recommended disposition of the case.

### *SUMMARY OF PROCEEDINGS*

Prior to the hearing and by letter dated February 4, 2026, Professor Larry Spain, Chair of the Honor Council, communicated with Ms. Fisher in writing to provide notice of the time and date of the hearing, information about the nature of the allegations prompting a referral to the Honor Council, and a general description of the process for conducting the hearing as outlined in the Honor Code of the Texas Tech University School of Law.

The following relevant documents were considered by the Honor Council, each of which was also made available to or otherwise submitted by Ms. Fisher and her counsel, and are made a part of the record of these proceedings:

1. Honor Council Notice dated February 4, 2026 and attachments from Professor Larry R. Spain, Chair of the Honor Council, to Ellie Fisher scheduling the hearing for February 20, 2026.

1

**Defs.' Appx. 66**

2. Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council, from Professor William R. Keffer referring the matter to the Honor Council.
3. Report of the Honor Code Investigator, Professor William R. Keffer, dated January 23, 2026.

In addition, the following documents were submitted to the Honor Council by counsel for Ellie Fisher, are made a part of the record of these proceedings, and were considered in deciding the matter:

1. Affidavit of **Student 9**
2. Affidavit of **Student 6**
3. Affidavit of **Student 12**
4. Affidavit of **Student 10**
5. Affidavit of Patrick Metze
6. Affidavit of **Student 11**
7. Ellie Mae Fisher's Opening Statement

The following individuals appeared and provided information to the Honor Council relevant to the allegations concerning a violation of the Honor Code:
1. Professor Joe Stephens
2. Professor Terri Morgeson
3. **Student 2**
4. **Student 3**
5. **Student 4**
6. **Student 5**
7. **Student 6** (at the request of Ellie Fisher)
8. Professor Kenneth Williams (at the request of Ellie Fisher)
9. Ellie Fisher

Each of these individuals responded to questions both from members of the Honor Council as well as Ellie Fisher.

## FINDINGS OF FACT

After a careful review and consideration of the Report of the Honor Council Investigator, the Affidavits submitted by legal counsel for Ellie Fisher, and the information provided by various witnesses at the hearing held on February 20, 2026 and assessing the credibility of the information provided, the Honor Council makes the following findings of fact:

1. The Council takes administrative notice that the Clinical Programs is an academic program of the School of Law in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic

2

**Defs.' Appx. 67**

credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

2. Various statements were made as to the actions taken and statements made by Ellie Fisher following the assassination of Charlie Kirk on September 10, 2025 within the Clinical Programs offices which could have been considered celebratory in tone.

3. Upon entering the offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that Professor Terri Morgeson and **Student 2** provided credible information that Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

4. Such statements endorsing or celebrating death or violence, particularly in a professional office setting, are contrary to respect for the rule of law and violate ordinary standards of professional conduct.

5. As a result of Ellie Fisher's actions, several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting which interfered with their normal work routine.

6. A majority of the Honor Council believed that certain activities took place in Professor Metze's office involving several students of the Criminal Defense Clinic, including Ellie Fisher. Information was provided by Professor Metze that Ellie Fisher was celebrating the shooting. However, there was conflicting information provided as to whether statements celebrating the death of Charlie Kirk and laughing at the video of Charlie Kirk's assassination could be attributed to Ellie Fisher. Accordingly, a majority of the Honor Council could not reach the conclusion that the actions and statements attributed to Ellie Fisher were supported by clear and convincing evidence.

7. Likewise, there was conflicting information about what actions and statements could be attributed to Ellie Fisher in the Criminal Defense Clinics workspace on that date and, as a result, the Honor Council was unable to reach a majority view on whether or not the statements or actions alleged had occurred.

8. Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

9. The actions and statements that were made by Ellie Fisher in a professional office setting were inappropriate, disrespectful, and demonstrated a lack of professional judgment and self-discipline.

10. As a result of the actions taken and statements made by Ellie Fisher, the operations of the Clinical Program were adversely affected and made some individuals uncomfortable.

### CONCLUSION AS TO VIOLATION OF THE HONOR CODE

Based on the foregoing findings of fact and applying the clear and convincing evidence standard, the Honor Council concludes, by a majority vote of 3-1, that the

3

**Defs.' Appx. 68**

Respondent, Ellie Fisher, violated the Honor Code including *Principle One-A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education*, specifically Section 2.H (**Violation of Professional Duties**) "by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as result of her actions and statements.

On the other hand, one member of the Honor Council concluded the evidence presented in the investigative report and at the February 20, 2026, hearing does not meet the clear and convincing standard required to find Ms. Fisher responsible for violating Section H of the Honor Code entitled "Violation of Professional Duties." This decision is based on conflicting evidence at the hearing and with the investigative report. The following are a few examples of conflicts on which this decision is based.

According to the majority of the Honor Council, the strongest evidence that Ms. Fisher acted unprofessionally on September 10, 2025, is her actions when she entered the clinic. Specifically, Professor Morgeson and **Student 2** stated they overheard Ms. Fisher saying "It's the best day ever. I'm so happy" and Ms. Fisher either said this alone or repeated it to Professor Stephens and said her happiness was because of Mr. Kirk's assassination. Professor Stephens does agree that Ms. Fisher stopped in his doorway, but then the accounts differ significantly. Professor Stephens stated that: "And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, 'No.' I didn't know who Charlie was. And she said, 'It looks bad,' and at some point said something that it's all over the Internet or something like that" which contradicts what Professor Morgeson stated she heard. As to Ms. Fisher's affect, he stated: "Ellie's demeanor to me was no different that day," she simply reported what had happened in the news, it was not disruptive or unprofessional. He repeated the last point several times during his testimony. Despite his location near clinic entrance, Professor Stephens did not report hearing Ms. Fisher make any loud proclamations upon entry. Although he may not have heard her, if she entered the clinic announcing Mr. Kirk's death in a celebratory manner, it seems inconsistent to me that she would be able to switch quickly to simply reporting the news to Professor Stephens.

Another conflict is Professor Morgeson's and **Student 2**'s testimony that they heard Professor Stevens admonish Ms. Fisher because her behavior was not appropriate. Professor Morgeson stated she overheard Professor Stephens say "Don't do that. Don't say that. Don't do that" or something similar. Because Professor Morgenson testified after Professor Stephens, he was not asked directly about this, but in his testimony, he stated: "When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong," which essentially answers the question, had it been asked. He also stated: "that interaction was 30 seconds and then that was it." Professor Stephens repeated statements that Ms. Fisher did not say anything he found to be unprofessional generally negates any statement that he was concerned about her behavior at the time she entered his door.

4

**Defs.' Appx. 69**

While much of the focus is on the statements and actions of Ms. Fisher as she entered the clinic office, I do not feel the evidentiary standard was met in Professor Metze's office or later in the conference room either. The primary testimony against Ms. Fisher in Professor Metze's office centered on watching the video of the shooting and discussing whether Mr. Kirk could have survived. Although I find this behavior reprehensible, there were several people in that room, including a faculty member, and no one at the hearing could tie any statements from the office directly to Ms. Fisher versus other parties. Professor Morgeson stated she is not sure who used a profanity, which she stated to the investigator although her doubt was not noted. She also said it might have been Professor Metze who said it. Professor Morgeson stated her students were "shocked and offended" which they both denied at the hearing and stated they did not request to leave early based specifically on Ms. Fisher's statements. Unfortunately, Professor Metze's statement in the investigation report provides no specific information related to Ms. Fisher's "celebratory" behavior or actions in his office and his affidavit seems to contract his initial statements. Testimony from students in the conference room also did not provide details of Ms. Fisher being unprofessional. Although **Student 5** did state Ms. Fisher's mood could have been interpreted as celebratory, **Student 4** disagreed.

In summary, while I do not believe that Ms. Fisher's behavior (and that of others around her) on September 10, 2015 was proper under the circumstances, I also do not feel that the evidence is sufficient to meet the clear and convincing evidentiary standard required to find her responsible for a violation of Section H of the Honor Code.

## RECOMMENDED SANCTION

In recommending a sanction appropriate to the violation, the majority of the Honor Council that concluded a violation of the Honor Code was established has been guided by those mitigating and aggravating factors set forth in the Honor Code. After careful consideration of all information provided and made a part of the record of the proceedings, the Honor Council determines that Respondent's actions and conduct reflected poorly on the exercise of professional judgment in the particular setting in which her actions took place. Accordingly, the Honor Council recommends that the Respondent, Ellie Fisher, receive a written letter of reprimand from the Dean of the School of Law to be placed in her permanent school record. The Council believes such sanction is proportionate to the severity of the conduct involved and sufficient to reinforce the obligation on the part of all law students to always act with honor and integrity in all of their professional interactions,

**Defs.' Appx. 70**

particularly when they may have serious consequences to the reputation of the School of Law and its academic programs.

*This decision may be subject to review by the Office of Student Conduct per university policies. A representative from the Office of Student Conduct is cc'd on this Honor Council Hearing report and will be in contact with you.*

_____
Professor Amy Hardberger

/s/ Alyson Outenreath
_____
Associate Dean and Professor
Alyson Outenreath

_____
Professor Larry Spain

_____
**Student 1**

6

**Defs.' Appx. 71**

# Exhibit D

**Defs.' Appx. 72**

# Board of Law Examiners

Appointed by the Supreme Court of Texas

## Authorization and Release

I, **ELLEN M. FISHER**, born in **CONCORD, CALIFORNIA, UNITED STATES**,
(Declarant's or Applicant's Printed Name)                    (City / State / Country)

hereby give my consent to the Board of Law Examiners to conduct an investigation as to my moral character and fitness and to make inquiries and request such information from third parties as, in the sole discretion of the Board, is necessary to such investigation. I further authorize the use of any such information in the course of the Board's investigation and evaluation of my moral character and fitness.

I authorize and request every person, firm, company, corporation, school, employer (past or present), governmental agency, court, association, institution, or other third party having opinions about me or knowledge or control of any information, documents, records (including but not limited to public or private disciplinary records, criminal history record information, medical or psychological records), or other data pertaining to me, to reveal, furnish and release to the Board of Law Examiners of the State of Texas, or any of its agents or representatives, any such opinions, knowledge, information, documents, records or other data. Without limiting the previously described authority, I specifically authorize the release of files of any bar association, bar admissions agency, grievance or other bar committee regarding charges or complaints filed against me, formal or informal, pending or closed, or any other pertinent data, as well as all undergraduate, graduate, or law school records relating to my admission to and conduct during my enrollment in such schools.

I hereby release, discharge and hold harmless the Board of Law Examiners of the State of Texas, its agents or representatives (including but not limited to expert witnesses or evaluators consulted or used by the Board or its staff in the course of its investigation), and any person, firm, company, corporation, school, employer (past or present), governmental agency, court, association, institution, or other third party, and their agents, from any and all liability of every nature and kind arising out of the furnishing, inspection, and use of such opinions, knowledge, documents, records or other data.

Notwithstanding any statement herein to the contrary, this Authorization and Release shall operate to agree to the release of only those mental health records relating to the following:

(a) my being diagnosed with bi-polar disorder, schizophrenia, paranoia, or any other psychotic disorder, and any treatment therefor, within the five years immediately preceding the filing of my Application with the Board of Law Examiners; and

(b) my admission to a hospital or other facility for the treatment of bi-polar disorder, schizophrenia, paranoia, or any other psychotic disorder, since attaining the age of 18 or within the five years immediately preceding the filing of my Application, whichever period is shorter.

This limitation, however, does not apply to records relating to chemical dependency nor to any records relating to a disability for which I am seeking or intend to seek nonstandard testing accommodations.

_____    1/29/2026
Signature of Declarant or Applicant          Date

**Defs.' Appx. 73**

| | |
|---|---|
| **From:** | Chapman, Sofia |
| **To:** | Eaton, Heather N |
| **Cc:** | Blanchard, Janessa |
| **Subject:** | RE: Request for reference - Texas Board of Law Examiners Ref:--CF00409704--Ellen Fisher (R11570761) |
| **Date:** | Monday, April 13, 2026 4:01:26 PM |

Dear Heather,

I have provided Dean Blanchard with a thumb drive of documents due to the volume of documents related to Miss Fisher.

As such, I have asked Dean Blanchard to please see the Law Maxient documents on the thumb drive that may be responsive for Ellie Fisher as of 4-13-2026. *No TTU files exist that could be responsive to the Bar.*

*Best,*

*Sofia*

Sofia Chapman, Ph.D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness
Office for Student Life Suite 103/104
Texas Tech University School of Law
Direct line: 806-834-2468
Sofia.chapman@ttu.edu

I recognize and understand that my working hours may be at times that are not your own. Please don't feel pressured to respond outside of your working hours. All the best!

**If you are in crisis, please call 911 immediately.**

Privacy/Confidentiality Notice:  This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Eaton, Heather N <Heather.N.Eaton@ttu.edu>
**Sent:** Wednesday, March 18, 2026 9:34 AM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>
**Subject:** FW: Request for reference - Texas Board of Law Examiners Ref:--CF00409704--Ellen Fisher (R11570761)

Sofia,

**Defs.' Appx. 74**

Please review the Maxient file(s) for **Ellen Fisher (R11570761)** and submit one of the following standard responses back to the Registrar's Office.

1. If no Law or TTU files in Maxient exist that could be responsive to the Bar, use the standard response: *"As of DATE, no Law or TTU Maxient files exist that could be responsive to the Bar.*

2. If files exist, use one of the following standard responses and attach/share all documents.

    a. Just Law Files in Maxient. Use response: *"Please see the attached Law Maxient file(s) for STUDENT as of DATE.  No TTU files exist that could be responsive to the Bar."*

    b. Just TTU Files in Maxient.  Use response:  *"Please see the attached TTU Maxient file(s) for STUDENT as of DATE. No Law files exist that could be responsive to the Bar."*

    c. Both TTU/Law in Maxient. Use response:  *"Please see the attached Law and TTU Maxient files for STUDENT as of DATE."*

Thanks!

**Heather Eaton, M.A.**
*Assistant Registrar*
Texas Tech University School of Law
3311 18th Street
Lubbock, Texas 79409-0004
Office: 806.834.3628
heather.n.eaton@ttu.edu **|** http://www.depts.ttu.edu/law/academics/registrar/

---

**From:** Blanchard, Janessa <Janessa.Blanchard@ttu.edu>
**Sent:** Wednesday, March 18, 2026 8:43 AM
**To:** Eaton, Heather N <Heather.N.Eaton@ttu.edu>
**Subject:** Fw: Request for reference - Texas Board of Law Examiners Ref:--CF00409704--

**Janessa Blanchard**
*Formerly, Janessa Walls*
Assistant Dean of Academic Services and Registrar

**Defs.' Appx. 75**

Director of Dual Degrees and Concentrations
Texas Tech University School of Law
(she/her)
3311 18th Street
Lubbock, TX 79409-0004
Tel (Direct): 806.834.0917

**From:** noreply@ble.texas.gov <noreply@ble.texas.gov>
**Sent:** Tuesday, March 17, 2026 11:45:03 AM
**To:** Blanchard, Janessa <Janessa.Blanchard@ttu.edu>
**Subject:** Request for reference - Texas Board of Law Examiners Ref:--CF00409704--

This email originated outside TTU. Please exercise caution!


To whom it may concern,

Ellen Fisher has applied for admission to the Bar of Texas. Please complete a reference form regarding this applicant to assist us in completing our investigation.

Click Here to access a form that can be completed and submitted electronically on our secure website. If you can't click on the link above, please copy and paste the below URL into your browser's address bar.

https://ble.texas.gov/getletter.action?key=0a26ed25-1bd2-430c-ae89-ec155786165b

**Texas Board of Law Examiners**
**205 W. 14th St, Suite 500**
**Austin TX  78701**
**www.ble.texas.gov**

**Defs.' Appx. 76**

# Exhibit E

Defs.' Appx. 77

**Chapman, Sofia**

---

| | |
|---|---|
| **From:** | Chapman, Sofia |
| **Sent:** | Monday, March 30, 2026 2:53 PM |
| **To:** | 'Michael Allen'; Gonzalez, Jarod |
| **Cc:** | Fisher, Ellie; Tiffany Lawson; Gonzalez, Jarod |
| **Subject:** | RE: Ellie Mae Fisher - Request for Review of Honor Council Decision |

Dear Mr. Allen and Ms. Fisher,

As per Dean Gonzalez's email, the full evidentiary record has been provided by me to Dean Gonzalez which includes the two emails you sent on February 16th along with the attached six sworn affidavits.

Sincerely,

Sofia

Sofia Chapman, Ph.D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness
Office for Student Life Suite 103/104
Texas Tech University School of Law
Direct line: 806-834-2468
Sofia.chapman@ttu.edu

I recognize and understand that my working hours may be at times that are not your own. Please don't feel pressured to respond outside of your working hours. All the best!

**If you are in crisis, please call 911 immediately.**

Privacy/Confidentiality Notice:  This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Michael Allen <mallen@allenharrislaw.com>
**Sent:** Monday, March 30, 2026 1:26 PM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** RE: Ellie Mae Fisher - Request for Review of Honor Council Decision

This email originated outside TTU. Please exercise caution!

Thank you Associate Dean Chapman, Has the complete record, including the six sworn affidavits of students, many clearly indicating the biased nature of the Keffer Report, been forwarded to Associate

**Defs.' Appx. 78**

Dean Gonzalez?  Or just the transcript of the hearing?  We can also forward those to Associate Dean Gonzalez if you do not have them readily available.

Thanks, and we appreciate your help throughout all of this.

Mike Allen

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Chapman, Sofia <Sofia.Chapman@ttu.edu>
**Sent:** Monday, March 30, 2026 2:13 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** Re: Ellie Mae Fisher - Request for Review of Honor Council Decision

Dear Ellie,

As a follow up to Dean Gonzalez's email, I have also provided Dean Gonzalez with the full typed transcript of the hearing.

Sincerely,

Sofia

Sofia Chapman, Ph. D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness

This email and any files transmitted with it may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this information contained herein (including any reliance thereon) is strictly prohibited.  If you have received this email transmission in error, please immediately notify me by telephone or via return email, and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.

On Mar 30, 2026, at 12:44 PM, Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu> wrote:

Defs.' Appx. 79

Dear Ellie:

I received your written request to review the Honor Council's decision.  The record has been provided to me.  You do not need to send any additional materials to me.

Best,

Dean Gonzalez

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law
Texas Tech University School of Law
806-834-8378
jarod.gonzalez@ttu.edu

---

**From:** Fisher, Ellie <Ellie.Fisher@ttu.edu>
**Sent:** Friday, March 27, 2026 2:10 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Ellie Mae Fisher - Request for Review of Honor Council Decision

Dean Gonzalez,

Pursuant to the Texas Tech University School of Law policies, I am formally requesting a review of the Honor Council's decision, including the sanction imposed. I trust that you will be provided with the full evidentiary record considered by the Honor Council from the appropriate university official. However, please let me know if you would like me to submit any materials directly. Attached is my written request for review.

Thank you,
Ellie Mae Fisher

**Ellie Mae Fisher | She, Her**
Texas Tech Law, *Candidate for Doctor of Jurisprudence* 26'
Criminal Defense Clinic, *Texas State Bar Qualified Law Student* | (806) 834-2194
Tech Law National Lawyers Guild, *President*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

**Defs.' Appx. 80**

# Exhibit F



TEXAS TECH UNIVERSITY
School *of* Law™

April 13, 2026

**Confidential**
Sent via Email
ellie.fisher@ttu.edu

IN RE: ELLIE MAE FISHER

REVIEW

On March 27, 2026, Ellie Fisher submitted her Request for Review of the Honor's Council's Decision. As Associate Dean for Academic Affairs, I conducted the review pursuant to *Section 6. Review* of the Honor Code and determined that the Honor Council's finding of an Honor Code violation is not clearly erroneous. Accordingly, I uphold the Honor Council's finding and the Council's recommended sanction. There is no further right to appeal or review within the University.

You have been found responsible for violating university policy. Your conduct may also be considered a violation of the Texas Tech University Code of Student Conduct 20252026StudentCodeoConduct.pdf and may be investigated through the University Conduct System. Thus, the Office of Student Conduct has been copied on my decision.

Sincerely,

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law

Copy:  Dean Jack Wade Nowlin via email jack.nowlin@ttu.edu
       Professor William R. Keffer via email william.keffer@ttu.edu
       Professor Larry Spain via email larry.spain@ttu.edu
       Associate Dean Sofia Chapman via email sofia.chapman@ttu.edu
       Assistant Dean JaWana Green via email jawana.green@ttu.edu

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629
An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 82**

# Exhibit G

**Defs.' Appx. 83**



TEXAS TECH UNIVERSITY
School *of* Law™

April 13, 2026

Ellen Fisher
Sent electronically to Ellie.fisher@ttu.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2025526801

Dear Miss Fisher,

Please see the attached Letter of Reprimand from Dean Nowlin.

Sincerely,

Sofia Rodriguez Chapman

Sofia Chapman
Associate Dean for Student Life

**Defs.' Appx. 84**



April 13, 2026

<u>SENT VIA EMAIL</u>
Ms. Ellie Fisher

Dear Ms. Fisher:

Pursuant to the Texas Tech University School of Law Honor Code and the Decision of the Honor Council, this letter serves as a **reprimand** for violation of the Code.

Specifically, you violated Honor Code Section 2.H (Violation of Professional Duties) by **"failing to uphold professional… obligations"** related to "clinical programs" when you engaged in conduct which adversely affected the operations of the clinic—a celebration of a political assassination in the Law School's clinical suite during work hours—as a clinical law student with a supervised law practice card representing clients in our law clinics under our professional supervision.

We expect clinical law students with supervised practice cards under our supervision to display the same levels of professionalism in our clinical spaces during work hours that law firms routinely expect from their attorneys in their law offices. To state the obvious, disrupting the clinical spaces by celebrating a murder is a reprehensible act radically inconsistent with widely recognized professional expectations in law firm spaces.

**You are hereby reprimanded for this violation of the Honor Code.**

I will also note here that you have refused to take responsibility for your professional failures or express remorse. Instead, you responded with repeated acts of dishonesty in an attempt to avoid accountability. Given that response, you have been shown an extraordinary degree of grace by the Honor Council, which, frankly, in the opinion of the Dean's Office, you do not deserve.

As you know, our Honor Code requires that law students exhibit the same qualities of heightened caution, attention to detail, foresight, responsibility, candor, truthfulness, and respect for the rights and



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 85**



interests of others that are regularly demanded of members of the legal profession. These are essential attributes for persons preparing to enter the legal profession, and they help to ensure that the public trust in the profession will not be compromised or questioned.

In the future, your conduct should justify the confidence that the public and the profession places in you as an aspiring future member of the bar. Should you have any questions regarding this letter, please contact me at 806-834-1504 or jack.nowlin@ttu.edu.


Sincerely,

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 86**

# Exhibit H

**Defs.' Appx. 87**



April 13, 2026

Texas Board of Law Examiners
205 W. 14th Street
Suite #500
Austin, TX 78701

Dear Board of Law Examiners,

The Dean's Office recommends against Ms. Ellen Fisher's admission to the Bar.

We do so for three related reasons. First, Ms. Fisher, as a clinical student with a supervised practice card, disrupted our clinical spaces with a celebration of a political assassination. Second, she has refused to take responsibility or show any remorse for her unprofessional actions. And, third, she has displayed dishonesty when discussing this incident in our Honor Code proceedings.

On September 10, 2025, Ms. Fisher celebrated a political assassination in the Law School's clinical suite during work hours. This occurred while Ms. Fisher was a clinical student with a supervised practice card and thus able to represent clients in our clinics under our professional supervision. The celebration was loud, overheard by others, and adversely affected the operation of the clinic.

Ms. Fisher's actions were unprofessional and also constitute a violation of the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs."  To state the obvious, we expect our clinical law students engaged in supervised practice under our supervision to display the same levels of professionalism in our clinical spaces that law firms expect from their attorneys in their law offices. The disruptive celebration of a political assassination in our clinical spaces is a reprehensible act radically inconsistent with widely recognized professional expectations in law firm spaces. Therefore, we also view this conduct as severe enough to constitute a violation of the Honor Code.

There are two fact-findings involved in this incident.

The first fact-finding is from a Dean's Office process conducted during September of 2025, which occurred as part of a disciplinary investigation of the supervising faculty member, Professor Metze, who failed to take appropriate steps to correct Ms. Fisher's celebratory behavior in his clinical office.

On September 12, I interviewed Professor Metze about the incident on September 10. Present at the interview were Clinical Directors Professor Dwight McDonald and Professor Larry Spain. Professor Metze freely admitted to the three of us that Ms. Fisher celebrated a murder in his clinical office and that he made no effort to correct her behavior. A second faculty member, Professor Terri Morgeson, also witnessed Ms. Fisher's celebratory conduct



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 88**

in the clinical hallway and moments later in Professor Metze's office and fully corroborated his account with additional details, including the impact on her and her clinical students. I interviewed her on September 11 and again on September 15. I also spoke with Associate Dean Sofia Chapman on September 12, who had interviewed Professor Morgeson and her students, and related to me the students' statements about how their work and studies were adversely affected by the celebration both directly and through the impact on their professor, Terri Morgeson.

Attached are statements from Professor McDonald (attesting to Professor Metze's admissions on September 12), Professor Morgeson (attesting to Ms. Fisher's disruptive celebratory behavior on September 10 and its impact on her and on her students), and Associate Dean Sofia Chapman (attesting to the student statements of the impact of the celebration on their clinical work and studies).

The Dean's Office has 100% confidence in its fact-finding that Ms. Fisher celebrated an assassination in the clinical suite in a disruptive fashion on September 10, 2025. Notably, on September 16, Professor Metze's administrative appointment as a clinical director was terminated and he was given modified instructional duties with limited student contact precisely because of his admitted failure to take any steps to correct Ms. Fisher's celebration of a murder in his office. Professor Metze later retired from the law faculty at the end of calendar year 2025 in the face of further disciplinary proceedings supported by Texas Tech University and the Texas Tech University System for this same admitted failure to perform basic job responsibilities on September 10. At no point, to my knowledge, during his employment with TTU did Professor Metze ever retract his admission that Ms. Fisher celebrated a murder in his office on September 10, though he would later claim that he could no longer recall details of what happened that day when the Honor Code investigation of Ms. Fisher began. Professor Terri Morgeson continues to corroborate Professor Metze's account, confirming Ms. Fisher's misconduct.

A second fact-finding is from an Honor Council inquisitorial process conducted during the spring of 2026. This fact-finding governs Ms. Fisher's responsibility under the Law School's Honor Code. After a hearing in which several witnesses were called, the Honor Council reached a split finding.

The Honor Council majority found by clear and convincing evidence that Ms. Fisher celebrated a murder in the *hallway* of our clinical suite. The Honor Council did not find by clear and convincing evidence that Ms. Fisher also celebrated the murder in Professor Metze's *office*, though a majority seem to agree that a celebration of the murder did take place in that office. The Dean's Office concurs in the Council's finding on the disruptive hallway murder celebration but believes the Council reached the wrong result on the question of the disruptive office murder celebration. The Dean's Office believes the Council reached the wrong result principally because it failed to follow a recommendation from the Dean's Office on which witnesses should be called to testify and thus failed to hear from crucial witnesses who would have provided important testimony on this point. Significantly, in our inquisitorial process, the Honor Council must call all relevant witnesses since there is



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 89**



no "prosecutor" to rely on to present a case for responsibility. The Dean's Office continues to believe that Professor Metze's admissions and Professor Morgeson's detailed corroboration establish that Ms. Fisher celebrated a murder not just in the clinical hallway but also in Professor Metze's clinical office.

The Honor Council's finding that Ms. Fisher celebrated a murder in the clinical hallway in a disruptive fashion led them to recommend a written reprimand as a sanction. Their finding and their recommended sanction have been upheld on appeal to our Associate Dean of Academic Affairs. There are no further appeals within our Honor Code process.

Notably, Ms. Fisher has refused to take responsibility for any of her misconduct or express any form of remorse for it. Instead, she has responded with repeated acts of dishonesty in an effort to avoid accountability, denying that the disruptive conduct in both the clinical hallway and the clinical office took place.

As we all know, often "the cover-up is worse than the crime." Had Ms. Fisher taken responsibility for her disruptive misconduct and expressed remorse rather than respond with repeated falsehoods, we would be offering a different recommendation today on her admission to the Bar. I will also note that Ms. Fisher has received an extraordinary degree of grace from our Honor Council in both its fact-finding and in its recommended sanction, which, frankly, in my opinion, she does not deserve, given her dishonesty, and which will only further reinforce her lack of character and fitness for the practice of law.

In sum, because Ms. Fisher, a clinical law student with a supervised practice card, disrupted our clinical spaces with a celebration of a political assassination, because she has refused to take responsibility or show any remorse for her actions, and because she has displayed repeated dishonesty in our Honor Code proceedings, the Dean's Office recommends against her admission to the Bar.

Should you have any questions regarding this letter, please contact me at 806-834-1504 or jack.nowlin@ttu.edu.

Sincerely

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 90**

# Exhibit I

Defs.' Appx. 91

Texas Board of Law Examiners
PO Box 13486
Austin, Texas 78711-3486
https://ble.texas.gov

**DEAN'S CHARACTER AND FITNESS CERTIFICATION**
March 30, 2026

*409704*

TEXAS TECH UNIVERSITY SCHOOL OF LAW
OFFICE OF THE REGISTRAR
3311 18TH STREET, MAIL STATION 0004
LUBBOCK, TX 79409-0004

| | |
|---|---|
| **Re:** | Ellen Margaret Fisher |
| **AKA:** | |
| **SSN:** | xxx-xx-3572 |
| **DOB:** | 03/13/2000 |
| **Dates:** | 8-2023 to 5-2026 |

The individual named above has begun the process for admission to the Bar in Texas and authorized us to contact you for information. Please provide the following information to assist us in evaluating this person's character and fitness. Attached is a copy of the Authorization and Release signed by this individual, consenting to the release of any pertinent information. Base your answers on the school's records, as well as the personal knowledge of the person(s) who complete and sign this form. While we recognize that a staff member may complete this form, we ask that a dean certify the form.

**Do not include information about any expunged or sealed criminal charges.**

1. Did your law school ever determine, within its discipline system, that there was "probable cause" to believe that this person had violated the law school's policies or honor code or the campus code of conduct?          ◉ Yes     ○ No

If yes, please explain.

Yes, an Honor Code investigation found probable cause to believe that Ms. Fisher violated the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs." Probable cause was found that Ms. Fisher celebrated a political assassination in our clinical spaces in a disruptive fashion. Please see our response to Question 8.

2. While engaging in law school activities including, without limitation, clinical courses and student bar association activities, did this person breach any professional or fiduciary obligation or any duty of trust?          ◉ Yes     ○ No

If yes, please explain.

Yes, Dean's Office and Honor Council processes have found that Ms. Fisher celebrated a political assassination in our clinical spaces in a disruptive fashion and thereby violated the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs." Please see our response to Question 8.

3. Has your law school determined that this person filed false charges against fellow students, professors, or other members of the law school community?          ○ Yes     ◉ No

If yes, please explain.

**Defs.' Appx. 92**

4. Is this person in default on any financial obligations to the law school?      ◯ Yes    ◉ No

If yes, please explain.

5. Has the administration of the law school received any complaints (regardless of disposition) alleging dishonesty or breach of an obligation or duty on the part of this person?    ◉ Yes    ◯ No

If yes, please explain.

Yes, complaints have been made that Ms. Fisher celebrated a political assassination in our clinical spaces in a disruptive fashion and thereby violated the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs." She has also refused to admit responsibility or express remorse. Instead, she has repeatedly displayed dishonesty in our Honor Code proceedings. Please see our response to Question 8.

6. Has this person exhibited conduct that could call into question their ability to practice law in a competent, ethical, and professional manner?    ◉ Yes    ◯ No

If yes, please explain.

Yes, Ms. Fisher has been found to have celebrated a political assassination in our clinical spaces in a disruptive fashion and thereby violated the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs." She has also refused to admit responsibility or express remorse. Instead, she has repeatedly displayed dishonesty in our Honor Code proceedings. Please see our response to Question 8.

7. Is there any additional information in your possession that might impact the Board's determination of this person's character and fitness?    ◉ Yes    ◯ No

If yes, please explain.

es, please see our response to Question 8. Additionally, although the student initially answered "no" on the law school application, she later submitted an addendum disclosing her academic history. No action was taken (see attached). Finally, the student was placed on academic probation following Fall 2023 grades, but improved and returned to good standing after the Spring 2024 semester (see attached).

8. Based on the information in your possession at this time, do you recommend this person's admission to the practice of law?    ◯ Yes    ◉ No    ◯ Undecided

If "No" or "Undecided", please explain

Please see attached letter from Dean Jack Wade Nowlin.

I certify that I conducted a review of this person's records maintained by this law school and the information provided is true and correct. I further certify that I will inform the Board immediately if I obtain information about, or otherwise become aware of, any fact (including a change in facts or circumstances) that renders incorrect or incomplete any response I have made in this certification form.

If you received this form electronically, please key in your response and return by clicking the submit button below. If additional documentation is being sent with your response, or you received this form by fax or mail, please enter your response and return by faxing to (512) 463-5300, via email to **information@ble.texas.gov**, or via regular mail.  Do not include a cover sheet or a copy of the authorization.

**This form was certified by:**

| | | | |
|---|---|---|---|
| Name: | Jack Wade Nowlin | Title: | Dean |
| Telephone | 806-834-1504 | Date | 4/13/2026 |

Direct questions to: Lisa Leitch, Licensure Analyst, , **information@ble.texas.gov**

**You have submitted this form on Mon Apr 13 16:25:10 CDT 2026**



April 13, 2026

Texas Board of Law Examiners
205 W. 14th Street
Suite #500
Austin, TX 78701

Dear Board of Law Examiners,

The Dean's Office recommends against Ms. Ellen Fisher's admission to the Bar.

We do so for three related reasons. First, Ms. Fisher, as a clinical student with a supervised practice card, disrupted our clinical spaces with a celebration of a political assassination. Second, she has refused to take responsibility or show any remorse for her unprofessional actions. And, third, she has displayed dishonesty when discussing this incident in our Honor Code proceedings.

On September 10, 2025, Ms. Fisher celebrated a political assassination in the Law School's clinical suite during work hours. This occurred while Ms. Fisher was a clinical student with a supervised practice card and thus able to represent clients in our clinics under our professional supervision. The celebration was loud, overheard by others, and adversely affected the operation of the clinic.

Ms. Fisher's actions were unprofessional and also constitute a violation of the Law School's Honor Code, Section 2.H (Violation of Professional Duties), which prohibits "failing to uphold professional… obligations" related to "clinical programs."  To state the obvious, we expect our clinical law students engaged in supervised practice under our supervision to display the same levels of professionalism in our clinical spaces that law firms expect from their attorneys in their law offices. The disruptive celebration of a political assassination in our clinical spaces is a reprehensible act radically inconsistent with widely recognized professional expectations in law firm spaces. Therefore, we also view this conduct as severe enough to constitute a violation of the Honor Code.

There are two fact-findings involved in this incident.

The first fact-finding is from a Dean's Office process conducted during September of 2025, which occurred as part of a disciplinary investigation of the supervising faculty member, Professor Metze, who failed to take appropriate steps to correct Ms. Fisher's celebratory behavior in his clinical office.

On September 12, I interviewed Professor Metze about the incident on September 10. Present at the interview were Clinical Directors Professor Dwight McDonald and Professor Larry Spain. Professor Metze freely admitted to the three of us that Ms. Fisher celebrated a murder in his clinical office and that he made no effort to correct her behavior. A second faculty member, Professor Terri Morgeson, also witnessed Ms. Fisher's celebratory conduct



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 94**



in the clinical hallway and moments later in Professor Metze's office and fully corroborated his account with additional details, including the impact on her and her clinical students. I interviewed her on September 11 and again on September 15. I also spoke with Associate Dean Sofia Chapman on September 12, who had interviewed Professor Morgeson and her students, and related to me the students' statements about how their work and studies were adversely affected by the celebration both directly and through the impact on their professor, Terri Morgeson.

Attached are statements from Professor McDonald (attesting to Professor Metze's admissions on September 12), Professor Morgeson (attesting to Ms. Fisher's disruptive celebratory behavior on September 10 and its impact on her and on her students), and Associate Dean Sofia Chapman (attesting to the student statements of the impact of the celebration on their clinical work and studies).

The Dean's Office has 100% confidence in its fact-finding that Ms. Fisher celebrated an assassination in the clinical suite in a disruptive fashion on September 10, 2025. Notably, on September 16, Professor Metze's administrative appointment as a clinical director was terminated and he was given modified instructional duties with limited student contact precisely because of his admitted failure to take any steps to correct Ms. Fisher's celebration of a murder in his office. Professor Metze later retired from the law faculty at the end of calendar year 2025 in the face of further disciplinary proceedings supported by Texas Tech University and the Texas Tech University System for this same admitted failure to perform basic job responsibilities on September 10. At no point, to my knowledge, during his employment with TTU did Professor Metze ever retract his admission that Ms. Fisher celebrated a murder in his office on September 10, though he would later claim that he could no longer recall details of what happened that day when the Honor Code investigation of Ms. Fisher began. Professor Terri Morgeson continues to corroborate Professor Metze's account, confirming Ms. Fisher's misconduct.

A second fact-finding is from an Honor Council inquisitorial process conducted during the spring of 2026. This fact-finding governs Ms. Fisher's responsibility under the Law School's Honor Code. After a hearing in which several witnesses were called, the Honor Council reached a split finding.

The Honor Council majority found by clear and convincing evidence that Ms. Fisher celebrated a murder in the *hallway* of our clinical suite. The Honor Council did not find by clear and convincing evidence that Ms. Fisher also celebrated the murder in Professor Metze's *office*, though a majority seem to agree that a celebration of the murder did take place in that office. The Dean's Office concurs in the Council's finding on the disruptive hallway murder celebration but believes the Council reached the wrong result on the question of the disruptive office murder celebration. The Dean's Office believes the Council reached the wrong result principally because it failed to follow a recommendation from the Dean's Office on which witnesses should be called to testify and thus failed to hear from crucial witnesses who would have provided important testimony on this point. Significantly, in our inquisitorial process, the Honor Council must call all relevant witnesses since there is



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 95**



no "prosecutor" to rely on to present a case for responsibility. The Dean's Office continues to believe that Professor Metze's admissions and Professor Morgeson's detailed corroboration establish that Ms. Fisher celebrated a murder not just in the clinical hallway but also in Professor Metze's clinical office.

The Honor Council's finding that Ms. Fisher celebrated a murder in the clinical hallway in a disruptive fashion led them to recommend a written reprimand as a sanction. Their finding and their recommended sanction have been upheld on appeal to our Associate Dean of Academic Affairs. There are no further appeals within our Honor Code process.

Notably, Ms. Fisher has refused to take responsibility for any of her misconduct or express any form of remorse for it. Instead, she has responded with repeated acts of dishonesty in an effort to avoid accountability, denying that the disruptive conduct in both the clinical hallway and the clinical office took place.

As we all know, often "the cover-up is worse than the crime." Had Ms. Fisher taken responsibility for her disruptive misconduct and expressed remorse rather than respond with repeated falsehoods, we would be offering a different recommendation today on her admission to the Bar. I will also note that Ms. Fisher has received an extraordinary degree of grace from our Honor Council in both its fact-finding and in its recommended sanction, which, frankly, in my opinion, she does not deserve, given her dishonesty, and which will only further reinforce her lack of character and fitness for the practice of law.

In sum, because Ms. Fisher, a clinical law student with a supervised practice card, disrupted our clinical spaces with a celebration of a political assassination, because she has refused to take responsibility or show any remorse for her actions, and because she has displayed repeated dishonesty in our Honor Code proceedings, the Dean's Office recommends against her admission to the Bar.

Should you have any questions regarding this letter, please contact me at 806-834-1504 or jack.nowlin@ttu.edu.

Sincerely

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law



# CLINICAL PROGRAMS

March 30, 2026

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law
Texas Tech University School of Law

On September 10, 2025, I returned to my office from my ISL class. Professor Morgeson immediately came to my office and told me that Ellie Fisher had come into the Clinic Suites and loudly proclaimed "They shot that Mfer." Professor Morgeson then explained that Ms. Fisher had gone into Professor Metze office and there was loud talking coming from Metze's office, so much so that she felt the need to close the door as they were disturbing herself and other students in the Clinic Suites. She went to close the door and explained to Professor Metze and the students in his office (Ms. Fisher being one of three students in the office) that Charlie Kirk had died and they were being too loud so she was going to close the door.

On September 12th, I met with Dean Nowlin, Pat Metze and Larry Spain regarding the incident on September 10th. Dean Nowlin explained to Pat that there had been information relayed to him that Ellie Fisher had said something to the effect of," They shot that Mfer" while she was in the Clinic Suites and she had participated in a loud, celebratory conversation regarding the shooting while in his office and that he did nothing. He also asked Pat if that were true and Pat stated, "who am I to tell a black woman what she can or can't say." Pat Metze never denied that Ms. Fisher made the statement during the meeting, nor did he deny that Ellie Fisher was in his office being loud and that Professor Morgeson had to close the door to his office due to the loudness. Pat Metze and I had several conversations about the situation involving Ms. Fisher and his response or lack thereof over the next 10 days to two weeks. At no time did Pat ever deny or contest that Ms. Fisher made the statement, "They shot the Mfer." Nor did he deny that Ellie Fisher participated in the loud, celebratory conversation regarding Charlie Kirk's assassination while in his office and that Professor Morgeson had to close the door to his office due to the volume of the conversation in his office.

Dwight McDonald



# CLINICAL PROGRAMS

April 10, 2026

Dean Jack Nowlin                                     **SENT VIA EMAIL**
Texas Tech School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Re: Formal Statement

Dear Dean Nowlin,

Please find below my formal statement of the events that occurred on September 10, 2026, in the Clinical Suite of the law school.

1. On Monday, September 10, 2025, I had just concluded teaching my Introduction to the Study of Law class and returned to the clinic to check in with my students.

2. I was in the family law clinic speaking with two students, **Student 2** and **Student 3**, when the clinic's front doors were abruptly and forcefully thrown open.

3. Ellie Fisher entered the clinic loudly exclaiming, "This is the best day ever. I am so happy." Her tone rose to a near-yell and was loud enough to be heard throughout the clinic hallway.

4. Ms. Fisher proceeded down the hallway toward faculty offices, continuing to speak at a disruptive volume. I was standing leaning up against a computer station on the north wall of my clinic. As Ellie approached, I turned to watch her walk down the hallway. I saw her enter the doorway to Professor Steven's office. I was standing less than 6 feet away from her. Her back was to me. Joe Stevens was sitting at his desk facing me and the hallway,



## TEXAS TECH
### School of Law

FROM HERE, IT'S POSSIBLE.™

Defs.' Appx. 98

April 10, 2026
Dean Nowlin – Formal Statement

5. She stopped at Joe Stevens's office, entered the threshold, and stated, "I am so happy. I'm having the best day ever." When he asked why, she responded, "Because Charlie Kirk was shot."

6. Professor Stevens appeared visibly taken aback. Ms. Fisher then asked whether he knew who Charlie Kirk was. Professor Stevens responded that he had done so and instructed her not to enter his office, making statements of that nature. Ellie then asked if he knew who Charlie was and about all the inflammatory statements he had made.

7. When they were discussing the matter, I saw my opportunity, and I left the family law clinic at that time. The volume of Ms. Fisher's voice made it difficult to continue my discussion with my students.  Her entire conversation with Professor Steven was within arm's length of the Family Law Clinic.

8. A short time later, Ms. Fisher left Professor Stevens's office and proceeded toward Professor Metze's office.

9. From my office, I observed Ms. Fisher standing in Professor Metze's doorway. She raised her hands over her head and exclaimed, "They shot him." I do not clearly recall whether she also used profanity.

10. Ms. Fisher then entered Professor Metze's office. Professor Metze's office shares a wall with mine, and voices from it can be heard clearly in mine.

11. While in his office, Ms. Fisher and Professor Metze engaged in a conversation about the shooting. Their voices were loud and clearly audible, carrying into the hallway.

12. During this conversation, they discussed the circumstances of the shooting and speculated about whether Charlie Kirk was deceased. Professor Metze referenced that his

**Defs.' Appx. 99**

April 10, 2026
Dean Nowlin – Formal Statement

daughter is a nurse and discussed possible medical implications from being shot in the neck.

13. The tone of the conversation was animated and loud. They were loud, laughing, almost giddy with happiness.

14. During this time, all doors were open. I could still clearly hear the conversation from Professor Metze's office and distinguish the speakers.

16. At one point, they were watching a video related to the shooting and laughing while describing how Mr. Kirk's head moved after he was shot.

17. I was concerned that this conduct would be disruptive to the educational and professional environment and potentially offensive to students and any clients present in the clinic. In an effort to minimize disruption, I decided to close all of the doors in the clinic suite.

19. While I was in the Family Law clinic, I learned that Charlie Kirk had died after President Trump publicly confirmed his death on social media.

20. After closing my Clinic door, I walked down the hallway to Professor Metze's office and informed them that Mr. Kirk had died. I stood in his doorway and observed clearly who was in his office and what they were doing.

21. As I was standing in his doorway, Professor Metze commented, "My students are having a really good day. I'm sorry—they're just really, really happy." After this statement, I walked out, closing his office door.

22. I then walked through the clinic suite to confirm that the doors to other clinic areas were closed.

**Defs.' Appx. 100**

April 10, 2026
Dean Nowlin – Formal Statement

23. Then I returned to my office, closed my door, and continued to try to work.

24. Even with all doors closed, I could still hear laughter, giggling, and comments that I considered inappropriate in a professional clinic setting. Their behavior limited my ability to work. I was scared to call anyone, so I tried to respond to clients' emails and texts.

25. Less than 10 minutes later, my two students wanted to leave the clinic early. Their office hours were scheduled to end at 5. They did not want to deal with the noise and disruption, which made it impossible to continue working. I agreed and allowed them to leave early.

25. When I refer to "they," I am referring to the voices I could clearly identify as Professor Metze and Ellie Fisher.

26. Two additional students were present in Professor Metze's office during this time. Those students were not participating in the conversation about the shooting. Based on what I could hear and observe from the doorway, they were engaged in separate work related to a case.

Sincerely,

Terri Morgeson
*Director of the Family Law Clinic*
*Attorney at Law*

# SCHOOL OF LAW
### TEXAS TECH

April 7, 2026

Dear Texas Board of Law Examiners,

I, Sofia Rodriguez Chapman, Associate Dean for Student Life, am writing this letter to the Texas Board of Law Examiners regarding information related to Ellie Fisher's character and fitness and her unprofessional behavior in the celebration of Charlie Kirk. I am 100% certain that Ellie Fisher celebrated the death of Charlie Kirk in both the clinic hallway and in Professor Patrick Metze's office, as I met with Professor Terri Morgeson and students **Student 2** and **Student 3** who confirmed Miss Fisher's behavior within 48 hours of September 10, 2025. Please see below for a summary of said meetings.

On September 11, 2025, Professor Terri Morgeson, who was visibly upset, came to me as it is common for anyone in the law school community to report an alleged violation of the Honor Code given my professional duties at the law school. Professor Morgeson also reported this to me as I oversee all wellness and mental health support for the law school community. As such, Professor Morgeson asked me to check on two of her Family Law students, **Student 2** and **Student 3**, as Professor Morgeson reported that they were upset and bothered by the unprofessional behavior of Miss Fisher and Professor Pat Metze.

Professor Morgesson reported to me that Ellie Fisher was celebrating Charlie Kirk's death and that she heard Ellie Fisher use curse words related to Charlie Kirk's death. She also reported to me that Ellie Fisher tried to engage Professor Joe Stephens in a celebratory way about Charlie Kirk and that Professor Stephens "shut Ellie down". She also reported that this behavior upset her family law students, **Student 2** and **Student 3**. Thus, she allowed them to go home early due to the totality of events.

On September 12, 2025, students **Student 2** and **Student 3** reported to me that they both thought that Ellie's behavior was unprofessional. **Student 2** reported that she heard Ellie Fisher say. "I am in the best mood ever, they Killed Charlie Kirk." Overall, both students reported that they were upset the day of the incident and that they both confirmed that Ellie Fisher was in fact celebrating in the clinic. Both reported that they left early due as they could not get any work done due to the unprofessionalism in the clinic.

In conclusion, on September 12, 2025, I reported these facts to Dean Nowlin in preparation for his meeting with Professor Patrick Metze. Please contact at sofia.chapman@ttu.edu should you have questions regarding this letter.

Sincerely,

Sofia Rodriguez Chapman, Ph.D.
Associate Dean for Student Life



3311 18th Street I Box 40004 I Lubbock, Texas 79409-0004 I T 806.742.3791 I F 806.742.1629

**Defs. Appx. 102**

**HONOR COUNCIL NOTICE**

February 4, 2026

Ellie Fisher                                              **Confidential**
Law School                                               *Sent via Email*
                                                         Ellie.fisher@ttu.edu

Dear Ms. Fisher:

Under the provisions of the Law School Honor Code, Professor William R. Keffer, acting as an Honor Code Investigator, found probable cause to believe that a violation of the Honor Code had occurred, specifically Section 2.H (**Violation of Professional Duties**) ". . . by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) and referring the matter to the Honor Council for further action.

After communicating with you as to your availability, a hearing has been set for **FRIDAY, February 20, 2026** at **9 am** at: Texas Tech University System Building. Room 106, 1508 Knoxville Avenue, Lubbock, Texas  79409.

The following members of the Honor Council will hear your case:  Professors Amy Hardberger,  Alyson Outenreath, and Larry Spain along with student member **Student 1**. Under Section 3(C) of the Honor Code, you may challenge any member of the Council as biased and present facts and arguments in support of the challenge.  If you wish to do so, please communicate such challenge to me in writing as soon as possible.

Your rights and procedures to be followed in conducting the hearing are set forth in detail in the Honor Code located at the following link:  Honor Code | School of Law | TTU  The following documents, which are attached, were forwarded to the Honor Council and will be considered as part of the hearing process:

- Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council from Professor William R. Keffer, Investigator, referring the matter to the Honor Council
- Report of Investigation dated January 23, 2026 from Profesor William R. Keffer

At this time, the Honor Council intends to call the following individuals to provide information at the hearing:  Professor Terri Morgeson, Professor Joe Stephens, **Student 2**, **Student 3**, **Student 4**, and **Student 5**.  If there are any changes to those that will provide information, I will advise you in writing in advance.

**Defs.' Appx. 103**

You may also request that witnesses provide information to the Council. If you desire that any witnesses having information be called to provide testimony, it is your responsibility to request that they be called by the Honor Council. If you desire the assistance of the Council in procuring the attendance of witnesses, please contact me. Please note that this process is not a court of law. Accordingly, the ability to subpoena witnesses for the hearing process does not apply to the Honor Council proceedings. Additionally, students may not retaliate against, harass, or threaten anyone participating in the process.

I acknowledge your written request that the hearing be recorded (audio only) and will arrange for that to occur.

If you have any other questions concerning the hearing in advance, please let me know.

Sincerely,

Larry R. Spain
Alvin R. Allison Professor of Law
Chair, Honor Council

Encl.

Copy to: Honor Council Members
Associate Dean Sofia Chapman

**Defs.' Appx. 104**



**TEXAS TECH UNIVERSITY**
**School *of* Law·**

January 23, 2026

Professor Larry Spain
Chair, Honor Council
Texas Tech University School of Law
3311 18th Street
Lubbock, Texas 79409-0004

Dear Professor Spain:

I am referring to the Honor Council a matter regarding Ellen Fisher. The Law School received information that Ms. Fisher allegedly violated Section H of the Honor Code ("Violation of Professional Duties") "…by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities."

Pursuant to the Student Handbook, I have conducted a preliminary factual investigation and have determined that probable cause exists to believe that Ms. Fisher violated the Honor Code. Accordingly, I am referring the matter to the Honor Council for consideration. In addition, on this date, I am notifying Ms. Fisher of this referral. Please contact Dean Chapman for information related to Ms. Fisher's case.

Please let me know if you have any questions or need more information.

Sincerely,

William R. Keffer
Texas Tech University School of Law
Janet Scivally and David Copeland Endowed Professor of Energy Law
Director, Energy Law Programs
Assistant Director, Bar Preparation Resources
806/834-3178
william.keffer@ttu.edu

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 105**



**TEXAS TECH UNIVERSITY**
**School *of* Law™**

January 23, 2026

Re: Honor Code Violation - Ms. Ellen Fisher

On 9/23/25, Dean Nowlin and Dean Chapman appointed me under Section 4(B) of the law school's Honor Code to investigate a potential violation concerning:

*"H. Violation of Professional Duties*

**A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One."**

Specifically, you are alleged to have acted unprofessionally on Wednesday, 9/10/25 relating to your behavior and statements in a clinical setting made about the assassination of Charlie Kirk.

I met with Dean Chapman on Tuesday, 9/23/25 regarding this matter. I then met with the following people as part of this investigation (Dean Chapman was present during all student interviews):

1. 10/1/25 – Dwight McDonald (faculty)
2. 10/2/25 – Joe Stephens (faculty)
3. 10/2/25 – Terri Morgeson (faculty)
4. 10/8/25 – **Student 2** (student)
5. 10/8/25 – **Student 3** (student)
6. 10/14/25 – Pat Metze (faculty)
7. 10/16/25 – **Student 7** (student)
8. 10/21/25 – Ellen Fisher (student)
9. 10/22/25 – **Student 6** (student)
10. 10/28/25 – Dwight McDonald (faculty) and Sofia Chapman (Associate Dean)
11. 10/28/25 – Jack Nowlin (Dean), Larry Spain (faculty) , and Dwight McDonald (faculty)
12. 11/6/25 – Ken Williams (faculty)
13. 11/7/25 – **Student 13** (student)
14. 11/12/25 – **Student 4** (student)
15. 11/13/25 – **Student 11** (student)
16. 11/13/25 – **Student 5** (student)
17. 11/14/25 – **Student 14** (student)
18. 11/14/25 – **Student 10** (student)

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 106**

The following information supporting the allegations was gathered from the interviews (all references are to events that occurred on 9/10/25, unless otherwise indicated):

1. Joe Stephens stated that Fisher made the following statements to him:
   a. "They shot Charlie."
   b. "There's video."
   c. "It looks bad."
2. Terri Morgeson stated that she heard Fisher make the following statements to others:
   a. "I'm in such a good mood."
   b. "That mother fucker got shot."
3. Morgeson described Fisher as loud, happy, and celebratory.
4. Morgeson later told Pat Metze and the students who were in his office (including Fisher) that Kirk had just died. Metze responded: "Well, my students are in a very good mood."
5. On the next day (9/11/25), Morgeson told Metze that he and his students had offended Morgeson's students with their behavior the previous day. Metze responded: "Well, it was Ellie."
6. Morgeson's student, **Student 2**, heard Fisher make the following statements:
   a. [to Joe Stephens] "I'm in the best mood ever."
   b. [to Joe Stephens] "They shot Charlie Kirk."
7. **Student 2** was upset by the behavior she witnessed and statements she heard seemingly celebrating Kirk's death and asked Morgeson if she could go home early.
8. Morgeson's student, **Student 3**, heard the following statements coming from a female student that sounded like Fisher:
   a. "They got him."
   b. "This is great."
   c. "He's dead."
9. Pat Metze made the following statements about the alleged incident:
   a. Fisher came "bopping into his office" and was "animated."
   b. He recalled Fisher saying that her mother was "really excited" about Kirk's assassination.
   c. When discussing the matter later with Dean Jack Nowlin, along with Dwight McDonald and Larry Spain, Metze told Nowlin that he himself did not celebrate Charlie Kirk's death, but Fisher did. Nowlin told Metze that he should have corrected Fisher's behavior. Metze responded that he "didn't think it was his place." Metze also stated in his meeting with Dean Nowlin that Fisher's behavior was immature, but she was entitled to her opinion. At no time during the lengthy discussion did Metze ever dispute the fact that Fisher had celebrated Charlie Kirk's murder while in his office.

d. Even though Metze later insisted in his interview with me that he couldn't recall any details and was of the opinion that Fisher had done nothing wrong, he eventually stated that:
   i. Fisher was loud and "expressed her happiness."
   ii. Not confirming or denying that Fisher stated, "that mother fucker got shot", Metze responded: "That's a common term in the Black community."
   iii. In response to my question as to whether Fisher could benefit from constructive criticism about her behavior (even if Metze didn't find it objectionable), Metze responded that "she would benefit from talking to a Black, female counselor."

10. While she and Fisher were in Metze's office, **Student 7** stated that Fisher commented that she had been on the phone with her mother earlier about Kirk's assassination. She also stated that Fisher seemed to be repeating her mom's happiness.

11. Ellen Fisher made the following statements:
    a. When she briefly spoke to Stephens, he was the one who asked her if she had "heard." She responded: "About what?"
    b. While she was in Metze's office, Metze told her and other students who Kirk was. Metze showed her and others the video of the shooting on his phone. Fisher said she didn't look at it.
    c. Fisher stated that she never showed anyone the video on her phone.
    d. In response to her alleged statement that "that mother fucker got shot", Fisher stated that she doesn't use curse words. She further stated that she would never use that kind of language in the clinic suite because clients are frequently present.
    e. Fisher stated that, before the shooting, she hadn't known who Charlie Kirk was.
    f. Fisher stated that she didn't talk to her mother about the Kirk assassination until later that day.
    g. Fisher agreed that behaving in the manner alleged would be wrong.
    h. Fisher agreed that making any of the alleged statements would be unprofessional but also referenced the First Amendment.

12. **Student 4** stated that Fisher showed him the video of Kirk's shooting on her phone.

13. **Student 4** stated that Fisher used "choice" words in her description of Kirk.

14. **Student 4** believes that, based on Fisher's discussion about Kirk that day, she seemed to know who he was.

15. **Student 11** stated that Fisher talked about Kirk like she knew who he was.

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 108**

16. When **Student 5** entered the conference room in the clinic where Fisher was, she was on her phone exclaiming that Kirk had been shot and showing others, including **Student 5**, the video. He was surprised at the manner in which she was describing the news because she was happy and excited. **Student 5** stated that he would definitely describe her behavior as celebrating Kirk's death. **Student 5** also said, "I wanted to say something, but we have to be in the room for two semesters, so I didn't want to get into a fight." **Student 5** also said, "Had I said something, it would have caused me stress." **Student 5** also said, "She said he got what he deserved." **Student 5** also said, "I feel it's not the right environment."

17. **Student 5** believes that Fisher knew who Kirk was before the shooting because she was quoting something Kirk had once said about the Second Amendment.

18. **Student 10** stated that Fisher offered to show her the video on her phone.

After conducting my investigation, I am of the opinion, pursuant to Section 4(D), that probable cause exists that you violated the Honor Code and that this matter should be referred to the Honor Council for further disposition.

Sincerely,

William R. Keffer
Janet Scivally and David Copeland Endowed Professor of Energy Law

Cc: Dean Jack Nowlin
Associate Dean Sofia Chapman

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 109**

March 11, 2026

Ellie Fisher
Law School

**Confidential**
*Sent via Email*
ellie.fisher@ttu.edu

Dear Ms. Fisher:

Please find attached a copy of the Report of Honor Council Hearing with Findings of Fact, Conclusion as to Violation of the Honor Code, and Recommended Sanction.

Under Section 6 of the Honor Code, if you do not consent to the sanction recommended by the Honor Council, you have a right to request review in writing to the Associate Dean for Academic Affairs which must be submitted within ten (10) calendar days from the date of the Council's transmittal of the Report to the Dean and the student.

You should also be advised that wellness resources are available to you at any time through the Office for Student Life within the School of Law.

Sincerely,

Professor Larry R. Spain
Chair, Honor Council

Copy:  Dean Jack Wade Nowlin via email  jack.nowlin@ttu.edu
        Associate Dean Sofia Chapman via email  sofia.chapman@ttu.edu
        Assistant Dean JaWana Green via email  jawana.green@ttu.edu
        Michael Allen via email  mallen@allenharrislaw.com

**Defs.' Appx. 110**

**IN RE: ELLIE MAE FISHER**

**Report of Honor Council Hearing**

The Honor Council met on Friday, February 20, 2026 at 9 am in Room 106 of the Texas Tech University System Building to consider whether Ellie Fisher violated Section 2.H (Violation of Professional Duties) of the Texas Tech University School of Law Honor Code "...by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of public figure Charlie Kirk on September 10, 2025.

Professor William R. Keffer, as Honor Code Investigator, referred the matter to the Honor Council after conducting a preliminary investigation and concluding that probable cause existed that a violation of the Honor Code had occurred. Present at the hearing and constituting a quorum were the following members of the Honor Council:  Professors Amy Hardberger, Alyson Outenreath, and Larry Spain in addition to law student member **Student 1**.  Ellie Fisher appeared with her legal counsel, Michael Thad Allen. Also present was Sofia Chapman, Associate Dean for Student Life, and Ronny H. Wall, Office of General Counsel, Texas Tech University System.

This report includes a summary of the Honor Council proceedings; the Council's findings of fact; and it's recommended disposition of the case.

### *SUMMARY OF PROCEEDINGS*

Prior to the hearing and by letter dated February 4, 2026, Professor Larry Spain, Chair of the Honor Council, communicated with Ms. Fisher in writing to provide notice of the time and date of the hearing, information about the nature of the allegations prompting a referral to the Honor Council, and a general description of the process for conducting the hearing as outlined in the Honor Code of the Texas Tech University School of Law.

The following relevant documents were considered by the Honor Council, each of which was also made available to or otherwise submitted by Ms. Fisher and her counsel, and are made a part of the record of these proceedings:

1.  Honor Council Notice dated February 4, 2026 and attachments from Professor Larry R. Spain, Chair of the Honor Council, to Ellie Fisher scheduling the hearing for February 20, 2026.

**Defs.' Appx. 111**

2. Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council, from Professor William R. Keffer referring the matter to the Honor Council.
3. Report of the Honor Code Investigator, Professor William R. Keffer, dated January 23, 2026.

In addition, the following documents were submitted to the Honor Council by counsel for Ellie Fisher, are made a part of the record of these proceedings, and were considered in deciding  the matter:

1. Affidavit of **Student 9**
2. Affidavit of **Student 6**
3. Affidavit of **Student 12**
4. Affidavit of **Student 10**
5. Affidavit of Patrick Metze
6. Affidavit of **Student 11**
7. Ellie Mae Fisher's Opening Statement

The following individuals appeared and provided information to the Honor Council relevant to the allegations concerning a violation of the Honor Code:
1. Professor Joe Stephens
2. Professor Terri Morgeson
3. **Student 2**
4. **Student 3**
5. **Student 4**
6. **Student 5**
7. **Student 6** (at the request of Ellie Fisher)
8. Professor Kenneth Williams (at the request of Ellie Fisher)
9. Ellie Fisher
Each of these individuals responded to questions both from members of the Honor Council as well as Ellie Fisher.

## FINDINGS OF FACT

After a careful review and consideration of the Report of the Honor Council Investigator, the Affidavits submitted by legal counsel for Ellie Fisher, and the information provided by various witnesses at the hearing held on February 20, 2026 and assessing the credibility of the information provided, the Honor Council makes the following findings of fact:

1. The Council takes administrative notice that the Clinical Programs is an academic program of the School of Law in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic

2

credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

2. Various statements were made as to the actions taken and statements made by Ellie Fisher following the assassination of Charlie Kirk on September 10, 2025 within the Clinical Programs offices which could have been considered celebratory in tone.

3. Upon entering the offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that Professor Terri Morgeson and **Student 2** provided credible information that Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

4. Such statements endorsing or celebrating death or violence, particularly in a professional office setting,  are contrary to respect for the rule of law and violate ordinary standards of professional conduct.

5. As a result of Ellie Fisher's  actions, several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting which interfered with their normal work routine.

6. A majority of the Honor Council believed that certain activities took place in Professor Metze's office involving several students of the Criminal Defense Clinic, including Ellie Fisher. Information was provided by Professor Metze that Ellie Fisher was celebrating the shooting. However, there was conflicting information provided as to whether statements celebrating the death of Charlie Kirk and laughing at the video of Charlie Kirk's assassination could be attributed to Ellie Fisher. Accordingly, a majority of the Honor Council could not reach the conclusion that the actions and statements attributed to Ellie Fisher were supported by clear and convincing evidence.

7. Likewise, there was conflicting information about what actions and statements could be attributed to Ellie Fisher in the Criminal Defense Clinics workspace on that date and, as a result, the Honor Council was unable to reach a majority view on whether or not the statements or actions alleged had occurred.

8. Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

9. The actions and statements that were made by Ellie Fisher in a professional office setting were inappropriate, disrespectful, and demonstrated a lack of professional judgment and self-discipline.

10. As a result of the actions taken and statements made by Ellie Fisher, the operations of the Clinical Program were adversely affected and made some individuals uncomfortable.

### CONCLUSION AS TO VIOLATION OF THE HONOR CODE

Based on the foregoing findings of fact and applying the clear and convincing evidence standard, the Honor Council concludes, by a majority vote of 3-1,  that the

3

Respondent, Ellie Fisher, violated the Honor Code including *Principle One-A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education*, specifically Section 2.H (**Violation of Professional Duties**) "by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as result of her actions and statements.

On the other hand, one member of the Honor Council concluded the evidence presented in the investigative report and at the February 20, 2026, hearing does not meet the clear and convincing standard required to find Ms. Fisher responsible for violating Section H of the Honor Code entitled "Violation of Professional Duties." This decision is based on conflicting evidence at the hearing and with the investigative report. The following are a few examples of conflicts on which this decision is based.

According to the majority of the Honor Council, the strongest evidence that Ms. Fisher acted unprofessionally on September 10, 2025, is her actions when she entered the clinic. Specifically, Professor Morgeson and **Student 2** stated they overheard Ms. Fisher saying "It's the best day ever. I'm so happy" and Ms. Fisher either said this alone or repeated it to Professor Stephens and said her happiness was because of Mr. Kirk's assassination. Professor Stephens does agree that Ms. Fisher stopped in his doorway, but then the accounts differ significantly. Professor Stephens stated that: "And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, 'No.' I didn't know who Charlie was. And she said, 'It looks bad,' and at some point said something that it's all over the Internet or something like that" which contradicts what Professor Morgeson stated she heard. As to Ms. Fisher's affect, he stated: "Ellie's demeanor to me was no different that day," she simply reported what had happened in the news, it was not disruptive or unprofessional. He repeated the last point several times during his testimony. Despite his location near clinic entrance, Professor Stephens did not report hearing Ms. Fisher make any loud proclamations upon entry. Although he may not have heard her, if she entered the clinic announcing Mr. Kirk's death in a celebratory manner, it seems inconsistent to me that she would be able to switch quickly to simply reporting the news to Professor Stephens.

Another conflict is Professor Morgeson's and **Student 2**'s testimony that they heard Professor Stevens admonish Ms. Fisher because her behavior was not appropriate. Professor Morgeson stated she overheard Professor Stephens say "Don't do that. Don't say that. Don't do that" or something similar. Because Professor Morgenson testified after Professor Stephens, he was not asked directly about this, but in his testimony, he stated: "When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong," which essentially answers the question, had it been asked. He also stated: "that interaction was 30 seconds and then that was it." Professor Stephens repeated statements that Ms. Fisher did not say anything he found to be unprofessional generally negates any statement that he was concerned about her behavior at the time she entered his door.

4

**Defs.' Appx. 114**

While much of the focus is on the statements and actions of Ms. Fisher as she entered the clinic office, I do not feel the evidentiary standard was met in Professor Metze's office or later in the conference room either. The primary testimony against Ms. Fisher in Professor Metze's office centered on watching the video of the shooting and discussing whether Mr. Kirk could have survived. Although I find this behavior reprehensible, there were several people in that room, including a faculty member, and no one at the hearing could tie any statements from the office directly to Ms. Fisher versus other parties. Professor Morgeson stated she is not sure who used a profanity, which she stated to the investigator although her doubt was not noted. She also said it might have been Professor Metze who said it. Professor Morgeson stated her students were "shocked and offended" which they both denied at the hearing and stated they did not request to leave early based specifically on Ms. Fisher's statements. Unfortunately, Professor Metze's statement in the investigation report provides no specific information related to Ms. Fisher's "celebratory" behavior or actions in his office and his affidavit seems to contract his initial statements. Testimony from students in the conference room also did not provide details of Ms. Fisher being unprofessional. Although **Student 5** did state Ms. Fisher's mood could have been interpreted as celebratory, **Student 4** disagreed.

In summary, while I do not believe that Ms. Fisher's behavior (and that of others around her) on September 10, 2015 was proper under the circumstances, I also do not feel that the evidence is sufficient to meet the clear and convincing evidentiary standard required to find her responsible for a violation of Section H of the Honor Code.

### RECOMMENDED SANCTION

In recommending a sanction appropriate to the violation, the majority of the Honor Council that concluded a violation of the Honor Code was established has been guided by those mitigating and aggravating factors set forth in the Honor Code. After careful consideration of all information provided and made a part of the record of the proceedings, the Honor Council determines that Respondent's actions and conduct reflected poorly on the exercise of professional judgment in the particular setting in which her actions took place. Accordingly, the Honor Council recommends that the Respondent, Ellie Fisher, receive a written letter of reprimand from the Dean of the School of Law to be placed in her permanent school record. The Council believes such sanction is proportionate to the severity of the conduct involved and sufficient to reinforce the obligation on the part of all law students to always act with honor and integrity in all of their professional interactions,

**Defs.' Appx. 115**

particularly when they may have serious consequences to the reputation of the School of Law and its academic programs.

*This decision may be subject to review by the Office of Student Conduct per university policies. A representative from the Office of Student Conduct is cc'd on this Honor Council Hearing report and will be in contact with you.*

Professor Amy Hardberger

Associate Dean and Professor
Alyson Outenreath

Professor Larry Spain

**Student 1**

6

**Defs.' Appx. 116**



**TEXAS TECH UNIVERSITY**
**School *of* Law**™

April 13, 2026

**Confidential**
Sent via Email
ellie.fisher@ttu.edu

IN RE: ELLIE MAE FISHER

REVIEW

On March 27, 2026, Ellie Fisher submitted her Request for Review of the Honor's Council's Decision.  As Associate Dean for Academic Affairs, I conducted the review pursuant to *Section 6. Review* of the Honor Code and determined that the Honor Council's finding of an Honor Code violation is not clearly erroneous.  Accordingly, I uphold the Honor Council's finding and the Council's recommended sanction. There is no further right to appeal or review within the University.

You have been found responsible for violating university policy.  Your conduct may also be considered a violation of the Texas Tech University Code of Student Conduct 20252026StudentCodeoConduct.pdf and may be investigated through the University Conduct System.  Thus, the Office of Student Conduct has been copied on my decision.

Sincerely,

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law

Copy:  Dean Jack Wade Nowlin via email jack.nowlin@ttu.edu
Professor William R. Keffer via email william.keffer@ttu.edu
Professor Larry Spain via email larry.spain@ttu.edu
Associate Dean Sofia Chapman via email sofia.chapman@ttu.edu
Assistant Dean JaWana Green via email jawana.green@ttu.edu

**Defs.' Appx. 117**

SCHOOL
OF **LAW**
TEXAS TECH

April 13, 2026

<u>SENT VIA EMAIL</u>
Ms. Ellie Fisher

Dear Ms. Fisher:

Pursuant to the Texas Tech University School of Law Honor Code and
the Decision of the Honor Council, this letter serves as a **reprimand** for
violation of the Code.

Specifically, you violated Honor Code Section 2.H (Violation of
Professional Duties) by **"failing to uphold professional… obligations"**
related to "clinical programs" when you engaged in conduct which
adversely affected the operations of the clinic—a celebration of a political
assassination in the Law School's clinical suite during work hours—as a
clinical law student with a supervised law practice card representing
clients in our law clinics under our professional supervision.

We expect clinical law students with supervised practice cards under our
supervision to display the same levels of professionalism in our clinical
spaces during work hours that law firms routinely expect from their
attorneys in their law offices. To state the obvious, disrupting the clinical
spaces by celebrating a murder is a reprehensible act radically
inconsistent with widely recognized professional expectations in law firm
spaces.

**You are hereby reprimanded for this violation of the Honor Code.**

I will also note here that you have refused to take responsibility for your
professional failures or express remorse. Instead, you responded with
repeated acts of dishonesty in an attempt to avoid accountability. Given
that response, you have been shown an extraordinary degree of grace by
the Honor Council, which, frankly, in the opinion of the Dean's Office, you
do not deserve.

As you know, our Honor Code requires that law students exhibit the
same qualities of heightened caution, attention to detail, foresight,
responsibility, candor, truthfulness, and respect for the rights and



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 118**



interests of others that are regularly demanded of members of the legal profession. These are essential attributes for persons preparing to enter the legal profession, and they help to ensure that the public trust in the profession will not be compromised or questioned.

In the future, your conduct should justify the confidence that the public and the profession places in you as an aspiring future member of the bar. Should you have any questions regarding this letter, please contact me at 806-834-1504 or jack.nowlin@ttu.edu.


Sincerely,

Jack Wade Nowlin
Dean and W. Frank Newton Professor of Law



3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

**Defs.' Appx. 119**

This transcript was exported on Mar 23, 2026 - view latest version here.

Alison Outenbury ([00:00:01](#)):

All right, here we go. Okay. I'm going to leave it right here in the middle and I'll go get... Well, I'll let you start first.

Lori Spain ([00:00:08](#)):

Yeah, I'm going to make some introductions.

Alison Outenbury ([00:00:10](#)):

Yes. Sorry. Okay.

Lori Spain ([00:00:12](#)):

So we're recording now?

Alison Outenbury ([00:00:13](#)):

We are recording now.

Lori Spain ([00:00:18](#)):

Okay. All right. Good morning, everyone. This is an Honor Council hearing involving Ellie Fischer. This hearing will be conducted in accordance with the honor code adopted by the Texas Tech University School of Law. This is an informal, non-adversarial hearing, not a court of law, designed to gather relevant information to allow us, as the Honor Council, to decide whether a violation of the honor code has occurred.

([00:00:52](#)):

Hearing is being recorded at your request. I'm going to start by having everyone introduce themselves for the record. So I'll start. My name is Lori Spain, member of the Faculty School of Law, and I'm chair of the Honor Council.

Amy Herberger ([00:01:10](#)):

My name is Amy Herberger. I'm also a faculty at the Law School.

Alison Outenbury ([00:01:14](#)):

Alison Outenbury, also faculty at the Law School.

**Student 1** ([00:01:18](#)):

**Student 1.** I'm a 2L student at the law school.

Lori Spain ([00:01:19](#)):

Okay. And do you want to introduce yourself as well?

Michael Allen ([00:01:19](#)):

My name is Michael Allen. I'm an attorney and advisor serving the interests of my client, Ellie Fischer.

Lori Spain ([00:01:33](#)):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

Ellie Mae Fisher (00:01:34):

Ellie Mae Fischer. I'm a 3L law student.

Lori Spain (00:01:35):

Okay.

Alison Outenbury (00:01:38):

Hi, I'm Sophia Chapman. I'm associate dean, dean of students at the Texas Tech School of Law.

 Ronnie Wall (00:01:43):

And I'm Ronnie Wall. I'm from the Office of General Counsel.

Lori Spain (00:01:48):

The expectations throughout this hearing is that any individual providing information will be honest and forthright. It is also expected that all individuals involved will conduct themselves in a professional and respectful manner and that no individual will be retaliated against for any statements or information that it's provided.

(00:02:12):

So as chair of the Honor Council, I will oversee and manage the hearing process, make any determinations as to relevancy, grant breaks as necessary, including allowing Ms. Fischer to consult with counsel upon request at any time, and adhere to the procedural requirements set forth in the honor code.

(00:02:36):

As an expectation, prior to this hearing, all panel members have thoroughly reviewed the information provided in the investigation report as well as the affidavit submitted by the student's legal counsel. At this time, can each panel member verbally acknowledge that they have read these materials?

Amy Herberger (00:02:58):

Yes, I have.

Alison Outenbury (00:02:58):

Yes.

Alison Outenbury (00:03:00):

Yes.

Lori Spain (00:03:01):

Ms. Fischer, do you acknowledge that you've received and had an opportunity to review the investigation report as well as the affidavits that have been submitted?

Ellie Mae Fisher (00:03:11):

This transcript was exported on Mar 23, 2026 - view latest version here.

Yes, sir.

Lori Spain ([00:03:12](#)):

And we will make those a part of the record of these proceedings as well. Okay. Accordingly, we will move directly into the information-gathering portion of the hearing. Ms. Fischer, you'll have an opportunity to make an opening statement if you so desire. You're not required to, but if you wish to do so, you can do so at this time.

Ellie Mae Fisher ([00:03:35](#)):

Yes, sir. I would respectfully request that this Council allow me to make an opening statement. I'm a little bit nervous this morning, so I preprepared something. I also have it here. It's a copy if you guys would like that. I can-

Lori Spain ([00:03:54](#)):

A copy of the opening statement?

Ellie Mae Fisher ([00:03:54](#)):

Yes, sir.

Lori Spain ([00:03:54](#)):

Okay.

Ellie Mae Fisher ([00:03:54](#)):

It's a copy. I was going to say, I'm not sure if you want me to pass it along.

Lori Spain ([00:03:54](#)):

We'll make that a part of your record as well.

Ellie Mae Fisher ([00:03:54](#)):

Sorry. It's kind of a big table. Yeah.

Lori Spain ([00:03:58](#)):

Okay.

Ellie Mae Fisher ([00:03:58](#)):

And Chair Spain, is it okay if I remain sitting or would-

Lori Spain ([00:04:00](#)):

Sure.

Ellie Mae Fisher ([00:04:00](#)):

Okay.

This transcript was exported on Mar 23, 2026 - view latest version here.

Lori Spain (00:04:00):

That's fine. This is informal.

Ellie Mae Fisher (00:04:02):

Yes, sir. Good morning, members of the council. I really appreciate everybody taking their time being here today. I'm a little bit nervous, so I would appreciate if everybody just bears with me. In addition, I am going to read through this. I hope not to take too much of y'all's time, but I really appreciate you guys giving me this opportunity.

(00:04:23):

So good morning, members and Chair of the Honor Council. I appear before you with respect for this institution and for the responsibility laid on your shoulders. You must determine whether my actions on September 10th, 2025, in the aftermath of the assassination of public figure Charlie Kirk violated section H, Violation of Professional Duties, of the Texas Tech University School of Law Honor Code.

(00:04:46):

Section H provides a student may violate this code by failing to uphold professional or fiduciary obligations, including but not limited to performance related to clinical programs, Student Bar Association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. It further reflects the foundational principle of our honor code, that we all must act with honor and integrity in matters pertaining to legal education.

(00:05:10):

I would first like to address the standard of evidence. Importantly, you must make your determination based on clear and convincing evidence. I understand that this council is not bound by the formal rules of evidence applicable in civil or criminal matters. Yet this council is bound to follow its own rules that require a clear and convincing standard.

(00:05:27):

This means in Texas, to find a violation, the evidence must weigh heavier than merely the greater weight of criminal evidence. This is not as strict as beyond the reasonable doubt, but it is the highest of standard of proof in the civil law, absent quasi-criminal issues such as the involuntary civil commitment of the mentally ill. To underscore the seriousness of the standard of proof that you must apply, Texas law reserves this clear and convincing standard for such critical issues like severing the parent-child relationship and terminating parental rights.

(00:05:55):

The clear and convincing standard requires the firm belief or conviction of the truth of allegations, not just a modicum of proof on one side that outweighs the other by a feather. It certainly requires more evidence than individuals' attestations that their subjective feelings may have been hurt, which some of the allegations in the Keffer report appear to dwell upon. I emphasize this only to underscore the heavy burden the university must carry.

(00:06:18):

I'd now like to briefly address the Keffer report. This matter was referred to the Honor Council by Professor William Keffer following his investigation and conclusion that probable cause, by contrast one of the lowest possible standards of proof, existed in my conduct on September 10th constituting a violation of Section H.

(00:06:35):

This transcript was exported on Mar 23, 2026 - view latest version here.

I stand before you, well, sitting after all that is followed since September 10th, with a heavy heart. A lot has been said about that day, much has been assumed. And yet this matter is not only about my actions, it is also about the fairness and integrity of this process.

(00:06:51):

To my knowledge, and as other students attest under oath in affidavits provided to this council, I do not believe that I acted any differently than other students that day. And yet, as far as I know, it is only I that have been brought before this council. You will see that the witnesses who have submitted affidavits demonstrate that Professor Keffer's referral was not fashioned from the whole of the evidence, but from a selection calculated to place me in the worst possible light, and not least by excluding evidence that other students acted in the same way or did not proceed in the unprofessional behavior.

(00:07:19):

Another example: I requested that Professor Kenneth Williams appears before this council. He would tell you that another student, **Student 8**, first announced in class that Charlie Kirk had been shot and words to the effect that he was a right-wing or a right-winger.

(00:07:32):

This is relevant for two reasons. First, it is further evidence that students did exactly what I'm accused of, but **Student 8**, who is significantly not Black, has not been charged or investigated. It is also relevant because Professor Williams was told that his testimony is irrelevant and was excluded from this hearing. In fact, he was excluded altogether from the Keffer report.

(00:07:51):

This does not indicate an attempt to apply the honor code consistently. Instead, it suggests an effort to shape the truth to fit a forgone verdict. Our honor code calls everyone to act with integrity, professors and students alike. It has been crafted to build us up, to show the courage and earn the public trust of the practice of law requires, but that sacred charge binds faculty, staff, and the very process by which we are judged.

(00:08:13):

When exculpatory evidence is intentionally set aside and excluded, the integrity and reliability of that process must be examined with the utmost seriousness and care. I humbly submit that it also fails the test of clear and convincing evidence.

(00:08:25):

I therefore humbly ask that you not only look to the allegations in the Keffer report, but please also look to the completeness of the evidence and the partiality of the investigation itself.

(00:08:35):

Now I'd like to turn to the facts. I fully understand by making this statement, I obligate myself to answer y'all's questions. Let me therefore give you a little bit of an account of what happened that day.

(00:08:45):

I believe the events that unfolded were confined to approximately two to three hours between when the shooting of Charlie Kirk was made known through social and general media in Professor Williams' class and about 5:00 PM when I went home. As I already indicated, we discussed Kirk's shooting in Professor Williams' class. I particularly remember discussing whether the gunshot would've been fatal.

(00:09:04):

This transcript was exported on Mar 23, 2026 - view latest version here.

Students were sharing videos which had just become publicly known. I had not much known about Charlie Kirk prior to that time, but news exploded across the internet. I quickly became increasingly informed, as everyone did, as we shared the news on our phones. Had this disrupted class, I firmly believe Professor Williams would've stopped it. As that was a Race and Racism class, I, for one, believe the events surrounding Charlie Kirk's assassination fell within the course.

(00:09:26):

After class, I walked downstairs to Professor Metz's office. I remember **Student 6** and **Student 7** were there. I also stopped to discuss the matter briefly with Professor Joe Stevens. I did not show Professor Stevens a video. I did ask if he had heard the news, and we talked about the shooting probably for less than 30 seconds.

(00:09:43):

Then the same kind of conversation that we had towards the end of Professor Williams' class continued in Professor Metz's office. Again, I learned more and more about Charlie Kirk. I confess, I didn't like what I learned about the man because we do not share the same political viewpoints, but I don't think that that entitles anyone to take another's life, certainly not in front of his wife and children, and definitely not on national TV.

(00:10:04):

I deny calling Charlie Kirk a "motherfucker." In the report, no student testifies to that. In the affidavit, no student testifies to that. Neither Professor Stevens nor Professor Metz say that, only Professor Morgeson. The clear and convincing weight of evidence is therefore against it.

(00:10:20):

Student shared videos and, as I recall, so too did Professor Metz. I cannot say any longer what any single individual shared with any other single individual, including myself, especially in the content. I do know that commentary among students, as well as online, included that Kirk was "a racist" and a gun nut or a transphobe, among other critical views. But there was also hero-worship of Kirk.

(00:10:43):

I did not know when, but at some point Professor Morgeson poked her head into the office to announce Charlie Kirk is dead, or other words to that effect. I'm still unclear as to why what I said or did was somehow more disruptive to her Family Law clinic students, if it was even disruptive at all. I remember Family Law clinic students outside Professor Metz's office, but I believe that Professor Stevens and Professor Morgeson will tell you that students in the Family Law clinic were also talking about Charlie Kirk's murder.

(00:11:08):

At some point I continued down to the hall to the clinic office, which serves as some kind of common area for clinical students. The conversation continued. Again, there was discussion of whether or not Charlie Kirk had died and discussion of political viewpoints. I think, again, there were different points of view.

(00:11:23):

I believe **Student 4** will tell you the view that Charlie Kirk was a "racist" is a common thing among clinic law students. From what I know,  is conservative and does not share that view. I've always considered **Student 4** my friend, and I hope he still considers me his. At no point did our conversation seem out of the ordinary or disrupt the clinic office.

(00:11:41):

This transcript was exported on Mar 23, 2026 - view latest version here.

In closing, I'd like to say one last thing. Professor Keffer seems to rise the First Amendment in his report, but please conduct this thought experiment. Please accept the investigation's version of what was said as true. Please disregard, as Professor Keffer did, exculpatory evidence as "irrelevant."

(00:11:59):

I believe you all know, as attorneys with decades of experience, that all of the alleged speech is constitutionally protected. For example, the First Amendment does not permit the state of Texas to discipline students for private conversations with their mother. I think you know that there is no evidence of disruption to clinical programs. A far greater disruption has been the removal of Professor Metz for his protected speech.

(00:12:19):

Texas Tech School of Law is a state school and cannot discipline protected expression. Charlie Kirk and all that he stood for was in the public sphere, not to mention his tragic public assassination. We therefore know this speech addressed a matter of public concern. I believe you also know that the discussion of this School of Law is what the School of Law is actually for.

(00:12:37):

As Professor Metz states, Texas Tech is not a third grade schoolyard. Absent narrow exceptions that are not present here, all of this speech is protected. My academic standing, my future in this noble profession, and my good name as a law student and future attorney stand in the balance.

(00:12:52):

You hold the authority to ensure the justice within the school is done rightly and in accordance with the clear and convincing standard you are sworn to uphold. When all the evidence is laid bare before you, the whole of it, I trust you will find but one conclusion consistent with that burden: that my actions on September 10th, 2025, did not violate Section H nor any provision of our honor code.

(00:13:11):

Thank you.

Lori Spain (00:13:12):

Thank you. Do you want to see if Joe Stevens is available first?

Alison Outenbury (00:13:17):

Yep. Uh-huh.

Lori Spain (00:13:18):

Because I know he has an appointment.

Alison Outenbury (00:13:19):

Yes. I'm just going to check. Excuse me. Test, test, test. Okay. Still going. Thank you.

(00:13:28):

I'm going to go ahead and have you... I'll go ahead and have you take a seat here if that's okay. And we've got a recording going, so if you'll speak up.

Professor Joe Stevens (00:14:40):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay. I can do that for the record.

Lori Spain ([00:14:41](#)):

Morning, Joe.

Professor Joe Stevens ([00:14:41](#)):

How are you?

Lori Spain ([00:14:46](#)):

Could you state your name for the record?

Professor Joe Stevens ([00:14:48](#)):

Joe Stevens.

Lori Spain ([00:14:49](#)):

Okay. We are interested in finding out any information from you as to the events that occurred on September 10th, 2025, shortly after the shooting of Charlie Kirk. Do you remember that day?

Professor Joe Stevens ([00:15:09](#)):

I do.

Lori Spain ([00:15:10](#)):

Okay.

Professor Joe Stevens ([00:15:10](#)):

Yeah.

Lori Spain ([00:15:12](#)):

Okay. And did you have any interactions with Ellie Fischer that day?

Professor Joe Stevens ([00:15:15](#)):

I did.

Lori Spain ([00:15:16](#)):

Okay. Could you explain what the nature of those contacts were?

Professor Joe Stevens ([00:15:24](#)):

Yeah.

Lori Spain ([00:15:24](#)):

As best you can.

Professor Joe Stevens ([00:15:25](#)):

Defs.' Appx. 127

This transcript was exported on Mar 23, 2026 - view latest version here.

Sure. I had been in court in Castro County that morning with a student, which is notable only because of how far away it is. And we got back shortly before lunch, I would assume, about a 160 mile roundtrip.

(00:15:45):

I came back from court, and I was in my office, and Ellie came in. My office is at the beginning of the clinic hallway.

Lori Spain (00:15:55):

It's towards the front of the clinic space.

Professor Joe Stevens (00:15:57):

Yeah.

Lori Spain (00:15:58):

Okay.

Professor Joe Stevens (00:15:58):

Other than Melissa's and Nancy's is the first one that you come from.

Lori Spain (00:16:00):

Okay. And is the Family Law clinic workroom directly across from your office?

Professor Joe Stevens (00:16:09):

It is.

Lori Spain (00:16:09):

Okay.

Professor Joe Stevens (00:16:12):

And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, "No." I didn't know who Charlie was. And she said, " It looks bad," and at some point said something that it's all over the Internet or something like that.

Lori Spain (00:16:39):

Had you been aware of the shooting prior to that?

Professor Joe Stevens (00:16:42):

No, and I'd spent the entire morning in the car with a student, and we had been talking about cases, we'd been in court, and the degree to which we were even listening to anything, there was no way that we would've been informed. He didn't tell me, we weren't listening to news or anything.

(00:17:01):

I also don't do that. I have enough drama in my work life.

Lori Spain (00:17:09):

Defs.' Appx. 128

This transcript was exported on Mar 23, 2026 - view latest version here.

So you didn't ask her if she had heard of the shooting?

Professor Joe Stevens (00:17:13):

I did not.

Lori Spain (00:17:14):

Okay, okay.

Professor Joe Stevens (00:17:15):

No. But that was it. It was obviously a very newsworthy event. Ellie and I think a lot of students, when Ellie left my office, I was aware that this was a buzz in the law school. People were finding out.

(00:17:38):

I am not one who is on social media. I have an Instagram account, but I'm not really on Twitter. I don't have any social media. I don't really absorb news or listen to news podcasts. It's just not the thing that matters to me.

(00:17:51):

But that interaction was 30 seconds and then that was it.

Lori Spain (00:17:59):

Okay. Did she attempt to show you a video of the shooting?

Professor Joe Stevens (00:18:02):

No, she let me know that it was, as other people did later, that it was all across the Internet. But to my knowledge, there was no effort on her part to show me except to let me know that it was everywhere, and that obviously turned out to be true.

Lori Spain (00:18:23):

Okay. Were her actions disruptive at all?

Professor Joe Stevens (00:18:27):

I didn't get a sense that they were, to me. When that news trickled out nationally, it was obviously quite nationally disruptive. So I imagine that people, when they found out about it, were also affected by it in different ways.

(00:18:48):

To be frank, I handle cases where there's a lot of difficult subject matter associated with them. And the way that she told me, it was kind of like, "Okay, this is just informative news." Again, I've interacted with Ellie a lot this semester, much more substantially than the 30 seconds she was in my office that day.

(00:19:17):

And Ellie is a passionate person, and Ellie is an animated person. She cares a lot about the work that she does in the clinic. And the way that she was in that moment felt very in keeping with the way that she is when she's talking about a client or when she's talking about someone that she is trying to get out of jail or get their case dismissed. So it didn't feel out of the sync with who she is in that moment, for me.

This transcript was exported on Mar 23, 2026 - view latest version here.

Lori Spain (00:19:42):

Did she make any other statements that you can recall? Any specific statements?

Professor Joe Stevens (00:19:47):

None that I can-

Lori Spain (00:19:47):

Other than what you've relayed?

Professor Joe Stevens (00:19:48):

No.

Lori Spain (00:19:48):

Okay.

Professor Joe Stevens (00:19:48):

None that I can remember that day.

Lori Spain (00:19:52):

Do you know if there were any other persons in the vicinity that day?

Professor Joe Stevens (00:19:57):

No, I just... As you described earlier, when I walk in that clinic hallway, I go to my office on the right. I don't remember if Nancy and Melissa were there. I would see them, but I don't remember if they were there.

(00:20:08):

When Ellie left, I remember because I'm directly across the Family Law clinic, the Family Law clinic was... There were people in that clinic, the doors, I don't know if they were open or not. I assume mine was. But those are the only people that I remember just seeing because I see them every day.

Lori Spain (00:20:27):

Okay. Any other members of the council have questions?

Amy Herberger (00:20:32):

I just have two really quick questions. So you mentioned that you've interacted quite a bit with Ellie. So I'm to assume there was nothing unusual about her popping her head into your office to chat with you about this or anything else?

Professor Joe Stevens (00:20:46):

No, not at all. And I think that's a point actually worth underscoring. She, dozens of times last semester, would come down and we'd talk about cases or she'd say she's got a situation, she's trying to get another opinion on what to do. I have students in my own clinic who don't come and talk to me as much

This transcript was exported on Mar 23, 2026 - view latest version here.

as Ellie does, and Ellie would really... She cares about the work that she does, and that has been 99% of the substance of the conversations we've had.

(00:21:20):

So nothing unusual about it at all, and I encourage that. I want people to feel comfortable coming to us and talking to us.

Amy Herberger (00:21:27):

So I guess my last question is just to sort of confirm, I know it was a long time ago, but how would you characterize the way that she was giving you this information?

Professor Joe Stevens (00:21:36):

The way that I took it, I remember when she left, I was like... Because I obviously know who Charlie Kirk is, but I don't... We got on my computer and I looked, and indeed she was right. He had been shot. At that point, I don't think he had been pronounced dead, but I was kind of taken aback.

(00:21:55):

And as I recall, we then had a clinic... I don't know if this is true, but we had a clinic-wide safety meeting. Maybe it was that day. It was definitely scheduled for that day. Maybe it was changed, but I was so in between things that I remember looking and then having to go into something else.

(00:22:12):

Ellie's demeanor to me was no different that day when she comes down and she's talking about, "What's happening to my client is not right." And there's passion behind what she says and what she does, but it didn't feel at all out of character. When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong."

Lori Spain (00:22:30):

Anyone else have questions?

Amy Herberger (00:22:41):

No.

Lori Spain (00:22:42):

Ellie, do you have any questions?

Ellie Mae Fisher (00:22:45):

Yes, just a few, please.

Lori Spain (00:22:45):

Okay.

Ellie Mae Fisher (00:22:46):

Professor Stevens, I want to keep it really quick. I really appreciate you for being here. So just for a little bit of context, I want to set the scene. When I walked past your office, that's because I was walking through the front doors and headed back, correct?

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Joe Stevens (00:23:00):

I would assume so.

Ellie Mae Fisher (00:23:02):

Okay, right. So I was just trying to... For the people who aren't familiar with the clinic, I was trying to just set up where it is and things like that. And to the best of your recollection, your door was open?

Professor Joe Stevens (00:23:11):

[inaudible 00:23:13].

Ellie Mae Fisher (00:23:12):

Okay. And so you testified, and the chair also mentioned that I made the following statements to you on the date in question, "They shot Charlie." "There's video." "It looks bad." Is that correct?

Professor Joe Stevens (00:23:25):

That sounds right to me, yes.

Ellie Mae Fisher (00:23:27):

And to the best of your knowledge, are any of those statements false?

Professor Joe Stevens (00:23:30):

No.

Ellie Mae Fisher (00:23:31):

And would you recall me saying any words to the effect of, "They shot the motherfucker"?

Professor Joe Stevens (00:23:35):

I don't remember you saying that, Ellie, not to me.

Ellie Mae Fisher (00:23:38):

Was that a question asked to you by Professor Keffer in his investigation?

Professor Joe Stevens (00:23:46):

I don't remember if he asked me that specifically, but what's in the report about what I remember you saying is the extent of evidence.

Ellie Mae Fisher (00:23:57):

I did not show you a video of Charlie Kirk's assassination, right?

Professor Joe Stevens (00:24:00):

No, you did not.

Ellie Mae Fisher (00:24:01):

This transcript was exported on Mar 23, 2026 - view latest version here.

And you recall saying that to Professor Keffer as well?

Professor Joe Stevens (00:24:05):

Yes, I would imagine... If he had asked me that, I would've said the same thing.

Ellie Mae Fisher (00:24:08):

And so after, if you asked that question, do you know any reason why that wouldn't be included in his investigation report?

Professor Joe Stevens (00:24:15):

No, I don't.

Ellie Mae Fisher (00:24:16):

Based on our very brief conversation on the date in question, do you believe that I was providing this information or intentionally misleading you in any way?

Professor Joe Stevens (00:24:23):

No.

Ellie Mae Fisher (00:24:24):

And in your view, did my statements constitute unprofessional conduct?

Professor Joe Stevens (00:24:29):

No.

Ellie Mae Fisher (00:24:29):

Do you believe anything that I said with you during our conversation violated any probation of the honor code as you're familiar with it?

Professor Joe Stevens (00:24:37):

Yes, I don't think that your interaction with me did not be violate anything that I know about the honor code.

Ellie Mae Fisher (00:24:45):

Professor Stevens, did you hear other students in the clinic offices speaking about the public assassination of Charlie Kirk?

Professor Joe Stevens (00:24:51):

Yeah, later that day, for sure. Everyone was speaking of it.

Ellie Mae Fisher (00:24:59):

And do you recall students in the other clinical programs such as the Family Law clinic assessing the assassination of Charlie Kirk?

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Joe Stevens (00:25:06):

Yeah, I remember later that day as well that... It came up. "Have you heard what happened? Did you see what happened?" Things like that. Yeah, people were talking about it in that clinic. People were talking about it in my clinic. People were talking about it.

(00:25:23):

Obviously, both criminal clinics are at the end of the hallway, and I remember getting a cup of coffee and people were stirring about it there too.

Ellie Mae Fisher (00:25:30):

And any of those conversations by students, other than myself, would you consider that to be unprofessional?

Professor Joe Stevens (00:25:37):

I don't remember hearing anyone actually talk about it in an unprofessional way.

Ellie Mae Fisher (00:25:42):

And last question, I promise we'll get you out of here. Have you heard that any of the other students were investigated by this law school for unprofessional behavior or honor code violations?

Professor Joe Stevens (00:26:03):

I have not.

Ellie Mae Fisher (00:26:03):

No further questions, Chair Spain.

Lori Spain (00:26:03):

Okay.

Ellie Mae Fisher (00:26:03):

Thank you so much, Professor Stevens.

Lori Spain (00:26:03):

Any other questions before we dismiss? Thanks.

Professor Joe Stevens (00:26:03):

Thank you.

Alison Outenbury (00:27:05):

You can sit right here.

Terri Morgeson (00:27:07):

Okay.

This transcript was exported on Mar 23, 2026 - view latest version here.

Alison Outenbury (00:27:07):

And I'm going to double check to just make sure that our recording is still going.

Terri Morgeson (00:27:12):

Okay.

Alison Outenbury (00:27:14):

Hello? Hello? Hello. Okay. Okay.

Lori Spain (00:27:15):

All right. All right. Do you want to introduce yourself for the record?

Terri Morgeson (00:27:25):

Yes. My name is Terri Morgeson. I'm the director of the Family Law clinic at Texas Tech.

Lori Spain (00:27:30):

Okay. And do you recall the events that occurred on September 10th of 2025?

Terri Morgeson (00:27:38):

Yes.

Lori Spain (00:27:39):

The day that Charlie Kirk was shot?

Terri Morgeson (00:27:41):

Yes, sir.

Lori Spain (00:27:45):

Okay. Can you kind of briefly explain what occurred that day, particularly in relationship to Ellie Fischer?

Terri Morgeson (00:27:54):

Yes, sir. So I had just got through teaching ISL class, and it is my custom that when I finish teaching a class, that I'm gone from the clinic for a period of time, that I check in with my students. So I was in my clinic speaking to two students, specifically **Student 3** and **Student 2**. And-

Lori Spain (00:28:14):

Was that in the clinic workspace for the Family-

Terri Morgeson (00:28:17):

Yeah, in my designated clinic workspace.

Lori Spain (00:28:20):

And where is that located in relationship to the clinic space, I guess?

This transcript was exported on Mar 23, 2026 - view latest version here.

Terri Morgeson (00:28:28):

It's the very first clinic, like past the offices, we have that reception area where Nancy Mojica sits, and then Melissa has her office right there at the front. But it is the first student space when you're walking down the hallway on your left.

Lori Spain (00:28:46):

And it's directly across from Professor Stevens' office?

Terri Morgeson (00:28:50):

Yes, it is literally directly across.

Lori Spain (00:28:52):

Okay, okay. So you want to continue on in terms of what you observed?

Terri Morgeson (00:28:58):

Yes. So as I'm sitting in there talking to **Student 2** and **Student 3**, I hear the doors of the clinic open, and I hear... I don't see her at first, but I hear Ms. Fischer walk in. She's making statements about, and it's loudly, "It's the best day ever. I'm so happy." And she's making these statements as she's walking down the hallway.

Lori Spain (00:29:20):

So those occurred in the reception area?

Terri Morgeson (00:29:24):

Yes, sir.

Lori Spain (00:29:24):

In the hallway?

Terri Morgeson (00:29:25):

Yes sir.

Lori Spain (00:29:25):

Even before she got to Professor Stevens' office?

Terri Morgeson (00:29:27):

Yes. And she was making them as she was walking in, just saying them out loud, not speaking to anybody, she was making those statements as she walked into the clinic. And then she gets to the doorway of Professor Stevens' office. He's in there, he's working on his computer. And I can see at this point, out of my periphery vision, she walks in and she's like, "It's the best day ever. Have you heard?" And he was very confused. And then she tells him that she's so happy because Charlie Kirk has died. And I hear Professor Stevens immediately respond, "Don't do that. Don't say that. Don't do that."

(00:30:16):

This transcript was exported on Mar 23, 2026 - view latest version here.

I know that there was more interaction. I believe she asked him if he knew who Charlie Kirk was. He said that he did. And that at that point in time, I leave my students because I've checked in with them, I go and I sit in my office. My office is... It's on the same side as Joe Stevens, and I'm kind of sandwiched in between Joe Stevens and Professor Metz, who was the director of the Criminal Defense clinic at that time.

(00:30:48):

There is a little bit of a delay. I don't remember how long, but then I see Ms. Fischer walking in the hallway and kind of... I can hear her standing in the doorway of Professor Metz's office, and I hear her say, "They shot that motherfucker." That's what I remember. And then she goes into Professor Metz's office, and they start talking about the video and kind of laughing and carrying on about that video.

Lori Spain (00:31:22):

You're certain as to the statement that she made?

Terri Morgeson (00:31:30):

I know she made a statement that she was happy... I don't know if she said "motherfucker." That could have been Professor Metz. But I do know that she made a statement, just being very happy that he had been shot. He had not died at that point.

(00:31:49):

And then I do remember her walking into Professor Metz's office, and they started watching the video because I hear Professor Metz say, "Look at his head. Look at his head. Nobody can survive that. Look at his head." And I get up, I call myself the noise monitor of the clinic. And I get up and I start shutting clinic doors because we have students who do not have... They have a variety of political beliefs. That's what makes the clinic great. And I don't want anybody to be offended about what I can hear in that room.

(00:32:25):

So I go back to my clinic office, I'm like, "Are y'all okay? I'm going to shut the door." And at that point in time, I receive a text from Sarah Hudman, who's a professional colleague of mine, saying, "Charlie Kirk is dead." So at that point in time, I shut the Family Law clinic office. I walk to see that your clinic office is closed. I walk into Professor Metz's office and I say, "By the way, he's dead." And I shut the door.

(00:32:58):

And then I walk all the way down the clinic hallway. I make sure that Tax is closed, I make sure that Professor Ryan's office is closed, and I make sure that the Criminal Defense clinic office is closed. And then I walk back to my office and continue to work.

Lori Spain (00:33:15):

So just to clarify, do you recall who made the statement, "That motherfucker got shot"? You said you didn't know-

Terri Morgeson (00:33:34):

I don't. I don't. And I've tried to remember, I think I was very vague in that in my statement to Professor Keffer. I don't remember who said it, but I do remember Ms. Fischer being very exuberant that he had been shot and that when she went into Professor Metz's office, they were very happy that he had been shot. And there was lots of discussion about, "He has to be dead. My daughter is a nurse. There's no way you can survive that."

This transcript was exported on Mar 23, 2026 - view latest version here.

Terri Morgeson ([00:34:03](#)):

My daughter is a nurse, there's no way you can survive that, and just lots of discussion about that. And that he was a horrible person and that he deserved it.

PART 1 OF 6 ENDS [00:34:04]

Moderator ([00:34:13](#)):

Did you consider Ms. Fisher's conduct that day unprofessional?

Terri Morgeson ([00:34:19](#)):

I considered it inappropriate for the setting, considering the diversity of students, which is why I was shutting doors because I did not want other students to be offended. She is not my student, I do not believe it's my responsibility to correct her. She was in the criminal clinics and I considered that to be her view of Professor Metz. And I do believe that Professor Stevens did try to quash those statements from her. That's what I heard him do.

Moderator ([00:34:55](#)):

How did your students react to the situation?

Terri Morgeson ([00:34:58](#)):

They were shocked and offended. That's why I went back to check on him. Lots of shaking their head in disgust. And then after we knew that he had died and I had shut the doors, they specifically came to my office and asked to be able to leave so they wouldn't have to listen to it anymore. And I granted them permission even though that was their designated office hours and we don't normally do that.

Moderator ([00:35:28](#)):

Did you have any discussions with Professor Metz the next day?

Terri Morgeson ([00:35:31](#)):

Yes, I did.

Moderator ([00:35:35](#)):

Okay. What was the content to her? What was the subject matter about?

Terri Morgeson ([00:35:39](#)):

It was the fact that I had hoped that none of the other students had heard him. There is a history between him and specifically the Federal Society. He had kind of gotten into it with them in years before. The year prior I had the president of FedSoc in my clinic, so I knew that those students were kind of integrated into the clinical setting. And I told him, I was like, "I hope nobody heard that. I hope nobody who is Republican and right-leaning, or a member of FedSoc had heard that. I think it's going to cause you some problems."

Moderator ([00:36:19](#)):

Anybody else have questions?

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 2 (00:36:21):

Yeah, I have a few. So just going back to the beginning, when you talked about what you had overheard in Professor Stevens office. In your recollection, did you mention that part? Did that come up in your discussion with Professor Keffer when you were initially interviewed, that Professor Stevens had asked Ms. Fisher, or at least indicated to her that maybe what she was saying was not appropriate?

Terri Morgeson (00:36:45):

Yes.

Speaker 2 (00:36:46):

Okay.

Terri Morgeson (00:36:46):

His response was immediate. It stands out immediately in my mind.

Speaker 2 (00:36:52):

And then, so Professor Stang kind of got to this, but I just wanted to dig in a little bit more on sort of, I haven't spent a lot of time in the clinic, so I'm a little unclear on the layout and how easy it's to overhear things. But you were confident that whatever was going on in Professor Metz's office, when Ms. Fisher was in there, was overheard by either people on your side or just other people in the clinic, before you close the door?

Terri Morgeson (00:37:22):

The walls are, they're like stone. I don't even know what they're made out of, but everything echoes down that hallway. Even if you're just talking to a student in your office, if you project too much, it just echoes. That's why, I mean, it sounds bad, but I'm always shutting doors because you can just overhear stuff, and confidentiality, and it drives me nuts when people are loud in the hallway. And particularly when you are standing in a doorway, like she was before she walked in, that is heard by everyone in that space.

Speaker 2 (00:38:00):

Okay. And when you put your head in Professor Metz's office to close the door, who was in there at that time?

Terri Morgeson (00:38:09):

I remember Ms. Fisher sitting on the couch with **Student 6**, I'm sorry, I don't know her name. There was another student in there who I do not remember who it was. Professor Metz is sitting behind his desk with his phone in his hand, and yeah. Yeah.

Speaker 2 (00:38:29):

Okay. And do you recall anybody else participating in the conversation? Did you hear other voices besides Ms. Fisher and Professor Metz?

Terri Morgeson (00:38:38):

Defs.' Appx. 139

This transcript was exported on Mar 23, 2026 - view latest version here.

No. I remember **Student 6** being on her computer, it looked like she was doing some sort of task. I don't remember hearing her.

Speaker 2 (00:38:45):

Okay. And then turning to the students, I assume that were in your clinic, when you said you were asking them if they were okay. Can you just provide some specific, you said shaking their head, what was said or what was other evidence did you take to show that they were offended or upset before they asked to leave? I have more questions about that too.

Terri Morgeson (00:39:15):

I remember one of the students shaking her head. I remember them saying that that's not appropriate. I remember, yeah, I just remember them shaking her head at her when she was doing that. I remember there being eye rolling like it shouldn't have happened.

Speaker 2 (00:39:36):

Okay. And do you have any way of knowing if they were feeling that way based on her statements or Professor Metz's statements, or a combination? Was there any statements made by them about Ms. Fisher specifically?

Terri Morgeson (00:39:49):

Their reaction was to her walking down the hallway and the interaction with Joe. I did not ask them after I sat down at my desk and when I went back the second time to ask them if they were okay, I did not stay in the room that long. I was literally, "Are y'all okay?" Yes. And I remember shutting the door and walking back.

Speaker 2 (00:40:11):

And so you know that it was attached to her initial statements because of the timing of when you asked them, "Are they okay?"

Terri Morgeson (00:40:16):

Mm-hmm.

Speaker 2 (00:40:16):

Okay. And then can you let us know who, you said some students or student asked to leave because they were upset. Was that multiple students? One student? Can you tell us who that was?

Terri Morgeson (00:40:27):

It was my two students. It was **Student 2** and **Student 3** [inaudible 00:40:29]

Speaker 2 (00:40:29):

Okay. Those were the only questions I had.

Moderator (00:40:37):

Anybody else?

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 3 (00:40:41):

I had a question. I know you said that there was students, you mentioned the students in there when you poked your head in. When she was standing in the doorway, do you remember seeing any students in there specifically in that moment? Or would they have came in after?

Terri Morgeson (00:40:55):

I don't know if **Student 6** and the other student were in there when she walked in. I just know that when I went to shut the door, they were in there. I don't remember when they entered the office.

Speaker 2 (00:41:10):

Actually, can I ask one more question? Are you done?

Speaker 3 (00:41:11):

Yes.

Speaker 2 (00:41:14):

I don't mean to interrupt. Again, I'm confused about the layout of the clinic. I understand that the, I'm just visual sight lines is what I'm interested in-

Terri Morgeson (00:41:21):

Do you want me to draw it?

Speaker 2 (00:41:22):

No, no, it's fine. I'm sort of putting it together in my head. But from your office, either from your office or from your workspace, can you see into Professor Metz's office?

Terri Morgeson (00:41:33):

No.

Speaker 2 (00:41:33):

Okay.

Terri Morgeson (00:41:33):

I can't.

Speaker 2 (00:41:33):

[inaudible 00:41:36]

Terri Morgeson (00:41:35):

... this way, and of course, but I can see, when she's walking down the hallway and she's making the corner, she's literally like this far away from my door, right?

Speaker 2 (00:41:45):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

Terri Morgeson ([00:41:45](#)):

So I can just see that she's kind of turned. And I remember she had a black sweatshirt and it has something on the back that was white. And I remember seeing that as she's kind of standing inside his doorway before she walks in. And that's when she makes a comment ... I just don't remember if she cussed, but she said they shot ...

Speaker 2 ([00:42:10](#)):

And same thing when you said in the beginning, you heard a voice, you weren't sure where it was, but then you were able to put that together because she became visible as she moved into Professor Stevens office. Is that ...

Terri Morgeson ([00:42:23](#)):

No, you got the timeline wrong. Okay.

Speaker 2 ([00:42:25](#)):

No, no, that's at the beginning. I understand. I'm switching. It's my fault, I'm going out of order.

Terri Morgeson ([00:42:28](#)):

No, when she's walking down the hallway, I am kind of leaning up against the desk parallel again to the doorway. And so when she walks by and she's standing there talking to Professor Stevens, she's clearly in my eyesight, all I can do is turn my head.

Speaker 2 ([00:42:45](#)):

Oh, okay.

Terri Morgeson ([00:42:45](#)):

She's right there.

Speaker 2 ([00:42:47](#)):

Okay, great. I was just confused by your, that you started to hear her before you saw her type of thing.

Terri Morgeson ([00:42:51](#)):

Right. Because when she comes in the doors, the double doors of the clinic, she is loud. She's like, "I'm having the best day." She's projecting.

Speaker 2 ([00:43:04](#)):

Okay.

Terri Morgeson ([00:43:07](#)):

I perceived she wanted engagement, she wanted to talk to somebody, she wanted to talk about it.

Speaker 2 ([00:43:12](#)):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay. Thank you.

Moderator (00:43:12):

Anything else [inaudible 00:43:17]?

Ms. Fisher (00:43:21):

Just a few questions, Professor Morgeson. I really appreciate you being here today. So just to kind of get it clear, you testified earlier to Professor Keffer that in the report that I said, and you heard me say, quote, "I'm in such a good mood," and quote, "That motherfucker got shot." Is that correct?

Terri Morgeson (00:43:37):

Mm-hmm.

Ms. Fisher (00:43:40):

But today you don't recall if I used the term motherfucker, would that be fair to say?

Terri Morgeson (00:43:44):

That's fair to say. And that's what I remember. I told Professor Keffer, it was the one thing that I was iffy about of whether or not you said it or whether or not Professor Metz said it. And I specifically always me and shaky on that term.

Ms. Fisher (00:44:00):

Well, do you have any reason to wonder or understand why that wouldn't be included in the final investigative report?

Terri Morgeson (00:44:07):

All I know is that I'm telling the truth of what I remember. I did not help Professor Keffer write that report, but I have always been consistent on that point.

Ms. Fisher (00:44:17):

I think we all know, but just to be clear, do I sound similarly to Professor Metz?

Terri Morgeson (00:44:22):

Not at all.

Ms. Fisher (00:44:24):

Okay. And so it would be fair to say that somebody would probably be able to differentiate between our voices.

Terri Morgeson (00:44:32):

Mm-hmm.

Ms. Fisher (00:44:33):

**Defs.' Appx. 143**

This transcript was exported on Mar 23, 2026 - view latest version here.

And so, to your knowledge, Professor Morgeson, do you recall anybody else hearing me make the statements quote, "I'm in such a good mood," or, "The motherfucker got shot?"

Terri Morgeson (00:44:44):

As far as you being in a good mood, **Student 3** and **Student 2** heard you say that when you walked in. So again, I did not review Professor Keffer's report, but yes, they heard you say that. But you were standing at Professor Metz's office door when you made the second statement. I don't know if they heard you or not, I wasn't with them at that time.

Ms. Fisher (00:45:07):

Well, just I'll break them down. So for the second statement, quote, "The motherfucker got shot," you would be the only person who's testified or it comes out in the report that you heard me make those statements directly?

Terri Morgeson (00:45:22):

I have been consistent in saying, "I don't know if you said motherfucker." I do remember you standing at his doorway being exuberant that Charlie Kirk got shot.

Ms. Fisher (00:45:33):

Okay. Perfect. Well, for sake of argument, we'll just take the whole MF word out of it. If you heard me make the statement, "He got shot," would that be factually incorrect or false in any way?

Terri Morgeson (00:45:45):

No.

Ms. Fisher (00:45:47):

And kind of jumping back to when you mentioned that you heard me in Professor Stevens's office discussing that he's dead, but Charlie Kirk wasn't actually-

Terri Morgeson (00:45:58):

No, no, no.

Ms. Fisher (00:45:59):

Did I get that mixed up?

Terri Morgeson (00:46:00):

You did. You got that very mixed up. You were, "Have you heard he got shot," and you were very happy that he got shot. And then when you asked Professor Stevens had he heard, he told you not to do that ... He told you. What I remember him saying is, "Don't do that. Don't come in here with that. Don't do that. That's not appropriate." And then he engaged with you about that and told you that that was not an appropriate discussion to be having in a clinical setting.

Ms. Fisher (00:46:31):

This transcript was exported on Mar 23, 2026 - view latest version here.

So I guess I'm a little confused, just for the council's understanding, did you hear Professor Stevens tell me, "Don't," or did we have kind of a longer discussion? Do you remember about how lengthy that discussion would've been?

Terri Morgeson (00:46:46):

45 seconds, maybe. 30 seconds.

Ms. Fisher (00:46:48):

Okay.

Terri Morgeson (00:46:49):

Because I remember leaving my office, or leaving the clinical office when you started talking to Professor Stevens, and then I had just sat down when you had made your way down the hallway and now you're standing at Professor Metz's door.

Ms. Fisher (00:47:05):

Okay. And can you confirm that you leaned into Professor Metz's office and informed us in there that Charlie Kirk is dead, or words to that effect?

Terri Morgeson (00:47:13):

I know I did that. Yes, ma'am.

Ms. Fisher (00:47:15):

And you didn't-

Terri Morgeson (00:47:15):

Because y'all were being inappropriate, and I wanted to shut the door because he was now not just shot, he had passed away. And I thought if I went in there and said that to y'all that there might be some stopping of the conversation or maybe some reflection on your part and his part. And I shut the door.

Ms. Fisher (00:47:40):

So you keep using the term inappropriate. Would you describe to you the difference between inappropriate versus unprofessional or do you kind of consider those one and the same?

Terri Morgeson (00:47:49):

I consider them one and the same. If you're having an inappropriate conversation in a professional setting, it by definition is unprofessional.

Ms. Fisher (00:47:59):

And just kind of going back to the inappropriate part, is that the entirety of the discussion happening, for example, that we were discussing the shooting, or for sake of the argument, that I made the comments, quote, "I'm in such a good mood," and quote, "That blank," or just he got shot?

Terri Morgeson (00:48:16):

This transcript was exported on Mar 23, 2026 - view latest version here.

Y'all were laughing at what his head was doing in the video that y'all were watching. It was the tone and the manner in which the discussion was being held. It wasn't, "Oh my gosh, have you heard that Charlie Kirk got shot?" It was exuberance in the fact that he got shot, that he deserved it because he was a horrible human being and y'all thought that he was dead because of the way that his head had moved and the blood shooting out of his neck. And Professor Metz was confirming that he probably got shot because his daughter was a nurse and there's no way that anyone could provide a direct shot to the jugular because of the way the blood was spurting out of his neck.

(00:48:56):

And it was those comments of why I got up the second time to shut the door, because again, we do have people in the clinical setting who are probably respect- ... not respectful, but TP members, Turning Point USA members, and FedSoc members. And so if they had heard y'all laughing at the fact that one of their political heroes had been shot and then ultimately was dead, that they would be very, very offended.

Ms. Fisher (00:49:30):

And so Professor Morgeson, were you yourself offended? Did you consider yourself offended or you were more so doing that action to ensure that other students were not later offended?

Terri Morgeson (00:49:42):

Yes, ma'am. I thought it was inappropriate. I thought Professor Metz should have done what Professor Stevens had done and told you to stop immediately.

Ms. Fisher (00:49:51):

And Professor Morgeson, do you recall telling me to stop or make any comments of indicating that my behavior may have not been allowed in the clinic that day?

Terri Morgeson (00:50:00):

Ma'am, you're not my student. You're his student.

Ms. Fisher (00:50:04):

So for sake of the record, that would ... No?

Terri Morgeson (00:50:07):

No ma'am.

Ms. Fisher (00:50:07):

Okay.

Terri Morgeson (00:50:07):

And I answered that earlier. I did not think it was my job to reprimand you. I thought that was Professor Metz's job.

Ms. Fisher (00:50:15):

Completely understood. So just jumping back to something that you said a little bit earlier, you mentioned FedSoc, and I believe you mentioned that Professor Metz kind of has this history with

This transcript was exported on Mar 23, 2026 - view latest version here.

FedSoc. Do you recall, is that because of his time in the organizations he's in or just because of his political leanings?

Terri Morgeson (00:50:37):

No, I believe that ... Well, I honestly don't know. I do know that there was kind of something between the Criminal Law Society and the Federalist Society. He's also had other investigations against him. So yeah, that's what I was referring to.

Ms. Fisher (00:50:59):

Right. And so the Federalist Society, it's your kind of understanding that they would oppose the view of any celebration, because you mentioned that that's like a prominent figure to them, correct?

Terri Morgeson (00:51:09):

Mm-hmm.

Ms. Fisher (00:51:09):

And Professor Morgeson, were you aware that the organization Professor Metz is currently an advisor of is the National Lawyers Guild?

Terri Morgeson (00:51:18):

No.

Ms. Fisher (00:51:18):

Okay. And so you didn't have any recollection prior to this day that the National Lawyer's Guild is sometimes known as a organization on campus that opposes the work of FedSoc?

Terri Morgeson (00:51:30):

No.

Ms. Fisher (00:51:31):

Okay. And so just kind of jumping around, were you aware that the students in your family law clinic were discussing Charlie Kirk?

Terri Morgeson (00:51:42):

Yes, they were.

Ms. Fisher (00:51:43):

And just kind of to give us-

Terri Morgeson (00:51:45):

But they weren't being loud and they weren't being disrespectful. Their comments were shock that he had been shot.

Ms. Fisher (00:51:53):

**Defs.' Appx. 147**

This transcript was exported on Mar 23, 2026 - view latest version here.

And so it would be fair to say that different people accept and experience different events differently and in different ways.

Terri Morgeson (00:52:04):

I don't think I can say that.

Ms. Fisher (00:52:05):

So you would disagree that students may react to something that's on the news or an event in differing ways?

Terri Morgeson (00:52:12):

Of that, I can say. I think that's kind of my point.

Ms. Fisher (00:52:17):

And so while some students would express discomfort or in your words, feeling offended, those feelings alone don't necessarily demonstrate that my actions were unprofessional.

Terri Morgeson (00:52:28):

It was the volume and the tone, and the manner in which you were having those conversations, particularly the volume that was unprofessional. Again, I never told y'all to stop, it wasn't my job. I shut the door, right?

Ms. Fisher (00:52:45):

And so back to my volume. Since, I guess just kind of for context, since you were not necessarily in the exact room with Professor Metz and I, you mentioned my volume, would it be fair to assume that other people or other persons in the clinic would've been able to hear the statements [inaudible 00:53:01] was making and you were overhearing as well?

Terri Morgeson (00:53:04):

It depends on which clinic. That's why I was shutting the doors. I think there was a high likelihood that if the Civil Clinic Office had been open, you could have been heard. I think that if the Tax Office door had been open that you could have been heard. I think it would've been very difficult for somebody to hear you in the Criminal Defense Clinic. And then the Civil Clinic, I mean, excuse me, my Family Law Clinic, I don't think you could have been heard there. But in that hallway, in that immediate area, you were being overheard, in my opinion. Professor Metz was being overheard, in my opinion.

Ms. Fisher (00:53:42):

And so I guess just to get it clear, you're saying that it was not necessarily the content that is alleged being discussed, but the manner in which it was being discussed, tone, other actions like that?

Terri Morgeson (00:53:59):

It's not the topic, it's what you were saying and how you were saying it. You were disrespectful in the fact that a man had gotten shot. Y'all were laughing at the way that his head bobbed and the way that he fell. Y'all were making fun of it and you were celebrating and said that he deserved it.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (00:54:17):

Professor Morgeson, you are currently a practicing attorney, correct?

Terri Morgeson (00:54:25):

Yes, ma'am.

Ms. Fisher (00:54:26):

And do you agree that the discussion of Charlie Kirk's assassination is like a matter of public concern or on the news?

Terri Morgeson (00:54:33):

It is a national topic, yes ma'am. Again, it's not that you were discussing it, it's the manner in which you were discussing it. It was specifically the things that you were saying and how you were saying them.

Ms. Fisher (00:54:46):

And I know you mentioned that you're not my clinic director, but I think you might be able to ... On that day in question, and kind of the timing question, when I was either in Professor Stevens office or I was in Professor Metz's office, do you recall there being any outside attorneys out of the clinic, any clients, any representatives of the court, anything like that?

Terri Morgeson (00:55:05):

No, I don't think I told Professor Keffer that. I don't remember there being any clients up front in the hallway or anybody having clients in their respective clinics.

Ms. Fisher (00:55:15):

And would you be able to think of any reason why that wouldn't be included in Professor Keffer's report?

Terri Morgeson (00:55:22):

No, ma'am.

Ms. Fisher (00:55:23):

And assuming that I did make the alleged statements, and I guess now just for purpose of it, we'll go with, " He got shot," do you believe that that statement would fall within the protection of the First Amendment?

Terri Morgeson (00:55:34):

In a political setting? Could you explain? Just the fact that you hold that belief or the fact that you were saying it?

Moderator (00:55:50):

Maybe you could reframe the question.

Ms. Fisher (00:55:51):

This transcript was exported on Mar 23, 2026 - view latest version here.

Yeah, absolutely. So assuming that, I guess back up because at the beginning and just what was indicated in the report is the terms, "I'm in such a good mood," and then, "I shot the motherfucker." But I think we kind of deduced, and just for sake of the argument, I'm going to use, "They shot him," Professor Morgeson. And so assuming that I did make those statements in question, do you believe that those statements would fall within the protection of the First Amendment?

Terri Morgeson (00:56:18):

I think you have every right to say the statements. However, just because of the fact that you make the statement does not mean that you were free from consequences for making the statement.

Ms. Fisher (00:56:32):

And so you mentioned that I made the statements in the Clinical Office. Do you recall any other professors who were in the clinic at that time? I know that not everyone's aware, but you know how there's like, do you recall if Professor Caudillo or any of the other offices?

Terri Morgeson (00:56:49):

I don't remember if Professor Caudillo was in his office. I do remember obviously that Professor Stevens was in his office. Miranda's office, I remember being closed. And I don't think Spain was in his office.

Ms. Fisher (00:57:04):

Okay. And then I'll just wrap this up to keep it really short. You mentioned that students had left clinic during office hours because they felt, quote, upset or offended?

Terri Morgeson (00:57:15):

Mm-hmm.

Ms. Fisher (00:57:15):

And did you have any indication beyond what Professor Hardberger already asked you? Did they ever make any affirmative statement that, "I would like to go home because of Ellie's conduct?"

Terri Morgeson (00:57:27):

They said, "I don't want to listen to this anymore, may I have please go home?"

Ms. Fisher (00:57:30):

And so they went home during office hours, and as you mentioned, those are scheduled and require that students attend those. Would you consider leaving during your scheduled office hours professional?

Terri Morgeson (00:57:44):

Ma'am, they're supposed to do 200 hours for the semester. And so it was about four o'clock. Yeah, I consider it professional. If they were kept from the ability to practice law and to do things because of your behavior, I do think it was professional to leave. It wasn't like they could talk on their phone. It wasn't like they could call a client into their office. So yeah, I think it was a professional decision to leave.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (00:58:09):

And so you mentioned they weren't able to practice law. Do you recall about, from the time that you heard me first with Professor Stevens to the time that you alleged you overheard but did not see me and Professor Metz's ... Do you know about how long that is, just kind of ballpark? Minutes, seconds, hours?

Terri Morgeson (00:58:28):

Wait a minute. I did see you in Professor Metz's office when I went in to shut the door, you were sitting on the couch.

Ms. Fisher (00:58:34):

Right, but you had mentioned when you said that I was just standing in the doorway?

Terri Morgeson (00:58:38):

Mm-hmm.

Ms. Fisher (00:58:39):

And so you said that I was standing in a doorway, but you would not be able to see that because your view was obstructed because you were next door.

Terri Morgeson (00:58:45):

Sorry, I saw you ... No, no, no. I did see you for a minute.

Ms. Fisher (00:58:48):

Okay.

Terri Morgeson (00:58:48):

You walked down the hallway. You slanted into the office to see if he was going to engage you, and then you walked into the office. I did see you.

Ms. Fisher (00:58:56):

Okay. And for sake of the argument, from that point, from when you heard me walk into the Clinic Office to that point, do you remember about how long it was or recall in any way?

Terri Morgeson (00:59:11):

That you were in there and y'all were laughing about the video?

Ms. Fisher (00:59:14):

Yeah. Or just from the time that-

Terri Morgeson (00:59:15):

About 35 minutes is what I remember that y'all were in there.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (00:59:19):

35. Okay. And so from the time that I walked into that time, you would say it would be about ... the time from I talked with Professor Stevens before, plus that, in total 40 minutes. Is that fair to say?

Terri Morgeson (00:59:33):

I think so, yeah.

Ms. Fisher (00:59:35):

Okay. And so for 40 minutes you overheard us quote-unquote laughing about the head-bobbing and kind of the situation in question you would argue is about 40 minutes long?

Terri Morgeson (00:59:47):

So when the door is open, I could hear distinctly what y'all were saying.

Ms. Fisher (00:59:51):

Okay.

Terri Morgeson (00:59:52):

Okay? And then after I shut the door, I can hear laughter and voices, but can't make out distinctly what y'all were saying.

Ms. Fisher (01:00:01):

Yes ma'am.

Terri Morgeson (01:00:02):

Okay.

Ms. Fisher (01:00:02):

Okay, yeah. Perfect. Okay, I've got that now. Thank you. And then you had mentioned earlier, and I promise this will be my last one, you'd mentioned earlier, it was not necessarily the subject, but my over-exuberance, et cetera. Do you, to your knowledge, know any student at the Texas Tech University School of Law who has been disciplined for their "exuberance?"

Terri Morgeson (01:00:25):

No, ma'am. I don't even really understand the question.

Ms. Fisher (01:00:28):

I can repeat. I don't want you to feel like I asked you something-

Terri Morgeson (01:00:31):

What do you mean disciplined for their exuberance?

Ms. Fisher (01:00:34):

This transcript was exported on Mar 23, 2026 - view latest version here.

Well-

Terri Morgeson (01:00:34):

Again, it wasn't your exuberance that was the issue. It was the fact that you were laughing that he was shot, you were saying that he deserved it. I don't consider that exuberance.

Ms. Fisher (01:00:51):

Okay, so I'll reframe. The way that you alleged that I was laughing about it, despite that not being contained in the Keffer report, the way that I was laughing about it and was discussing it with Professor Metz, have you heard of anybody at Texas Tech School of Law being brought forth, and by discipline, I mean an honor counsel hearing due to similar behavior of them laughing?

Terri Morgeson (01:01:24):

I don't have any knowledge of honor counsel proceedings at all.

Ms. Fisher (01:01:29):

And so-

Terri Morgeson (01:01:29):

Do you understand what I'm saying? I would not know that.

Ms. Fisher (01:01:31):

Okay.

Terri Morgeson (01:01:32):

If a student had been disciplined, it would not be ... I'm not allowed to know that.

Ms. Fisher (01:01:36):

Okay.

Terri Morgeson (01:01:37):

That's not my, I don't know how to say that, but we're not allowed to know this.

Ms. Fisher (01:01:41):

Right. And last question, your family law students, maybe you would know this or maybe you wouldn't, to the best of your knowledge, your family law students haven't been brought before the Honor Council due to their discussions of Charlie Kirk on September 10th, is that correct?

Terri Morgeson (01:01:55):

There were private conversations. They were not projecting into the hallway. And them saying that he got shot is not the same thing as, "He deserved it," and laughing about his head bobbing, and being joyful that he died. Their comments were, "Did you hear Charlie Kirk got shot? Isn't that crazy?" Do you see how those two things are different? That's my point.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (01:02:24):

Yeah. I guess I'm getting a little bit confused on your answer. So would it be fair to say that you have not heard of other students in the students in your Family Law Clinic that you allege made the statements, "He got shot," and, "Did you hear he got shot," they have not been disciplined or had any disciplinary proceedings brought against them?

Terri Morgeson (01:02:47):

No, because I don't think that those are the statements that brings you here today.

Ms. Fisher (01:02:52):

Okay. But Professor Morgeson, do you recall previously stating to this counsel that you overheard me telling Professor Stevens, "Charlie got shot," and, "He got shot," in Professor Mess's doorway?

Terri Morgeson (01:03:09):

Yes, ma'am, but you also said other things.

Ms. Fisher (01:03:13):

And were those other things the, "I'm in such a good mood," and quote ... I guess, quote, "I'm in such a good mood?"

Terri Morgeson (01:03:21):

"I'm in such a good mood." And then, "Look at his head, look at his head." And then your comments about that he deserved it, that he was such a horrible person, that you weren't going to feel sorry for him because of the other things that he had said. All of those things were said in Metz's office.

Ms. Fisher (01:03:40):

Okay, perfect. Yeah, no further questions for [inaudible 01:03:42]

Moderator (01:03:44):

Okay. Any other question?

Speaker 2 (01:03:46):

I do. I'm sorry, go ahead. Go ahead. I have one too.

Speaker 3 (01:03:48):

This might just be my question. I'm not familiar with the clinics and how [inaudible 01:03:53] clients. Would you know if any of the other clinics, like if any students or any of the clinic directors were meeting with clients during that time? Or is it all separate?

Terri Morgeson (01:04:02):

No, I would know.

Speaker 3 (01:04:03):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

Terri Morgeson (01:04:05):

And again, I walked down the hallway, so I would recognize that there was somebody else in one of the spaces. And normally we don't meet with clients in those spaces, but there are times that we do. So I would know if there was a student and a client in one of the other clinics.

Speaker 3 (01:04:22):

Thank you.

Terri Morgeson (01:04:22):

You're welcome.

Speaker 2 (01:04:25):

I know that you stated that you are aware that they were watching the video because you heard comments about it. Did you see Ms. Fisher showing the video to anyone in the clinic?

Terri Morgeson (01:04:36):

No, no, no. I saw Professor Metz showing her the video and them laughing about it. When I went in there, he had his phone in his hand and then he was watching it and then showing them, and then they were making comments. That's what I remember.

Speaker 2 (01:04:54):

Okay, great. And then my last question is, when you were having the discussion with Professor Keffer as part of the investigation, the report says that in the next day when you spoke with Professor Metz, which you discussed earlier, Professor Metz had said something to the effect of, "Well, it was Ellie." When you said, it says, I guess you mentioned to him that some of your students were offended, and he said, "Well, it was Ellie." Can you expand on, was that the full extent of that conversation?

Terri Morgeson (01:05:30):

No. He was saying that it was her making the statements, and then he went on to say that it wasn't him. And I was like, "Are you sure?" And then I remember him also saying that it wasn't his job to tell her that she shouldn't say those things.

Speaker 2 (01:05:46):

Okay.

Terri Morgeson (01:05:46):

That he didn't think it was his job as her professor to rein her in.

Speaker 2 (01:05:51):

Okay. That was it. Thank you.

Speaker 4 (01:05:56):

Defs.' Appx. 155

This transcript was exported on Mar 23, 2026 - view latest version here.

I have one question. Terri, at the beginning you talked about loud statements while walking down the hallway in the reception area. Can you go through that again?

Terri Morgeson (01:06:08):

Yes. So when she comes in, she's just talking about being in a good mood. "It's the best day ever. I'm so happy." And so she's not making statements about Charlie Kirk then, she's talking about being happy. But then when she stops in Joe Stevens doorway, she was like, "I'm so happy. It's the best day ever." And I think he looks up and says, "Why?" And she was like, "Well, have you heard Charlie Kirk got shot?" And then, "Do you know who that is?" And he was like, "Yes, I know who that is." And then I remember him going, "Don't do that. Don't say that. Don't come in here with that," maybe. And then that's when I left and I walked down the hallway and then they had that little interaction, and then she moved on to the next doorway.

Speaker 4 (01:06:54):

The statements were made before Joe's office?

Terri Morgeson (01:06:59):

There were statements made when she was standing in the hallway to Joe's office, yes, ma'am.

Speaker 4 (01:07:03):

[inaudible 01:07:09]

Moderator (01:07:12):

Anything else? Thank you, Terri. **Student 2** should be on the same-

Speaker 2 (01:07:21):

Yep.

Speaker 3 (01:07:22):

Thank you, Terri.

Speaker 1 (01:07:25):

Is she going to be on both [inaudible 01:07:26].

Speaker 5 (01:07:27):

Yes. Yes.

Speaker 1 (01:07:30):

Okay. This is going to be [inaudible 01:07:31].

Speaker 2 (01:07:30):

They're every where.

Speaker 5 (01:07:31):

This transcript was exported on Mar 23, 2026 - view latest version here.

And I tested it yesterday, and full disclosure, I'm not the best with technology, but we're going to make it work. But it's voice activated, so it will move.

Speaker 2 (01:07:39):

Oh, okay.

Speaker 5 (01:07:39):

Yeah. So just let me get in there real quick. Bear with me. Now it's not working. Of course. [inaudible 01:08:01]

PART 2 OF 6 ENDS [01:08:04]

Dean Chapman (01:08:04):

Thank you.

(01:08:04):

Okay. And **Student 2**'s the.... **Student 2**?

Professor Spain (01:08:04):

Right.

Dean Chapman (01:08:29):

Okay.

(01:08:29):

Okay. There's more people right now in the waiting room.

Ms. Fisher (01:08:45):

Where's the camera?

Speaker 6 (01:08:45):

[inaudible 01:08:55].

Ms. Fisher (01:08:45):

Okay. That's crazy.

Dean Chapman (01:08:45):

They're everywhere.

Dean Chapman (01:08:58):

Yeah, it's really cool. It's really good.

Professor Spain (01:08:59):

It actually looks like a little nut or acorn.

This transcript was exported on Mar 23, 2026 - view latest version here.

Dean Chapman (01:09:00):

Yeah.

Dean Chapman (01:09:01):

Yup, a cone now.

Speaker 6 (01:09:01):

All right. We're that much closer to Star Wars.

Dean Chapman (01:09:08):

Yes. Also going for the record, I'm recording this as well, the Zoom, but also have this because I want to make sure. Okay. **Student 2**, can you hear us?

**Student 2** (01:09:21):

Yes. Can you hear me?

Dean Chapman (01:09:22):

Yes.

Professor Spain (01:09:26):

Okay. Thank you for joining us today. Could you state your name for the record please?

**Student 2** (01:09:34):

Yes, **Student 2**.

Professor Spain (01:09:36):

Okay. What I'm going to do is ask some questions of you. This all relates to an incident on September 10th, 2025, the day that Charlie Kirk was shot. Can you briefly explain what kind of observations you had that day regarding Ellie Fisher?

**Student 2** (01:10:03):

Yes. Can you all hear me?

Professor Spain (01:10:05):

Yes.

**Student 2** (01:10:07):

Okay. I was in my clinic office, which is in the front of the office, and it was me and **Student 3** [inaudible 01:10:13] in there. And I had heard Ellie walk in and go to Joe's office and say that she's in a good mood because Charlie Kirk was shot.

Professor Spain (01:10:25):

Okay. And how would you describe her mood that day?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 2** (01:10:34):

She seemed happy, but she's always pretty chipper, so nothing out of the ordinary.

Professor Spain (01:10:42):

Okay. And your workspace is directly across the hallway from Joe Stevens' office. Is that right?

**Student 2** (01:10:47):

Yes.

Professor Spain (01:10:47):

Okay.

**Student 2** (01:10:47):

Yes.

Professor Spain (01:10:50):

Were there any other students or clients or staff around at that time?

**Student 2** (01:10:57):

There were no clients. I don't know if Melissa or Nancy were in the front. It was at the end of the day, but there there was not many people there. It was pretty quiet.

Professor Spain (01:11:11):

Okay. And did she enter Joe Stevens' office? Or was she speaking with him in kind of the doorway?

**Student 2** (01:11:19):

The doorway.

Professor Spain (01:11:20):

Okay. And did she appear to be celebrating the shooting of Charlie Kirk in any way? I mean from your observation?

**Student 2** (01:11:42):

I don't think I'd call it celebrating. What do you mean by celebrating?

Professor Spain (01:11:48):

Well, was there anything about her actions or her statements that she is making where she seemed pleased with the fact that he had been shot?

**Student 2** (01:12:01):

Yeah, I think saying she's in a good mood he got killed is being pleased, but it was just the statement. She wasn't really doing anything else.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (01:12:14):

What was your reaction to this whole interaction that she had with Joe Stevens?

**Student 2** (01:12:23):

I thought it was a little inappropriate. I had just seen the video right before that, and it was pretty brutal, so I just thought the statement was a little bit inappropriate.

Professor Spain (01:12:37):

Okay. Was it upsetting to you?

**Student 2** (01:12:43):

I wasn't upset about it. I was just like, "It's just not appropriate to say after something like that." But I wasn't personally offended by it.

Professor Spain (01:12:57):

Okay. And did you later on that day ask to leave early from your office hours?

**Student 2** (01:13:07):

Yeah, I had walked into Dwight's office where Terry was sitting and I just asked to go home.

Professor Spain (01:13:18):

Okay. Why was that? Why did you ask to go home early?

**Student 2** (01:13:23):

I think it was just the situation was just awkward after that point and **Student 3** had also asked to go home and it was just her and I in there. So I was like, "I don't think I'm going to get any more work done today."

Professor Spain (01:13:41):

Anyone else have questions?

Dean Chapman (01:13:42):

I do. Yep.

Professor Spain (01:13:42):

Okay.

Dean Chapman (01:13:44):

Hi, I just have a couple of questions. Were you able to hear anything that Professor Stevens said in response to Miss Fisher's statements that you mentioned?

**Student 2** (01:13:58):

No, I was not. He said something but I couldn't hear it and it looked really brief.

This transcript was exported on Mar 23, 2026 - view latest version here.

Dean Chapman (01:14:05):

Okay, so it was a brief interaction and you didn't hear that?

**Student 2** (01:14:08):

Yeah.

Dean Chapman (01:14:08):

That's fine. And then did you hear conversations that Miss Fisher was involved in in Professor Metz's office after she-

**Student 2** (01:14:18):

I did not.

Dean Chapman (01:14:19):

You did not? Okay, great.

**Student 2** (01:14:21):

No.

Dean Chapman (01:14:22):

And then I just want to ask you, you just stated that you had asked to leave early because sort of it was upsetting and you weren't going to get work done. Can you recall when you say "It was upsetting," do you mean Miss Fisher's statements and how she was responding? Are you referencing the whole situation, the video that you've seen? Can you remember back how you would characterize what you found to be the end of the day for you?

**Student 2** (01:14:49):

Yeah, I think it was really the whole situation in general. I had seen the video and then she came in and said that and I think it was just... Yeah, the whole situation.

Dean Chapman (01:15:04):

Okay. Thank you. That's all I have.

Professor Spain (01:15:10):

Anybody else have any questions?

Ms. Fisher (01:15:18):

Okay. I don't know how to do this.

Dean Chapman (01:15:19):

Just go ahead and speak in it. It'll turn to you.

Dean Chapman (01:15:20):

This transcript was exported on Mar 23, 2026 - view latest version here.

And then you'll hear.

Ms. Fisher (01:15:23):
Hi, **Student 2**. Sorry, I'm waiting for the-

**Student 2** (01:15:25):
Hi.

Ms. Fisher (01:15:26):
Okay, hold on. It should come over. I'm going to keep this really brief.

**Student 2** (01:15:29):
It's turning.

Ms. Fisher (01:15:30):
Yeah, I'm sorry.

Dean Chapman (01:15:30):
There it goes.

Ms. Fisher (01:15:31):
Okay, period. So I'm going to keep this really, really brief, **Student 2**, I really appreciate you being here today. So you testified or I guess, told Professor Keffer that I said quote, "I'm in the best mood ever," End quote. "They shot Charlie Kirk." Is that correct?

**Student 2** (01:15:46):
Yes.

Ms. Fisher (01:15:47):
And you mentioned that that would've been in Joe's office, right where y'all's work space is directly across the hall?

Madison Wright (01:15:56):
Correct, in the doorway. Yes.

Ms. Fisher (01:15:58):
You mentioned that you and **Student 3** were in y'all's office. Do you recall anybody else being around? I know you say you don't remember if Nancy or Melissa, but do you recall anybody else?

**Student 2** (01:16:10):
No, I don't remember anybody else being around.

Ms. Fisher (01:16:13):

**Defs.' Appx. 162**

This transcript was exported on Mar 23, 2026 - view latest version here.

And it stated that you were upset because of what happened on September 10th. Just so can you clarify, was that because of the shooting of Charlie Kirk? Or did you ever mention to Professor Morgeson that you wanted to go home due to my conduct?

**Student 2** (01:16:36):

I think it was just the whole situation. I didn't think that your comment was appropriate, but I think seeing the video and just everything combined about that afternoon was what was upsetting.

Ms. Fisher (01:16:53):

Do you recall other people in the clinic and throughout the law school discussing that Charlie Kirk being shot that day?

**Student 2** (01:17:04):

No, I was only in the clinic office that day, so I didn't really talk to anybody else.

Ms. Fisher (01:17:10):

Do you recall if anybody else in the clinical space was discussing it?

**Student 2** (01:17:18):

I heard voices, but I didn't hear if people were talking about that. I didn't hear anything else.

Ms. Fisher (01:17:24):

Okay. And so just to confirm, I didn't threaten you, direct you to leave, or prevent you from participating in class or clinic in any way. Is that correct?

**Student 2** (01:17:34):

No, definitely not.

Ms. Fisher (01:17:36):

And do you agree that discussion of Charlie Kirk's public murder would be considered protected by the First Amendment?

**Student 2** (01:17:50):

Yeah, I would think so.

Ms. Fisher (01:17:52):

That's all. No further questions, Professor Spain. Thank you, **Student 2**.

Professor Spain (01:17:56):

Anything else? Thank you very much for appearing today.

**Student 2** (01:18:03):

Yes.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (01:18:03):

Okay.

Dean Chapman (01:18:07):

So I'll let... **Student 2**, I'll let you exit.

**Student 2** (01:18:10):

Okay, thank you.

Ms. Fisher (01:18:12):

Can we just have a quick bathroom break after?

Dean Chapman (01:18:15):

Yeah, absolutely.

Professor Spain (01:18:15):

Sure.

Ms. Fisher (01:18:15):

Thank you.

Dean Chapman (01:18:15):

So for the record, we're going to take a quick break, but I'm just going to keep the recording going if that's okay.

Ms. Fisher (01:18:21):

I just grabbed the big slot [inaudible 01:18:22].

Dean Chapman (01:18:22):

Yes. Let me show you where to go.

Ms. Fisher (01:18:24):

Yes, ma'am. Thank you.

Speaker 6 (01:18:31):

Just to note, is there another witness waiting? Do we need to... I mean, I don't want to hold anyone.

Professor Spain (01:18:37):

They're just in the waiting room so they'll be fine.

Dean Chapman (01:18:47):

Yeah, let me show you.

This transcript was exported on Mar 23, 2026 - view latest version here.

Dean Chapman (01:18:48):

Okay. Is **Student 3** next?

Professor Spain (01:19:19):

Yeah.

Dean Chapman (01:19:19):

[inaudible 01:21:11]. Thank you. I like that open that gives you a little breeze. And then I've got, yeah, I wrap around it. I need that to be warmer.

Allyson (01:19:52):

I always bring a jacket.

Dean Chapman (01:21:24):

No, you have to. In fact, I left without one and then went back and I was like, "I should get my wrap because you just never know when you're going to."

Allyson (01:21:31):

I actually so TMI, but I have lost like 60 pounds.

Dean Chapman (01:21:36):

Wow.

Allyson (01:21:36):

Ever since I lost all that weight-

Dean Chapman (01:21:37):

I bet.

Allyson (01:21:38):

... I'm like-

Dean Chapman (01:21:39):

Got to feel totally different.

Allyson (01:21:44):

Yes. I'm like cold all the time.

Dean Chapman (01:21:44):

Must feel very different.

Allyson (01:21:44):

This transcript was exported on Mar 23, 2026 - view latest version here.

It does, yes. But now I used to get, be warm all the time, and now I'm freezing all day. So I always have to have a jacket with me.

Dean Chapman (01:21:45):

Just a reminder, the recording is still going.

Dean Chapman (01:21:46):

Oh, yeah, we're talking about-

Allyson (01:21:56):

Losing weight.

Dean Chapman (01:21:57):

... menopause and being hot. So I'll go on the record for that all day long. I want to warn the young people. Nobody tells you. I'm like, "I'm here to inform. It's a monster that's coming toward you."

Dean Chapman (01:22:08):

I have a thyroid condition, and so Hashimoto's, I'm always cold and my hands are always cold. I mean literally all the time. So my boyfriend bought me, I didn't even know there were battery-operated hand warmers.

Dean Chapman (01:22:23):

Oh, yeah, those things are-

Allyson (01:22:23):

Warmers.

Dean Chapman (01:22:24):

I've used some skiing before, in your boots too.

Allyson (01:22:27):

At my job, I keep an electric snuggy at my desk so I can put arms in it and stay warm.

Dean Chapman (01:22:32):

That's nice.

Allyson (01:22:34):

And they also make little hoodies that you can fill up, wrap up in.

Dean Chapman (01:22:44):

Just to remind everybody, the recording is still on.

Professor Spain (01:22:46):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

Dean Chapman (01:22:47):

Okay.

Allyson (01:22:47):

Your name is spelled A-L-Y, assuming, the Allison.

Dean Chapman (01:22:47):

Right.

Allyson (01:22:47):

Okay. That's my name is spelled almost exactly the same.

Dean Chapman (01:23:09):

Are you E or A? Are you also A?

Allyson (01:23:11):

Yes.

Dean Chapman (01:23:11):

Yeah. Okay.

Allyson (01:23:12):

So it's A-L-L-Y-S-O-N but I hardly ever meet someone else.

Dean Chapman (01:23:14):

Oh, okay.

Allyson (01:23:17):

I saw that on there, I was like, "Wow."

Dean Chapman (01:23:28):

The next is Allison, right?

Speaker 6 (01:23:28):

Right.

Dean Chapman (01:23:30):

I got a friend, I helped set up her whole Africa trip. The questions I get, what kind of plug do they use in Tanzania? Just Google it. I don't know what the name of it is. I just have it in my drawer. I'm not the end-all deal.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (01:24:20):

Thank you all.

Dean Chapman (01:24:22):

For the record, we're back in and I'm going to let **Student 3** into the room. Hi, **Student 3**, it's Dean Chapman, are you there, Mija?

**Student 3** (01:24:45):

Yes, I am.

Professor Spain (01:24:48):

Good morning, **Student 3**. Thank you for appearing today. We are going to ask you a few questions about the events of September 10th, 2025, the day that Charlie Kirk was shot. Can you briefly kind of explain what you observed or heard that day particularly related to Ellie Fisher in the clinic offices?

**Student 3** (01:25:20):

Sure. So it started when I got into clinic after evidence. It was around 3:00 o'clock that day. I'd gotten out of class and **Student 2** and I were the only ones in clinic. And we were discussing the shooting because this was, it was my first opportunity to talk about it with anybody because I had been in class when I found out about it.

(01:25:43):

And **Student 2** told me that while I was in class, Ellie had come in and stopped by Joe Stevens' office, Professor Stevens, and said something to the effect of, "They got him." Or, "This is a great day." And **Student 2** told me that Professor Stevens told Ellie to get out of his office and not do that here.

(01:26:11):

So **Student 2** and I were talking about it. And then either during that or right after it, we had both seen Ellie walk into clinic, so we kind of stopped talking about it. Yeah. So then we got some notifications on our-

Professor Spain (01:26:31):

Let me stop you there. So just to clarify, you did not actually hear any statements yourself that Ellie Fisher may have made to Joe Stevens?

**Student 3** (01:26:47):

No, I did not. I was in class at that time.

Professor Spain (01:26:47):

Okay. So you came in after she had stopped by his office, is that right?

**Student 3** (01:26:52):

Yes.

Professor Spain (01:26:52):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

**Student 3** (01:26:53):

Yes.

Professor Spain (01:26:54):

Did you hear any statements that she may have made subsequent to stopping by Joe Stevens' office?

**Student 3** (01:27:03):

Yes. So after we got the notifications on our phones that Charlie Kirk had passed away, **Student 2** and I heard yelling and laughing from down the hall, and so I was curious. So I went up and I walked past. I went down to the printer in the clinic office down the hall and I walked past Professor Metz's office and I saw Ellie in there with two other students and Professor Metz.

(01:27:34):

And they were saying, "He's dead." And it seemed to me like they were excited looking at the video, maybe laughing. Or it was like, I just remember walking by and being like, "Oh, that's a weird energy in the room for having found out somebody died." So that's what I had heard and seen as I walked by.

(01:27:59):

And then later when Professor Morgeson came into the clinic office with **Student 2**, she shut the door and that's when she told us she heard Ellie saying, I'm going to curse for the quotation. But that's when Professor Morgeson told us, "Ellie said they got the motherfucker."

Professor Spain (01:28:20):

So did you yourself hear any statements yourself that Ellie Fisher may have said in Professor Metz's office?

**Student 3** (01:28:32):

I didn't hear. I can't recall anything that I heard specifically, but I know I walked by and I saw her laughing and chatting about it with other students in Professor Metz's office.

Professor Spain (01:28:45):

What was your reaction to the situation?

**Student 3** (01:28:51):

I think I felt very uncomfortable in clinic and I think that was exemplified through Professor Morgeson coming in and checking on us after and being like, "Are you okay? Is everything okay?" I was uncomfortable just because we're all finding out this news as it comes, and it was a very strange day.

Professor Spain (01:29:16):

Did you leave your office hours early that day?

**Student 3** (01:29:21):

This transcript was exported on Mar 23, 2026 - view latest version here.

I did, yes. After Professor Morgeson came in and checked on **Student 2** and I, the three of us were actually talking about how even though everyone may not agree with what somebody says, you shouldn't act like this in the clinic. The three of us were talking about that and she told us that we could leave clinic hours early. It was about 4:30 I think when I left. So I was done with office hours at 5:00, so I didn't miss too much of office hours.

Professor Spain (01:29:53):

Okay. So did you have any contact or conversations with Miss Fisher thereafter?

**Student 3** (01:30:01):

About, I think it was about a week after, I was outside the school. This wasn't planned contact or anything. I was outside the school on a call with a client and Ellie and **Student 9** and my friend **Student 10** were outside the school. And I went up to say hi to **Student 10** and they were in the middle of talking about the situation.

(01:30:27):

And this was after I had met with Dean Chapman. I was called into Dean Chapman's office to talk about it beforehand. And Ellie was talking about how they're trying to get her and she was asking if we, because she knew I was in clinic, so she was asking if I knew anything.

Professor Spain (01:30:47):

What was your response?

**Student 3** (01:30:50):

I said I didn't, because at that time, Dean Chapman told me to not speak about it with anyone. And so I said I didn't know anything and I left the conversation pretty quickly after that. Because I don't enjoy to lie and I was uncomfortable and I didn't want to get stuck in a situation where I would have to lie to her. I didn't like saying I didn't know anything to her, but I also felt like I couldn't say anything.

Professor Spain (01:31:17):

What specifically did she ask of you?

**Student 3** (01:31:23):

She just turned to me and was like, "Did you hear about this? They're trying to get me." It's hard to recall because it wasn't something I had to, I knew I should commit to memory because this was so long ago. But the conversation was about her looking for information about who reported her.

Professor Spain (01:31:45):

Who reported her. She is asking for the name of anybody that had made a report?

**Student 3** (01:31:53):

Yes, I believe. I took it that way, yes.

Professor Spain (01:31:57):

Okay. Did that whole situation make you uncomfortable?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 3** (01:32:01):

It did for me because I didn't know the appropriate way to react, so I was pretty uncomfortable there. Yeah.

Professor Spain (01:32:09):

Okay. Were you reluctant to appear at this hearing today?

**Student 3** (01:32:16):

Yes. I had told Dean Chapman, had I told Professor Morgeson, this is not something I wanted to be involved in, and it really stinks that I was there that day, but I'm here.

Professor Spain (01:32:31):

Other questions?

Dean Chapman (01:32:33):

Yeah, I just have a couple. When you went to the copy machine and saw into Professor Metz's office, do you recall who else was in there?

**Student 3** (01:32:44):

Yes, **Student 6**, I don't know her last name. But **Student 6** was in there and I believe it was **Student 15** was the other student.

Dean Chapman (01:32:54):

Okay. And you said earlier that you heard laughing. Could you tell, I mean, would you say that Miss Fisher was the one person that you heard laughing and others weren't laughing? Was it sort of just a general noise from the office? Were you able to tell or provide any more specifics about who might've been saying what in that context?

**Student 3** (01:33:21):

I thought it was Ellie at the time because **Student 6** has a very distinct laugh. And it's like if anybody knows **Student 6**, they know her laugh and it wasn't **Student 6**'s laugh. So when I walked by, that's when I thought it was Ellie.

Dean Chapman (01:33:39):

And did you hear the statements that they were talking about? I mean, did you hear them saying anything about Mr. Kirk before you heard the laughter? Or you just knew they were generally talking about what had happened?

**Student 3** (01:33:55):

The laughter was pretty immediate after **Student 2** and I got the notifications on our phone that were like, he had died. It was within the same minute that occurred. **Student 2** and I looked at each other and we were like, "Oh, they also got the news."

Dean Chapman (01:34:12):

This transcript was exported on Mar 23, 2026 - view latest version here.

So because of the timing, you connected those two things. Okay. And then when you said that you decided to leave or were offered to go home early, can you just talk a little bit about, if you can remember back, how would you characterize when you said just that you wanted to leave maybe because of the situation? What do you mean by this? Is that one thing in particular? Was it the news itself? Can you just talk a little bit about that if you can recall?

Student 3 (01:34:45):

I think it was. I think, so when Professor Morgeson came and talked to us, **Student 2**, Professor Morgeson, and I were all talking about how we were all kind of uncomfortable. Because none of us had dealt with a situation like this, especially with it being so politically charged one way and the other, it was almost like the tensions were weird in the room.

(01:35:10):

Nobody wanted to, I wasn't going to turn around and write a client letter after that. My brain, I was kind of distracted. I was processing what I had heard from Professor Morgeson about what was being said and what I saw and the conversations we were having. And so Professor Morgeson was like, "If you can't focus for the rest of the day, that's okay. You can go home."

Dean Chapman (01:35:34):

Okay. So it's fair to say it was the event itself and then sort of what was happening in the space together?

Student 3 (01:35:43):

Yeah, for sure.

Dean Chapman (01:35:45):

Okay. Then my last question for you is, there's an irony to me asking you this question, so I apologize, but the reticence to appear, can you talk a little bit? What made you reticent to appear or be involved in this investigation any further? Can you be specific on that?

Student 3 (01:36:08):

I mean, it's obviously a very politically charged conversation we're having today. And I think that it's very easy for someone to be involved on the side that I am right now, where a student is being charged with something for expressing her feelings in the moment, to be classified as an ultra conservative where that's not who I am.

(01:36:39):

So it's hard to... I'm trying to figure out the best way to say this. I don't want to be attacked because I was asked to be here because I was in clinic that day. And I feel like there is a chance that I would be brought up in this when I did not ask. I did not make the report to be here. And it's just a situation that I really don't love to be tied into.

(01:37:12):

I've had a lot of anxiety about how my classmates would perceive me, even though I didn't ask to be here. And with the whole situation with Professor Metz saying it's two blond Republicans and Family Clinic who reported him, it is not a great look to be involved.

This transcript was exported on Mar 23, 2026 - view latest version here.

Dean Chapman (01:37:38):

Thank you. That's helpful. That's all I have.

**Student 3** (01:37:41):

Okay.

Speaker 6 (01:37:44):

Ellie, your turn.

Ms. Fisher (01:37:48):

Good morning, **Student 3**. It's going to switch over to me. Okay. There we go. I'm going to try to keep you really brief. I really appreciate you being here. I know this is not where you want to be on a Friday.

(01:37:57):

So I'm going to, first, I have a few questions and then we'll just kind of jump to some of the things that you told the counsel. So just to confirm, the first statements of me in Professor Stevens' office, whatever is alleged, you yourself didn't hear those. You were told those by **Student 2**?

**Student 3** (01:38:16):

Yeah.

Ms. Fisher (01:38:17):

And then when it comes to the statement of, "The mother effer was shot." Or, "He was shot," that was later told to you by Professor Morgeson?

**Student 3** (01:38:28):

Yeah, she came in and told us about it.

Ms. Fisher (01:38:30):

Okay. And so would it be fair to say what you witnessed was when you walked down the clinic hall and you saw me laughing in Professor Metz's office?

**Student 3** (01:38:43):

Yep. That's what I saw.

Ms. Fisher (01:38:44):

Okay, good deal. I just wanted to make sure I have everything right.

**Student 3** (01:38:46):

Okay.

Ms. Fisher (01:38:47):

This transcript was exported on Mar 23, 2026 - view latest version here.

So with going back a little bit to the discussion you had with Professor Morgeson, do you recall ever leaving the family law office and then meeting Professor Morgeson in Professor Dwight McDonald's office and asking her if you could go home?

**Student 3** (01:39:10):

I am trying to remember. I don't remember if Professor McDonald was there at the time. He might've been, but I don't know.

Ms. Fisher (01:39:20):

And so just, do you recall, I know it was so long ago, but do you recall kind of around when all the incidents are alleged to the time in question, do you recall whose doors were open or maybe shut? Do you recall if the family law clinic doors kind of thing? Do you know? I can rephrase it, if that makes sense.

**Student 3** (01:39:42):

Yeah, our door was open, Professor Stevens' door was open, but he wasn't in there when I was in clinic. And then Terri's door was, Professor Morgeson's door was open, Metz's door was open. I didn't see Sybil's door open. Their door's always closed in Sybil.

(01:40:03):

I think Professor McDonald's door was closed because I don't remember seeing him, but he might've been in there. I have no idea. And then Taks, I have no idea if Taks' door was open or closed.

Ms. Fisher (01:40:16):

And do you recall Professor Morgeson ever shutting the doors or going up and down? Okay. And so do you recall about when that was? Was that prior to you walking up and down the hall or after?

**Student 3** (01:40:34):

It was after I went down the hall, I think because our door was open because that we heard the noise. So our door was open and then she came in and we had a closed door conversation.

Ms. Fisher (01:40:45):

Right. And so, perfect. So when you guys were having that closed door conversation, you mentioned that you, Professor Morgeson, **Student 2**, were all kind of discussing how you're feeling uncomfortable. You yourself mentioned that it was kind of a lot, right? It's all over the news, this whole thing. Do you recall about how long that conversation was with the private conversation with you three?

**Student 3** (01:41:08):

Oh, my gosh, if I had to guess. I don't remember exactly. Maybe five minutes.

Ms. Fisher (01:41:17):

Okay. Yeah.

**Student 3** (01:41:17):

The three of us [inaudible 01:41:18].

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (01:41:17):

Doesn't need to be exact. Just trying to spitball it. And so then, would it be fair to say, you're kind of having this conversation, y'all are discussing your reactions to the news and what the videos that y'all are viewing online. And then at that time, Professor Morgeson expresses that she's uncomfortable as well, and "If we can't do this, we could all just go home." Is that kind of, am I understanding that correctly?

Allison Monticelli (01:41:45):

Terri came in and... Sorry Professor Morgeson came in and talked to us and then she left us and closed the door. And **Student 2** I think, and then **Student 2** and I were in there for a little bit longer. And then she had came back a little bit later maybe, I don't know. But I know **Student 2** and I were in there alone after.

**Student 3** (01:42:03):

... spirits, maybe? I don't know, but I know **Student 2** and I were in there alone after Professor Morgansen talked to us for a short amount of time, and then we were told we could go home.

PART 3 OF 6 ENDS [01:42:04]

Ms. Fisher (01:42:13):

Okay. Good deal. So, I'm not going to keep you forever, I promise. So jumping a little bit to your reluctance to be here today, trust me, I get it, but I just want to make it kind of clear for everybody's understanding. Have you and I... Have we ever shared other conversations not concerning Charlie Kirk in the clinic? Would you say that that would be out of the norm for us to have a discussion?

**Student 3** (01:42:34):

No. You stopped by family clinic and chat. I stopped by criminal clinic and visit people, and we chat. Yeah.

Ms. Fisher (01:42:39):

Then, just to jump back from... We were talking about a week after when you mentioned that **Student 10** and **Student 9** and I were outside the school discussing me being referred or the investigation, do you recall if we walked up to you or if you kind of walked up to us as you were walking in?

**Student 3** (01:43:02):

I went to say hi to **Student 10**, and you guys were deep in that conversation? Yeah.

Ms. Fisher (01:43:07):

Okay. Good deal, and so, assuming for sake of the argument, like I did make any alleged statements, were those statements in any way, did they obstruct you to meet with any clients or anything like that, or was it more so, the entirety of the day, the videos, et cetera, et cetera?

**Student 3** (01:43:31):

This transcript was exported on Mar 23, 2026 - view latest version here.

That day, I didn't have any clients coming in. I mean, I had work that I was supposed to be doing, but I didn't have any clients coming in.

Ms. Fisher (01:43:43):

Last kind of thing. Do you, in your opinion, because we're using like, professional/unprofessional, would you consider leaving office hours to be professional?

Student 3 (01:43:55):

Leaving office hours early?

Ms. Fisher (01:43:57):

Yeah.

Student 3 (01:43:58):

I would not leave office hours early unless I was directed to.

Ms. Fisher (01:44:01):

Okay, perfect.

Student 3 (01:44:02):

Or if I had permission to do so.

Ms. Fisher (01:44:05):

Oh, absolutely. So then would it be fair to say that you recognize that that would be kind of allowed, because you were told that you were able to do so either by, I'm going to assume Professor Morgansen, but I could be incorrect.

Student 3 (01:44:20):

So you're asking if it was okay that day that we got excused early?

Ms. Fisher (01:44:25):

Yeah.

Student 3 (01:44:25):

I'm trying to figure out...

Ms. Fisher (01:44:27):

Yeah, so what I'm kind of asking is to you, because first you're saying that you would never leave office hours, and I totally believe you on that one. You would never leave office hours without being given express consent to leave or whatever, and so then my follow-up to that is, do you yourself consider the act of leaving office hours early, that would be considered to be professional because you were given that kind of allowance by Professor Morgansen?

Student 3 (01:44:58):

This transcript was exported on Mar 23, 2026 - view latest version here.

That day, when I left office hours.

Ms. Fisher (01:44:59):

Yeah. Just that day.

**Student 3** (01:45:00):

I thought...

Ms. Fisher (01:45:00):

Okay.

**Student 3** (01:45:03):

Yeah, I thought she let us go.

Ms. Fisher (01:45:06):

Okay. Understood. Thank you so much for being here, **Student 3**. No further questions, Professor Stern.

Professor Spain (01:45:09):

Anything else? Anybody else? Yeah.

Speaker 7 (01:45:12):

I have a couple questions. Maybe it'll come to [inaudible 01:45:16]-

Ms. Fisher (01:45:16):

Can you speak up?

Speaker 7 (01:45:17):

Yes, sorry, I'll speak up.

(01:45:19):

Hi, **Student 3**. I had two questions. So my first question was, I know you said **Student 2** was the one that told you about the statements. Was this something that she... I guess happened way before? I'm just trying to understand the timeline. Or is this something that happened maybe like five minutes before or what did she express about the timeline of when that happened?

**Student 3** (01:45:45):

I think so I had gone out of evidence at three, and when I sat down in evidence at two was when I found out about the shooting. So I came into clinic at three, and she told me right when I got there, because I was like, "Did you hear what happened?". It was my first opportunity to talk about it, and I think it had happened right after the shooting maybe, and she didn't specify a time, but it felt like, oh yeah, when it happened, this also occurred in Joe's office.

Speaker 7 (01:46:22):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay, thank you, and my next question, talking about Professor Morgansen, did she direct you that you can go home, or was this... Could you kind of go re-explain the conversation that you had?

**Student 3** (01:46:39):

Yeah, I mean, we were all talking about how it was kind of uncomfortable, and the tensions were kind of high in the clinic office, because it is a small space. You can't really get away from anybody in there, and so she said, "If you feel like you can't get any work done, you can go home," and **Student 2** and I went home.

Speaker 7 (01:47:03):

Okay. So she didn't directly send you home or anything? This was, she offered it and then you took the offer, I guess?

**Student 3** (01:47:13):

Yeah. She didn't say like, "Get out of here". She was like, "If you want to go, it is totally fine, and you can go."

Speaker 7 (01:47:20):

Okay, thank you.

**Student 3** (01:47:22):

Yeah.

Professor Spain (01:47:28):

Nothing else? Okay. Thank you very much for appearing this morning.

**Student 3** (01:47:30):

Okay, thank you. I'll go ahead and let you exit the room.

(01:47:35):

Okay.

Ms. Fisher (01:47:39):

**Student 4**.

Professor Spain (01:47:39):

Yeah.

Ms. Fisher (01:47:44):

Okay.

(01:47:44):

Oh, sorry I didn't bring you another one.

Professor Spain (01:47:45):

This transcript was exported on Mar 23, 2026 - view latest version here.

No.

Ms. Fisher (01:47:46):

**Student 4** is next.

(01:47:54):

Hi **Student 4**, it's Dean Chapman. How are you, [inaudible 01:47:57]?

**Student 4** (01:47:58):

Good. How are you doing?

Ms. Fisher (01:47:59):

Good, good.

Professor Spain (01:48:01):

Good morning, thank you for appearing. I'm going to ask a couple of questions about the events that occurred on September 10th, 2025, and I know that you had spoken to Professor Keffer before. Let me start out by asking, at any time that day, did Ellie Fisher show you a video of the shooting of Charlie Kirk? Do you recall?

**Student 4** (01:48:33):

Like I said to Keffer, after I came in from evidence, I think it had just broken. She had showed me, but I think it was just to let me know what had happened. So I was kind of in disbelief whenever she said it initially.

Professor Spain (01:48:47):

This occurred in the Criminal Defense Clinic conference room, is that right?

**Student 4** (01:48:54):

Yes, sir.

Professor Spain (01:48:54):

All of you were meeting in there?

**Student 4** (01:48:57):

Yes sir.

Professor Spain (01:48:58):

So do you recall who else was in the room at the time?

**Student 4** (01:49:02):

Like I said to Keffer, I just remember **Student 5** and **Student 11**. I mean, I think there was a few other people, but those were the immediate ones right next to me. So that's all I can remember off the top of my head.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (01:49:12):

Okay, and how would you describe Ellie Fisher's demeanor that day?

**Student 4** (01:49:22):

I mean, like I said, when we talked, I think it was a little disrespectful, but I don't think it was celebratory at all or anything like that, but yeah.

Professor Spain (01:49:31):

When you say disrespectful, what do you mean by that?

**Student 4** (01:49:37):

Just because she had said he was a racist. I thought that was a crude thing to say at that moment.

Professor Spain (01:49:44):

Okay, and did she make any other statements that you found disrespectful or offensive in any way?

**Student 4** (01:49:55):

Not that I remember now.

Professor Spain (01:49:56):

Not that you recall? Okay.

**Student 4** (01:49:57):

Not that I recall now.

Professor Spain (01:49:57):

Okay.

Dean Chapman (01:50:02):

Hi. Yeah, I just have a couple of questions. I just want to just move a little bit backwards from when you said she showed you the video, can you just talk about... Were you already in the room when she came in? Can you just kind of talk about the beginning of that interaction as you remember it?

**Student 4** (01:50:20):

I think they were already talking about it, because it had just happened, like I said, and I was coming out of evidence, and I came in and she was like, "Did you hear Charlie Kirk got shot?", and I was like, "No, that's not what happened," and she said, "No, it did, and then she showed me," because I really wasn't believing it initially.

Dean Chapman (01:50:37):

Okay, and at any time, did you say, "I don't want to see that video," or was it all just part of just the conversation of overcoming your disbelief?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 4** (01:50:51):

I think it was just part of the conversation.

Dean Chapman (01:50:52):

Okay. Did you hear Ms. Fisher in any conversations in Professor Metz's office with any other students one-on-one? Okay.

**Student 4** (01:51:00):

No.

Dean Chapman (01:51:00):

So this interaction that you had that you just described was the only one that you had with Ms. Fisher about this situation?

**Student 4** (01:51:10):

Yes ma'am.

Dean Chapman (01:51:10):

Okay. Did she say anything else? You said they said that he was a racist. Did she say anything else specifically that you recall about Mr. Kirk?

**Student 4** (01:51:21):

Not that I recall right now.

Dean Chapman (01:51:22):

And who all was, I know you said... Can you just... Who all was in the room during this part of the conversation?

**Student 4** (01:51:30):

Like I was saying, I can only remember **Student 5** and **Student 11**, because they were sitting next to me when it happened, but I think it was a few other people. I just don't remember exactly who it was.

Dean Chapman (01:51:39):

Do you remember anyone else that was in that room discussing the event itself?

**Student 4** (01:51:46):

I mean, I think we were all talking about it when I came in because it just happened. So we were all just trying to figure out, I guess, what happened.

Dean Chapman (01:51:54):

Do you remember anyone else in the room saying anything positive or negative about Mr. Kirk?

**Student 4** (01:52:01):

This transcript was exported on Mar 23, 2026 - view latest version here.

I remember somebody saying that he probably was going to hell because I had said something about my Christian beliefs to them, but I don't remember who it was exactly who said that. Okay. I know it wasn't Ellie Fisher, it wasn't Ellie who said that one. It was someone else, but I don't recall who exactly it was.

Dean Chapman (01:52:21):
Okay. I think that's all I have.

Professor Spain (01:52:22):
Okay. Yeah.

Speaker 7 (01:52:28):
I had a question. Hi. So I know you said that what she said was disrespectful in the sense that she said he was racist. What was the tone? Or was it like the volume was... Did she say it really loud, or what was kind of the tone of it?

**Student 4** (01:52:47):
I don't think she was saying it real loud. I think we were mainly just talking about his political stances.

Speaker 7 (01:52:54):
Okay.

(01:52:54):
So I guess when I say the volume, was it something that others could have heard throughout the clinic, or just maybe in the office?

**Student 4** (01:53:02):
I don't think others could have heard that throughout the clinic. I think we had the clinic door closed at that time, but I'm not sure.

Professor Spain (01:53:05):
Anything else?

Ms. Fisher (01:53:18):
Hi **Student 4**, or **Student 4**. I'm going to keep it really quick. I know. Thank you so much for being here today. So just to make it really concise for everybody, do you recall there being other students in the clinic room at that time discussing Charlie Kirk?

**Student 4** (01:53:35):
I think, like I said, we were all discussing it, because it was a pretty big thing that had happened that day.

Ms. Fisher (01:53:39):
Right, and so in Professor Keffer's report, it states that I used quote-unquote choice words in describing Charlie Kirk. Do you mean that I used the term racist by those choice words?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 4** (01:53:51):

Yeah.

**Ms. Fisher** (01:53:54):

Do you think that it is a common viewpoint among students in the clinical office that Charlie Kirk is a " racist"?

**Student 4** (01:54:01):

I mean other, people were saying it afterwards. A few others in the defense clinic when we talked about later.

**Ms. Fisher** (01:54:08):

To your knowledge, have any of those students who made this similar comment that Charlie Kirk is a "racist", have they been investigated or have any disciplinary sanctions?

**Student 4** (01:54:18):

No, not to my knowledge.

**Ms. Fisher** (01:54:20):

Based on our brief conversations that day, and I know we interact all the other time, but on September 10th, 2025, would you say that I acted unprofessionally?

**Student 4** (01:54:31):

I wouldn't say unprofessionally. Like I said, I would say maybe just a little disrespectful just because of the racist thing, but other than that, I mean, we were all trying to process, I guess, what happened.

**Ms. Fisher** (01:54:45):

So based off of that conversation, were you in any way unable to perform your clinical duties, meet with clients, go to court, read cases, et cetera.

**Student 4** (01:54:58):

No.

**Ms. Fisher** (01:54:58):

Okay, and so to your knowledge, am I the only student who was brought before this counsel regarding your discussion of Mr. Kirk on September 10th?

**Student 4** (01:55:07):

Yes.

**Ms. Fisher** (01:55:09):

To the best of your knowledge, again, are you aware of anyone being investigated or being brought before this counsel for making the comment that Charlie Kirk's "going to hell" on September 10th, 2025?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 4** (01:55:22):

No.

Ms. Fisher (01:55:23):

**Student 4**, is it fair to say that we both know that you and I have different political viewpoints?

**Student 4** (01:55:30):

Yes.

Ms. Fisher (01:55:31):

But has that ever gotten in the way of us acting professionally any of our duties together as clinic students or even us interacting as students at tech law?

**Student 4** (01:55:40):

No.

Ms. Fisher (01:55:42):

No further questions, Chair [inaudible 01:55:44]. Thank you so much, **Student 4**.

Speaker 7 (01:55:45):

I have one more question.

(01:55:46):

Hi. I have one more question. So I know in the report, it said that based on the discussion about Kirk that day, it seems that Ellie knew who he was. Could you kind of elaborate on what you kind of meant with that exactly?

**Student 4** (01:56:05):

Just because we were talking about his viewpoints on things, I assume she knew who he was, because we were talking about the different stances we had on his issues.

Speaker 7 (01:56:14):

Okay. Thank you.

Professor Spain (01:56:17):

Thank you very much for appearing today.

Ms. Fisher (01:56:20):

Okay, thank you, **Student 4**. Thank you. I'll let you go ahead and exit the room.

**Student 4** (01:56:25):

All right, thank you all.

Professor Spain (01:56:30):

This transcript was exported on Mar 23, 2026 - view latest version here.

Yeah, I don't see **Student 6** or Ken.

Ms. Fisher (01:56:33):
No, **Student 6**'s there. I don't think Ken... I'm going to message Ken.

Professor Spain (01:56:36):
Do you want to have Frank maybe text him?

Ms. Fisher (01:56:42):
Yeah, let me go see.

Professor Spain (01:56:42):
Just the numbers.

Ms. Fisher (01:56:42):
Okay, perfect. Yeah. Thank you.

Professor Spain (01:56:42):
Very aggressive.

Speaker 7 (01:56:42):
Thank you, Dean Chapman.

Professor Spain (01:56:42):
Thanks so much.

Ms. Fisher (01:56:42):
You're welcome.

Speaker 7 (01:58:13):
You can bill me for all of the waters that I drink.

Ms. Fisher (01:58:17):
Oh yeah.

Speaker 7 (01:58:17):
I'll add it to my tuition. Sorry about that.

Ms. Fisher (01:58:19):
You're fine. You have, you're fine. Don't worry about that. Please know we're still recording.
(01:58:43):
Hello? Hello?

This transcript was exported on Mar 23, 2026 - view latest version here.

(01:58:44):

Okay, does anybody else need a water? Okay.

Professor Spain (01:59:16):

[inaudible 01:59:14] video [inaudible 01:59:17].

Speaker 7 (01:59:16):

Way too much of it picks up the sound in here.

Ms. Fisher (01:59:20):

It's cool, isn't it? Yeah. I came yesterday afternoon just to make sure and test it all.

Professor Spain (01:59:26):

I think you've got to give them little nice little attractive hats.

Ms. Fisher (01:59:27):

Yes, right?

Professor Spain (01:59:33):

Or a mask. Isn't the mascot here like the...

Speaker 7 (01:59:35):

Masked Rider.

Ms. Fisher (01:59:36):

The Masked...

Professor Spain (01:59:36):

The Lone Ranger, sort of?

Ms. Fisher (01:59:38):

Yeah... Masked Rider.

Professor Spain (01:59:40):

I think they deserve real masks.

Ms. Fisher (01:59:44):

Yeah. Yeah. Those are always fun.

Speaker 7 (01:59:45):

[inaudible 02:00:06]

(01:59:45):

This transcript was exported on Mar 23, 2026 - view latest version here.

[inaudible 02:00:17].

Professor Spain (01:59:45):
[inaudible 02:00:26].

Speaker 7 (02:00:33):
Such a shame it's cold today. I should've prepared for yesterday [inaudible 02:00:40].

Ms. Fisher (02:00:39):
When did you get in?

Professor Spain (02:00:41):
Last night.

Ms. Fisher (02:00:43):
Okay. I was thinking the same thing today.

Professor Spain (02:00:45):
It's not easy to get to Loch.

Ms. Fisher (02:00:47):
Yeah. Where did you fly in from?

Professor Spain (02:00:48):
Well, I came from Connecticut, but that means I had to go Providence, which is one regional area to another regional area.

Ms. Fisher (02:00:57):
Yeah.

Professor Spain (02:01:01):
But it is what it is.

Ms. Fisher (02:01:08):
Yeah.
(02:01:08):
Okay. **Student 5**?

**Student 5** (02:01:08):
Yeah.

Ms. Fisher (02:01:14):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

(02:01:14):

There's Ken.

(02:01:21):

Hi **Student 5**. Hi Michal. You there? This is Dean Chapman.

**Student 5** (02:01:29):

Yes. Sorry, excuse me.

Ms. Fisher (02:01:36):

Thank you.

Professor Spain (02:01:36):

Thank you for appearing today, **Student 5**. We're going to ask you a few questions about the events that occurred on September 10th, 2025, the day that Charlie Kirk was shot. Do you recall the events that occurred that day, particularly related to discussions that were being had in the Criminal Defense Clinic conference room?

**Student 5** (02:02:05):

I do recall.

Professor Spain (02:02:06):

Okay. Can you briefly explain, I guess, what was going on that day?

**Student 5** (02:02:12):

Yep. I walked into the clinic room. There was, I don't know, discussions going around, walked in, Ms. Fisher was on her phone looking at something. I asked what was going on. I had just found out that Charlie Kirk had been shot, and then she showed me the video of that. I sat down, I was waiting for my fiance to pick me up. We only have one vehicle at the moment.

Professor Spain (02:02:54):

Do you recall who else was in the conference room that day when you entered the room?

**Student 5** (02:03:02):

It was Ms. Fisher, **Student 4**, I believe **Student 9**, if I'm pronouncing that correctly. Another female, I forget her name. **Student 16**, something along those lines, and **Student 12**, I believe.

Professor Spain (02:03:41):

Okay. What was Ellie Fisher's mood that day when you entered the room?

**Student 5** (02:03:45):

I'm sorry?

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (02:03:46):

What was her mood that day when you entered the room?

**Student 5** (02:03:52):

She seemed in an excited state, happy even.

Professor Spain (02:04:02):

Okay.

**Student 5** (02:04:03):

Or joking wrong, something along that.

Professor Spain (02:04:06):

Did she make any kind of statement that Charlie Kirk got what he deserved? Do you recall that statement being made?

**Student 5** (02:04:17):

I recall something along those lines.

Professor Spain (02:04:22):

Something along those lines. Okay. Did you believe that that statement was appropriate to make in that kind of a setting?

**Student 5** (02:04:31):

I don't. My personal opinion is that I don't think it was appropriate considering the circumstances of what was happening to him.

Professor Spain (02:04:49):

Did it bother you that that statement was made?

**Student 5** (02:04:52):

It did, yeah.

Professor Spain (02:04:52):

Was it upsetting to you?

**Student 5** (02:05:00):

Yeah, it was quite shocking.

Professor Spain (02:05:01):

Okay. Anything else that you can recall about that day that you think may be relevant?

**Student 5** (02:05:21):

Defs.' Appx. 189

This transcript was exported on Mar 23, 2026 - view latest version here.

No, just really quite shocking that, obviously, what happened to him and people's attitude towards somebody dying at that moment, but that's all my personal opinion.

Professor Spain (02:05:45):

Okay, thank you.

Dean Chapman (02:05:47):

Yes. I just have a couple of questions for you. Going back to Mr. [inaudible 02:05:52] showing folks the video, did you feel like she was showing it... What's the word? Sort of without people wanting to see it? Was that upsetting for you or anyone else in the room? Not the video itself, which I think most people would find upsetting, but the actual... Her either volunteering to show it. Was there consent in that conversation?

**Student 5** (02:06:24):

I can't speak for anybody else. I know I asked what was going on, and she was on her phone in an excited state, so I asked what was going on, and so for myself, I suppose there was consent.

Dean Chapman (02:06:44):

Okay, and then in terms of the conversation in the room, and I know it was a while ago, and there are a lot of people in the room, but do you recall anyone else saying anything negative or positive about Charlie Kirk?

**Student 5** (02:07:04):

Only bits and pieces, just mentioning, I guess, some of his political points, like something along the lines of... There are... No matter what, for the Second Amendment to continue, people are going to get shot, and then discussion of irony or things of that nature.

Dean Chapman (02:07:35):

Do you remember that specifically? Was that Ms. Fisher saying that, or others, or you don't recall?

**Student 5** (02:07:40):

I don't recall.

Dean Chapman (02:07:44):

Did you hear Ms. Fisher reference Mr. Kirk as a racist, or did anyone else use that term in the room?

**Student 5** (02:07:54):

I don't recall that specifically.

Dean Chapman (02:07:57):

Okay. I think that's it for me.

Ms. Fisher (02:08:05):

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 5**, you indicated that Ms. Fisher was in an excited state and happy. Do you describe it as celebratory related to Charlie Kirk's death?

**Student 5** (02:08:26):

It could be described as that. Yeah, it could be that. Yeah.

Professor Spain (02:08:33):

Okay. Any other questions?

(02:08:33):

Nothing. Ellie.

Ms. Fisher (02:08:55):

Hi, **Student 5**, I really appreciate you being here today. It's going to switch over to me in a sec. I'm going to try to keep this brief so you can go back to class or whatever else you have going on on Fridays. So you stated that you walked into the clinic space and you had just learned about Mr. Kirk being shot. Do you recall other students also engaging in discussing the topic of Charlie Kirk?

**Student 5** (02:09:20):

Yes.

Ms. Fisher (02:09:21):

Are you aware of any other students who have been brought before the Honor Council other than myself?

**Student 5** (02:09:27):

None to my knowledge.

Ms. Fisher (02:09:29):

So you described my reaction as happy and excited, but is it fair to say that was your perception and not something that I announced, "I am excited"?

**Student 5** (02:09:44):

Correct. My perception of it.

Ms. Fisher (02:09:48):

So we're chatting about my mood and how I was for the council and maybe people who don't interact with me often. Can you describe what my mood is generally? Would you describe me as a generally animated person? I'm reserved, quiet, etc.

**Student 5** (02:10:06):

Yeah, animated, outspoken, pretty upbeat.

Ms. Fisher (02:10:13):

This transcript was exported on Mar 23, 2026 - view latest version here.

So would you agree that it's possible that other people who are present with us in the clinic suites may have perceived my reaction differently, similarly to how people could perceive the news differently?

**Student 5** (02:10:27):

Sure, yeah.

Ms. Fisher (02:10:29):

Moving along. Did I threaten you, instruct you or do anything to prevent you from leaving the room or doing any of your work in the space that day?

**Student 5** (02:10:39):

No.

Ms. Fisher (02:10:41):

Do you feel... Actually, I'm going to ask this in a different way, right? So you mentioned that you were there with **Student 4**... or not **Student 11**, I believe you said **Student 12**. Do you recall kind of the content of their discussion? Were they also engaging in talking about Charlie Kirk?

**Student 5** (02:11:06):

I think they joined him in the conversation.

Ms. Fisher (02:11:10):

Okay, and this is just kind of like your subjective feelings. Do you feel as if law students at Texas Tech School of Law should have a right not to feel upset about certain viewpoints and other viewpoints?

**Student 5** (02:11:26):

Sorry, the connection broke out. Can you...

Ms. Fisher (02:11:27):

You're good. Yeah, I'll repeat it. Again, it's just subjective. So how you feel. Do you believe that law students at Texas Tech Law have a right to not feel upset by others' viewpoints and opposing viewpoints and things like that?

**Student 5** (02:11:48):

I mean, I think that they can... Any student can feel how they want to feel.

Ms. Fisher (02:11:55):

Okay, and then I'm just going to chitchat a little bit about just kind of our time in clinic. **Student 5**, would it be fair to say that topics, sometimes even sensitive topics, are regularly discussed in the clinic as well as the clinic suite?

**Student 5** (02:12:18):

Sensitive topics? I mean, pertaining to the nature of some of our cases, some of those can be sensitive topics, so yes.

**Defs.' Appx. 192**

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (02:12:29):

Okay, perfect, and then just kind of jumping to the end, assuming whatever I'm alleged of, this statement of... Whatever my statement is and whatever my actions or however they were interpreted, to your knowledge, is reacting publicly to publicly reported news, even with words that may be upsetting, is that generally falling under the protections of the First Amendment?

**Student 5** (02:13:02):

Yeah.

Ms. Fisher (02:13:03):

No further questions. I really appreciate your time, **Student 5**.

Professor Spain (02:13:06):

Anything else?

Speaker 7 (02:13:09):

Hi, I had a question. I know in the report it said had you said something, it would've caused you stress. In that moment, when all this was going on, did you feel... Was it the environment itself or were you just more reluctant to say something, or did you feel that if you did say something... I know you said there could have been a fight, but was it the environment itself, or could you just kind of elaborate on what the environment was?

**Student 5** (02:13:40):

Right, and as you know, politics at the moment are quite polarized. I may not think in ways that other students think when I'm not outspoken as to my political beliefs as others are. I wanted to leave politics out of it and if I would've said anything, I was concerned of their perception of me or what they would think my political beliefs are, and obviously, the murder of Charlie Kirk was a hot topic and could have led to further verbal discussions and disagreements, but I just wanted to work with that, since we're all in the same clinic room for the remainder of the year.

Speaker 7 (02:14:43):

Okay. So I guess it wasn't... Just clarifying, it was that's more of a general statement about all kind of political talk, or was it just the specific conversation that you didn't feel comfortable saying something in?

**Student 5** (02:15:00):

At the moment, that specific topic, but I also looked at it generally. I don't really bring up politics for that reason as well.

Speaker 7 (02:15:14):

Okay. Thank you.

Dean Chapman (02:15:15):

Can I just clarify...

This transcript was exported on Mar 23, 2026 - view latest version here.

(02:15:18):

On your previous statement about feeling uncomfortable in that politically charged room, was that specific to Ms. Fisher and how you perceived sort of her mood, or was that just everybody talking about it and feeling like there were maybe people on both sides, and you just really didn't want to weigh in and create more friction in the room?

**Student 5** (02:15:46):

I guess more generally for the entire room, it seems they were leaning one way politically. I, myself or a few others in the minority were leaning a different way.

PART 4 OF 6 ENDS [02:16:04]

**Student 5** (02:16:04):

In the minority, we're leaning a different way.

Heidi (02:16:05):

Okay.

**Student 5** (02:16:05):

If that makes sense.

Heidi (02:16:06):

Yeah, it does. Thank you so much.

Professor Spain (02:16:10):

Thank you very much for appearing today.

**Student 5** (02:16:14):

Not a problem.

Dean Chapman (02:16:16):

Thank you. **Student 5**, I'll go ahead and let you exit the room meanwhile, thank you.

Professor Spain (02:16:20):

We've got another hour.

**Student 5** (02:16:20):

Okay. Thank you.

Speaker 8 (02:16:22):

Can I request another-

Professor Spain (02:16:22):

This transcript was exported on Mar 23, 2026 - view latest version here.

Can we have a-

Speaker 8 (02:16:23):

... short bathroom break?

Dean Chapman (02:16:26):

Yes, absolutely.

Speaker 8 (02:16:26):

Okay, thank you.

Dean Chapman (02:16:26):

Yes, yes, yes.

Speaker 8 (02:16:26):

I'm sorry.

Dean Chapman (02:16:27):

Yep, no, no, no, I actually am going to do that as well.

Professor Spain (02:16:29):

We have two-

Speaker 8 (02:16:30):

[inaudible 02:16:30] I won't drink anymore.

Professor Spain (02:16:30):

... witnesses left, am I wrong?

Dean Chapman (02:16:32):

Two. Yes, sir. Yes. For the record, we're taking another break.

Professor Spain (02:16:35):

[inaudible 02:16:37].

Heidi (02:16:47):

So Ken and **Student 6** are the [inaudible 02:16:48]?

Professor Spain (02:16:47):

What's that?

Heidi (02:16:47):

We have Ken left.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (02:16:47):

Ken, and **Student 6**-

Heidi (02:16:47):

And **Student 6**-

Professor Spain (02:16:47):

Yeah.

Heidi (02:16:47):

... and then we have an opportunity to question.

Professor Spain (02:16:47):

Yeah. Yeah, might have.

Heidi (02:16:47):

Yeah, got it.

Speaker 10 (02:16:47):

Hey Larry?

Heidi (02:16:47):

Got it.

Speaker 10 (02:16:47):

If you all are waiting on me to come back over there, you do not have to wait on me.

Professor Spain (02:16:47):

Okay.

Speaker 10 (02:16:47):

I may have to step out-

Professor Spain (02:16:47):

That's fine.

Speaker 10 (02:16:47):

... at various times-

Professor Spain (02:16:47):

Okay. Okay.

Speaker 10 (02:16:59):

Defs.' Appx. 196

This transcript was exported on Mar 23, 2026 - view latest version here.

... and you do not have to wait on me.

Professor Spain (02:17:00):
Okay. Okay.

Speaker 10 (02:17:00):
So I apologize-

Heidi (02:17:00):
My-

Speaker 10 (02:17:07):
... for that. I've been depending on... We're waiting down. Because depending on what kind of [inaudible 02:17:10] I had to step out, see what's going on.

Professor Spain (02:17:13):
Right.

Heidi (02:17:14):
You have other things to do, that's shocking. The world continued?

Professor Spain (02:17:18):
It does, unfortunately.

Heidi (02:17:19):
I know it. I had a student first year in my office the other day, stressed. I was talking about law school and they said, "I know, it's not just the pressure and the whatever, it's this other stuff in life that's happening." And I go, "You think that's not true for your faculty?"

Professor Spain (02:17:38):
Right.

Heidi (02:17:38):
The difference is you don't know because we compartmentalize like crazy.

Professor Spain (02:17:44):
Right.

Heidi (02:17:44):
Welcome to the rest of your life.

Professor Spain (02:17:46):
And it's all getting faster and faster.

This transcript was exported on Mar 23, 2026 - view latest version here.

Heidi (02:17:48):

I know. Every day.

Professor Spain (02:17:49):

I feel so sorry for the next generation of lawyers because AI-

Speaker 10 (02:18:03):

AI.

Professor Spain (02:18:03):

... is not going to be helpful.

Speaker 10 (02:18:04):

Right.

Professor Spain (02:18:07):

And right now, attorneys struggle with that work-life balance.

Speaker 10 (02:18:15):

Right.

Professor Spain (02:18:15):

And I don't think AI is going to help with that. I think it's going to make it worse.

Speaker 10 (02:18:15):

Right.

Professor Spain (02:18:16):

So, it's going to be-

Speaker 11 (02:18:16):

We use AI sometimes and, oh, I use AI sometimes when I'm like, is my email too aggressive or is it too nice? How can I make this? I have-

Speaker 10 (02:18:29):

A lot of students using chat GPT that way.

Speaker 11 (02:18:34):

Yes.

Speaker 10 (02:18:34):

And it's gotten to where I can actually recognize it.

Defs.' Appx. 198

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 11 (02:18:36):

Yes. And the em dashes-

Speaker 10 (02:18:37):

[inaudible 02:18:39].

Speaker 11 (02:18:38):

... that's always my first giveaways when I see a bunch of the em dashes all throughout, I'm like, "This was written by ChatGPT."

Speaker 10 (02:18:48):

Yeah, once you get used to it, you can start to spot it.

Speaker 11 (02:18:49):

Mm-hmm.

Speaker 10 (02:18:51):

But yeah, I've noticed that in a lot of interactions, probably the last three months or so. It seems like everybody's running, what they're going to say, they're running it through ChatGPT to change the tone.

Speaker 11 (02:19:03):

Yes.

Professor Spain (02:19:03):

Yes. But-

Speaker 11 (02:19:03):

I'm glad you asked him already.

Dean Chapman (02:19:03):

Yes.

Speaker 11 (02:19:03):

I was like, "Huh-"

Dean Chapman (02:19:03):

"Hi, Tony, [inaudible 02:19:04]-"

Speaker 11 (02:19:03):

... I was coming down, I was like, "I think I'm going to head to that soup-

Dean Chapman (02:19:04):

Yeah.

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 11 (02:19:14):

... myself real quick."

Dean Chapman (02:19:15):

Yeah. No, no, no. Take your time.

Speaker 10 (02:19:15):

So, when you stepped out, Sofia told Larry that, "Y'all do not have to wait on me." They have to step out.

Speaker 8 (02:19:15):

Okay.

Speaker 10 (02:19:15):

Come back.

Speaker 8 (02:19:27):

Yep. Tell us then. Yep.

Speaker 10 (02:19:39):

You all just keep on [inaudible 02:19:39].

Speaker 8 (02:19:39):

Yes, sir.

Speaker 10 (02:19:39):

[inaudible 02:19:39].

Speaker 8 (02:19:39):

I know.

Dean Chapman (02:19:39):

There's like a vent right outside the bathroom.

Speaker 8 (02:19:39):

Yeah.

Dean Chapman (02:19:39):

It's like a-

Speaker 8 (02:19:39):

I should have brought my head warmers.

Dean Chapman (02:19:39):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay. Arctic blast. Blanket time. Okay.

Heidi (02:19:40):

Are we all back?

Professor Spain (02:19:50):

Yep.

Heidi (02:19:50):

Yep. All right. Next is **Student 6**.

Professor Spain (02:19:52):

Right.

Speaker 10 (02:19:52):

Mmkay. Yeah, oh, Professor, you're going to have to move [inaudible 02:19:56].

Heidi (02:19:52):

We can some, good to do, right.

Dean Chapman (02:20:01):

Hi, **Student 6**. Oh, let's see. Hi **Student 6**, it's Dean Chapman. Okay. Hi Miha. I think you're on mute. There we go.

**Student 6** (02:20:14):

Sorry, I didn't see her.

Dean Chapman (02:20:14):

No worries.

Professor Spain (02:20:19):

Thank you very much for appearing today. I've just got a few questions and then we'll let others ask questions of you as well.

Dean Chapman (02:20:27):

And I-

Professor Spain (02:20:29):

I'm going to be referring to the events that occurred on the day that Charlie Kirk was shot. And I understand that you were in Professor Metz's office that morning and-

**Student 6** (02:20:44):

Yes.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (02:20:44):

... some discussion about Charlie Kirk's death. Is that right?

**Student 6** (02:20:50):

Yes.

Professor Spain (02:20:51):

Can you relate as best you can, the substance of the conversation that day in his office?

**Student 6** (02:21:02):

So basically me, **Student 7**, and Ellie were in there to talk to Professor Metz about some of our clinic stuff. And then one of the professors, Terry Morgan, she came in and said, "He died" or something like that.

(02:21:19):

And we were like, "Who died?" And then someone said, "Charlie Kirk." And we're like, "Who is that?" And then Professor Metz was like, "Do you want to see this video?" Or like, "Here's the video of him getting shot." And then that was it, basically. We were like, "Who is he?" And that was it.

Professor Spain (02:21:45):

So, are you saying that it was Professor Morgensen that first informed the people in his office as to the-

**Student 6** (02:21:53):

Yes.

Professor Spain (02:21:53):

... shooting of Charlie Kirk?

**Student 6** (02:21:56):

Yes. She said he died. She didn't say who? I don't know if it was her or somebody else who said who, but she definitely came in and said he died.

Professor Spain (02:22:08):

So there hadn't been any discussion about Charlie Kirk prior to her entering the room?

**Student 6** (02:22:17):

No. Talking about our... I think me and **Student 7** came in to talk about our PNC that we just had, and then Ellie came in and sat on the couch and was waiting to ask them him a question about something. And then Terry came in and was like, "He died."

Professor Spain (02:22:38):

Okay. Do you recall any specific statements that Ellie Fisher may have made while in the office that morning or that afternoon?

20250614011 (Completed  02/24/26)
Transcript by Rev.com

**Defs.' Appx. 202**

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 6** (02:22:52):

Mm-hmm. Yeah.

Professor Spain (02:22:52):

So you-

**Student 6** (02:22:52):

It was a really long time ago.

Professor Spain (02:22:52):

Right. Right.

**Student 6** (02:22:52):

I can't really remember it exactly, but no.

Professor Spain (02:22:55):

Okay. And she was not celebrating his death in any way?

**Student 6** (02:23:06):

Not when I was in the office, no.

Professor Spain (02:23:09):

Nothing that she said or indicated that would indicate that, is that right?

**Student 6** (02:23:17):

No, it was more like we all were just like, "Who's that?" And then we got explained, and then the video was shown to us, and then that was basically it.

Professor Spain (02:23:31):

And you don't recall her... When I say "her," Ellie Fisher indicating in any way that Charlie Kurt got what he deserved. Do you recall that statement-

**Student 6** (02:23:42):

No.

Professor Spain (02:23:42):

... being made at all? Okay.

**Student 6** (02:23:46):

Hm-mm.

Professor Spain (02:23:46):

Okay. [inaudible 02:23:49].

This transcript was exported on Mar 23, 2026 - view latest version here.

Heidi (02:23:51):

Yeah, sorry. I can't write and talk at the same time. So I know it was a long time ago, so just let us know what you do remember. Do you remember either before, I guess not before, but after Professor Morgensen came in viewing the video either as a group or individually while y'all were together in the office?

**Student 6** (02:24:13):

Terry didn't watch the video with us. She came in, said, "He died," and then left. And then Professor Metz went and showed us the video. I don't know if it was like two of us that saw it or all three of us. I can't really remember. But-

Heidi (02:24:27):

Okay.

**Student 6** (02:24:28):

... he went and showed us after she left.

Heidi (02:24:31):

Okay. And you don't remember, do you remember any from anyone in the office, any laughter or profanities being used against Mr. Kirk? Name calling-

**Student 6** (02:24:45):

Not when I was in the office or anything. I can't really remember specific details.

Heidi (02:24:53):

Okay, that's fine.

**Student 6** (02:24:54):

But I don't remember. Yeah. Okay.

Heidi (02:24:54):

Yeah, that's good. Thank you.

**Student 6** (02:24:55):

Mm-hmm.

Professor Spain (02:24:55):

Others' questions?

Speaker 11 (02:25:04):

I have a question. Sorry, I may have missed it when you first said it, but what was the order of going into Professor Metz's office? Was Ellie already in there when you got in there or what, I guess, could you explain that?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 6** (02:25:18):

I think me and **Student 7** came back from our PNCs, went into his office, and then I think Ellie came in and then sat down on the couch.

Speaker 11 (02:25:35):

Thank you.

Professor Spain (02:25:37):

Did you all leave the office at the same time or did you leave before?

**Student 6** (02:25:42):

I don't think so, because I needed to talk about my PNC, so I stayed and went and asked questions about my PNC.

Professor Spain (02:25:50):

Okay. Helen?

Helen (02:25:53):

Hi **Student 6**, thank you so much for being here today. I'm going to ask you just some brief questions just so that I can keep it quick. So just to confirm, you were present there with me, **Student 7**, and Professor Metz in his office on September 10th, 2025?

**Student 6** (02:26:07):

Yes.

Helen (02:26:08):

And you learned about the news regarding Charlie Kirk in his passing from Professor Morgensen who popped her head in?

**Student 6** (02:26:17):

Yes.

Helen (02:26:18):

Do you recall Professor Morgensen making any statements to the effect of making it known that she was upset, offended, wanted any conversation to continue or making any actions like shutting the door?

**Student 6** (02:26:31):

No, I can't remember.

Helen (02:26:33):

And I know it was super long time ago, but even to the best of your memory, did you ever hear me use the word "motherfucker" when discussing Charlie Kirk?

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 6** (02:26:45):

No.

Helen (02:26:46):

And did you ever hear me say, "Charlie Kirk got what he deserved"?

**Student 6** (02:26:50):

No.

Helen (02:26:51):

And when you first saw the video of the assassination, was that in Professor Metz's office?

**Student 6** (02:26:58):

Yes.

Helen (02:26:59):

And do you recall who showed you the video?

**Student 6** (02:27:02):

Yes. Professor Metz.

Helen (02:27:04):

Did you ever witness me celebrating the death of Charlie Kirk?

**Student 6** (02:27:08):

No.

Helen (02:27:09):

Would you say that you and I are social friends and we spend a lot of time together?

**Student 6** (02:27:16):

Yes.

Helen (02:27:17):

And so would it not be unusual for you and I to be laughing together?

**Student 6** (02:27:23):

Yeah, that wouldn't be unusual.

Helen (02:27:25):

And is your testimony today consistent with the statement you gave to Professor William Keffer on October 22nd, 2025?

Defs.' Appx. 206

This transcript was exported on Mar 23, 2026 - view latest version here.

**Student 6** (02:27:33):

Yes.

Helen (02:27:34):

To your knowledge, would you have any reasoning as to why your statements wouldn't be included in the final investigative report delivered by Professor Keffer?

**Student 6** (02:27:44):

No.

Helen (02:27:44):

Do you recall Professor Keffer asking you if I used the terms "mother fucker" and said, "He got what he deserved" in Professor Metz's office?

**Student 6** (02:27:53):

I do remember him saying something about you saying "mother fucker," but that's-

Helen (02:27:59):

And to wrap it up, based on your observations that day and obviously your understanding of the honor code, did you witness me engaging in any conduct that you would consider unprofessional or a violation of our honor code?

**Student 6** (02:28:09):

No.

Helen (02:28:12):

No further questions, Chair. Thank you-

Professor Spain (02:28:13):

Thank you, **Student 6**.

Helen (02:28:13):

Oh.

Professor Spain (02:28:14):

Just because you're [inaudible 02:28:17]-

Helen (02:28:18):

Oh, can I say one more thing?

Professor Spain (02:28:19):

Sure.

This transcript was exported on Mar 23, 2026 - view latest version here.

Helen (02:28:19):

Just because we're friends also, I want to ensure just for the council's awareness as well that you are forthcoming in this process. And just because of our social, you weren't prompted to make any testimony today and you wouldn't lie to this counsel on my behalf or anything like that?

**Student 6** (02:28:32):

No.

Helen (02:28:35):

Thank you.

Dean Chapman (02:28:35):

Okay. Final question.

Professor Spain (02:28:38):

Anything else anybody has? Yeah.

Speaker 11 (02:28:40):

Sorry, I have too many questions. Hi, I have two questions. So, my first question is, were you in Professor Metz's office the entire time Ellie would've been in the office or would there have been any times that you weren't or vice versa?

**Student 6** (02:28:57):

I think so. I'm not sure who left first. Because it was just, I don't know, it wasn't that significant for me to remember all the details, but I know we all left at different times, so I don't know if she left before me or I left after her.

Dean Chapman (02:29:15):

Okay. Thank you.

**Student 6** (02:29:18):

And then-

Professor Spain (02:29:19):

Right, thank you for her-

Dean Chapman (02:29:20):

Oh, she has some more, she might have some more.

Professor Spain (02:29:20):

Oh, okay.

**Student 6** (02:29:40):

**Defs.' Appx. 208**

This transcript was exported on Mar 23, 2026 - view latest version here.

Sorry, I'm trying to remember. Okay.

Professor Spain (02:29:41):

You're okay?

**Student 6** (02:29:41):

Yes.

Professor Spain (02:29:41):

Okay. Anything else?

Dean Chapman (02:29:44):

No, sir. But thank you.

**Student 6** (02:29:45):

Okay.

Dean Chapman (02:29:45):

**Student 6**, thank you.

Professor Spain (02:29:47):

Thank you.

Dean Chapman (02:29:47):

We'll go ahead and let you exit the room, Miha.

**Student 6** (02:29:51):

Okay. Thank you. Bye-bye.

Dean Chapman (02:29:53):

Mm-hmm, bye-bye. Hi, Professor Williams. It's Dean Chapman, I think you're on mute.

Professor Williams (02:30:09):

Hi.

Professor Spain (02:30:10):

Good morning, Professor Williams. Thank you for appearing today. I'm going to ask you a few questions and the others may have questions as well, but I am referring to events that occurred on September 10th, 2025, when Charlie Kirk was shot. As far as I understand, news of that occurred during your class, is that right?

Professor Williams (02:30:43):

Right at the end of class, that's correct.

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Spain (02:30:45):

Right at the end of class. And do you recall any students making any or statements regarding the shooting?

Professor Williams (02:30:55):

I do, yes. A student announced that Charlie Kirk had been... I don't remember the exact word that we used, killed, assassinated, or whatever, but a student did announce that as we were ending a class.

Professor Spain (02:31:08):

Mmkay. Do you remember which student it was?

Professor Williams (02:31:11):

I believe it was **Student 8**. I don't remember his last name, but I'm not certain about that. But I believe he was the one who did.

Professor Spain (02:31:19):

Okay. And what was the substance of his statement? Simply that he had been shot or?

Professor Williams (02:31:26):

That he had been, yeah, he had been shot, killed, assassinated. Like I said, I don't remember the exact word that was used.

Professor Spain (02:31:34):

Okay. Was there anything said beyond that by either him or-

Professor Williams (02:31:39):

Yeah.

Professor Spain (02:31:40):

... any other students and?

Professor Williams (02:31:42):

Well, I asked the question after he said that, I asked the question, "Well, who is Charlie Kirk?"

Professor Spain (02:31:50):

Okay.

Professor Williams (02:31:51):

Because I actually didn't know who he was, so I asked the question, who was Charlie Kirk.

Professor Spain (02:31:53):

Okay. I know this occurred at the end of class. Did any other student make any kind of comment after it was announced that Charlie Kirk had been shot that you can recall?

This transcript was exported on Mar 23, 2026 - view latest version here.

Professor Williams (02:32:08):

After? You mean before I asked the question?

Professor Spain (02:32:13):

No. Any other comment after-

Professor Williams (02:32:15):

At any point? Okay.

Professor Spain (02:32:16):

Yeah.

Professor Williams (02:32:16):

Yeah. I believe a student did indicate that he had been... Who he was, I believe something to the effect, I don't remember again, the exact wording that was used, that he was a conservative activist or something along those lines.

Professor Spain (02:32:35):

Okay.

Professor Williams (02:32:35):

Somebody said something like that. Yeah.

Professor Spain (02:32:38):

Okay. And do you recall which student it was that made that comment?

Professor Williams (02:32:42):

I believe it was **Student 8**, but again, I'm not certain about that.

Professor Spain (02:32:45):

Okay.

Professor Williams (02:32:46):

It was right at the end of class. I was packing my books, getting ready to leave class, and yeah, I asked the question, he made the announcement, I believe it was him who made the announcement, and I just asked, "Who's Charlie Kirk?"

(02:32:59):

And then a comment was made about I guess who he was. And then I left class and I looked at my phone to check messages. Generally, I usually do that after a class. And my phone finally had blown up with news about Charlie Kirk. So-

Professor Spain (02:33:14):

Okay. Okay. Others?

This transcript was exported on Mar 23, 2026 - view latest version here.

Heidi (02:33:17):

I just have one quick question. Do you recall any students making any celebratory comments or comments that were negative about Charlie Kirk or "He got what he deserved"? Anything? Were there-

Professor Williams (02:33:34):

Nothing like that, no, I would've remembered that. I'm pretty certain I would've remembered that. Had there been any sort of celebratory comments, anything like that had been made, I would've remembered that. No. I just remembered kind of a matter of fact response to my question. "Well, you know," so, I asked the question.

(02:33:54):

I remember that for certain, asked the question, and I do remember a student did announce that he had been killed. But no, I don't remember any sort of celebratory or any kind of real reaction to it.

Heidi (02:34:07):

Mmkay. And then after you completed class, did you go to the clinic at any time that afternoon?

Professor Williams (02:34:14):

No, I did not. No. I went straight to my office.

Heidi (02:34:19):

Okay. Thank you.

Professor Williams (02:34:23):

Okay.

Professor Spain (02:34:23):

Others?

Heidi (02:34:23):

No.

Professor Spain (02:34:23):

Pauline?

Pauline (02:34:24):

Professor Williams, thank you so much for being here today. I'm going to keep it really short. SBA is most respectful with your time. So just to confirm, I was a student in your race and racism class on September 10th, 2025, correct?

Professor Williams (02:34:34):

Correct.

Pauline (02:34:37):

This transcript was exported on Mar 23, 2026 - view latest version here.

And I recall you saying, "It's been so long ago," but can you say that I was not the student who announced Charlie Kirk's being shot?

Professor Williams (02:34:47):

I don't believe it was you, but again, I can't say with 100% certainty.

Pauline (02:34:52):

And do you recall in the class there being further discussions about Charlie Kirk? I think we kind of mentioned that, but just from my end.

Professor Williams (02:35:01):

No, no, no. Hm-mm.

Pauline (02:35:03):

And as your time as a law professor, have you heard any discussions now to present day about Charlie Kirk in the law school? Has it become a point of discussion, that sort of thing?

Professor Williams (02:35:16):

Has Charlie Kirk become a point of discussion at the law school?

Pauline (02:35:20):

Right. Have you heard... Sorry if I'm not being loud enough... Have you heard other students discussing it? Was it widely discussed at the law school or was it kind of confined to that discussion? And this is not just me, just kind of your knowledge of the law school and being a professor.

Professor Williams (02:35:36):

Yeah, I haven't heard any students discuss Charlie Kirk, no. No.

Pauline (02:35:42):

And so in your opinion, the announcement, I believe it's attributed to **Student 8**, the announcement of saying just plain, "Charlie Kirk was shot." Would you consider that unprofessional in any way?

Professor Williams (02:35:57):

No. No.

Pauline (02:36:00):

And to confirm, did you ever hear me use the term "motherfucker" in your class?

Professor Williams (02:36:06):

No.

Pauline (02:36:07):

This transcript was exported on Mar 23, 2026 - view latest version here.

Did you ever hear me make statements sort of to statements similar to that of, "Charlie Kirk got what he deserved," or, "He should be shot," anything to that effect?

Professor Williams (02:36:17):

No.

Pauline (02:36:18):

Do you recall any of my actions to be that of out of the ordinary of how I usually am in your class after Charlie Kirk was shot?

Professor Williams (02:36:29):

No.

Pauline (02:36:30):

And I know you said you can't say with 100% certainty, but just want to wrap back to after you had asked the question, who was Charlie Kirk and a student mentioned, "Oh, he's conservative," or right-wing, or whatever it was. Can you reasonably say that you recall that that was not me?

Professor Williams (02:36:54):

I don't believe it was you, but I can't say again with certainty-

Pauline (02:36:55):

Okay.

Professor Williams (02:36:56):

... that it wasn't.

Pauline (02:36:57):

Okay. No further questions at this time. Thank you so much, Professor Williams.

Professor Williams (02:37:00):

Okay.

Professor Spain (02:37:02):

Anybody else?

Pauline (02:37:02):

Okay. All right.

Professor Spain (02:37:05):

Thank you very much.

Pauline (02:37:06):

Defs.' Appx. 214

This transcript was exported on Mar 23, 2026 - view latest version here.

Thank you Professor Williams-

Professor Williams (02:37:06):

Okay.

Pauline (02:37:07):

... I'll let you go ahead and exit.

Professor Williams (02:37:10):

Okay.

Heidi (02:37:10):

Well, [inaudible 02:37:11] class.

Professor Spain (02:37:17):

All right. At this time, Ellie, I know that you made an opening statement. Would you like to make any kind of further statement to the counsel at this time?

Ellie (02:37:29):

Yes, but-

Professor Spain (02:37:29):

Particularly in response to anything that may have been stated?

Ellie (02:37:34):

Like a closing statement? Just asking for clarification.

Professor Spain (02:37:36):

Well, just any kind of statement.

Ellie (02:37:39):

Yes, please. But-

Professor Spain (02:37:40):

Okay.

Ellie (02:37:40):

... I would request, can I confer with my counsel for a bit-

Professor Spain (02:37:43):

Sure.

Ellie (02:37:43):

Defs.' Appx. 215

This transcript was exported on Mar 23, 2026 - view latest version here.

... before?

Professor Spain (02:37:43):

Sure.

Ellie (02:37:43):

Thank you so much.

Professor Spain (02:37:44):

Yeah.

Dean Chapman (02:37:44):

You'll take-

Ellie (02:37:44):

[inaudible 02:37:45].

Dean Chapman (02:37:45):

... the secret passage.

Ellie (02:37:46):

Okay. That's what we call it.

Dean Chapman (02:37:59):

We're still recording.

Ellie (02:38:03):

So, procedurally-

Dean Chapman (02:38:06):

We're still-

Ellie (02:38:06):

... she's going to say to-

Dean Chapman (02:38:07):

Yeah.

Ellie (02:38:07):

Yeah.

Professor Spain (02:38:07):

She's making a statement.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ellie (02:38:07):

I know.

Professor Spain (02:38:07):

Yeah.

Ellie (02:38:09):

Sorry. I'm sorry. I'm sorry. Yeah, yeah.

Dean Chapman (02:38:11):

I know the rules. And then she'll make a statement and then we can follow up with any questions.

Professor Spain (02:38:15):

Right. Right.

Dean Chapman (02:38:15):

And then if she wants to make a closing statement she can.

Professor Spain (02:38:15):

On the statement she can, yeah, yeah. Right.

Speaker 10 (02:38:15):

I just wanted to confirm.

Ellie (02:38:15):

Okay, it's okay. Sorry. [inaudible 02:38:29]-

Dean Chapman (02:38:15):

I'm a lawyer. I know the rules.

Ellie (02:38:15):

Yeah, no, no. Yeah.

Dean Chapman (02:38:15):

Been one for 20-plus years.

Ellie (02:38:15):

Yes.

Dean Chapman (02:38:15):

[inaudible 02:39:10].

Speaker 12 (02:38:15):

**Defs.' Appx. 217**

This transcript was exported on Mar 23, 2026 - view latest version here.

[inaudible 02:39:16]. Okay. [inaudible 02:39:25]. [inaudible 02:39:30]. Okay. And then [inaudible 02:40:04]. [inaudible 02:40:28]. [inaudible 02:40:40] yeah, [inaudible 02:40:43]. [inaudible 02:41:01]. [inaudible 02:41:38].

Dean Chapman (02:38:15):

Okay, yeah, if you're [inaudible 02:42:37] confined [inaudible 02:42:40] shoot [inaudible 02:42:41] and then if you're shooting then out after the government [inaudible 02:42:51] and then [inaudible 02:42:54] and yeah, Hosanna got it, [inaudible 02:43:01] read it, but I think that's going off that [inaudible 02:43:06]. But they are 3D, because I [inaudible 02:43:10] I have extra wood.

(02:38:15):

But, you know, [inaudible 02:43:15] black really [inaudible 02:43:28] don't die, [inaudible 02:43:34] and then you could do three meals after this, so that changed [inaudible 02:43:40]. I've already been with Joseph. I'm just [inaudible 02:44:12] and she'd come down and she would keep pushing me to [inaudible 02:44:18].

(02:38:15):

I was [inaudible 02:44:21].

Speaker 10 (02:38:15):

Larry, do you want to step out for just a second?

Professor Spain (02:38:15):

Let's get some air.

Speaker 10 (02:38:15):

Do you step out for a second?

Professor Spain (02:38:15):

Sure.

Speaker 10 (02:38:15):

Yeah. Yeah. [inaudible 02:46:17].

Dean Chapman (02:46:18):

I know. We had two individuals step out for a second.

Heidi (02:46:20):

Okay, no worries.

Dean Chapman (02:46:22):

Yeah. I'm going to get another water. You all good on water?

Professor Spain (02:46:24):

I'll be fine.

Defs.' Appx. 218

This transcript was exported on Mar 23, 2026 - view latest version here.

Dean Chapman (02:46:24):

Yeah.

Professor Spain (02:46:24):

Yeah.

Dean Chapman (02:46:26):

I didn't have time to do coffee, I apologize. No, it's perfect.

Professor Spain (02:46:28):

That's not your responsibility, don't worry.

Dean Chapman (02:46:33):

Well, I wanted to and I just, it was just a busy...

Heidi (02:46:36):

You always ensure that we have coffee every week at the school.

Dean Chapman (02:46:39):

Right.

Heidi (02:46:39):

So, we'll let you off on this one.

Dean Chapman (02:46:42):

All righty hun, and all the fun stuff, right?

Heidi (02:46:43):

Yeah. You make sure that we're fed throughout finals, so all the fun stuff.

Dean Chapman (02:46:47):

Yeah.

Heidi (02:46:54):

As long as it's not the Monster energy drinks. I don't like y'all drinking those. I worry about y'all.

Dean Chapman (02:47:01):

They need to get them out of the-

Heidi (02:47:02):

I know.

Professor Spain (02:47:02):

This transcript was exported on Mar 23, 2026 - view latest version here.

Well, I think last I tried-

Dean Chapman (02:47:02):

... mainline-

Professor Spain (02:47:02):

... one of those I [inaudible 02:47:05]-

Dean Chapman (02:47:04):

... [inaudible 02:47:05] by Monster.

Heidi (02:47:05):

Main route, yeah, I know. And-

Dean Chapman (02:47:09):

I have the Redbulls-

Heidi (02:47:09):

... I did the-

Dean Chapman (02:47:09):

... that are so bad for you.

Heidi (02:47:11):

... I just worry. And my first year at the law school, I saw a lot of it and then was where I saw the students were Door Dashing food. I was like, "We can't have this." That's why I kind of restructured my budget. I was like, "Let's have food and try to take care of ourselves." So.

Dean Chapman (02:47:26):

It really is nice.

Heidi (02:47:27):

Yeah.

Dean Chapman (02:47:28):

Sometimes I don't eat any kind of meal during that time, so it's like a meal of the day.

Heidi (02:47:30):

Yeah, yeah.

Dean Chapman (02:47:31):

So [inaudible 02:47:33] stress, should I eat? No.

This transcript was exported on Mar 23, 2026 - view latest version here.

Heidi (02:47:36):

I try to make sure you have a little bit of good, a little bit of bad.

Dean Chapman (02:47:38):

Eat Turkey. That's your friend.

Heidi (02:47:38):

Yes.

Dean Chapman (02:47:38):

Down at Costco-

Heidi (02:47:43):

Yes.

Dean Chapman (02:47:43):

... organic beef.

Heidi (02:47:44):

That one's really good. My son goes through the whole bag in three days.

Dean Chapman (02:47:48):

That's what I have for my office.

Speaker 9 (02:47:48):

I like the sticks-

Heidi (02:47:48):

Yeah. I know.

Speaker 9 (02:47:48):

... the Chomp Sticks.

Heidi (02:47:48):

The Chomp-

Speaker 9 (02:47:48):

All those are so good.

Heidi (02:47:54):

Those are good.

Speaker 9 (02:47:55):

**Defs.' Appx. 221**

This transcript was exported on Mar 23, 2026 - view latest version here.

They need a Trader Joe's out here.

Heidi (02:47:56):

Yeah.

Speaker 9 (02:47:58):

That would be awesome.

Heidi (02:47:58):

Oh, I know.

Speaker 10 (02:47:58):

It'll come [inaudible 02:47:59]-

Heidi (02:47:58):

And it won't come. It will never be here.

Speaker 10 (02:48:00):

I don't have one in my area [inaudible 02:48:02]-

Heidi (02:48:02):

All right, we're back.

Professor Spain (02:48:02):

Heidi?

Heidi (02:48:02):

Yeah.

Professor Spain (02:48:02):

Are you still recording?

Heidi (02:48:02):

Yeah, I'll still recording.

Professor Spain (02:48:02):

Still recording.

Heidi (02:48:04):

Yeah, I'm still recording. I haven't turned it off.

Speaker 9 (02:48:06):

Always be recording.

This transcript was exported on Mar 23, 2026 - view latest version here.

Heidi (02:48:08):

Yes.

Professor Spain (02:48:09):

All right. I just want to clarify that we've received a lot of information here this morning, and so I want to give you an opportunity to make any kind of statement that you might wish to make-

Ellie (02:48:22):

Yes, sir.

Professor Spain (02:48:22):

... to the counsel. If you do so, counsel will have an opportunity to ask you any follow- up questions. You're not required to make a statement, but if you choose to do so after that concludes, then I'll give you an opportunity to make a closing statement. Okay?

Ellie (02:48:42):

Oh, so this is not my closing statement.

Professor Spain (02:48:43):

Wouldn't necessarily be considered a closing statement.

Ellie (02:48:48):

Okay. Yeah. I'll go ahead. Just to preface this one I did not type up before, so apologies if it's not necessarily a scripted, but I think the first thing that I wanted to address with this counsel is it's been asked a bunch of some witnesses.

(02:49:04):

It's been asked of me, so I wanted to provide a little bit of clarification on the allegations surrounding this video. Right? So it was asked to a few witnesses if I showed this video, your interpretation of the video, et cetera. What I want to bring forth to the counsel is that I believe my statement in the report or the investigative report was a little bit misconstrued, and so I'd like to provide a little bit of context behind that.

(02:49:29):

When I was first asked about showing this video, what I understood and how I was asked was if I had shown the video in Professor Metz's office, what I brought forth to Professor Keffer was that I was not the one in Professor Metz's office who had the video, and I submitted to him that it was Professor Metz.

(02:49:48):

I did not intend for this statement to be taken as I did not ever view the video. I did not ever watch the video or share it or view it with other students. My understanding was that I was being asked about this situation in Professor Metz's office.

Ms. Fisher (02:50:03):

This transcript was exported on Mar 23, 2026 - view latest version here.

... listen, I was being asked about this situation in Professor Metz' office, further, I was asked directly if I had shown the video to Professor Stevens, which through his testimony and his affidavits, he testified here today that I did not, which was similar to exactly what I had told Professor Keffer.

(02:50:17):

So, when it came down to being questioned about the video, I had understood that I was being asked in a short situation. And so, I believe that it was a little bit misrepresented on that video. I absolutely submit to the council that I saw the video. I believe it was quite public that day. I watched it, other students watched it. In fact, it wasn't even something that people were Googling. It was just coming up on social media.

(02:50:47):

I believe that other witnesses also shared that they viewed the video. They watched the video either on my cellphone or theirs. However, they did confirm that that was not without their consent, and that there was no time that I was showing this graphic image or a graphic video without people's consent. And, additionally, of course not, in a way to make them uncomfortable, or to offend anybody, and definitely not to be celebratory.

(02:51:13):

And so, that takes me to my second point of the insinuation that I did not know who Charlie Kirk was. Summarily, I think that my statements of that was a little bit misrepresented in this report. Of course, I think y'all could understand just how confusing it is to be confronted with allegations that aren't necessarily true by a law professor. In doing so, I was also pretty nervous. Right? And so, what I was trying to bring forth to the council was that prior to Charlie Kirk's death I did not have strong feelings in which would make me celebrate him further.

(02:51:54):

Of course, as my clinic mates and fellow students at the school were learning about who he was through what's being posted on the news, once it got towards the end of the day I definitely would say that I had a further indication of Charlie Kirk, who he was, but I still submit that I don't necessarily know him to the point of even knowing his viewpoints. Right? I know that he is conservative. However, it was on that day that I actually learned about what Turning Point was. The only way I was made aware of what Turning Point was was that it was shared to me that it was similar to FedSoc. And so, I assumed what Turning Point stood for.

(02:52:38):

I think one of the main things that I hope that this council recalls, and understands throughout the testimony today is that there was a lot of speculative reports made about him. However, none of them were confirmed.

(02:52:52):

To the allegation that I said the term, "Motherfucker," the person who was with me all day, **Student 6**, testifies that that wasn't heard. Professor Stevens testified that I didn't say that statement. In fact, family law students also testified that I didn't make that statement.

(02:53:11):

It was further alleged that I was celebratory, or I was engaged in some sort of conduct that could be understood as celebratory. And, even though, we had witnesses come today and say that I was not celebratory, I'd like to take this opportunity to further reference how me being in a good mood is not necessarily something that is out of the ordinary.

This transcript was exported on Mar 23, 2026 - view latest version here.

(02:53:33):

Witnesses testified today that I am generally in a good mood, I'm generally animated. I believe it's encompassed in Professor Metz' affidavit that I'm known as somebody who "bops around." And so, I'd just like to remind the council that my behavior, and who I am as a person, combined with a day of tragedy that I didn't necessarily schedule, I'm not sure if that meets the clear and convincing burden that I, for some reason, was specifically celebrating the death of Charlie Kirk.

(02:54:06):

We heard from Professor Morgeson, who in her initial statement was pretty sure that I had said the, "Motherfucker" and today she said that she was not able to confirm that. However, other witnesses were able to confirm with certainty that they didn't hear that.

(02:54:22):

I submit that after the testimony of Professor Morgeson today I don't believe that her remembrance of the event is necessarily equal to that of all the other witnesses who came forth today and their recollection of the events. For example, Professor Morgeson recalls shutting the door. Her own clinic students don't recall her shutting the door. Professor Stevens, certainly, didn't testify to her shutting the door. **Student 6** recalls her not shutting the door. Professor Metz also in his affidavit testifies to the door not being shut.

(02:54:56):

Further, it was stated that I was corrected. And Professor Stevens, certainly, didn't bring that forth to the council today. Although, Professor Williams' testimony was not able to confirm 100%, as he said, with certainty that I was not the one who first announced that Charlie Kirk was shot in Professor Williams' course, he was able to say that he reasonably believed it was another student. And that's consistent with the statement that I gave to Professor Keffer in October.

(02:55:28):

Through that ... Right? I think that it is extremely relevant that it was a male student, and not a female student. Even if you're not able to identify which who made that statement that day.

(02:55:38):

Throughout the investigative report, it was stated that a lot of the exculpatory evidence for me was considered "irrelevant," however, I believe it's incredibly relevant to my stance as well as my integrity. I stand here before you with not only my credibility, but my future as in this profession is hanging in the balance.

(02:55:59):

And so, it's incredibly important for me to ensure that this council has a full view of what I believe to be the events. It's been my understanding that there's been a lot of rumors circulating, and that's no surprise. Right? It's a law school. However, I'm not necessarily sure that because I was somebody who also reacted to the rumors of the largest news that was on the news that day how I find myself singled out in here before this council.

(02:56:29):

I really appreciate all of the time that everybody's taken in investigating this. I recognize that there's been a lot of evidence, and there's been a lot of testimony today, but with that I hope that this council finds when it's all laid out before them the clear and convincing burden is not met. And, in fact, this council should not be able to find that a violation even occurred at all.

(02:56:54):

Defs.' Appx. 225

This transcript was exported on Mar 23, 2026 - view latest version here.

On that day, I remember it as being nothing out of the ordinary. Right? As many of the witnesses came to say, "It was months ago." However, the aftermath of the situation has been incredibly devastating. People talked about this in court. People know I'm a clinical student. This has affected my mental health. This has affected the way in which I participate in school.

(02:57:18):

And through that, and I only bring this up, because we're talking about my professional conduct, I have continued in clinical programs, I've continued to represent my clients, I've continued to go to class. In fact, I've been purely successful in clinical end.

(02:57:32):

So, I would bring that forth to say in the wake of the allegations of my unprofessional conduct, using that as an example of just how professional I am. In addition, I take this process extremely seriously. I take my role as a student at Texas Tech Law very seriously. And I would hope that this council recognizes the position that I'm in when I have to defend myself to allegations that seemingly were either swayed against me or exculpatory evidence was completely left out. And, thus, this council hadn't really had the opportunity to view all the evidence in light.

(02:58:07):

And so, with that, I really appreciate y'all's time. I appreciate you guys giving me this opportunity to bring forth my witnesses. And if you guys have any questions, I'd be more than happy to answer them.

PART 5 OF 6 ENDS [02:50:04]

Speaker 13 (02:58:16):

I've just got a few questions. So, just for clarification, you're indicating that Professor Keffer mischaracterized some of your statements to him?

Ms. Fisher (02:58:33):

I'm not here to necessarily speak to motives, but I recall what was stated that day. And what I read in the investigative report I don't feel as it was the correct characterization of our conversation.

Speaker 13 (02:58:51):

You're saying that it was inaccurate then?

Ms. Fisher (02:58:53):

I believe that some of the statements were definitely left out of context or were even combined or shortened to leave out the necessary context that would give this council the fullest informed light of the situation.

Speaker 13 (02:59:11):

Okay. One of the statements that was in his report was that you had made a statement that it was Professor Stevens that asked you whether or not you had heard, presumably, about the shooting of Charlie Kirk. Is that accurate?

Ms. Fisher (02:59:29):

This transcript was exported on Mar 23, 2026 - view latest version here.

Similar. I think that was mischaracterized. When I was explaining it to Professor Keffer I was, basically, walking him through it. So, instead of answering direct questions like you and I are doing now, I was giving him more so a summary. And so, what I brought forth to Professor Keffer was that when I walked into the clinic, I got just about here and it is a clear glass, and then Professor Stevens' door was open. When I saw Professor Stevens was there I took about an inch step back, and I said, "What's up, Joe Lou?" Because that's what I call him. I said, "What's up?" to Joe Lou. And he said, "Hey. Did you hear?"

(03:00:02):

And so, at that time, Professor ... I told the council that Professor Stevens asked me, "Did you hear?" What I told him was, "No. About Charlie Kirk?" And he said, "No. What happened?" And I said, "He was shot." And that was the conversation.

(03:00:21):

So, I think what was mischaracterized was maybe what discussion was started, if that makes sense. I think what I've brought forward to Professor Keffer was the initial interaction of Joe and I in the office when I said, "What's up?" He said, "Hey." But was I the first one to say that [inaudible 03:00:44] Charlie Kirk? Absolutely. I just don't think that that was necessarily the question that I was asked.

Speaker 13 (03:00:57):
Okay. And did you show the video on your phone to Joe Stevens?

Ms. Fisher (03:01:03):
No. Not to Joe Stevens and-

Speaker 13 (03:01:05):
Okay.

Ms. Fisher (03:01:05):
... I did not show it to Professor [inaudible 03:01:07].

Speaker 13 (03:01:10):
Okay. What other parts of his report did you think were inaccurate?

Ms. Fisher (03:01:15):
Some of the things that I found to be inaccurate was just ... So, some of the things that I found to be inaccurate, at least, were people's exclamations. For example, **Student 4** in the report is stated as I'm using choice words, which I think reasonably assumes that I was using curse words as is alleged further in the report.

(03:01:37):

But there was testimony today, **Student 4** confirmed that the choice word I used was the term "racist". And I think that that is an example of something that was misconstrued. And I don't think that it was necessarily construed to put me in a positive light.

(03:01:51):

And I also think that the report just plain lacks exculpatory evidence. You would note that **Student 6**... Sorry. She has two last names. **Student 6**, as she's referenced here, she was spoken with with Professor

This transcript was exported on Mar 23, 2026 - view latest version here.

Keffer. And not only does she confirm my contention of how the events went, but she actually further goes on to state that it was Professor Morgeson who made people aware of Charlie Kirk dying, that it was not I, it was Professor Metz, who had the video on his phone, that I was not acting celebratory, that I did not use the terms "Motherfucker," that the door was not shut.

(03:02:33):

And she was actually one of the only people who testified that I was in their presence. However, **Student 6**'s completely left out of that report. Similarly, Professor Williams is left out of the report. And it's my understanding that Professor Williams was told that his testimony is "irrelevant," but I actually think that it's extremely relevant, especially, when we're talking about something months ago to, at least, build context around the situation.

Speaker 13 (03:03:04):

So, was the statement in the report by Professor Keffer inaccurate? That he asked you if the acts and statements alleged were true, that you acknowledge that that would be wrong, and unprofessional.

Ms. Fisher (03:03:22):

Again, I think that that was not necessarily even being misconstrued. I just think that it was an extremely short version of events. When I was asked by Professor Keffer, I actually answered multiple times and said that I was unable to speak to that answer, because he was requiring me to place subjective feelings on something that did not happen. And so, I was unable to let him know how I felt about something that did not occur.

(03:03:48):

After being asked that, I was then asked again, "Well, place yourself in that situation. If you were in a law office or a clinical setting where there is clients and people around, and somebody was running up and down the hall, and screaming, "The motherfucker is dead," would you consider that professional?" And, at that point, I conceded, "If that had happened, and there was clients around, and there was members of court staff, I would not believe that conduct to be professional."

(03:04:17):

But I further tried to bolster it, and tried to set the scene similarly to how we did today, and say, "But there was not clients present. We were back in this room. It was later in the day." However, that part didn't make it into the report.

Speaker 13 (03:04:31):

Okay. Others?

Speaker 14 (03:04:35):

Yeah. I have a few. So, in the different testimony, we have you in, at least, three different locations. So, I'm just going to ... If you'll just help me walk through that. So, you walk in the door. Do you have any memory of stating wildly the statements, "I'm having such a good day"? Or, I don't remember what the other one was, that Professor Morgeson ... Before you got to Professor Stevens' office.

Ms. Fisher (03:05:03):

I would say that I did not make those statements.

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 14 (03:05:07):

Okay. You have no memory of making those statements. Okay. Then you go into Professor Stevens' office. Do you recall him saying anything to you after you had the conversation that you just mentioned? Where you said-

Ms. Fisher (03:05:18):

No. At no point ... After I said, "There's a video. It looks bad," he said, "Well ..." We just headed out. At no point do I recall him telling me to, "Stop," "Leave," anything like that. And, in fact, I think I would have remembered that, because if I had felt like Professor Stevens was uncomfortable with my presence I don't think I would have continued to go to him as a professor as often as I do. And I still go to him pretty constantly. I go into his office. I text message him with questions, things of that sort.

Speaker 14 (03:05:50):

Okay. So, where did you go from there? Is that when you went to Professor Metz' office?

Ms. Fisher (03:05:57):

Yes, ma'am. And I'm going to be the one to get the map, because I think it's helpful. Right? So, the clinic office starts here. And right at the front that's the clinic office, everybody sees the double doors. When you walk in, you have Miss Nancy's desk, Miss Melissa's office right here. So, about five feet, maybe 10. Joe's office, family law clinic.

Speaker 14 (03:06:17):

Okay.

Ms. Fisher (03:06:18):

Another five feet ... So, all these offices are sharing a wall. I believe that's the civil ... No. That's Professor Caudillo on this side. And then one down is Professor Morgeson. Then go another down, you have I want to say it's either ... I think civil practice clinic is prior to Professor McDonald's office, but then there's another clinic-

Speaker 13 (03:06:41):

[inaudible 03:06:42].

Ms. Fisher (03:06:43):

I'm so close. Right?

Speaker 13 (03:06:45):

Yeah.

Ms. Fisher (03:06:45):

Professor McDonald's office directly across ... Yeah. I wish there was a [inaudible 03:06:50].

Speaker 14 (03:06:49):

It's fine.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (03:06:51):

Directly across from Professor Metz' office. Then we have civil practice clinic, we have ... I don't know her last name. So, I'm just going to refer to her as the tax clinic professor.

Speaker 14 (03:07:02):

Sure.

Ms. Fisher (03:07:03):

Right here. And then we have the tax clinic down here right at the corner right in front of the clinic. And then at the end of the hall, that's Professor Spain, and right next to Professor Spain around this corner is the clinic's office.

Speaker 14 (03:07:17):

Okay.

Ms. Fisher (03:07:18):

And so, the norm is that you walk in the front doors, and because where my conference room is is in the back, I was walking down the hallway.

Speaker 14 (03:07:29):

Sure.

Ms. Fisher (03:07:29):

And so, as I'm walking down the hallway ... Professor Stevens, as he had mentioned, he's always in court. And since he does cap [inaudible 03:07:36] he's the far out one. And so, I walked past him, and I was surprised. That's why I said hi to him. I was surprised to see him in the office after court, because we thought court was going to take longer. And so, that's why I said hi. I said, "Hi." We had 20 seconds of conversation maybe, if that. At no point ... I didn't even take my bag off. I was in his office. Walked out, said, "Okay. What's happening today," and I brought this forth to Professor Keffer, but it didn't make it in the report is I was having issues with Discovery.

(03:08:07):

And I only recall that, because that's why I went to Professor Metz' office in clinic to get Discovery, because we're not actually attorneys. Our professors are the ones who get it. And so, it's a code that you need, a verification code. And so, the verification code expires after two minutes, or something like that.

(03:08:27):

And what I had been dealing with was, as **Student 6** mentioned, PNCs were coming up, and every time my Discovery would download to about 75%, it would log me out. And so, I was extremely frustrated, because I was trying to get back and forth to that computer, and get that code.

(03:08:44):

And so, after I saw Joe Lou. All right. I walked in. **Student 7** and **Student 6** were already in the office and they were discussing their PNCs, which was a big topic, because this was earlier in the semester. So, nobody had really had experience with them yet. And so, they were discussing them. And so, that's why

This transcript was exported on Mar 23, 2026 - view latest version here.

I chose to sit on the couch instead of sitting in the chairs that used to be in Professor Metz' office, because they were in front of them.

(03:09:08):

So, we're sitting there, discussing PNCs. In fact, I wasn't really saying anything. I'm on my phone. They're talking about PNCs. I recall asking **Student 6**, "It wasn't as bad as it really was. Right?" And she's like, "No. It wasn't as bad."

(03:09:23):

And then we're sitting there. There's this announcement. Right? And I don't recall who, similar to **Student 6**, "He's dead." And I believe it was **Student 6** like, "Who's that?"

Speaker 14 (03:09:36):
Okay. Can I just pause you real quick?

Ms. Fisher (03:09:38):
Yeah.

Speaker 14 (03:09:38):
So, before that time you were not discussing the shooting? Even though, you were aware of it, because it had happened in crim law class, and then you had mentioned it to Professor Stevens. And when you walked in, that wasn't the topic of conversation?

Ms. Fisher (03:09:51):
Uh-uh. I walked in for my Discovery code.

Speaker 14 (03:09:52):
Okay.

Ms. Fisher (03:09:52):
And so-

Speaker 14 (03:09:53):
So, then Professor Morgeson, is that your memory of who came in to shift the conversation?

Ms. Fisher (03:10:00):
And I recall because she had it on her phone.

Speaker 14 (03:10:02):
Okay.

Ms. Fisher (03:10:02):
So, she poked in the office, and she said, "Hey, y'all. Trump just announced he died."

Speaker 14 (03:10:05):

This transcript was exported on Mar 23, 2026 - view latest version here.

Okay.

Ms. Fisher (03:10:06):

And so, when she did that she poked her head in, and **Student 6** was like, "Who?" And I think Professor Metz said something to the effect of, like, "Turning Point" or, "He's right ..." Something like that, "Oh, he's Turning Point." And that's when he said, "Did y'all see the video?"

(03:10:25):

And so, he had the video and he was behind his own desk. He's like, "Y'all see?" They're looking at it. And that's where Sam goes, "Of course, he died. I'm sure he died. That doesn't look like somebody could survive that" kind of thing.

(03:10:41):

But it wasn't necessarily even long enough that people ... There was no [inaudible 03:10:46]. It was, "Wow. Oh my gosh. That's super graphic. He must be dead." I got my Discovery code, walked out of Metz' office down to the ... I guess now it's 20 feet down into the clinic suite where there were already students present. There was-

Speaker 14 (03:11:01):

Okay. Before we get to that, can I ask you a couple more questions about-

Ms. Fisher (03:11:03):

Yup. Absolutely. Sorry.

Speaker 14 (03:11:05):

Sorry. So, after he shows the video do you have any recollection of any laughter by anyone in the room? Or other celebratory comments.

Ms. Fisher (03:11:15):

I can say no celebratory comments, but I wouldn't be able to say that we weren't laughing. I can say we weren't laughing about Charlie Kirk.

Speaker 14 (03:11:22):

Okay.

Ms. Fisher (03:11:24):

But **Student 7**, **Student 6**, and I, we're goofy. And so, it would not be uncommon that we were joking about **Student 6** being nervous for PNCs, which we were laughing about that. We were joking ... It's a big joke that all three of us, they call us the three dwarves, because we're all about, like, 5'1. And so, we were laughing about how we were going to go into court for the first time and no one was going to notice us, because we're this tall.

(03:11:54):

And so, I know that we didn't have a party about Charlie Kirk. And, in fact, I don't even recall the conversation about Mr. Kirk being long enough, or so substantial that celebrating could even happen.

Defs.' Appx. 232

This transcript was exported on Mar 23, 2026 - view latest version here.

Speaker 14 (03:12:09):

So, I'm hearing you say ... And how long do you think you were in that office? Total.

Ms. Fisher (03:12:14):

To me, it was, like, max five, 10 minutes.

Speaker 14 (03:12:18):

Okay. And the conversation was moving between things?

Ms. Fisher (03:12:22):

Mm-hmm.

Speaker 14 (03:12:23):

Okay. Now you go to the conference room.

Ms. Fisher (03:12:26):

Right.

Speaker 14 (03:12:26):

And there's people in the conference room. Who do you recall was in that room?

Ms. Fisher (03:12:29):

So, I walk in and the door ... Imagine the door is over there, and the room is similar to this. So, I walk in, I recall **Student 4** ... So, **Student 4**, **Student 5**, and **Student 12** were in the corner. And they were also discussing the video. And I guess they have experience in hunting and guns, and stuff. And so, they were discussing, "Well, from this angle with this gun, could the person"-

Speaker 14 (03:12:55):

So, they were already discussing it when you walked in?

Ms. Fisher (03:12:57):

Already discussing it.

Speaker 14 (03:12:58):

Okay.

Ms. Fisher (03:12:59):

So, then I sat down, and I believe that's when **Student 10** came in at one point. She was either already there. But just for context, people also leave their stuff in there. So, since it's between classes people are in and out, in and out. And so, **Student 10** came in. Everybody is discussing it. **Student 10** mentioned that one of her friends had messaged her, and was upset, but she wasn't necessarily sure how to respond kind of thing. And then that's when the discussion turned to politics, and what I recall saying

This transcript was exported on Mar 23, 2026 - view latest version here.

was that it was ironic that a school shooting happened with somebody who, seemingly, is pro-firearms. And that was it.

Speaker 14 (03:13:52):

Do you recall anyone visually seeming upset by any part of the conversation? It's hard to separate maybe from the event, or expressing that what anybody, you, or anyone else in the room was saying was inappropriate or making them uncomfortable?

Ms. Fisher (03:14:11):

No. And, in fact, I would further state that if somebody was uncomfortable, I think they would have felt like they could say that. It's not uncommon that we talk about sensitive topics in the clinical programs. But we also are quite respectful of each other. And we also are aware of people's political leanings at this point. We've been in school for three years.

(03:14:35):

And so, I think not only were people in recognition of that, but there was never any sense that people who had different viewpoints than me, or even similar viewpoints to me, was uncomfortable with the discussion, wanted the discussion to stop, or even felt like they didn't want to be in the presence of that topic.

Speaker 14 (03:14:57):

Okay. And on that day in the clinic did you have any conversations directly with **Student 2** or **Student 3**?

Ms. Fisher (03:15:07):

I did not.

Speaker 14 (03:15:08):

Okay. I think that's it for me now. Thank you.

Speaker 15 (03:15:13):

I had a question. So, I read the ... Obviously, I read the report, and then I read the affidavit that y'all submitted for Professor Metz. One thing it didn't touch on was Professor Morgeson saying something the next day. I think he said it was not [inaudible 03:15:31] ... Oh, yeah. At the time. But it doesn't touch on I guess going the next day and talking, and him saying ... I believe he said ... Oh, he, himself, didn't celebrate Charlie Kirk's death, but Fisher did.

(03:15:49):

Just to get an understanding of what he was referencing, like, the conduct I guess he made in referencing in that, was there any sort of ... I guess what actions would he have meant about celebrating and then saying it wasn't him, it was you? I'm just trying to get an understanding of-

Ms. Fisher (03:16:09):

I'm not sure. So, I was made aware of that conversation when I was given this investigative report about a week ago. I was not privy to the conversation between Professor Morgeson and Professor Metz. I wasn't made aware of it.

This transcript was exported on Mar 23, 2026 - view latest version here.

(03:16:24):

My understanding after Professor Morgeson's testimony today was that she went in, and by her own admission I guess said that she was uncomfortable. He said that he did not say anything to make her uncomfortable, and she said it was me. And then I believe what Professor Morgeson testified today was that she asked Professor Metz, "Are you sure? I think it was you."

(03:16:50):

But I wouldn't be able to speak to what Professor Metz is referencing in that point.

Speaker 14 (03:16:52):

I do have one more. Okay. Either in the clinic or after that, have you heard other students reference Charlie Kirk as a racist?

Ms. Fisher (03:17:07):

Oh, yeah.

Speaker 14 (03:17:08):

Okay. Do you remember saying that yourself?

Ms. Fisher (03:17:11):

I'm sure.

Speaker 14 (03:17:11):

Okay.

Speaker 13 (03:17:18):

Any other questions anybody has? Okay. At this time, if you want to make a closing statement you're welcome to do so. I know we've asked you some questions, but if you want to summarize anything.

Ms. Fisher (03:17:42):

No. I think I'm just going to wrap it up. If I could just thank all of y'all for taking this time to allow me to be here. I really appreciate you guys allowing me to write this testimony. I really appreciate the council considering the evidence I brought forth, and if you guys have any questions, please contact me.

Speaker 13 (03:18:00):

Okay. Well, at this point, the council will deliberate, and consider all of the information that we have received as well as everything that was said today. We will then issue a written determination, and send that out to you as soon as it's made.

Ms. Fisher (03:18:21):

Yes, sir.

Speaker 13 (03:18:22):

I can't promise how quickly that will be, but-

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (03:18:25):

I understand.

Speaker 13 (03:18:25):

... it will be no longer than two weeks.

Ms. Fisher (03:18:28):

Okay. Yeah. No. Completely. I understand.

Speaker 13 (03:18:30):

Okay. So, that concludes the hearing.

Ms. Fisher (03:18:33):

Thank you so much.

Speaker 13 (03:18:33):

Thank you.

Speaker 14 (03:18:34):

Allie, just a reminder, we have resources should you need anything.

Ms. Fisher (03:18:38):

Okay. Yes, ma'am.

Speaker 14 (03:18:38):

Okay? All right. You know how to find me.

Ms. Fisher (03:18:40):

Yes, ma'am.

Speaker 16 (03:18:40):

Will the recording of the session be made available to Miss Fisher?

Speaker 14 (03:18:45):

Yes. Absolutely. And so, what I will do, give me some time, I will make sure that the recording is available, send that to you all. Absolutely. And I am also going to look into seeing if I can get a written transcript of it as well. Okay?

Speaker 16 (03:19:00):

Thank you.

Speaker 14 (03:19:01):

Absolutely. Yeah.

This transcript was exported on Mar 23, 2026 - view latest version here.

Ms. Fisher (03:19:02):

Can we be excused?

Speaker 13 (03:19:03):

Sure.

Speaker 14 (03:19:04):

Yeah.

(03:19:05):

At this time, we are done with the questioning.

Speaker 13 (03:19:10):

Yes.

Speaker 14 (03:19:10):

Okay.

Speaker 16 (03:19:10):

You don't need anything from me?

Speaker 13 (03:19:10):

I don't believe so.

Speaker 16 (03:19:10):

Okay.

Speaker 14 (03:19:10):

Nope.

Speaker 16 (03:19:23):

I am upstairs on the third floor. You know [inaudible 03:19:25].

Speaker 14 (03:19:24):

Okay.

PART 6 OF 6 ENDS [03:19:29]

## AFFIDAVIT OF PATRICK METZE

My name is Patrick Metze, I am over the age of 18 and understand the meaning of an oath. I make the following statements based on my direct knowledge and experience:

1.      I am an attorney licensed to practice law in the state of Texas.

2.      Until I was forced into retirement, I was the director of the criminal clinical programs at Texas Tech School of Law.

3.      While I served as their clinical law professor at the Texas Tech School of Law, I made sure that the students knew my office was a safe space in which they could say anything that they needed to say.

4.      All kinds of things have been said in my office, which have included the use of profanity, but this was never an issue because previously the Texas Tech School of Law, at least prior to my forced retirement, did not conceive of itself as a third grade school yard. All my students have been grown adult, graduate students in their third year of law school.

5.      In my decades of experience, it is not uncommon that professional attorneys licensed in the state of Texas use profanity. Anyone who suggests otherwise is either hopelessly naïve or lying.

6.      I am not aware of anyone being declared "unprofessional" for that reason, without more.

7.      On September 10, 2025, I recall that Charlie Kirk was murdered in Utah. This almost immediately became a widespread topic of conversation throughout the school of law.

8.      I am only aware that the third-year law student Ellie Fisher, who is black, has been singled out for discipline because she discussed this obvious topic of national news.

1

9.     For example, I remember my colleague and fellow clinical law professor Terri Morgeson standing in my door while students were in my office, and announced something to the effect, "Trump just said that he [Charlie Kirk] died." I did not consider this unprofessional.

10.     I no longer recall exactly what the students or clinical professors said that day, and my quote above of Ms. Morgeson is a paraphrase.

11.     I worked with the third-year law student Ellie Fisher directly in my law clinic.

12.     I know Ellie Fisher to be an excellent student who represented our clients in a professional manner. I am not aware that any client has ever complained about Ms. Fisher.

13.     On the day Charlie Kirk was shot, Ellie Fisher came in my office, probably at some point after 3:00 PM.

14.     I remember Ellie was animated, but that is more or less her nature. I have a hard time thinking of any occasion on which Ellie behaved in a subdued manner.

15.     Other students were in my office and were discussing the shooting of Charlie Kirk as well. To my knowledge, no one considered this unprofessional behavior.

16.     I do not recall Ellie Fisher using any description of Charlie Kirk's murder that included "mother fucker."

17.     But again, I no longer recall exactly what the students said.

18.     I can say that students have used strong language in my office before, but this has never been an issue of "unprofessional behavior."

19.     Only Ellie Fisher has been singled out based on the allegation that she said various things about Charlie Kirk.

20.     Even if Ellie Fisher did say "mother fucker," I would not consider that unprofessional behavior in the privacy of my office.

2

**Defs.' Appx. 239**

21.     I do recall that Terri Morgeson was standing outside my office at the time the students were discussing Charlie Kirk.

22.     To my knowledge, Terri Morgeson did not say anything at the time about professionalism, although she was standing in my door.  For example, Morgeson did not shut my door, which she could easily have done.

23.     Nothing was unusual about these interactions.  It was just another day at work in the clinical programs of the Texas Tech School of Law—until Texas Tech opened an investigation into Ellie Fisher and forced me into retirement.  I had never heard of anything like that happening in the school of law.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF FEBRUARY 2026,



Patrick Metze

STATE OF TEXAS
COUNTY OF _____Lubbock_____

Subscribed, sworn, and acknowledged before me this 13th day of __February__, 2026.
Notary Public

My commission expires: ____July 19, 2028____

JENNIFER M. BEADLES
My Notary ID # 129557834
Expires July 19, 2028

3

**Defs.' Appx. 240**

**Chapman, Sofia**

| | |
|---|---|
| **From:** | Michael Allen <mallen@allenharrislaw.com> |
| **Sent:** | Monday, February 16, 2026 11:52 AM |
| **To:** | Spain, Larry; Chapman, Sofia; Outenreath, Alyson; Hardberger, Amy; **Student 1** |
| **Cc:** | Tiffany Lawson; Ellie Mae Fisher |
| **Subject:** | FW: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 1/2 |
| **Attachments:** | Notaraized Affidavit of **Student 9**.pdf; Notarized Affidavit of **Student 6**.pdf; Notarized Affidavit of **Student 12**.pdf |

This email originated outside TTU. Please exercise caution!

Dear Professor Spain,

As you are an attorney and as the Honor Code and Rules of the School of Law of Texas Tech only state that I may not speak on behalf of my client, Ellen Fisher, only "at the hearing," but the Code and Rules are otherwise silent; I am writing you directly on her behalf. We know of no indication that this is not permitted. I will also accompany Ms. Fisher to the hearing, but as your rules prescribe, I will remain silent but be available to consult with her at the hearing itself.

Also, according to the Honor Code and Rules, Ms. Fisher is to receive a notice of hearing specifying the "allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow." At this time, we have received no information about the latter. Please forward to us information concerning the procedures the Council will follow at your earliest convenience.

Although Ms. Fisher did receive a notice of allegations, these appear chiefly to recite reactions common to all students in the wake of the public assassination of Charlie Kirk, including factual statements such as, "They shot Charlie"; "There's video"; and "It looks bad." All of which are factually true and all of which were clearly observations made by many other students in addition to Ms. Fisher. Thus, it is unclear how these allegations support "probable cause" of an honor code violation.

In addition, it is apparently alleged that Ms. Fisher was in a good mood, in other words that she had impermissible subjective feelings of some sort. One other allegation is that she spoke to her mother, who likewise is alleged to have had impermissible subjective feelings, although why these are monitored by Texas Tech and its School of Law is nowhere stated or clear. In particular, what is unclear is how Ms. Fisher is alleged to have violated the honor code prohibiting conduct that, "fail[ed] to uphold professional or fiduciary obligations" of any kind. None of the witnesses report disruption to the clinics or work at the law school, which was likewise suppressed in the Keffer Report.

In addition, all of the actions, words, or observations listed in the Keffer Report, even if they were all true, cannot remotely be considered violations of clinical work or duties. Moreover, they are quite obviously protected by the First Amendment to United States Constitution.

I believe, as a lawyer yourself, you will therefore recognize that the Notice is impossibly vague.

1

**Defs.' Appx. 241**

I also write to address your questions about the relevance of witnesses that Ms. Fisher's has requested to be summoned to the honor Council meeting.  To that end, I attach the following evidence for the honor Council's consideration:

    1) Affidavit of **Student 9**
    2) Affidavit of **Student 6**
    3) Affidavit of **Student 12**
    4) Affidavit of **Student 10**
    5) Affidavit of Patrick Metze
    6) Affidavit of **Student 11**

We have taken the liberty of gathering sworn affidavits from witnesses in the event that Ms. Fisher will be required to file for a Temporary Restraining Order and Preliminary Injunction following the hearing.  You will receive two emails due to the size of the files.  This is one of two; each will have the identical message.

As to relevance, you will see that material facts provided by these witnesses, whether they were interviewed by Professor Keffer or not, have been suppressed in his Report.

By way of example, **Student 11**, **Student 10**, **Student 12**, and **Student 9** all attest that Ms. Fisher was not disrespectful, hostile, or unprofessional in the Clinic Office, and did not say "mother fucker" in connection with Charlie Kirk's death.  Several attest that their statements to Professor Keffer were misrepresented in his report— which would seem to be itself an Honor Code violation that you are obligated to report and investigate.

In fact, there appears to have been a concerted effort to eliminate exculpatory information.  For example, **Student 6**, who was in the office of Professor Metze, attests that Ms. Fisher did not use the term "mother fucker" when discussing the murder of Charlie Kirk—but again. this important fact was suppressed in Professor Keffer's report.  In fact, no one testifies to the use of "mother fucker" except Professor Terri Morgeson, and yet it was she who interjected words to the effect that Charlie Kirk had died or "he is dead" in Professor Metze's office, as **Student 6** also attests.  To our knowledge, **Student 6** is the only witness available to testify to this fact and who was in the presence of both Ms. Fischer and Professor Morgeson.

Several affiants also attest to cursing and curse words being commonly used in the Clinic Office and in Professor Metze's office, as does Professor Metze, and yet no evidence in the Keffer Report suggests or implies that this has ever interfered with either the operation of the law clinics or the representation of clients.  Multiple witnesses attest that the kinds of discussions engaged in by the students, and even profanity, was common in the Clinic Office; and yet somehow only Ms. Fisher has been investigated and faces discipline.

As to your question of what can be provided by the other witness, Professor Kenneth Williams, whom Ms. Fisher has respectfully requested that you call before the Council; we expect him to testify that it was the student, **Student 8** (not Ms. Fisher), who first announced in Professor Williams' Race & Racism class that Charlie Kirk had been shot as well as words to the effect that Charlie Kirk was a "right wing" figure or a "right-winger."  In other words, some of the same things of which Ms. Fisher now stands accused of saying.  And yet **Student 8**, who is not black, was somehow spared a disciplinary investigation for an

**Defs.' Appx. 242**

honor code violation—obviously because there was none, just as there is none in the case of Ms. Fisher-- even if the worst alleged against her were true.

Again, we respectfully request that the Honor Council consider the attached affidavits as well as summon Professor Kenneth Williams and **Student 6**. However, if the Council intends to exclude exculpatory evidence, as does the Keffer Report, please inform us of that fact in writing, and we will proceed accordingly.

Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Spain, Larry <Larry.Spain@ttu.edu>
**Sent:** Friday, February 13, 2026 5:09 PM
**To:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Chapman, Sofia <Sofia.Chapman@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; **Student 1**
**Cc:** Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Re: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing

In response to your inquiry, have you attempted on your own to request the appearance of **Student 6** and Professor Kenneth Williams and do they have information that would be relevant to the matter resulting in a referral to the Honor Council? I had asked Professor William Keffer who conducted the investigation and made the referral to the Honor Council for clarification. He indicated that he had interviewed both but concluded that neither had information relevant to the issues resulting in a referral. Can you explain what information they might have that would be relevant? If justified, I can ask if they would appear to provide information but since the Honor Council proceeding is not a formal process such as a court hearing, we do not have subpoena power.

As to your other procedural questions:

- Likely the witnesses will be called in the order listed in the notice previously provided although this could vary depending on their particular availability
- For witnesses that the Council requests, each member of the Council will have the opportunity to ask questions and you will have the opportunity as well
- You are permitted to make an Opening Statement and Closing Statement if you desire as well as any other information you wish to present although you are not required to do so

If you have any other questions, please let me know.

Professor Larry R. Spain
Alvin R. Allison Professor of Law
*Texas Tech University School of Law*
3311 18th Street
Lubbock, TX 79409-0004
(806) 834-6649

3

**Defs.' Appx. 243**

(806) 742-4199 FAX
larry.spain@ttu.edu

---

**From:** Fisher, Ellie <Ellie.Fisher@ttu.edu>
**Sent:** Friday, February 13, 2026 12:00 PM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Spain, Larry <Larry.Spain@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; **Student 1**
**Cc:** mallen@allenharrislaw.com <mallen@allenharrislaw.com>; tlawson@allenharrislaw.com <tlawson@allenharrislaw.com>
**Subject:** Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing

Dear Members of the Honor Council,

I hope this message finds you well. I am writing in advance of my hearing scheduled for February 20, 2026, to respectfully request the Council's assistance in securing two witnesses and to seek clarification regarding certain aspects of the hearing process, as the Honor Code does not address these details.

First, I kindly request that the Council assist in securing the attendance of the following witnesses: **Student 6** (student) and Kenneth Williams  (Faculty). With respect to **Student 6**, I want to formally express my concern that she may be hesitant to testify due to fear of potential retaliation. I believe it is important to place this concern on the record now as I do not have subpoena power to require her attendance. I respectfully ask the Council to consider any steps available to ensure she may participate without concern.

Additionally, I would appreciate guidance on the following procedural questions:

• Will there be a designated order in which witnesses are called?

• For witnesses the University intends to call, who will conduct the questioning—the Honor Council or the General Counsel?

• Will I be permitted to provide an opening statement and a closing statement?

Thank you in advance for your time and assistance. I would be grateful for clarification at your earliest convenience.

Sincerely,

Ellie

**Ellie Mae Fisher | She, Her**

4

**Defs.' Appx. 244**

Texas Tech Law, *Candidate for Doctor of Jurisprudence* 26'

Criminal Defense Clinic, *Texas State Bar Qualified Law Student* | (806) 834-2194

Tech Law National Lawyers Guild, *President*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

**Defs.' Appx. 245**

**Chapman, Sofia**

| | |
|---|---|
| **From:** | Michael Allen <mallen@allenharrislaw.com> |
| **Sent:** | Monday, February 16, 2026 11:52 AM |
| **To:** | Spain, Larry; Chapman, Sofia; Outenreath, Alyson; Hardberger, Amy; **Student 1** |
| **Cc:** | Tiffany Lawson; Ellie Mae Fisher |
| **Subject:** | FW: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 2/2 |
| **Attachments:** | Notarized Affidavit of **Student 10**.pdf; 2026-02-13 EXECUTED P. Metze Affidavit.pdf; Notarized Affidavit of **Student 11**.pdf |

This email originated outside TTU. Please exercise caution!

Dear Professor Spain,

As you are an attorney and as the Honor Code and Rules of the School of Law of Texas Tech only state that I may not speak on behalf of my client, Ellen Fisher, only "at the hearing," but the Code and Rules are otherwise silent; I am writing you directly on her behalf. We know of no indication that this is not permitted. I will also accompany Ms. Fisher to the hearing, but as your rules prescribe, I will remain silent but be available to consult with her at the hearing itself.

Also, according to the Honor Code and Rules, Ms. Fisher is to receive a notice of hearing specifying the "allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow." At this time, we have received no information about the latter. Please forward to us information concerning the procedures the Council will follow at your earliest convenience.

Although Ms. Fisher did receive a notice of allegations, these appear chiefly to recite reactions common to all students in the wake of the public assassination of Charlie Kirk, including factual statements such as, "They shot Charlie"; "There's video"; and "It looks bad." All of which are factually true and all of which were clearly observations made by many other students in addition to Ms. Fisher. Thus, it is unclear how these allegations support "probable cause" of an honor code violation.

In addition, it is apparently alleged that Ms. Fisher was in a good mood, in other words that she had impermissible subjective feelings of some sort. One other allegation is that she spoke to her mother, who likewise is alleged to have had impermissible subjective feelings, although why these are monitored by Texas Tech and its School of Law is nowhere stated or clear. In particular, what is unclear is how Ms. Fisher is alleged to have violated the honor code prohibiting conduct that, "fail[ed] to uphold professional or fiduciary obligations" of any kind. None of the witnesses report disruption to the clinics or work at the law school, which was likewise suppressed in the Keffer Report.

In addition, all of the actions, words, or observations listed in the Keffer Report, even if they were all true, cannot remotely be considered violations of clinical work or duties. Moreover, they are quite obviously protected by the First Amendment to United States Constitution.

I believe, as a lawyer yourself, you will therefore recognize that the Notice is impossibly vague.

**Defs.' Appx. 246**

I also write to address your questions about the relevance of witnesses that Ms. Fisher's has requested to be summoned to the honor Council meeting.  To that end, I attach the following evidence for the honor Council's consideration:

1) Affidavit of **Student 9**
2) Affidavit of **Student 6**
3) Affidavit of **Student 12**
4) Affidavit of **Student 10**
5) Affidavit of Patrick Metze
6) Affidavit of **Student 11**

We have taken the liberty of gathering sworn affidavits from witnesses in the event that Ms. Fisher will be required to file for a Temporary Restraining Order and Preliminary Injunction following the hearing.  You will receive two emails due to the size of the files.  This is one of two; each will have the identical message.

As to relevance, you will see that material facts provided by these witnesses, whether they were interviewed by Professor Keffer or not, have been suppressed in his Report.

By way of example, **Student 11**, **Student 10**, **Student 12**, and **Student 9** all attest that Ms. Fisher was not disrespectful, hostile, or unprofessional in the Clinic Office, and did not say "mother fucker" in connection with Charlie Kirk's death.  Several attest that their statements to Professor Keffer were misrepresented in his report— which would seem to be itself an Honor Code violation that you are obligated to report and investigate.

In fact, there appears to have been a concerted effort to eliminate exculpatory information.  For example, **Student 6**, who was in the office of Professor Metze, attests that Ms. Fisher did not use the term "mother fucker" when discussing the murder of Charlie Kirk—but again. this important fact was suppressed in Professor Keffer's report.  In fact, no one testifies to the use of "mother fucker" except Professor Terri Morgeson, and yet it was she who interjected words to the effect that Charlie Kirk had died or "he is dead" in Professor Metze's office, as **Student 6** also attests.  To our knowledge, **Student 6** is the only witness available to testify to this fact and who was in the presence of both Ms. Fischer and Professor Morgeson.

Several affiants also attest to cursing and curse words being commonly used in the Clinic Office and in Professor Metze's office, as does Professor Metze, and yet no evidence in the Keffer Report suggests or implies that this has ever interfered with either the operation of the law clinics or the representation of clients.  Multiple witnesses attest that the kinds of discussions engaged in by the students, and even profanity, was common in the Clinic Office; and yet somehow only Ms. Fisher has been investigated and faces discipline.

As to your question of what can be provided by the other witness, Professor Kenneth Williams, whom Ms. Fisher has respectfully requested that you call before the Council; we expect him to testify that it was the student, **Student 8** (not Ms. Fisher), who first announced in Professor Williams' Race & Racism class that Charlie Kirk had been shot as well as words to the effect that Charlie Kirk was a "right wing" figure or a "right-winger."  In other words, some of the same things of which Ms. Fisher now stands accused of saying.  And yet **Student 8**, who is not black, was somehow spared a disciplinary investigation for an

**Defs.' Appx. 247**

honor code violation—obviously because there was none, just as there is none in the case of Ms. Fisher-- even if the worst alleged against her were true.

Again, we respectfully request that the Honor Council consider the attached affidavits as well as summon Professor Kenneth Williams and **Student 6**.  However, if the Council intends to exclude exculpatory evidence, as does the Keffer Report, please inform us of that fact in writing, and we will proceed accordingly.

Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

3

**Defs.' Appx. 248**

**Chapman, Sofia**

| | |
|---|---|
| **From:** | Michael Allen <mallen@allenharrislaw.com> |
| **Sent:** | Thursday, February 19, 2026 7:43 AM |
| **To:** | Spain, Larry; Chapman, Sofia; Outenreath, Alyson; Hardberger, Amy; **Student 1** |
| **Cc:** | Tiffany Lawson; Ellie Mae Fisher |
| **Subject:** | RE: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 2/2 |

> Some people who received this message don't often get email from mallen@allenharrislaw.com. Learn why this is important

Dear Attorney and Professor Spain, thank you for your response. I'm sure I speak for Ms. Fisher in saying that we appreciate your consideration of the evidence that Ms. Fisher has submitted to the Council and the Council's arrangement for Professor Williams and **Student 6** to appear as witnesses.

I note that you have also decided to stand on the notice of allegations that has already been provided to Ms. Fisher, which as stated previously nowhere indicates what or how Ms. Fisher has violated any aspect of the honor code. The notice you refer to mostly concerns utterances of true statements concerning the tragic murder of Charlie Kirk or issues of students' subjective feelings or viewpoints. Having examined the Honor Code, it is not clear how any of this has or can violate the code. But thank you for clarifying. I also see that you declined to clarify any further the procedures you intend to follow. I understand this will not be a court proceeding, but of course we must respectfully lodge our objections in the event that we are forced to resort to federal court.

Once again, thank you for the clarification, and I look forward to seeing you in person tomorrow.
Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com |
Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Spain, Larry <Larry.Spain@ttu.edu>
**Sent:** Wednesday, February 18, 2026 6:02 PM
**To:** Michael Allen <mallen@allenharrislaw.com>; Chapman, Sofia <Sofia.Chapman@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; **Student 1**
**Cc:** Tiffany Lawson <tlawson@allenharrislaw.com>; Ellie Mae Fisher <elliemaefisherttu@gmail.com>
**Subject:** Re: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 2/2

Dear Mr. Allen-

Thank you for your email regarding the referral to the Honor Council of Ellie Fisher who you represent. You raise several matters which I will address. First, you inquire as to the specific allegations resulting in a referral to the Honor Council. Those are specified in the report of the Honor Code Investigator , which has been previously furnished to Ms. Fisher.

You also asked about the hearing procedures. The procedures are set forth in our Honor Code which was previously furnished to Mr. Fisher and is available here: https://www.depts.ttu.edu/law/policies/honor-code.php

**Defs.' Appx. 249**

As noted in the Honor Code, the process is not a court proceeding governed by the rules of procedure or formal rules of evidence but rather a non-adversarial process designed to gather information and determine whether a violation of the Honor Code occurred.  Information will be gathered through questioning of individuals by members of the Honor Council and the student involved will have an opportunity to ask questions and provide a statement if desired.

You presented several affidavits which will be made part of the record of the proceedings and given such weight as the Honor Council determines appropriate.

Finally, you have requested two witnesses to appear to provide information during the hearing.  I have spoken with both of them and they have agreed to be available remotely even though we do not have the authority to compel or ensure their attendance.

I hope this adequately responds to the matters you raised.

Professor Larry R. Spain
Alvin R. Allison Professor of Law
*Texas Tech University School of Law*
3311 18th Street
Lubbock, TX  79409-0004
(806) 834-6649
(806) 742-4199 FAX
larry.spain@ttu.edu

---

**From:** Michael Allen <mallen@allenharrislaw.com>
**Sent:** Monday, February 16, 2026 11:52 AM
**To:** Spain, Larry <Larry.Spain@ttu.edu>; Chapman, Sofia <Sofia.Chapman@ttu.edu>; Outenreath, Alyson <Alyson.Outenreath@ttu.edu>; Hardberger, Amy <Amy.Hardberger@ttu.edu>; **Student 1**

**Cc:** Tiffany Lawson <tlawson@allenharrislaw.com>; Ellie Mae Fisher <elliemaefisherttu@gmail.com>
**Subject:** FW: Request for Witness Assistance and Procedural Clarification – February 20, 2026 Hearing 2/2

This email originated outside TTU. Please exercise caution!

Dear Professor Spain,

As you are an attorney and as the Honor Code and Rules of the School of Law of Texas Tech only state that I may not speak on behalf of my client, Ellen Fisher, only "at the hearing," but the Code and Rules are otherwise silent; I am writing you directly on her behalf.  We know of no indication that this is not permitted.  I will also accompany Ms. Fisher to the hearing, but as your rules prescribe, I will remain silent but be available to consult with her at the hearing itself.

Also, according to the Honor Code and Rules, Ms. Fisher is to receive a notice of hearing specifying the "allegation or allegations, the time set for the hearing, and the procedure that the Honor Council will follow."  At this time, we have received no information about the latter.  Please forward to us information concerning the procedures the Council will follow at your earliest convenience.

Although Ms. Fisher did receive a notice of allegations, these appear chiefly to recite reactions common to all students in the wake of the public assassination of Charlie Kirk, including factual statements such

**Defs.' Appx. 250**

as, "They shot Charlie"; "There's video"; and "It looks bad."  All of which are factually true and all of which were clearly observations made by many other students in addition to Ms. Fisher.  Thus, it is unclear how these allegations support "probable cause" of an honor code violation.

In addition, it is apparently alleged that Ms. Fisher was in a good mood, in other words that she had impermissible subjective feelings of some sort.  One other allegation is that she spoke to her mother, who likewise is alleged to have had impermissible subjective feelings, although why these are monitored by Texas Tech and its School of Law is nowhere stated or clear.  In particular, what is unclear is how Ms. Fisher is alleged to have violated the honor code prohibiting conduct that, "fail[ed] to uphold professional or fiduciary obligations" of any kind.  None of the witnesses report disruption to the clinics or work at the law school, which was likewise suppressed in the Keffer Report.

In addition, all of the actions, words, or observations listed in the Keffer Report, even if they were all true, cannot remotely be considered violations of clinical work or duties.  Moreover, they are quite obviously protected by the First Amendment to United States Constitution.

I believe, as a lawyer yourself, you will therefore recognize that the Notice is impossibly vague.

I also write to address your questions about the relevance of witnesses that Ms. Fisher's has requested to be summoned to the honor Council meeting.  To that end, I attach the following evidence for the honor Council's consideration:

1) Affidavit of **Student 9**
2) Affidavit of **Student 6**
3) Affidavit of **Student 12**
4) Affidavit of **Student 10**
5) Affidavit of Patrick Metze
6) Affidavit of **Student 11**

We have taken the liberty of gathering sworn affidavits from witnesses in the event that Ms. Fisher will be required to file for a Temporary Restraining Order and Preliminary Injunction following the hearing.  You will receive two emails due to the size of the files.  This is one of two; each will have the identical message.

As to relevance, you will see that material facts provided by these witnesses, whether they were interviewed by Professor Keffer or not, have been suppressed in his Report.

By way of example, **Student 11**, **Student 10**, **Student 12**, and **Student 9** all attest that Ms. Fisher was not disrespectful, hostile, or unprofessional in the Clinic Office, and did not say "mother fucker" in connection with Charlie Kirk's death.  Several attest that their statements to Professor Keffer were misrepresented in his report— which would seem to be itself an Honor Code violation that you are obligated to report and investigate.

In fact, there appears to have been a concerted effort to eliminate exculpatory information.  For example, **Student 6**, who was in the office of Professor Metze, attests that Ms. Fisher did not use the term "mother fucker" when discussing the murder of Charlie Kirk—but again. this important fact was suppressed in Professor Keffer's report.  In fact, no one testifies to the use of "mother fucker" except Professor Terri Morgeson, and yet it was she who interjected words to the effect that Charlie Kirk had

3

died or "he is dead" in Professor Metze's office, as **Student 6** also attests.  To our knowledge, **Student 6** is the only witness available to testify to this fact and who was in the presence of both Ms. Fischer and Professor Morgeson.

Several affiants also attest to cursing and curse words being commonly used in the Clinic Office and in Professor Metze's office, as does Professor Metze, and yet no evidence in the Keffer Report suggests or implies that this has ever interfered with either the operation of the law clinics or the representation of clients.  Multiple witnesses attest that the kinds of discussions engaged in by the students, and even profanity, was common in the Clinic Office; and yet somehow only Ms. Fisher has been investigated and faces discipline.

As to your question of what can be provided by the other witness, Professor Kenneth Williams, whom Ms. Fisher has respectfully requested that you call before the Council; we expect him to testify that it was the student, **Student 8** (not Ms. Fisher), who first announced in Professor Williams' Race & Racism class that Charlie Kirk had been shot as well as words to the effect that Charlie Kirk was a "right wing" figure or a "right-winger."  In other words, some of the same things of which Ms. Fisher now stands accused of saying.  And yet **Student 8,** who is not black, was somehow spared a disciplinary investigation for an honor code violation—obviously because there was none, just as there is none in the case of Ms. Fisher-- even if the worst alleged against her were true.

Again, we respectfully request that the Honor Council consider the attached affidavits as well as summon Professor Kenneth Williams and **Student 6**.  However, if the Council intends to exclude exculpatory evidence, as does the Keffer Report, please inform us of that fact in writing, and we will proceed accordingly.

Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

4

**Defs.' Appx. 252**

**Chapman, Sofia**

| | |
|---|---|
| **From:** | Chapman, Sofia |
| **Sent:** | Monday, March 30, 2026 2:53 PM |
| **To:** | 'Michael Allen'; Gonzalez, Jarod |
| **Cc:** | Fisher, Ellie; Tiffany Lawson; Gonzalez, Jarod |
| **Subject:** | RE: Ellie Mae Fisher - Request for Review of Honor Council Decision |

Dear Mr. Allen and Ms. Fisher,

As per Dean Gonzalez's email, the full evidentiary record has been provided by me to Dean Gonzalez which includes the two emails you sent on February 16th along with the attached six sworn affidavits.

Sincerely,

Sofia

Sofia Chapman, Ph.D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness
Office for Student Life Suite 103/104
Texas Tech University School of Law
Direct line: 806-834-2468
Sofia.chapman@ttu.edu

I recognize and understand that my working hours may be at times that are not your own. Please don't feel pressured to respond outside of your working hours. All the best!

**If you are in crisis, please call 911 immediately.**

Privacy/Confidentiality Notice:  This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Michael Allen <mallen@allenharrislaw.com>
**Sent:** Monday, March 30, 2026 1:26 PM
**To:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** RE: Ellie Mae Fisher - Request for Review of Honor Council Decision

This email originated outside TTU. Please exercise caution!

Thank you Associate Dean Chapman, Has the complete record, including the six sworn affidavits of students, many clearly indicating the biased nature of the Keffer Report, been forwarded to Associate

1

**Defs.' Appx. 253**

Dean Gonzalez?  Or just the transcript of the hearing?  We can also forward those to Associate Dean Gonzalez if you do not have them readily available.

Thanks, and we appreciate your help throughout all of this.

Mike Allen

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Chapman, Sofia <Sofia.Chapman@ttu.edu>
**Sent:** Monday, March 30, 2026 2:13 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Fisher, Ellie <Ellie.Fisher@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>; Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Subject:** Re: Ellie Mae Fisher - Request for Review of Honor Council Decision

Dear Ellie,

As a follow up to Dean Gonzalez's email, I have also provided Dean Gonzalez with the full typed transcript of the hearing.

Sincerely,

Sofia

Sofia Chapman, Ph. D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness

This email and any files transmitted with it may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this information contained herein (including any reliance thereon) is strictly prohibited.  If you have received this email transmission in error, please immediately notify me by telephone or via return email, and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.

On Mar 30, 2026, at 12:44 PM, Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu> wrote:

2

**Defs.' Appx. 254**

Dear Ellie:

I received your written request to review the Honor Council's decision. The record has been provided to me. You do not need to send any additional materials to me.

Best,

Dean Gonzalez

Jarod S. Gonzalez
Associate Dean for Academic Affairs and
J. Hadley and Helen Edgar Professor of Law
Texas Tech University School of Law
806-834-8378
jarod.gonzalez@ttu.edu

---

**From:** Fisher, Ellie <Ellie.Fisher@ttu.edu>
**Sent:** Friday, March 27, 2026 2:10 PM
**To:** Gonzalez, Jarod <Jarod.Gonzalez@ttu.edu>
**Cc:** Chapman, Sofia <Sofia.Chapman@ttu.edu>; Michael Allen <mallen@allenharrislaw.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Ellie Mae Fisher - Request for Review of Honor Council Decision

Dean Gonzalez,

Pursuant to the Texas Tech University School of Law policies, I am formally requesting a review of the Honor Council's decision, including the sanction imposed. I trust that you will be provided with the full evidentiary record considered by the Honor Council from the appropriate university official. However, please let me know if you would like me to submit any materials directly. Attached is my written request for review.

Thank you,
Ellie Mae Fisher

**Ellie Mae Fisher | She, Her**
Texas Tech Law, *Candidate for Doctor of Jurisprudence* 26'
Criminal Defense Clinic, *Texas State Bar Qualified Law Student | (806) 834-2194
Tech Law National Lawyers Guild, *President*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

**Defs.' Appx. 255**

## Chapman, Sofia

| | |
|---|---|
| **From:** | Michael Allen <mallen@allenharrislaw.com> |
| **Sent:** | Thursday, February 26, 2026 9:44 AM |
| **To:** | Chapman, Sofia |
| **Cc:** | Tiffany Lawson |
| **Subject:** | RE: FERPA waiver |

Thank you, Associate Dean Chapman.  I think this email was re-sent to you by mistake, because I remember we handled this last week before the hearing.  Thanks for all your help in this!

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375 www.allenharrislaw.com |
Tel: (610) 634-8258 | Fax: (860) 481-7899

---

**From:** Chapman, Sofia <Sofia.Chapman@ttu.edu>
**Sent:** Thursday, February 26, 2026 10:23 AM
**To:** Michael Allen <mallen@allenharrislaw.com>
**Cc:** Ellie Mae Fisher <elliemaefisherttu@gmail.com>; Tiffany Lawson <tlawson@allenharrislaw.com>
**Subject:** Re: FERPA waiver

Dear Mr. Allen,

Ellie took care of this.

Best!

Sofia

Sofia Chapman, Ph. D.
Associate Dean for Student Life
Director of Community Engagement
Director of Wellness

This email and any files transmitted with it may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this information contained herein (including any reliance thereon) is strictly prohibited.  If you have received this email transmission in error, please immediately notify me by telephone or via return email, and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.

**Defs.' Appx. 256**

On Feb 26, 2026, at 6:11 AM, Michael Allen <mallen@allenharrislaw.com> wrote:

This email originated outside TTU. Please exercise caution!

Dear Ms. Chapman, I am happy to have Ms. Fisher execute a FERPA waiver, but have not received a link to any such form that Texas Tech prefers, although I did get a link to a Red Raider portal, and established a profile.  If you could direct me to the required form that Texas Tech prefers, I would be happy to get the document executed.  I do believe, however, Ms. Fisher already executed at least one FERPA waiver indicating our firm.
Thank you for your help in this.
Sincerely,

**Michael Thad Allen, J.D., Ph.D.**
**ALLEN HARRIS PLLC**
mallen@allenharrislaw.com | Connecticut Office | PO Box 404 | Quaker Hill, CT 06375
www.allenharrislaw.com | Tel: (610) 634-8258 | Fax: (860) 481-7899

**Defs.' Appx. 257**

### AFFIDAVIT OF Student 9

My name is **Student 9**. I am over the age of eighteen (18), competent to testify, and understand the obligation to provide truthful statements under oath. The following statements are made based upon my personal knowledge and experience:

1.      I am a third-year law student at Texas Tech University School of Law, which has its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2.      I met Ellie Fisher on the first day of law school. She was the first person I spoke to, and we have been close friends since that time.

3.      On Wednesday, September 10, 2025, at approximately 2:47 p.m., I received a text message from Ellie Fisher. I informed her that I was in the clinic office at that time.

4.      While in the clinic office, **Student 4** and **Student 12** were present. I believe **Student 5** and **Student 11** were also present.

5.      A few minutes later, Ellie entered the clinic office. She asked whether I had heard the news. I told her I had not. She informed me that Charlie Kirk had been shot.

6.      Ellie asked whether I wanted to see the video, and I said yes. She showed me a video depicting Charlie Kirk being shot.

7.      We discussed the incident and expressed disbelief that it had occurred.

8.      **Student 10** later entered the room and, after asking about the news, was also shown the video.

9.      Multiple individuals in the room participated in the conversation.

10.      Statements were made by various individuals that Charlie Kirk was a racist and a white supremacist. I cannot state with certainty who made those remarks.

11.      Someone stated that it had not yet been confirmed whether he had died. Ellie, **Student 12**, and I expressed that, based on the video, it appeared the gunshot was fatal.

1

**Defs.' Appx. 258**

12. I commented that I was surprised that someone who likely received death threats would not have protective measures such as bulletproof glass in place.

13. The discussion concerned a current event, and most individuals present contributed to the conversation.

14. We have consistently been informed that the clinic suites are a safe environment for discussing sensitive topics. In the past, we have discussed matters of similar sensitivity, including public incidents.

15. Someone mentioned that the shooter might never be identified. Ellie stated that authorities already had someone in custody.

16. **Student 4** made a statement regarding felons not being permitted to possess firearms. I responded that there had been no indication the shooter was a felon and that such an assumption was speculative.

17. **Student 12** and **Student 4** then discussed matters relating to felons, juveniles, and Texas gun laws.

18. The discussion lasted approximately ten (10) minutes.

19. I had completed my work for the day and informed Ellie that I was leaving. She exited the clinic office with me.

20. I did not witness Ellie celebrate the death of Charlie Kirk.

21. I did not hear Ellie say "that mother fucker got shot" or use the term "mother fucker" when referencing Charlie Kirk.

22. I have heard several law students use curse words in the clinic suites but have never seen anyone brought before the honor council except Ellie.

23. I have even used curse words.

2

**Defs.' Appx. 259**

24.    I understand that this affidavit may be reviewed and relied upon by the Honor Code Office or other related decision-makers.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF FEBRUARY 2026,



**Student 9**

STATE OF TEXAS
COUNTY OF _Lubbock_

Subscribed, sworn, and acknowledged before me this 13 day of _February_, 2026.
Notary Public

My commission Expires: _April 9 2028_

> C DOCKAL
> Notary ID #134841518
> My Commission Expires
> April 9, 2028

3

**Defs.' Appx. 260**

## AFFIDAVIT OF Student 6

My name is **Student 6**    I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience:

1.      I am currently a third-year law student at Texas Tech University School of Law, which ha s its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2.      I know Ellie Fisher because she is a fellow third-year law student and a member of the Criminal Defense Clinic previously taught by Professor Patrick Metze. I am also a member of the Criminal Defense Clinic.

3.      I distinctly remember the day that Charlie Kirk was assassinated, which was September 10, 2025.

4.      On the day of Charlie Kirk's assassination, I was in Professor Metze's office with Ellie Fisher, , **student 7**,  and Professor Metze.

5.      I learned about Charlie Kirk's assassination while in Professor Metze's office. The conversation in the room was normal and productive, and lasted no more than 5 or 10 minutes.

6.      The first time I saw the video of the assassination was when Professor Metze showed it to me on his phone.

7.      Initially, I did not know that Charlie Kirk had died. I learned that he had died when Professor Terri Morgeson walked into the room and told Professor Metze words to the effect of "he died" or "he is dead."

8.      I never witnessed anyone in the room, including Ellie, say that "Charlie Kirk got what he deserved."

9.      I did not hear Ellie Fisher use the term "motherfucker" when discussing Charlie Kirk. I did not hear Ellie Fisher say, "The motherfucker got shot" or "They shot the motherfucker."

1

**Defs.' Appx. 261**

10.    I never saw Ellie celebrate the death of Charlie Kirk.

11.    This affidavit is consistent with the statement I gave to William Keffer during my interview with him on or about October 22, 2025.

12.    I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13 DAY OF FEBRUARY 2026,



Student 6

STATE OF TEXAS
COUNTY OF    Lubbock

Subscribed, sworn, and acknowledged before
me this 13 day of February, 2026.
Notary Public Marlyse Jarrett
My commission expires: 01/27/2029

> MARLYSE JARRETT
> Notary Public, State of Texas
> Comm. Expires 01-27-2029
> Notary ID 132891673

2

**Defs.' Appx. 262**

# AFFIDAVIT OF Student 12

My name is **Student 12**. I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience:

1.      I am currently a third-year law student at Texas Tech University School of Law.

2.      I know Ellie Fisher because she is a fellow third-year law student who is a member of one of the Criminal Defense Clinics that shares the Criminal Defense Clinic workroom.

3.      I distinctly remember the day that Charlie Kirk was assassinated, which was September 10, 2025.

4.      On the day of Charlie Kirk's assassination, after my Evidence class ended at 2:50 p.m., I walked into the Criminal Defense Clinic workroom.

5.      I learned about Charlie Kirk's assassination while in my Evidence class and had already seen the video prior to entering the Criminal Defense Clinic workroom.

6.      When I entered the Criminal Defense Clinic workroom, several students were already discussing the assassination, including, as I recall, Ellie Fisher, **Student 9**, **Student 11**, and **Student 4**

7.      With respect to the discussion about Charlie Kirk's assassination, we were not discussing it in a political context. Instead, we were discussing how gruesome the video of the shooting appeared and the low likelihood that he survived.

8.      I do not recall Ellie Fisher coming across as celebratory when discussing the assassination of Charlie Kirk.

9.      I do not remember anyone in the clinic workroom stating that Charlie Kirk deserved what happened to him.

1

10.     I did not hear Ellie Fisher use the term "motherfucker" when discussing Charlie Kirk.

11.     I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 11 DAY OF FEBRUARY 2026,



**Student 12**

STATE OF TEXAS
COUNTY OF        LUBBOCh

Subscribed, sworn, and acknowledged before me this 11 day of FEBUARY, 2026.
Notary Public
My commission expires: April 4, 2029

ANDRES CASTRO
Notary ID #135510110
My Commission Expires
April 4, 2029

2

# AFFIDAVIT OF Student 10

My name is **Student 10** I am over the age of 18 and competent to provide this statement. I make the following statements based on my direct knowledge and experience:

1.      I am currently a third-year law student at Texas Tech University School of Law, where I was enrolled in the Criminal Defense Clinic alongside Ellie Fisher.

2.      On September 10, 2025, at approximately 2:55 p.m., I was in the Criminal Defense Clinic workroom, sitting at the conference table with **Student 4,** a student in the Caprock Criminal Defense Clinic. The door to the workroom was open, and students were coming in and out of the room. I did not hear anything unusual, loud, or concerning at that time.

3.      Shortly thereafter, Ellie Fisher entered the workroom and asked if I had heard that Charlie Kirk had been shot. She asked if I wanted to see the video, and I said yes. I wanted to see the video and consented to the same. She showed me the video on her phone. Others in the room viewed the video if they chose to, and some of us also reviewed news articles about the incident.

4.      We discussed the event and what we knew about what had happened to Charlie Kirk. I asked if he had died, and Ellie said he probably had. Other students, including **Student 12** , and **Student 15** may have joined the conversation. Others may have joined the conversation as well as it was the topic of discussion amongst law students at the time. Several students were entering and exiting the clinic workroom during this time, but all were students in the Criminal Defense Clinic or Caprock Criminal Defense Clinic programs.

5.      The discussion in the clinic workroom was ordinary and aligned with the type of sensitive conversations that occur routinely in the clinic, which often include topics such as criminal matters, the death penalty, racism, and mental health. People in the room held differing political

1

Defs.' Appx. 265

opinions, but the discussion remained civil, and no one became emotional or indicated a desire to end the conversation abruptly.

6.      At the start of the semester, Professor Metze emphasized that the clinic was a "safe space" where students could discuss sensitive topics they might not discuss elsewhere. Conversations in the clinic are understood to be confidential and are part of the professional environment in which students learn to navigate challenging discussions related to criminal law and client representation.

7.      My initial reaction to the video and conversation was shock. I do not recall Ellie making any statements to the effect that "he got what he deserved."

8.      I have heard other law students including myself use curse words but have never heard of someone brought before the honor council like Ellie.

9.      Her demeanor was consistent with the range of reactions I observed among students present. Nothing she said or did struck me as inappropriate or unprofessional.

10.     Based on my direct observations, Ellie's conduct that day did not interfere with any work in the clinic or violate any rules or expectations I am familiar with.

11.     I have had the opportunity to review the investigative report prepared by William Keffer regarding the interview I gave on November 11, 2025. In that report, my statement is summarized in a single sentence noting that "Fisher offered to show me her video on her phone." I am unsure why the remainder of my statements from that interview were omitted.

12.     During the interview, I was asked whether I heard Ellie make a statement such as "The mother fucker got shot" or "They shot the mother fucker," and I responded that I did not.

13.     This response was not included in the report.

2

14.    I was also asked whether I believed Ellie was capable of making such a statement, and I explained that it would depend on the setting, but that she would never say something like that in class. This was also omitted from the report.

15.    I don't know why these statements were excluded from the report, though it appears that leaving them out served to unfairly portray Ellie in a negative light.

16.    I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

SIGNED UNDER THE PENALTIES OF PERJURY THIS ___ DAY OF FEBRUARY 2026,

**Student 10**

STATE OF TEXAS
COUNTY OF     Lubbock

Subscribed, sworn, and acknowledged before me this 12th day of February, 2026.
Notary Public
My commission expires:    5/2/2028



SALLY ANN MORENO
Notary Public, State of Texas
Notary ID# 134853808
My Commission Expires 05-02-2028

3

# AFFIDAVIT OF Student 11

My name is **Student 11**    I am over the age of eighteen (18), competent to testify, and understand the obligation to provide truthful statements under oath. The following statements are made based upon my personal knowledge and experience:

1. I am a third-year law student at Texas Tech University School of Law, which has its principal place of operations at 3311 18th St, Lubbock, TX 79409.

2. I know Ellie Fisher from law school, where we are both third-year students at Texas Tech University School of Law. I consider her to be a friend.

3. I provide this affidavit voluntarily in connection with an Honor Code investigation involving Ellie Fisher.

4. I recall the day that Charlie Kirk was assassinated, which occurred on September 10, 2025.

5. On the day of Charlie Kirk's assassination, at approximately 2:55 p.m., I was in the Criminal Defense Clinic Workroom with Ellie Fisher and **Student 4**.

6. **Student 4**, Ms. Fisher, an dI were discussing the assassination within hours of its occurrence. It was a topic widely discussed among students at the law school that day.

7. The Criminal Defense Clinic Workroom is a shared space used by students from the Criminal Defense Clinic and the Caprock Criminal Defense Clinic. It has always been a place where students may speak freely and discuss sensitive topics, including matters such as the assassination of Charlie Kirk.

8. During the discussion, Ellie was not disrespectful or hostile towards me or **Student 4** despite our differing opinions. During the conversation, I recall Ellie stating that she found it ironic that Charlie Kirk was shot while discussing gun violence and while holding views that, in her opinion, treated gun violence as essentially acceptable. Ellie did not direct hostility toward anyone present; she simply did not appear upset by the news of Charlie Kirk's assassination.

9. In my opinion, Ellie's reaction to Charlie Kirk's assassination was one of genuine surprise and shock, as if she was processing what she had seen out loud in real time. In fact, all of us appeared to be in a state of shock after seeing a widely circulated video of a controversial political figure being shot in the neck.

10. I have heard other law students use curse words in the clinic workroom on numerous occasions, and none of those students have ever been brought before the Honor Council as Ellie has.

11. Several months later, on or about November 13, 2025, I was asked to participate in an interview with William Keffer and Dean Chapman.

1

12.     At the beginning of the interview, I was not informed of its purpose. I initially believed the interview concerned an incident in which I had shown Ellie Fisher a photograph of her vehicle after racial slurs, specifically the word "nigger," had been written on it days earlier. I later learned that the interview instead concerned the discussion regarding Charlie Kirk's assassination that had occurred months prior. I found this unexpected.

13.     During the interview, I was asked whether I believed Ellie Fisher knew who Charlie Kirk was prior to his assassination. I responded that she "probably had heard of him, like most people," because Mr. Kirk was widely covered in the news at the time. I did not intend to state that Ms. Fisher knew him personally or was particularly familiar with him. After reviewing the investigative report regarding Ellie F isher, I observed that it states, "**Student 11** stated that Fisher talked about Kirk like she knew who he was." I do not believe this accurately reflects my statement or the context in which it was made. I do not know why my statements to Professor Keffer would be misconstrued in this light other than to make Fisher somehow look bad.

14.     I was also asked whether Ellen Fisher insinuated that Charlie Kirk was going to hell. I informed the investigator that I did not recall Ms. Fisher making such a statement and further stated that such a statement would not be determinative, as she is not God. This portion of my response was not included in the investigative report.

15.     As I was leaving the interview, I informed the investigator that I could understand why Ellie Fisher felt scared or apprehensive regarding the school's response, and that I believed it was unreasonable for the institution to focus more heavily on a months-old conversation about Charlie Kirk rather than the recent incident involving racial slurs written on Ms. Fisher's vehicle. I was informed that campus police would be present going forward. These statements were also not reflected in the investigative report.

16.     This affidavit is based solely on my personal observations and recollection. I have not been pressured, threatened, or promised anything in exchange for providing this statement.

17.     I understand that this affidavit may be reviewed and relied upon by the Honor Code Office or other related decision-makers.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 16ᵗʰ DAY OF FEBRUARY 2026,

**Student 11**

STATE OF TEXAS
COUNTY OF _Lubbock_

Subscribed, sworn, and acknowledged before me this 16ᵗʰ day of _February_, 2026.

My commission Expires: _09/04/2029_

CHRISTA GIBSON
Notary Public, State of Texas
Comm. Expires 09-04-2029
Notary ID 135529832

2



**TEXAS TECH UNIVERSITY**
School *of* Law™

June 6, 2023

Board of Law Examiners
PO BOX 13486
Austin, TX  78711-3486

RE: Ellen Fisher (xxxx-xx-3572)

To whom it may concern:

No action was taken by the Texas Tech University School of Law regarding Ms. Fisher's amendment to her application. She amended her application prior to matriculation, which does not trigger our formal Admissions and Honor Council proceedings, which occurs if the matter is serious. In this case, the amended offense was not considered serious and her transcript accurately notes her academic history.

No action was taken by the admissions office.

Sincerely,

Danielle Saavedra, J.D.
Assistant Dean of Admissions

3311 18th Street | Box 40004 | Lubbock, Texas 79409-0004 | T 806.742.3791 | F 806.742.1629

An EEO/AA/Vet/Disability Employer

**Defs.' Appx. 270**

**Saavedra, Danielle**

| | |
|---|---|
| **From:** | Fisher, Ellie |
| **Sent:** | Monday, June 5, 2023 11:44 AM |
| **To:** | Saavedra, Danielle |
| **Subject:** | Character & Fitness |

Hi there Danielle!

Sorry to pop in with yet another question. 😅 Just working my way through the checklist! I believe I made an error on my C&F on my application.  On the Character & Fitness section, I marked 'NO' when asked if I have ever been subject to any disciplinary action by TTU, including being suspended or expelled. I initially marked no because I misunderstood discipline as non-academic matters only. As I knew disclosing my academic history was important, I did initially include an academic addendum to explain my transcript history. This was truly just an oversight on my part, and I did not intend to apply with any dishonesty on my application.

Do I send in an updated version, or does the academic addendum that I included work? I am so, so sorry again.

Thank you so much!

Ellie

**ELLIE MAE FISHER | She/her/hers**
T: 1(408)687-3295
E: ellie.fisher@ttu.edu
Alt. E: elliemaefisherttu@gmail.com

*"Your silence will **not** protect you" – Audre Lorde*

**Defs.' Appx. 271**



January 4, 2024

Ellen Fisher
*Via email*

RE:    Placement on Academic Probation

Dear Ellen:

Now that your Fall 2023 semester grades have been reported, this letter is to address your academic performance at Texas Tech Law.

As you know, the law school's Academic Standards Policy sets forth the grade requirements for first-year students: "[a] first-year student who has a GPA below 2.250 but above 1.850 at the end of the first fall semester will be placed on academic probation." Your fall semester GPA was 2.218, which falls within the range for academic probation. As a result, you are no longer in good academic standing and have been placed on academic probation. *To be removed from academic probation at the end of the Spring 2024 semester, you must attain both a semester and cumulative GPA of 2.250 or higher.*

We want you to be successful at Texas Tech Law, so the policy also sets out some conditions that will help you achieve your academic goal during the spring semester.

**Meet with Academic Affairs Dean:** Please email me as soon as possible to set up a time to meet with me about your academic probation. The meeting with me must take place on or before Friday, January 19, 2024. As the Academic Affairs Dean, I want to make sure you understand the terms of your academic probation and provide you with general support.

**Academic Success Meetings:** To help you with academic success resources, time management, etc., you are required to meet with Erica Lux, Director of Academic Success Programs, (or Jessica Aycock, the Associate Director) on a regular basis throughout the Spring 2024 semester. The first meeting with Director Lux must be no later than Friday, January 19, 2024. Please contact her at erica.lux@ttu.edu to set up your meeting time. (You may meet with her before or after you meet with me.)

**Prioritizing Academic Performance:** We want students who are on academic probation to focus on their academic performance, and therefore, they cannot participate in certain law school activities. Following the academic standards policy, students on academic probation cannot do the following: participate in Board of Barristers activities (including acting as a witness or a bailiff) or in any other advocacy competitions; serve on the staff of any law school journals, law reviews, or other publications; participate in externships; enroll in clinical programs; serve as an elected or appointed officer in any student organization; or serve as a 1L mentor. Further, students on academic probation may not be employed for compensation outside of the law school without permission from me. Please note that failure to abide by this condition may be a violation of the Honor Code.

**Defs.' Appx. 272**

Academic Probation
January 4, 2024
Page -2-

_____

**Meet with Associate Dean Chapman:** I am aware that you have been in touch with Associate Dean Chapman. I highly encourage you to continue communicating with her, as she can assist you with well-being resources and general advice to help you be successful.

We want you to succeed academically at Texas Tech Law and will do what we can to make that happen. Please keep in mind, however, that if you are unable to achieve both a semester and cumulative GPA of 2.250 or higher at the end of the Spring 2024 semester, you will be academically dismissed from the law school.

If you have any questions, please do not hesitate to contact me. I am here to help in any way I can.

Kind regards,

*W. Humphrey*

Wendy-Adele Humphrey
Associate Dean for Academic Affairs
Brock Endowed Professor of Law

cc:  Sofia Chapman, Associate Dean for Student Life
     Janessa Walls, Assistant Dean for Academic Services and Registrar
     Erica Lux, Director of Academic Success Programs

**Defs.' Appx. 273**



May 21, 2024


Ellen Fisher
*Via email at Ellie.fisher@ttu.edu*

Dear Ellie:

This letter is to address your academic performance during the Spring 2024 semester. As you know, the law school's Academic Standards Policy sets forth the grade requirements to be removed from academic probation. Your grades improved during the Spring 2024 semester, and you reached the GPA threshold to no longer be on academic probation. Your hard work and dedication paid off!

We extend our best wishes and hope for your continued success at Texas Tech Law. If you ever need assistance with anything, please do not hesitate to contact any member of the law school team.

Kind regards,

Wendy A. Humphrey
Associate Dean for Academic Affairs
Brock Endowed Professor of Law

cc: Sofia Chapman, Associate Dean for Student Life
    Janessa Walls, Assistant Dean for Academic Services & Registrar
    Erica Lux, Director of Academic Success Programs

# Appendix 7

Declaration of Alyson Outenreath

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

ELLIE MAE FISHER,

     *Plaintiff,*

v.

CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,

     *Defendants.*

Civil Action No. 5:26-cv-00073-X

---

## DECLARATION OF ALYSON OUTENREATH

Pursuant to 28 U.S.C. § 1746, I, Alyson Outenreath, declare the following:

1.     My name is Alyson Outenreath. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am an Associate Dean and Professor and Member of the Honor Council at Texas Tech School of Law (the "Law School").

3.     On January 23, 2026, after conducting a preliminary factual investigation, Professor Keffer, the Honor Code Investigator, referred the matter of Ellie Fisher to the Honor Council, as he found probable cause existed to believe that Ms. Fisher violated part 2.H of the Honor Code. In my role on the Honor Council, I became aware of the allegations that Ms. Fisher had celebrated the assassination of Charlie Kirk in the Law School Clinic area.

1

**Defs.' Appx. 276**

4.     On February 20, 2026, the Honor Council, including myself as a Member, convened to consider whether Ms. Fisher violated part 2.H. (Violation of Professional Duties) of the Honor Code ("… by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs …") as a result of her alleged behavior and statements within the Clinical Programs offices publicly celebrating the assassination of Charlie Kirk on September 10, 2025.

5.     On March 11, 2026, the Honor Council issued a report pursuant to Honor Code part 4.H., which included findings of fact, the Honor Council's conclusion as to the violation of the Honor Code, and the recommended sanction.

6.     The Honor Council took administrative notice that the Law School Clinic is an academic program of the Law School in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

7.     A majority of the Honor Council found, by clear-and-convincing evidence, that Ms. Fisher was loud, happy, and celebratory when entering the Law School Clinic and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

8.     The Honor Council did not consider the viewpoint of Ms. Fisher's comments in making its finding. Rather, the Honor Council found that statements endorsing or celebrating death or violence, particularly in a professional setting, are contrary to respect for the rule of law and violate ordinary standards of professional conduct. The Honor Council also found Ms. Fisher's actions interfered with the normal work routine of several individuals in the Law School Clinic and adversely affected the operations of the Clinical Program.

9.     The Honor Council, applying the clear and convincing evidence standard, concluded by majority vote of 3-1 that Ms. Fisher violated part 2.H. of the Honor Code.

2

**Defs.' Appx. 277**

10.     The Honor Council recommended that Ms. Fisher receive a written letter of reprimand from the Dean of the Law School to be placed in her permanent school record.

11.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 24 , 2026.


Alyson Outenreath

# Appendix 8

Declaration of Allyson Owens

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>　　　　*Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>　　　　*Defendants.* | Civil Action No. 5:26-cv-00073-X |

---

**DECLARATION OF ALLYSON OWENS**

---

Pursuant to 28 U.S.C. § 1746, I, Allyson Owens, declare the following:

1.　　My name is Allyson Owens. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.　　I am a law student and Member of the Honor Council at Texas Tech School of Law (the "Law School").

3.　　On September 10, 2025, there were multiple reports that Ms. Fisher celebrated the public assassination of Charlie Kirk while in the Law School's clinical suite during work hours. This occurred while Ms. Fisher was a clinical student with a supervised practice card and thus able to represent clients in our clinics under our professional supervision. The celebration was

1

**Defs.' Appx. 280**

loud, overheard by others, and adversely affected the operation of the clinic. The matter was referred to Professor Keffer to investigate pursuant to part 4.C. of the Honor Code.

4.      On January 23, 2026, after conducting a preliminary factual investigation, Professor Keffer, the Honor Code Investigator, referred the matter of Ellie Fisher to the Honor Council, as he found probable cause existed to believe that Ms. Fisher violated Section 2.H of the Honor Code.

5.      On February 20, 2026, the Honor Council, including myself as a Member, convened to consider whether Ms. Fisher violated part 2.H. (Violation of Professional Duties) of the Honor Code ("… by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs …") as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of Charlie Kirk on September 10, 2025.

6.      On March 11, 2026, the Honor Council issued a report pursuant to Honor Code part 4.H., including findings of fact, conclusion as to the violation of the Honor Code, and recommended sanction.

7.      The Honor Council took administrative notice that the Law School Clinic is an academic program of the Law School in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

8.      A majority of the Honor Council found by clear-and-convincing evidence that Ms. Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot when entering the Law School Clinics.

9.      The Honor Council did not consider the viewpoint of Ms. Fisher's comments in making its finding. Rather, the Honor Council found that statements endorsing or celebrating death or violence, particularly in a professional setting, are contrary to respect for the rule of

2

law and violate ordinary standards of professional conduct. The Honor Council also found Ms. Fisher's actions interfered with the normal work routine of several individuals in the Law School Clinic and adversely affected the operations of the Clinical Program.

10.    The Honor Council, applying the clear and convincing evidence standard, concluded by majority vote of 3-1 that Ms. Fisher violated section 2.H. of the Honor Code.

11.    The Honor Council recommended that Ms. Fisher receive a written letter of reprimand from the Dean of the Law School to be placed in her permanent school record.

12.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23rd, 2026.

_____
Allyson Owens

3

**Defs.' Appx. 282**

# Appendix 9

Declaration of Larry R. Spain

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| ELLIE MAE FISHER,<br><br>*Plaintiff,*<br><br>v.<br><br>CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of The Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of The Texas Tech School of Law, JAROD GONZALEZ, in his individual and official capacity as Associate Dean for Academic Affairs, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,<br><br>*Defendants.* | Civil Action No. 5:26-cv-00073-X |

---

## DECLARATION OF LARRY R. SPAIN

Pursuant to 28 U.S.C. § 1746, I, Larry R. Spain, declare the following:

1.      My name is Larry R. Spain. I am over eighteen (18) years of age and competent to make the following statement. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      I am a Professor and Chair of the Honor Council at Texas Tech School of Law (the "Law School").

3.      On September 10, 2025, there were multiple reports that Ms. Fisher celebrated the public assassination of Charlie Kirk while in the Law School's clinical suite during work hours. This occurred while Ms. Fisher was a clinical student with a supervised practice card and thus able to represent clients in our clinics under our professional supervision. The celebration was

1

**Defs.' Appx. 284**

loud, overheard by others, and adversely affected the operation of the clinic. The matter was referred to Professor Keffer to investigate pursuant to part 4.C. of the Honor Code.

4.    On January 23, 2026, after conducting a preliminary factual investigation, Professor Keffer, the Honor Code Investigator, referred the matter of Ellie Fisher to the Honor Council, as he found probable cause existed to believe that Ms. Fisher violated Section 2.H of the Honor Code.

5.    On February 20, 2026, the Honor Council, including myself as Chair, convened to consider whether Ms. Fisher violated part 2.H. (Violation of Professional Duties) of the Honor Code ("... by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs ...") as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of Charlie Kirk on September 10, 2025.

6.    On March 11, 2026, the Honor Council issued a report pursuant to Honor Code part 4.H., including findings of fact, conclusion as to the violation of the Honor Code, and recommended sanction. A true and correct copy of the Honor Council's Report in the matter of Ms. Fisher is attached hereto as **Exhibit A**.

7.    The Honor Council took administrative notice that the Law School Clinic is an academic program of the Law School in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

8.    A majority of the Honor Council found by clear-and-convincing evidence that Ms. Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot when entering the Law School Clinics.

9.    The Honor Council did not consider the viewpoint of Ms. Fisher's comments in making its finding. Rather, the Honor Council found that statements endorsing or celebrating

2

death or violence, particularly in a professional setting, are contrary to respect for the rule of law and violate ordinary standards of professional conduct. The Honor Council also found Ms. Fisher's actions interfered with the normal work routine of several individuals in the Law School Clinic and adversely affected the operations of the Clinical Program.

10.     The Honor Council, applying the clear and convincing evidence standard, concluded by majority vote of 3-1 that Ms. Fisher violated section 2.H. of the Honor Code.

11.     The Honor Council recommended that Ms. Fisher receive a written letter of reprimand from the Dean of the Law School to be placed in her permanent school record.

12.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2026.

_____
Larry R. Spain

3

**Defs.' Appx. 286**

# Exhibit A

**Defs.' Appx. 287**

March 11, 2026


Ellie Fisher                                              **Confidential**
Law School                                               *Sent via Email*
                                                         ellie.fisher@ttu.edu


Dear Ms. Fisher:

Please find attached a copy of the Report of Honor Council Hearing with Findings of Fact, Conclusion as to Violation of the Honor Code, and Recommended Sanction.

Under Section 6 of the Honor Code, if you do not consent to the sanction recommended by the Honor Council, you have a right to request review in writing to the Associate Dean for Academic Affairs which must be submitted within ten (10) calendar days from the date of the Council's transmittal of the Report to the Dean and the student.

You should also be advised that wellness resources are available to you at any time through the Office for Student Life within the School of Law.

Sincerely,

Professor Larry R. Spain
Chair, Honor Council


Copy:  Dean Jack Wade Nowlin via email  jack.nowlin@ttu.edu
       Associate Dean Sofia Chapman via email  sofia.chapman@ttu.edu
       Assistant Dean JaWana Green via email  jawana.green@ttu.edu
       Michael Allen via email  mallen@allenharrislaw.com


EXHIBIT A                                          **Defs.' Appx. 288**

**IN RE: ELLIE MAE FISHER**

**Report of Honor Council Hearing**

The Honor Council met on Friday, February 20, 2026 at 9 am in Room 106 of the Texas Tech University System Building to consider whether Ellie Fisher violated Section 2.H (Violation of Professional Duties) of the Texas Tech University School of Law Honor Code "...by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as a result of her behavior and statements within the Clinical Programs offices publicly celebrating the assassination of public figure Charlie Kirk on September 10, 2025.

Professor William R. Keffer, as Honor Code Investigator, referred the matter to the Honor Council after conducting a preliminary investigation and concluding that probable cause existed that a violation of the Honor Code had occurred. Present at the hearing and constituting a quorum were the following members of the Honor Council: Professors Amy Hardberger, Alyson Outenreath, and Larry Spain in addition to law student member Allyson Owens. Ellie Fisher appeared with her legal counsel, Michael Thad Allen. Also present was Sofia Chapman, Associate Dean for Student Life, and Ronny H. Wall, Office of General Counsel, Texas Tech University System.

This report includes a summary of the Honor Council proceedings; the Council's findings of fact; and it's recommended disposition of the case.

### SUMMARY OF PROCEEDINGS

Prior to the hearing and by letter dated February 4, 2026, Professor Larry Spain, Chair of the Honor Council, communicated with Ms. Fisher in writing to provide notice of the time and date of the hearing, information about the nature of the allegations prompting a referral to the Honor Council, and a general description of the process for conducting the hearing as outlined in the Honor Code of the Texas Tech University School of Law.

The following relevant documents were considered by the Honor Council, each of which was also made available to or otherwise submitted by Ms. Fisher and her counsel, and are made a part of the record of these proceedings:

1. Honor Council Notice dated February 4, 2026 and attachments from Professor Larry R. Spain, Chair of the Honor Council, to Ellie Fisher scheduling the hearing for February 20, 2026.

1

**Defs.' Appx. 289**

2. Letter dated January 23, 2026 to Professor Larry Spain, Chair of the Honor Council, from Professor William R. Keffer referring the matter to the Honor Council.

3. Report of the Honor Code Investigator, Professor William R. Keffer, dated January 23, 2026.

In addition, the following documents were submitted to the Honor Council by counsel for Ellie Fisher, are made a part of the record of these proceedings, and were considered in deciding the matter:

1. Affidavit of Holland Pombrio
2. Affidavit of Ashanty Bishop
3. Affidavit of Caleb Barkman
4. Affidavit of Callahan Ard
5. Affidavit of Patrick Metze
6. Affidavit of Tristan Perez
7. Ellie Mae Fisher's Opening Statement

The following individuals appeared and provided information to the Honor Council relevant to the allegations concerning a violation of the Honor Code:

1. Professor Joe Stephens
2. Professor Terri Morgeson
3. Madison Wright
4. Allison Monacelli
5. Anthony Bomar
6. Jakob Gomez
7. Ashanty Bishop (at the request of Ellie Fisher)
8. Professor Kenneth Williams (at the request of Ellie Fisher)
9. Ellie Fisher

Each of these individuals responded to questions both from members of the Honor Council as well as Ellie Fisher.

## FINDINGS OF FACT

After a careful review and consideration of the Report of the Honor Council Investigator, the Affidavits submitted by legal counsel for Ellie Fisher, and the information provided by various witnesses at the hearing held on February 20, 2026 and assessing the credibility of the information provided, the Honor Council makes the following findings of fact:

1. The Council takes administrative notice that the Clinical Programs is an academic program of the School of Law in which law students provide legal services to actual clients and other professional services to individuals under faculty supervision for academic

2

**Defs.' Appx. 290**

credit and functions as would a regular law office. As such, law students participating in the program are subject to the same ethical rules and professionalism standards as a duly licensed attorney.

2. Various statements were made as to the actions taken and statements made by Ellie Fisher following the assassination of Charlie Kirk on September 10, 2025 within the Clinical Programs offices which could have been considered celebratory in tone.

3. Upon entering the offices on September 10, 2025, a majority of the Council found by clear and convincing evidence that Professor Terri Morgeson and Madison Wright provided credible information that Ellie Fisher was loud, happy, and celebratory and made certain statements to the effect that she was in a good mood because Charlie Kirk had been shot.

4. Such statements endorsing or celebrating death or violence, particularly in a professional office setting,  are contrary to respect for the rule of law and violate ordinary standards of professional conduct.

5. As a result of Ellie Fisher's  actions, several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting which interfered with their normal work routine.

6. A majority of the Honor Council believed that certain activities took place in Professor Metze's office involving several students of the Criminal Defense Clinic, including Ellie Fisher. Information was provided by Professor Metze that Ellie Fisher was celebrating the shooting. However, there was conflicting information provided as to whether statements celebrating the death of Charlie Kirk and laughing at the video of Charlie Kirk's assassination could be attributed to Ellie Fisher. Accordingly, a majority of the Honor Council could not reach the conclusion that the actions and statements attributed to Ellie Fisher were supported by clear and convincing evidence.

7. Likewise, there was conflicting information about what actions and statements could be attributed to Ellie Fisher in the Criminal Defense Clinics workspace on that date and, as a result, the Honor Council was unable to reach a majority view on whether or not the statements or actions alleged had occurred.

8. Ellie Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among co-workers that would interfere with performance of work.

9. The actions and statements that were made by Ellie Fisher in a professional office setting were inappropriate, disrespectful, and demonstrated a lack of professional judgment and self-discipline.

10. As a result of the actions taken and statements made by Ellie Fisher, the operations of the Clinical Program were adversely affected and made some individuals uncomfortable.

## CONCLUSION AS TO VIOLATION OF THE HONOR CODE

Based on the foregoing findings of fact and applying the clear and convincing evidence standard, the Honor Council concludes, by a majority vote of 3-1,  that the

3

Respondent, Ellie Fisher, violated the Honor Code including *Principle One-A Law Student Should Always Act with Honor and Integrity in Matters Pertaining to Legal Education*, specifically Section 2.H (**Violation of Professional Duties**) "by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs . . .) as result of her actions and statements.

On the other hand, one member of the Honor Council concluded the evidence presented in the investigative report and at the February 20, 2026, hearing does not meet the clear and convincing standard required to find Ms. Fisher responsible for violating Section H of the Honor Code entitled "Violation of Professional Duties." This decision is based on conflicting evidence at the hearing and with the investigative report. The following are a few examples of conflicts on which this decision is based.

According to the majority of the Honor Council, the strongest evidence that Ms. Fisher acted unprofessionally on September 10, 2025, is her actions when she entered the clinic. Specifically, Professor Morgeson and Madison Wright stated they overheard Ms. Fisher saying "It's the best day ever. I'm so happy" and Ms. Fisher either said this alone or repeated it to Professor Stephens and said her happiness was because of Mr. Kirk's assassination. Professor Stephens does agree that Ms. Fisher stopped in his doorway, but then the accounts differ significantly. Professor Stephens stated that: "And she came in and said to me something like, "Have you heard that Charlie was shot?" And I said, 'No.' I didn't know who Charlie was. And she said, 'It looks bad,' and at some point said something that it's all over the Internet or something like that" which contradicts what Professor Morgeson stated she heard. As to Ms. Fisher's affect, he stated: "Ellie's demeanor to me was no different that day," she simply reported what had happened in the news, it was not disruptive or unprofessional. He repeated the last point several times during his testimony. Despite his location near clinic entrance, Professor Stephens did not report hearing Ms. Fisher make any loud proclamations upon entry. Although he may not have heard her, if she entered the clinic announcing Mr. Kirk's death in a celebratory manner, it seems inconsistent to me that she would be able to switch quickly to simply reporting the news to Professor Stephens.

Another conflict is Professor Morgeson's and Madison Wright's testimony that they heard Professor Stevens admonish Ms. Fisher because her behavior was not appropriate. Professor Morgeson stated she overheard Professor Stephens say "Don't do that. Don't say that. Don't do that" or something similar. Because Professor Morgenson testified after Professor Stephens, he was not asked directly about this, but in his testimony, he stated: "When she left, I don't remember having a memory of being like, "That was weird," or, "That was wrong," which essentially answers the question, had it been asked. He also stated: "that interaction was 30 seconds and then that was it." Professor Stephens repeated statements that Ms. Fisher did not say anything he found to be unprofessional generally negates any statement that he was concerned about her behavior at the time she entered his door.

Defs.' Appx. 292

While much of the focus is on the statements and actions of Ms. Fisher as she entered the clinic office, I do not feel the evidentiary standard was met in Professor Metze's office or later in the conference room either. The primary testimony against Ms. Fisher in Professor Metze's office centered on watching the video of the shooting and discussing whether Mr. Kirk could have survived. Although I find this behavior reprehensible, there were several people in that room, including a faculty member, and no one at the hearing could tie any statements from the office directly to Ms. Fisher versus other parties. Professor Morgeson stated she is not sure who used a profanity, which she stated to the investigator although her doubt was not noted. She also said it might have been Professor Metze who said it. Professor Morgeson stated her students were "shocked and offended" which they both denied at the hearing and stated they did not request to leave early based specifically on Ms. Fisher's statements. Unfortunately, Professor Metze's statement in the investigation report provides no specific information related to Ms. Fisher's "celebratory" behavior or actions in his office and his affidavit seems to contract his initial statements. Testimony from students in the conference room also did not provide details of Ms. Fisher being unprofessional. Although Jacob Gonzalez did state Ms. Fisher's mood could have been interpreted as celebratory, Anthony Bomar disagreed.

In summary, while I do not believe that Ms. Fisher's behavior (and that of others around her) on September 10, 2015 was proper under the circumstances, I also do not feel that the evidence is sufficient to meet the clear and convincing evidentiary standard required to find her responsible for a violation of Section H of the Honor Code.

## RECOMMENDED SANCTION

In recommending a sanction appropriate to the violation, the majority of the Honor Council that concluded a violation of the Honor Code was established has been guided by those mitigating and aggravating factors set forth in the Honor Code. After careful consideration of all information provided and made a part of the record of the proceedings, the Honor Council determines that Respondent's actions and conduct reflected poorly on the exercise of professional judgment in the particular setting in which her actions took place. Accordingly, the Honor Council recommends that the Respondent, Ellie Fisher, receive a written letter of reprimand from the Dean of the School of Law to be placed in her permanent school record. The Council believes such sanction is proportionate to the severity of the conduct involved and sufficient to reinforce the obligation on the part of all law students to always act with honor and integrity in all of their professional interactions,

Defs.' Appx. 293

particularly when they may have serious consequences to the reputation of the School of Law and its academic programs.

*This decision may be subject to review by the Office of Student Conduct per university policies. A representative from the Office of Student Conduct is cc'd on this Honor Council Hearing report and will be in contact with you.*

_____
Professor Amy Hardberger

_____
Professor Larry Spain

/s/ Alyson Outenreath
_____
Associate Dean and Professor
Alyson Outenreath

_____
Ally Owens

6

**Defs.' Appx. 294**