ELLEN FISHER,

      Plaintiff

      vs.

TEXAS TECH UNIVERSITY SYSTEM BOARD OF REGENTS, CODY CAMPBELL, DUSTIN WOMBLE, ARCILIA ACOSTA, PAT GORDON, CLAY C. CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DONALD SINCLAIR, and ELI HEATH, in their official capacity as Regents of the Texas Tech University System Board of Regents, and JACK WADE NOWLIN, in his individual and official capacity as Dean of the Texas Tech School of Law, JAROD GONZALES, in his individual and official capacity as Associate Dean for Academic Affairs, WILLIAM KEFFER, LARRY SPAIN, AMY HARDBERGER, ALLISON OUTENREATH, ALLY OWENS, and TERRI MORGESON, in their individual and official capacities as Faculty and/or Officers of the Texas Tech School of Law Honor Council,

      Defendants.

Civil Case No. _____

## COMPLAINT AND JURY DEMAND

### I.   INTRODUCTION

1.     As supported by the Affidavit of Ellie Fisher, the Affidavit of Attorney Michael Thad Allen, and the exhibits and admissible evidence authenticated in those Affidavits, Plaintiff Ellen "Ellie" Fisher bring suit against all Defendants and the Texas Tech University system Board of Regents, the individual Regents in their official capacities as well as Jack Wade Nowlin and Jarod Gonzales in their individual and official capacities as state actors and agents as state actors of Texas Tech University ("TTU") and against the Individual Defendants (identified

1

below) in their individual capacities to vindicate her rights under the First and Fourteenth Amendments to the United States Constitution, as made actionable under 42 USC § 1983 and Title VI of the Civil Rights Act of 1964, 42 USC §2000d, et seq.

## II.    PARTIES

### A.  Texas Tech University System Board of Regents

2.    Defendant Texas Tech University System Board of Regents ("TTU Board"), as mandated by Tex. Ed. Code, §109.001, is a legal entity that receives federal financial assistance and is the governing body of Texas Tech University School of Law. The TTU Board is responsible for the administration and management of federal funds and grants of any kind, and is authorized to enter into contracts, sue, and be sued on behalf of the TTU School of Law. Its principal place of business is 1508 Knoxville Ave., Suite 302, Lubbock, TX 79409

3.    As a recipient of federal funding, the TTU Board is sued under Title VI for discrimination against Plaintiff Ellie Fisher.

### A.B.    The Regents Defendants

2.4.    The Defendants who are members and officers of the TTU System Board of Regents ("Regents") will be referred to as the "Regents Defendants." The Regents isare the primary governing body for the Texas Tech School of Law (the "School of Law") with the authority under the laws and regulations of the State of Texas, including the Texas Education Code and the Texas Tech University System regulations, to implement and enforce the policies of the School of Law, including but Notnot limited to the Honor Code and Rules of the School of Law.[1]

---

[1] Avail. at https://www.depts.ttu.edu/law/policies/honor-code.php.

3.5. All members of the Regents, including the Chairman and Vice Chairman are state actors acting under the color of state law.

4.6. Cody Campbell is a Chairman of the Regents. On information and belief Mr. Campbell is a resident of Fort Worth, Texas.

5.7. Dustin Womble is a Vice Chairman of the Regents. On information and belief, Mr. Womble is a resident of Lubbock, Texas.

6.8. Arcilia Acosta is a member of the Regents. On information and belief, Ms. Acosta is a resident of Dallas Texas.

7.9. Pat Gordon is a member of the Regents. On information and belief, Mr. Gordon is a resident of El Paso, Texas.

8.10. Clay C. Cash is a member of the Regents. On information and belief, Mr. Cash is a resident of Lubbock, Texas.

9.11. Tim Culp is a member of the Regents. On information and belief, Mr. Culp is a resident of Midland, Texas.

10.12. Shelly Sweatt is a member of the Regents. On information and belief, Ms. Sweatt is a resident of Wichita Falls, Texas.

11.13. Doug McReaken is a member of the Regents. On information and belief, Mr. McReaken is a resident of Pearland, Texas.

12.14. Donald Sinclair is a member of the Regents. On information and belief, Mr. Sinclair is a resident of Houston, Texas.

13.15. Eli Heath is a member of the Regents. On information and belief, Mr. Heath is a resident of Lubbock, Texas.

16. The Regents Defendants are sued in their official capacity as state actors acting under color of state law for their acts and omissions in retaliation against Plaintiff Ellie Fisher for her speech as a private citizen on matters of public concern.

**C.       The Individual Defendants**

17. The following are individual officers and faculty of the School of Law and are sued in their individual and official capacities. The below Defendants are referred to collectively as the "Individual Defendants."

18. Jack Wade Nowlin is the Dean and W. Frank Newton Professor of Law at the School of Law and in this capacity, he is ultimately responsible for the actions of the School of Law Honor Council and all matters of student and faculty discipline. In this capacity and in exercising oversight over the Honor Council, Dean Nowlin was and is a state actor acting under color of state law. On information and belief, Dean Nowlin is a resident of Lubbock, Texas.

19. Jared Gonzales is Associate Dean for Academic Affairs and J. Hadley and Helen Edgar Professor of Law. In his capacity as Associate Dean for Academic Affairs, Dean Gonzales was assigned to decide Plaintiff Ellie Fisher's appeal of the Honor Council reprimand issued to suppress her free speech on a matter of public concern. He exercises oversight over the Honor Council and its enforcement of student discipline.  In this capacity, Dean Gonzales was and is a state actor acting under color of state law. On information and belief, Dean Gonzales resides in Lubbock, Texas.

20.     William Keffer is Janet Scivally and David Copeland Endowed Professor of Energy Law at Texas Tech University School of Law. In this capacity, Professor Keffer was responsible for "investigating" Plaintiff Ellen Mae Fisher for her alleged utterances at TTU, deemed to be improper. .  In this capacity, Keffer was and is a state actor acting under color of state law. On information and belief, Keffer resides in Lubbock, Texas.

4

18.21.  Larry Spain is Alvin R. Allison Professor of Law and Director of the Clinical Programs and Civil Practice Clinic at the School of Law as well as Chair of the Honor Council responsible for suppressing the free speech of Plaintiff Ellie Fisher as a private citizen speaking on matters of public concern.  In this capacity, Professor Spain was and is a state actor acting under color of state law. On information and belief, Professor Spain resides in Lubbock, Texas.

19.22.  Amy Hardberger is the George W. McCleskey Professor of Water Law and Director of the Center for Water Law and Policy at the School of Law and also an officer of the Honor Council responsible for suppressing the free speech of Plaintiff Ellie Fisher as a private citizen speaking on matters of public concern. In this capacity, Professor Hardberger was and is a state actor acting under color of state law. On information and belief, Professor Hardberger resides in Lubbock, Texas.

20.23.  Allison Outenreath is Associate Dean for Faculty Development, and the Erwin and Elaine Davenport Endowed Professor of Law at the School of Law and also an officer of the Honor Council responsible for suppressing the free speech of plaintiffPlaintiff Ellie Fisher as a private citizen speaking on matters of public concern. In this capacity Professor Outenreath was and is a state actor acting under color of state law. On information and belief, Professor Outenreath resides in Lubbock, Texas.

21.24.  Ally Owens was and is a student member of the School of Law Honor Council responsible for suppressing the free speech of plaintiffPlaintiff Ellie Fisher as a private citizen speaking on matters of public concern. In this capacity, Ms. Owens was and is a state actor acting under color of state law. On information and belief, Ms. Owens resides in Lubbock, Texas.

5

22.    Terri Morgeson is a clinical instructor and Director of the School of Law Family Law Clinic. As soon as Fisher uttered viewpoints on the murder of Mr. Kirk that hurt Morgeson's subjective feelings, in her capacity as a state employee and faculty member, with full knowledge that the speech of Plaintiff Ellie Fisher was that of a private citizen on matters of public concern, Director Morgeson scampered to the School of Law administration to tattletale on Ms. Fisher for expressing what Morgeson considered impure thoughts.  Morgeson reported Fisher to Defendant Spain of TTU's Honor Council, among others.  As explained below, supported by admissible evidence, suppressing Ms. Fisher's protected speech was so important to Morgeson that she also spread hysterical rumors, misrepresented facts, and lobbied to have Ms. Fisher punished by the School of Law's Honor Council.  In her capacity as Director, Morgeson was and is a state actor acting under color of state law.  On information and belief, Director Morgeson resides in Lubbock, Texas.

C.D.    **Plaintiff Ellen "Ellie" Fisher.**

23.25.  The Plaintiff Ellen Mae "Ellie" Fisher is a 3L law student at the School of Law where she is a zealous defender of her clients' rights in the Criminal Law Clinics.  Fischer Appendix ("(ECF No. 4.1, "FA") at 4, (Fisher Affidavit ("Fisher Aff"),")), ¶ 20.

24.26.  Fisher attended TTU both as an undergraduate, earning a BS in 2023. FA at 4, Fisher Aff, ¶ 22.

25.27.  Fisher is black, but she was raised by white parents, and she is a resident of California's Bay Area.  FA at 4, Fisher Aff, ¶ 23.

26.28.  Ms. Fisher first enrolled in TTU in 2018 after she was offered the Agricultural Education and Communications Endowed Alumni Scholarship for the academic year 2021-2022 and 2022-2023.  FA at 4, Fisher Aff, ¶ 24.

6

27.29.  In 2023, TTU awarded her its Law Admissions Scholarship.  FA at 5, Fisher Aff, ¶ 32.

28.30.  The School of Law has also asked Fisher to serve as its Texas Tech Pre Law Ambassador. FA at 4, Fisher Aff, ¶ 25.

29.31.  In 2021, Fisher founded the Texas Tech chapter of the NAACP, and she has served the NAACP in state-level leadership, including as its Press Secretary and Assistant Secretary.  Id., Fisher Aff, ¶ 26.  In the NAACP's YouYouth & College Division for the State of Texas, Fisher was appointed the First Vice President.  Id.

30.32.  Fisher also founded the TTU Chapter of NextGen America, the nation's largest youth voter organization.  Id., Fisher Aff, ¶ 27.

31.33.  By the TTU's Student Body Senate, Fisher was distinguished and recognized by Student Body Senate Resolution 57.145 in 2022.  Id., Fisher Aff, ¶ 28.

32.34.  TTU distinguished Fisher with its "Raider Wo Rocks Difference Maker Award" in 2022.  Id., Fisher Aff, ¶ 29.

33.35.  Also in 2022, TTU bestowed upon Fisher its President's Excellence in Diversity award.  Id. at 4, Fisher Aff, ¶ 30.

34.36.  Pulse Magazine recognized Fisher as its 2023 Speaker of the Year.  Id. at 5, Fisher Aff, ¶ 33.

35.37.  She has also served two terms as President of the TTU Chapter of the National Lawyers' Guild (2024-2025 and 2025-2026).  Id., Fisher Aff, ¶ 34.

36.38.  In Spring 2024, she earned Top Oralist Advocate in Texas Tech's Mock Trial, and in Fall 2024 and again in Spring 2025, she earned the distinction of Semi-Finalist in Advanced Mock Trial.  Id., Fisher Aff, ¶ 35.

7

37.39.  On information and belief, most particularly but not limited to DefendantTTU Professor Morgeson, TTU faculty view Fisher's advocacy, distinctions, and achievements as nothing more than evidence that Fisher is a loud-mouth, uppity black woman whose viewpoints and zealous advocacy activism they despise.

### III.    JURISDICTION AND VENUE

38.40.  This Court has jurisdiction under 28 USC § 1331 because Ms. Fisher's claims arise under the Constitution and laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq. and 42 USC § 1983 as well as the First and Fourteenth Amendment to the United States Constitution.

39.41.  Venue is proper under 28 USC § 1391(b) because all the Defendants reside in the state of Texas, and a substantial part of the events or omissions giving rise to the claim occurred in Lubbock, Texas within the jurisdiction of this Court.

### IV.    FACTS

**A.  The Murder of Charlie Kirk Is Discussed Throughout the School of Law but Only the Black Student, Ellie Fisher, Is Singled Out for Expressing Inappropriate Viewpoints about Kirk**

*1)  The Murder of Charlie Kirk*

40.42.  This Court may take judicial notice that at approximately 12:30 Mountain Time/1:30 Central Time, an assassins bullet cut down the public intellectual, conservative organizer, and father Charlie Kirk, during an outdoor speaking event in Utah where he was advocating for free and open debate on a state university campus.  He was slain by a young man who found Kirk's viewpoints intolerable, and as such Kirk's assassin must be considered an assault on all that the First Amendment to the United States Constitution stands for and a violent affront to free and open debate on campus.

41.43.  Unfortunately, the lesson taken by Defendants and TTU's faculty and administration from this tragic event was that more rather than less viewpoint suppression is required.

42.44.  By punishing Fisher for her thought crimes and speech as a private citizen on matters of public concern, Defendants betray the legacy of Charlie Kirk.  Rather than engage Fisher in honest and open debate, the admissible evidence shows that Defendants singled out Fisher for discipline and punishment (and only Fisher, as a black woman).

43.45.  Kirk's assassination became instant national news and a matter of public concern.

44.46.  This news of Kirk's murder became a topic of almost universal discussion throughout the School of Law and throughout the United States.  See e.g., FA at 39 (Hearing Transcript ("HT"), 24:45-24:51).

*2)  The News Breaks in Professor Kenneth Williams' Race & Racism Course*

45.47.  On September 10, 2025, Ellie Fisher was attending her Race and Racism law class with Professor Kenneth Williams, the Fred Gray Endowed Chair for Civil Rights and Constitutional Law at the School of Law.  FA at 5, Fisher Aff, ¶ 37 and FA at 115 (HT at 2:30:10).

46.48.  Professor Williams class was held from approximately 12:00-3:50 p.m. on September 10, 2025.

47.49.  In Professor Williams' course, Charlie Kirk's murder became known before the end of class.  FA at 115, HT at 2:30:10-45.

48.50.  Professor Willaims recalled, "A student announced that Charlie Kirk had been... I don't remember the exact word that we used, killed, assassinated, or whatever, but a student did announce that as we were ending a class."  Id. at 2:30:55.

9

49.51.  That student, whom Professor Williams did not exactly remember, was identified by Professor Williams as a man named Henry. FA at 116, HT at 2:31:11. Professor Williams said, "I believe it was Henry," although he was not exactly sure. FA at 117, HT at 2:32:42. This was in fact Henry Tecssi. FA at 5, Fisher Aff, ¶ 39.

50.52.  However, Ellie Fisher also recalls that this student was Henry Tecssi. Id.

51.53.  Henry Tecssi, who is not black, was never brought up on Honor Code violations for discussing Charlie Kirk's murder.  FA at 30, HT at 7:19, 7:32.

52.54.  Mr. Tecssi announced that Charlie Kirk was shot and something to the effect that Kirk was a conservative activist. FA at 117, HT at 2:32:16. Mr. Tecssi also stated that Kirk was a "racist," or words to that effect.  FA at 5, Fisher Aff, ¶ 39.

53.55.  Professor Williams did not consider this open discussion of Charlie Kirk in his class unprofessional. FA at 119, HT at 2:35:42-57.

54.56.  Students in Professor William's class viewed videos of the assassination and discussed whether the shooting they witnessed would be fatal or not, among other topics, such as Kirk's alleged "racism."  FA at 5, Fisher Aff., ¶ 40.

55.57.  Of all the students who discussed Kirk's shooting in Professor Williams' class, none are black except Fisher. FA at 5, Fisher Aff, ¶ 41. None were brought before the School of Law Honor Council except Fisher.

56.58.  There is no evidence that TTU disciplined or accused any student in Professor Williams' course or anyone else who discussed Charlie Kirk on September 10, 2025 of Honor Code violations.  FA at 119, HT at 2:35:42-57; see also FA at 40, HT 25:42-26:03; FA at 89, HT at 1:54:08-18.

10

57.59. The School of Law only accused the black student Ellie Fisher of violating its alleged "Honor Code" for discussing Charlie Kirk. Id.

**B. The Conversation Continues with Clinical Faculty and Students**

*1) Ellie Fisher's Discussion with Clinical Professor Joe Stephens*

58.60. After Professor Williams' Race and Racism class let out, Fisher went down one flight of stairs to the hallway where the faculty that teaches the School of Law's clinical program share their offices. HA at 31, HT at 9:26.

59.61. She first stopped at Joe Stephens's office, which is positioned near the beginning of the hallway. FA at 34, HT at 15:45.

60.62. Joe Stephens is Clinical Lecturer and Chief Public Defender of the Caprock Regional Public Defender Office.[2]

61.63. Attorney Stephens is an officer of this Court, and TTU holds out Attorney Stephens on its website as a distinguished public servant of the State of Texas:

> As Chief Public Defender of the Caprock Regional Public Defender Office, Joe [Stephens] runs the only public defender office in the country housed inside a law school. His students represent real clients facing real consequences across rural West Texas counties where access to counsel is most fragile. As a Clinical Lecturer, he teaches criminal defense practice skills.
>
> […]
>
> Before Caprock, Joe built the Concho Valley Public Defender Office from the ground up into the largest rural public defender office in Texas, covering twelve counties with locations in San Angelo and Abilene. He previously served in public defender offices across rural South Texas and the Hill Country.
>
> Joe has served on the Board of Directors of the Texas Criminal Defense Lawyers Association and currently sits on TCDLA's Public Defender, Rural Practice, and School of Law committees. He is a Member of the State Bar of Texas Legal Services to the Poor in Criminal Matters Committee, a mentor in the Future Indigent Defense Leaders of Texas program and sits on the Oversight Board of two regional public defender offices. He is Board Certified in Criminal Law by

---

[2] https://www.depts.ttu.edu/law/faculty/j_stephens.php?v=preview

11

the Texas Board of Legal Specialization — a distinction held by fewer than 10% of Texas criminal defense attorneys — and speaks frequently across Texas on criminal defense matters including mental health in criminal representation, indigent defense systems, magistration, and pretrial procedure.

62.64.  Although Attorney Stephens was not Fisher's instructor that semester, because of his skill as an attorney, Fisher frequently stopped in his office for private conversations to discuss the law, criminal defense, and many other topics.  FA at 6, Fisher Aff., ¶ 43.

63.65.  As Attorney Stephens testified to TTU's Honor Council:

She, dozens of times last semester, would come down and we'd talk about cases or she'd say she's got a situation, she's trying to get another opinion on what to do. I have students in my own clinic who don't come and talk to me as much as Ellie does, and Ellie would really... She cares about the work that she does, and that has been 99% of the substance of the conversations we've had.

FA at 36, HT at 20:46.

64.66.  When Fisher came in, she said, "Have you heard that Charlie was shot?" and "It looks bad"—or words to that effect. FA at 34, HT at 16:12.  Their interaction was about 30 seconds.  Id. At 35, HT at 17:51.

65.67.  "It was obviously a very newsworthy event," Attorney Stephens testified to the Honor Council. Id. at 17:15. And also, "I was aware that this was a buzz in the law school. People were finding out."  Id. Attorney Stephens testified to the Honor Council, "… both criminal clinics are at the end of the hallway, and I remember getting a cup of coffee, and people were stirring about it there too." FA at 40, HT at 25:23. In other words, Fisher was not the only student speaking openly about Kirk's assassination.

66.68.  Attorney Stephens further testified that Fisher's discussion with him that day was not disruptive. Id.at 18:23-48.

67.69.  There was "nothing unusual about it at all." FA at 37, HT at 21:20.

Ellie [Fisher]'s demeanor to me was no different that day when she comes down and she's talking about, ""What's happening to my client is not right."." And

12

there's passion behind what she says and what she does, but it didn't feel at all out of character. When she left, I don't remember having a memory of being like, ""That was weird,"," or, ""That was wrong.".".

FA at 36, HT at 20:12.

68.70. Attorney Stephens did not view Fisher's statements to be "unprofessional conduct." FA at 39, HT at 24:24-29.

71. Attorney Stephens has made sure that students know that his office is designated as open for frank and open discussions, or as he says, "I want people to feel comfortable coming to us in talking to us." FA at 37, HT at 21:20.

69.72. Joe Stephens told the Honor Council that Fisher's interaction with him did not violate anything that he knows about the Honor Code. Id. at 24:37.

70.73. Joe Stephens did not recall Fisher saying words to the effect, "They shot the motherfucker." FA at 38, HT at 23:31-35.

74. Joe Stephens, whose office is more or less directly across from Terri Morgeson's office, did not testify to the Honor Council that he heard Fisher being loud or disruptive in the clinic hallway. FA at 32-40.

71.75. Joe Stephens also heard other students in the clinic offices speaking about the public assassination of Charlie Kirk. FA at 39, HT at 24:45-51. "Everyone was speaking of it." Id. This included the students in Defendant Morgeson's Family Law Clinic, which is directly across from Joe Stephens' office. FA at 34, HT at 16:00-09; FA at 39-40, HT at 24:59-06.

72.76. The students working in the Family Law Clinic that day, Madison Wright and Allison Monticelli, who discussed Charlie Kirk across the hall from Joe Stephens's office, are white. FA at 6, Fisher Aff, ¶ 46.

73.77. Astonishingly, only Ellie Fisher, who is black, was ever brought up by the School of Law on Honor Council charges.

13

*2) The Conversation in Patrick Metze's Office*

74.78.  After turning from Joe Stephens's- Office, Fisher went into the office of her clinical law professor Patrick Metze. FA at 6, Fisher Aff, ¶ 48. There she joined fellow law students Ashanty Bishop and Bridget Pembroke.  Id.

75.79.  The same kind of conversation that Fisher and other students were having about Charlie Kirk's murder continued in Metze's office. Id., ¶ 49.

76.80.  Until his recent forced retirement, Metze had been a long-time clinical law professor at the School of Law.  FA at 167, Affidavit of Patrick Metze, ¶ 3.

77.81.  Until the School of Law disciplined the black student Ellie Fisher with Honor Code violations for discussing Charlie Kirk's assassination, in Metze's "decades of experience," it had not been uncommon "that professional attorneys licensed in the state of Texas use profanity."  Id., ¶ 5.

78.82.  Indeed, "[a]ll kinds of things have been said in [Metze's] office, which have included the use of profanity." Id., ¶ 4.

79.83.  "[B]ut this was never an issue because previously the Texas Tech School of Law … did not conceive of itself as a third-grade school yard"; and "All [Metze's] students have been grown adult, graduate students in their third year of law school."  Id., ¶ 4.

80.84.  It is part of what makes Metze an inspiring clinical law professor that he "made sure that the students knew my office as a safe space in which they could say anything that they needed to say."  Id., ¶ 3.

81.85.  While Fisher was in Metze's office during a time when the students were discussing Kirk, Defendant Terri Morgeson suddenly interjected from where she was standing outside Metze's office, "Trump just said that he [Charlie Kirk] died."  FA at 168, Affidavit Patrick Metze, ¶ 9.

14

82.86.  On information and belief, Morgeson, who is white, has never been brought up on Honor Code charges (which apply to faculty as well as students) for discussing Charlie Kirk.

83.87.  Again, at the School of Law, the only individual sanctioned for discussing Charlie Kirk was the black student Ellie Fisher.

84.88.  Metze did not consider any behavior by Ellie Fisher unprofessional that day, and to his knowledge "no one considered this [the discussion in his office] unprofessional behavior." Id., ¶ 15.

85.89.  Ashanty Bishop is a fellow 3L student who was in Metze's office that day and discussed Charlie Kirk.  FA at 157, Affidavit of Ashanty Bishop, ¶¶ 2, 5.

86.90.  Bishop learned about the assassination of Charlie Kirk for the first time in Professor Metze's office, under his instruction.  Id., ¶ 5.  The conversation lasted no more than 5-10 minutes.  Id.

87.91.  Professor Metze showed his students a video of the shooting in the privacy of his office.  Id., ¶ 6; FA at 108, HT at 2:21:19.

88.92.  According to Bishop:

> … we were like, "Who died?" And then someone said, "Charlie Kirk." And we're like, "Who is that?" And then Professor Metze was like, "Do you want to see this video?" Or like, "Here's the video of him getting shot." And then that was it, basically. We were like, "Who is he?" And that was it.

Id.

89.93.  The conversation only kicked off when Morgeson popped into the office and told Professor Metze and the students' words to the effect of "he's dead."  Affidavit of Ashanty Bishop, ¶ 7; FA at 108, HT at 2:21:02-2:22:17.

90.94.  If Morgeson was actually upset by what she was hearing coming from Metze's office, nothing required her to join the conversation. FA at 168-169, Affidavit of Patrick Metze,

15

¶¶ 21-22.  Morgeson did not complain about "professionalism" at the time, although she was standing in the doorway to Metze's office.  Id., ¶ 22.  Morgeson did not shut Metze's door, for example, which she could have easily done if there were truly tender ears.  Id.

91.95.  If not for Morgenson's uninvited interruption, the conversation may never have happened. FA at 108, HT at 2:22:17-38.

92.96.  To Metze and his students, nothing seemed unusual about the conversation.  FA at 169, Affidavit of Patrick Metze, ¶ 23; FA at 157, Affidavit of Ashanty Bishop Aff, ¶ 5.

93.97.  Bishop did not observe anything unprofessional that day in Metze's office. FA at 113, HT at 2:27:59-28:09.

94.98.  Bishop did not observe anything that constituted a violation of the Honor Code. Ex. ## at 2:27:59-28:09.

95.99.  For example, although that day Morgeson would scampergo to the administration to tell on Fisher for alleged "unprofessionalism" and various alleged improper feelings and thoughts supposedly expressed by Fisher, at the time Morgeson made no mention to the effect that she was upset, offended, or wanted any conversation to continue or cease; nor did she make any effort to shut the door. Id. at 2:26:18-31.

96.100.      Bishop, for example, did not witness Fisher celebrate the death of Charlie Kirk, contrary to Morgeson's later stories.  FA at 158, Affidavit of Ashanty Bishop, ¶ 12; FA at 109, HT at 2:23:31-42; FA at 112, HT at 2:27:04-08.

3)  *Fisher Leaves Metze's Office and Walks to the Clinic Office*

97.101.      The School of Law maintains a relatively large conference room at the end of the hall where the clinical faculty have their offices.  FA at 7, Fisher Aff, ¶ 58.

98.102.      In addition to a conference table, computers line the walls.  Id. at 8, ¶ 59.

16

99.103.      School of Law students use the clinic conference office to take calls with clients, meet with clients, and discuss cases and the days' events.  Id.

100.104.      Unsurprisingly, the conversation about Charlie Kirk's murder continued in the clinic office among the students.  See FA at 160-161, Affidavit of Caleb Barkman, ¶¶ 6-10; FA at 153-154, Affidavit of Holland Pombrio, ¶¶ 5-16; FA at 163-164, Affidavit of Callighan Ard, ¶¶ 2-10; FA at 171, Affidavit of Tristan Perez, ¶¶ 5-9.

101.105.      One student attested to the following:

> The discussion in the clinic workroom was ordinary and aligned with the type of sensitive conversations that occur routinely in the clinic, which often include topics such as criminal matters, the death penalty, racism, and mental health. People in the room held differing political opinions, but the discussion remained civil, and no one became emotional or indicated a desire to end the conversation abruptly.

FA at 163, Affidavit of Callighan Ard, ¶ 5.

102.106.      In other words, the law students acted like full grown adults capable of adult conversation. No one became infantilized, overly emotional, or indicated a desire to repress the conversation, that is, at least until Morgeson scampered to the administration to tell on Ellie Fisher for supposed "Honor Code" violations.

103.107.      The only black student to discuss Charlie Kirk in the clinic office that day was Ellie Fisher. FA at 8, Fisher Aff, ¶ 61.

104.108.      As the student Callighan Ard attests, and as one would expect at a lively law school, some students in the clinics are conservative, some are liberal, and some are in between.  FA at 163, Affidavit of Callighan Ard, ¶ 5.

105.109.      One conservative student in the clinic that day was Anthony Bomar, another 3L student who is white. FA at 8, Fisher Aff, ¶¶ 61-62.

17

106.110.    Another conservative student in the clinic that day was Jacob Gomez, another 3L student, who is not black. Id, ¶ 60.

107.111.    Bomar did not believe Fisher acted unprofessionally by discussing Charlie Kirk's murder that day in the clinic office. FA at 89, HT whom at 1:54:31.

108.112.    Gomez attested that, whatever Fisher's statements, what she said fell within the protection of the First Amendment. FA at 98-99, HT at 2:12:29-13:02.

109.113.    Both Bomar and Gomez recalled other students talking about Charlie Kirk in addition to Ellie Fisher. FA at 97, HT at 2:08:55-09:20.

110.114.    Bomar, who was sitting next to Gomez at the time they discuss Charlie Kirk's death with Fisher, also remembered somebody (not Fisher) saying that "he [Charlie Kirk] was going to hell." FA at 87, HT at 1:52:01.

111.115.    Gomez found the conversation upsetting but also agreed that there is no right among law students to be protected from being "upset"; and "any student can feel how they want to feel." FA at 98, HT at 2:11:55. He also recalled students discussing things like, "for the Second Amendment to continue, people are going to get shot" in reference to Charlie Kirk. FA at 96, HT at 2:07:04.

112.116.    It was not Fisher's specific mood or anything specific to Fisher that made Gomez feel this way, or as he said, "I guess more generally for the entire room [the clinic office], it seems they were leaning one way politically. I, myself or a few others in the minority were leaning a different way." FA at 99-100, HT at 2:15:18-46.

113.117.    Yet only Ellie Fisher was ever investigated by the School of Law.  No similarly situated student that made people like Gomez feel on edge, to the extent that anyone

18

did, have ever been disciplined by the school of Law for speaking their mind about Charlie Kirk in the Clinic Office.

114.118.	No one launched an investigation of anyone who said that Charlie Kirk was going to hell.

115.119.	No one investigated anyone who suggested that being shot, as Charlie Kirk was, was just something you could expect with the Second Amendment.

116.120.	No other students were ever accused of having improper subjective feelings or moods. Only the black student, Ellie Fisher.

117.121.	Apparently, in the criminal law clinics of the School of Law students were expected to be and expected themselves to behave like adults who could even have difficult adult conversations about sensitive topics of public concern. See e.g., FA at 98-99, HT at 2:12:29-13:02.

122.	On information and belief, at least some clinical instructors no longer meet with students in the clinic suites because the School of Law's suppression of free speech and free inquiry has chilled expression. They fear that they or their students will be reported, for example based on false allegations such as those advanced by Morgeson, for various thought crimes which are impossible to anticipate.

123.	On information and belief, students no longer gather in the Clinic Office to speak their mind on issues of public concern because of the School of Law's suppression of free expression and free inquiry. They fear that they, too, will be reported, for example based on false allegations such as those advanced by Morgeson, for various thought crimes which are impossible to anticipate.

C. **The School of Law Initiates a Five-Month-Long Process to Investigate whether Fisher Had Impermissible Thoughts and Feelings**

118.124.    On November 6, 2026, someone scrawled the word "nigger" on the rear window Ellie Fisher's car, while it was parked on Texas Tech property. FA at 9, Fisher Aff, ¶ 69 and the **Exhibit S**.

119.125.    Fisher reported this to the School of Law. Id.

120.126.    The School of Law did nothing, and Fisher was told it was irrelevant. Id.

121.127.    Instead, the School of Law began investigating Fisher for so-called "unprofessional conduct" because she had supposedly expressed what the School of Law's administration believed where improper feelings and thoughts about the death of Kirk a month before. FA at 21-24 (the "Keffer Report").

122.128.    From October 1, 2025, to November 14, 2025, Professor William R. Keffer conducted no fewer than 21 interviews (although anyone with exculpatory information was excluded from his report). FA at 21. This included 9 faculty members, one Associate Dean, the School of Law Dean, and 12 students. Id.

123.129.    This zealous investigation of a single black student's allegedly improper feelings was, of course, funded entirely by the taxpayers of Texas.

124.130.    By way of example, Terri Morgeson and her students Madison Wright and Allison Monacelli allegedly told "Investigator" Keffer the following things were said to Professor Joe Stephens:

"That mother fucker [Charlie Kirk] got shot" (Morgeson);

"I'm in the best mood ever" (Wright); and

"They got him … This is great" (Monacelli).

FA at 22.

20

125.131.    However, when Professor Joe Stephens was asked about his approximately 30 seconds of interaction with Ellie Fisher that day in a Honor Council hearing, he testified:

> [Fisher] … came in and said to me something like, 'Have you heard that Charlie was shot?' And I said, 'No.' I didn't know who Charlie was. And she said, 'It looks bad,' and at some point said something that it's all over the Internet or something like that.

FA at 16:42. There were no other statements that he could recall. FA at 36, HT at 19:42-47. He did not recall hearing Fisher say anything to the effect of, "They shot the mother fucker." FA at 38, HT at 23:31-35. Yet Keffer did not put this in the report or other exculpatory information which directly contradicted what Professor Morgeson said.

126.132.    Likewise, multiple students who were interviewed by Keffer attested that they never said anything to the effect that Charlie Kirk was a "mother fucker."  FA at 154, Affidavit of Holland Pombrio, ¶ 21; FA at 157, Affidavit of Ashanty Bishop, ¶ 9; FA at 162, Affidavit of Caleb Barkman, ¶ 10; FA at 164, Affidavit of Callighan Ard, ¶ 12.

127.133.    The witness Ashanty Bishop, who was in Professor Metze on that day with Fisher when Morgeson poked her head in to announce that Charlie Kirk had died, specifically told the "Investigator" Keffer that she had never heard Ellie Fisher celebrate the death of Charlie Kirk and that she heard Fisher say anything like, "They shot the mother fucker." FA at 157-158, Affidavit of Ashanty Bishop, ¶¶ 8-11.

128.134.    Keffer purposely left everything that Bishop said out of his report. FA at 21-24.

129.135.    Tristen Perez also complained that his comments were not reflected in the Keffer Report. FA at 172, Affidavit of Tristen Perez, ¶ 15. The only thing Keffer recorded about

Perez was that "Fisher talked about Kirk like she knew who he was"—which is apparently also suspicious for a young black law student to be doing at the School of Law. FA at 23.

~~130.~~136.      Perez attested, "I do not know why my statements to Professor Keffer would be misconstrued in this light other than to make Fisher somehow look bad."  FA at 172, Affidavit of Tristen Perez, ¶ 13.

~~131.~~137.      The Keffer Report is almost comically biased.  It makes Fisher out to be some sort of Charlie Kirk-hating fanatic, rather than just another law student participating in discussion of national news. See FA at 21-24.

~~132.~~138.      It also misconstrues what little evidence Keffer could gin up that Fisher "upset" or "offended" others, such as Allison Monacelli, who is mentioned in the report as being so distraught that she asked her clinical instructor, Morgeson, "if she could go home early." FA at 22.

~~133.~~139.      In the eventual Honor Council hearing, however, Monacelli testified that it was Morgeson who came in their Family Law Clinic office and told her what Fisher had supposedly said, and "that's when Professor Morgeson told us, 'Ellie said they got the mother fucker.'" FA at 75, 79, HT at 1:27:59; 1:38:17-43. (This was something Morgeson actually retracted in the hearing, saying, "I don't know if she said, 'mother fucker.'" FA at 43, HT at 31:30.)

~~134.~~140.      Monacelli also testified that it was Morgeson who "told us that we can leave clinic hours early" (4:30). FA at 75-76, HT at 1:29:21-53.

~~135.~~141.      "Professor Morgeson came in and talked to us and then she left us and closed the door … then she had come back … and then we were told we could go home." FA at

81, HT at 1:41:45-42:13.  And Monacelli testified that she "would not leave office hours early unless [she] was directed to."  Id. at 1:43:58.

136.142.      It was not Monacelli who "asked."  This did not matter to Keffer.

137.143.      Thus, if there was any unprofessional conduct that day, it was a clinical law instructor, Morgeson, who directed students to skip out of office hours simply because they did not like what they allegedly heard in political discussions among full-grown adults (or more probably, because of what they heard secondhand from Morgeson, whose relationship to the truth is, at best, unstable).

**D.  Hearing and Sanction**

138.144.      On February 16, 2026, Ellie Fisher, through counsel, sent the Texas Tech School of Law six affidavits indicating, among other things, that Fisher was clearly not the only student, albeit she was the only black student, discussing Charlie Kirk on September 10, 2025 and that the Keffer Report was obviously biased due to the exclusion of exculpatory evidence. FA at 181-27 (email of Attorney Allen to L. Spain, dated February 16, 2026).

139.145.      Fisher also sought clarification of how the various improper thoughts and subjective feelings she was accused of having on September 10, 2025, could be violations of the honor code. Id.

140.146.      Professor Spain never provided any response to this query.

141.147.      Many of the affiants had been interviewed but exculpatory evidence was either suppressed, or the witness was omitted from the Keffer Report entirely. Id. (The email was sent twice, with different affidavits attached due to the size of the files.)

142.148.      The affidavits attached were the following, all direct witnesses to Ellie Fisher's activities in the School of Law on September 10, 2025:

1) Affidavit of Holland Pombrio. FA, **Exhibit G**.

2) Affidavit of Ashanty Bishop. FA, **Exhibit H**.

3) Affidavit of Caleb Barkman. FA, **Exhibit I.**

4) Affidavit of Callahan Ard. FA, **Exhibit J**.

5) Affidavit of Patrick Metze. FA, **Exhibit K**.

6) Affidavit of Tristan Perez. FA, **Exhibit L**.

143.149.    The School of Law scheduled the Honor Council hearing for February 20, 2025. FA at 18-19, **Exhibit B**.

144.150.    The hearing was held over the course of proximally 3 hours and 20 minutes, as the hearing transcript indicates. Id., **Exhibit D**, **Exhibit F**.

145.151.    Texas Tech's Honor Code required the Honor Counsel to apply the "clear and convincing evidence standard." FA at 175, Honor Code, § 4.H.

146.152.    The testimony of the various witnesses has already been summarized in relevant part above.  Any supposedly inculpatory evidence was both hearsay and clearly contradicted by direct witnesses such as Professor Joe Stephens and the student Ashanty Bishop.

147.153.    Defendants refused to apply the clear and convincing standard, which in Texas demands the evidence must weigh heavier than merely the greater weight of credible evidence.

148.154.    Although "clear and convincing evidence" is not as strict a standard as "beyond a reasonable doubt"; it is the highest standard of proof in the civil law, absent quasi-criminal issues such as the involuntary civil commitment of the mentally ill.  FA at 29, HT 5:27-6:18.

149.155.    To underscore the seriousness of this standard of proof, Texas law reserves the "clear and convincing standard" for such fundamental rights like severing the parent-child relationship and terminating parental rights.  Id.

24

150.156.    The "clear and convincing" standard requires the firm belief or conviction in the truth of allegations; not just a modicum of proof on one side that outweighs the other side "by a feather."  It certainly requires more than evidence of individuals' attestations that their subjective feelings were hurt. But these are the allegations that the Honor Council elevated to the level of a "violation." Id.

151.157.    Professor Larry Spain presided as the chair of the Honor Council hearing panel.  The other four members of the panel constituted that day were Professor Amy Hardberger, Associate Dean and Professor Alyson Outenreath, and student panel member Ally Owens. FA at 145-151, **Exhibit F**.

152.158.    All were on notice, including in Fisher's opening statement, that prosecution on the basis of accusations of having improper subjective feelings and engaging in protected speech violated Fisher's constitutional rights, for which they would all be individually liable as well as liable in their official capacities. FA at 32, HT at 11:41-13:11.

153.159.    Fisher stated plainly:

> [P]lease conduct this thought experiment. Please accept the investigation'sinvestigation's version of what was said as true. Please disregard, as Professor Keffer did, exculpatory evidence as ""irrelevant."."
>
> I believe you all know, as attorneys with decades of experience, that all of the alleged speech is constitutionally protected. For example, the First Amendment does not permit the state of Texas to discipline students for private conversations with their mother. I think you know that there is no evidence of disruption to clinical programs. A far greater disruption has been the removal of Professor Metze for his protected speech.
>
> Texas Tech School of Law is a state school and cannot discipline protected expression. Charlie Kirk and all that he stood for was in the public sphere, not to mention his tragic public assassination. We therefore know this speech addressed a matter of public concern. I believe you also know that the discussion of this School of Law is what the School of Law is actually for.
>
> As Professor Metze states, Texas Tech is not a third-grade schoolyard. Absent narrow exceptions that are not present here, all of this speech is protected. My

academic standing, my future in this noble profession, and my good name as a law student and future attorney stand in the balance.

You hold the authority to ensure the justice within the school is done rightly and in accordance with the clear and convincing standard you are sworn to uphold. When all the evidence is laid bare before you, the whole of it, I trust you will find but one conclusion consistent with that burden: that my actions on September 10th, 2025, did not violate Section H nor any provision of our honor code.

Id.

154.160.    The Honor Council and all Individual Defendants were bound to uphold

Texas Tech University System Regulation 07.04 (Freedom of Expression). FA at 190-194,

**Exhibit O**.

155.161.    Texas Tech University System Regulation 07.04 provides:

The Texas Tech University System ("System") and its component universities (referred to herein collectively as the "University") recognize freedom of speech and expression as a fundamental right and seek to ensure free, robust, and uninhibited debate and deliberations by students enrolled at the University and employees of the University (collectively, "University Members"). This regulation is intended to protect the expressive rights of University Members guaranteed by the constitutions of the United States and the State of Texas by recognizing freedom of speech and assembly as central to the mission of the University and ensuring that University Members may assemble peaceably on University campuses for expressive activities. For purposes of this regulation, "expressive activities" means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, of the Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions.

Id. at § 07.04(1)(a).

156.162.    Regulation 07.04 further provides:

Students, student organizations, faculty, or staff who unduly interfere with the expressive activities of other University Members on campus or who have been found to violate System or University policies and procedures, or other applicable laws, rules, and regulations, to include the requirements set forth in this System Regulation 07.04, may be subject to the disciplinary policies and procedures, to include possible expulsion or termination, as applicable, outlined

26

> in the applicable University Student Code of Conduct, Student Handbook, University Catalog, or University operating policies and procedures.

Id. at § 07.04(7)(a).

157.163.    Contrary to Terri Morgeson, who lectured Fisher during the Honor Council hearing that exercise of free speech carries "consequences" in the School of Law, Regulation 07.04 actually indicates that it is the faculty who interfere with expressive activities who may be subject to disciplinary proceedings—not students who speak on matters of public concern.  Id.

158.164.    But neither the Regulations of the Texas Tech University System nor the Constitution of the United States were of any concern to the Honor Council, which decided to retaliate against Fisher for her protected speech.

159.165.    By a 3-1 split decision, the Honor Council issued its decision on March 11, 2026. FA, **Exhibit F**.

160.166.    Fisher was found responsible because, upon the findings of the Honor Council,

- Fisher made "[v]arious statements … following the assassination of Charlie Kirk on September 10, 2025 within the Clinical Programs offices which could have been considered celebratory";

- "Professor Terri Morgeson and Madison Wright provided credible information that Ellie Fisher was loud, happy and celebratory";

- Fisher "made certain statements to the effect that she was in a good mood";

- "… several students as well as a faculty member expressed concerns about the appropriateness of Ms. Fisher's response to the shooting";

- "Fisher was aware that students in the clinical program had different political viewpoints and that statements and actions taken following the death of Charlie Kirk within a professional setting could create conflict among coworkers…"

- Unspecified "operations" were "adversely affected and made some individuals uncomfortable."

In short, Fisher was found responsible for expressing viewpoints that allegedly wounded others' subjective feelings. Id.

161.167.    At the Texas Tech School of Law, it now violates the Honor Code for a black law student to hurt people's feelings by saying something they disagree with, or even by displaying improper emotions or impure thoughts to a professor in his private office (e.g. Metze, Stephens).

162.168.    Importantly, the Honor Council indicated no evidence showing that its Clinical Programs had been disrupted (other than by Morgeson, who, as Allison Monacelli testified, elected to send home her students, Monacelli and Wright). FA at 81, HT at 1:41:45-42:13.

163.169.    Witnesses also testified to Fisher's right to express her viewpoints, including witnesses whose subjective feelings Fisher was supposed to have injured. See e.g. FA at 69, 98-99, HT at1:17:36 -52 (Wright), 2:12:29-13:02 (Gomez).

164.170.    Even Morgeson acknowledged, after making up various facts about Fisher's interactions with Joe Stephens, "I think you have every right to say the statements." FA at 56, HT at 56:18.

165.171.    Only then, Morgeson warned, "However, just because of the fact that you make the statement does not mean that you were free from consequences for making the statement." Id.

166.172.    In other words, Director Morgeson, an instructor paid by the taxpayers of Texas to teach the law, expressed her firm belief that First Amendment rights need to be punished at TTU.

28

167.173.    Madison Wright knew better, and contrary to the Honor Council's findings, she also testified that she "wasn't personally offended" and "wasn't upset." FA at 66, HT at 1:12:37-12:43.

168.174.    And when asked, "do you agree that discussion of Charlie Kirk's public murder would be considered protected by the First Amendment?"; Wright testified: "Yeah, I would think so." FA at 69, HT at 1:17:36-50.

169.175.    Jacob Gomez, one of the students who allegedly felt "uncomfortable," agreed. FA at 99, HT at 2:13:09-16:05.

170.176.    When asked by Fisher in the hearing, "… whatever my actions or however they were interpreted, to your knowledge, is reacting publicly to publicly reported news, even with words that may be upsetting, is that generally falling under the protections of the First Amendment?"; Gomez answered, "Yeah." FA at 98, HT at 2:12:29-13:02.

171.177.    The Honor Council found Fisher had violated § 2.H (violation of professional duties) by "failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs…" FA at 16, **Exhibit A**; 146, **Exhibit F**.

172.178.    Rule 2.H of the Honor Code,[3] reads in full:

> H. Violation of Professional Duties
>
> A student may violate this Code by failing to uphold professional or fiduciary obligations including, but not limited to, performance related to clinical programs, student-bar association activities, leadership in student organizations, maintenance of financial records, and pro bono activities. Conduct of this kind typically violates Principle One.

FA at 175, **Exhibit M,** Honor Code, § 2.H.

---

[3] Avail. at https://www.depts.ttu.edu/law/policies/honor-code.php.

29

173.179.        Nowhere in the Honor Council decision did the panel explain how "performance" related to the clinical programs had been compromised, other than to note that certain individuals had improper subjective feelings that caused other individuals to have certain subjective feelings. **Exhibit F**.

174.180.        The Honor Council did not identify any specific "professional" obligations that Fisher failed to uphold. Id.

175.181.        The Honor Council did not identify any specific "fiduciary" obligations that Fisher failed to uphold. Id.

176.182.        The Honor Council did not indicate any performance related to the clinical programs in which Fisher was deficient. Id.

177.183.        As a sanction, the Honor Council recommended that Fisher "receive a written letter of reprimand from the Dean of the School of Law" to be placed in her permanent school record." FA at 150.

178.184.        The Honor Council recommended this sanction to the Dean of the School of Law to Dean Jack Wade Nowlin, who will act individually to put the sanction into effect. Id.. Id.4

179.185.        On March 27, 2026, Ellie Fisher timely appealed through a request for review to Defendant Jarod Gonzales, who will act individually to decidedecided the appeal.

180.186.        Even before this process has been finalized, it is already clear that Defendants' suppression of free speech has chilled students of ordinary firmness from continuing to speak freely on matters of public concern.

181.187.        There is no question that this action of Texas Tech has chilled and continues to chill student speech on campus—not only Fisher's.

30

182.188.　　　For example, multiple witnesses refused to appear at Fisher's hearing out of fear that they too would be singled out for thought crimes, impure subjective feelings, and improper viewpoints on Charlie Kirk's murder, in particular but not limited to Bridget Pembroke. FA at 11, Fisher Aff, ¶ 82. Bridget Pembroke was in Patrick Metze's office next to Ashanty Bishop. FA at 31, 108, 110, HT at 9:26-43; 2:21:02-19; 2:22:17-38; 2:25:18-35.

183.189.　　　Up until the Honor Council sanctioned Fisher, she has been an outspoken activist on campus, both as an undergraduate and throughout her education as a law student. FA at 11, Fisher Aff, ¶ 83.

184.190.　　　Now she is afraid to express her views because of the impact the Honor Council and the suppression of her protected speech will have on her law career and ability to practice law. Id., ¶¶ 83-84.

185.191.　　　And it is not only liberal law students who fear for the impact upon their protected speech and political expression on campus.

186.192.　　　Allison Monacelli—one of the students made "uncomfortable" (FA at 78, HT at 1:34:45) allegedly by what Fisher said that day, but actually based on what Morgeson told her Fisher said, also expressed her decision to appear at the hearing:

> I had told Dean Chapman, had I told Professor Morgeson, this is not something I wanted to be involved in, and it really stinks that I was there that day, but I'm here.
>
> […]
>
> I mean, it's obviously a very politically charged conversation we're having today. And I think that it's very easy for someone to be involved on the side that I am right now, where a student is being charged with something for expressing her feelings in the moment, to be classified as an ultra conservative where that's not who I am.
>
> So it's hard to... I'm trying to figure out the best way to say this. I don't want to be attacked because I was asked to be here because I was in clinic that day. And I feel like there is a chance that I would be brought up in this when I did not ask.

> I did not make the report to be here. And it's just a situation that I really don't love to be tied into.
>
> I've had a lot of anxiety about how my classmates would perceive me, even though I didn't ask to be here. And with the whole situation with Professor Metze saying it's two blond Republicans and Family Clinic who reported him, it is not a great look to be involved.

FA at 77-78, HT at 1:32-09-16; 1:36:08-37:12.

193.    As so often happens when the state suppresses free expression, it degrades all free expression, not only the viewpoints that the state wishes to privilege as the most proper. So it was with Allison Monacelli.

194.    Rather than allowing full-grown adult law students to discuss such a pressing topic of public concern amongst themselves like capable citizens of the state of Texas; Defendants have decided to brandish the muzzle.

195.    On April 9, 2026, through her attorney, Plaintiff Fisher emailed attorney Ronny Wall, Managing Attorney and Executive Director for Public Information of the Texas Tech University System, attaching a draft complaint informing him that his clients, including the Defendants above except for William Keffer and the Texas Tech University System Board of Regents, would be sued if the suppression of her speech if the retaliation against Fisher did not cease.

196.    On information and belief, as soon as Defendants had affirmative knowledge that they would be sued, they doubled down and accelerated their retaliatory action against Fisher.

197.    But Plaintiff Fisher received no response other than an email from Attorney Wall informing her that he had referred the matter to the Texas Attorney General's Office, which handles all of TTU's litigation on behalf of the State of Texas.

32

198.    On April 12, 2026, Plaintiff Fisher filed her original Complaint and also her First Amended Complaint in this Civil Action as well as her Motion for Temporary Restraining Order and Preliminary Injunction.

199.    A mere 24 hours later, Defendant Nowlin hasten to issue a formal "reprimand," which he immediately reported to the Texas Bar of Law Examiners (on April 13, 2026).

200.    Nowlin's so-called "reprimand" not only referred to the Honor Council's decision but also indicated that he had held some sort of Dean's office Star Chamber which likewise opined on the offensive nature of Plaintiff Fisher's protected speech, but only Plaintiff Fisher's protected speech.

201.    In retaliation for speaking "while black" on matters of public concern, Dean Nowlin singled out only Fisher.

189.202.    The damage to Fisher's career, should the decision become final, is incalculable.

190.203.    She will not only be required to report the disciplinary infraction to the Texas Board of Bar Examiners whose rules for admission require applicants to self-report any "[e]vidence of recent aberrant conduct or behavior that calls into question the Applicant's ability to practice law in a competent, ethical, and professional manner," among other things. FA, **Exhibit Q**, § IV.A.1. She will be required to report Dean Nowlin's "reprimand" to any other bar she may apply to. The so-called "reprimand" will follow her throughout her career.

191.204.    Fisher must also prove her "good moral character" under Rule 4 (Present Good Moral Character and Fitness Requirement) of the Rules Governing Admission to the Bar of Texas, among other rules. FA, **Exhibit R**, Rule 4.

192.205.    Thus, the damage to Fisher's career is therefore ongoing and the relief she seeks is prospective.

**CAUSES OF ACTION**

**COUNT 1:**
**First Amendment Retaliation under the First and Fourteenth Amendment to United States Constitution as applied under 42 USC 1983**

193.206.    All factual statements in each and every preceding paragraphs are incorporated into this paragraph by reference as if restated fully here.

194.207.    The First Amendment to United States Constitution provides in relevant part:

> Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble. . .

195.208.    The Fourteenth Amendment to the United States Constitution makes the First Amendment applicable against the states.

196.209.    42 USC § 1983 provides for a private right of action to enforce these rights against state actors such as Defendants.

197.210.    The Texas Tech School of Law, all of its institutions, offices, sub offices, and departments act as arms of the state of Texas. All defendants are agents of the state of Texas.

198.211.    All defendants, both the Regents Defendants and the Individual Defendants, are therefore state actors acting under the color of state law.

199.212.    The Regents Defendants are vested with the authority and obligation to uphold and enforce the rules and regulations of the state of Texas that apply to Texas Tech and its School of Law.

200.213.    On September 10, 2025, Plaintiff Ellie Fisher engaged in speech on a matter of public concern, namely on the public murder of Charlie Kirk.

34

201.214.    Acting on the pretext that this somehow disturbed the Clinic Programs of the School of Law, Fisher was dragged before an Honor Council and punished for expressing viewpoints that Texas Tech finds objectionable.

215.    Both students and professors of the TTU law clinics have testified before the Honor Council that the clinic offices have been designated as spaces where students may speak freely on controversial topics, including but not limited to the assassination of Charlie Kirk.

202.216.    All Defendants had affirmative knowledge that no actual work or operations of the School of Law clinical programs had been disrupted by Fisher.

203.217.    All Defendants had affirmative knowledge that other students expressed many of the same thoughts, emotions, and viewpoints expressed by Fisher.

204.218.    One student went so far is to announce as to announce that Charlie Kirk would "go to hell."

205.219.    One student, not Fisher, interrupted the class of Professor Kenneth Williams to announce that "Charlie Kirk" had been shot.

206.220.    Terri Morgeson interrupted the Clinic Program by sticking your head in Patrick Metze's office to announce that Pres. Donald Trump said that Charlie Kirk had died.

207.221.    Yet no other students and certainly not Morgeson were ever investigated or punished. This is because, obviously, expressing thoughts, emotions, and viewpoints—not to mention factually true statements—do not disrupt the School of Law clinical programs.  And none were disrupted that day.

208.222.    Through its Honor Council and through the direct actions and decisions of the Individual Defendants, the School of Law and the State of Texas imposed a written

reprimand on Fisher which will follow her throughout her law career, which is only now beginning.

209.223.        Indeed, the Honor Council's acts and omissions have done far more to disrupt the ordinary operations of the School of Law— which remains to actually instruct students in the practice and doctrine of the law— than anything ever uttered by Plaintiff Ellie Fisher.

210.224.        The Regents Defendants, with full knowledge of the dereliction of duty on behalf of the Individual Defendants and the School of Law, did nothing.

211.225.        Fisher has therefore suffered an adverse action in retaliation for her protected speech, the damage of which is irreparable and ongoing.

212.226.        The Regents Defendants are liable in their official capacity for suppressing Ellie Fisher's First Amendment rights.

213.227.        The Individual Defendants are liable in their individual and official capacities for suppressing Ellie Fisher's First Amendment rights.

### COUNT 2:   Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, et seq.
### (Texas Tech University system Board of Regents)

228.    All factual statements in each and every preceding paragraphs are incorporated into this paragraph by reference as if restated fully here.

229.    The Civil Rights Act of 1964, 42 USC § 2000d, et seq., provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

36

230.    The School of Law is a complement of the TTU System and as such falls under the umbrella of the TTU Board, which receives and dispenses federal funding to the School of Law.

231.    Plaintiff Ellen Mae Fisher experience direct discrimination and disparate treatment at the School of Law on the basis of her race, which is black.

232.    Only the black student, Ellen Mae Fisher, was singled out for the suppression of her protected speech whereas direct comparators, including but not limited to Law Students Henri Tessci, Ashanty Bishop, Madison Wright, and Allison Monacelli, and Bridget Pembroke, none of whom are black, engaged in the same or substantially similar speech but were not harassed and persecuted by Defendants via a Honor Council disciplinary process, a quasi-Star Chamber of the Dean's office, or a biased investigation by Defendant Keffer.

233.    In addition, at least one student who is not black disparaged Charlie Kirk in the Clinic Suites on September 10, 2025 by announcing he was "going to hell."

234.    White students Madison Wright and Allison Monacelli could also be heard that day speaking in the Clinic Office of Terri Morgeson at such volume that they could be overheard by Professor Joe Stephens in his office across the hall.

235.    Professor Stephens also testified to the Honor Council that students could be heard discussing Charlie Kirk's assassination in the clinic office hallway as he got coffee.

236.    Each of these individuals was similarly situated to Plaintiff Fisher. All were students of the School of Law, most if not all in their third year, just as Fisher. All spoke in the same or substantially similar spaces or in fact the exact same spaces as Fisher about Charlie Kirk.

237.    By way of example, the Honor Council found that "Certain activities took place in Professor [Patrick] Metze" office "involving several students [including Plaintiff Fisher, Bridget Pembroke, and Ashanty Bishop] of the Criminal Defense Clinic," activities that included celebrating the death of Charlie Kirk and laughing at the video of Charlie Kirk's assassination. In fact, the Honor Council could not tell who was laughing. Yet only the black student Ellen Mae Fisher was investigated and punished for her protected speech.

238.    In addition, when Plaintiff Fisher's car was vandalized on TTU property when someone scrawled the word "nigger" on her window, the Individual Defendants told Fisher that this was of no concern of the School of Law.

239.    The Individual Defendants did nothing other than, by their inaction, make it clear that any and everyone was free to harass Plaintiff Fisher on the basis of race.

240.    Race was so important to Defendant Keffer, that he included the observation, otherwise irrelevant and heard from Patrick Metze, that "mother fucker" is a common phrase in the black community. Even by the standards of his almost comically biased investigation, any connection of this to an Honor Code violation is difficult to discern--unless the intent was to disparage black Americans.

241.    Likewise, direct discrimination against Fisher was so important to Defendant Keffer, that he suppressed evidence of students who were not black, who said the same or substantially similar things about Charlie Kirk that Plaintiff Fisher said.

242.    Discriminating against Fisher was so important to Defendant Keffer that he also suppressed evidence in his Keffer Report that an unidentified individual had scrawled "nigger" on Fisher's car while it was parked on TTU property.

38

243. Discriminating against Fisher was so important to Defendant Keffer that he suppressed all exculpatory evidence that came to light in his investigation. Defendant Keffer included no exculpatory evidence brought to his attention in the Keffer Report.

244. On information and belief, Dean Nowlin and Defendant Gonzalez knew about the suppression of evidence in the Keffer Report but remained deliberately indifferent or encouraged its suppression by directing Keffer's actions.

245. TTU and the Individual Defendants therefore singled out Fisher for disparate treatment on the basis of race and subjected her to direct discrimination on the basis of race.

246. Due to Defendants' discrimination against Fisher, Fisher suffered damages including but not limited to interference with her admission to the Texas bar.

247. Individual Defendants, including but not limited to all officers of the Honor Council, Defendant Gonzales, and Defendant Nowlin, to the extent they claim ignorance of the disparate treatment of Fisher or ignorance of the racial animus directed toward Fisher, relied upon biased information without conducting an independent investigation untainted by racial animus.

248. In bringing their charges against Fisher, the Honor Council did not rely on any other investigation than the Keffer Report.

249. No disciplinary action would have been issued but for the racially biased Keffer Report, which was calculated to generate a biased disciplinary record through the suppression of exculpatory evidence and other evidence indicating direct discrimination against Fisher.

250. In consequence, Defendant TTU's Board of Regents is liable for the violation of Title VI and liable to pay Fisher's direct and indirect damages in an amount to be determined at trial.

39

**PRAYER FOR RELIEF**

Now comes Plaintiff Ellie Mae Fisher and prays this Honorable Court for the following relief:

   i.   Declare Defendants have violated Plaintiff Ellie Mae Fisher's rights under the First and Fourteenth Amendments to the United States Constitution;

  ii.   Declare Defendants have violated Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, et seq.

  iii.  Order Defendants to expunge Plaintiff Ellie Mae Fisher's student record of all discriminatory and retaliatory disciplinary records;

  ~~ii.~~iv.  Enjoin Defendants from any further violation of Plaintiff Ellie May Fisher's rights under the First and Fourteenth Amendments to the United States Constitution;

  ~~iii.~~v.  Enjoin any sanction to be imposed on Plaintiff Ellie Mae Fisher By the Texas Tech School of Law and further enjoin any report of any sanction;

  ~~iv.~~vi.  Order the Individual Defendants and The Texas Tech University System Board of Regents to pay Plaintiff Ellie Mae Fisher damages in an amount to be determined at trial, including all compensable, direct, indirect, and punitive damages;

  vii.  Order, in the alternative, the Individual Defendants and The Texas Tech University System Board Of Regents to pay Plaintiff Ellie Mae Fisher nominal damages;

  ~~v.~~viii.  Order such other legal and equitable relief as the Court deems just and proper.

40

**PLAINTIFF ELLIE MAE FISHER DEMANDS A TRIAL BY JURY ON
ALL CLAIMS SO TRIABLE**

Respectfully submitted,

DATE: May 18, 2026

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06375
(860) 772-4738
mallen@allenharrislaw.com


Mark T. Mansfield
Local Counsel for Ellie Fisher
Mansfield & Mansfield, P.C.
1550 Norwood Dr.
Suite 107
Hurst, Texas 76054 817-282-3450
mark@mansfieldpc.com

**Formatted:** Not Highlight

**Formatted:** Underline

41